**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
09/25/2020

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| ARENA ENERGY, LP, *et al.*,[1] | ) Case No. 20-34215 (MI) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

**ORDER (I) APPROVING THE DISCLOSURE STATEMENT, (II) CONFIRMING
THE DEBTORS' JOINT PREPACKAGED PLAN PURSUANT TO CHAPTER 11
OF THE BANKRUPTCY CODE, AND (III) GRANTING RELATED RELIEF**

The Bankruptcy Court[2] having:

    a. entered, on August 21, 2020, the *Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Disclosure Statement, (III) Establishing Plan and Disclosure Statement Objection and Reply Deadlines and Related Procedures, (IV) Approving the Solicitation Procedures, (V) Approving the Combined Notice, and (VI) Conditionally Waiving the Requirements that the U.S. Trustee Convene a Meeting of Creditors and the Debtors File Schedules and SOFAs* [Docket No. 44] (the "Combined Scheduling Order"), pursuant to which the Bankruptcy Court conditionally approved the *Disclosure Statement Relating to the Debtors' Joint Prepackaged Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 13] (the "Disclosure Statement");

    b. set September 18, 2020, at 4:00 p.m. (prevailing Central Time), as the deadline for filing objections to the adequacy of the Disclosure Statement and Confirmation of the Plan (the "Objection Deadline");

    c. set August 28, 2020, at 12:00 p.m. (prevailing Central Time), as the deadline for voting on the Plan (the "Voting Deadline");

    d. set September 25, 2020, at 10:00 a.m. (prevailing Central Time), as the date and time for the hearing to consider, among other things, final approval of the adequacy of the Disclosure Statement and Confirmation of the *Debtors' Joint Prepackaged*

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Arena Energy, LP (1436); Arena Energy 2020 GP, LLC (N/A); Arena Energy GP, LLC (7454); Arena Exploration, LLC (1947); Sagamore Hill Holdings, LP (8266); and Valiant Energy, L.L.C. (7184). The location of the debtors' service address is: 2103 Research Forest Drive, Suite 400, The Woodlands, Texas 77380.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan (as defined below) or the Disclosure Statement, as applicable. The rules of interpretation set forth in Article I.B of the Plan apply to the Confirmation Order.

*Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 12] (the "Plan," and such hearing to consider Confirmation of the Plan, the "Confirmation Hearing") attached hereto as **Exhibit A**, pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code, as set forth in the Combined Scheduling Order;

e.  reviewed:  (i) the Plan; (ii) the Disclosure Statement; (iii) the *Notice of Plan Supplement for the Debtors' Joint Prepackaged Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 179] (the "Plan Supplement"); (iv) the *Debtors' Memorandum of Law in Support of an Order Approving the Debtors' Disclosure Statement and Confirming the Debtors' Joint Prepackaged Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 215] (the "Confirmation Brief"); (v) the *Declaration of Anthony R. Horton, Independent Director of Arena Energy GP, LLC, in Support of Confirmation of the Debtors' Joint Prepackaged Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 237] (the "Horton Declaration"); (vi) the *Declaration of Curtis Flood, Managing Director of Evercore Group L.L.C., in Support of Confirmation of the Debtors' Joint Prepackaged Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 235] (the "Flood Declaration"); (vii) the *Certification of Andres A. Estrada with Respect to the Tabulation of Votes on the Debtors' Joint Prepackaged Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 96] and the *Supplemental Certification of Andres A. Estrada with Respect to the Tabulation of Votes on the Debtors' Joint Prepackaged Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 225] (collectively, the "Voting Declarations" and, together with the Horton Declaration and the Flood Declaration, the "Declarations"); (viii) the *Notice of (I) Commencement of Prepackaged Chapter 11 Bankruptcy Cases, (II) Combined Hearing on the Disclosure Statement, Confirmation of the Joint Prepackaged Chapter 11 Plan, and Related Matters, and (III) Related Objection and Briefing Deadlines* (the "Confirmation Hearing Notice"), the form of which is attached as Exhibit 1 to the Combined Scheduling Order; (ix) the *New York Times Affidavit of Publication* [Docket No. 126] and the *Houston Chronicle Affidavit of Publication* [Docket No. 127] (collectively, the "Publication Affidavits"); (x) the *Certificate of Service* dated August 21, 2020 [Docket No. 36] and the *Supplemental Certificate of Service* dated September 4, 2020 [Docket No. 148] (collectively, the "Solicitation Affidavits" and, together with the Publication Affidavits, the "Affidavits"); and (xi) all Filed[3] pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement and Confirmation, including all objections, statements, and reservations of rights;

f.  held the Confirmation Hearing on September 25, 2020, at 10:00 a.m. (prevailing Central Time);

---

[3]  Unless otherwise indicated, use of the term "Filed" herein refers also to the service of the applicable document Filed on the docket in these chapter 11 cases, as applicable.

g. heard the statements and arguments made by counsel in respect of approval of the Confirmation and having considered the record of the Chapter 11 Cases and taken judicial notice of all papers and pleadings Filed in the Chapter 11 Cases; and

h. considered all oral representations, testimony, documents, filings, and other evidence regarding Confirmation.

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court hereby makes and issues the following findings of fact, and conclusions of law:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS DETERMINED, FOUND, ADJUDGED, DECREED AND ORDERED THAT:

A. **Findings of Fact**.  The findings of fact and conclusions of law set forth herein, in the Plan, including specifically in Article XI of the Plan and in the record of the Confirmation Hearing constitute the Bankruptcy Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  To the extent any of the following conclusions of law constitute findings of fact, or vice versa, they are adopted as such.

B. **Jurisdiction, Venue, and Core Proceeding**.  The Bankruptcy Court has jurisdiction over the Chapter 11 Cases pursuant to section 1334 of title 28 of the United States Code.  The Bankruptcy Court has exclusive jurisdiction to determine whether the Disclosure Statement and Plan comply with the applicable provisions of the Bankruptcy Code and should be confirmed.  Venue is proper in this district pursuant to sections 1408 and 1409 of title 28 of the United States Code.  Confirmation of the Plan is a core proceeding within the meaning of section 157(b)(2) of title 28 of the United States Code.  This Bankruptcy Court may enter a Final Order consistent with Article III of the United States Constitution.

C.     **Disclosure Statement.**     The Disclosure Statement contains (a) sufficient information of a kind necessary to satisfy the disclosure requirements of all applicable nonbankruptcy laws, rules, and regulations, including the Securities Act, (b) "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein, and (c) specific descriptions of releases and injunctions related thereto in accordance with Bankruptcy Rule 3016(c).  The filing of the Disclosure Statement with the Clerk of the Bankruptcy Court satisfied Bankruptcy Rule 3016(b).

D.     **Eligibility for Relief**.  The Debtors were and are entities eligible for relief under section 109 of the Bankruptcy Code.

E.     **Ballots**.  The Classes entitled to vote on the Plan (collectively, the "<u>Voting Classes</u>") are set forth below:

| Class | Designation |
|-------|-------------|
| 3 | RBL Facility Claims |
| 4 | Term Loan Claims |

F.     Holders of Claims in Class 1 (Other Priority Claims), Class 2 (Other Secured Claims) and Class 5 (General Unsecured Claims) (collectively, the "<u>Unimpaired Classes</u>") are Unimpaired and conclusively presumed to have accepted the Plan.  Holders of Claims and Interests in Class 8 (Section 510(b) Claims), Class 9 (Arena Energy, LP Interests), Class 10 (Arena Energy GP, LLC Interests), Class 11 (Arena Energy 2020 GP, LLC Interests) and Class 12 (Sagamore Hill Holdings, LP Interests) (collectively, the "<u>Deemed Rejecting Classes</u>") are Impaired and deemed to reject the Plan.  Holders of Claims and Interests in Class 6 (Intercompany Claims) and Class 7 (Intercompany Interests) (together, the "<u>Deemed Accepting/Rejecting Classes</u>" and, collectively, with the Unimpaired Classes and the Deemed Rejecting Classes, the "<u>Non-Voting Classes</u>") are

4

Unimpaired and conclusively presumed to have accepted the Plan or are Impaired and deemed to reject the Plan.

G.  As set forth and approved in the Combined Scheduling Order, the Ballots the Debtors used to solicit votes to accept or reject the Plan from Holders in the Voting Classes adequately addressed the particular needs of the Chapter 11 Cases and were appropriate for Holders in the Voting Classes to vote to accept or reject the Plan.  Under sections 1126(f) and 1126(g) of the Bankruptcy Code, the Debtors were not required to solicit votes from the Holders of Claims or Interests, as applicable, in the Non-Voting Classes, each of which is conclusively presumed to have accepted, or deemed to have rejected, the Plan.

H.  **Notice**.  As evidenced by the Affidavits and the Voting Declarations, all parties required to be given notice of the commencement of the Chapter 11 Cases, the Disclosure Statement, the Plan, the Plan Sponsor Transaction, and the Confirmation Hearing (including the deadline for filing and serving objections to Confirmation of the Plan) have been given due, proper, adequate, timely, and sufficient notice thereof in accordance with the Combined Scheduling Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and all other applicable non-bankruptcy rules, laws, and regulations and such parties have had an opportunity to appear and be heard with respect thereto.  No other or further notice is or shall be required.

I.  **Solicitation**.  As described in and evidenced by the Affidavits and the Voting Declarations, transmittal and service of the Solicitation Materials (collectively, the "Solicitation") were timely, adequate, appropriate, and sufficient under the circumstances.  The Solicitation was conducted in good faith and complied with the Bankruptcy Code, including sections 1125 and 1126 thereof, the Bankruptcy Rules, including rules 3017 and 3018 thereof, the Bankruptcy Local

Rules, the Combined Scheduling Order, and all other applicable non-bankruptcy rules, laws, and regulations applicable to the Solicitation.  Accordingly, no further notice is required.  The period during which the Debtors solicited acceptances or rejections to the Plan was a reasonable and sufficient period of time for each Holder in the Voting Classes to make an informed decision to accept or reject the Plan.

J.      **Vote Tabulation**.  As described in the Voting Declarations, the Holders of Claims in Class 3 (RBL Facility Claims) and Class 4 (Term Loan Claims) are Impaired under the Plan and have voted to accept the Plan in the numbers and amounts required by section 1126 of the Bankruptcy Code.  All procedures used to tabulate the Ballots were fair, reasonable, and conducted in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Combined Scheduling Order, and all other applicable non-bankruptcy rules, laws, and regulations.

K.      **Service of Opt-Out Form**.   The process described in the Voting Declarations and the Solicitation Affidavits that the Debtors and the Claims and Noticing Agent followed to identify the relevant parties on which to serve the applicable ballot or notice containing an opportunity to opt out of the Third-Party Releases (as defined herein) (each, an "Opt-Out Form") and to distribute the Opt-Out Forms (i) is consistent with the industry standard for the identification and dissemination of such materials on holders of public securities, and (ii) was reasonably calculated to ensure that each of the Holders of Claims in Interests in all non-voting Classes was informed of its ability to opt out of the Third-Party Releases and the consequences for failing to timely do so.

L.      **Modifications to Plan**.  Pursuant to section 1127 of the Bankruptcy Code, the modifications to the Plan made after solicitation of the Plan or in this Confirmation Order constitute technical or clarifying changes, changes with respect to particular Claims by agreement

with Holders of such Claims, or modifications that do not otherwise materially and adversely affect or change the treatment of any other Claim under the Plan. These modifications are consistent with the disclosures previously made pursuant to the Disclosure Statement, and notice of these modifications was adequate and appropriate under the facts and circumstances of the Chapter 11 Cases. In accordance with Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, and they do not require that Holders of Claims be afforded an opportunity to change previously cast acceptances or rejections of the Plan. Accordingly, the Plan is properly before this Bankruptcy Court and all votes cast with respect to the Plan prior to such modification shall be binding and shall apply with respect to the Plan.

M. **Securities Law Matters**. The sale and issuance to the Plan Sponsor of the Reorganized Acquired Debtor Interests (as defined below) shall be exempt from the registration requirements of section 5 of the Securities Act and any other applicable United States laws requiring registration prior to the offering, issuance, distribution, or sale of securities in accordance with, or pursuant to, the exemption provided by section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder.

N. **Plan Supplement**. All documents and forms of documents, agreements, schedules, and exhibits contained in the Plan Supplement comply with the terms of the Plan and are integral, part of, and incorporated by reference into the Plan, and are approved by the Bankruptcy Court. In addition, the filing and notice of all documents and forms of documents, agreements, schedules, and exhibits included in the Plan Supplement were adequate, proper and in accordance with the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and requirements, and no other or further notice is required.

O.     **Compliance with Bankruptcy Code Requirements—Section 1129(a)(1)**. The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code.  In addition, the Plan is dated and identifies the Entities submitting it, thereby satisfying Bankruptcy Rule 3016(a).

i.     *Proper Classification—Sections 1122 and 1123.*

P.     The Plan satisfies the requirements of sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.  Article III of the Plan provides for the separate classification of Claims and Interests into 12 Classes.   Valid business, factual, and legal reasons exist for the separate classification of such Classes of Claims and Interests.  The classifications reflect no improper purpose and do not unfairly discriminate between, or among, Holders of Claims or Interests.  Each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.

ii.     *Specified Unimpaired Classes—Section 1123(a)(2).*

Q.     The Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code. Article III of the Plan specifies that Claims, as applicable, in the following Classes are Unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code.

| Class | Claims and Interests |
|-------|----------------------|
| 1 | Other Priority Claims |
| 2 | Other Secured Claims |
| 5 | General Unsecured Claims |

R.     For the avoidance of doubt, Holders of Intercompany Claims and Intercompany Interests are Unimpaired and conclusively presumed to have accepted the Plan, or are Impaired and deemed to reject the Plan, and, in either event, are not entitled to vote to accept or reject the Plan.   Additionally, Article II of the Plan specifies that Allowed Administrative Claims,

Professional Fee Claims, and Priority Tax Claims will be paid in full in accordance with the terms of the Plan, although these Claims are not classified under the Plan.

     *iii.    Specified Treatment of Impaired Classes—Section 1123(a)(3).*

     S.    The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code. Article III of the Plan specifies that Claims and Interests, as applicable, in the following Classes (the "Impaired Classes") are Impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code, and describes the treatment of such Classes:

| Class | Claims and Interests |
|-------|----------------------|
| 3 | RBL Facility Claims |
| 4 | Term Loan Claims |
| 8 | Section 510(b) Claims |
| 9 | Arena Energy, LP Interests |
| 10 | Arena Energy GP, LLC Interests |
| 11 | Arena Energy 2020 GP, LLC Interests |
| 12 | Sagamore Hill Holdings, LP Interests |

     T.    For the avoidance of doubt, Holders of Intercompany Claims and Intercompany Interests are Unimpaired and conclusively presumed to have accepted the Plan, or are Impaired and deemed to reject the Plan, and, in either event, are not entitled to vote to accept or reject the Plan.

     *iv.    No Discrimination—Section 1123(a)(4).*

     U.    The Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code. The Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest.

*v.    Adequate Means for Plan Implementation—Section 1123(a)(5).*

V.     The Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code. The provisions in Article IV and elsewhere in the Plan, and in the exhibits and attachments to the Plan and the Disclosure Statement, provide, in detail, adequate and proper means for the Plan's implementation, including regarding:   (a) the general settlement of Claims and Interests; (b) authorization for the Debtors to take all actions necessary to effectuate the Plan and implement the Restructuring Transactions, including the Plan Sponsor Transaction; (c) the purchase of the Reorganized Acquired Debtor Interests (pursuant to the Plan Sponsor Equity Election) and the other Assets by the Plan Sponsor; (d) the payment of Cure Costs; (e) the Wind Down and dissolution of the Debtors (other than the Acquired Debtors); (f) the authority of the Plan Administrator; (g) the cancellation of existing notes and instruments; (h) the authorization and approval of corporate actions under the Plan; (i) the dissolution of the existing boards of directors; (j) the effectuation and implementation of documents and further transactions; and (k) the retention of Causes of Action.

*vi.    Voting Power of Equity Securities—Section 1123(a)(6).*

W.     The Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code. In accordance with Articles IV.I and VII of the Plan, on the Effective Date, all fiduciary duties, authority, power, and incumbency of any and all persons acting as directors and officers of the Debtors and the non-Debtors subsidiaries shall be deemed to have been terminated, and the Plan Administrator shall be responsible for: (a) winding down the businesses of the Debtors (other than the Acquired Debtors); (b) resolving Disputed Claims; (c) making all distributions to Holders of Allowed Claims; (d) filing tax returns; and (e) administering the Plan.

vii.     *Directors and Officers—Section 1123(a)(7).*

X.      The Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code. In accordance with Article IV.L of the Plan, on the Effective Date, the term of the current members of the board of directors and officers of the Debtors and non-Debtor subsidiaries shall expire, the Plan Sponsor shall designate the new officers and directors, and the Plan Administrator will be appointed by the Debtors in consultation with the Plan Sponsor.   The identity of the Plan Administrator was disclosed in the Plan Supplement.

viii.     *Impairment / Unimpairment of Classes—Section 1123(b)(1).*

Y.      The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.  Article III of the Plan impairs or leaves Unimpaired each Class of Claims and Interests.

ix.     *Assumption—Section 1123(b)(2).*

Z.      The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.  Article V of the Plan provides that all Executory Contracts or Unexpired Leases not otherwise assumed, assumed and assigned, or rejected will be deemed assumed by the Acquired Debtors in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that:  (i) are identified on the schedule of Rejected Contracts and Leases; (ii) have previously expired or terminated pursuant to their own terms; (iii) have been previously assumed, assumed and assigned, or rejected by the Debtors pursuant to a Final Order; (iv) are the subject of a motion to reject that is pending on the Effective Date; or (v) have an ordered or requested effective date of rejection that is after the Effective Date.

x.     *Settlement, Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action—Section 1123(b)(3).*

AA.     In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided under the Plan,

11

the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim and Interest, or any distribution to be made on account of such Allowed Claim or Interest.

BB.     Article IX.D of the Plan describes certain releases granted by the Debtors and their Estates (the "Debtor Releases").   The Debtors have satisfied their burden with respect to the propriety of the Debtor Releases.   Such releases are a necessary and integral element of the Plan, and are fair, reasonable, and in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.   The Debtor Releases are:  (a) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitate the Restructuring Transactions and implement the Plan; (b) a good-faith settlement and compromise of the Claims released by Article IX.D of the Plan; (c) in the best interests of the Debtors and their Estates and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given, and made, after due notice and opportunity for hearing; (f) appropriately tailored under the facts and circumstances of the Chapter 11 Cases; and (g) a bar to any of the Debtors, the Reorganized Acquired Debtors (as defined below), and the Debtors' Estates asserting any Claim or Cause of Action released by the Debtor Releases.

CC.     The Debtor Releases appropriately offer protection to parties that participated in the Debtors' restructuring process.   Each of the Released Parties made significant concessions and contributions to the Chapter 11 Cases.   The scope of the Debtor Releases is appropriately tailored under the facts and circumstances of the Chapter 11 Cases.   The Debtor Releases are appropriate in light of, among other things, the value provided by the Released Parties to the Debtors' Estates and the critical nature of the Debtor Releases to the Plan.

DD.      Article IX.E of the Plan describes certain releases (the "Third-Party Releases")
granted by the Releasing Parties of the Released Parties which include:  (a) each Consenting RBL
Facility Lender and any other Holders of RBL Facility Claims that vote to accept the Plan and do
not opt out of the releases in the Plan; (b) the RBL Facility Agent; (c) the Plan Sponsor; (d) each
Consenting Term Loan Lender and any other Holders of Term Loan Claims that vote to accept
the Plan and do not opt out of the releases in the Plan; (e) the Term Loan Agent; (f) each current
and former Affiliate of each Entity in clause (a) through (e); (g) with respect to each Entity in
clause (a) through (f), each such Entity's current and former equity holders (direct and indirect),
subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board
members, financial advisors, partners, attorneys, accountants, investment bankers, consultants,
representatives, and other professionals, each in their capacity as such; and (h) each Debtor's
current and former Affiliates, and each Debtor's and each such Affiliate's current and former
equity holders (direct and indirect), subsidiaries, officers, directors, managers, principals,
members, employees, agents, advisory board members, financial advisors, partners, attorneys,
accountants, investment bankers, consultants, representatives, and other professionals, each in
their capacity as such; as more fully set forth in Article I.A.93 of the Plan.  The Third-Party
Releases are an integral part of the Plan.  Like the Debtor Releases, the Third-Party Releases
facilitated participation in the RSA, the Restructuring Stipulation, the Plan, and the chapter 11
process generally.  The Third-Party Releases were a critical and integral component of the Plan
Sponsor Transaction, the RSA, the Restructuring Stipulation, and the parties' agreement to provide
the consideration distributed under the Plan and to support the Plan, thereby preventing significant
and time-consuming litigation regarding the parties' respective rights and interests.  The Third-
Party Releases were a core negotiation point in connection with the Plan Sponsor Transaction and

the RSA and instrumental in developing a Plan that maximized value for all of the Debtors' stakeholders.  As such, the Third-Party Releases appropriately offer certain protections to parties who constructively participated in the Debtors' restructuring process by, among other things, providing the consideration distributed under the Plan and supporting the Plan.

EE.    The Third-Party Releases are consensual as to all parties in interest, including the Releasing Parties, and such parties in interest were provided notice of the Chapter 11 Cases, the Plan, and the deadline to object to Confirmation of the Plan, and received the Confirmation Hearing Notice and were properly informed that the Holders of Claims against or Interests in the Debtors that did not (a) check the "opt-out" box on the applicable Ballot or Opt-Out Form attached to the *Notice of (I) Non-Voting Status to Holders or Potential Holders of Unimpaired Claims Conclusively Presumed to Accept the Plan and Holders or Potential Holders of Impaired Claims and Interests Conclusively Presumed to Reject the Plan and (II) Opportunity for Holders of Claims and Interests to Opt Out of the Third-Party Releases* (the "Notice of Non-Voting Status"), returned in advance of the Voting Deadline, or (b) object to their inclusion as a Releasing Party on or before the Objection Deadline would be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release and discharge of all Claims and Causes of Action against the Debtors and the Released Parties as set forth in Article IX.E.  The Confirmation Hearing Notice was additionally published in the *New York Times* and the *Houston Chronicle* on August 28, 2020.  The release provisions of the Plan were conspicuous, emphasized with boldface type in the Plan, the Disclosure Statement, the Ballots, the Confirmation Hearing Notice, and the Notice of Non-Voting Status.  Importantly, the inclusion of the parties to the RSA in the Third-Party Releases was a material inducement for their participation, negotiation, and ultimate resolution of Claims through the RSA.

FF.     The Third-Party Releases provide finality for the Debtors, the Reorganized Acquired Debtors, and the Released Parties regarding the parties' respective obligations under the Plan and with respect to the Reorganized Acquired Debtors.  Such releases are a necessary and integral element of the Plan, and are fair, equitable, reasonable, and in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests.  The Third-Party Releases are: (a) consensual; (b) essential to Confirmation of the Plan; (c) given in exchange for a substantial contribution and for the good and valuable consideration provided by the Released Parties that is important to the success of the Plan; (d) a good-faith settlement and compromise of the Claims and Causes of Action released by the Third-Party Releases; (e) materially beneficial to, and in the best interests of, the Debtors, the Estates, and Holders of Claims and Interests, and important to the overall objectives of the Plan to finally resolve certain Claims among or against certain parties in interest in the Chapter 11 Cases; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released by the Third-Party Release against any of the Released Parties; and (i) consistent with sections 105, 524, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Code.

GG.     The exculpation, described in Article IX.F of the Plan (the "Exculpation"), is appropriate under applicable law because it was proposed in good faith, was formulated following extensive good-faith, arm's-length negotiations with key constituents, and is appropriately limited in scope.  Without limiting anything in the Exculpation, each Exculpated Party has participated in good faith in the Chapter 11 Cases and is appropriately released and exculpated from any obligation, Cause of Action, or liability for any act taken or omitted to be taken in connection with, or arising from or relating in any way to, the Chapter 11 Cases, the formulation, preparation,

dissemination, negotiation, or filing of the RSA and related prepetition transactions (including any draws under the RBL Facility Credit Agreement), the Disclosure Statement, the Plan, the Plan Supplement, the Restructuring Stipulation, the Plan Sponsor Transaction, any transaction related to, or actions taken to effectuate, the Plan, the Restructuring Transaction, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement.

HH.     The injunction provisions set forth in Article IX.G of the Plan are necessary to implement, preserve, and enforce the Debtors' discharge, the Debtor Releases, the Third-Party Releases, and the Exculpation, and are narrowly tailored to achieve this purpose.

II.     In accordance with section 1123(b)(3)(B) of the Bankruptcy Code, Article IV.P of the Plan, and the Plan Sponsor Equity Election, the Reorganized Acquired Debtors (or, with respect to any Causes of Action held by any Debtor that is not an Acquired Debtor, the Plan Sponsor) will retain, and may enforce, all rights to commence and pursue, as appropriate, any and all Causes of Action held by the Debtors that have not been expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement and the Reorganized Acquired Debtors' and the Plan Sponsor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the Effective Date.  The provisions regarding the preservation of Causes of Action in the Plan are appropriate, fair, equitable, and

16

reasonable, and are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.

JJ.     The release and discharge of all mortgages, deeds of trust, Liens, pledges, or other security interests against any property, assets, or interests of the Estates described in Article IX.C of the Plan (the "Lien Release"), except as otherwise expressly provided in the Plan and this Confirmation Order, is necessary to implement the Plan.  The provisions of the Lien Release are appropriate, fair, equitable, and reasonable and are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.

> *xi.     Additional Plan Provisions—Section 1123(b)(6).*

KK.     The other discretionary provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b)(6) of the Bankruptcy Code.

> *xii.     Cure of Defaults—Section 1123(d).*

LL.     The Debtors have proven that it is an exercise of their sound business judgment to assume or assume and assign the Assumed Contracts and Leases in connection with the consummation of the Plan and the Plan Sponsor Transaction, and the assumption by the Acquired Debtors or assumption and assignment to the Plan Sponsor of the Assumed Contracts and Leases is in the best interests of the Debtors, their estates and creditors, and all parties in interest. The Assumed Contracts and Leases are an integral part of the Assets being purchased by the Plan Sponsor, and accordingly, such assumption or assumption and assignment of the Assumed Contracts and Leases is reasonable and enhances the value of the Debtors' Estates.  The cure amounts necessary to cure all monetary defaults under the Assumed Contracts and Leases pursuant to section 365 or 1123 of the Bankruptcy Code at the time of the assumption or assumption and

assignment thereof as provided under the Plan, as such amounts are determined pursuant to the assignment and assumption procedures provided for in the Combined Scheduling Order with respect thereto (or such lesser amounts as may be agreed upon by the parties under the applicable Assumed Contracts and Leases) (the "Cure Costs") are deemed to be the entire cure obligation due and owning under the Assumed Contracts and Leases.  Except as set forth herein, any objections to the Cure Costs are hereby overruled.  The Debtors are authorized to resolve any pending Cure Disputes without need for further order of the Bankruptcy Court.   To the extent that any counterparty failed to timely object to the Cure Costs for any of the Assumed Contracts and Leases listed on Exhibit 5A to the *Notice to Contract and Lease Counterparties* [Docket No. 106] or to raise any other alleged default or breach of contract, such counterparty is deemed to have consented to such Cure Cost and to the assumption of its respective Assumed Contract or Lease by the applicable Acquired Debtor and to have waived any other defaults or breaches, and such proposed Cure Cost shall be deemed to be the entire monetary cure obligation due and owing under the applicable Assumed Contract or Lease.  The Bankruptcy Court finds that the payment of the Cure Costs as provided in the Plan Sponsor Agreement is reasonable and appropriate and is deemed to fully satisfy the Debtors' obligations under sections 365(b), 365(f), and 1123 of the Bankruptcy Code.

MM.   Each provision of any Assumed Contract or Lease or applicable nonbankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning, assignment of any Assumed Contract or Lease has been satisfied or is otherwise unenforceable under Bankruptcy Code section 365.  Assumption or assumption and assignment of any Assumed Contract or Lease pursuant to this Confirmation Order, the Plan Sponsor Transaction, and the Plan, and payment in full or satisfaction of any applicable Cure Cost shall

result in the full release and satisfaction of any and all cures, Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Contract or Lease at any time prior to or as of the Closing Date.

NN.    Pursuant to the Plan and the Plan Sponsor Agreement, the Cure Costs will be paid by the applicable Reorganized Acquired Debtor in the ordinary course of business, on the Effective Date, or as soon thereafter as reasonably practicable, or on such other terms as the parties to such Assumed Contracts and Leases may agree.  The applicable Reorganized Acquired Debtor's payment of Cure Costs and performance of the obligations under the Assumed Contracts and Leases, in accordance with the Plan Sponsor Agreement, shall constitute adequate assurance of future performance of all Assumed Contracts and Leases within the meaning of section 365 of the Bankruptcy Code.  Upon assumption or assumption and assignment of each Assumed Contract or Lease and the payment of any applicable Cure Cost, such Assumed Contract or Lease shall be deemed valid and binding and in full force and effect in accordance with its terms, and all defaults thereunder, if any, shall be deemed cured, subject to the provisions of this Confirmation Order, and the Reorganized Acquired Debtors shall continue to perform under such Assumed Contract or Lease in the ordinary course of business.

OO.    Accordingly, all of the requirements of sections 365 of the Bankruptcy Code have been satisfied for the assumption or assumption and assignment by the Debtors of each Assumed Contract or Lease pursuant to this Confirmation Order, the Plan Sponsor Agreement, and the Plan.

PP.    **Debtor Compliance with the Bankruptcy Code—Section 1129(a)(2)**. The Debtors have complied with the applicable provisions of the Bankruptcy Code and, thus,

satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.   Specifically, each Debtor:

  a.   is an eligible debtor under section 109, and a proper proponent of the Plan under section 1121(a), of the Bankruptcy Code;

  b.   has complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Bankruptcy Court; and

  c.   complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126, the Bankruptcy Rules, the Bankruptcy Local Rules, any applicable nonbankruptcy law, rule, and regulation, the Combined Scheduling Order, and all other applicable law, in transmitting the Solicitation Materials, and related documents and notices, and in soliciting and tabulating the votes on the Plan.

QQ.   **Plan Proposed in Good Faith—Section 1129(a)(3)**.   The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.   The Debtors have proposed the Plan in good faith and not by any means forbidden by law.   In so determining based on the evidence presented to this Bankruptcy Court, including the Declarations, the Plan, the Disclosure Statement, and the other motions and pleadings Filed and the testimony elicited at the Confirmation Hearing, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself, the RSA, the Plan Sponsor Agreement, the Restructuring Stipulation, the process leading to Confirmation, including the support of Holders of Claims in the Voting Classes for the Plan, and the transactions to be implemented pursuant thereto. The Chapter 11 Cases were Filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to implement the Restructuring Transactions (including the Plan Sponsor Transaction), pursuant to which the Plan Sponsor shall acquire the Reorganized Acquired Debtor Interests and the other Assets in exchange for the consideration to be distributed to the Estates under the Plan, and the Acquired Debtors shall be reorganized and emerge from bankruptcy with a capital and organizational structure that will allow them to conduct their business and satisfy their obligations with sufficient liquidity and capital resources.   The Debtors believe that any valid

alternative to the Plan Sponsor Transaction would result in significant delays, litigation, additional costs, and, ultimately, would jeopardize recoveries for Holders of Allowed Claims.  The Plan is the product of good-faith, arm's length negotiations by and among the Debtors and the parties to the RSA and the Restructuring Stipulation, among others.  The Plan itself and the process leading to its formulation provides independent evidence of the Debtors' and such other parties' good faith, serves the public interest, and assures fair treatment of Holders of Claims and Interests.  Consistent with the overriding purpose of chapter 11, the Debtors Filed the Chapter 11 Cases with the belief that the Debtors were in need of restructuring, and the Plan was negotiated and proposed with the intention of accomplishing a successful restructuring and maximizing stakeholder value and for no ulterior purpose.

RR.  **Payment for Services and Costs and Expenses—Section 1129(a)(4)**.  The procedures set forth in the Plan for the Bankruptcy Court's review and ultimate determination of the fees and expenses to be paid by the Debtors in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, satisfy the objectives of, and are in compliance with, section 1129(a)(4) of the Bankruptcy Code.

SS.  **Directors, Officers, and Insiders—Section 1129(a)(5)**.  Because the Plan provides for the liquidation of the Estates' remaining assets and dissolution of the Debtors (other than the Acquired Debtors), section 1129(a)(5) of the Bankruptcy Code is inapplicable.  In any event, Article IV.I of the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code, to the extent applicable, by providing for the appointment of the Plan Administrator.

TT.  **No Rate Changes—Section 1129(a)(6)**.  Section 1129(a)(6) of the Bankruptcy Code is not applicable to the Chapter 11 Cases.  The Plan proposes no rate change subject to the jurisdiction of any governmental regulatory commission.

UU. **Best Interest of Creditors—Section 1129(a)(7)**. The Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code. All holders of Claims and Interests in all Impaired Classes will recover at least as much under the Plan as they would in a hypothetical chapter 7 liquidation. Substantially all of the Debtors' assets will remain fully operational and the business preserved as a going concern and maximized through the Plan Sponsor Transaction, which provides for the restructuring of the Debtors' obligations whereby the Plan Sponsor will purchase the Reorganized Acquired Debtor Interests and the other Assets, continue to operate the business, and will eliminate nearly $1 billion of secured debt from the balance sheet. A chapter 7 liquidation, to the contrary, would achieve the opposite result and destroy nearly all value, triggering hundreds of millions of dollars of plugging and environmental claims, and the Debtors' assets would become worthless. The Plan provides a greater recovery to holders of Allowed RBL Facility Claims, Allowed Term Loan Claims, and Allowed General Unsecured Claims than would a chapter 7 liquidation.

VV. **Acceptance by Certain Classes—Section 1129(a)(8)**. The Plan satisfies the requirements of section 1129(a)(8) of the Bankruptcy Code. Classes 1, 2, and 5 constitute Unimpaired Classes, each of which is conclusively presumed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code. The Voting Classes, Classes 3 and 4, have all voted to accept the Plan. Holders of Claims and Interests in Classes 6 and 7 are Unimpaired and conclusively presumed to have accepted the Plan or are Impaired and deemed to reject the Plan, and, in either event, are not entitled to vote to accept or reject the Plan. The remaining classes, Classes 8–12, are Impaired and deemed to reject the Plan. The Plan satisfies the cram down requirements of section 1129(b) with respect to Classes 6–12 or the cram down provision is otherwise inapplicable.

WW.  **Treatment of Claims Entitled to Priority Under Section 507(a) of the Bankruptcy Code—Section 1129(a)(9)**.  The treatment of Allowed Administrative Claims, Professional Fee Claims, and Priority Tax Claims under Article II of the Plan, and of Other Priority Claims under Article III of the Plan, satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

XX.  **Acceptance by At Least One Impaired Class—Section 1129(a)(10)**.  The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.  As evidenced by the Voting Report, the Voting Classes, each of which is Impaired, voted to accept the Plan by the requisite numbers and amounts of Claims, determined without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code), specified under the Bankruptcy Code.

YY.  **Feasibility—Section 1129(a)(11)**.  The Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.  The Plan is predicated on the Plan Sponsor Transaction, pursuant to which the Plan Sponsor shall acquire the Reorganized Acquired Debtor Interests and the other Assets in exchange for the consideration to be distributed to the Estates under the Plan.  The Debtors are fully capable of consummating the proposed Plan Sponsor Transaction.  Therefore, section 1129(a)(11) of the Bankruptcy Code is inapplicable to the Plan.

ZZ.  To the extent that section 1129(a)(11) of the Bankruptcy Code is applicable, the Plan is feasible.  Confirmation of the Plan will enable the Debtors to consummate the Plan Sponsor Transaction and make distributions to Holders of Allowed Claims without delay depending on their respective treatments.  Through the Plan, the Debtors will pay Other Priority Claims, Other Secured Claims, Allowed Administrative Claims, and Allowed Priority Tax Claims in full.  The Debtors will also establish and fund the Professional Fee Escrow Account to pay

Professional Fee Claims.  Certain of the Debtors' liabilities will be assumed by the Plan Sponsor in accordance with the Plan Sponsor Transaction.  As a prerequisite to entering into the Plan Sponsor Agreement, the Plan Sponsor committed to fund the closing of the Plan Sponsor Transaction.  Following the closing of the Plan Sponsor Transaction, the Reorganized Acquired Debtors will no longer be encumbered by their current funded debt and will be poised to generate significant cash flows from their ordinary course operations.  Thus, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code under Fifth Circuit law.

AAA.  **Payment of Fees—Section 1129(a)(12)**.  The Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.  Article XIII.C of the Plan provides for the payment of all fees payable by the Debtors under 28 U.S.C. § 1930(a).

BBB.  **Continuation of Employee Benefits—Section 1129(a)(13)**.  The Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.  Article IV.Q of the Plan provides that all employee wages and Compensation and Benefits Programs in place as of the Effective Date with the Debtors shall be assumed and assigned by the Debtors to the Plan Sponsor and shall remain in place as of the Effective Date, and the Plan Sponsor will continue to honor such agreements, arrangements, programs, and plans.

CCC.  **Non-Applicability of Certain Sections—Sections 1129(a)(14), (15), and (16)**.  Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to the Chapter 11 Cases.  The Debtors owe no domestic support obligations, are not individuals, and are not nonprofit corporations.

DDD.  **"Cram Down" Requirements—Section 1129(b)**.  The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.  All of the Impaired Classes (Classes 3 and 4) voted to accept the Plan.  Notwithstanding the fact that the Deemed Rejecting Classes have

been deemed to reject the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code. *First*, the Plan is fair and equitable with respect to the Deemed Rejecting Classes. The Plan has been proposed in good faith, is reasonable, and meets the requirements that (a) no holder of any Claim or Interest that is junior to each such Class will receive or retain any property under the Plan on account of such junior Claim or Interest and (b) no holder of a Claim in a Class senior to such Class is receiving more than 100% on account of its Claim. Accordingly, the Plan is fair and equitable to all holders of Claims and Interests in the Deemed Rejecting Classes. *Second*, the Plan does not discriminate unfairly with respect to the Deemed Rejecting Classes because similarly situated creditors and interest holders will receive substantially similar treatment on account of their Claims and Interests irrespective of Class. The Plan may therefore be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

EEE. **Only One Plan—Section 1129(c)**. The Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code. The Plan is the only chapter 11 plan Filed in each of the Chapter 11 Cases.

FFF. **Principal Purpose of the Plan—Section 1129(d)**. No Governmental Unit has requested that the Bankruptcy Court refuse to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act. As evidenced by its terms, the principal purpose of the Plan is not such avoidance. Accordingly, the requirements of section 1129(d) of the Bankruptcy Code have been satisfied.

GGG. **Good Faith Solicitation—Section 1125(e)**. The Debtors, the Released Parties, and the Exculpated Parties, have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code

and Bankruptcy Rules in connection with all of their respective activities relating to support and Consummation of the Plan, including the negotiation, execution, delivery, and performance of the RSA, the Restructuring Stipulation, and the Plan Sponsor Agreement, the issuance of the Reorganized Acquired Debtor Interests and the transfer of the other Assets to the Plan Sponsor, and the solicitation of acceptances of the Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

HHH. **Sufficiency of Marketing**. The Debtors and their professionals conducted a fair, open, and adequate prepetition marketing and sale process as set forth in the Flood Declaration. The marketing and sale process was non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any Entity to make an offer, and the process conducted by the Debtors obtained the highest or best value for the Debtors' Estates. There was no other transaction available or presented that would have yielded as favorable an economic result for the Debtors' Estates as that provided by the Plan Sponsor Transaction. Based upon the record of these proceedings, all creditors and other parties in interest and all prospective buyers have been afforded a reasonable and fair opportunity to make a higher or otherwise better offer, seek to exercise alleged Preferential Purchase Rights, or submit an Assignment Objection or Rights Objection (as such terms are defined in the Confirmation Hearing Notice), as the case may be. The marketing and sale process undertaken by the Debtors and their professionals has been adequate and appropriate and reasonably calculated to maximize the value for the benefit of all stakeholders in all respects. The Debtors have presented credible evidence that they and their professionals explored various strategic alternatives for the Debtors' businesses over an extended period of time and communicated with numerous parties regarding, among other potential transactions, a sale of all or substantially all of the assets of the Debtors. The Plan Sponsor Transaction is the result of

the Debtors' extensive efforts in seeking to maximize value to the Debtors' estates for the benefit of creditors.

      III.   **Sound Business Purpose; Sale Highest or Best Offer**.  Assumption of the Plan Sponsor Agreement and consummation of the Plan Sponsor Transaction constitute a valid and sound exercise of the Debtors' business judgment, and such acts are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.  This Bankruptcy Court finds that the Debtors have articulated good and sufficient business reasons for the Bankruptcy Court to authorize (i) the immediate assumption of the Plan Sponsor Agreement and the consummation of the Plan Sponsor Transaction pursuant to the terms of the Plan Sponsor Agreement and the Plan, (ii) the assumption or assumption and assignment of the Assumed Contracts and Leases as set forth herein, in the Plan Sponsor Agreement, and the Plan, and (iii) the assumption of the Assumed Liabilities as set forth herein, in the Plan Sponsor Agreement, and the Plan.

      JJJ.   The Debtors have articulated good and sufficient business reasons justifying the sale of the Reorganized Acquired Debtor Interests and the other Assets to the Plan Sponsor on the terms and conditions set forth in the Plan Sponsor Agreement.  Additionally:  (a) the total consideration provided by the Plan Sponsor pursuant to the Plan Sponsor Transaction is the highest or best offer available to the Debtors; (b) the Plan Sponsor Transaction presents the best opportunity to realize the maximum value for the Debtors' Estates and avoid a decline and devaluation of their assets; (c) there is risk that the value of the Debtors' assets will deteriorate, and the Plan Sponsor may terminate the Plan Sponsor Agreement, if the Plan Sponsor Agreement is not immediately assumed and the Plan Sponsor Transaction is not consummated promptly; (d) the Plan Sponsor Agreement and the consummation of the Plan Sponsor Transaction will provide a greater recovery for the Debtors' creditors than would be provided by any other presently

available alternative; (e) the Plan Sponsor would not agree to purchase the Reorganized Acquired Debtor Interests and the other Assets if the Assets remained subject to higher or better offers after the entry of this Confirmation Order; and (f) the Debtors' assumption of the Plan Sponsor Agreement and consummation of the Plan Sponsor Transaction is reasonable and appropriate under the circumstances. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for (i) the consummation of the Plan Sponsor Transaction, (ii) a restriction on the Debtors pursuing, considering, or accepting any further offers for the Assets from and after the entry of this Confirmation Order through the earlier of the consummation of the Plan Sponsor Transaction or termination of the Plan Sponsor Agreement in accordance with its terms, and (iii) the immediate assumption of the Plan Sponsor Agreement. To maximize the value for the Debtors' Estates and preserve the viability of the operations of the Acquired Debtors and to which the other Assets relate, it is essential that the Plan Sponsor Transaction occur within the time constraints set forth in the Plan Sponsor Agreement and this Confirmation Order and that the Plan Sponsor be protected against any further offers for the Assets.

KKK. The Debtors' decision to enter into and assume the Plan Sponsor Agreement and consummate the Plan Sponsor Transaction constitutes a proper exercise of the fiduciary duties of the Transaction Committee. Because entry into and assumption of the Plan Sponsor Agreement and the consummation of the Plan Sponsor Transaction constitutes the exercise of sound business judgment by the Debtors, none of the Debtors, or their respective current and former members, managers, officers, directors, employees, advisors, professionals, or agents in their capacity as such, shall incur or have any liability to the Estates or any Holder of a Claim against or Interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations

of the Plan Sponsor Agreement or the consummation of the Plan Sponsor Transaction contemplated thereunder, other than liability arising out of or relating to any act or omission of the Debtors that constitutes a breach of the Plan Sponsor Agreement, willful misconduct, or fraud, in each case as determined by a court of competent jurisdiction.

LLL. **Arm's-Length Sale and Plan Sponsor's Good Faith**.   The Plan Sponsor Agreement and the Plan Sponsor Transaction were negotiated, proposed, and undertaken by the Debtors and the Plan Sponsor at arm's length, without collusion or fraud, and in good faith within the meaning of section 363(m) of the Bankruptcy Code.  The Plan Sponsor (i) recognizes that the Debtors were free to deal with any other party interested in making an offer, (ii) complied with the procedures governing the Debtors' marketing and sale process in all respects, and (iii) willingly subjected its bid to the competitive marketing and sale process.  All payments to be made by the Plan Sponsor and other agreements or arrangements entered into by the Plan Sponsor in connection with the Plan Sponsor Transaction have been disclosed.  As a result of the foregoing, the Plan Sponsor is a "good faith purchaser" and, as such, is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code, including in the event this Confirmation Order or any portion thereof is reversed or modified on appeal, and the Plan Sponsor has proceeded in good faith in all respects in connection with the Plan Sponsor Transaction specifically and the Chapter 11 Cases generally.

MMM. **Title to the Assets**.   The Assets sought to be transferred and/or assigned, as applicable, by the Debtors to the Plan Sponsor pursuant to the Plan Sponsor Agreement are property of the Debtors' Estates and good title thereto is presently vested in the Debtors' Estates within the meaning of section 541(a) of the Bankruptcy Code.  Except as provided in the Plan

Sponsor Agreement, the Debtors are the sole and rightful owners of such Assets with all rights, title, and interests to the Assets.

NNN. **Authority**. The Debtors have: (i) full power and authority to execute and assume the Plan Sponsor Agreement and all other documents contemplated thereby, (ii) all of the power and authority necessary to consummate the transactions contemplated by the Plan Sponsor Agreement subject to the terms of the Plan and this Confirmation Order, and (iii) taken all corporate action necessary to authorize and approve the Plan Sponsor Agreement and the immediate assumption thereof, the sale of the Assets, and all other actions required to be performed by the Debtors in order to consummate the Plan Sponsor Transaction. No consents or approvals, other than those already obtained or expressly provided for in the Plan Sponsor Agreement or this Confirmation Order, are required for the Debtors to consummate the Plan Sponsor Transaction.

OOO. **No Fraudulent Transfer**. The total consideration provided by the Plan Sponsor pursuant to the Plan Sponsor Agreement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transfer Act, and any other applicable law, and may not be avoided under section 363(n) of the Bankruptcy Code or under any other law of the United States, any state, territory, possession thereof, the District of Columbia, or any other applicable law. The Plan Sponsor Agreement was not entered into, and the Plan Sponsor Transaction is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. Neither the Debtors nor the Plan Sponsor entered into the Plan Sponsor Agreement or is consummating

the Plan Sponsor Transaction with any fraudulent or otherwise improper purpose.   Neither the Debtors nor the Plan Sponsor engaged in any conduct that would cause or permit the Plan Sponsor Agreement or the consummation of the Plan Sponsor Transaction to be avoided, or costs or damages to be imposed, under Bankruptcy Code section 363(n) or under any other law of the United States, any state, territory, possession thereof, the District of Columbia or any other applicable law.

PPP.   **Plan Sponsor Equity Election**.   The Plan Sponsor Equity Election pursuant to section 8.9(b) of the Plan Sponsor Agreement and Article IV.R. of the Plan permits the Plan Sponsor to acquire the reorganized equity interests in one or more of the Debtors to the extent determined necessary or desirable by the Plan Sponsor at no additional cost to the Plan Sponsor. The Plan Sponsor has made the Plan Sponsor Equity Election and elected, subject to Confirmation and Consummation of the Plan, in accordance with the terms of the Plan, the RSA, and the Plan Sponsor Agreement, that Arena Energy, LP ("Arena Energy"), Valiant Energy L.L.C., and Arena Exploration, LLC will constitute Acquired Debtors (such Acquired Debtors, as reorganized pursuant to this Confirmation Order and section 1141 of the Bankruptcy Code, the "Reorganized Acquired Debtors" and, the reorganized equity interests therein, the "Reorganized Acquired Debtor Interests").[4] The Plan Sponsor Equity Election, including the direct and indirect acquisition by the Plan Sponsor of the Reorganized Acquired Debtor Interests pursuant thereto, is an integral part of the Plan Sponsor Transaction and the Plan.

QQQ.   **Classification**.   The classification of Claims and Interests pursuant to the Plan is appropriate under section 1122 of the Bankruptcy Code.   Without limitation, the classification of

---

[4]   *See Notice Regarding Plan Sponsor Equity Election Pursuant to Article IV.R of the Debtors' Joint Prepackaged Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 169].   References herein and in the Plan to the Acquired Debtors shall include the Reorganized Acquired Debtors from and after the Effective Date.

RBL Facility Claims (including any secured or undersecured deficiency Claims arising under, or in connection with the RBL Facility) in Class 3 is appropriate.

RRR.  **Satisfaction of Confirmation and Requirements**.  Based on the foregoing and the findings contained in Article III of the Plan, the Debtors, as proponents of the Plan, have met their burden of proving by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation, that the Plan satisfied all applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code required for Confirmation.  In addition, and to the extent applicable, the Plan is confirmable under the clear and convincing evidentiary standard.

SSS.  **Likelihood of Satisfaction of Conditions Precedent to the Effective Date**.  Each of the conditions precedent to the Effective Date, as set forth in Article X.B of the Plan, has been or is reasonably likely to be satisfied or waived in accordance with Article X.C of the Plan.

TTT.  **Disclosure of Facts.**  The Debtors have disclosed all material facts regarding the Plan, including with respect to the Plan Sponsor Transaction, and the fact that each Acquired Debtor will emerge from the Chapter 11 Cases as a validly existing limited liability company with separate assets, liabilities, and obligations.

UUU.  **Good Faith**.  The Debtors have proposed the Plan in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' Estates for the benefit of their stakeholders.  The Plan accomplishes this goal.  Accordingly, the Debtors, the Reorganized Acquired Debtors, or the Plan Sponsor, as applicable, and their respective officers, directors, and advisors have been, are, and will continue to act in good faith if they proceed to (a) consummate the Plan and the Plan Sponsor Transaction and the agreements, settlements, transactions, and transfers contemplated thereby and (b) take the actions authorized and directed by this Confirmation Order and the Plan to effectuate the foregoing.

VVV. **Essential Element of the Plan.**   The Plan Sponsor Agreement and the other documents in the Plan Supplement are essential elements of the Plan, are necessary for Confirmation and Consummation of the Plan, and are critical to the overall success and feasibility of the Plan.  The Plan Sponsor Transaction and the Definitive Documents were negotiated in good faith and at arm's length among the Debtors, the Plan Sponsor, the RBL Facility Agent, the RBL Facility Lenders, and the Term Loan Lenders.  The Debtors have provided sufficient and adequate notice of the material terms of the Definitive Documents to all parties in interest in the Chapter 11 Cases.  The execution, delivery, or performance by the Debtors, the Reorganized Acquired Debtors, or the Plan Sponsor, as applicable, of any of the Definitive Documents and any other documents related to the Plan Sponsor Transaction and compliance by the Debtors, the Reorganized Acquired Debtors, or the Plan Sponsor, as applicable, with the terms thereof is authorized by, and will not conflict with, the terms of the Plan or this Confirmation Order.

WWW. **Time is of the Essence**.   The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Restructuring Transactions, including the Plan Sponsor Transaction, as contemplated by the Plan and the Plan Sponsor Agreement.  In order to maximize value for the Debtors' Estates, it is essential that the Plan Sponsor Transaction and assumption or assumption and assignment of the Assumed Contracts and Leases occur within the time constraints set forth in the Plan Sponsor Agreement and the RSA.  Accordingly, there is cause to waive the stays contemplated by Bankruptcy Rules 3020, 6004, 6006, 7026 and 9014.

## **ORDER**

IT IS HEREBY ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

**I.      Objections Overruled**.

1.      All objections, if any, with regard to the relief sought in this Confirmation Order that have not been withdrawn, waived, settled, or otherwise dealt with as expressly provided herein or on the record at the Confirmation Hearing are hereby **OVERRULED** and **DENIED** on the merits, with prejudice.  All objections to the entry of this Confirmation Order or to the relief granted herein that were not timely Filed are hereby forever barred.

**II.     Approval of the Disclosure Statement**.

2.      The Disclosure Statement and the Solicitation Materials are approved on a final basis pursuant to section 1125 of the Bankruptcy Code.  Any and all remaining objections or reservations of rights with respect to the Disclosure Statement that have not been withdrawn or resolved as of the entry of this Confirmation Order are hereby overruled in their entirety on the merits.

**III.    Confirmation of the Plan**.

3.      The Plan is approved in its entirety and **CONFIRMED** pursuant to section 1129 of the Bankruptcy Code.

4.      Any and all remaining objections and reservations of rights pertaining to the Plan that have not been withdrawn or resolved as of the entry of this Confirmation Order are hereby overruled in their entirety on the merits.

5.      The documents contained in the Plan Supplement and the Plan Sponsor Agreement are integral to the Plan, are in the best interests of the Debtors, the Estates, and the Holders of Claims and Interests and are approved by the Bankruptcy Court, and the Debtors, the Reorganized

Acquired Debtors, and the Plan Sponsor, as applicable, are authorized to take all actions required under the Plan and the Plan Supplement documents.

6.      The terms of the Plan and the Plan Supplement are incorporated herein by reference, and are an integral part of this Confirmation Order.  The terms of the Plan, the Plan Supplement, the Plan Sponsor Agreement, and all other relevant and necessary documents shall be immediately effective and enforceable and deemed binding as of the Effective Date on all parties in interest, including the Debtors, the Reorganized Acquired Debtors, the Debtors' Estates, all Holders of Claims and Interests (irrespective of whether or not any such Holder of Claims or Interests is Impaired under the Plan, and whether or not such Holder voted to accept the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharged, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors, and, in each case, each of their respective affiliates, successors, and assigns.  The failure to specifically include or refer to any particular article, section, or provision of the Plan, the Plan Supplement, or any related document in this Confirmation Order does not diminish or impair the effectiveness or enforceability of such article, section, or provision.

7.      In consideration for the distributions and other benefits, including releases, provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Interests, and controversies resolved under the Plan, and the entry of this Confirmation Order constitutes approval of such compromise and settlement under Bankruptcy Rule 9019.  The compromises and settlements set forth in the Plan are approved, and will be effective immediately and binding on all parties in interest on the Effective Date.

8.      The Debtors shall cause to be served a notice of the entry of this Confirmation Order and occurrence of the Effective Date, substantially in form attached hereto as **Exhibit B** (the "Confirmation Notice"), upon (a) all parties listed in the creditor matrix maintained by the Claims and Noticing Agent and (b) such additional persons and entities as deemed appropriate by the Debtors, no later than five (5) business days after the Effective Date.  The Debtors shall cause the Confirmation Notice to be published in the *New York Times* and the *Houston Chronicle* within seven (7) business days after the Effective Date, or as soon as reasonably practicable thereafter.

**IV.     The Plan Sponsor Transaction**.

9.      The Plan Sponsor Transaction as set forth in the Plan Sponsor Agreement and the Plan, and all transaction contemplated thereby, and all of the terms and conditions thereof, are authorized and approved pursuant to sections 105, 363, 365, 1123 and 1141 of the Bankruptcy Code.  The failure to specifically reference any particular provision set forth in the Plan Sponsor Agreement in this Confirmation Order shall not diminish or impair the efficacy of such provision, it being the intent of this Bankruptcy Court that the Plan Sponsor Agreement and all other agreements or arrangements entered into by the Plan Sponsor and the Debtors in connection with the Plan Sponsor Transaction, and each and every provision, term and condition thereof be authorize and approved in its entirety.

10.     The Plan Sponsor Agreement shall be deemed assumed immediately upon entry of this Confirmation Order without the need for further action by any party or the Bankruptcy Court.

11.     Immediately upon entry of this Confirmation Order, and pending the consummation of the Plan Sponsor Transaction or the termination of the Plan Sponsor Agreement in accordance with its terms, the Debtors shall neither solicit nor accept any bids or offers for the Assets.  The Debtors shall immediately close access to any "due diligence data room" or similar

36

information sharing medium to all third parties other than the Plan Sponsor, and all prospective bidders in connection with the sale process (and any other person or entity who may have been provided any confidential information by or on behalf of any such bidder) are hereby directed to return or destroy any confidential information provided to or obtained by such bidder and/or person in connection with the sale process in accordance with the terms of applicable confidentiality agreements (or, in the absence of such a confidentiality agreement, this Confirmation Order).

12.     Each of the Debtors or the Reorganized Acquired Debtors, as applicable, is hereby authorized and directed to (a) consummate the Plan Sponsor Transaction in accordance with the Plan Sponsor Agreement, the Plan, and this Confirmation Order, (b) assume or assume and assign the Assumed Contracts and Leases, (c) consummate, implement, and close fully the Plan Sponsor Transaction under the Plan Sponsor Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Plan Sponsor Transaction, and (d) perform each of its covenants and undertakings as provided in the Plan Sponsor Agreement and the Definitive Documents prior to, on or after the Effective Date, without further order of the Bankruptcy Court.

13.     The Plan Sponsor Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of this Bankruptcy Court; *provided* that any such modification, amendment, or supplement neither is material nor materially changes the economic substance of the transactions contemplated thereby.

**V.     Assumed Contracts and Leases.**

14.     Notwithstanding any provision of any Assumed Contract or Lease or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of such Assumed Contract or Lease, the Debtors are authorized to assume or assume and assign to the Plan Sponsor

37

the Assumed Contracts and Leases pursuant to section 365 of the Bankruptcy Code, which assumption or assumption and assignment shall take place on and be effective as of the Effective Date, except as otherwise provided herein. There shall be no accelerations, assignment fees, increases, or any other fees charged to the Debtor, the Reorganized Acquired Debtors, or the Plan Sponsor as a result of the assumption or assumption and assignment of the Assumed Contracts and Leases, which shall not be a default under any such Assumed Contract or Lease. After the payment or satisfaction of the relevant Cure Cost (if applicable), none of the Debtors, their Estates, the Reorganized Acquired Debtors, or the Plan Sponsor shall have any further liabilities under the Assumed Contracts and Leases to the non-Debtor counterparties under the Assumed Contracts and Leases, other than the obligations under the Assumed Contracts and Leases that accrue or become due and payable on or after the Effective Date. Upon assumption by the Reorganized Acquired Debtors or assumption and assignment to the Plan Sponsor of the Assumed Contracts and Leases, the Assumed Contracts and Leases shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Confirmation Order. As of the Effective Date, the Reorganized Acquired Debtor shall retain, or the Plan Sponsor shall succeed to, the entirety of the applicable Debtor's rights and obligations under each Assumed Contract or Lease.

**VI.    Discharge and Releases.**

15.    The following discharge, release, exculpation, and injunction provisions of the Plan are hereby approved in their entirety, and will be effective and binding on all Persons or Entities to the extent provided therein immediately on the Effective Date without further order or action by the Bankruptcy Court, any of the parties to such releases, or any other Entity:

a.   Discharge of Claims (Article IX.B)

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property or interest in property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has voted to accept the Plan.  Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date with respect to a Claim that is Unimpaired by the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than Reinstated Claims) and Interests subject to the Effective Date occurring.**

b.   Release of Liens (Article IX.C)

**Except as otherwise specifically provided in the Plan, the Plan Sponsor Agreement or in any contract, instrument, release, or other agreement or document created pursuant to the Plan (including the terms of the RBL Contingent Value Rights, the RBL Contingent Value Rights Memorandum, the Term Loan Contingent Value Rights, the Term Loan Contingent Value Rights Agreement, and the Term Loan Contingent Value Rights Memorandum), on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and the Plan Sponsor Agreement, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property, assets, or interests of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Plan Sponsor (or the Acquired Debtor, as applicable) without any further approval or**

order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors.  Any Holder of a Secured Claim (including any applicable agents for such Holder) shall be authorized and directed to release any collateral or property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and any applicable agents), and to take such actions as may be reasonably requested by the Debtors or the Plan Sponsor to evidence the release of such Lien, including the execution, delivery and filing or recordation of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.  In addition, the RBL Facility Agent and the Term Loan Agent shall execute and deliver all documents reasonably requested by the Debtors, the Plan Administrator or the Plan Sponsor to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.

c.   Debtor Releases (Article IX.D)

**Notwithstanding anything contained in the Plan, the Confirmation Order, or the Plan Sponsor Agreement to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors and their Estates, in each case on behalf of themselves and their respective successors, assigns and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the RBL Facility, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the Plan Sponsor Transaction, the Restructuring Transaction, the**

formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Plan Supplement, the Plan Sponsor Transaction, the Restructuring Transaction, or any other contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) related to any of the foregoing or created or entered into in connection with the RSA, the Disclosure Statement, the Plan, the Plan Supplement, the Plan Sponsor Transaction, or the Restructuring Transaction, or any other actions taken to effectuate the Plan, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities or other property pursuant to the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding the inclusion of any Released Parties as a potential party to any Transferred Causes of Action (including, for each, Avoidance Actions), such parties shall remain Released Parties.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, any Definitive Document or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any Claims or Causes of Action with respect to Todd Stone divorce litigation, titled In the Marriage Matter of Todd and Jennifer Stone DC No. 18-02-01705.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases herein, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the releases herein are:  (1) essential to the Confirmation of the Plan; (2) in exchange for a substantial contribution and the good and valuable consideration provided by the Released Parties that is important to the success of the Plan; (3) a good faith settlement and compromise of the Claims released by the releases herein; (4) in the best interests of the Debtors and all Holders of Claims and Interests; (5) fair, equitable and reasonable; (6) given and made after reasonable investigation by the Debtors and after due notice and opportunity for hearing; and (7) a bar to any of the Debtors asserting any Claim or Cause of Action released by the releases herein against any of the Released Parties.

d.   Third-Party Releases (Article IX.E)

**Except as otherwise expressly set forth in the Plan, the Plan Sponsor Agreement, or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Debtor and Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by each Releasing Party from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operations thereof), the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, any intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the Plan Sponsor Transaction, the Restructuring Transaction, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Plan Sponsor Agreement, the Restructuring Stipulation, the Disclosure Statement, the Plan, the Restructuring Transaction, or any other contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing or created or entered into in connection with the RSA, the Plan Sponsor Transaction, the Restructuring Stipulation, the Disclosure Statement, the Plan, or the Restructuring Transaction, or any other actions taken to effectuate the Plan, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities or other property pursuant to the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, any Definitive Document or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any Claims or Causes of Action with respect to**

Todd Stone divorce litigation, titled **In the Marriage Matter of Todd and Jennifer Stone DC No. 18-02-01705.**

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the releases herein are: (1) essential to the Confirmation of the Plan; (2) in exchange for a substantial contribution and the good and valuable consideration provided by the Released Parties that is important to the success of the Plan; (3) a good faith settlement and compromise of the Claims released by the Releasing Parties; (4) in the best interests of the Debtors and all Holders of Claims and Interests; (5) fair, equitable and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released by the releases herein against any of the Released Parties.

  e.  Exculpation (Article IX.F)

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur any liability for, and each Exculpated Party is hereby released and exculpated from any Claims or Cause of Action for, any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions (including the RBL Facility), the Disclosure Statement, the Plan, the Plan Supplement, the Restructuring Stipulation, the Plan Sponsor Transaction and any actions taken to effectuate the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Releasing Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property, assets, and interest under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects the Exculpated Parties shall be

entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

    f.   Injunction (Article IX.G)

Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan shall be discharged pursuant to the Plan, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Released Parties, or the Exculpated Parties (to the extent of the exculpation provided pursuant to the Plan with respect to the Exculpated Parties):  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or interest in property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or interest in property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or

**Consummation of the Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article IX.G.**

## VII.    **Implementation of the Plan**.

16.    The Debtors are authorized to consummate the Plan after the entry of this Confirmation Order subject to satisfaction or waiver of the conditions precedent to the Effective Date as set forth in the Plan. The Debtors or the Reorganized Acquired Debtors, as applicable, are hereby authorized, immediately upon entry of this Confirmation Order, to enter into and effectuate the Restructuring Transactions and may take any actions as may be necessary or appropriate to effect the Plan Sponsor Transaction. To the extent not approved by the Court previously, entry of this Confirmation Order shall be deemed approval of the Restructuring Transactions (including the transactions and related agreements contemplated thereby, including by the RSA, the Restructuring Stipulation, the Plan Sponsor Agreement, as the same may be modified in accordance with their terms from time to time prior to the Effective Date), and all actions to be taken, undertakings to be made, are hereby effective and authorized to be taken.

17.    Under section 1142(b) of the Bankruptcy Code and applicable nonbankruptcy law, no action of the directors, partners, managers, members, or equity holders of the Debtors, the Reorganized Acquired Debtors, or the Plan Sponsor, as applicable, is required to authorize the Debtors, the Reorganized Acquired Debtors, and the Plan Sponsor, as applicable, to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan, the Restructuring Transactions (including the Plan Sponsor Transaction), and any contract, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan and the Restructuring Transactions (including

the Plan Sponsor Transaction), and each of the Definitive Documents will be a legal, valid, and binding obligation of the Debtors or the Reorganized Acquired Debtors, as applicable, enforceable against the Debtors and the Reorganized Acquired Debtors in accordance with the respective terms thereof.

18. Subject to the terms of the RSA and the Restructuring Stipulation, the Debtors are also authorized from and after the date hereof to negotiate, execute, issue, deliver, implement, file, or record any contract, instrument, release, or other agreement or document or take any action necessary or appropriate to implement the transactions contemplated by the Plan.

19. This Confirmation Order shall constitute all authority, approvals, and consents required, if any, by the laws, rules, and regulations of all states and any other governmental authority or any contract to which any of the Debtors are party with respect to the implementation or Consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts and transactions referred to in or contemplated by the Plan, the Plan Supplement, the Disclosure Statement, and any documents, instruments, securities, or agreements provided for therein, and any amendments or modifications thereto.

20. Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized and directed to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring Transactions (including the Plan Sponsor Transaction), and this Confirmation Order.

**VIII.   Cancellation of Instruments**.

21. On the Effective Date, except as otherwise specifically provided for in the Plan: (a) the obligations of any Debtor under any certificate, share, membership or limited partner interest, note, bond, indenture, purchase right, or other instrument or document, directly or

indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or portfolio interest in the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest shall be canceled and deemed surrendered as to the Debtors and shall not have any continuing obligations thereunder; (b) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, operating agreements, partnership agreements or certificates or articles of incorporation or formation or similar documents governing the equity interests, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, discharged, settled, and compromised; and (c) the Intercreditor Agreement and any other similar intercreditor agreements or contracts shall be canceled and the parties thereto shall not have any continuing obligations thereunder.

**IX.     Release of Liens**.

22.     Except as otherwise specifically provided in the Plan, and without limitation to the terms of the RBL Contingent Value Rights, the RBL Contingent Value Rights Memorandum, the Term Loan Contingent Value Rights, and the Term Loan Contingent Value Rights Memorandum, on the Effective Date, all Liens on any property, assets or interests of any Debtors shall automatically terminate, all property, assets and interests subject to such Liens shall be automatically released, and all guarantees of any Debtors shall automatically be discharged and released.

**X.     Valid Transfer; No Liability**.

23.     The transfer to the Plan Sponsor of the Debtors' rights, title, and interest in the Assets pursuant to the Plan Sponsor Agreement shall be, and hereby is deemed to be, a legal,

valid, and effective transfer of the Debtors' rights, title, and interest in the Assets, except with respect to the Assets of the Acquired Debtors, which shall vest in the Reorganized Acquired Debtors, in either case notwithstanding any requirement for approval or consent by any person, and all rights, title, and interest of the Debtors in the Assets shall vest with or will vest in the Plan Sponsor or the applicable Reorganized Acquired Debtor free and clear of all Claims of any kind or nature whatsoever (other than the Assumed Liabilities), including, without limitation (except to the extent specifically set forth herein), any restrictions on transfer, Preferential Purchase Rights, rights of first refusal, or any other consent rights set forth in an Executory Contract.

24.     Except as expressly provided in the Plan Sponsor Agreement, the other documents entered into in connection therewith, the Plan, or by this Confirmation Order, all Persons and Entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants, non-Debtor parties to the Assumed Contracts and Leases, and other persons holding Claims or Liens of any kind or nature whatsoever against or in the Debtors or the Debtors' interests in the Assets (whether known or unknown, legal, or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, whether imposed by agreement, understanding, law, equity, or otherwise) shall be and hereby are forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing or taking any other action against the Plan Sponsor, the Reorganized Acquired Debtors, the Plan Sponsor's or the Reorganized Acquired Debtors' respective affiliates, successors, assigns, equity holders, directors, officers, employees, or professionals, the Assets, or the interests of the Debtors, the Reorganized Acquired Debtors, or the Plan Sponsor in such Assets based on any Claims,

Interests, Liens, or other encumbrances to the extent such Claims, Interests, Liens, or encumbrances are released or discharged pursuant to the Plan, including any Claims arising under or out of, in connection with, or in any way relating to, the transfer of the Debtors' interests in the Assets to the Plan Sponsor. Following the Closing, no holder of a Claim against the Debtors (other than Assumed Liabilities) shall interfere with the Plan Sponsor's or the Reorganized Acquired Debtors' title to or use and enjoyment of the Debtors', the Reorganized Acquired Debtors', or the Plan Sponsor's interest in the Assets based on or related to such Claim. All Persons and Entities are hereby enjoined from taking action that would interfere with or adversely affect the ability of the Debtors to transfer the Assets or issue the Reorganized Acquired Debtor Interests in accordance with the terms of the Plan Sponsor Agreement, the Plan, and this Confirmation Order.

25.     On the Closing Date, this Confirmation Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Debtors' rights, title, and interest in the Assets or a bill of sale transferring good and marketable title in such Assets to the Plan Sponsor, except with respect to the assets of the Acquired Debtors, which shall revest in the Reorganized Acquired Debtors, pursuant to the terms of the Plan Sponsor Agreement and the Plan, in each case free and clear of all Claims (other than Assumed Liabilities).

26.     All counterparties to the Assumed Contracts and Leases shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Plan Sponsor, any instruments, applications, consents, or other documents which may be required by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the sale of the Assets and assignment of the Assumed Contracts and Leases (if applicable).

27.     All entities (other than holders of Assumed Liabilities) that are presently, or on the Closing Date may be, in possession of some or all of the Assets are hereby directed to surrender possession of the Assets to the Plan Sponsor or the applicable Reorganized Acquired Debtor as of the Closing Date.  The Debtors shall use commercially reasonable efforts to assure that all persons that are presently, or on the Closing Date may be, in possession of some or all of the Assets surrender possession of the Assets to either the Debtors before the Closing Date or the Plan Sponsor (or its designee) or the applicable Reorganized Acquired Debtor on or after the Closing Date.

28.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Plan Sponsor Transaction.  The Debtors and the Plan Sponsor waive, and hereby shall be deemed to have waived, any requirement of compliance with, and any claims related to non-compliance with, the provisions of any bulk sales, bulk transfer, or similar law of any jurisdiction that may be applicable.  Except as otherwise provided in the Plan Sponsor Agreement or the other Transaction Documents (as defined in the Plan Sponsor Agreement), no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment is due to any person in connection with the Plan Sponsor Agreement, the other Transaction Documents, or the transactions contemplated thereunder or under the Plan for which the Plan Sponsor is or will become liable.

**XI.     Enforceability of Plan**.

29.     Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code, upon the Effective Date, the provisions of this Confirmation Order and the Plan shall apply and be binding and enforceable notwithstanding any otherwise applicable nonbankruptcy law.

## XII.  Continued Effect of Stays and Injunctions.

30.     Unless otherwise provided in the Plan or this Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court that is in existence upon entry of this Confirmation Order shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms.

## XIII.  Good Faith.

31.     The Plan Sponsor is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and is therefore entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.  The Plan Sponsor has proceeded in good faith in all respects in connection with this proceeding.

32.     Neither the Debtors nor the Plan Sponsor engaged in any conduct that would cause or permit the Plan Sponsor Agreement or the consummation of the Plan Sponsor Transaction to be avoided, or costs or damages to be imposed, under Bankruptcy Code section 363(n) or any other applicable law, and the consideration provided by the Plan Sponsor for the Plan Sponsor Transaction under the Plan Sponsor Agreement shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.  Accordingly, the Plan Sponsor Transaction may not be avoided, or costs or damages imposed or awarded under Bankruptcy Code section 363(n) or any other provision of the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, or any other similar applicable laws.

## XIV.   Provision Regarding Certain Surety Indemnity Agreements.

33.     Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the releases set forth in Article IX of the Plan do not release any Claims or Causes or Action with respect to any indemnity agreements in favor of RLI Insurance Company ("RLI Insurance"), Munich Reinsurance America, Inc., or Evergreen National Indemnity Company.

## XV.    Reservation of Rights in Favor of Governmental Units; Federal Lease Interests.

34.     Notwithstanding anything to the contrary in this Confirmation Order, the Plan, the Plan Supplement, or any exhibits to the Plan or, with respect to the foregoing, any of their respective implementing documents (collectively, for purposes of paragraphs 34 and 35 of this Confirmation Order, the "Confirmation Documents"), nothing shall release, discharge, limit, preclude, or enjoin:   (a) any liability to any "Governmental Unit" (as defined in 11 U.S.C. § 101(27)) that is not a Claim as set forth in 11 U.S.C. § 101(5); (b) any Claim of a Governmental Unit arising on or after the Effective Date; (c) any liability to a Governmental Unit on the part of any non-Debtor; (d) any police or regulatory liability to a Governmental Unit that any Entity would be subject to as an owner or operator of property after the Effective Date; (e) any obligations to a Governmental Unit under the Debtors' interests in any Federal Leases (as defined below) assumed under the Plan; and/or (f) any right of setoff or recoupment by any Governmental Unit, all of which are expressly preserved; *provided* that the foregoing shall not, and nothing in this Confirmation Order or the Plan shall, limit, diminish or otherwise alter the Debtors', the Reorganized Acquired Debtors', or the Plan Sponsor's defenses, Claims, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the matters described in (a)–(e) above or any other Claims, Causes of Action, or rights of Governmental Units; *provided further* that nothing in the Confirmation Documents shall divest any tribunal of jurisdiction to adjudicate the matters described in (a)–(e) above or any other Claims, Causes of Action, or rights of Governmental Units.

Nothing in the Confirmation Documents shall exculpate any third party or non-Debtor Entity from any liability owed to, or Claim, action, proceeding, or Cause of Action of the United States, or a State, except to the extent that such non-Debtor is exculpated for acting in its fiduciary capacity to the Estates as explicitly provided for in the Bankruptcy Code; *provided, however*, that nothing in the Confirmation Documents shall exculpate any Entity or party with respect to any violation of any laws intended to protect the public health and safety or any liability under environmental laws.

35.    The United States Department of the Interior (the "Interior") consents to the Debtors' (including, as applicable, any Reorganized Acquired Debtor's) assumption of the Debtors' interests in their Federal Leases (as defined below).  Nothing in the Confirmation Documents shall be construed as a compromise or settlement of any Claim, interest, or Cause of Action of the United States under the Federal Leases or affect the treatment of any interest in contracts, leases, covenants, operating rights agreements, rights-of-use and easement, and rights-of-way or other interests or agreements with the federal government involving federal land or minerals (collectively, the "Federal Lease(s)"). Notwithstanding anything to the contrary in the Confirmation Documents, upon the date of entry of this Confirmation Order, the Debtors (including, as applicable, the Reorganized Acquired Debtors) shall assume all of, and shall not abandon or otherwise reject, the Debtors' current or former interests in any Federal Leases.  On the Effective Date, the Federal Leases shall be assumed by the Debtors pursuant to 11 U.S.C. § 365.  Upon any assumption of the Federal Leases, the Plan Sponsor and/or the Reorganized Acquired Debtors, as applicable, shall assume and/or succeed to all financial assurance, bonding, maintenance and monitoring, reclamation, decommissioning, plugging and abandonment and other obligations related to the Federal Leases.  Nothing in the Confirmation Documents shall be interpreted to release the Debtors, Reorganized Acquired Debtors, or Plan Sponsor from any

reclamation, plugging and abandonment, or other operational requirement under applicable Federal laws or to address, or otherwise affect, any decommissioning obligations, financial assurance or other regulatory or contractual requirements under the Federal Leases, as determined by the United States, that must be met by the Debtors, the Reorganized Acquired Debtors, the Plan Sponsor, or their successors and assigns with respect to the Federal Leases.  Notwithstanding anything to the contrary in the Confirmation Documents or in any Cure Notices contemplated by, or associated with, the Confirmation Documents, nothing therein shall be interpreted to set cure amounts, and any amounts owing under the Federal Leases shall be promptly paid when due in the ordinary course subject to applicable non-bankruptcy laws, regulations and administrative procedures.  If the Debtors, the Reorganized Acquired Debtors, or the Plan Sponsor, as applicable, do not timely pay amounts owing on account of Federal Leases when due in the ordinary course pursuant to applicable non-bankruptcy laws, regulations and administrative procedures, the Debtors, the Reorganized Acquired Debtors, and/or the Plan Sponsor, as applicable, will pay late payment charges on the untimely payment at the rate established in 30 C.F.R. § 1218.54 to the fullest extent permitted by applicable non-bankruptcy laws and regulations.  For the avoidance of any doubt, and notwithstanding anything to the contrary in the Confirmation Documents, the assumption of any the Debtors' interests in the Federal Leases shall not release any monetary or non-monetary obligations that are owing by the Debtors, the Reorganized Acquired Debtors, and/or the Plan Sponsor as applicable, under applicable laws and regulations on account of such Federal Leases.  Notwithstanding any provision to the contrary in the Confirmation Documents, the United States and/or its respective delegees will retain, and have, the right to audit and/or perform any compliance review and, if appropriate, collect from the Debtors, the Reorganized Acquired Debtors, the Plan Sponsor, and/or their successor(s) and assign(s) under the Federal

Leases, any monies that the Debtors or the Reorganized Acquired Debtors are later determined to owe for periods prior to the assumption of the Federal Leases without those rights being adversely affected by the Chapter 11 Cases.  Such rights shall be preserved in full as if the Chapter 11 Cases had not occurred.  The Debtors, the Reorganized Acquired Debtors, the Plan Sponsor, and their successors and assigns, as applicable, will each individually retain all defenses and/or rights, other than defenses and/or rights arising from the Chapter 11 Cases, to challenge any such determination; *provided, however*, that any such challenge, including any challenge associated with the Chapter 11 Cases, must be raised in the United States' administrative review process leading to a final agency determination by the Interior.  The audit and/or compliance review period shall remain open for the full statute of limitations period established by the Federal Oil and Gas Royalty Simplification and Fairness Act of 1996, 30 U.S.C. § 1701, *et seq*.  For the avoidance of any doubt, but subject to and without limiting the requirements otherwise set forth in this paragraph, pending compliance reviews, including ongoing Compliance Review No. 10076944, shall be preserved and continue in an administrative proceeding until a final determination has been made by the Interior, and all parties reserve their rights in the administrative process with respect to such compliance reviews.   To the extent that anything in the Confirmation Documents conflict with this paragraph 35, the terms of this paragraph shall expressly supersede and control.

**XVI.   Provision Regarding CyrusOne LLC**.

36.   The Master Services Agreement between Arena Energy and CyrusOne LLC ("CyrusOne"), dated October 27, 2016,  along with any order forms thereunder, shall be assumed by the Debtors.  Any amounts outstanding on account of unpaid invoices, including the invoices dated August 3, 2020, in the amount of $3,662.17, and September 1, 2020, in the amount of $3,662.17, shall be paid in accordance with the terms of the Plan Sponsor Agreement by the applicable Reorganized Acquired Debtor to CyrusOne as a cure pursuant to the assumption.

**XVII. Provision Regarding Seismic Data of Seitel Data, Ltd. and CGG Land (U.S.) Inc.**

37. Notwithstanding anything in the Plan, any Plan Supplement, or this Confirmation Order to the contrary, (a) all Executory Contracts, including, but not limited to, all Master Licensing Agreements and all supplements, amendments, schedules and attachments thereto (collectively, the "Seitel and CGG Agreements") between any of the Debtors, on the one hand, and Seitel Data, Ltd., Seitel Offshore Corp., Seismic Enterprises Mexico, S. de R.L. de C.V. and other affiliates (collectively, "Seitel") or CGG Land (U.S.) Inc. f/k/a CGGVeritas Land (U.S.) Inc. ("CGG"), on the other hand, shall be and hereby are rejected pursuant to section 365 of the Bankruptcy Code as of the date of entry of this Confirmation Order, (b) to the extent necessary, the automatic stay under section 362 of the Bankruptcy Code is hereby modified to permit the termination of the Seitel and CGG Agreements, and (c) the Debtors shall comply with all confidentiality provisions, destruction of data, and verification of destruction of data provisions required by the Seitel and CGG Agreements. Notwithstanding the foregoing, the rejection of the Seitel and CGG Agreements shall be subject to the agreement by Seitel or CGG, as applicable, and the Plan Sponsor, or the determination by the Bankruptcy Court, of any Claim arising from such rejection in an amount acceptable to the Plan Sponsor. In the event there is no agreement between Seitel or CGG, as applicable, and the Plan Sponsor with respect to any such Claim and the Bankruptcy Court determines such Claim to be in amount that is not acceptable to the Plan Sponsor, the Plan Sponsor may seek to assume such Seitel and CGG Agreements, in which case Seitel or CGG, as applicable, shall have a reasonable opportunity to object to such assumption, including any required cure amount associated therewith.

**XVIII. Provision Regarding Certain Employee Agreements**.

38. As of the Effective Date, Arena Energy shall assume the agreements set forth in **Exhibit C** to this Confirmation Order.

XIX. **Provision Regarding Certain Seismic and Geological Counterparties**.

39.     Notwithstanding anything in the Plan, the Plan Supplement, any schedule of Assumed Contracts and Leases, any schedule of Rejected Contracts and Leases, or this Confirmation Order, (i) the transfer under the Plan of any seismic, geological, or geophysical data, derivatives, or interpretations thereof, or of intellectual property (collectively, the "Materials") owned by (a) WesternGeco LLC or its affiliates, (b) Fairfield Industries Incorporated d/b/a Fairfield Geotechnologies f/k/a FairfieldNodal or its affiliates, (c) TGS-NOPEC Geophysical Company ASA, TGS-NOPEC Geophysical Company, A2D Technologies, Inc., d/b/a TGS Geological Products and Services, successor to A2D LP, or their affiliates, (d) Petroleum Geo-Services, Inc., successor to Diamond Geophysical Service Corporation, Multiklient Invest AS, or their affiliates, and/or (e) Geophysical Pursuit, Inc. or its affiliates (collectively, the "Seismic and Geological Counterparties"); and/or (ii) the assumption, assumption and assignment, rejection, modification, termination, or release (including the validity and applicability of the provisions of the Plan with respect to any change in ownership or control provisions) under the Plan of any master license agreement, license agreement, and/or supplemental or related agreements between any of the Seismic and Geological Counterparties and any Debtor (the "Seismic or Geological Agreements"), in each case, shall remain subject to a subsequent court order after notice to the applicable Seismic and Geological Counterparty and an opportunity to respond; *provided, however*, that the Reorganized Acquired Debtors are authorized to continue operating under the Seismic or Geological Agreements (including the use of the Materials and any intellectual property thereunder) in the ordinary course of business (without the payment of any change in ownership or control fees) until the earliest of (x) sixty (60) days from the entry of the Confirmation Order or such later date as may be agreed between the Reorganized Acquired Debtors and the applicable Seismic and Geological Counterparty and

(y) the date such agreements are deemed assumed, assumed and assigned, rejected, or terminated, in which case, the order authorizing such assumption, assumption and assignment, rejection, or termination, when final, shall govern with respect to all matters provided for therein, including any continued operation under the applicable Seismic or Geological Agreement; *provided further* that all rights and defenses of the Debtors, the Reorganized Acquired Debtors, the Plan Sponsor, and the Seismic and Geological Counterparties under non-bankruptcy and bankruptcy law, and all objections of the Seismic and Geological Counterparties (and the Debtors', the Reorganized Acquired Debtors', and the Plan Sponsor's rights and defenses with respect thereto) to the terms of the Plan, insofar as they should relate or be applied to the Seismic and Geological Counterparties and regarding assumption or assumption and assignment (including all rights and defenses under section 365 of the Bankruptcy Code and with respect to the validity and enforceability of change in ownership and control provisions and whether any of the Materials constitute intellectual property), are reserved and preserved with respect to such Seismic or Geological Agreements.

## XX. **Provision Regarding Exxon Mobile Corporation**.

40. Notwithstanding anything to the contrary in the Plan or this Confirmation Order, neither the Plan nor the Confirmation Order shall have any effect upon or in any manner alter or impair Exxon's,[5] the Debtors', or the Plan Sponsor's rights and interests pursuant to the following: (a) that certain Purchase and Sale Agreement among Exxon and Pipeline, as sellers, and Arena Energy, as buyer, effective June 1, 2011 (the "Eugene Island PSA"), (b) that certain Financial Security/Abandonment Funding Agreement executed pursuant to the Eugene Island PSA, effective

---

[5] For purposes of this Confirmation Order, the terms "Exxon" and "Exxon Entities" shall mean and include one or more, as applicable, of Exxon Corporation, Exxon Mobil Corporation, Exxon Mobil Pipeline Company ("Pipeline"), Exxon Mobil Oil Corporation, Exxon Mobil Gas & Power Marketing, Exxon Mobil Production, Exxon Co. USA, Exxon Production Co., Exxon Energy, Inc., Exxon Mobil Exploration Co., XTO Energy, Inc., XTO Holdings, LLC, XH, LLC, and any parent, subsidiary or affiliate of any such entities.

June 1, 2011, among Exxon, Pipeline, and Arena Energy (the "Funding Agreement"), (c) that certain Escrow Agreement executed pursuant to the Funding Agreement, effective June 1, 2011, among Exxon, Arena Energy, and Wells Fargo, National Association, as escrow agent (the "Eugene Escrow Agreement"), (d) Performance Bond No. RLB 0015909 ("Performance Bond 1") issued pursuant to the Funding Agreement, effective June 1, 2011, among Arena Energy, as principal, Exxon, as obligee, and RLI Insurance, as surety, (e) Performance Bond No. RLB 0013842 ("Performance Bond 2") also issued pursuant to the Funding Agreement, effective June 1, 2011, among Arena Energy, as principal, Exxon, as obligee, and RLI Insurance, as surety, as amended by Rider No. 1 dated as of December 18, 2014, (f) that certain Purchase and Sale Agreement, effective January 1, 2019, among Exxon and Pipeline, as sellers, and Arena Energy, as buyer (the "GOM PSA"), and (g) Performance Bond SUR 0056455 ("Performance Bond 3" and, together with Performance Bond 1 and Performance Bond 2, the "Exxon Performance Bonds") issued pursuant to the GOM PSA, dated as of July 16, 2019, among Arena Energy, as principal, Exxon, as obligee, and Argonaut Insurance Company, as surety. Except as expressly provided in the immediately following paragraph, all of Exxon's rights, remedies, and Claims pursuant to the Eugene Island PSA, the Funding Agreement, the Eugene Escrow Agreement, the GOM PSA, and the Exxon Performance Bonds shall be Reinstated under the Plan.

41.    Exxon agrees that each of the Exxon Performance Bonds may be amended by a rider substituting the Plan Sponsor as principal in place of Arena Energy. Otherwise, except as expressly provided in this paragraph, the terms of the Exxon Performance Bonds shall not be altered in any manner, and Exxon's rights pursuant to the Exxon Performance Bonds are unaffected, by either the Plan or this Confirmation Order. Without limiting the generality of the foregoing, nothing in the Plan or Confirmation Order shall preclude Exxon from giving any notice

to, or making any demand upon, the principal on any of the Exxon Performance Bonds to the extent required by the terms of any of the Exxon Performance Bonds, the Eugene Island PSA, the Eugene Escrow Agreement, the GOM PSA, or the Funding Agreement.  In addition, Exxon agrees that a rider may be added to Performance Bond 3 adding Markel Insurance Company as an additional surety.  This will satisfy the requirement of section 8.04(f)(2) of the GOM PSA regarding the credit rating for the surety on Performance Bond 3.

42.     Nothing contained in the Plan or this Confirmation Order shall act to (a) determine any Cure Cost with respect to any of the Exxon Entities, or (b) preclude any netting (either based on setoff or recoupment) in the ordinary course of business by any of the Exxon Entities.

**XXI.    Provision Regarding Certain Texas Taxing Entities**.

43.     Notwithstanding any other provision of the Plan or this Confirmation Order, any allowed Other Secured Claims of the Certain Texas Taxing Entities[6] (the "Allowed Secured Tax Claims"), shall be classified in Class 2 and paid in full in Cash (a) within ten (10) business days after the Effective Date or as soon thereafter as is reasonably practical, or (b) when due according to their terms, whichever occurs later.  The prepetition and postpetition tax liens, including statutory liens and privileges, if any, of the Certain Texas Taxing Entities, shall be expressly retained in accordance with applicable non-bankruptcy law.  The Allowed Secured Tax Claims shall include all accrued interest properly charged in accordance with sections 511, 506(b), and 1129(a)(9)(C) or 1129(a)(9)(D) of the Bankruptcy Code through the date of payment of such Allowed Secured Tax Claims.  In the event of a default in payment of an Allowed Secured Tax Claim as provided for herein, the affected Texas Taxing Entity shall send written notice of default

---

[6]     For purposes of this Confirmation Order, the "Certain Texas Taxing Entities" shall refer to the Cypress-Fairbanks Independent School District, Harris County, Montgomery County, the Woodlands Metro Center Municipal Utility District, and the Woodlands Road Utility District #1.

to the Debtors or Reorganized Acquired Debtors, as applicable, and their counsel.  If such default is not cured within thirty (30) days after such notice of default is mailed, the affected Texas Taxing Entity may proceed with applicable state law remedies for collection of any amounts due.  Any postpetition ad valorem tax liabilities incurred by the Debtor after the Petition Date shall be paid by the Debtors in the ordinary course of business, subject to applicable non-bankruptcy laws including penalty and interest, when due without further notice to of order of this Court.

## XXII.  Provisions Regarding the Texas Comptroller.

44.     The following provisions of this Confirmation Order will govern the treatment of the Texas Comptroller of Public Accounts (the "Texas Comptroller") concerning the duties and responsibilities of the Debtors relating to all unclaimed property presumed abandoned before the Petition Date (the "Texas Unclaimed Property") under Texas Property Code, Title 6, Chapters 72-76 and other applicable Texas laws (the "Texas Unclaimed Property Laws"):

    a. On or within thirty (30) days after the Effective Date, the Debtors shall review their books and records and turn over to the Texas Comptroller any known Texas Unclaimed Property presumed abandoned before the Petition Date and reflected in property reports delivered by the Debtors to the Texas Comptroller under the Texas Unclaimed Property Laws (the "Reported Unclaimed Property").  With respect to such Reported Unclaimed Property, the Texas Comptroller will not seek payment of any interest or penalty by the Debtors.

    b. Notwithstanding section 362 of the Bankruptcy Code and the injunction contained in Article IX.G of the Plan, after the Effective Date, the Texas Comptroller and its agents may commence an audit of the Debtors in accordance with the Texas Unclaimed Property Laws (the "Texas Unclaimed Property Audit") and pursue recovery of any unremitted Texas Unclaimed Property identified pursuant to the Texas Unclaimed Property Audit.  The Debtors shall fully cooperate with the Auditors to enable them to accurately and timely perform the Texas Unclaimed Property Audit by making the entities' employees, professionals, books, and records available.

    c. The Debtors' rights and defenses with respect to any allegations and Claims asserted against the Debtors arising from or relating to the Texas Unclaimed Property Audit are hereby reserved; *provided, however*, that upon agreement between the Debtors and the Texas Comptroller or a final nonappealable determination by a court or other tribunal with jurisdiction as to the amount of

unremitted Texas Unclaimed Property, if any, that is due in connection with the Texas Unclaimed Property Audit, the Debtors shall turn over such unremitted Texas Unclaimed Property to the Texas Comptroller.

d.  The Texas Comptroller may file or amend any Proofs of Claim in the Chapter 11 Cases following the Effective Date as a result of the filing of any property reports or in the ordinary course of the Unclaimed Property Audit.

e.  Any assets sold or transferred following entry of this Confirmation Order and the terms of the Plan Sponsor Transaction shall not include unclaimed property held in trust by the Debtors, as defined pursuant to State unclaimed property laws including Texas Property Code, Title 6, Chapter 72-76, and other applicable Texas laws.

f.  Nothing herein precludes the Debtors from compliance with continued obligations pursuant to Texas Unclaimed Property Laws.

## XXIII. Provision Regarding the Targa Entities.

45.     Nothing in this Confirmation Order, the Plan, or the Plan Supplement shall prejudice or operate as a bar or adjudication of any rights, interests, Claims, defenses, objections or remedies that the Debtors, the Plan Sponsor, and/or Targa Midstream Services LLC ("Targa Midstream") and Venice Energy Services Company, L.L.C. ("Venice Energy" and, together with Targa Midstream, the "Targa Entities") have, may have, assert or may assert in relation to the Targa Dedication (as defined below).  Further, nothing in this Confirmation Order, the Plan, or the Plan Supplement shall prejudice or impair the Targa Dedication, to the extent applicable, in and to any of the Debtors' or the Plan Sponsor's property and assets (if any), and nothing in this Confirmation Order, the Plan, or the Plan Supplement shall impair, alter, abrogate, limit, reduce, strip, or otherwise negatively or adversely affect any of the Targa Entities' rights and interests (if any) under the Targa Dedication, to the extent applicable.  All rights, interests, Claims, defenses, objections, and remedies of the Debtors, the Plan Sponsor, and the Targa Entities in relation to the validity, priority, and extent of the Targa Dedication are reserved.  In the event of any conflict between this paragraph, on the one hand, and the Plan, the Plan Supplement, or any prior Bankruptcy Court order, on the other hand, the provisions of this paragraph shall control.

62

The Targa Entities provide processing and related services to Arena Energy pursuant to various contracts including, but not limited to:  (i) the Gas Processing Agreement between Arena Energy and Targa Midstream effective as of August 1, 2019; (ii) the Gas Processing Agreement between Arena Energy and Venice Energy effective as of April 1, 2013, as assigned; (iii) the Gas Processing Agreement (Venice Gas Process Plant) between Arena Energy and Venice Energy effective as of November 1, 1996, as amended and assigned; (iv) the Gas Processing Agreement (Venice Gas Process Plant) between Arena Energy and Venice Energy effective as of August 1, 2008; and (v) the Successor Natural Gas Processing Agreement (Gulf of Mexico) between Arena Energy and Targa Midstream effective as of December 1, 2012 (collectively, the "Targa Agreements").  Each of the Targa Agreements includes a dedication as more fully set forth in the Targa Agreements (the "Targa Dedication").

**XXIV. Provision Regarding Fieldwood Energy LLC**.

46.     Notwithstanding anything in the Plan, any Plan Supplement, or this Confirmation Order to the contrary, all agreements (collectively, the "Assumed Fieldwood Agreements") by and among Arena Energy, on the one hand, and Fieldwood Energy LLC or Fieldwood Energy SP LLC (collectively, "Fieldwood"), on the other hand, including that certain Offshore Operating Agreement dated as of November 1, 2004 (as amended from time to time, including by the Assignment Agreement and Amendment to Operating Agreements, dated May 5, 2006, among Arena Energy f/k/a Arena Energy LLC ("Arena LLC"), Arena Offshore, LLC ("AOL") and SPN Resources, LLC ("SPN"), the Second Amendment to Operating Agreements, dated July 12, 2007, among Arena Energy f/k/a Arena LLC, AOL, and SPN, the Third Amendment to Operating Agreements, dated July 12, 2007, among Arena Energy f/k/a Arena LLC, AOL, and SPN, and the Amendment to Operating Agreement, dated August 1, 2010, among SPN, Dynamic Offshore Resources, LLC, Arena Energy, and Arena Offshore, LP, and as may be further amended,

supplemented, or modified from time to time, the "WD 85/86 Operating Agreement"), shall be assumed by Arena Energy on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code.

47.     Arena Energy asserts that the Cure Costs owed under each of the Assumed Fieldwood Agreements (including the WD 85/86 Operating Agreement) is $0.00 (the "Proposed Fieldwood Cure Costs").  Pursuant to the *Objection of Fieldwood to Confirmation of the Joint Prepackaged Chapter 11 Plan of Arena Energy, LP and its Debtor Affiliates* [Docket No. 189] (the "Fieldwood Objection"), Fieldwood asserts that the Cure Costs owed under the WD 85/86 Operating Agreement are approximately $2,039,126.90, plus interest, attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

48.     Following the Effective Date, Arena Energy and Fieldwood shall work in good faith to resolve any dispute regarding the Proposed Fieldwood Cure Costs (the "Cure Disputes"). If any Cure Disputes are not resolved by the parties within twenty (20) days after the Effective Date, any such Cure Disputes shall be adjudicated by this Bankruptcy Court after notice and a hearing.  In such case, Fieldwood and Arena Energy will jointly request that this Bankruptcy Court hold an evidentiary hearing regarding the Cure Costs set forth in the Fieldwood Objection no later than forty-five (45) days after the Effective Date (unless otherwise agreed in writing by the parties), or as soon thereafter as the Bankruptcy Court's calendar permits.  Fieldwood reserves the right to amend the amount of asserted Cure Costs owed to Fieldwood.  The rights of Fieldwood, the Debtors, and the Plan Sponsor with respect to the Assumed Fieldwood Agreements or any Claims or Causes of Action between Fieldwood and the Debtors are fully reserved in all respects.

**XXV.  Provision Regarding Regions Bank and DNB Capital LLC.**

49.     The terms of the *Stipulation and Agreed Order Regarding Regions Bank's Objection to Debtors' Disclosure Statement and Chapter 11 Plan Pursuant to Bankruptcy*

*Rules 3018(a) and 9019* [Docket No. 218] and the *Stipulation and Agreed Order Regarding DNB Capital LLC's Objection to Debtors' Proposed Chapter 11 Plan of Reorganization Pursuant to Bankruptcy Rules 3018(a) and 9019* [Docket No. 219] are incorporated herein by reference, and are an integral part of this Confirmation Order.

**XXVI. Provision Regarding Certain Professionals**.

50.    To the extent a professional utilized by the Debtors in the ordinary course of business in matters unrelated to the Chapter 11 Cases holds a prepetition advance payment retainer, such professional is authorized without further order of the Bankruptcy Court to apply amounts from the prepetition advance payment retainer to compensate and reimburse the professional for fees or expenses incurred on or prior to the Petition Date consistent with its ordinary course billing practice.

**XXVII. Miscellaneous**.

51.    After the Effective Date, the Debtors or the Reorganized Acquired Debtors, as applicable, shall have no obligation to file with the Bankruptcy Court or serve on any parties reports that the Debtors or the Reorganized Acquired Debtors, as applicable, were obligated to file under the Bankruptcy Code or a Bankruptcy Court order, including monthly operating reports (even for those periods for which a monthly operating report was not Filed before the Effective Date), ordinary course professional reports, reports to any parties otherwise required under the "first" and "second" day orders entered in the Chapter 11 Case, including the Final Cash Collateral Order, and monthly or quarterly reports for Professionals; *provided*, *however*, that the Debtors or the Reorganized Acquired Debtors, as applicable, will comply with the U.S. Trustee's quarterly reporting requirements.

52.    Except as otherwise set forth herein, this Bankruptcy Court retains jurisdiction over all matters arising out of or related to the Chapter 11 Cases and the Plan, including without

65

limitation matters pertaining to the assumption or assumption and assignment of any of the Seismic or Geological Agreements and the matters set forth in Article XI of the Plan.

53.     Notwithstanding the possible applicability of Bankruptcy Rules 3020(e), 6004(h), 6006(d), 7062, 9014, or otherwise, (a) the terms and conditions of this Confirmation Order shall be effective and enforceable immediately upon its entry, (b) the Debtors are not subject to any stay of this Confirmation Order or the implementation, enforcement, or realization of the relief granted in this Confirmation Order, and (c) the Debtors are authorized to take any action and perform any act authorized under this Confirmation Order without delay.

54.     Each term and provision of the Plan, and the transactions related thereto as it heretofore may have been altered or interpreted by the Bankruptcy Court is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified except as provided by the Plan or this Confirmation Order; and (c) nonseverable and mutually dependent.

55.     The provisions of this Confirmation Order, the Plan, and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

56.     Subject to the terms of the Plan and the RSA, the Debtors are hereby authorized to amend or modify the Plan at any time prior to the Consummation of the Plan, but only in accordance with section 1127 of the Bankruptcy Code and Article XI.A of the Plan, without further order of this Bankruptcy Court.

Signed: September 25, 2020

Marvin Isgur
United States Bankruptcy Judge

<u>**Exhibit A**</u>

**Plan**

> **THE PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL ONCE THE DEBTORS FILE CHAPTER 11 UNDER THE BANKRUPTCY CODE. THE INFORMATION IN THE PLAN IS SUBJECT TO CHANGE. THIS PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES. THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ARENA ENERGY, LP, *et al.*,[1] | ) | Case No. 20-[_____] (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DEBTORS' JOINT PREPACKAGED PLAN
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Genevieve Graham (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
Victoria Argeroplos (TX Bar No. 24105799)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4200
Facsimile:    (713) 752-4221

Email:    mcavenaugh@jw.com
          ggraham@jw.com
          vpolnick@jw.com
          vargeroplos@jw.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian Schartz, P.C. (TX Bar No. 24099361)
609 Main Street
Houston, Texas 77002
Telephone:    (713) 836-3600
Facsimile:    (713) 836-3601
Email:        brian.schartz@kirkland.com

-and-

Gregory F. Pesce (*pro hac vice* admission pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        gregory.pesce@kirkland.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are:  Arena Energy, LP (1436); Arena Energy 2020 GP, LLC (N/A); Arena Energy GP, LLC (7454); Arena Exploration, LLC (1947); Sagamore Hill Holdings, LP (8266); and Valiant Energy, L.L.C. (7184).  The location of the debtors' service address is:  2103 Research Forest Drive, Suite 400, The Woodlands, Texas 77380.

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ..................................................................................................................1

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
      AND GOVERNING LAW**..................................................................................1
**A.**     Defined Terms.................................................................................................1
**B.**     Rules of Interpretation...................................................................................10
**C.**     Computation of Time.....................................................................................11
**D.**     Governing Law..............................................................................................11
**E.**     Reference to Monetary Figures. ....................................................................11
**F.**     Controlling Document....................................................................................11

**ARTICLE II. ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY
      TAX CLAIMS** ...............................................................................................11
**A.**     Administrative Claims....................................................................................11
**B.**     Professional Compensation. ..........................................................................12
**C.**     Priority Tax Claims........................................................................................13
**D.**     U.S. Trustee...................................................................................................13
**E.**     Costs and Expenses of the RBL Facility Agent. .............................................13
**F.**     Costs and Expenses of the Consenting Term Loan Lenders. ...........................13

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**...............13
**A.**     Summary of Classification. ............................................................................13
**B.**     Treatment of Claims and Interests..................................................................14
**C.**     Special Provision Governing Unimpaired Claims............................................18
**D.**     Elimination of Vacant Classes........................................................................18
**E.**     Voting Classes; Presumed Acceptance by Non-Voting Classes. ......................18
**F.**     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code..................18
**G.**     Subordinated Claims. ....................................................................................18

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ....................................................19
**A.**     General Settlement of Claims.........................................................................19
**B.**     Sources of Plan Consideration. ......................................................................19
**C.**     The Plan Sponsor Transaction........................................................................19
**D.**     Restructuring Transactions.............................................................................19
**E.**     Payment of Cure Costs and Other Amounts....................................................20
**F.**     Vesting of Assets...........................................................................................20
**G.**     Wind-Down Amount. ....................................................................................20
**H.**     Wind-Down...................................................................................................21
**I.**     Plan Administrator.........................................................................................21
**J.**     Cancellation of Notes, Instruments, Certificates, and Other Documents. ........21
**K.**     Corporate Action. ..........................................................................................21
**L.**     Dissolution of the Boards of the Debtors. .......................................................22
**M.**     Release of Liens.............................................................................................22
**N.**     Effectuating Documents; Further Transactions................................................22
**O.**     Exemption from Certain Taxes and Fees. .......................................................22
**P.**     Causes of Action. ..........................................................................................23
**Q.**     Employee and Retiree Benefits.......................................................................23
**R.**     The Plan Sponsor Equity Election...................................................................23
**S.**     Closing the Chapter 11 Cases. .......................................................................23

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ........24
**A.**     Assumption and Rejection of Executory Contracts and Unexpired Leases .......24

| | | |
|---|---|---|
| B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases. | 24 |
| C. | Cure of Defaults for Assumed Contracts and Leases. | 25 |
| D. | Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. | 25 |
| E. | Indemnification Obligations. | 26 |
| F. | Insurance Policies. | 26 |
| G. | D&O Policies. | 26 |
| H. | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 26 |
| I. | Reservation of Rights. | 26 |
| J. | Nonoccurrence of Effective Date. | 27 |
| K. | Contracts and Leases Entered Into After the Petition Date. | 27 |

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** .......................................................... **27**
| | | |
|---|---|---|
| A. | Timing and Calculation of Amounts to Be Distributed. | 27 |
| B. | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 27 |
| C. | Compliance with Tax Requirements/Allocations. | 29 |
| D. | Allocation of Plan Distributions Between Principal and Interest. | 29 |
| E. | Setoffs and Recoupment. | 29 |
| F. | Claims Paid or Payable by Third Parties. | 29 |
| G. | Indefeasible Distributions. | 30 |

**ARTICLE VII. THE PLAN ADMINISTRATOR AND DISSOLUTION OF THE DEBTORS** .......... **30**
| | | |
|---|---|---|
| A. | The Plan Administrator. | 30 |
| B. | Wind-Down. | 31 |
| C. | Exculpation; Indemnification; Insurance; Liability Limitation. | 32 |
| D. | Tax Returns. | 32 |
| E. | Dissolution of the Debtors. | 32 |

**ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND DISPUTED CLAIMS** ............................................................................................................................ **33**
| | | |
|---|---|---|
| A. | Disputed Claims Process. | 33 |
| B. | Allowance of Claims. | 33 |
| C. | Claims Administration Responsibilities. | 33 |
| D. | Estimation of Claims. | 34 |
| E. | Adjustment to Claims or Interests Without Objection. | 34 |
| F. | Disallowance of Claims or Interests. | 34 |
| G. | No Distributions Pending Allowance. | 34 |
| H. | Distributions After Allowance. | 34 |
| I. | No Interest. | 35 |

**ARTICLE IX. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** .......... **35**
| | | |
|---|---|---|
| A. | Settlement, Compromise, and Release of Claims and Interests. | 35 |
| B. | Discharge of Claims and Termination of Interests. | 35 |
| C. | Release of Liens. | 35 |
| D. | Releases by the Debtors. | 36 |
| E. | Releases by Holders of Claims and Interests. | 37 |
| F. | Exculpation. | 38 |
| G. | Injunction. | 38 |
| H. | Protection Against Discriminatory Treatment. | 39 |
| I. | Recoupment. | 39 |
| J. | Subordination Rights. | 39 |
| K. | Reimbursement or Contribution. | 39 |

**ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE** **39**
| | | |
|---|---|---|
| A. | Conditions Precedent to Confirmation. | 39 |
| B. | Conditions Precedent to the Effective Date. | 39 |
| C. | Waiver of Conditions. | 41 |

| | | |
|---|---|---|
| **D.** | Substantial Consummation. | 41 |
| **E.** | Effect of Non-Occurrence of Conditions to the Effective Date | 41 |

**ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ...... **41**

| | | |
|---|---|---|
| **A.** | Effect of Confirmation on Modifications. | 41 |
| **B.** | Revocation or Withdrawal of the Plan. | 41 |

**ARTICLE XII. RETENTION OF JURISDICTION** ................................................ **42**

**ARTICLE XIII. MISCELLANEOUS PROVISIONS** ............................................ **44**

| | | |
|---|---|---|
| **A.** | Immediate Binding Effect. | 44 |
| **B.** | Additional Documents. | 44 |
| **C.** | Payment of Statutory Fees. | 44 |
| **D.** | Dissolution of Statutory Committees. | 44 |
| **E.** | Reservation of Rights. | 44 |
| **F.** | Successors and Assigns. | 44 |
| **G.** | Service of Documents. | 45 |
| **H.** | Enforcement of Confirmation Order. | 46 |
| **I.** | Term of Injunctions or Stays. | 46 |
| **J.** | Entire Agreement. | 46 |
| **K.** | Exhibits. | 46 |
| **L.** | Nonseverability of Plan Provisions. | 46 |
| **M.** | Votes Solicited in Good Faith. | 47 |
| **N.** | Waiver. | 47 |

## INTRODUCTION

Capitalized terms used in this prepackaged chapter 11 plan shall have the meanings set forth in Article I.A. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of the Plan, the Restructuring Transactions, and certain related matters.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

**A.      Defined Terms.**

As used in the Plan, capitalized terms have the meanings and effect as set forth below.

1.      "*Acquired Debtor*" means any Debtor with respect to which the equity thereof is acquired (directly or indirectly) by the Plan Sponsor pursuant to the Plan Sponsor Equity Election.

2.      "*Administrative Claim*" means any Claim against any of the Debtors for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates; (b) Allowed Professional Fee Claims; and (c) all fees and charges assessed against the Estates pursuant to chapter 123 of title 28 of the United States Code.

3.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

4.      "*Allowed*" means, with reference to any Claim or Interest, (a) any Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (b) any Claim or Interest expressly allowed under the Plan. Notwithstanding anything to the contrary herein, the Debtors or the Plan Sponsor, as applicable, shall retain all claims and defenses with respect to Allowed Claims Reinstated or otherwise Unimpaired pursuant to the Plan. "*Allow*" and "*Allowing*" shall have correlative meaning.

5.      "*Assets*" shall have the meaning assigned to it in the Plan Sponsor Agreement.

6.      "*Assumed Contracts and Leases*" means those Executory Contracts and Unexpired Leases that the Plan Sponsor agrees to assume, and which shall be assumed and assigned by the Debtors to the Plan Sponsor (or, in the event the Plan Sponsor makes the Plan Sponsor Equity Election and the applicable Debtor counterparty is an Acquired Debtor, assumed by such Acquired Debtor) pursuant to the Plan, as set forth in the Plan Supplement.

7.      "*Assumed Liabilities*" has the meaning set forth in the Plan Sponsor Agreement.

8.      "*Avoidance Actions*" means any and all causes of action to avoid a transfer of property or interest in property or an obligation incurred by any of the Debtors arising under sections 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code or other similar or related state or federal statutes and common law.

9.      "*Ballot*" means the form of ballot approved by the Bankruptcy Court and distributed to Holders of Impaired Claims entitled to vote on the Plan on which is to be indicated the acceptance or rejection of the Plan.

10.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

11.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division or such other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under 28 U.S.C. § 157, the United States District Court for the Southern District of Texas.

12.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court.

13.    "*Business Day*" means any day, other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, both the State of New York and the State of Texas.

14.    "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

15.    "*Cash Collateral Order*" means an order of the Bankruptcy Court authorizing the Debtors to use the cash collateral of the RBL Facility Lenders and the Term Loan Lenders.

16.    "*Causes of Action*" means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, Disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  For the avoidance of doubt, "*Cause of Action*" includes:  (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to dispute, object to, compromise, or seek to recharacterize, reclassify, subordinate or disallow Claims or Interests; (d) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) any claim or defense including fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any state or foreign law fraudulent transfer or similar claim.

17.    "*Chapter 11 Cases*" means the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

18.    "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

19.    "*Claims Register*" means the official register of Claims against the Debtors maintained by the Clerk of the Bankruptcy Court.

20.    "*Class*" means a category of Holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

21.    "*Collateral*" means any property or interest in property of the Estate of any Debtor subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge, or other encumbrance is not subject to a Final Order ordering the remedy of avoidance of any such Lien, charge, or other encumbrance under the Bankruptcy Code.

22.    "*Compensation and Benefits Programs*" means all employment, consulting, and severance agreements and policies, and all employment, compensation, and benefit plans, policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive and retention plans, programs and payments, life and accidental death and dismemberment insurance plans, and programs of the Debtors, and all amendments and

2

modifications thereto, applicable to the Debtors' and their Affiliates' employees, former employees, retirees, and non-employee directors and the employees, former employees and retirees of their subsidiaries.

23.     "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases.

24.     "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

25.     "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

26.     "*Confirmation Order*" means an order entered by the Bankruptcy Court confirming the Plan, approving the adequacy of the Disclosure Statement, and approving the Plan Sponsor Transaction, which order shall be subject to the consent rights provided herein and under the RSA.

27.     "*Consenting RBL Facility Lenders*" means the Holders of RBL Facility Claims that have executed and delivered counterpart signature pages to the RSA, a Joinder Agreement, or a Transfer Agreement, as applicable (as defined in the RSA).

28.     "*Consenting RBL Facility Parties*" means the Consenting RBL Facility Lenders and the RBL Facility Agent.

29.     "*Consenting Term Loan Lenders*" means the Holders of Term Loan Claims that have executed and delivered counterpart signature pages, or Transfer Agreement, as applicable, to the Restructuring Stipulation.

30.     "*Consenting Term Loan Lenders Reimbursement Amount*" as defined in Article II.F.

31.     "*Consummation*" or "*Consummated*" means the occurrence of the Effective Date.

32.     "*Cure Costs*" means the amount necessary to cure all monetary defaults under the Assumed Contracts and Leases pursuant to section 365 or 1123 of the Bankruptcy Code at the time of the assumption or assumption and assignment thereof as provide hereunder as such amounts are determined pursuant to the assignment and assumption procedures provided for in the Cure Notice with respect thereto (or such lesser amounts as may be agreed upon by the parties under the applicable Assumed Contracts and Leases).

33.     "*Cure Notice*" means any notice that sets forth the proposed Cure Costs under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed or assumed and assigned by the Debtors under the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code, as applicable, which notice shall include (a) procedures for objecting to proposed assumptions or assumptions and assignments of Executory Contracts and Unexpired Leases, (b) Cure Costs to be paid in connection therewith, and (c) procedures for resolution by the Bankruptcy Court of any related dispute.

34.     "*D&O Policies*" means all insurance policies that have been issued at any time to any of the Debtors as a first named insured providing directors', members', partners', trustees', officers', or managers' liability coverage.

35.     "*Debtors*" means, collectively, Arena Energy, LP; Arena Energy 2020 GP, LLC; Arena Energy GP, LLC; Arena Exploration, LLC; Sagamore Hill Holdings, LP, and Valiant Energy L.L.C.

36.     "*Definitive Documents*" has the meaning ascribed to such term in the RSA.

37.     "*Description of Transaction Steps*" means the description of the steps to be carried out to effectuate the Restructuring Transactions in accordance with the Plan and as set forth in the Plan Supplement.

38.     "*Disclosure Statement*" means the *Disclosure Statement Relating to the Debtors' Joint Prepackaged Plan Pursuant to Chapter 11 of the Bankruptcy Code*, including all exhibits and schedules thereto and references

therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

39.     "*Disputed*" means, with respect to a Claim against or an Interest in any Debtor, a Claim or an Interest or any portion thereof (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

40.     "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under the Plan, which date shall be the Confirmation Date.

41.     "*Effective Date*" means, with respect to the Plan, the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Article X.B of the Plan have been satisfied or waived in accordance with Article X.C of the Plan.

42.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

43.     "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

44.     "*Excluded Assets*" has the meaning set forth in the Plan Sponsor Agreement.  For the avoidance of any doubt, the Wind-Down Amount and any Claims of the Debtors arising under the Plan Sponsor Agreement shall constitute Excluded Assets; provided that any portion of the Wind-Down Amount remaining after the payment in full of all amounts required to be paid therewith shall not be Excluded Assets and shall be transferred to the Plan Sponsor.

45.     "*Exculpated Party*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) each Consenting RBL Facility Lender; (c) the RBL Facility Agent; (d) the Plan Sponsor; (e) each Consenting Term Loan Lender; (f) the Term Loan Agent; and (g) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders (direct and indirect), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

46.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 and 1123 of the Bankruptcy Code.

47.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Effective Date.

48.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Notice and Claims Agent or the Bankruptcy Court.

49.     "*Final Order*" means an order of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified or amended, that is not stayed, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

50.     "*General Unsecured Claim*" means any Claim against a Debtor that is not Secured by a Lien and is not an Administrative Claim, a Professional Fee Claim, a Priority Tax Claim, an Other Priority Claim, an RBL Facility Claim, or a Term Loan Claim.

51.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

52.     "*Holder*" means an Entity holding a Claim against or Interest in a Debtor, as applicable.

53.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

54.     "*Initial Distribution Date*" means the date on which the Debtors or the Plan Administrator make initial distributions to Holders of Allowed Claims pursuant to the Plan.

55.     "*Intercompany Claim*" means any Claim against a Debtor held by another Debtor or an Affiliate of a Debtor.

56.     "*Intercompany Interest*" means any Interest in one Debtor held by another Debtor or an Affiliate of a Debtor and is not an Arena Energy, LP Interest, an Arena Energy GP, LLC Interest, an Arena Energy 2020 GP, LLC Interest, or a Sagamore Hill Holdings, LP Interest.

57.     "*Intercreditor Agreement*" means that certain Intercreditor Agreement dated as of July 16, 2014, by and among certain of the Debtors, Wells Fargo Bank, National Association, as First Lien Administrative Agent, and Wells Fargo Energy Capital, Inc., as Second Lien Administrative Agent (both as defined therein), as may be amended or supplemented from time to time.

58.     "*Interest*" means any common stock, preferred stock, limited liability company interests, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, or profits interests in any Debtor, any other options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, performance shares, performance units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor (whether or not arising under or in connection with any employment agreement).

59.     "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

60.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

61.     "*Notice and Claims Agent*" means Kurtzman Carson Consultants LLC, the notice, claims, and solicitation agent for the Debtors in the Chapter 11 Cases.

62.     "*Other Priority Claim*" means any Claim against any of the Debtors entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

63.     "*Other Secured Claim*" means any Secured Claim against any of the Debtors, other than an Administrative Claim, a Professional Fee Claim, an Other Priority Claim, a Priority Tax Claim, an RBL Facility Claim, or a Term Loan Claim.

64.     "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

65.     "*Petition Date*" means the date of commencement of the Chapter 11 Cases.

66.     "*Plan*" means this chapter 11 plan, including all exhibits, supplements (including the Plan Supplement), appendices, and schedules, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof.

5

67.     "*Plan Administrator*" means the Person or Entity selected by the Debtors and the Plan Sponsor to conduct the Wind Down.

68.     "*Plan Sponsor*" means San Juan Offshore, LLC or any other Entity designated as the Buyer (as defined in the Plan Sponsor Agreement) in accordance with the Plan Sponsor Agreement.

69.     "*Plan Sponsor Agreement*" means the Asset Purchase Agreement between the Debtors and the Plan Sponsor, dated as of August 19, 2020, as amended, restated, amended and restated, waived, modified or supplemented from time to time in accordance with the terms thereof.  A copy of the Plan Sponsor Agreement is attached hereto as **Exhibit A**.

70.     "*Plan Sponsor Cash Amount*" means Cash in the amount of $64,157,079.00, which cash shall be transferred to the Debtors in full by the Plan Sponsor or one or more designees thereof on the Effective Date pursuant to the terms of the Plan Sponsor Agreement.

71.     "*Plan Sponsor Equity Election*" means the election described in Section 8.9(b) of the Plan Sponsor Agreement.

72.     "*Plan Sponsor Transaction*" means the sale and other transactions between the Debtors and the Plan Sponsor contemplated by the Plan Sponsor Agreement and the Plan.

73.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, each of which shall be consistent with the RSA (including the consent rights provided thereunder), and the consent rights provided herein, including:  (a) the schedule of Assumed Contracts and Leases; (b) the schedule of Rejected Contracts and Leases; (c) the identity of the Plan Administrator and the compensation of the Plan Administrator; (d) the Wind-Down Budget; (e) the Description of Transaction Steps; (f) the Plan Sponsor Agreement; and (g) the RBL Contingent Value Rights Memorandum, and such other documents related to the RBL Contingent Value Rights; (h) the Term Loan Contingent Value Rights Memorandum, and such other documents related to the Term Loan Contingent Value Rights (including the Term Loan Contingent Value Rights Agreement); and (i) the Transferred Causes of Action.

74.     "*Priority Tax Claim*" means any Claim against the Debtors of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

75.     "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class.

76.     "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with section 327 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

77.     "*Professional Fee Claim*" means any Administrative Claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

78.     "*Professional Fee Escrow Account*" means an account funded in accordance with Article II.B of the Plan in an amount equal to the Professional Fee Escrow Amount.

79.     "*Professional Fee Escrow Amount*" means the reasonable estimate of the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors and the Plan Sponsor as set forth in Article II.B of the Plan.

80.     "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

81.     "*RBL Contingent Value Rights*" means contingent value rights to be issued by the Plan Sponsor to the Holders of RBL Facility Claims, on the terms set forth in the Plan Sponsor Agreement.

82.     "*RBL Contingent Value Rights Memorandum*" means the memorandum of the RBL Contingent Value Rights filed of record in the applicable real property records where the Assets are located.

83.     "*RBL Facility*" means the reserve-based revolving credit facility provided for under the RBL Facility Credit Agreement.

84.     "*RBL Facility Agent*" means Wells Fargo Bank, National Association, or any successor thereto, as administrative agent under the RBL Facility Credit Agreement.

85.     "*RBL Facility Agent Advisors*" has the meaning ascribed to such term in the RSA.

86.     "*RBL Facility Claims*" means all Claims (including adequate protection Claims (other than for reimbursement of reasonable and documented fees and expenses of the RBL Facility Agent Advisors)) derived from, arising under, based upon, or secured pursuant to the RBL Facility Credit Documents, including all Claims in respect of principal amounts outstanding, interest, fees, expenses, costs, reimbursement obligations, hedging obligations, and other charges arising thereunder or related thereto, in each case, with respect to the RBL Facility Credit Agreement.

87.     "*RBL Facility Credit Agreement*" means that certain second amended and restated credit agreement (as amended), dated as of December 30, 2009, among Arena Energy L.P., as borrower, each of the banks from time to time party thereto, and the RBL Facility Agent, as administrative agent.

88.     "*RBL Facility Credit Documents*" means all agreements, documents (including security, collateral, collateral agency or pledge agreements or documents), letters of credit, mortgages, or instruments executed or delivered in connection with the RBL Facility, including the RBL Facility Credit Agreement.

89.     "*RBL Facility Lenders*" means the lenders under the RBL Facility Credit Agreement.

90.     "*RBL Secured Parties*" means the RBL Facility Agent and the RBL Facility Lenders.

91.     "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

92.     "*Rejected Contracts and Leases*" means those Executory Contracts and Unexpired Leases that the Plan Sponsor agrees to reject, and which shall be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement.

93.     "*Released Parties*" means, collectively, and in each case, in their respective capacities as such: (a) each Consenting RBL Facility Lender and any other Holders of RBL Facility Claims that vote to accept the Plan and do not opt out of the releases in the Plan; (b) the RBL Facility Agent; (c) the Plan Sponsor; (d) each Consenting Term Loan Lender and any other Holders of Term Loan Claims that vote to accept the Plan and do not opt out of the releases in the Plan; (e) the Term Loan Agent; (f) each current and former Affiliate of each Entity in clause (a) through (e); (g) with respect to each Entity in clause (a) through (f), each such Entity's current and former equity holders (direct and indirect), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (h) each Debtor's current and former Affiliates, and each

Debtor's and each such Affiliate's current and former equity holders (direct and indirect), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

94.     "*Releasing Parties*" means, collectively, and in each case in their respective capacities as such: (a) each Consenting RBL Facility Lender; (b) the RBL Facility Agent; (c) each Consenting Term Loan Lender; (d) the Term Loan Agent; (e) each Holder of Claims and Interests that votes to accept the Plan; (f) each Holder of Claims or Interests that (i) abstains from voting on the Plan and who does not opt out of the releases in the Plan, (ii) votes to reject the Plan and who does not opt out of the releases in the Plan, or (iii) is presumed to accept or deemed to reject the Plan and who does not opt out of the releases in the Plan; (g) the Plan Sponsor; (h) each current and former Affiliate of each Entity in clause (a) through (g); (i) with respect to each Entity in clause (a) through (h), each such Entity's current and former Affiliates, and each such Entity's and each such Affiliate's current and former equity holders (direct and indirect), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (j) each Debtor's current and former Affiliates, and each Debtor's and each such Affiliate's current and former equity holders (direct and indirect), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

95.     "*Required Consenting RBL Facility Lenders*" has the meaning set forth in the RSA.

96.     "*Restructuring Stipulation*" means that certain Stipulation in Respect of Restructuring Transactions, dated as of August 20, 2020, by and among the Consenting Term Loan Lenders, the Debtors, the RBL Facility Agent, and the Plan Sponsor.

97.     "*Restructuring Transactions*" means the transactions described in Article IV.

98.     "*RSA*" means that certain Restructuring Support and Plan Sponsor Agreement, dated as of August 19, 2020, by and among the Company Parties (as defined therein), the Plan Sponsor, and the Consenting RBL Facility Parties, including all exhibits and attachments thereto, as may be amended, restated, amended and restated, modified, or supplemented from time to time in accordance with the terms thereof, which is attached to the Disclosure Statement as Exhibit B.

99.     "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs to be Filed by the Debtors pursuant to section 521 of the Bankruptcy Code.

100.    "*Section 510(b) Claims*" means any Claim against any of the Debtors subject to subordination under section 510(b) of the Bankruptcy Code.

101.    "*Secured*" or "*Secured Claim*" means, when referring to a Claim, a Claim that is:  (a) secured by a Lien on property in which an Estate has an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code; or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code to the extent of the value of such right of setoff.

102.    "*Secured Tax Claim*" means any Secured Claim against any of the Debtors that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

103.    "*Securities Act*" means the U.S. Securities Act of 1933, as amended.

104.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

8

105.    "*Solicitation Materials*" means all documents, forms, and other materials provided in connection with the solicitation of votes on the Plan pursuant to section 1125 and 1126 of the Bankruptcy Code.

106.    "*Subsequent Distribution Date*" means the date following the Initial Distribution Date on which the Plan Administrator in its reasonable discretion elects to make distributions to Holders of Allowed Claims pursuant to the Plan.

107.    "*Term Loan*" means the term loan provided for under the Term Loan Credit Agreement.

108.    "*Term Loan Agent*" means Wells Fargo Energy Capital Inc., as administrative agent under the Term Loan Credit Agreement.

109.    "*Term Loan Claims*" means all Claims (including adequate protection Claims) derived from, arising under, based upon, or secured pursuant to the Term Loan Credit Documents, including all Claims in respect of principal amounts outstanding, interest, fees, expenses, costs, reimbursement obligations, hedging obligations, and other charges arising thereunder or related thereto.

110.    "*Term Loan Contingent Value Rights*" means contingent value rights to be issued by the Plan Sponsor to the Holders of Term Loan Claims, on the terms set forth in Term Loan Contingent Value Rights Agreement.

111.    "*Term Loan Contingent Value Rights Agreement*" means an amendment to the Plan Sponsor Agreement providing for the terms and conditions of the Term Loan Contingent Value Rights, which terms and conditions shall be substantially similar to those set forth in Exhibit F to the Plan Sponsor Agreement (except with respect to economic terms, which shall be consistent with the Restructuring Stipulation and Exhibit B thereto), and shall be otherwise acceptable to the Plan Sponsor and a majority of the Consenting Term Loan Lenders.

112.    "*Term Loan Contingent Value Rights Memorandum*" means the memorandum of the Term Loan Contingent Value Rights filed of record in the applicable real property records where the Assets are located.

113.    "*Term Loan Credit Agreement*" means that certain second lien term loan agreement (as amended), dated as of July 16, 2014, among Arena Energy, as borrower, each of the lenders from time to time party thereto, and the Term Loan Agent, as administrative agent.

114.    "*Term Loan Credit Documents*" means all agreements, documents (including security, collateral, collateral agency or pledge agreements or documents), letters of credit, mortgages, or instruments executed or delivered in connection with the Term Loan, including the Term Loan Credit Agreement.

115.    "*Term Loan Lenders*" means the lenders under the Term Loan Credit Agreement.

116.    "*Term Loan Secured Parties*" means the Term Loan Agent and the Term Loan Lenders,

117.    "*Transferred Causes of Action*" means all Causes of Action not otherwise expressly released pursuant to the Plan.

118.    "*Undeliverable Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

119.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

120.    "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

121.    "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

122.    "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

123.    "*Voting Deadline*" means August 28, 2020.

124.    "*Voting Report*" means the report certifying the methodology for the tabulation of votes and results of voting under the Plan, prepared and filed by the Notice and Claims Agent.

125.    "*Wind Down*" means the wind down and dissolution of the Debtors (other than any Acquired Debtors), and the closure of the Chapter 11 Cases to the extent necessary, as set forth in Article IV.H.

126.    "*Wind-Down Amount*" means Cash funded by the Plan Sponsor in an amount determined by the Debtors and the Plan Sponsor in their reasonable discretion, which amount shall be retained by the Debtors and used by the Plan Administrator to fund the Wind Down in accordance with the Wind-Down Budget.

127.    "*Wind-Down Budget*" means a budget agreed to by the Debtors and the Plan Sponsor, for the reasonable activities and expenses to be incurred in winding down the Chapter 11 Cases following the Confirmation Date.  The Wind-Down Budget, a copy of which shall be Filed with the Plan Supplement, shall include line item estimates for, among other things, post-Effective Date Professional fees and U.S. Trustee Fees, and will be financed by the Wind-Down Amount.  The RBL Facility Lenders nor the Term Loan Lenders shall have no responsibility or liability to the Debtors or the Plan Sponsor to fund any of the Wind Down or the Wind-Down Budget.

## B.    Rules of Interpretation.

For purposes of the Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (5) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (11) any immaterial effectuating provisions may be interpreted by the Debtors or the Plan Administrator in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall control; *provided* that no effectuating provision shall be immaterial or deemed immaterial if it has any substantive legal or economic effect on any party; (12) on and after the Effective Date, all references to the Debtors in the Plan shall be deemed references to the Debtors, the Plan Administrator, or the Plan Sponsor, as applicable, and (13) with respect to any provision in the Plan providing for any payment, distribution or treatment to be made subject to the election, option, discretion or agreement of any Debtor or the Plan Administrator, as applicable, such election, option, discretion

or agreement shall be subject to the consent of the Plan Sponsor to the extent such payment, distribution or treatment is to be paid or provided by the Plan Sponsor.

## C.      Computation of Time.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

## D.      Governing Law.

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

## E.      Reference to Monetary Figures.

All references in the Plan to monetary figures shall refer to the legal tender of the United States, unless otherwise expressly provided.

## F.      Controlling Document.

In the event of an inconsistency between the Plan, the RSA, and the Disclosure Statement, the terms of the Plan shall control in all respects. Except with respect to Article IX of the Plan, which shall control in all instances, in the event of an inconsistency between the Plan (excluding the Plan Supplement) and the Plan Supplement, the Plan Supplement shall control. Except with respect to Article IX of the Plan, which shall control in all instances, in the event of an inconsistency between the Plan (including the Plan Supplement), the Disclosure Statement, and the Plan Sponsor Agreement (including the Term Loan Contingent Value Rights Agreement), the Plan Sponsor Agreement shall control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.

## A.      Administrative Claims.

Except with respect to Professional Fee Claims, or as otherwise set forth herein, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtors agree to less favorable treatment or such Holder has been paid prior to the Effective Date, each Holder of an Allowed Administrative Claim shall receive, at the option of the Debtors, (a) payment in full in Cash on the later of the Effective Date and the date on which such Allowed Administrative Claim becomes an Allowed Claim or, in each case, as reasonably practicable thereafter, (b) Reinstatement of such Allowed Administrative Claim, or (c) such other treatment so as to render such Allowed Administrative Claim Unimpaired; *provided* that any Allowed Administrative Claim that has been expressly assumed by the Plan Sponsor under the Plan Sponsor Agreement shall be an obligation of the Plan Sponsor.

B.      **Professional Compensation.**

1.      **Final Fee Applications and Payment of Professional Fee Claims.**

All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date shall be Filed no later than 30 days after the Effective Date.  All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court, and once approved by the Bankruptcy Court, shall be promptly paid from the Professional Fee Escrow Account up to the full Allowed amount.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Allowed Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan.

2.      **Professional Fee Escrow Amount.**

As soon as possible after Confirmation and not later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash in an amount equal to the Professional Fee Escrow Amount; provided that, to the extent the Debtors lack sufficient funding as of the Effective Date to fund the entire Professional Fee Claims Amount, the Plan Sponsor shall transfer to such account Cash equal to the unfunded portion of the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals.  Such funds shall not be considered an asset or property of the Debtors' Estates.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Claims are Allowed by a Final Order.  When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the Plan Sponsor without any further notice to or action, order or approval of the Bankruptcy Court or any other Entity.

3.      **Estimation of Fees and Expenses.**

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred before and as of the Confirmation Date and shall deliver such estimate to the Debtors and the Plan Sponsor by the earlier of (a) five Business Days after the Confirmation Date and (b) two Business Days prior to the Effective Date; *provided* that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals, the Debtors and the Plan Sponsor are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors, in consultation with the Plan Sponsor, may estimate the unbilled fees and expenses of such Professional.

4.      **Post-Confirmation Date Fees and Expenses.**

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors will, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Debtors or the Plan Administrator, subject to the following sentence.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code, in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors and the Plan Administrator may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that to the extent such amounts are unpaid as of the Effective Date, they shall only be paid from the Wind-Down Amount in accordance with the Wind-Down Budget.

5.      **Substantial Contribution.**

Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), or (5) of the Bankruptcy Code must File an application and serve such application on counsel for the Debtors and as

otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules, on or before the Voting Deadline.

**C.      Priority Tax Claims.**

Except to the extent that a Holder of an Allowed Priority Tax Claim and, as applicable, the Debtors or the Plan Administrator agree to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Priority Tax Claim, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors, (a) payment in full in Cash on the later of the Effective Date and the date on which the Allowed Priority Tax Claim becomes an Allowed Claim or, in each case, as reasonably practicable thereafter, (b) Reinstatement of such Allowed Priority Tax Claim, or (c) such other treatment in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; *provided* that any Allowed Priority Tax Claim that has been expressly assumed by the Plan Sponsor under the Plan Sponsor Agreement shall be an obligation of the Plan Sponsor.  In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.  On the Effective Date, any Liens securing any Allowed Priority Tax Claims shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order or rule, or the vote, consent, authorization, or approval of any Person.

**D.      U.S. Trustee.**

The Debtors or the Plan Administrator, as applicable, shall timely pay all U.S. Trustee Fees for each quarter under 28 U.S.C. § 1930(a)(6), until the entry of a Final Order dismissing or closing the Chapter 11 Cases, or converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.  Following Confirmation, the Debtors shall file with the Bankruptcy Court quarterly operating reports.

**E.      Costs and Expenses of the RBL Facility Agent.**

Notwithstanding anything to the contrary contained herein, any unpaid Claim payable to the RBL Facility Agent on account of the reasonable and documented fees and expenses of the RBL Facility Agent Advisors pursuant to a Cash Collateral Order shall constitute Allowed Administrative Claims and shall be paid on a current basis in full in Cash on the earlier of the date set forth in the Cash Collateral Order and the Effective Date, or to the extent accrued after the Effective Date, on a current basis in full in Cash as invoiced.  Nothing herein shall require the RBL Facility Agent or the RBL Facility Agent Advisors to file applications, a Proof of Claim or otherwise seek approval of the Bankruptcy Court as a condition to the payment of such Allowed Administrative Claims.

**F.      Costs and Expenses of the Consenting Term Loan Lenders.**

Notwithstanding anything to the contrary contained herein, any unpaid Claim payable to the Consenting Term Loan Lenders on account of the reasonable and documented fees and expenses of Milbank LLP and Houlihan Lokey Capital, Inc., subject to an aggregate maximum cap of $750,000 (the "Consenting Term Loan Lenders Reimbursement Amount"), shall constitute Allowed Administrative Claims and shall be paid in full in Cash on the Effective Date.  Nothing herein shall require Milbank LLP and Houlihan Lokey Capital, Inc. to file applications, a Proof of Claim or otherwise seek approval of the Bankruptcy Court as a condition to the payment of such Allowed Administrative Claims.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

**A.      Summary of Classification.**

The Plan constitutes a separate chapter 11 plan for each Debtor.  Except for the Claims addressed in Article II (or as otherwise set forth herein), all Claims against and Interests in a particular Debtor are placed in Classes for each of the Debtors.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, Priority Tax Claims, and Professional Fee Claims as described in Article II.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation, and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or an Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | RBL Facility Claims | Impaired | Entitled to Vote |
| Class 4 | Term Loan Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 6 | Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 7 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Arena Energy, LP Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Arena Energy GP, LLC Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 11 | Arena Energy 2020 GP, LLC Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 12 | Sagamore Hill Holdings, LP Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**B.      Treatment of Claims and Interests.**

Except to the extent that the Debtors and a Holder of an Allowed Claim or Interest, as applicable, agrees to a less favorable treatment, such Holder shall receive under the Plan treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest.  Unless otherwise indicated, each Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date on which such Claim or Interest is Allowed by Final Order of the Bankruptcy Court or, in either case, as soon as reasonably practicable thereafter (or, if payment is not then due, in accordance with its terms in the ordinary course), the timing of which shall be subject to the reasonable discretion of the Debtors (with the consent of the Plan Sponsor, such consent not to be unreasonably withheld).

1.  **Class 1—Other Priority Claims.**

    (a)  *Classification*:  Class 1 consists of all Other Priority Claims.

    (b)  *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive, at the option of the Debtors, (i) payment in full in Cash, (ii) Reinstatement of such Allowed Other Priority Claim, or (iii) such other treatment so as to render such Allowed Other Priority Claim Unimpaired; *provided* that any Allowed Other Priority Claim that has been expressly assumed by the Plan Sponsor under the Plan Sponsor Agreement shall be an obligation of the Plan Sponsor.

    (c)  *Voting*:  Class 1 is Unimpaired under the Plan.  Each Holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Allowed Other Priority Claim is not entitled to vote to accept or reject the Plan.

2.  **Class 2—Other Secured Claims.**

    (a)  *Classification*:  Class 2 consists of all Other Secured Claims.

    (b)  *Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors, (i) payment in full in Cash, (ii) Reinstatement of such Allowed Other Secured Claim, or (iii) such other treatment so as to render such Allowed Other Secured Claim Unimpaired; *provided* that any Allowed Other Secured Claim that has been expressly assumed by the Plan Sponsor under the Plan Sponsor Agreement shall be an obligation of the Plan Sponsor.

    (c)  *Voting*:  Class 2 is Unimpaired under the Plan.  Each Holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.  **Class 3—RBL Facility Claims.**

    (a)  *Classification*:  Class 3 consists of all RBL Facility Claims.

    (b)  *Allowance*:  The RBL Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the RBL Facility Credit Agreement and the Cash Collateral Order, including all principal, accrued and unpaid interest, and all accrued and unpaid fees, expenses, and all other amounts payable under the RBL Facility Credit Agreement and the Cash Collateral Order.

    (c)  *Treatment*:  On the Effective Date, each Holder of an Allowed RBL Facility Claim shall receive, in full and final satisfaction of such Allowed RBL Facility Claim, its Pro Rata portion of (i) the Plan Sponsor Cash Amount and (ii) the RBL Contingent Value Rights.

    (d)  *Voting*:  Class 3 is Impaired under the Plan.  Each Holder of an RBL Facility Claim is entitled to vote to accept or reject the Plan.

4.  **Class 4—Term Loan Claims.**

    (a)  *Classification*:  Class 4 consists of all Term Loan Claims.

    (b)  *Allowance*:  The Term Loan Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Term Loan Credit Agreement and the Cash Collateral Order, including all principal, accrued and unpaid interest, and all accrued and unpaid fees, expenses, and all other amounts payable under the Term Loan Credit Agreement and the Cash Collateral

Order.

(c)     *Treatment*:  On the Effective Date, each Holder of an Allowed Term Loan Claim shall receive, in full and final satisfaction of such Allowed Term Loan Claim, its Pro Rata portion of the Term Loan Contingent Value Rights.

(d)     *Voting*:  Class 4 is Impaired under the Plan.  Each Holder of a Term Loan is entitled to vote to accept or reject the Plan.

5.    **Class 5—General Unsecured Claims.**

(a)     *Classification*:  Class 5 consists of all General Unsecured Claims.

(b)     *Treatment*:  Each holder of a General Unsecured Claim shall receive, in full and final satisfaction of such Allowed General Unsecured Claim, at the election of the Plan Sponsor, (i) payment in full in the ordinary course of business, (ii) Reinstatement of such Allowed General Unsecured Claim, or (iii) such other treatment as to render such Allowed General Unsecured Claim Unimpaired; *provided* that any Allowed General Unsecured Claim that has been expressly assumed by the Plan Sponsor under the Plan Sponsor Agreement shall be an obligation of the Plan Sponsor.

(c)     *Voting*:  Class 5 is Unimpaired.  Each Holder of an Allowed General Unsecured Claim is conclusively presumed to have accepted the Plan.  Therefore, Holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan.

6.    **Class 6—Intercompany Claims.**

(a)     *Classification*:  Class 6 consists of all Intercompany Claims.

(b)     *Treatment*:  On the Effective Date, each Intercompany Claim shall be, at the election of the Plan Sponsor in its sole discretion (i) Reinstated; (ii) compromised, distributed, contributed, set off, settled, canceled, released and/or extinguished, without any distribution on account of such Intercompany Claim; or (iii) otherwise treated as determined by the Plan Sponsor in its sole discretion.

(c)     *Voting*:  Class 6 is either (i) Unimpaired, in which case the Holders of Allowed Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code; or (ii) Impaired, and not receiving any distribution under the Plan, in which case the Holders of Allowed Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan.

7.    **Class 7—Intercompany Interests.**

(a)     *Classification*:  Class 7 consists of all Intercompany Interests.

(b)     *Treatment*:  On the Effective Date, Intercompany Interests shall be, at the election of the Plan Sponsor in its sole discretion (i) Reinstated; (ii) compromised, distributed, contributed, set off, settled, canceled, released and/or extinguished, without any distribution on account of such Intercompany Interest; or (iii) otherwise treated as determined by the Plan Sponsor in its sole discretion.

(c)     *Voting*:  Class 7 is either (i) Unimpaired, in which case the Holders of Allowed Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code; or (ii) Impaired, and not receiving any distribution under the Plan, in

which case the Holders of Allowed Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an Allowed Intercompany Interest in Class 7 will not be entitled to vote to accept or reject the Plan. Therefore, Holders of Allowed Intercompany Interests are not entitled to vote to accept or reject the Plan.

8. **Class 8—Section 510(b) Claims.**

(a) *Classification:* Class 8 consists of all Section 510(b) Claims.

(b) *Treatment:* Section 510(b) Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive any distribution on account of such Section 510(b) Claims.

(c) *Voting:* Class 8 is Impaired and not receiving any distribution under the Plan. Therefore, Holders of Section 510(b) Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

9. **Class 9—Arena Energy, LP Interests.**

(a) *Classification*: Class 9 consists of all Arena Energy, LP Interests.

(b) *Treatment*: On the Effective Date, Arena Energy, LP Interests shall be, at the election of the Plan Sponsor in its sole discretion (i) canceled, released and extinguished; or (ii) otherwise treated as determined by the Plan Sponsor in its sole discretion, in either case without the Holders thereof receiving any distribution on account of such Interests.

*Voting*: Class 9 is Impaired, and not receiving any distribution under the Plan. Therefore, Holders of Allowed Arena Energy, LP Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

10. **Class 10—Arena Energy GP, LLC Interests.**

(a) *Classification*: Class 10 consists of Arena Energy GP, LLC Interests.

(b) *Treatment*: Arena Energy GP, LLC Interests shall be, at the election of the Plan Sponsor in its sole discretion (i) canceled, released and extinguished; or (ii) otherwise treated as determined by the Plan Sponsor in its sole discretion, in either case without the Holders thereof receiving any distribution on account of such Interests.

(c) *Voting*: Class 10 is Impaired, and not receiving any distribution under the Plan. Therefore, Holders of Allowed Arena Energy GP, LLC Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

11. **Class 11—Arena Energy 2020 GP, LLC Interests.**

(a) *Classification*: Class 11 consists of all Arena Energy 2020 GP, LLC Interests.

(b) *Treatment*: Arena Energy 2020 GP, LLC Interests shall be, at the election of the Plan Sponsor in its sole discretion (i) canceled, released and extinguished; or (ii) otherwise treated as determined by the Plan Sponsor in its sole discretion, in either case without the Holders thereof receiving any distribution on account of such Interests.

> *Voting*: Class 11 is Impaired, and not receiving any distribution under the Plan. Therefore, Holders of Arena Energy 2020 GP, LLC Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

**12. Class 12—Sagamore Hill Holdings, LP Interests.**

   (a)   *Classification*: Class 12 consists of all Sagamore Hill Holdings, LP Interests.

   (b)   *Treatment*: Sagamore Hill Holdings, LP Interests shall be, at the election of the Plan Sponsor in its sole discretion (i) canceled, released and extinguished; or (ii) otherwise treated as determined by the Plan Sponsor in its sole discretion, in either case without the Holders thereof receiving any distribution on account of such Interests.

   (c)   *Voting*: Class 12 is Impaired, and not receiving any distribution under the Plan. Therefore, Holders of Sagamore Hill Holdings, LP Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

**C.     Special Provision Governing Unimpaired Claims.**

Except as otherwise provided in the Plan, nothing under the Plan shall affect, diminish, or impair the rights of the Debtors with respect to any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims. All rights to exercise any and all such rights and to settle any such Claims shall be preserved and shall vest in the Plan Sponsor as of the Effective Date.

**D.     Elimination of Vacant Classes.**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**E.     Voting Classes; Presumed Acceptance by Non-Voting Classes.**

If a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

**F.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.**

Acceptance of the Plan by either Class 3 or 4 will satisfy section 1129(a)(10) of the Bankruptcy Code. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article XI to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**G.     Subordinated Claims.**

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any

Allowed Claim (except for any Professional Fee Claims, RBL Facility Claims, or Term Loan Claims) or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.     General Settlement of Claims.**

As discussed further in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Distributions made to Holders of Allowed Claims in any Class are intended to be final.

**B.     Sources of Plan Consideration.**

Cash on hand, the Plan Sponsor Cash Amount, the RBL Contingent Value Rights, the Term Loan Contingent Value Rights, the Wind-Down Amount, the Debtors' rights under the Plan Sponsor Agreement, payments made directly by the Plan Sponsor under the Plan Sponsor Agreement, and payments of Cure Costs made by the Plan Sponsor pursuant to sections 363, 365 and 1123 of the Bankruptcy Code, shall be used to fund the distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and subject to the terms provided herein.  Except as to the Plan Sponsor Cash Amount, and unless otherwise agreed in writing by the Debtors and the Plan Sponsor, distributions required by the Plan shall be the sole responsibility of the Plan Sponsor to the extent such Claim is Allowed against the Debtors.

**C.     The Plan Sponsor Transaction.**

Upon entry of the Confirmation Order, the Debtors shall be authorized to consummate the Plan Sponsor Transaction with the Plan Sponsor pursuant to the terms of the Plan Sponsor Agreement, the Plan, and the Confirmation Order.

Subject to the terms of the Plan Sponsor Agreement, on the Effective Date, the Debtors shall consummate the Plan Sponsor Transaction by, among other things, transferring the Assets to the Plan Sponsor free and clear of all Liens, Claims, Interests, charges, and other encumbrances, pursuant to sections 365 and 1123 of the Bankruptcy Code, the Plan and the Confirmation Order.

The transactions contemplated by the Plan Sponsor Agreement and the Plan are undertaken by the Debtors and the Plan Sponsor without collusion and in good faith, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the transactions contemplated thereunder and hereunder shall not affect the validity of such transactions (including the assumption, assignment and/or transfer of any Assumed Contract or Lease).  The Plan Sponsor is a good faith purchaser and, as such, is entitled to the full protections as such of the Bankruptcy Code.

**D.     Restructuring Transactions.**

Upon entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Plan Sponsor Agreement and the Plan, and any documents in connection therewith and herewith, shall be deemed authorized and approved without any requirement of further act or any actions by the Debtors or their general partners, managers, members, directors, or other governing bodies, or any other Entity or Person.  Upon the entry of

the Confirmation Order, the Debtors, the Plan Administrator and the Plan Sponsor are authorized (without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation or rule, or the vote, authorization or approval of any Entity) to take all actions as may be necessary or appropriate to effect the Restructuring Transactions, including the Plan Sponsor Transaction and any other transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including:  (1) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, interest, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) the filing of appropriate certificates or articles of organization, limited partnership, incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (5) the execution, delivery, filing, recordation and issuance of any other notes, documents, instruments, or agreements in connection with the Restructuring Transactions; (6) any transactions described in the Description of Transaction Steps; and (7) subject to the occurrence of the Effective Date, the consummation of the transactions contemplated by the Plan Sponsor Agreement and the Plan.

The Confirmation Order shall and shall be deemed to, pursuant to section 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect the Restructuring Transactions, including the Plan Sponsor Transaction and any other transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

**E.      Payment of Cure Costs and Other Amounts.**

On the Effective Date, the Plan Sponsor shall pay all Cure Costs that are required to be paid (if any) pursuant to and in accordance with sections 365 or 1123 of the Bankruptcy Code with respect to any Assumed Contracts and Leases.  The Debtors shall not have any obligation to make any payment or other distribution on account of any Cure Costs.

**F.      Vesting of Assets.**

Except as otherwise provided in the Plan, the Plan Sponsor Agreement, or any agreement, instrument, or other document incorporated herein or therein, on the Effective Date:  (a) the Assets shall be preserved and shall vest in the Plan Sponsor, free and clear of all Liens, Claims, charges, and other encumbrances; and (b) the Excluded Assets shall vest in the Debtors for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, and other encumbrances.

On and after the Effective Date, except as otherwise provided in the Plan and subject in all respects to the Plan Sponsor Agreement and the Plan, the Debtors may operate their businesses and use, acquire, or dispose of any property, assets or interests, and, as applicable, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  For the avoidance of doubt, following the Effective Date, the Plan Sponsor may operate its businesses and use, acquire, or dispose of property, assets or interests, including the Assets, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**G.      Wind-Down Amount.**

On or prior to the Effective Date, the Debtors shall retain the Wind-Down Amount to be used solely in accordance with the Wind-Down Budget.  Any amounts in the Wind-Down Amount remaining after the payment of all required distributions therefrom in accordance with the Wind-Down Budget shall promptly be transferred to the Plan Sponsor.

## H.      Wind-Down.

On and after the Effective Date, in accordance with the Wind-Down Budget, the Debtors (other than any Acquired Debtors) shall (1) continue in existence for purposes of (a) winding down the businesses and affairs of such Debtors as expeditiously as reasonably possible, (b) resolving Disputed Claims as provided hereunder, (c) filing appropriate tax returns, (d) complying with their continuing obligations under the Plan Sponsor Agreement (including with respect to the transfer of permits to the Plan Sponsor as contemplated therein), and (e) administering the Plan in an efficacious manner; and (2) thereafter liquidating as set forth in the Plan.

## I.      Plan Administrator.

On and after the Effective Date, the Plan Administrator shall act for the Debtors (other than any Acquired Debtors) in the same fiduciary capacity as applicable to a board of managers or directors, and officers, subject to the provisions hereof (and all certificates of formation, partnership agreements, operating agreements, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as general partners, managing members, managers and officers of the Debtors shall be deemed to have resigned, and a representative of the Plan Administrator shall be appointed as the sole manager and sole officer of the Debtors (other than any Acquired Debtors), and shall succeed to the powers of such Debtors' general partners, managing members, managers and officers.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Debtors (other than any Acquired Debtors) as further described in Article VII.  The operations of the Plan Administrator shall be subject in all respects to the Wind-Down Budget.

## J.      Cancellation of Notes, Instruments, Certificates, and Other Documents.

On the Effective Date, except as otherwise specifically provided for in the Plan:  (1) the obligations of any Debtor under any certificate, share, membership or limited partner interest, note, bond, indenture, purchase right, or other instrument or document, directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or portfolio interest in the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest shall be canceled and deemed surrendered as to the Debtors and shall not have any continuing obligations thereunder; (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, operating agreements, partnership agreements or certificates or articles of incorporation or formation or similar documents governing the equity interests, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, discharged, settled, and compromised; and (3) the Intercreditor Agreement and any other similar intercreditor agreements or contracts shall be canceled and the parties thereto shall not have any continuing obligations thereunder.

## K.      Corporate Action.

Upon the Effective Date, all actions contemplated by the Plan and the Plan Sponsor Agreement (including any action to be undertaken by the Debtors or the Plan Administrator, as applicable) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, the Plan Administrator, or any other Entity or Person.  All matters provided for in the Plan involving the corporate, limited liability company or partnership structure of the Debtors or the Plan Sponsor, the consummation of the Plan Sponsor Transaction, and any corporate, limited liability company or partnership action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in full force and effect, without any requirement of further action by the Debtors or the Debtors' Estates.

On or after the Effective Date, after making all distributions provided for under the Plan, the Debtors (other than any Acquired Debtors) shall be deemed to be dissolved and terminated, except as necessary to satisfy their obligations under the Plan Sponsor Agreement.  The directors, managers, and officers of the Debtors and the Plan Administrator, as applicable, shall be authorized to execute, deliver, File, or record such contracts, instruments, and other agreements or documents and take such other actions as they may deem necessary or appropriate to implement the provisions of this Article IV.K.

The authorizations and approvals contemplated by this Article IV.K shall be effective notwithstanding any requirements under applicable nonbankruptcy law.

## L.   Dissolution of the Boards of the Debtors.

As of the Effective Date, the existing boards of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, partners, equity holders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the partners or equity holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members or partners of any Debtor.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, general partner, member, and manager, as applicable, of the Debtors (other than any Acquired Debtor) with respect to their affairs other than matters substantially related to the Plan Sponsor Transaction. Subject in all respects to the terms of the Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors (other than any Acquired Debtor), and, if applicable, shall: (a) file a certificate of dissolution for any of such Debtors, together with all other necessary corporate, company, or partnership documents, to effect the dissolution of such Debtors under the applicable laws of the applicable state(s) of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by direct or indirect equity holders, general partners, members, board of directors, board of managers, or any other governing bodies of any of the Debtors or any of their affiliates.

## M.   Release of Liens.

Except as otherwise expressly provided herein, and without limitation to the terms of the RBL Contingent Value Rights, the RBL Contingent Value Rights Memorandum, the Term Loan Contingent Value Rights, and the Term Loan Contingent Value Rights Memorandum, on the Effective Date, all Liens on any property, assets or interests of any Debtors shall automatically terminate, all property, assets and interests subject to such Liens shall be automatically released, and all guarantees of any Debtors shall automatically be discharged and released.

## N.   Effectuating Documents; Further Transactions.

The Debtors and the officers, managers, general partners, and members thereof are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, consents, approvals, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

## O.   Exemption from Certain Taxes and Fees.

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan, the Plan Sponsor Transaction or the Plan Sponsor Agreement or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (2) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or

recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**P.      Causes of Action.**

Any Causes of Action held by the Debtors on the Effective Date that have not been expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan shall be retained, shall be deemed Transferred Causes of Action and shall be assigned and transferred to and shall vest in the Plan Sponsor on the Effective Date.  The Transferred Causes of Action shall be described in the Plan Supplement.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any such Cause of Action against them as any indication that the Plan Sponsor or the Debtors will not pursue any and all available Causes of Actions against them.  No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

**Q.      Employee and Retiree Benefits.**

All employee wages and Compensation and Benefits Programs in place as of the Effective Date with the Debtors shall be assumed and assigned by the Debtors to the Plan Sponsor and shall remain in place as of the Effective Date, and the Plan Sponsor will continue to honor such agreements, arrangements, programs, and plans.

**R.      The Plan Sponsor Equity Election.**

In the event the Plan Sponsor makes the Plan Sponsor Equity Election, 100% of the equity in one or more of the Debtors, as reorganized pursuant to the Plan, as determined by the Plan Sponsor, shall be issued, contributed and/or distributed to the Plan Sponsor (or a designee thereof) on the Effective Date, and, notwithstanding anything to the contrary herein, (i) the Acquired Debtors shall not be dissolved or otherwise subject to the Wind Down, and each Acquired Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership or other form, as the case may be, with all the powers thereof pursuant to applicable law, (ii) all Assets (including all Assumed Contracts and Leases) of the Acquired Debtors shall re-vest in (and be assumed by) the applicable Acquired Debtor, free and clear of all Liens, Claims and other encumbrances to the same extent such Assets would otherwise have vested in the Plan Sponsor pursuant to the terms of the Plan and the Plan Sponsor Agreement (for purposes of clarity, the Assets shall remain subject to the terms of the RBL Contingent Value Rights, the RBL Contingent Value Rights Memorandum, the Term Loan Contingent Value Rights, and the Term Loan Contingent Value Rights Memorandum), and (iii) all Assumed Liabilities of the Acquired Debtors shall remain liabilities of the applicable Acquired Debtor to the same extent such Assumed Liabilities would otherwise have been assumed by the Plan Sponsor pursuant to the terms of the Plan and the Plan Sponsor Agreement.  For the avoidance of doubt, neither the Plan Sponsor nor any Acquired Debtor shall acquire, assume or retain (as applicable) any Excluded Assets or Excluded Liabilities (as defined in the Plan Sponsor Agreement) in connection with the foregoing.  No further notice to or order of the Bankruptcy Court shall be required to effectuate the Plan Sponsor Equity Election, including the transfer of the Acquired Debtors to the Plan Sponsor.

**S.      Closing the Chapter 11 Cases.**

Upon the occurrence of the Effective Date, the Plan Administrator shall be permitted to close all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of one designated Debtor (which shall not be an Acquired Debtor), and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of such Debtor.

When all Disputed Claims have become Allowed or disallowed and all remaining Cash has been distributed in accordance with the Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close any remaining Chapter 11 Cases of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.** **Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided herein, all Executory Contracts and Unexpired Leases not otherwise assumed, assumed and assigned, or rejected will be deemed assumed and assigned to the Plan Sponsor (or, if applicable, assumed by the Acquired Debtors), in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that: (1) are identified on the schedule of Rejected Contracts and Leases; (2) have previously expired or terminated pursuant to their own terms; (3) have been previously assumed, assumed and assigned, or rejected by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date. Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each Assumed Contract and Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. The RSA, the Restructuring Stipulation, and the Plan Sponsor Agreement (including the Term Loan Contingent Value Rights Agreement), shall be deemed assumed by the Debtors upon entry of the Confirmation Order.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the schedule of Assumed Contract and Leases, or the schedule of Rejected Contracts and Leases, pursuant to sections 365 and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions, assumptions and assignments or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Assumed Contract and Lease shall re-vest in and be fully enforceable by the Plan Sponsor (or, if applicable, the Acquired Debtors), except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume or assume and assign Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Plan Sponsor.

To the maximum extent permitted by law, to the extent any provision in any Assumed Contract or Lease restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Assumed Contract or Lease (including any "change of control" provision or payment), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Assumed Contract or Lease or to exercise any other default-related rights (or demands for payment) with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors (at the direction of the Plan Sponsor) and the Plan Sponsor shall reserve the right to alter, amend, modify, or supplement the schedule of Assumed Contracts and Leases and the schedule of Rejected Contracts and Leases at any time up to forty-five (45) days after the Effective Date.

**B.** **Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claim are not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable**

24

**against the Debtors or the Plan Sponsor, or their property, assets and interests without the need for any objection by the Debtors or the Plan Sponsor or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary**. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.4(b) of the Plan.

C.      **Cure of Defaults for Assumed Contracts and Leases.**

Any monetary defaults under each Assumed Contract and Lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. On or as soon as reasonably practicable after the Petition Date, the Debtors shall provide Cure Notices of proposed assumptions or assumptions and assignments to the counterparties to the agreements listed on the schedule of Assumed Contracts and Leases, which shall include a description of the procedures for resolving disputes related to the proposed assumption or assumption and assignment of applicable Assumed Contracts and Leases. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Plan Sponsor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Assumed Contract or Lease, or (3) any other matter pertaining to assumption or assumption and assignment, the Bankruptcy Court shall hear such dispute at the Confirmation Hearing. Unless otherwise agreed in writing by the parties to the applicable Assumed Contract or Lease and the Plan Sponsor, any objection by a counterparty thereto to a proposed assumption or assumption and assignment must be Filed, served and actually received by counsel to the Debtors and the Plan Sponsor no later than the date and time specified in the Cure Notice. Any counterparty that fails to object timely to a proposed assumption or assumption and assignment shall be deemed to have consented to such assumption or assumption and assignment. At the Confirmation Hearing, the Bankruptcy Court shall hear and resolve all timely filed objections to the proposed assumption or assumption and assignment, the proposed Cure Cost or the adequate assurances of future performance by the Plan Sponsor or the applicable Debtor. The Allowed Cure Costs, as set forth in the Cure Notice or otherwise determined by the Bankruptcy Court in the Confirmation Order (or such other Final Order entered upon resolution at the Confirmation Hearing of any objection to the Cure Costs set forth in the Cure Notice) shall be paid on the Effective Date, subject to the right of the Plan Sponsor to remove any Executory Contract or Unexpired Lease from the list of Assumed Contracts and Leases at any time prior to the Effective Date.

In any case, at any time prior to the Effective Date, the Plan Sponsor will have the right to remove any Executory Contract or Unexpired Lease from the schedule of Assumed Contracts and Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected (if applicable) and such Executory Contract or Unexpired Lease shall not be an Assumed Contract or Lease.

Assumption (or assumption and assignment) of any Assumed Contract or Lease pursuant to the Plan or otherwise and full payment of any applicable Cure Costs pursuant to this Article V.C shall result in the full release and satisfaction of any Cure Cost Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Contract or Lease at any time prior to or as of the effective date of assumption or assumption and assignment, as applicable. **Any and all Proofs of Claim based upon Assumed Contracts and Leases, and for which any Cure Costs have been fully paid pursuant to this Article V.C, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

D.      **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Rejected Contracts and Leases, and all rights to such preexisting obligations shall vest in the Plan Sponsor (or the Acquired Debtors, if applicable) on the Effective Date. In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors and the Plan Sponsor expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide,

warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to Rejected Executory Contracts and Unexpired Leases.

**E.     Indemnification Obligations.**

All indemnification provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former members of any governing body, general partners, directors, officers, managers, members, employees, attorneys, accountants, investment bankers, advisors, and other professionals of, or acting on behalf of, the Debtors, as applicable, shall be assumed by the Plan Sponsor and shall remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former members of any governing body, general partners, directors, officers, managers, employees, attorneys, accountants, investment bankers, advisors, and other professionals of, or acting on behalf of, the Debtors than the indemnification provisions in place prior to the Effective Date.

**F.     Insurance Policies.**

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Plan Sponsor.

**G.     D&O Policies.**

The D&O Policies shall be assumed by the Debtors on behalf of the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such D&O Policy previously was rejected by the Debtors or the Debtors' Estates pursuant to a Bankruptcy Court order or is the subject of a motion to reject pending on the Effective Date, and nothing shall alter, modify, or amend, affect or impair the terms and conditions of (or the coverage provided by) any of the D&O Policies including the coverage for defense and indemnity under any of the D&O Policies, which shall remain available to all individuals within the definition of "Insured" in any of the D&O Policies.

**H.     Modifications, Amendments, Supplements, Restatements, or Other Agreements.**

Unless otherwise provided in the Plan, each Assumed Contract and Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Assumed Contract or Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, absent a Final Order of the Bankruptcy Court to the contrary.

**I.     Reservation of Rights.**

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the schedule of Assumed Contracts and Leases, nor anything contained in the Plan or the Plan Sponsor Agreement, shall constitute an admission by the Debtors, the Plan Sponsor, or any other Entity that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor, the Plan Sponsor or any other Entity has any liability thereunder.  In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, the Plan Sponsor or the Plan Administrator, as applicable, shall have

90 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

**J.      Nonoccurrence of Effective Date.**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**K.      Contracts and Leases Entered Into After the Petition Date.**

Any contracts and leases entered into after the Petition Date by any Debtor, including any Assumed Contracts and Leases, will be performed by the applicable Debtor or the Plan Sponsor liable thereunder, each in the ordinary course of its business. Accordingly, such contracts and leases (including any Assumed Contacts and Leases) will survive and remain unaffected by entry of the Confirmation Order.

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

**A.      Timing and Calculation of Amounts to Be Distributed.**

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class from the Debtors or the Plan Administrator on behalf of the Debtors, as applicable. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIII. Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

**B.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.**

**1.      Record Date for Distribution.**

On the Distribution Record Date, the Claims Register shall be closed and the Debtors, the Plan Administrator, or any other party responsible for making distributions instead shall be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. The Distribution Record Date shall not apply to the RBL Facility Agent with respect to beneficial holders of the RBL Facility Claims or the Term Loan Agent with respect to beneficial holders of Term Loan Claims.

**2.      Delivery of Distributions on RBL Facility Claims.**

Notwithstanding any provision of the Plan to the contrary, all distributions on account of Allowed RBL Facility Claims shall be governed by the RBL Facility Credit Agreement and shall be deemed completed when made to the RBL Facility Agent, which shall be deemed the Holder of the entirety of the Allowed RBL Facility Claims for purposes of distributions to be made hereunder. The RBL Facility Agent shall hold or direct such distributions for the benefit of the respective Holders of Allowed RBL Facility Claims. As soon as practicable following compliance with the requirements set forth in this Article VI.B, the RBL Facility Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the respective Holders of RBL Facility Claims, pursuant to the terms of the RBL Facility Credit Agreement.

3.    **Delivery of Distributions on Term Loan Claims.**

Notwithstanding any provision of the Plan to the contrary, all distributions on account of Allowed Term Loan Claims shall be governed by the Term Loan Credit Agreement and shall be deemed completed when made to the Term Loan Agent, which shall be deemed the Holder of the entirety of the Allowed Term Loan Claims for purposes of distributions to be made hereunder.  The Term Loan Agent shall hold or direct such distributions for the benefit of the respective Holders of Allowed Term Loan Claims.  As soon as practicable following compliance with the requirements set forth in this Article VI.B, the Term Loan Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the respective Holders of Term Loan Claims, pursuant to the terms of the Term Loan Credit Agreement.

4.    **Delivery of Distributions in General.**

(a)    Payments and Distributions on Disputed Claims.

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall, in the reasonable discretion of the Plan Administrator, be deemed to have been made by the Plan Administrator on the Effective Date unless the Plan Administrator and the Holder of such Claim agree otherwise.

(b)    Special Rules for Distributions to Holders of Disputed Claims.

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors or the Plan Administrator, as applicable, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim, other than with respect to Professional Fee Claims, until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

(c)    Distributions.

On and after the Effective Date, the Debtors shall make the distributions required to be made on account of Allowed Claims under the Plan.  Any distribution that is not made on the Initial Distribution Date or on any other date specified in the Plan because the Claim that would have been entitled to receive that distribution is not an Allowed Claim on such date, shall be held by the Debtors in reserve in accordance with the Plan, as applicable, and distributed on the next Subsequent Distribution Date that occurs after such Claim is Allowed.  Subject to Article VI.D, no interest shall accrue or be paid on the unpaid amount of any distribution paid pursuant to the Plan.

5.    **Undeliverable Distributions and Unclaimed Property.**

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Plan Administrator has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date the distribution is made.  After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Plan Sponsor, automatically and without need for a further order by the Bankruptcy Court and the Claim of any holder to such property or interest in property shall be released, discharged, settled, compromised, and forever barred.

6.    **Manner of Payment Pursuant to the Plan.**

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Plan Administrator by check or by wire transfer, at the sole and exclusive discretion of the Plan Administrator.

C.    **Compliance with Tax Requirements/Allocations.**

In connection with the Plan, to the extent applicable, the Plan Administrator or the Debtors shall request distributees to provide appropriate documentation that may be required for an exemption from withholding and reporting, and shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements unless an exception applies.  Notwithstanding any provision in the Plan to the contrary, the Plan Administrator and the Debtors shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms it believes is reasonable and appropriate.  The Plan Administrator and the Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.  All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes.  Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

D.    **Allocation of Plan Distributions Between Principal and Interest.**

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed therein.

E.    **Setoffs and Recoupment.**

Except with respect to the RBL Facility Claims or Term Loan Claims, or as otherwise expressly provided herein, the Debtors may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Plan Sponsor of any such Claim it may have against the Holder of such Claim.  At any time after the Confirmation Date, without the need for Bankruptcy Court approval, the Debtors may exercise, litigate or settle any rights of setoff or recoupment that they or any creditor may have.  On the Effective Date, all such rights of setoff or recoupment shall be preserved and shall vest in the Plan Sponsor.

F.    **Claims Paid or Payable by Third Parties.**

1.    **Claims Paid by Third Parties.**

The Debtors shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.  All distributions returned or repaid and all interest therein shall be promptly delivered by the Debtors to the Plan Sponsor.

### 2. Claims Payable by Insurance, Third Parties.

No distributions under the Plan shall be made on account of a Claim that is payable pursuant to one of the Debtors' insurance policies, surety agreements, other non-Debtor payment agreements, or collateral held by a third party, until the Holder of such Claim has exhausted all remedies with respect to such insurance policy, surety agreement, other non-Debtor payment agreement, or collateral, as applicable. To the extent that one or more of the Debtors' insurers, sureties, or non-Debtor-payors pays or satisfies in full or in part a Claim (if and to the extent finally adjudicated by a court of competent jurisdiction or otherwise settled), or such collateral or proceeds from such collateral is used to satisfy such Claim, then immediately upon such payment, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3. Applicability of Insurance Policies.

Notwithstanding anything to the contrary in the Plan or Confirmation Order, Confirmation and Consummation of the Plan shall not limit or affect the rights of any third-party beneficiary or other covered party of any of the Debtor's insurance policies with respect to such policies (including the D&O Policies), nor shall anything contained herein (a) constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under any insurance policy, applicable law, equity, or otherwise, or (b) establish, determine, or otherwise imply any liability or obligation, including any coverage obligation, of any insurer.

### G. Indefeasible Distributions.

Any and all distributions, other than in respect of General Unsecured Claims, made under the Plan shall be indefeasible and not subject to clawback.

### ARTICLE VII.
### THE PLAN ADMINISTRATOR AND DISSOLUTION OF THE DEBTORS

### A. The Plan Administrator.

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the Wind-Down Amount, and conduct the Wind Down, including: (1) liquidating, receiving, holding, and investing, supervising, and protecting the Excluded Assets; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Wind-Down Amount; (3) making distributions from the Wind-Down Amount as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying reasonable fees, expenses, debts, charges, and liabilities of the Debtors on and after the Effective Date; (7) administering and paying taxes of the Debtors on and after the Effective Date, including filing tax returns; (8) representing the interests of the Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Debtors (other than any Acquired Debtor) and the Plan Sponsor, and filed with the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Debtors shall be terminated.

1. **Plan Administrator's Rights and Powers.**

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out its responsibilities under the Plan, and as otherwise provided in the Confirmation Order. The Plan Administrator shall be the exclusive trustee of the Excluded Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to Bankruptcy Code § 1123(b)(3)(B).

Except as otherwise set forth herein, all distributions under the Plan shall be made on the Effective Date or as soon as reasonably practicable thereafter by the Debtors or the Plan Administrator (or its designee(s)), the timing of which shall be subject to the reasonable discretion of the Debtors or the Plan Administrator, as applicable.

Except as otherwise provided herein, on and after the Effective Date, the Plan Administrator and its designees or representatives shall have the right (with the consent of the Plan Sponsor, such consent not to be unreasonably withheld) to object to, Allow, or otherwise resolve any General Unsecured Claim, Other Priority Claim, or Other Secured Claim (in each case, other than any Claims assumed by the Plan Sponsor), subject to the terms hereof.

The Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court. However, in the event that the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash by the Debtors.

2. **Retention of Professionals.**

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of its duties. The reasonable fees and expenses of such professionals shall be paid by the Debtors upon the monthly submission of statements to the Plan Administrator, but solely out of the Wind-Down Budget and the Wind-Down Amount. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business by the Debtors and shall not be subject to the approval of the Bankruptcy Court but shall be subject to the Wind-Down Budget and the Wind-Down Amount.

3. **Compensation of the Plan Administrator.**

The Plan Administrator's post-Effective Date compensation will be set forth in the Plan Supplement and paid out of the Wind-Down Budget and the Wind-Down Amount.

4. **Plan Administrator Expenses.**

Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to or action, order, or approval of the Bankruptcy Court in Cash from the Wind-Down Amount solely in accordance with the Wind-Down Budget.

B. **Wind-Down.**

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to conduct the Wind Down.

As soon as practicable after the Effective Date, in connection with the Wind Down, the Plan Administrator shall: (1) cause the Debtors to comply with, and abide by, the terms of the Plan Sponsor Agreement and any other documents contemplated thereby; (2) take any actions necessary to wind down the Estates of the Debtors (other than any Acquired Debtors); *provided* that such Debtors shall not be dissolved until the satisfaction of the conditions precedent to such dissolution in Article VII.E; (3) take such other actions as the Plan Administrator may determine to

be necessary or desirable to carry out the purposes of the Plan. From and after the Effective Date, except as set forth herein, the Debtors (other than any Acquired Debtors) (x) for all purposes shall be deemed to have withdrawn their business operations from any state in which such Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (y) shall be deemed to have canceled pursuant to the Plan all Interests, and (z) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

The filing of the final monthly operating report (for the month in which the Effective Date occurs) and all subsequent quarterly operating reports shall be the responsibility of the Plan Administrator.

### C.    Exculpation; Indemnification; Insurance; Liability Limitation.

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Debtors. The Plan Administrator may obtain, at the expense of the Debtors, but solely from the Wind-Down Amount and pursuant to the Wind-Down Budget, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors and their advisors.

For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

### D.    Tax Returns.

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, other than as may be required in connection with a Plan Sponsor Equity Election, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

### E.    Dissolution of the Debtors.

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of the completion of all distributions, completion of all its duties under the Plan, and entry of a final decree closing the last of the Debtors' Chapter 11 Cases, the Debtors (other than any Acquired Debtors) shall be deemed to be dissolved without any further action by the Debtors, the Plan Administrator, or the Bankruptcy Court, including the filing of any documents with the secretary of state for each state in which each of the Debtors is formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Debtors (other than any Acquired Debtors) in and withdraw such Debtors from applicable state(s), if applicable.

For the avoidance of doubt, notwithstanding any dissolution of any Debtor on or after the Effective Date, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

To the extent the Debtors have any Cash or other property, assets or interests remaining after the Chapter 11 Cases have been closed and all payments have been made under the Plan (including all payments on account of Allowed Claims and the Plan Administrator's compensation and reimbursement), such Cash or other property, assets or interests shall be immediately allocated and distributed to the Plan Sponsor.

**ARTICLE VIII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

**A.      Disputed Claims Process.**

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under the Plan, except as required by the Plan, Holders of Claims need not File Proofs of Claim, and the Plan Administrator or the Plan Sponsor and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable.  All Proofs of Claim filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.   Upon the Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Proofs of Claim filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below.  Notwithstanding anything in the Plan to the contrary, disputes regarding the amount of any Cure Costs Claims pursuant to section 365 of the Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

For the avoidance of doubt, there is no requirement to File a Proof of Claim or Proof of Interest (or move the Bankruptcy Court for allowance) to be an Allowed Claim or Allowed Interest, as applicable, under the Plan. Notwithstanding the foregoing, Entities must File Cure Costs Claim objections as set forth in Article V of the Plan to the extent such Entity disputes the amount of the Cure Costs paid or proposed to be paid by the Debtors or the Plan Sponsor to a counterparty.  **Except as otherwise provided herein, all Proofs of Claim filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against the Plan Sponsor or the Debtors, without the need for any objection by the Plan Sponsor or the Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

**B.      Allowance of Claims.**

After the Effective Date and subject to the terms of the Plan, the Plan Sponsor shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

**C.      Claims Administration Responsibilities.**

Except as otherwise specifically provided in the Plan, after the Effective Date, the Plan Sponsor shall have the sole authority:  (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Plan Administrator or the Plan Sponsor, as applicable, shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest.

Notwithstanding the foregoing, the Debtors and the Plan Administrator or the Plan Sponsor, as applicable, shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable nonbankruptcy law.  In any action to determine the existence, validity, or amount of any General Unsecured Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim shall be preserved and enforceable by the Plan Administrator or the Plan Sponsor, as applicable.

D.    **Estimation of Claims.**

On and after the Effective Date, the Plan Administrator or the Plan Sponsor, as applicable, may (but is not required to), at any time, request that the Bankruptcy Court estimate any Claim (other than any Professional Fee Claim) pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code and/or Bankruptcy Rule 3012, for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Plan Administrator or the Plan Sponsor, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

E.    **Adjustment to Claims or Interests Without Objection.**

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Plan Administrator or the Plan Sponsor without the Plan Administrator or the Plan Sponsor having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.    **Disallowance of Claims or Interests.**

All Claims and Interests of any Entity from which property or an interest in property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Plan Sponsor allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Plan Sponsor, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or any interest in property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property or interest in property, as applicable, by the date set forth in such agreement or Final Order.

G.    **No Distributions Pending Allowance.**

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

H.    **Distributions After Allowance.**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Plan Administrator shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim.

## I.    No Interest.

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## ARTICLE IX.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

### A.    Settlement, Compromise, and Release of Claims and Interests.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Plan Sponsor may compromise and settle Claims against the Debtors and their Estates and Transferred Causes of Action against other Entities.

### B.    Discharge of Claims and Termination of Interests.

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property or interest in property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has voted to accept the Plan.  Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date with respect to a Claim that is Unimpaired by the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than Reinstated Claims) and Interests subject to the Effective Date occurring.

### C.    Release of Liens.

**Except as otherwise specifically provided in the Plan, the Plan Sponsor Agreement or in any contract, instrument, release, or other agreement or document created pursuant to the Plan (including the terms of the RBL Contingent Value Rights, the RBL Contingent Value Rights Memorandum, the Term Loan Contingent Value Rights, the Term Loan Contingent Value Rights Agreement, and the Term Loan Contingent Value Rights Memorandum), on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and the Plan Sponsor Agreement, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property, assets, or interests of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of**

trust, Liens, pledges, or other security interests shall revert to the Plan Sponsor (or the Acquired Debtor, as applicable) without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors.  Any Holder of a Secured Claim (including any applicable agents for such Holder) shall be authorized and directed to release any collateral or property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and any applicable agents), and to take such actions as may be reasonably requested by the Debtors or the Plan Sponsor to evidence the release of such Lien, including the execution, delivery and filing or recordation of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.  In addition, the RBL Facility Agent and the Term Loan Agent shall execute and deliver all documents reasonably requested by the Debtors, the Plan Administrator or the Plan Sponsor to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.

**D.      Releases by the Debtors.**

Notwithstanding anything contained in the Plan, the Confirmation Order, or the Plan Sponsor Agreement to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors and their Estates, in each case on behalf of themselves and their respective successors, assigns and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the RBL Facility, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the Plan Sponsor Transaction, the Restructuring Transaction, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Plan Supplement, the Plan Sponsor Transaction, the Restructuring Transaction, or any other contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) related to any of the foregoing or created or entered into in connection with the RSA, the Disclosure Statement, the Plan, the Plan Supplement, the Plan Sponsor Transaction, or the Restructuring Transaction, or any other actions taken to effectuate the Plan, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities or other property pursuant to the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding the inclusion of any Released Parties as a potential party to any Transferred Causes of Action (including, for each, Avoidance Actions), such parties shall remain Released Parties.

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, any Definitive Document or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any Claims or Causes of Action with respect to Todd Stone divorce litigation, titled In the Marriage Matter of Todd and Jennifer Stone DC No. 18-02-01705.**

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases herein, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the releases herein are:  (1) essential to the Confirmation of the Plan; (2) in exchange for a substantial contribution and the good and valuable consideration provided by the Released Parties that is important to the success of the Plan; (3) a good faith settlement and compromise of the Claims released by the releases herein; (4) in the best interests of the Debtors and all Holders of Claims and Interests; (5) fair, equitable and reasonable; (6) given and made after reasonable investigation by the Debtors and after due notice and opportunity for hearing; and (7) a bar to any of the Debtors asserting any Claim or Cause of Action released by the releases herein against any of the Released Parties.

**E.      Releases by Holders of Claims and Interests.**

Except as otherwise expressly set forth in the Plan, the Plan Sponsor Agreement, or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Debtor and Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by each Releasing Party from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operations thereof), the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, any intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the Plan Sponsor Transaction, the Restructuring Transaction, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Plan Sponsor Agreement, the Restructuring Stipulation, the Disclosure Statement, the Plan, the Restructuring Transaction, or any other contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing or created or entered into in connection with the RSA, the Plan Sponsor Transaction, the Restructuring Stipulation, the Disclosure Statement, the Plan, or the Restructuring Transaction, or any other actions taken to effectuate the Plan, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities or other property pursuant to the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, any Definitive Document or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any Claims or Causes of Action with respect to Todd Stone divorce litigation, titled In the Marriage Matter of Todd and Jennifer Stone DC No. 18-02-01705.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the releases herein are:  (1) essential to the Confirmation of the Plan; (2) in exchange for a substantial contribution and the good and valuable consideration provided by the Released Parties that is important to the success of the Plan; (3) a good faith settlement and compromise of the Claims released by the Releasing Parties; (4) in the best interests of the Debtors and all Holders of Claims and Interests; (5) fair, equitable and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released by the releases herein against any of the Released Parties.

F.      Exculpation.

        Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur any liability for, and each Exculpated Party is hereby released and exculpated from any Claims or Cause of Action for, any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions (including the RBL Facility), the Disclosure Statement, the Plan, the Plan Supplement, the Restructuring Stipulation, the Plan Sponsor Transaction and any actions taken to effectuate the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Releasing Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property, assets, and interest under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects the Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

G.      Injunction.

        Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan shall be discharged pursuant to the Plan, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Released Parties, or the Exculpated Parties (to the extent of the exculpation provided pursuant to the Plan with respect to the Exculpated Parties): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or interest in property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or interest in property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

        Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim, as

applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article IX.G.

**H.      Protection Against Discriminatory Treatment.**

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Debtor, or any Entity with which a Debtor has been or is associated, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtors, or another Entity with whom the Debtors have been associated, solely because such Debtor was a debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**I.      Recoupment.**

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

**J.      Subordination Rights.**

Any distributions under the Plan to Holders shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights.  Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property, assets, and interests distributed under the Plan, in each case other than as provided in the Plan.

**K.      Reimbursement or Contribution.**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE X.
## CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

**A.      Conditions Precedent to Confirmation.**

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of the Plan:  (1) the Bankruptcy Court shall have entered the Confirmation Order; and (2) the Plan Sponsor Agreement shall not have been terminated in accordance with its terms.

**B.      Conditions Precedent to the Effective Date.**

It shall be a condition to Consummation that the following conditions shall have been satisfied or waived pursuant to the provisions of the Plan:

1.      the Bankruptcy Court shall have entered the Confirmation Order, and such Confirmation Order shall not have been stayed or modified, or vacated on appeal;

2.      the RSA and the Restructuring Stipulation shall not have terminated and remain in full force and effect;

3.      the Definitive Documents contain terms and conditions consistent in all material respects with the RSA and the Restructuring Stipulation, and will otherwise be reasonably acceptable to the Plan Sponsor and the RBL Facility Agent as required by the RSA, and with respect to any terms and conditions in the Definitive Documents that would be reasonably expected to materially adversely affect the Term Loan Settlement (as defined in the Restructuring Stipulation) or the rights of holders of Term Loan Claims, such terms and conditions shall be acceptable to the Required Consenting Term Loan Lenders (as defined in the Restructuring Stipulation);

4.      each of the Definitive Documents, including all documents contained in the Plan Supplement and any exhibits, schedules, amendments, or modifications thereto, shall have been executed in form and substance reasonably acceptable to the Plan Sponsor and the RBL Facility Agent as required by the RSA, and with respect to any terms and conditions in the Definitive Documents that would be reasonably expected to materially adversely affect the Term Loan Settlement (as defined in the Restructuring Stipulation) or the rights of holders of Term Loan Claims, such terms and conditions shall be acceptable to the Required Consenting Term Loan Lenders (as defined in the Restructuring Stipulation);

5.      the Term Loan Contingent Value Rights Agreement shall have been executed and shall be consistent with the Restructuring Stipulation and the consent rights hereunder or under the RSA, as applicable;

6.      the Plan Sponsor Cash Amount has been paid to the RBL Facility Agent in accordance with Article III and Article VI of the Plan;

7.      the Debtors and/or the Plan Sponsor have obtained all authorizations, consents and approvals (including governmental, regulatory and third-party authorizations, consents and approvals), rulings and documents that are necessary (as determined by the Plan Sponsor, in consultation with the Debtors) to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring Transactions;

8.      the final version of each of the Plan and the Definitive Documents, and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, as applicable, in form and substance consistent in all respects with the RSA, the Restructuring Stipulation, the Plan and the Plan Sponsor Agreement, and comply with the applicable consent rights set forth in the RSA, the Restructuring Stipulation, the Plan and/or the Plan Sponsor Agreement for such documents and shall not have been modified in a manner inconsistent with the RSA, the Plan and the Plan Sponsor Agreement, and all conditions precedent to the effectiveness of the Definitive Documents shall have been satisfied or waived in accordance with the terms of such Definitive Documents;

9.      the establishment and funding of the Professional Fee Escrow Account in accordance with Article II of the Plan;

10.     the Debtors shall have timely paid and reimbursed all of the RBL Facility Agent's reasonable and documented fees and expenses owing under the RBL Facility Credit Documents, limited to the reasonable and documented fees and expenses of the RBL Facility Agent Advisors;

11.     the Debtors shall have paid the Consenting Term Loan Lenders Reimbursement Amount;

12.     the Restructuring Transactions, including the Plan Sponsor Transaction and all other transactions contemplated under the Plan, the Plan Sponsor Agreement, or the Term Loan Contingent Value Rights Agreement shall have been consummated in accordance with the terms and conditions of the Plan and the Plan Sponsor Agreement.

On the Effective Date, the Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

C.       **Waiver of Conditions.**

The conditions to Consummation of the Plan may be waived by the Debtors, the Plan Sponsor, and the RBL Facility Agent, in accordance with the terms hereof and of the RSA and the Restructuring Stipulation.

D.       **Substantial Consummation.**

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

E.       **Effect of Non-Occurrence of Conditions to the Effective Date.**

If the Effective Date does not occur, the Plan (including any settlement or compromise embodied in the Plan, any assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan (including the Plan Sponsor Agreement)) shall be null and void in all respects (*provided* that the Debtors and the Plan Sponsor (or any designee of any Debtor or the Plan Sponsor, as applicable) shall retain any rights under the RSA and the Plan Sponsor Agreement) and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, the Debtors' Estates, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, the Debtors' Estates, any Holders, or any other Entity in any respect.

## ARTICLE XI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

Except as otherwise provided herein in the RSA, the Restructuring Stipulation, or the Plan Sponsor Agreement, the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article XI.

A.       **Effect of Confirmation on Modifications.**

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof and before the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

B.       **Revocation or Withdrawal of the Plan.**

Subject to the terms of the RSA and the Plan Sponsor Agreement, the Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any Debtor or all Debtors, prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan with respect to any Debtor, or if Confirmation or Consummation does not occur with respect to any Debtor, then:  (1) the Plan with respect to such Debtor shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan with respect to such Debtor (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan with respect to such Debtor, and any document or agreement executed pursuant to the Plan with respect to such Debtor, shall be deemed null and void, *provided* the Debtors and the Plan Sponsor (or any designee of any Debtor or the Plan Sponsor, as applicable) shall retain any rights under the RSA and the Plan Sponsor Agreement; and (3) nothing contained in the Plan with respect to such Debtor shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the

rights of the Debtors, the Debtors' Estates, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Debtors' Estates, or any other Entity.

## ARTICLE XII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Assumed Contract or Lease; (c) the Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V of the Plan, any Executory Contracts or Unexpired Leases to the schedule of Assumed Contracts and Leases or the schedule of Rejected Contracts and Leases otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article IX of the Plan and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

13.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.F of the Plan;

14.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     Determine any other matters that may arise in connection with or relate to the Plan, the Plan Sponsor Agreement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.     Adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

21.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' release, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

23.     Enforce all orders previously entered by the Bankruptcy Court;

24.     To resolve any disputes arising under the Plan Sponsor Agreement or other documents related to the Restructuring Transactions;

25.     Hear any other matter not inconsistent with the Bankruptcy Code; and

26.     Enter an order concluding or closing the Chapter 11 Cases.

# ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

**A.**    **Immediate Binding Effect.**

Subject to Article VIII of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the Plan, the Plan Sponsor Agreement, and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, any and all Holders of Claims or Interests (irrespective of whether the Holders of such Claims or Interests accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, discharges, releases, and injunction described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

**B.**    **Additional Documents.**

On or before the Effective Date, the Debtors, subject to the consent provisions herein and the RSA, may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, all Holders of Claims receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

Notwithstanding anything to the contrary in the Plan, any modification, waiver, or other action pursuant to the Plan, and the form and substance of the Plan Supplement and any other document, agreement, or instrument entered into by the Debtors, the Plan Sponsor, any Consenting RBL Facility Party, or any Consenting Term Loan Lender in connection with the Plan and the Restructuring Transactions contemplated by the Plan, shall be subject in all respects to the consent provisions herein, the RSA and the Restructuring Stipulation, as applicable.

**C.**    **Payment of Statutory Fees.**

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid by the Debtors for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

**D.**    **Dissolution of Statutory Committees.**

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases on the Effective Date.

**E.**    **Reservation of Rights.**

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by the Plan Sponsor or any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Plan Sponsor or any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

**F.**    **Successors and Assigns.**

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign, Affiliate, officer, director, manager, trustee, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.    **Service of Documents.**

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors shall be served on:

1.    **the Debtors:**

Arena Energy, LP
2103 Research Forest Drive, Suite 400
The Woodlands, Texas 77380
Attention:  Ed Menger, Interim General Counsel
Email address:  EMenger@arenaenergy.com

with copies to:

Kirkland & Ellis LLP
609 Main Street
Houston, Texas 77002
Attention:  Brian Schartz, P.C
Email address:  brian.schartz@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attention:  Gregory F. Pesce
Email Address:  gregory.pesce@kirkland.com

2.    **The Plan Sponsor**

San Juan Offshore, LLC
Attention:  Michael J. Minarovic, Chief Executive Officer
E-mail:  mike@sanjuanoffshore.com

with copies to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attention: Brian Resnick and Stephanie Massman
E-mail address:  brian.resnick@davispolk.com, stephanie.massman@davispolk.com

**and**

3.    **The RBL Facility Agent or the Consenting RBL Facility Lenders:**

Haynes and Boone, LLP
2323 Victory Avenue
Suite 700
Dallas, Texas 75219
Attention:  J. Frasher Murphy, Eli Columbus
E-mail address:  frasher.murphy@haynesboone.com, eli.columbus@haynesboone.com

and

Haynes and Boone, LLP
1221 McKinney Street
Suite 4000
Houston, Texas 77010
Attention:  Austin Elam, Ellen Conley
E-mail address:  austin.elam@haynesboone.com, ellen.conley@haynesboone.com

**4.   The Consenting Term Loan Lenders:**

Milbank LLP
55 Hudson Yards
New York, New York 10001
Attention:  Evan Fleck, Parker Milender
E-mail address:    efleck@milbank.com, pmilender@milbank.com

After the Effective Date, the Debtors shall have authority to send a notice to Entities that continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to the Plan Sponsor and those Entities who have Filed such renewed requests.

**H.     Enforcement of Confirmation Order.**

On and after the Effective Date, the Debtors, the Plan Administrator, and the Plan Sponsor, as applicable, shall be entitled to enforce the terms of the Confirmation Order and the Plan (which shall include, for the avoidance of doubt, the Plan Supplement and the Plan Sponsor Agreement).

**I.     Term of Injunctions or Stays.**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order (including the injunction set forth in Article IX.G) shall remain in full force and effect in accordance with their terms.

**J.     Entire Agreement.**

Except as otherwise indicated, the Plan, the Confirmation Order, the Plan Sponsor Agreement, and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**K.     Exhibits.**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://www.kccllc.net/Arena or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy.

**L.     Nonseverability of Plan Provisions.**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall not alter or interpret such term or provision to make it valid or

enforceable, *provided* that at the request of the Debtors, which request shall be subject to the RSA, and the consent provisions herein, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors in accordance with the RSA, and the consent provisions herein; and (3) nonseverable and mutually dependent.

**M.     Votes Solicited in Good Faith.**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and the Plan Sponsor and each of their respective Affiliates, agents, representatives, members, principals, equity holders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

**N.     Waiver.**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court before the Confirmation Date.

Respectfully submitted,

Dated:  August 20, 2020                              ARENA ENERGY, LP
                                                     on behalf of itself and all other Debtors

                                                     _____
                                                     */s/ Anthony R. Horton*
                                                     Name: Anthony R. Horton
                                                     Title: Authorized Representative
                                                     Company: Arena Energy, LP


                                                     _____
                                                     */s/ Dean Swick*
                                                     Name: Dean Swick
                                                     Title: Authorized Representative
                                                     Company: Arena Energy, LP

# Exhibit A

**Plan Sponsor Agreement**

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**dated as of August 19, 2020**

**by and among**

**ARENA ENERGY, LP,**

**ARENA EXPLORATION, LLC,**

**VALIANT ENERGY LLC,**

**SAGAMORE HILL HOLDINGS, LP,**

**collectively, as Seller,**

**SAN JUAN OFFSHORE, LLC,**

**as Buyer,**

**and**

**solely for the purposes set forth herein,**

**WELLS FARGO BANK, N.A.**

# TABLE OF CONTENTS

## ARTICLE 1
## DEFINITIONS

| | | |
|---|---|---|
| 1.1 | Definitions | 1 |
| 1.2 | Other Definitions and Interpretive Matters | 13 |

## ARTICLE 2
## PURCHASE AND SALE

| | | |
|---|---|---|
| 2.1 | Purchase and Sale | 14 |
| 2.2 | Excluded Assets | 17 |
| 2.3 | Assumed Liabilities | 18 |
| 2.4 | Excluded Liabilities | 19 |
| 2.5 | Cure Costs | 20 |
| 2.6 | Assignment of Assets Subject to Consent Requirements | 21 |
| 2.7 | Preferential Purchase Rights | 22 |
| 2.8 | Further Assurances | 23 |

## ARTICLE 3
## PURCHASE PRICE

| | | |
|---|---|---|
| 3.1 | Purchase Price | 23 |
| 3.2 | Deposit | 23 |
| 3.3 | Allocation of Purchase Price; Allocated Value | 24 |
| 3.4 | Withholding | 24 |

## ARTICLE 4
## CLOSING

| | | |
|---|---|---|
| 4.1 | Closing Date | 24 |
| 4.2 | Payment on the Closing Date | 24 |
| 4.3 | Buyer's Deliveries | 25 |
| 4.4 | Seller's Deliveries | 26 |

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF SELLER

| | | |
|---|---|---|
| 5.1 | Organization and Good Standing | 27 |
| 5.2 | Authority; Validity; Governmental Authority Consents | 27 |
| 5.3 | No Conflict | 27 |
| 5.4 | Permits | 28 |
| 5.5 | Legal Proceedings | 28 |
| 5.6 | Brokers or Finders | 28 |
| 5.7 | Approved Work Programs and Budgets | 28 |
| 5.8 | Consents and Preferential Purchase Rights | 28 |

5.9     Material Assigned Contracts ........................................................................ 28
5.10    Outstanding Capital Commitments; Non-Consent Operations ........................... 29
5.11    Taxes ........................................................................................................ 29
5.12    Cure Costs ................................................................................................. 30
5.13    Imbalances ................................................................................................. 30
5.14    Insurance ................................................................................................... 30
5.15    Surety Bonds and Credit Support ................................................................. 30

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF BUYER

6.1     Organization and Good Standing .................................................................. 31
6.2     Authority; Validity; Consents ....................................................................... 31
6.3     No Conflict ................................................................................................. 31
6.4     Availability of Funds .................................................................................... 32
6.5     Litigation .................................................................................................... 32
6.6     Bankruptcy ................................................................................................. 32
6.7     Brokers or Finders ...................................................................................... 32
6.8     Relationships .............................................................................................. 32
6.9     Knowledge and Experience .......................................................................... 32
6.10    Qualification to Own the Assets ................................................................... 33

## ARTICLE 7
## ACTIONS PRIOR TO THE CLOSING DATE

7.1     Operations Prior to the Closing Date ............................................................ 33
7.2     Reasonable Best Efforts .............................................................................. 34
7.3     Bankruptcy Court Approval .......................................................................... 35
7.4     Updates and Amendments of Exhibits .......................................................... 36
7.5     Commitment Letters .................................................................................... 37
7.6     BOEM Qualifications .................................................................................... 37
7.7     Credit Support ............................................................................................ 37
7.8     Access to the Properties .............................................................................. 38
7.9     Employee Matters ....................................................................................... 39

## ARTICLE 8
## ADDITIONAL AGREEMENTS

8.1     Taxes ........................................................................................................ 39
8.2     Allocation of Purchase Price ........................................................................ 40
8.3     Bulk Sales ................................................................................................. 40
8.4     Assigned Contracts and Assigned Leases and Interests; Adequate Assurance and Performance .................................................................................. 40
8.5     Post-Closing Books and Records and Personnel ............................................. 41
8.6     No Other Representations or Warranties; Disclaimers; NORM ......................... 41
8.7     Casualty .................................................................................................... 43
8.8     Environmental Liabilities .............................................................................. 44

8.9      Additional Agreements ....................................................................... 44

## ARTICLE 9
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

9.1      Accuracy of Representations ............................................................... 45
9.2      Seller's Performance .......................................................................... 45
9.3      No Order .............................................................................................. 46
9.4      Seller's Deliveries .............................................................................. 46
9.5      Sale Order ........................................................................................... 46

## ARTICLE 10
## CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLER TO CLOSE

10.1     Accuracy of Representations ............................................................... 46
10.2     Sale Order in Effect ........................................................................... 47
10.3     Buyer's Performance .......................................................................... 47
10.4     No Order .............................................................................................. 47
10.5     Buyer's Deliveries .............................................................................. 47

## ARTICLE 11
## TERMINATION

11.1     Termination Events ............................................................................ 47
11.2     Effect of Termination ......................................................................... 49
11.3     Specific Performance ......................................................................... 50
11.4     Break-Up Fee and Expense Reimbursement ..................................... 50
11.5     Dispute Resolution ............................................................................. 51

## ARTICLE 12
## SURVIVAL AND INDEMNIFICATION

12.1     No Survival of Seller's Representations and Warranties .................... 52
12.2     Survival of Buyer's Representations and Warranties ........................ 52
12.3     Indemnification by Buyer ................................................................... 52
12.4     Indemnification Procedures ............................................................... 53
12.5     Calculation of Liabilities ................................................................... 54
12.6     Tax Treatments of Indemnity Payments ............................................ 54
12.7     Exclusive Remedy .............................................................................. 54

## ARTICLE 13
## GENERAL PROVISIONS

13.1     Confidentiality ................................................................................... 54
13.2     Public Announcements ....................................................................... 55
13.3     Notices ................................................................................................ 55
13.4     Waiver; Waiver of Damages............................................................... 57
13.5     Entire Agreement; Amendment ......................................................... 58

13.6    Assignment ................................................................................................ 58
13.7    Severability ............................................................................................... 58
13.8    Expenses ................................................................................................... 58
13.9    Time of the Essence .................................................................................. 58
13.10   Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver............. 58
13.11   Counterparts .............................................................................................. 59
13.12   Parties in Interest; No Third Party Beneficiaries ................................................ 59
13.13   No Recourse .............................................................................................. 60
13.14   Specific Performance ................................................................................. 60
13.15   Liquidating Trustee .................................................................................... 60

**SCHEDULES**:

Schedule 1.1(a)          Seller's Knowledge Persons
Schedule 1.1(b)          Buyer's Knowledge Persons
Schedule 2.1(b)(xiii)    Offices and Office Leases
Schedule 2.1(b)(xvi)     Bank and Escrow Accounts
Schedule 2.2(g)          Excluded Contracts
Schedule 3.3             Allocated Values
Schedule 5.3             No Conflicts
Schedule 5.8             Consents and Preferential Rights
Schedule 5.9(a)          Material Contracts Breaches
Schedule 5.9(b)          Material Contracts
Schedule 5.9(c)          Other Material Contracts
Schedule 5.10            Outstanding Capital Commitments
Schedule 5.12            Cure Costs
Schedule 5.13            Imbalances
Schedule 5.14            Insurance
Schedule 5.15            Surety Bonds and Credit Support
Schedule 6.8             Relationships
Schedule 7.7(b)          Specified Seller Credit Obligations

**EXHIBITS**:

Exhibit A       Assigned Leases and Interests
Exhibit B       Wells
Exhibit C       Assigned Contracts
Exhibit D       Form of County Assignment
Exhibit E       Form of Assignment of OIL Interests
Exhibit F       Contingent Consideration Provisions
Exhibit G       Employee Matters
Exhibit H       Form of Memorandum

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of August 19, 2020 (the "Execution Date"), but effective for all purposes as of the Effective Time, is by and among Arena Energy, LP, a Delaware limited partnership ("Arena"), Arena Exploration, LLC, a Delaware limited liability company ("AEX"), Valiant Energy LLC, a Delaware limited liability company ("Valiant"), and Sagamore Hill Holdings, LP, a Delaware limited partnership ("Sagamore Hill" and, together with Arena, AEX and Valiant, each a "Seller Party", and collectively, "Seller"), San Juan Offshore, LLC, a Delaware limited liability company ("Buyer"), and, solely for purposes of Sections 3.1(x), 13.3, 13.4, 13.5, 13.6, 13.9, 13.10, 13.11, 13.12, 13.14 and Exhibit F, Wells Fargo Bank, N.A., a national banking association, as the initial representative for the RBL Facility Lenders pursuant to Exhibit F (the "RBL Facility Agent").  Capitalized terms used but not otherwise defined herein have the meanings set forth in Article 1.  Seller and Buyer are sometimes referred to collectively herein as the "Parties" and individually as a "Party".

## RECITALS

WHEREAS, Seller is the owner of record of certain interests in oil and gas leases, oil and gas wells, and other properties located in the Gulf of Mexico;

WHEREAS, concurrently with the execution of this Agreement, the Debtors, the Buyer and the Required Supporting Parties (defined below) shall enter into the Restructuring Support Agreement (defined below), pursuant to which the Debtors will, among other things, commence a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court");

WHEREAS, Seller desires to sell to Buyer all of the Assets, and Buyer desires to purchase from Seller all of the Assets and assume all of the Assumed Liabilities, upon the terms and conditions hereinafter set forth;

WHEREAS, the Parties intend to effectuate the transactions contemplated by this Agreement through a chapter 11 plan and pursuant to section 1123 of the Bankruptcy Code; and

WHEREAS, Seller's ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court;

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1     Definitions.  For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"AAA" means the American Arbitration Association.

"AAA Rules" means the Commercial Arbitration Rules of the AAA.

"Action" means any action, suit, claim, right, cause of action, litigation, proceeding or arbitration, or any inquiry, proceeding or investigation, by or before any Governmental Authority.

"AEX" has the meaning set forth in the introductory paragraph.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly (through one or more intermediaries) Controls, is Controlled by, or is under common Control with, such specified Person; *provided, however*, that for purposes of this Agreement, (a) none of (i) Arena Offshore, LP, (ii) Arena Offshore Operating, LLC, (iii) White Fleet Holdings, LLC and its Subsidiaries, and (iv) Rosefield Pipeline Company, LLC and its Subsidiaries, shall be considered or deemed to be an "Affiliate" of any Seller, except for purposes of Section 5.9, or of Buyer, (b) none of Lime Rock Management LP or any of its Affiliates (other than Buyer and its Subsidiaries) shall be considered or deemed to be an "Affiliate" of Buyer, except for purposes of Section 13.13 and (c) no member of the Buyer Group shall be considered or deemed to be an "Affiliate" of any member of the Seller Group.

"Agreement" has the meaning set forth in the introductory paragraph.

"Allocated Value" means the portion of the Purchase Price allocated to an Asset, as described on Schedule 3.3.

"Arbitrator" has the meaning set forth in Section 11.5

"Arena" has the meaning set forth in the introductory paragraph.

"Asset Taxes" means all ad valorem, property, excise, severance, production or similar Taxes based upon operation or ownership of the Assets or the production of Hydrocarbons or the receipt of proceeds therefrom (but excluding, for the avoidance of doubt, income, franchise and similar Taxes and Transfer Taxes).

"Assets" has the meaning set forth in Section 2.1(b).

"Assigned Actions" has the meaning set forth in Section 2.1(b)(xiv).

"Assigned Contracts" has the meaning set forth in Section 2.1(b)(iv).

"Assigned Leases and Interests" has the meaning set forth in Section 2.1(b)(i).

"Assignment of OIL Interests" means the Assignment of OIL Interests from Seller to Buyer, pertaining to the Assets described in Section 2.1(b)(xv)(A), substantially in the form attached to this Agreement as Exhibit E.

"Assignments" means, collectively, (i) the Assignment, Bill of Sale and Conveyance (County/Parish) from Seller to Buyer, pertaining to the Assets, substantially in the form attached to this Agreement as Exhibit D, and (ii) Assignments of Record Title Interest or

Operating Rights Interest in Federal OCS Oil and Gas Lease (DOI) from Seller to Buyer, pertaining to the Assets.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Avoidance Actions" means any and all claim, right or cause of action of any Seller Party arising under chapter 5 of the Bankruptcy Code and any analogous state or federal statutes and common law.

"Bankruptcy Case" means the case commenced by Seller under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, styled *Arena Energy LP, et al.*, and pending before the Bankruptcy Court.

"Bankruptcy Code" means Title 11 of the United States Code, Sections 101 *et seq.*

"Bankruptcy Court" has the meaning set forth in the recitals.

"Benefit Plan" means each pension, benefit, retirement, compensation, employment, consulting, profit-sharing, deferred compensation, incentive, bonus, performance award, phantom equity, stock or stock-based, change in control, retention, severance, vacation, paid time off, welfare, fringe-benefit and other similar agreement, plan, policy, program or arrangement (and any amendments thereto), in each case whether or not reduced to writing and whether funded or unfunded, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not tax-qualified and whether or not subject to ERISA, which is or has been maintained, sponsored, contributed to, or required to be contributed to by Seller or its Affiliates, or under which Seller or any its Affiliates has or may have any Liability.

"BOEM" means the Bureau of Ocean Energy Management.

"Break-Up Fee" has the meaning set forth in Section 11.4(a).

"BSEE" means the Bureau of Safety and Environmental Enforcement.

"Business Day" means any day, other than Saturday or Sunday, on which commercial banks are open for commercial business with the public in Houston, Texas.

"Buyer" has the meaning set forth in the introductory paragraph.

"Buyer Group" means Buyer, its Affiliates and the former, current and future partners, co-owners, direct and indirect equity holders and Representatives of each of the foregoing.

"Buyer Termination Notice" has the meaning set forth in Section 11.1(b)(i).

"Cash Collateral Order" means the order or orders of the Bankruptcy Court (a) authorizing Seller to use the cash collateral of the prepetition lenders and (b) providing the prepetition lenders with adequate protection.

"Casualty Loss" means any loss, damage or destruction of (a) the Assets or (b) any assets owned, Controlled, maintained or otherwise operated by third parties which are covered by Seller's or its Affiliates' insurance policies, that occurs during the period between the Execution Date and the Closing for any reason, including any act of God, fire, explosion, collision, earthquake, hurricane, storm, tropical depression, windstorm, flood, or other casualty or condemnation taking under the right of eminent domain, but excluding any loss, damage, or destruction as a result of depreciation, ordinary wear and tear, and any change in condition of the Assets for production of Hydrocarbons through normal depletion (which exclusion shall include the watering-out of any Well, collapsed casing, sand infiltration of any Well, or other reservoir changes relating to production issues).

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" has the meaning set forth in Section 4.1.

"Code" means the Internal Revenue Code of 1986, as amended.

"Commitment Letters" has the meaning set forth in Section 7.5.

"Consent Deadline" has the meaning set forth in Section 2.6(b).

"Contingent Consideration" has the meaning set forth in Exhibit F.

"Contract" means any agreement, contract, obligation, promise or undertaking (in each case, whether written or oral), other than a Lease, that is legally binding.

"Contract Notice" has the meaning set forth in Section 2.5(b).

"Control" means the ability (directly or indirectly through one or more intermediaries) to direct or cause the direction of the management or affairs of a Person, whether through the ownership of voting interests, by contract or otherwise.

"Copyrights" means all United States and foreign copyright rights in any original works of authorship, whether registered or unregistered, including all copyright registrations and applications.

"Credit Support" has the meaning set forth in Section 5.15.

"Cure Costs" has the meaning set forth in Section 2.5.

"Customary Post-Closing Consent" has the meaning set forth in Section 2.6(a).

"Debt Contract" means any Assigned Contract that is an indenture, mortgage, loan, credit or sale-leaseback guarantee of any obligation, bonds, letters of credit or similar financial contract that will remain in effect following the Closing.

"Debtors" means Arena, AEX, Valiant and Sagamore Hill.

"<u>Decommissioning</u>" means and includes all of the following as may be required under the Assigned Leases and Interests, Assigned Contracts, applicable Legal Requirements and Environmental Laws:

(a)     The plugging, replugging and abandonment of the Wells.

(b)     The removal, abandonment and disposal of the Equipment and Facilities.

(c)     The clearance, reclamation, restoration and Remediation of the lands, groundwater and water bottoms covered by or subject to the Assigned Leases and Interests or the Facilities or otherwise affected by the Assets and the Remediation, restoration and reclamation of the sea floor portion of the Assigned Leases and Interests or the Facilities associated with the Assets.

(d)     Any other activity associated with those enumerated in clauses (a) through (c), above, required to comply with any applicable Legal Requirements or the Assigned Leases and Interests.

"<u>Decommissioning Obligations</u>" has the meaning set forth in <u>Section 2.3(a)</u>.

"<u>Deposit</u>" has the meaning set forth in <u>Section 3.2</u>.

"<u>Designation Deadline</u>" means 5:00 p.m. (Central Time) on the date that is three (3) Business Days prior to the scheduled Closing Date or such later date as Buyer and Seller shall mutually agree and as the Bankruptcy Court may authorize.

"<u>Disputed Matters</u>" has the meaning set forth in <u>Section 11.5</u>

"<u>DOI</u>" means the United States Department of the Interior and its various U.S. government agencies responsible for management of energy resources on the Outer Continental Shelf, including the Bureau of Ocean Energy Management; Bureau of Safety and Environmental Enforcement and Office of Natural Resources Revenue, as applicable, and any of their predecessor agencies, the Bureau of Ocean Energy Management, Regulation and Enforcement and the Minerals Management Service, and any successors agencies.

"<u>Effective Time</u>" means 12:00 a.m. Central Time on the Closing Date.

"<u>Encumbrance</u>" means any charge, lien, claim, mortgage, lease, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal (or similar right), right of setoff, easement, servitude, restrictive covenant, encroachment, encumbrance, third party interest or other restriction or limitation of any kind.

"<u>Environmental Condition</u>" means (a) a condition, whenever existing or occurring, with respect to the air, soil, subsurface, surface waters, ground waters and/or sediments that causes an Asset (or Seller with respect to an Asset) not to be in compliance with any Environmental Law or (b) the existence with respect to an Asset of any environmental pollution, contamination, degradation, damage or injury.

5

"Environmental Laws" means any and all Legal Requirements pertaining to (a) use, storage, emission, discharge, clean-up, Release, or threatened Release, manufacture, processing, distribution, treatment, storage, disposal, transportation or handling of Hazardous Materials, or (b) protection of the environment, wildlife or natural resources applicable to the Assets and in effect on or prior to the Effective Time in or for the jurisdiction in which the Assets are located, including the Clean Air Act (Air Pollution Control Act), the Clean Water Act (CWA), the Federal Water Pollution Act, the Rivers and Harbors Act, the Safe Drinking Water Act, the National Environmental Policy Act of 1969 (NEPA), the Endangered Species Act (ESA), the Fish and Wildlife Conservation Act of 1980, the Fish and Wildlife Coordination Act (FWCA), the Oil Pollution Act, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), the Superfund Amendments and Reauthorization Act of 1986 (SARA), the Resources Conservation and Recovery Act (RCRA), the Toxic Substance Control Act, the Emergency Planning and Community Right-To-Know Act (EPCRA), the Hazardous Materials Transportation Act, the Hazardous and Solid Waste Amendments of 1984 (HSWA).

"Environmental Obligations" means and includes all of the following, regardless of the sole, joint or concurrent negligence, breach of contract, breach of warranty, strict liability, regulatory liability, statutory liability, or other fault or responsibility of any Person:

      (a)      Liabilities relating to any Environmental Condition;

      (b)      Liabilities relating to Remediation;

      (c)      Liabilities resulting from injury or death to natural Persons caused by the exposure or alleged exposure to Hazardous Materials (including expenses associated with claims investigation, testing and assessment); and

      (d)      Liabilities relating to the presence, release, emission or discharge of Hazardous Materials, pollution, contaminant or other regulated substances in or into the environment.

"Equipment" has the meaning set forth in Section 2.1(b)(vi).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"Escrow Account" means the account maintained by the Escrow Agent in connection with the Escrow Agreement.

"Escrow Agent" has the meaning set forth in Section 3.2.

"Escrow Agreement" has the meaning set forth in Section 3.2.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" means all Contracts of Seller other than the Assigned Contracts, including, for purposes of clarity (subject to Section 2.5), among others, those Contracts described on Schedule 2.2(g).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Records" means (a) the general corporate files and records of Seller, insofar as they relate to Seller's business generally and are not required for the future ownership or operation of the Assets, (b) all legal files and records (other than title opinions), (c) Seller's federal or state income, franchise or margin tax files and records, (d) employee files, (e) reserve evaluation information or economic projections, (f) records relating to the sale of the Assets, including competing bids, (g) proprietary data, information and data under contractual restrictions on assignment or disclosure, (h) privileged information and (i) any other files or records to the extent relating to any Excluded Assets.

"Execution Date" has the meaning set forth in the introductory paragraph.

"Expense Reimbursement" has the meaning set forth in Section 11.4(a).

"Expiration Date" has the meaning set forth in Section 12.2.

"Facilities" has the meaning set forth in Section 2.1(b)(vi).

"Final Order" means an Order issued by the applicable Governmental Authority as to which: (a) no request for stay of the Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (b) no petition for rehearing or reconsideration of the Order, or protest of any kind, is pending before the Governmental Authority and the time for filing any such petition or protest is passed; (c) the Governmental Authority does not have the Order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (d) the Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"Financing" has the meaning set forth in Section 7.5.

"Governmental Authority" means any court or tribunal (including an arbitrator or arbitral panel) in any jurisdiction (domestic or foreign) or any federal, tribal, state, county, municipal or other governmental or quasi-governmental body, agency, authority, department, board, commission, bureau, official or other authority or instrumentality.

"Governmental Authorization" means any approval, consent, license, permit, waiver or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Authority.

"Hard Consent" has the meaning set forth in Section 2.6(a).

"Hazardous Material" means any chemical substance, product, waste or other material which is, or becomes identified, listed, published, regulated, or defined as, or which shows the characteristics of, a hazardous substance, hazardous waste, hazardous material, toxic substance or other similar regulatory term, including oil, oil waste, by-products and components, NORM, Hydrocarbons, and Hydrocarbons waste, produced water, by-products and components,

7

polychlorinated biphenyls, and asbestos, or which is otherwise regulated or restricted under any Environmental Law or by any Governmental Authority.

"Hydrocarbons" means oil, gas, minerals, and other gaseous and liquid hydrocarbons, or any combination of the foregoing, produced from and attributable to the Properties.

"Imbalances" means over-production or under-production or over-deliveries or under-deliveries with respect to Hydrocarbons produced from or allocated to the Properties, regardless of whether such over-production or under-production or over-deliveries or under-deliveries arise at the wellhead, pipeline (taking into account any line fill), gathering system, transportation system, processing plant, or other location, including any imbalances under gas balancing or similar agreements, imbalances under production handling agreements, imbalances under processing agreements, imbalances under the Assigned Leases and Interests, imbalances under gathering or transportation agreements, and imbalances under operating agreements.

"Indemnification Claim" has the meaning set forth in Section 12.4(a).

"Intellectual Property" means all intellectual property, including all Copyrights, Patents and Trademarks, owned, used or licensed by Seller and used or held for use exclusively in the ownership and operation of the Assets, but specifically excluding, for the avoidance of doubt, all seismic, geological, geochemical or geophysical data licensed by Seller and any of Seller's interpretations of such data.

"Knowledge" means, with respect to any matter in question, (a) in the case of Seller, the actual knowledge (without any duty of inquiry) of any of the individuals listed on Schedule 1.1(a) with respect to such matter, and (b) in the case of Buyer, the actual knowledge (without any duty of inquiry) of any of the individuals listed on Schedule 1.1(b) with respect to such matter.

"Lease" means any oil and gas lease, oil, gas and mineral lease or sublease, and other leasehold interest, and the leasehold estates created thereby, including carried interests, rights of recoupment, options, reversionary interests, convertible interests and rights to reassignment.

"Legal Requirement" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other administrative Order, constitution, law, ordinance, principle of common law, regulation, statute or treaty.

"Liability" means any and all claims, rights, demands, causes of action, liabilities (including civil fines), obligations, damages, losses, fines, penalties, sanctions of every kind and character (including reasonable fees and expenses of attorneys, technical experts and expert witnesses), judgments or proceedings of any kind or character whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and whether arising or founded in law, equity, statute, contract, tort, strict liability or voluntary settlement, and all reasonable expenses, costs and fees (including reasonable attorneys' fees) in connection therewith.

"Lime Rock" means Lime Rock Partners VIII, L.P.

"Material Adverse Effect" means any change, event or occurrence that individually or in the aggregate (taking into account all other such changes, events or occurrences) has had, or would reasonably be expected to have, (1) a material adverse change in or material adverse effect on the Assets taken as a whole or (2) a material adverse effect on Seller's ability to consummate the transactions contemplated by this Agreement or to perform its obligations hereunder, but excluding (a) any change or effect to the extent that it results from or arises out of (i) the pendency of the Bankruptcy Case; (ii) the execution and delivery of this Agreement or the announcement thereof or consummation of the transactions contemplated hereby (it being understood and agreed that this clause (a)(ii) shall not apply to the term "Material Adverse Effect" as used in this Agreement to the extent related to any representation or warranty or any related condition contained in this Agreement that is intended to address the consequences of the negotiation, execution, announcement, performance or pendency of this Agreement or the consummation of the transactions contemplated hereby); (iii) changes in (or proposals to change) Legal Requirements, generally accepted accounting principles or other accounting regulations or principles; (iv) acts of God, including hurricanes, storms and other natural disasters; (v) any action required by this Agreement (other than Section 7.1) or taken at the written request of Buyer; (vi) actions of Governmental Authorities; or (vii) the terms and provisions of the Assigned Leases and Interests or Assigned Contracts; (b) any change or effect generally applicable to (i) the industries and markets in which Seller operates or (ii) economic or political conditions or interest rates, exchange rates, commodity prices or the securities or financial markets in any country or region; (c) any outbreak or escalation of hostilities or war or any act of terrorism; (d) the departure of officers or directors of Seller after the Execution Date; (e) any objections in the Bankruptcy Court to (i) this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby; (ii) the reorganization of Seller and any related plan of reorganization or disclosure statement; or (iii) the assumption or rejection of any Material Assigned Contract with Buyer's prior written consent; (f) any Order of the Bankruptcy Court (other than any Order that would preclude or prohibit the consummation of the transactions contemplated under this Agreement) or any actions or omissions of Seller in compliance therewith; and (g) any action taken by Seller at the written request of, or with the express written consent of, Buyer; *provided, however* that, in the cases of clauses (a)(iii), (a)(iv), (a)(vi), (b), and (c), if such change, inaccuracy, effect, event, result, occurrence, condition or fact has a disproportionate impact on Seller when compared to similarly situated owners or operators of oil and gas assets in the area in which the Assets are located, then such change, inaccuracy, effect, event, result, occurrence, condition or fact shall be deemed to create, cause or otherwise constitute a Material Adverse Effect for purposes hereof.

"Material Assigned Contract" has the meaning set forth in Section 5.9(b).

"Memorandum" means the Memorandum between Buyer and the RBL Facility Agent, substantially in the form attached to this Agreement as Exhibit H.

"Non-Disclosure Agreement" has the meaning set forth in Section 13.1.

"NORM" means naturally occurring radioactive materials.

"Oil Insurance Limited" has the meaning set forth in Section 2.1(b)(xv).

"Order" means any award, writ, injunction, judgment, order or decree entered, issued, made, or rendered by any Governmental Authority.

"Outside Date" has the meaning set forth in Section 11.1(a)(iii).

"Party" or "Parties" means, individually or collectively, Buyer and Seller.

"Party Affiliate" has the meaning set forth in Section 13.13.

"Patents" means United States and foreign patents and patent applications, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals and patent disclosures related thereto.

"Permits" has the meaning set forth in Section 2.1(b)(v).

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"Petition Date" means the filing date of Seller's chapter 11 petition commencing the Bankruptcy Case.

"Plan" means the Debtors' chapter 11 plan, which shall (a) provide for the transactions contemplated under this Agreement, including the transfer to Buyer or Buyer's designee of one hundred percent (100%) of the equity interests in any applicable reorganized Seller Party as may be elected by Buyer pursuant to Section 8.9(b), and (b) be in form and substance (i) consistent with the Restructuring Term Sheet attached as Exhibit B to the Restructuring Support Agreement, and (ii) acceptable to Buyer to the extent provided in the Restructuring Support Agreement.

"Post-Closing Covenant" has the meaning set forth in Section 12.1.

"Preferential Purchase Right" means any right or agreement that enables any Person to purchase or acquire any Asset or any interest therein or portion thereof as a result of or in connection with the execution or delivery of this Agreement or the consummation of the transactions contemplated hereby or any similar right or interest.

"Proceeding" means any Action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"Properties" has the meaning set forth in Section 2.1(b)(ii).

"Purchase Price" has the meaning set forth in Section 3.1(a).

"RBL Facility Agent" has the meaning set forth in the introductory paragraph.

10

"RBL Facility Claims" has the meaning set forth in the Restructuring Support Agreement.

"RBL Facility Lenders" has the meaning set forth in the Restructuring Support Agreement.

"Records" has the meaning set forth in Section 2.1(b)(vii).

"Release" means the spilling, leaking, disposing, discharging, emitting, depositing, dumping, ejecting, leaching, escaping, or release of any Hazardous Materials into the environment.

"Remediation" means action taken to correct an Environmental Condition to the extent required by Environmental Law in the most cost effective manner reasonably available, consistent with applicable Environmental Laws, taking into account that taking no action, leaving the condition unaddressed and non-permanent remedies (such as mechanisms to contain or stabilize Hazardous Materials, including monitoring site conditions, natural attenuation, risk-based corrective action, institutional controls or other appropriate restrictions on the use of property, caps, dikes, encapsulation, leachate collection systems, etc.) may be the most cost effective manner reasonably available.

"Representative" means, with respect to a particular Person, any director, officer, member, manager, principal, partner, employee, agent, consultant, advisor, investor, shareholder, contractor, subcontractor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Required Supporting Parties" means (a) the RBL Facility Lenders holding no fewer than two-thirds (2/3) in dollar amount and a majority in number of RBL Facility Claims and (b) the RBL Facility Agent.

"Restoration Costs" has the meaning set forth in Section 11.1(b)(vi).

"Restructuring Support Agreement" means the restructuring support and plan sponsor agreement, dated as of August 18, 2020, by and among the Seller Parties, the Required Supporting Parties, and Buyer, which restructuring support agreement shall provide for the Required Supporting Parties' support of, and consent to, the transactions contemplated by this Agreement.

"Sagamore Hill" has the meaning set forth in the introductory paragraph.

"Sale Order" means the Order entered by the Bankruptcy Court authorizing the transactions contemplated under this Agreement, including the sale of the Assets under sections 365, 1123 and 1141 of the Bankruptcy Code pursuant to the Plan, in each case, in accordance with the terms of this Agreement, which Order shall be (x) the same Order as the Order confirming the Plan and (y) in form and substance acceptable to Buyer to the extent provided in the Restructuring Support Agreement. For the avoidance of doubt, the Break-Up Fee and the Expense Reimbursement provided for in this Agreement shall be approved in the Sale Order.

"Seller" has the meaning set forth in the introductory paragraph.

"Seller Credit Obligations" has the meaning in Section 7.7(a).

"Seller Group" means each of the Seller Parties, their Affiliates and the former, current and future partners, co-owners, direct and indirect equity holders and Representatives of each of the foregoing.

"Seller Indemnified Parties" has the meaning set forth in Section 12.3(a).

"Seller Party" has the meaning set forth in the introductory paragraph.

"Seller's Supplemented Schedules" has the meaning set forth in Section 7.4(b).

"Seller Termination Notice" has the meaning set forth in Section 11.1(c)(i).

"Specified Seller Credit Obligations" has the meaning set forth in Section 7.7(b).

"Specified Surety Bonds" means, collectively, that certain (a) Performance Bond (Bond No. SUR0056455), dated effective as of January 1, 2019, by and among Arena Energy, LP, as principal, Argonaut Insurance Company, as surety, and Exxon Mobil Corporation and ExxonMobil Pipeline Company, as obligees, and (b) Private Performance Bond (Bond No. B007929), dated effective as of May 1, 2013, by and among Arena Energy, LP, as principal, U.S. Specialty Insurance Company, as surety, and Apache Corporation, as obligee.

"Subsidiary" means any entity with respect to which a specified Person (or a Subsidiary thereof) (a) has the power, through the ownership of securities or otherwise, to elect a majority of the directors or similar managing body or (b) owns directly or indirectly all of the outstanding equity interests therein.

"Surety Bonds" has the meaning set forth in Section 7.7(a).

"Suspense Funds" means proceeds of production and associated penalties and interest in respect of any of the Assets that are payable to third parties and are being held in suspense by Seller.

"Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means (i) any taxes, assessments, fees, unclaimed property and escheat obligations and other charges of any kind whatsoever imposed by any Governmental Authority, including federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental, natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other tax of any kind whatsoever, including any interest, penalty or addition thereto, whether disputed or not and (ii) any liability in respect of any item described in clause (i) above that arises by reason of a contract (other than a contract entered into in the ordinary course of business, the primary purpose of which is not Taxes), assumption, transferee or successor liability, or operation of Legal

Requirement (including by reason of participation in an affiliated, consolidated, combined or unitary Tax Return).

"Tax Allocation" has the meaning set forth in Section 8.2.

"Tax Return" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed with any Governmental Authority in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Term Loan Claim" has the meaning set forth in the Restructuring Support Agreement.

"Trademarks" means United States, state and foreign trademarks, service marks, logos, slogans, trade dress and trade names, Internet domain names and any other similar designations of source of goods or services, whether registered or unregistered, and registrations and pending applications to register the foregoing, and all goodwill related to or symbolized by the foregoing.

"Transaction Documents" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

"Transfer Taxes" has the meaning set forth in Section 8.1(a).

"Units" has the meaning set forth in Section 2.1(b)(i).

"Valiant" has the meaning set forth in the introductory paragraph.

"Wells" has the meaning set forth in Section 2.1(b)(ii).

"Wind Down Amount" has the meaning set forth in the Restructuring Support Agreement.

1.2     Other Definitions and Interpretive Matters.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     Dollars. Any reference in this Agreement to "$" or "dollars" means United States dollars.

(iii)    <u>Exhibits/Schedules</u>.  All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)    <u>Gender and Number</u>.  Any reference in this Agreement to gender includes all genders, and words imparting the singular number only include the plural and vice versa.

(v)    <u>Headings</u>.  The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement.  All references in this Agreement to any "<u>Section</u>" or "<u>Article</u>" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(vi)    <u>Herein</u>.  Words such as "<u>herein,</u>" "<u>hereof</u>" and "<u>hereunder</u>" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(vii)    <u>Including</u>.  The word "<u>including</u>" or any variation thereof means "<u>including, without limitation</u>," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(viii)    <u>Statute</u>.  Unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder; *provided* that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance with, any Legal Requirement, the reference to such Legal Requirement means such Legal Requirement as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(b)    <u>No Strict Construction</u>.  Buyer, on the one hand, and Seller, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Seller, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE 2
## PURCHASE AND SALE

2.1    <u>Purchase and Sale</u>.

(a)    Upon the terms and subject to the conditions of this Agreement, on the Closing Date, and effective as of the Effective Time, Seller shall sell, transfer, assign, convey and

deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer (or its designee), and Buyer (or its designee) shall purchase from Seller, the Assets.

(b)     The "Assets" shall include all right, title and interest of Seller in, to or under all oil and gas properties and all other assets, rights and interests owned by Seller (but excluding the Excluded Assets), including the following:

(i)     all Leases, including the Leases described in Exhibit A, together with any and all other rights, titles, and interests of Seller in and to the leasehold estates created thereby, including royalty interests, overriding royalty interests, production payments, net profits interests, farmout interests, carried interests, reversionary interests, and all other interests of any kind or character described in Exhibit A, subject to any depth restrictions described in Exhibit A, the terms, conditions, covenants, and obligations set forth in the Leases and/or Exhibit A, along with all pools and units that include all or any part of any Lease (the "Units"), including without limitation, all of Seller's right, title and interest in Hydrocarbon production from any Unit, regardless of whether such Unit production is derived from wells located on or off a Lease (collectively, the "Assigned Leases and Interests");

(ii)     all oil and gas wells (whether producing, inactive, temporarily or permanently abandoned, shut-in or otherwise) and any water injection wells located on or traversing the Assigned Leases and Interests (collectively, and including the wells set forth in Exhibit B, the "Wells", and together with the Assigned Leases and Interests, the "Properties");

(iii)     (A) all Hydrocarbons produced from or allocated to any or all of the Properties prior to, on or after the Effective Time (which have not already been sold), and all proceeds therefrom and revenues related thereto; and (B) all marketable Hydrocarbons produced from or attributable to the Properties in storage tanks, and Hydrocarbons above or below a custody transfer point, and all proceeds attributable thereto;

(iv)     all Contracts, including sales and purchase contracts, unit operating agreements, exploration agreements, development agreements, seismic licenses, balancing agreements, farmout agreements, service agreements, transportation, processing, treatment and gathering agreements, equipment leases and other contracts, agreements and instruments, including the Contracts described on Exhibit C attached hereto, in each case, insofar as they relate to any other Asset (collectively, the "Assigned Contracts"), and any rights to reimbursement due thereunder;

(v)     to the extent that they may be transferred to Buyer, whether through assignment or otherwise as contemplated under Section 8.9(b) (provided that Seller will use commercially reasonable efforts to obtain any necessary consent to assignment, without any obligation to incur any out-of-pocket cost or expense or to provide any other consideration), all permits, licenses, servitudes, easements, rights-of-way and other surface agreements used primarily in connection with the ownership or operation of the Properties, including any pending applications therefor (collectively, the "Permits");

(vi)     all equipment, machinery, fixtures, and other real, personal, and mixed property, operational and nonoperational, known or unknown, located on the Properties

15

or the other Assets described above, but excluding any such items constituting Excluded Assets (collectively, the "Equipment"); all physical assets located on the Properties or other Assets described above as of the Effective Time or covered by an Assigned Contract and used or previously used for production, mechanical separation, handling, gathering, storage, treatment, sale, disposal or other operations relating to assigned Hydrocarbons, including (a) all buildings, structures, facilities and foundations; (b) all platforms, pipelines of every form and character, including gathering lines, transfer lines, gas lines, oil lines, water lines, flowlines and production and storage facilities and (c) pipeline laterals, to the extent located on or within any of the Assigned Leases or Interests as a lease term pipeline or serving the Assets in any manner, including as a gathering line under a distinct right of way (collectively, the "Facilities");

(vii)    all of the files, records, information, and data, whether written or electronically stored, in Seller's possession and primarily relating to the Assets, including (a) land and title records (including abstracts of title and title curative documents); (b) contract files; (c) correspondence; (d) operations, environmental, production, and accounting records; (e) proprietary seismic and specific seismic lines if assignable by Seller without cost, unless Buyer has agreed to and pays the cost; and (f) facility and well records but excluding any of the foregoing items that are Excluded Assets (collectively, the "Records");

(viii)    except with respect to the Excluded Assets and the Excluded Liabilities, all claims, refunds, abatements, variances, allocations, causes of action, claims for relief, choses in action, rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, counter-claims, cross-claims and defenses of Seller to the extent related to the Assets and arising or relating to events occurring prior to, on or after the Effective Time or related to the Assumed Liabilities, but excluding any such matters released pursuant to the Plan;

(ix)    all cash call pre-payments and other refunds due to Seller for royalty overpayments and/or future deductions as royalty offsets associated with any Asset;

(x)    all trade credits, accounts receivable, note receivables, take or pay amounts receivable, and other receivables attributable to the other Assets, with respect to any period of time;

(xi)    all proprietary rights and non-proprietary rights to all geological, geochemical, geophysical and other seismic and related technical data and information relating to the Assets, to the extent such data and information may be assigned without the payment of a fee (or, in the event a transfer fee applies, to the extent Buyer has agreed in writing to pay, or has paid, such transfer fee); *provided* that Seller will use commercially reasonable efforts to obtain any necessary consent to assignment, without any obligation to incur any out-of-pocket cost or expense or to provide any other consideration;

(xii)    all Intellectual Property;

(xiii)    the office(s) and associated office lease(s) described on Schedule 2.1(b)(xiii) and all personal computers and associated peripherals, office fixtures, office equipment and inventory located at such office(s);

16

(xiv)    any and all actions, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, in each case whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured and whether asserted or assertable directly or derivatively, in law, equity, or otherwise, including Avoidance Actions owned by or available to any Seller Party (such Actions, the "Assigned Actions");

(xv)    (A) all interests of any kind or character owned by Seller or any of its Affiliates in and to Oil Insurance Limited, a Bermuda company ("Oil Insurance Limited"), subject to Buyer's compliance with the applicable requirements set forth the Shareholders' Agreement of Oil Insurance Limited issued to Arena Energy, LP., and (B) subject to Section 8.7(b), all insurance policies and rights to proceeds (and rights of recovery) thereof, including all insurance policies issued by Oil Insurance Limited and rights to proceeds thereof;

(xvi)    (A) all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit, letters of credit, bank accounts and other bank deposits as of the Closing Date, including the Suspense Funds (and applicable accounts therefor), and (B) all escrow accounts maintained by Seller or any of its Affiliates to secure Decommissioning Obligations or relating to the Properties (other than the Escrow Account), in each case, (x) including those accounts identified on Schedule 2.1(b)(xvi), and any and all funds and other income thereof, (y) including any retainers returned by Seller's advisors to Seller due to the fees owing to such advisors being less than the applicable retainer, and (z) excluding the Wind Down Amount;

(xvii)    all receivables related to the Assets including all expenditures incurred by Seller in connection with the ownership, operation and maintenance of the Properties (including rentals, overhead, royalties, Lease option and extension payments, Taxes and other charges and expenses billed under applicable operating agreements or applicable Legal Requirements) and billed by Seller to third party working interest owners, which remain outstanding and owed to Seller;

(xviii)    all claims, refunds, loss carry forwards, abatements, variances, allocations, causes of action, claims for relief, choses in action, rights of recovery, audit rights, rights of set-off, rights of indemnity, contribution or recoupment, counter-claims, cross-claims and defenses of Seller, other than those constituting Excluded Assets or those related to any Excluded Liability or released pursuant to the Plan; and

(xix)    all rights, defenses, claims and causes of action (including rights to enforce Encumbrances, trade credits, receivables, audit rights and rights to receive indemnity, funds, reimbursements or other payments and rights under policies or agreements of insurance) except to the extent released pursuant to the Plan.

2.2    Excluded Assets.  Notwithstanding the foregoing, the Assets shall not include, and there is excepted, reserved and excluded from the transaction contemplated hereby, the following (collectively, the "Excluded Assets"):

(a)    the Purchase Price delivered to Seller pursuant to this Agreement;

(b)      all shares of capital stock or other equity interest of Seller or any of Seller's Subsidiaries or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of Seller or any of Seller's Subsidiaries;

(c)      all minute books, stock ledgers, corporate seals and stock certificates of Seller;

(d)      all Excluded Records;

(e)      any rights, claims or causes of action of Seller against Buyer under this Agreement or any other Transaction Document;

(f)      documents prepared or received by Seller with respect to (i) lists of prospective purchasers for such transactions compiled by Seller, (ii) bids submitted by other prospective purchasers of the Assets, (iii) analyses by Seller of any bids submitted by any prospective purchaser, (iv) correspondence between or among Seller, its respective representatives, and any prospective purchaser other than Buyer, (v) internal valuations or economic models prepared in connection with the transactions contemplated in this Agreement and (vi) correspondence between Seller or any of its respective representatives with respect to any of the bids, the prospective purchasers, or the transactions contemplated in this Agreement;

(g)      all Excluded Contracts;

(h)      all Benefit Plans and any assets associated with or attributable thereto;

(i)      the Wind Down Amount; and

(j)      all rights to the use of deposits and retainers to the extent held and applied by Seller's professionals on or before sixty (60) days after the earlier to occur of (i) the effective date of a plan of reorganization or liquidation, (ii) the conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, or (iii) the dismissal of the Bankruptcy Case by the Bankruptcy Court; *provided, however*, any right to deposits or retainers in excess of the fees owing to such advisors shall constitute Assets.

2.3      Assumed Liabilities.  Upon the terms and subject to the conditions of this Agreement, and other than the Excluded Liabilities, on the Closing Date, Buyer shall assume and agree to discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), all Liabilities associated with the Assets, whether such Liabilities arise prior to, at, or after the Effective Time (collectively, the "Assumed Liabilities"), including the following:

(a)      Decommissioning Obligations.  Any obligations or Liabilities associated with Decommissioning, whether incurred under any of the Assigned Leases and Interests, Assigned Contracts or under any Legal Requirement, judgment, decree, or other obligation, and including any residual liability for anticipated or necessary continuing insurance, maintenance and monitoring costs, whether such Liabilities arise prior to, at or after the Effective Time (collectively, the "Decommissioning Obligations").

18

(b)   <u>Assigned Contracts</u>.   All of Seller's Liabilities under the Assigned Contracts, whether such Liabilities arise prior to, at or after the Effective Time.

(c)   <u>Properties</u>.   All of Seller's Liabilities arising out of the ownership or operation of the Properties (including the terms of the applicable Permits and Assigned Contracts), whether such Liabilities arise prior to, at or after the Effective Time.

(d)   <u>Cure Costs</u>.   All Cure Costs and all rejection damages incurred by Seller due to the rejection by Seller of any Excluded Contract.

(e)   <u>Suspense Funds</u>.   All Suspense Funds, together with any escheatment obligations related thereto.

(f)   <u>Buyer Taxes</u>.   All Taxes imposed on or attributable to the Assets, other than income, franchise and similar Taxes of any Seller Party (except any Seller Party that is directly or indirectly acquired by Buyer pursuant to <u>Section 8.9(b)</u>), or any of such Seller Party's direct or indirect owners or any affiliated, combined, consolidated or unitary group with respect to Taxes of which any of the foregoing is or was a member.

(g)   <u>Transfer Taxes</u>.   All Transfer Taxes.

(h)   <u>Environmental Liabilities</u>.   All Environmental Obligations and Liabilities under Environmental Law arising from, related to or associated with the Assets (including the performance of all related salvage, site clearance, and surface restoration operations), whether such Liabilities arise prior to, at or after the Effective Time.

(i)   <u>Other Assets</u>.   To the extent not already described in <u>Section 2.3(a)</u> through <u>(h)</u> above, all Liabilities arising from, related to or associated with the Assets, whether such Liabilities arise prior to, at or after the Effective Time.

(j)   <u>Employment Liabilities</u>.   Any employment-related liability expressly assumed under <u>Exhibit G</u> , as well as any Liability with respect to which Liability may be imposed on any current or former officer, director, or employee of Seller or its Subsidiaries on the basis of any so-called "responsible person" statutes, including any wage payment statute, that cannot ultimately be discharged by the Bankruptcy Code.

The assumption by Buyer of the Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.

2.4   <u>Excluded Liabilities</u>.   Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge the following Liabilities of Seller (the "<u>Excluded Liabilities</u>"); for the avoidance of doubt, the sale of Assets to Buyer shall be effectuated free and clear of any and all Excluded Liabilities:

(a)   all indebtedness for borrowed money of Seller and all hedging obligations of Seller;

(b)    (i) any income, franchise or similar Taxes imposed on any Seller Party (other than any Seller Party that is directly or indirectly acquired by Buyer pursuant to Section 8.9(b)), any of such Seller Party's direct or indirect owners or any affiliated, combined, consolidated or unitary group with respect to Taxes of which any of the foregoing is or was a member, and (ii) any Taxes attributable to the Excluded Assets;

(c)    all Liabilities of Seller to any owner or former owner of capital stock or warrants, or holder of indebtedness for borrowed money; and

(d)    all Liabilities related to the Excluded Assets.

2.5    Cure Costs.

(a)    On or prior to the Closing, Buyer shall pay any and all cure costs or expenses that must be paid or otherwise satisfied to cure any monetary defaults required to be cured under section 365 of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption or assumption and assignment to Buyer or its designee of the Assigned Contracts and Assigned Leases and Interests, in each case as such amounts are determined by the Bankruptcy Court (the "Cure Costs").

(b)    At any time prior to the Designation Deadline, Buyer shall have the right, which may be exercised in Buyer's sole discretion, to provide written notice to Seller (each such notice, a "Contract Notice") of Buyer's election to designate any Contract (including any Contract that is an Assigned Contract immediately before such designation) (A) as an Excluded Contract and upon such designation such Contract shall constitute an Excluded Contract and, if applicable, shall cease to constitute an Assigned Contract or (B) to the extent not already rejected with Buyer's prior written consent, as an Assigned Contract and upon such designation such Contract shall constitute an Assigned Contract and shall cease to constitute an Excluded Contract. Notwithstanding anything to the contrary in this Section 2.5, if, at any time after the Designation Deadline, the Cure Costs fixed by the Bankruptcy Court for any Assigned Contract are (i) greater than the amount set forth on the initial schedule of Cure Costs filed by Seller with the Bankruptcy Court prior to the Designation Deadline and (ii) are not consented to by Buyer, then Buyer shall be permitted, no later than five (5) Business Days after entry of an order by the Bankruptcy Court setting such Cure Costs, to provide Seller a Contract Notice of Buyer's election to revoke its designation of any such Contract as an Assigned Contract and thereupon such Contract shall be deemed to be an Excluded Contract.

(c)    If Buyer exercises its rights in Section 2.5(b) above to designate any Contract (including a Contract that was an Assigned Contract immediately before such designation) as an Excluded Contract, then, there shall be no reduction in the Purchase Price as a result of such designation or change in designation, and Buyer shall bear all rejection damages incurred by Seller due to the rejection by Seller of such Excluded Contract.

(d)    In the event that Seller identifies (whether before or after the Designation Deadline) any additional Contracts capable of being assumed or rejected that were not previously identified as such, Seller shall promptly notify Buyer of (i) such Contracts and (ii) Seller's good faith estimate of the amount of the Cure Costs payable in respect of each such Contract. For the avoidance of doubt, Buyer may designate each such additional Contract described in the

20

immediately preceding sentence as an Assigned Contract or Excluded Contract pursuant to this Section 2.5, notwithstanding the passage of the Designation Deadline.

2.6    Assignment of Assets Subject to Consent Requirements.

(a)    If prior to the Closing Date any consent to assignment applicable to the transactions contemplated hereby (other than approvals by BOEM and other governmental consents or approvals customarily (and legally permitted to be) obtained post-Closing (each such consent or approval, a "Customary Post-Closing Consent")) (i) has not been obtained, waived or satisfied, and (ii) has not been determined to be inapplicable to the transactions contemplated hereby by reason of any Order of the Bankruptcy Court, and further, failure to obtain such third party consent or waiver may result in either the termination of a Lease, including causing such to be void or voidable, or the inability to transfer or assign a Contract or the imposition of, or obligation to pay, a financial or other penalty (each such consent, a "Hard Consent"), the Properties affected by such third party Hard Consent shall be excluded from the Assets conveyed at Closing; *provided,* that there shall be no adjustments to the Purchase Price for such excluded Asset.

(b)    If, after Closing, a Hard Consent that was not obtained, waived or otherwise satisfied at Closing is obtained by Seller, waived by the applicable consentholder or otherwise satisfied on or before December 1, 2020 (the "Consent Deadline"), or, at Buyer's sole discretion and election, Buyer waives the requirement that such Hard Consent be obtained, waived or otherwise satisfied, then, in any such case, the Property affected by such Hard Consent and excluded at the Closing will be conveyed to Buyer within ten (10) Business Days after such Hard Consent has been obtained, waived by the applicable consentholder or Buyer or otherwise satisfied, and the Liabilities for such Property excluded at Closing to the extent arising from such Hard Consent not having been obtained, waived or otherwise satisfied shall constitute Assumed Liabilities from and after the applicable subsequent closing.  At such subsequent closing, Seller shall assign, transfer and convey to Buyer, and Buyer shall acquire and accept from Seller, such excluded Assets (or portions thereof).  For the avoidance of doubt, if the Hard Consent for a Property excluded from the Assets conveyed at Closing pursuant to Section 2.6(a) is not obtained by Seller, waived by the applicable consentholder or otherwise satisfied or Buyer does not waive the requirement that such Hard Consent be obtained, waived or otherwise satisfied, in each case, upon the expiration of the Consent Deadline, then the applicable Assets excluded at Closing shall be deemed to be Excluded Assets for all purposes hereunder, including for purposes of Section 2.4.

(c)    Except for Hard Consents, if any consents to the assignment of any Asset are not obtained prior to Closing, then with respect to each affected Asset, the affected Assets shall nevertheless be sold and conveyed to Buyer at the Closing and Buyer shall pay for the affected Asset(s) at Closing in accordance with this Agreement as though the consent had been obtained. In the case of licenses, certificates, approvals, authorizations, Leases, Contracts and other commitments included in the Assets (A) that cannot be transferred or assigned without the Hard Consent of third parties, which Hard Consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), Seller shall, following the Closing, at Buyer's sole expense and subject to any approval of the Bankruptcy Court that may be required, cooperate with Buyer in all reasonable respects to provide to Buyer the benefits thereof in some other manner, or (B) that are otherwise not transferable or assignable (after giving effect to the

Sale Order and the Bankruptcy Code), Seller shall, following the Closing, at Buyer's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with Buyer to provide to Buyer the benefits thereof in some other manner (including the exercise of the rights of Seller thereunder); *provided* that nothing in this Section 2.6 shall (1) require Seller to make any expenditure or incur any obligation on its own or on behalf of Buyer for which funds in the full amount of such expenditure or obligation are not provided to Seller by Buyer in advance in cash or (2) prohibit Seller from ceasing operations or winding up its affairs following the Closing.

(d)     With respect to Customary Post-Closing Consents, Buyer and Seller shall use commercially reasonable efforts after Closing to obtain all Customary Post-Closing Consents from, and make all filings with, all Governmental Authorities that may be required by applicable Legal Requirements or under the terms of an Assigned Lease and Interest.  Until the earlier to occur of (i) the date on which such Customary Post-Closing Consent is obtained and (ii) the expiration of the Consent Deadline, Seller shall continue to hold record title to the applicable Assets as nominee for Buyer and Seller shall only be authorized to act, with respect to such Assets, upon and in accordance with Buyer's specific instructions.  Buyer shall indemnify, defend and hold harmless Seller for all Liabilities to the extent solely related to or arising from Seller's obligation to hold record title to the applicable Assets from and after Closing, in accordance with this Section 2.6(d).

2.7     Preferential Purchase Rights.

(a)     With respect to each Preferential Purchase Right set forth on Schedule 5.8, within five (5) Business Days after the Petition Date, Seller shall send to the holder of each such Preferential Purchase Right a notice reasonably satisfactory to Buyer (i) containing a copy of the Plan and this Agreement, and (ii) to the extent that the Sale Order does not preclude the exercise of such rights, informing such holder that it must submit a notice to Seller such holder's intent to exercise or not exercise its Preferential Purchase Right prior to the date of the hearing regarding the entry of the Sale Order.

(b)     With respect to each Preferential Purchase Right that is not set forth on Schedule 5.8 but is discovered by Seller prior to Closing, Seller shall send to the holder of each such Preferential Purchase Right a notice reasonably satisfactory to Buyer (A) containing a copy of the Plan and this Agreement, and (B) to the extent that the Sale Order does not preclude the exercise of such rights, informing such holder that it must submit a notice to Seller of such holder's intent to exercise or not exercise its Preferential Purchase Right, as soon as reasonably practicable after discovery of any such Preferential Purchase Right (but in no event later than two Business Days thereafter).  Seller shall promptly provide Buyer with copies of all notices delivered to and received from holders of Preferential Purchase Rights hereunder.  Any Preferential Purchase Right that is not precluded by the Sale Order or determined to be inapplicable to the transactions contemplated by this Agreement by reason of any Order of the Bankruptcy Court must be exercised subject to all terms and conditions set forth in this Agreement, and the consideration payable under this Agreement and the Sale Order for the purposes of all Preferential Purchase Right notices shall be the Allocated Value of the applicable Asset.

(c)  If, prior to Closing, any holder of a Preferential Purchase Right notifies Seller that it intends to consummate the acquisition of the Assets to which its Preferential Purchase Right applies or if the time for exercising such Preferential Purchase Right has not expired (and the holder of such right has not waived such right), then, unless the Bankruptcy Court has entered an order providing that such Preferential Purchase Right is not enforceable or is not required to be complied with, in either case, as such Preferential Purchase Right relates to the sale of the affected Assets to Buyer under this Agreement, Buyer shall be responsible for complying with such Preferential Purchase Right, and the affected Asset shall be included in the Assets conveyed to Buyer at Closing.  If the Closing occurs, Buyer shall be entitled to all consideration given by any Person exercising a Preferential Purchase Right, and there shall be no adjustment to the Purchase Price for any exercised (or unexercised Preferential Purchase Rights).

(d)  All Assets for which any applicable Preferential Purchase Right has not been exercised (and the sale and assignment of such affected Asset has been consummated prior to the Closing) shall be sold to Buyer at Closing pursuant to the provisions of this Agreement and Buyer shall be deemed to have assumed any and all Liabilities with respect to such Preferential Purchase Right as part of the Assumed Liabilities hereunder and Buyer shall have no claim against, and hereby releases and indemnifies the Seller Indemnified Parties from any Liability with respect to such Preferential Purchase Right.

2.8  _Further Assurances_.  The Parties agree to (a) furnish upon request to each other such further information, (b) execute, acknowledge and deliver to each other such other documents and (c) do such other acts and things, all as the other Party may reasonably request for the purpose of carrying out the intent of this Agreement and the Transaction Documents; _provided_ that nothing in this Section 2.8 shall prohibit Seller from ceasing operations or winding up its affairs following the Closing.

### ARTICLE 3
### PURCHASE PRICE

3.1  _Purchase Price_.  The purchase price for the purchase, sale, assignment and conveyance of Seller's right, title and interest in, to and under the Assets shall consist of (x) the Contingent Consideration (as defined in Exhibit F) if any, payable to the RBL Facility Lenders in accordance with Exhibit F, and (y) the following:

(a)  cash in an amount equal to Sixty-Four Million One Hundred Fifty-Seven Thousand Seventy-Nine and No/100 Dollars ($64,157,079.00) (the "Purchase Price"); and

(b)  the assumption of the Assumed Liabilities.

3.2  _Deposit_.  Prior to the execution of this Agreement, Buyer has paid (or shall have caused to be paid) to Citi Private Bank ("Escrow Agent"), pursuant to that certain escrow agreement by and among Seller, Buyer and Escrow Agent (the "Escrow Agreement") into the Escrow Account, a deposit in the amount of Six Million Four Hundred Fifteen Thousand Seven Hundred Seven and 90/100 Dollars ($6,415,707.90) (the "Deposit"), such amount representing ten percent (10%) of the Purchase Price.  At Closing, the Parties shall cause the Escrow Agent to release the Deposit to Seller, and the Deposit shall be credited against the amount required to be paid by Buyer to Seller at Closing.  If this Agreement is terminated by Seller prior to Closing

pursuant to Section 11.1(c)(i), then, subject to Section 11.2(b), the Parties shall cause the Escrow Agent to release the Deposit to Seller within two (2) Business Days of such termination, and such amount shall constitute liquidated damages (and not a penalty).  If this Agreement is terminated prior to Closing for any other reason, then the Parties shall cause the Escrow Agent to release the Deposit to Buyer or its designee within two (2) Business Days of such termination.

3.3     Allocation of Purchase Price; Allocated Value.  Buyer and Seller agree that (a) the unadjusted Purchase Price shall be allocated among the Assets as set forth in Schedule 3.3 and (b) the Allocated Values, shall be used by the Parties as the basis for reporting asset values and other items for purposes of this Section 3.3.

3.4     Withholding.  Buyer shall be entitled to deduct and withhold from the consideration otherwise payable to any Person pursuant to this Agreement such amounts as may be required to be deducted and withheld with respect to Taxes under applicable law; provided, however, other than with respect to any withholding as a result of a Seller Party's failure to provide the forms described in Section 4.4(d), Buyer shall provide at least five Business Days' written notice to the Seller Parties if Buyer intends to withhold any amounts under this Section 3.4.  To the extent that amounts are so withheld and paid over to the appropriate taxing authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made by Buyer.  The Parties shall cooperate in good faith to minimize or establish an exemption from, to the extent permissible under applicable Law, any deduction or withholding.

**ARTICLE 4**
**CLOSING**

4.1     Closing Date.  Upon the terms and subject to the conditions hereof, the closing of the sale of the Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place at the office of Kirkland & Ellis, LLP, at 609 Main Street, Suite 4500, Houston, Texas 77002 (or at such other location as the Parties may mutually agree), if all conditions to Closing in Article 9 and Article 10 have been satisfied or (if permissible) waived (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), no later than three (3) Business Days following the date on which the conditions set forth in Article 9 and Article 10 have been satisfied or (if permissible) waived (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions); *provided, however*, that in no event will the Closing occur prior to October 1, 2020 without Buyer's prior written consent.  The date and time at which the Closing actually occurs is hereinafter referred to as the "Closing Date."

4.2     Payment on the Closing Date.  Subject to satisfaction or (if permissible) waiver of the conditions set forth in Article 9 and Article 10, at the Closing, (a) Buyer shall pay (or cause to be paid) the cash components of the Purchase Price (less the amount of the Deposit) by wire transfer of immediately available funds to an account specified in writing by Seller prior

to the Closing Date, and (b) the Parties shall cause the Escrow Agent to release the Deposit to Seller, in accordance with Section 3.2.

4.3     Buyer's Deliveries.   At the Closing, Buyer shall deliver or cause to be delivered to Seller (or such other Persons where so designated):

(a)     the cash consideration referenced in Section 3.1(a) (less the amount of the Deposit) to Seller in accordance with Section 4.2;

(b)     the appropriate DOI forms (including without limitation, as applicable, Form BOEM-1017, Form BOEM-1019 and Form BOEM-1022) to reflect Buyer as the designated applicant for oil spill financial responsibility purposes for the Leases (or portions thereof) and shall deliver to Seller such other evidence that Buyer is qualified with the applicable Governmental Authorities to succeed Seller as the designated applicant of the Assets for oil spill financial responsibility purposes;

(c)     transfers and assignments, on appropriate forms (including Form BOEM-0150, Form BOEM-0151 and corresponding designation of operator form (Form BOEM-1123), as applicable) and as may be required by any Governmental Authority in order to transfer the Assets from Seller to Buyer pursuant to the terms of this Agreement;

(d)     all instruments necessary to become a party to and assume obligations in the unit operating agreements applicable to the Assets;

(e)     each other Transaction Document to which Buyer is a party, duly executed (and acknowledged, where applicable) by Buyer, including the Assignments, Assignment of OIL Interests, letters-in-lieu of transfer orders, change of operator forms to be prepared by Seller, change of operator notices required under applicable operating agreements, and any other applicable forms and declarations required by federal and state agencies relative to Buyer's assumption of operations and plugging and abandonment Liabilities with respect to all of the Assets;

(f)     the certificates of Buyer to be received by Seller pursuant to Sections 10.1 and 10.3;

(g)     such forms or documents (including evidence of satisfaction of all applicable insurance requirements) as may be required (or otherwise may be reasonably requested by Seller) to demonstrate that Buyer is qualified with the applicable Governmental Authorities and pursuant to any applicable operating agreement to succeed Seller as the owner of the Assets;

(h)     evidence of all Surety Bonds and replacement of (i) the Specified Surety Bonds and (ii) all Seller Credit Obligations (other than the Specified Seller Credit Obligations) required to obtained by Buyer pursuant to this Agreement or written evidence that Buyer is not required to obtain such Surety Bond or replacements for such Seller Credit Obligations;

(i)     the Memorandum (in sufficient counterparts to facilitate recording in the necessary recording offices), duly-executed and acknowledged by Buyer; and

25

(j)     such other assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Seller, as Seller may reasonably request to transfer and assign the Assumed Liabilities to Buyer.

4.4     Seller's Deliveries.  At the Closing, Seller shall deliver to Buyer:

(a)     (i) the Assignments and each other Transaction Document to which Seller is a party (including letters-in-lieu of transfer orders and change of operator forms), and (ii) the Assignment of OIL Interests, in each case, duly executed (and acknowledged, where applicable) by Seller and Oil Insurance Limited, as applicable;

(b)     a certified copy (which may be in .pdf format) of the Sale Order;

(c)     the certificates of Seller to be received by Buyer pursuant to Sections 9.1 and 9.2;

(d)     a non-foreign affidavit from each Seller Party dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Code §1445, stating that such Seller Party (or its regarded owner, if such Seller Party is disregarded as separate from its owner for U.S. federal income tax purposes) is not a "foreign person" for purposes of Sections 1445 and, if applicable, 1446(f) of the Code;

(e)     transfers and assignments, on appropriate forms (including Form BOEM-0150, Form BOEM-0151 and corresponding designation of operator form (Form BOEM-1123), as applicable) and as may be required by any Governmental Authority in order to transfer the Assets from Seller to Buyer pursuant to the terms of this Agreement;

(f)     the Memorandum (in sufficient counterparts to facilitate recording in the necessary recording offices), duly-executed and acknowledged by the RBL Facility Agent;

(g)     duly-executed, recordable releases (in sufficient counterparts to facilitate recording in the applicable counties where the Assets are located) in form reasonably acceptable to Buyer of any mortgages or security interest covering the Assets, in each case, securing indebtedness for borrowed money of Seller or their respective Affiliates; provided, however, in lieu of such releases, Seller may deliver certified copies of the Sale Order to satisfy this obligation;

(h)     consents, notices, transfers or other documentation required by the financial institutions with respect to the bank accounts of any Seller Party, in each case, in order to (i) transfer the bank accounts of such Seller Party to Buyer pursuant to the terms of this Agreement; and (ii) cancel and/or terminate any Seller Representative's authority, access and/or control with respect to such account; and

(i)     such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all the right, title and interest of Seller in, to or under any or all the Assets or to evidence that Seller retains the Excluded Liabilities.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF SELLER

Each Seller Party represents and warrants to Buyer, as of the Execution Date and the Closing Date, the following:

5.1     Organization and Good Standing.  Such Seller Party is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.  Such Seller Party has the requisite corporate power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.  Such Seller Party is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character of its business or the nature of its properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect.

5.2     Authority; Validity; Governmental Authority Consents.  Such Seller Party has, subject to requisite Bankruptcy Court approval, the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which such Seller Party is a party and to consummate the transactions contemplated hereby and thereby, and, subject to requisite Bankruptcy Court approval, the execution, delivery and performance of this Agreement and such other Transaction Documents by such Seller Party and the consummation by such Seller Party of the transactions contemplated herein and therein have been duly and validly authorized by all requisite corporate action.  This Agreement has been duly and validly executed and delivered by such Seller Party and each other Transaction Document required to be executed and delivered by such Seller Party at the Closing will be duly and validly executed and delivered by such Seller Party at the Closing.  Subject to requisite Bankruptcy Court approval, this Agreement and the other Transaction Documents constitute, with respect to Seller, the legal, valid and binding obligations of such Seller Party, enforceable against such Seller Party in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Legal Requirements affecting the enforcement of creditors' rights generally and by general principles of equity, regardless of whether such principles are considered in a proceeding at law or in equity.  Subject to requisite Bankruptcy Court approval, except for (a) entry of the Sale Order, (b) notices, filings and consents required in connection with the Bankruptcy Case, (c) any applicable notices, filing, consents or approvals under any applicable antitrust, competition or trade regulation Legal Requirements and (d) any notices, filings and consents customarily obtained post-Closing, such Seller Party is not required to give any notice to, make any filing with or obtain any consent from any Governmental Authority in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.3     No Conflict.  Except as set forth on Schedule 5.3, and assuming the receipt of all consents (including any Hard Consent) and the waiver of all Preferential Purchase Rights (in each case) applicable to the transactions contemplated hereby, execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of such

27

Seller Party under (a) any agreement, indenture, or other instrument to which such Seller Party is bound, (b) the certificate of incorporation, bylaws or other governing documents of such Seller Party, (c) any Order or (d) any Legal Requirement, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.4     Permits.  To Seller's Knowledge, as of the Execution Date, (a) Seller has not received written notice of default under any Permit and (b) no violations exist in respect of such Permits, except for such non-compliance and such facts, conditions or circumstances, the existence of which would not constitute a Material Adverse Effect.

5.5     Legal Proceedings.  Except for the Bankruptcy Case and any adversary proceedings or contested motions commenced in connection therewith, there is no Proceeding or Order pending, outstanding or, to Seller's Knowledge, threatened against Seller that seeks to restrain or prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.6     Brokers or Finders.  Seller has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable, except to the extent that such fees, commissions and other similar payments constitute Assumed Liabilities.

5.7     Approved Work Programs and Budgets.  Complete and correct copies of the work programs and budgets that have been approved by Seller, or deemed to have been approved, under and in accordance with the Assigned Leases and Interests or Assigned Contracts, have been provided to Buyer for review at or prior to Buyer's execution of this Agreement.

5.8     Consents and Preferential Purchase Rights.  Except as set forth on Schedule 5.8, none of the Assets is subject to any (i) Preferential Purchase Rights or (ii) any consent to assignment, in each case, applicable to the transactions contemplated hereby (other than governmental consents or approvals customarily obtained post-Closing).

5.9     Material Assigned Contracts.

(a)     Except as set forth on Schedule 5.9(a), Seller, in any material respect, is not in breach of, or default under the terms of, and, to the knowledge of Seller, no other party to any Material Assigned Contract is, in any material respect, in breach of, or default under the terms of, any Material Assigned Contract, and to the knowledge of Seller, no event or omission has occurred that would constitute such a breach or default (whether by lapse of time or notice or both) under any Material Assigned Contract.

(b)     Schedule 5.9(b) sets forth a correct and complete list (*provided, however,* that such list shall be deemed correct and complete as long as the Assigned Contracts applicable to any of items (i)-(x) below are listed on the Schedule), as of the Execution Date, of the following Assigned Contracts that are included in the Assets and binding on the assigned Hydrocarbons, to the extent following the Closing same would be binding on the Assets, or any portion thereof, or on Seller (collectively, the "Material Assigned Contracts"): (i) any Assigned Contract involving payments individually or in the aggregate in excess of Five Million Dollars ($5,000,000.00) net to Seller's interest, or that constitutes a lease under which Seller or any Affiliate of Seller is the lessor

28

or the lessee of any real or personal property which is to be included in the sale of the Assets hereunder (including equipment and real property, but not including any of the Assigned Leases and Interests or Wells) which lease (A) is not cancelable without material penalty on less than ninety (90) days' prior written notice and (B) involves an annual base rental of more than Two Million Dollars ($2,000,000.00); (ii) any Assigned Contract for the sale, transportation, exchange, or other disposition of Hydrocarbons produced from or attributable to Seller's interest in the Assets that is (1) not cancelable without penalty on less than ninety (90) days' prior written notice (2) and that contains a call upon or options to purchase or any dedication or delivery commitment of production; (iii) any material Assigned Contract (executory or otherwise) to sell, lease, farmout, or otherwise dispose of any interest in the Assets after the Effective Time, other than conventional rights of reassignment arising in connection with Seller's surrender or release of any of the Assets; (iv) joint operating agreements, unit operating agreements, area of mutual interest agreements, farmout agreements, joint venture agreements, development agreements, participation agreements, partnership agreements or similar Assigned Contract (other than tax partnership agreements) that will remain in effect following the Closing; (v) any Debt Contract; (vi) any Assigned Contract that provides for a power of attorney with respect to the Assets that will not be terminated prior to the Closing Date; (vii) any purchase and sale agreements pursuant to which Seller or its Affiliates (directly or indirectly) acquired the Assets that contain indemnity obligations that will be binding on Buyer following Closing; (viii) any Assigned Contract that includes non-competition restrictions, non-solicitation or no-hire obligations binding on Buyer or the Assets after Closing or any settlement agreements pursuant to which obligations remain in the amount of more than One Million Dollars ($1,000,000.00) or that contain behavior commitments or restrictions that must continue to be performed after Closing; (ix) any Assigned Contract with any Affiliate of Seller; and (x) any Assigned Contract, the primary purpose of which is to provide indemnity rights or indemnity obligations.

(c)     Each Material Assigned Contract is valid and binding on Seller, and, to the knowledge of Seller, each other party thereto, and is in full force and effect in accordance with its terms, except for terminations or expirations at the end of the stated term. Further, except as disclosed on Schedule 5.9(c), Seller has disclosed correct and complete copies of the Material Assigned Contracts (including any and all amendments and supplements thereto and written waivers thereof) to Buyer.

5.10    Outstanding Capital Commitments; Non-Consent Operations. As of the Execution Date, except as set forth on Schedule 5.10, there is no individual outstanding authority for expenditure which is binding on the Assets, the value of which Seller reasonably anticipates exceeds One Million Dollars ($1,000,000.00) chargeable to Seller's interest participating in the operation covered by such authority for expenditure after the Effective Time. Seller has not declined to participate in any operation or activity proposed by a third party operator with respect to the Assets that has resulted or could result in Seller's interest in any Assets becoming subject to a penalty or forfeiture as a result of such election not to participate in such operation or activity.

5.11    Taxes. All Tax Returns required to be filed by any Seller Party with respect to Asset Taxes have been timely filed and each such Tax Return is true, correct and complete in all material respects. All Asset Taxes that are required to be paid by any Seller Party that are or have become due and payable have been timely paid. No Tax audits or administrative or judicial proceedings are being conducted, are presently pending or have been threatened in writing against

any Seller Party, in each case, with respect to Asset Taxes. There are no Encumbrances on any of the Assets attributable to Taxes other than statutory liens for Taxes that are not yet due and payable. No Seller Party or any its Affiliates has received written notice of any pending claim with respect to Asset Taxes, and there is no assessment, deficiency, or adjustment (in each case which remains unresolved) that has been asserted in writing, proposed in writing or, to the Knowledge of each Seller Party, threatened in writing with respect to such Asset Taxes. No Asset is subject to any tax partnership agreement or provisions requiring a partnership income Tax Return to be filed under subchapter K of the Code. With respect to any Seller Party that is acquired by Buyer pursuant to Section 8.9(b), (a) all income and other material Tax Returns required to be filed by such Seller Party have been timely filed and each such Tax Return is true, correct and complete in all material respects; (b) all income and other material Taxes that are required to be paid by such Seller Party that are or have become due and payable have been timely paid; (c) such Seller Party has withheld and timely paid all material Taxes required to have been withheld and paid by it and all such payments have been properly reported to Governmental Authorities in accordance with applicable Law; (d) there is not in force any extension of time with respect to the due date for the filing of any Tax Return of or with respect to such Seller Party (other than any extension entered into in the ordinary course of business) or any waiver or agreement for any extension of time for the assessment or payment of any Tax of or with respect to such Seller Party and no request for any such extension or waiver is currently pending; (e) no Tax audits or administrative or judicial proceedings are being conducted, are presently pending or have been threatened in writing against such Seller Party; (f) such Seller Party has not received written notice of any pending claim with respect to Taxes, and there is no assessment, deficiency, or adjustment (in each case which remains unresolved) that has been asserted in writing, proposed in writing or, to the Knowledge of such Seller Party, threatened in writing with respect to such Taxes, and (g) such Seller Party is, and at all times since formation has been, properly treated as a partnership or disregarded entity for U.S. federal and applicable state income Tax purposes. Notwithstanding any other provision in this Agreement, the representations and warranties in this Section 5.11 are the only representations and warranties of Seller in this Agreement with respect to Tax matters.

5.12    Cure Costs.  Schedule 5.12, which shall be completed ten (10) Business Days prior to the Bankruptcy Court hearing to approve the Sale Order, sets forth Seller's good faith estimate of Cure Costs with respect to all Assigned Contracts and Assigned Leases and Interests, as of such date.

5.13    Imbalances.  To the Knowledge of Seller as of the Execution Date, Schedule 5.13 sets forth all Imbalances associated with the Assets as of the Effective Time.

5.14    Insurance.  To the Knowledge of Seller, (a) Schedule 5.14 sets forth a list of all insurance policies maintained by or for the benefit (in each case, directly or indirectly) of Seller or its Affiliates with respect to the Assets, (b) all premiums due on such insurance policies have either been paid or, if not yet due, accrued, (c) all such insurance policies are in full force and effect and enforceable in accordance with their terms and (d) Seller and its Affiliates are not in default under, and has not otherwise failed to comply with, any material provision contained in any such insurance policy.

5.15    Surety Bonds and Credit Support.  Schedule 5.15 sets forth a true and complete list of all Surety Bonds and Seller Credit Obligations currently maintained, posted or

otherwise provided by or on behalf of Seller or any of its Affiliates with respect to the Assets (including with respect to the ownership, operation, development or use thereof) or the Assumed Liabilities (collectively, the "Credit Support").  True and complete copies of all such Credit Support have been made available to Buyer prior to the Execution Date.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller, as of the Execution Date and the Closing Date, as follows:

6.1    Organization and Good Standing.  Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware.  Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.  Buyer is duly qualified or licensed to do business in the State(s) where the Assets are located.

6.2    Authority; Validity; Consents.  Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated herein have been duly and validly authorized by all requisite limited liability company or corporate actions in respect thereof.  This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a Party will be duly and validly executed and delivered by Buyer, as applicable, at the Closing.  This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except in each case as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Legal Requirements affecting the enforcement of creditors' rights generally and by general principles of equity, regardless of whether such principles are considered in a proceeding at law or in equity.  Buyer is not or will not be required to give any notice to, make any filing with, or obtain any consent or approval from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a Party or the consummation or performance of any of the transactions contemplated hereby or thereby, except for such notices, filings, consents and approvals, the failure of which to provide, make or obtain, would not, individually or in the aggregate, have a material adverse effect on Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

6.3    No Conflict.  When the consents and other actions described in Section 6.2 have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Buyer under (a) any agreement,

indenture or other instrument to which it is bound, (b) the description of organization documents of Buyer, as applicable, (c) any Order or (d) any Legal Requirement.

6.4     Availability of Funds.  Pursuant to the Financing, Buyer has access to sufficient cash in immediately available funds to pay the Purchase Price, all costs, fees and expenses to be paid by Buyer that are necessary to consummate the transactions contemplated by this Agreement and the other Transaction Documents, and assume the Assumed Liabilities. Buyer's ability to consummate the transaction contemplated hereby is not contingent upon its ability to secure financing or to complete any public or private placement of securities prior to or upon Closing.

6.5     Litigation.   There are no Proceedings or Orders pending or, to the Knowledge of Buyer, threatened against Buyer, that seek to restrain or prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or that would, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

6.6     Bankruptcy.   There are no bankruptcy, reorganization or arrangement proceedings pending, being contemplated by, or to the Knowledge of Buyer, threatened against Buyer or any of its Affiliates.

6.7     Brokers or Finders.  Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which Seller is or will become liable.

6.8     Relationships.  As of the Closing Date, those Persons listed on Schedule 6.8, (a) have not directly contributed more than fifty percent (50%) of the capital of Buyer and (b) are not entitled to directly participate in more than fifty percent (50%) of the profits of Buyer until the other members of Buyer that contributed capital on the Closing Date have received aggregate distributions from Buyer equal to the amount of capital contributed by such other members plus a return.

6.9     Knowledge and Experience.   Buyer (a) is engaged in the business of exploring for and producing Hydrocarbons as an ongoing business and (b) is purchasing the Assets for its own account for investment purposes and not with the intent to resell the Assets in violation of any federal or state securities laws.  Buyer is an experienced and knowledgeable investor in oil and gas properties, is knowledgeable with respect to the tax ramifications associated therewith and herewith, has the financial and business expertise to fully evaluate the merits and risks of the transaction covered by this Agreement and has relied solely upon the basis of its own independent investigation of the Assets for all purposes (including the geologic and geophysical characteristics of the Assets, the estimated Hydrocarbon reserves recoverable therefrom, and the price and expense assumptions applicable thereto).  In acquiring the Assets, Buyer is acting in the conduct of its own business and not under any specific contractual commitment to any third party, or any specific nominee agreement with any third party, to transfer to, or to hold title on behalf of, such third party, with respect to all or any part of the Assets.  Buyer acknowledges that it has had the opportunity to seek the advice of persons it deemed appropriate concerning the consequences of

32

the provisions of this Agreement and hereby waives any and all rights to claim that it is an unsophisticated investor in oil and gas properties.

6.10    Qualification to Own the Assets.  At Closing, Buyer is qualified to own the Assets in all jurisdictions where the Assets are located, and the consummation of the transactions contemplated by this Agreement will not cause Buyer to be disqualified as such an owner.  To the extent required by the applicable state, tribal and federal Governmental Authorities, Buyer currently has, and will continue to maintain, lease bonds, area-wide bonds or any other surety bonds or insurance policies as may be required by, and in accordance with, any Governmental Authorities with jurisdiction over the ownership of such Assets or any operating agreement.  Buyer acknowledges that (i) Seller is not the operator of the Assets, and (ii) Seller is not transferring, and shall not be required to transfer, operatorship of any of the Assets to Buyer pursuant to this Agreement.

## ARTICLE 7
## Actions Prior to the Closing Date

7.1    Operations Prior to the Closing Date.  Seller covenants and agrees that, after the Execution Date and prior to the Closing Date, except (w) as expressly contemplated by this Agreement, (x) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), (y) as otherwise required by Legal Requirements and (z) as required by Order of the Bankruptcy Court or restrictions or limitations under the Bankruptcy Code on chapter 11 debtors:

(a)    Seller shall:

(i)    use commercially reasonable efforts, taking into account Seller's status as debtor in possession, to maintain the Assets or cause such Assets to be operated as a reasonably prudent operator in the ordinary course of business;

(ii)    maintain books, accounts and records relating to the Assets in accordance with past custom and practice;

(iii)    maintain (A) insurance coverage on the Assets in the amounts and types described in Schedule 5.14, and (B) all Permits; and

(iv)    subject to Section **Error! Reference source not found.**, maintain all Credit Support.

(b)    Seller shall not:

(i)    abandon any Asset (except any abandonment of Leases to the extent any such Leases terminate pursuant to their terms);

(ii)    commence, propose, or agree to participate in any single operation with respect to the Wells or Assigned Leases and Interests with an anticipated cost in excess of One Million Dollars ($1,000,000) net to the interest of Seller, except for emergency operations taken in the face of risk to life, injury, property or the environment, operations

33

scheduled under applicable authorities for expenditures, or operations required by any Governmental Authority (including with respect to Decommissioning Obligations);

(iii)    terminate, cancel, or materially amend or modify any Assigned Contract or Assigned Lease and Interest;

(iv)    sell, lease, encumber, or otherwise dispose of all or any portion of any Assets, except sales of Hydrocarbons in the ordinary course of business, or as otherwise contemplated in this Agreement;

(v)    enter into any contract or agreement that if entered into on or prior to the Execution Date, would be required to be listed on Schedule 5.9;

(vi)    settle or compromise any material suit or litigation or waive any material claims;

(vii)    terminate, cancel, or materially amend or modify any license or agreement relating to seismic, geological, geochemical or geophysical data;

(viii)   (A) other than in accordance with the agreed budget attached to the Cash Collateral Order or the Restructuring Support Agreement, declare, set aside or pay any dividends on, or make any other distributions (whether in cash, stock or property or any combination thereof) in respect of any equity interests, debt securities or other instruments (or options, warrants or other rights to acquire equity interests, debt securities or other instruments) of any Seller Party or any RBL Facility Claim or Term Loan Claim, (B) purchase, redeem or otherwise acquire, or offer to purchase, redeem or otherwise acquire, any equity interests, debt securities or other instruments (or options, warrants or other rights to acquire equity interests, debt securities or other instruments) of any Seller Party, or (C) make a prepayment under any debt securities or other instruments to which any Seller Party is a party or subject; or

(ix)    enter into any agreement or commitment to take any action prohibited by this Section 7.1(b).

7.2    Reasonable Best Efforts.

(a)    Seller, on the one hand, and Buyer, on the other hand, shall use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using reasonable best efforts to accomplish the following: (i) the taking of all reasonable acts necessary to cause the conditions precedent set forth in Article 9 and Article 10 to be satisfied, (ii) the obtaining, at the earliest practicable date, of all necessary Governmental Authorizations and the making of all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and the taking of all reasonable steps as may be necessary to avoid any Proceeding by any Governmental Authority, and (iii) the execution or delivery of any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.  Buyer shall, as soon as reasonably practicable after the Closing Date, deliver to the applicable operator of each Property

a copy of the recorded Assignment(s) evidencing the conveyance of Seller's interest in such Property to Buyer, as well as any other documentation reasonably requested by such operator to evidence such conveyance.

(b)     Seller, on the one hand, and Buyer, on the other hand, (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto. In addition, neither of the Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Party in advance and, to the extent permitted by any such Governmental Authority, gives the other Party the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Subject to any restrictions under applicable Legal Requirements, each of Buyer, on the one hand, and Seller, on the other hand, shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and its respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting non-disclosure agreements or to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval.  Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.

(c)     Subject to the terms and conditions of this Agreement, Buyer shall take any and all steps necessary to avoid or eliminate any impediments under any applicable antitrust, competition or trade regulation laws that may be asserted by any Governmental Authority with respect to the transactions contemplated hereby so as to enable the Closing to occur as soon as reasonably possible, including proposing, negotiating, committing to and effecting, by consent decree or otherwise, the sale, divestiture or disposition of such assets or businesses of Buyer or any of its Subsidiaries as may be required in order to avoid the entry, or to effect the dissolution, of any injunction, temporary restraining order or other order in any suit or proceeding, which would otherwise have the effect of preventing, delaying or restricting the consummation of the transactions contemplated in this Agreement.

7.3     Bankruptcy Court Approval.

(a)     Seller and Buyer acknowledge that this Agreement and the sale of the Assets and the assumption and assignment of the Assigned Contracts and Assigned Leases and Interests are subject to Bankruptcy Court approval.  Seller and Buyer acknowledge that (i) to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest and otherwise best offer possible for the Assets, and that such demonstration shall include giving notice of the transaction contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, and (ii) Buyer must provide adequate assurance of

future performance as required under the Bankruptcy Code with respect to each Assigned Contract and Assigned Lease and Interest.

(b)     As soon as reasonably practicable following the date of this Agreement and the commencement of the Bankruptcy Cases, Seller shall, subject to the Restructuring Support Agreement, seek entry of the Sale Order by the Bankruptcy Court in accordance with the terms and conditions of this Agreement and the Restructuring Support Agreement.  Seller shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Assigned Contracts and to determine the amount of the Cure Costs.  Seller agrees that all pleadings and other materials relating to this Agreement, the transactions contemplated hereunder, the Assets, Buyer or its Affiliates, the Sale Order or the Plan shall be provided to Buyer no later than three (3) Business Days prior to filing or otherwise as soon as reasonably practicable prior to being filed with the Bankruptcy Court and shall be reasonably acceptable to Buyer to the extent provided in the Restructuring Support Agreement.

(c)     Subject to Section 13.03(c) of the Restructuring Support Agreement, from and after the Execution Date and prior to the Closing or the termination of this Agreement in accordance with Section 11.1, Seller shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the termination, reversal, voiding, modification or staying of the Restructuring Support Agreement, the Sale Order or this Agreement.  In the event an appeal is taken from (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacatur, stay, rehearing or reargument shall be filed with respect to) the Sale Order, Seller shall (i) promptly notify Buyer of such appeal, petition or motion, and promptly provide Buyer with a copy of the related notice thereof, and with written notice of any motion or application filed in connection with any of the foregoing and (ii) use commercially reasonable efforts to defend such appeal, petition or motion.  Seller shall waive its rights to appeal (or file any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacatur, stay, rehearing or reargument) with respect to the Sale Order, and such waiver shall be explicitly set forth in the Sale Order.

7.4     Updates and Amendments of Exhibits.

(a)     Until Closing and subject to Section 7.1, Seller shall have the right to amend, modify and/or supplement Exhibit A and Exhibit C, in each case, as applicable, in order to reflect any new Contracts or Leases taken by Seller.

(b)     Prior to Closing, Seller has the right to supplement, correct or amend its Schedules relating to the representations and warranties set forth in Article 5 with respect to any matters first occurring subsequent to the Execution Date ("Seller's Supplemented Schedules"); *provided* that any disclosure in a Seller's Supplemented Schedule shall not be deemed to have been included in Seller's representations and warranties for any purpose under this Agreement.  Notwithstanding the foregoing, in the event that Closing occurs, then such Seller's Supplemented Schedules shall be deemed to have been included in Seller's representations and warranties for all purposes of this Agreement and Buyer shall be deemed to have waived the matters relating to such schedules in regard to Buyer's obligation to close this transaction pursuant to Section 11.1(b)(i).

36

7.5    Commitment Letters.  Prior to the execution of this Agreement, Buyer has delivered to Seller true and complete, fully-executed copies of the equity commitment letters by and between Buyer and Lime Rock and including all exhibits, schedules, annexes and amendments to such agreements in effect as of such date of delivery (the "Commitment Letters"), pursuant to which and subject to the terms and conditions thereof each of the parties thereto (other than Buyer), has severally agreed and committed to provide to Buyer the equity financing set forth therein ("Financing").  As of the Closing Date, the Commitment Letters shall have not been amended, restated or otherwise modified or waived subsequent to the date of delivery to Seller and the respective commitments contained in the Commitment Letters shall have not been withdrawn, modified or rescinded in any respect.  There shall be no conditions precedent to the funding of the full amount of the Financing, other than as expressly set forth in the Commitment Letters.  There shall be no other agreements, side letters or arrangements that would permit the parties to the Commitment Letters to reduce the amount of the Financing or that would otherwise affect the availability of the Financing.  The Commitment Letters provide Buyer with binding financial commitments that, when funded at Closing, will provide it with sufficient funds to pay the Purchase Price and to pay any other amounts required to be paid by it in connection with the consummation of the transactions contemplated by this Agreement.  On or before the Closing Date, Buyer shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and obtain the Financing on the terms and conditions described in the Commitment Letter.  Buyer acknowledges and agrees that the consummation of, and receipt of proceeds from, any Financing is not a condition to Buyer's obligations hereunder.

7.6    BOEM Qualifications.  Prior to Closing, and only to the extent that any such qualification is required by applicable laws to own the Assets, Buyer shall (i) become qualified with the BOEM to hold oil and gas leases, rights-of-way, and rights-of-use and easements on the U.S. Outer Continental Shelf under 30 CFR 550 and 30 CFR 556.35 and to meet any other requirements under Legal Requirement to receive and hold such assets and properties, (ii) become qualified with each applicable Governmental Authority to hold all state oil and gas leases, state rights-of-way and state right-of-use easements included in the Assets, and (iii) provide Seller evidence of such qualification, including copies of all filings and correspondence submitted to or received from the BOEM, BSEE (in either case, if any) and such other Governmental Authorities to obtain such registration and qualification, including all applicable BOEM approval letters and issuance of Company Number for Buyer.

7.7    Credit Support.

(a)    Buyer acknowledges that none of the bonds, letters of credit and guarantees posted by Seller or its Affiliates with Governmental Authorities relating to the Assets (collectively, the "Surety Bonds") or Seller Credit Obligations will be transferred to Buyer.  Without limiting the provisions of Section 8.4(a), Buyer further acknowledges that Seller has no duty to maintain any bonds, letters of credit, guarantees, cash deposits and insurance to secure performance or payment under any Assigned Contracts or Assigned Leases and Interests (collectively, "Seller Credit Obligations") after the Closing.

(b)    As of the Execution Date, Buyer has provided Seller (i) subject to Section 7.7(b)(ii), evidence of binding commitments to obtain bonds, letters of credit and guarantees necessary to substitute or otherwise effectively replace the Surety Bonds and

37

substantially all of the Seller Credit Obligations as required pursuant to <u>Section 7.7(c)</u> and applicable law, to be effective as of Closing, except for those Surety Bonds or Seller Credit Obligations that cannot be obtained until BOEM approves assignment of the Assets (to the extent any such approval is necessary), as further provided in <u>Section 7.7(c)</u>, and (ii) evidence in the form of surety bond riders that substitute Buyer, or an Affiliate of Buyer, as named principal, with respect to those certain Seller Credit Obligations for which the obligee(s) (and, if applicable, co-obligee(s)) applicable thereto must consent in writing to such substitution of the named principal under such Seller Credit Obligation, which are set forth and described on <u>Schedule 7.7(b)</u> (collectively, the "<u>Specified Seller Credit Obligations</u>").

        (c)      In addition, on or before the Closing Date, or, with respect to those Surety Bonds that cannot be obtained until the assignment of the Assets has been approved by the BOEM (to the extent any such approval is necessary) or the Specified Seller Credit Obligations, as soon after the Closing Date as possible, Buyer shall (i) use commercially reasonable efforts to obtain, or cause to be obtained in the name of Buyer and effective as of the Closing Date, replacements for such Surety Bonds (in each case, as may be required by applicable laws) and replacements (or an equivalent thereto) for such Specified Seller Credit Obligations and take any other actions required by any Governmental Authority or reasonably requested by any other third party to the extent such replacements or actions are necessary (A) for Buyer's ownership of the Assets and (B) to permit the cancellation of the Surety Bonds and, if applicable, substitution of Buyer, or an Affiliate of Buyer, as named principal therein, with respect to the Specified Seller Credit Obligations posted by Seller and/or its Affiliates with respect to the Assets; (ii) reasonably cooperate with Seller in Seller's efforts to cause Seller's obligations arising under all Credit Support (other than the Specified Seller Credit Obligations) posted by Seller and/or its Affiliates with respect to the Assets to be cancelled on or before the Closing; and (iii) satisfy any requirements and obligations of any Governmental Authority or pursuant to contracts with respect to any Decommissioning Obligations related to any of the Assets. In addition, at or prior to Closing, or, with respect to those Surety Bonds that cannot be obtained until the assignment of the Assets has been approved by the BOEM (to the extent any such approval is necessary), as soon after the Closing Date as possible, Buyer shall deliver to Seller evidence of the posting of bonds or other security with all applicable Governmental Authorities meeting the requirements of such authorities to own the Assets. If any Seller Credit Obligation (including any Specified Seller Credit Obligation) remains outstanding as of the Closing Date, Buyer shall indemnify each member of the Seller Group and hold them harmless against any Liabilities that the Seller Group may incur under any such Seller Credit Obligations (including any Specified Seller Credit Obligation) to the extent attributable to the period from and after the Effective Time and not attributable to any acts or omissions of any member of the Seller Group that are inconsistent with any Seller Party's obligations under this Agreement.

        7.8      <u>Access to the Properties</u>.

        (a)      Buyer or its Affiliates may propose to visit or access the Assets or the premises of Seller for the purpose of transition planning and coordination, or production operations review after the Execution Date and prior to Closing. Buyer shall provide to Seller at least forty-eight hours written notice prior to the date of the visit, setting forth the purpose for the visit, the proposed visitation date(s), the names of Buyer's personnel who will be visiting, and a designated Buyer's Representative, with Buyer supervisory responsibility for the visit, with accompanying contact information including name, title, electronic mail address, and office and cell phone

number. Buyer's notice may be submitted by electronic mail but must be followed up with a confirming phone call to Seller's contact representative. Seller will provide, or will cause Arena Offshore, LP to provide, Buyer, and its representatives, with access to the Assets which Arena Offshore, LP operates subject to the prior execution by such parties of Seller's and Arena Offshore, LP's standard access or boarding agreement and shall use commercially reasonable efforts to arrange for Buyer's, and its agent's, access to the Assets not operated by Arena Offshore LP.

(b)     Buyer's or its Representative's access must be conducted in such a manner as not to interfere with the operation of the Assets. Buyer shall abide by Seller's, Arena Offshore, LP's, and any third party operator's safety rules, regulations, search and seizure policies, and operating policies during Buyer or its Representative's access, and any Buyer or its Representatives' access must at Buyer's sole cost and expense. Buyer's review of the Assets shall not include any operation of equipment, sampling, testing, monitoring or any invasive environmental review or investigation commonly referred to as a Phase II without the prior written consent of Seller, which consent may be withheld by Seller in its sole discretion.

(c)     Buyer, on behalf of itself and the Buyer's Representatives, hereby releases and agrees to indemnify, defend and hold harmless Seller Group, Arena Offshore, LP and the other owners of interests in the Assets from and against any and all Liabilities, losses, costs and expenses (including court costs, expert fees and reasonable attorneys' and engineers' fees) arising out of or relating to any and all access to the Assets and the Records (and other related information) by Buyer and its Representatives, and any related activities by Buyer or its Representatives, **EVEN IF CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT), STRICT LIABILITY OR OTHER LEGAL FAULT OF ANY INDEMNIFIED PERSON EXCLUDING, HOWEVER, ANY CLAIMS, LIABILITIES, LOSSES, COSTS OR EXPENSES CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY INDEMNIFIED PERSON.**

(d)     Any Seller, in its sole discretion, has the right to suspend or terminate any Buyer or Buyer's Representatives access at any time for any violation of this Section 7.8 or any action or omission by Buyer personnel that such Seller determines, in its sole discretion, may create a risk of harm, damage or Liability of any type.

7.9     Employee Matters. With respect to employee matters, the Parties agree to the provisions set forth in Exhibit G.

## ARTICLE 8
## ADDITIONAL AGREEMENTS

8.1     Taxes.

(a)     Any transfer, documentary, sales, use, stamp, registration and other similar Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with the transfer of the Assets to Buyer pursuant to this Agreement and not exempted under the Sale Order, by Section 1146(a) of the Bankruptcy Code or applicable state or municipal law ("Transfer Taxes") shall be borne by Buyer. Buyer will, at its own expense, file all necessary Tax Returns and other documentation with respect to all Transfer Taxes, and, if required by applicable law, the Parties will, and will cause their Affiliates to, join in the execution of any such Tax Returns and other documentation. Seller and Buyer will

cooperate in good faith to minimize, to the extent permissible under applicable law, the amount of any such Transfer Taxes.

(b)     Buyer and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Assets (including access to books and records and Tax Returns and related working papers dated before Closing) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax; *provided*, *however*, that neither Buyer nor Seller shall be required to disclose the contents of its income Tax Returns to any Person.  Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(b) shall be borne by the Party requesting it.

8.2     Allocation of Purchase Price.  Buyer and Seller shall use commercially reasonable efforts to agree to an allocation of the Purchase Price (but including Assumed Liabilities only to the extent such liabilities are required to be included for federal income Tax purposes and the fair market value of the Contingent Consideration (as of the Closing Date)) to the extent necessary to allocate the Purchase Price (but including Assumed Liabilities only to the extent such liabilities are required to be included for federal income Tax purposes) among the asset classes listed on Internal Revenue Service Form 8594, which shall be in accordance with Code §1060 and the regulations thereunder (and any similar provision of state, local, or non-U.S. law, as appropriate) by the date that is sixty (60) days after the Closing Date (the "Tax Allocation").  If Seller and Buyer reach an agreement with respect to the Tax Allocation pursuant to the foregoing sentence, Seller and Buyer each agree to report, and to cause their respective Affiliates to report, the federal, state, and local income and other Tax consequences of the transactions contemplated herein, and in particular to report the information required by Code §1060(b), and to jointly prepare Internal Revenue Service Form 8594 (Asset Acquisition Statement under Code §1060) in a manner consistent with the Tax Allocation, as may be revised to take into account subsequent adjustments to the Purchase Price, including any adjustments pursuant to the Agreement to determine the Purchase Price, and shall not take any position for U.S. federal, state or local income tax purposes inconsistent therewith upon examination of any Tax return, in any refund claim, in any tax litigation, investigation or otherwise, unless required to do so by a "determination" (as defined in Code §1313(a)(1)), or with such other Party's prior consent; *provided, however*, that nothing contained herein shall prevent Buyer or Seller from settling any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of the Tax Allocation, and neither Buyer nor Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Authority challenging the Tax Allocation.  If Seller and Buyer do not reach an agreement with respect to the Tax Allocation under this Section 8.2, Seller and Buyer shall be free to file their own asset allocation statements and shall not be subject to the reporting requirements of this Section 8.2.  Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 8.2 shall survive the Closing without limitation.

8.3     Bulk Sales.  Buyer and Seller hereby waive compliance with all "bulk sales," "bulk transfer" and similar laws that may otherwise be applicable with respect to the sale and transfer of any or all of the Assets to Buyer.

8.4     Assigned Contracts and Assigned Leases and Interests; Adequate Assurance and Performance.

(a)     With respect to each Assigned Contract and Assigned Lease and Interest, Buyer shall provide adequate assurance as required under the Bankruptcy Code of the future performance by Buyer of each such Assigned Contract or Assigned Lease and Interest.  Buyer and Seller agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts and the Assigned Leases and Interests, such as furnishing timely requested and factually accurate affidavits and other documents or information for filing with the Bankruptcy Court and making Buyer's and Seller's employees and Representatives available to testify before the Bankruptcy Court.  Notwithstanding the foregoing, Seller shall have no obligation under this Agreement (including, for the avoidance of doubt, pursuant to Section 7.2 or this Section 8.4(a)) to provide any assistance with respect to the preparation of any financial information.

(b)     From and after Closing, Buyer shall pay, perform or satisfy the Assumed Liabilities from time to time and as such Assumed Liabilities become due and payable or are required to be performed or satisfied in accordance with their respective terms.

8.5     <u>Post-Closing Books and Records and Personnel</u>.  For three (3) years after the Closing Date (or such longer period as may be required by any Governmental Authority or ongoing claim), (a) Buyer shall not dispose of or destroy any of the Records received by Buyer as Assets and (b) Buyer shall allow Seller (including, for clarity, any trust established under the Plan or any other successors of Seller) and any of its directors, officers, employees, counsel, representatives, accountants and auditors reasonable access during normal business hours, at Seller's sole expense and upon reasonable advance notice, to all employees and files of Buyer and its respective Subsidiaries and any Records included in the Assets for purposes relating to the Bankruptcy Case, the wind-down of the operations of Seller, the functions of any such trusts or successors, or other reasonable business purposes, and Seller (including any such trust or successors) and such directors, officers, employees, counsel, representatives, accountants and auditors shall have the right to make copies of any such files, books, records and other materials. Until the closing of the Bankruptcy Case or the liquidation and winding up of Seller's estate, Seller shall preserve and keep the Records and, at Buyer's sole expense, shall make such Records, records, and Seller's personnel available to Buyer as may be reasonably required by Buyer in connection with, among other things, any insurance claims by, Proceedings, Actions or Tax audits against, or governmental investigations of, Buyer or any of its Affiliates or in order to enable Buyer to comply with its obligations under this Agreement and each other Transaction Document.  In the event any Party desires to destroy any such Records during or after the time during which they must be maintained pursuant to this Section 8.5, such Party shall first give ninety (90) days prior written notice to the other Party and such other Party shall have the right at their option and expense, upon prior written notice given within such ninety (90) day period to the Party desiring to destroy such Records or records, to take possession of the Records within one hundred and eighty (180) days after the date of such notice, or such shorter period as the liquidation and winding up of Seller's estate shall permit.

8.6     <u>No Other Representations or Warranties; Disclaimers; NORM</u>.

(a)     Notwithstanding anything to the contrary contained in this Agreement, except as and to the extent expressly set forth in this Agreement, the certificate delivered by Seller pursuant to Section 4.4(c), the Assignments, and in the Transaction Documents, Seller makes no

representations or warranties whatsoever, and disclaims all liability and responsibility for any representation, warranty, statement or information made or communicated (orally or in writing) to Buyer (including any opinion, information, or advice that may have been provided to Buyer by any respective Affiliate or Representative of Seller or by any investment bank or investment banking firm, any petroleum engineer or engineering firm, Seller's counsel, or any other agent, consultant, or Representative of Seller).  Except as and to the extent expressly set forth in this Agreement, the certificate delivered by Seller pursuant to Section 4.4(c), the Assignments, and in the Transaction Documents, Seller further makes no representation, covenant or warranty, express or implied, as to the accuracy or completeness of any files, records or data heretofore or hereafter furnished in connection with the Assets, or as to the quality or quantity of Hydrocarbon reserves (if any) attributable to the Assets, or the ability of the Assets to produce Hydrocarbons.  Any and all such files, records and data furnished by Seller is provided as a convenience, and any reliance on or use of the same shall be at Buyer's sole risk.  Without limiting the generality of the foregoing, except as and to the extent expressly set forth in Article 5, the certificate delivered by Seller pursuant to Section 4.4(c), the Assignments, and the Transaction Documents, Seller expressly disclaims and negates any representation or warranty, express, implied, at common law, by statute, or otherwise, relating to (a) the title to any of the Assets, (b) the condition of the Assets (including any implied or express warranty of merchantability, fitness for a particular purpose, or conformity to models or samples of materials), it being distinctly understood that the Assets are being sold "As Is," "Where Is," and "With All Faults As To All Matters," (c) freedom from hidden or redhibitory defects or vices (d) any infringement by Seller of any patent or proprietary right of any third party, (e) any information, data, or other materials (written or oral) furnished to Buyer by or on behalf of Seller (including without limitation, in respect of any seismic data, the existence or extent of Hydrocarbons or the mineral reserves, the recoverability of such reserves, any product pricing assumptions, and the ability to sell Hydrocarbon production after the Closing), and (f) the environmental condition and other condition of the Assets and any potential liability arising from or related to the Assets.

(b)      Waiver of consumer and other rights:  Buyer waives its rights under the Texas Deceptive Trade Practices-Consumer Protection Act, specifically including section 17.41 et seq., Vernon's Texas Code Annotated, Business and Commerce, a law that gives consumers special rights and protections, or any similar state or federal law.  After an opportunity to consult with an attorney of its own selection, Buyer acknowledges that the disclaimers and waivers given in and under this Agreement shall be considered material and integral parts of this Agreement, with consideration given therefor, and acknowledges that all disclaimers and waivers are "conspicuous" and, have been brought to the attention of Buyer, and that Buyer has voluntarily and knowingly consented to all disclaimers and waivers.

(c)      Buyer acknowledges and affirms that it has made its own independent investigation, analysis, and evaluation of the transactions contemplated hereby and the Assets (including Buyer's own estimate and appraisal of the extent and value of Seller's Hydrocarbon reserves attributable to the Assets and an independent assessment and appraisal of the environmental risks associated with the acquisition of the Assets).  Buyer acknowledges that in entering into this Agreement, it has relied on the aforementioned investigation and the terms and conditions of this Agreement.  Buyer hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim, or commencing, instituting, or causing to be commenced, any

Proceeding of any kind against Seller or its Affiliates or Subsidiaries, alleging facts contrary to the foregoing acknowledgment and affirmation.

(d)     BUYER ACKNOWLEDGES THAT THE ASSETS HAVE BEEN USED FOR EXPLORATION, DEVELOPMENT AND PRODUCTION OF OIL, GAS AND WATER AND THAT THERE MAY BE PETROLEUM, PRODUCED WATER, WASTES OR OTHER HAZARDOUS MATERIALS LOCATED ON, UNDER OR ASSOCIATED WITH THE ASSETS AND THE ASSETS MAY ALSO CONTAIN PREVIOUSLY PLUGGED AND ABANDONED WELLS, BURIED PIPELINES, STORAGE TANKS, AND OTHER EQUIPMENT, WHETHER OR NOT OF A SIMILAR NATURE, THE LOCATIONS OF WHICH MAY NOT BE KNOWN BY SELLER OR BE READILY APPARENT BY A PHYSICAL INSPECTION OF THE ASSETS. EQUIPMENT AND SITES INCLUDED IN THE ASSETS MAY CONTAIN NORM. NORM MAY AFFIX OR ATTACH ITSELF TO THE INSIDE OF WELLS, MATERIALS AND EQUIPMENT AS SCALE, OR IN OTHER FORMS; THE WELLS, MATERIALS AND EQUIPMENT LOCATED ON OR INCLUDED IN THE ASSETS MAY CONTAIN NORM AND OTHER WASTES OR HAZARDOUS MATERIALS; AND NORM CONTAINING MATERIAL AND OTHER WASTES OR HAZARDOUS MATERIALS MAY HAVE BEEN BURIED, COME IN CONTACT WITH THE SOIL OR OTHERWISE BEEN DISPOSED OF ON OR AROUND THE ASSETS. SPECIAL PROCEDURES MAY BE REQUIRED FOR THE REMEDIATION, REMOVAL, TRANSPORTATION OR DISPOSAL OF WASTES, ASBESTOS, HAZARDOUS MATERIALS, INCLUDING HYDROGEN SULFIDE GAS AND NORM FROM THE ASSETS. FROM AND AFTER THE CLOSING, BUYER SHALL ASSUME RESPONSIBILITY FOR THE CONTROL, STORAGE, HANDLING, TRANSPORTING AND DISPOSING OF OR DISCHARGE OF ALL MATERIALS, SUBSTANCES AND WASTES FROM THE ASSETS (INCLUDING PRODUCED WATER, HYDROGEN SULFIDE GAS, DRILLING FLUIDS, NORM, HAZARDOUS MATERIALS AND OTHER WASTES) IN A SAFE AND PRUDENT MANNER AND IN ACCORDANCE WITH ALL APPLICABLE ENVIRONMENTAL LAWS.

8.7     Casualty.

(a)     If, after the Execution Date and prior to the Closing, (i) a part of the Assets or (ii) a part of any assets owned, Controlled, maintained or otherwise operated by third parties which are covered by Seller's or its Affiliates' insurance policies, in each case, suffers a Casualty Loss or is taken in condemnation or under the right of eminent domain or if proceedings for such purposes are pending or threatened, Seller shall promptly give Buyer written notice of such occurrence, including reasonable particulars with respect thereto, and, subject to Section 11.1(b)(vi), this Agreement shall remain in full force and effect notwithstanding any such Casualty Loss.

(b)     With regard to a Casualty Loss occurring after the Execution Date through the Closing, without limitation of Section 11.1(b)(vi), at Closing, Seller shall pay (or cause to be paid) to Buyer all sums paid to Seller or its Affiliates by third parties by reason of such Casualty Loss. In addition, Seller shall seek to recover, and transfer (or cause to be transferred) to Buyer, at the Closing, all of the right, title and interest of Seller and its Affiliates' in and to any insurance claims, unpaid awards or other proceeds and any other rights against third parties arising out of such Casualty Loss, including any such rights under insurance policies owned or maintained (directly or indirectly) by third parties on behalf of Seller or its Affiliates covering the Assets or any assets owned, Controlled, maintained or otherwise operated by third parties which are covered by Seller's or its Affiliates' insurance policies; *provided, however*, that Seller shall reserve and retain all rights, title and interests and claims against third parties for the recovery of Seller's costs

43

and expenses incurred prior to the Closing in pursuing or asserting any such insurance claims with respect to any such Casualty Loss.

(c) Notwithstanding anything to the contrary in this Agreement and subject to Section 11.1(b)(vi), (i) at the Closing, the Assets affected by a Casualty Loss or condemnation shall be included in the Closing and Buyer shall pay the full Allocated Value therefor, subject to any applicable adjustments under this Agreement, and (ii) Buyer's recourse with respect to a Casualty Loss shall be limited to the proceeds of Seller's or its Affiliates' applicable insurance coverage or any other insurance policies owned or maintained (directly or indirectly) by third parties on behalf of Seller or its Affiliates covering the Assets in respect thereof or other sums paid to Seller or its Affiliates by third parties (or an assignment of claims related thereto), which proceeds or other sums shall be payable to Buyer only upon or after the Closing of the transaction contemplated hereby, and subject to Seller's retention of its recovery as contemplated by the last sentence of Section 8.7(b). Seller shall have no other liability or responsibility to Buyer with respect to a Casualty Loss, **EVEN IF SUCH CASUALTY LOSS SHALL HAVE RESULTED FROM OR SHALL HAVE ARISEN OUT OF THE SOLE OR CONCURRENT NEGLIGENCE, FAULT, OR VIOLATION OF A LEGAL REQUIREMENT, EXCEPT TO THE EXTENT CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SELLER OR ANY MEMBER OF SELLER GROUP**.

8.8 <u>Environmental Liabilities</u>. Buyer hereby releases, indemnifies, defends and holds harmless Seller from and against any and all liabilities (including any personal injury, death or loss or damage of property) to the extent arising out of, resulting from or relating to any office visit, field visit, environmental property assessment or other due diligence activity conducted by Buyer or Buyer's environmental consultant with respect to the Assets, **EVEN IF SUCH LIABILITIES ARISE OUT OF OR RESULT FROM, IN WHOLE OR IN PART, THE SOLE, ACTIVE, PASSIVE, CONCURRENT OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OF SELLER, EXCEPTING ONLY LIABILITIES TO THE EXTENT ACTUALLY RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SELLER.**

8.9 <u>Additional Agreements</u>.

(a) <u>Restructuring Support Agreement</u>. Seller shall provide Buyer a copy of the Restructuring Support Agreement at or prior to the execution of this Agreement. Seller shall notify Buyer (x) if at any time after the date hereof, the parties to the Restructuring Support Agreement do not constitute the Required Supporting Parties and (y) of any default thereunder, termination thereof or amendment thereto reasonably promptly upon becoming aware of any such default, termination or amendment, including any such amendment under consideration, and shall promptly provide to Buyer a copy of any default notice, termination notice or amendment (including any drafts thereof).

(b) <u>Chapter 11 Plan</u>. The Plan shall include a provision that allows Buyer, at Buyer's reasonable discretion, or any designee of Buyer, to receive the equity in one or more reorganized legal entities comprising Seller to facilitate the transfer of any Asset or Contract to the extent determined necessary or desirable by Buyer at no additional cost to Buyer. For the avoidance of doubt, any provisions in the Plan that would affect such equity transfer or any reorganized Seller entity which is to be transferred shall be subject to Buyer's prior written

approval (such approval not to be unreasonably withheld), including any provisions relating to the discharge of the reorganized Seller and any provisions affecting any remaining assets or liabilities held by any such Seller entity.  For the avoidance of doubt, neither Buyer nor any designee of Buyer shall acquire any Excluded Assets or Excluded Liabilities in connection with receipt of any such reorganized Seller equity.

(c)    Revenues.  After the Closing, any proceeds (including proceeds held in suspense or escrow), receipts, credits and income attributable to the Assets (or otherwise earned with respect thereto or in connection therewith) received by any Seller Party shall be paid by such Seller Party to Buyer within thirty (30) days after such Seller Party's receipt of such amounts.

## ARTICLE 9
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions; *provided* that Buyer may not rely on the failure of any condition set forth in this Article 9 to be satisfied if such failure was primarily caused by Buyer's failure to act in good faith or to use its commercially reasonable efforts to cause the Closing to occur; *provided further* that if Seller obtains knowledge that any of the following conditions precedent will not be satisfied at or prior to Closing, then Seller shall provide written notice thereof to Buyer:

9.1    Accuracy of Representations.  The representations and warranties of each Seller Party set forth in this Agreement shall be true and correct in all respects on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (*provided* that representations and warranties which are expressly confined to a specified date shall speak only as of such date); *provided, however*, that in the event of a breach of or inaccuracy in the representations and warranties of a Seller Party set forth in this Agreement (which shall be determined without giving effect to any limitation or qualification as to materiality, Material Adverse Effect or similar qualification), the condition set forth in this Section 9.1 shall be deemed satisfied unless the effect of all such breaches of or inaccuracies in such representations and warranties taken together for all Seller Parties results in a Material Adverse Effect; *provided*, *further*, *however*, that Buyer shall not be entitled to assert that the condition set forth in this Section 9.1 has not been satisfied with respect to any breach of or inaccuracy in the representations and warranties of a Seller Party if such breach or inaccuracy was actually known to any of Buyer's Knowledge persons set forth on Schedule 1.1(b) as of the Execution Date.  In addition, Buyer shall have received a certificate of each Seller Party to such effect signed by a duly authorized officer thereof.  If Buyer determines that there has been a breach of or inaccuracy in any of the Seller Parties' representations and warranties on which it will rely for purposes of asserting the condition set forth in this Section 9.1 is not satisfied, it shall provide Seller with notice of such breach or inaccuracy as promptly as reasonably practicable after the determination thereof.

9.2    Seller's Performance.  Each covenant and agreement that Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects (except that those covenants and agreements that are qualified as to materiality or Material Adverse Effect or similar expressions

45

shall have been duly performed and complied with in all respects), and Buyer shall have received a certificate of Seller to such effect signed by a duly authorized officer thereof.

9.3   No Order.   No Governmental Authority shall have enacted, issued, promulgated or entered any Order or other Legal Requirement which is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or could cause any of such transactions to be rescinded following the Closing.  No suit, action, or other proceeding instituted by any Person (other than Buyer or any Affiliate of Buyer) shall be pending before any Governmental Authority seeking to restrain, prohibit, enjoin, or declare illegal, or seeking substantial damages in connection with the transactions contemplated by this Agreement.

9.4   Seller's Deliveries.   Seller shall have delivered (or shall deliver at the Closing) each of the deliveries required to be made to Buyer pursuant to Section 4.4.

9.5   Sale Order.   The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be final, binding, non-appealable and in full force and effect.

## ARTICLE 10
## CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLER TO CLOSE

Seller's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions; *provided* that no Seller Parties may rely on the failure of any condition set forth in this Article 10 to be satisfied if such failure was primarily caused by any of the Seller Party's failure to act in good faith or to use its commercially reasonable efforts to cause the Closing to occur; *provided further* that if Buyer obtains knowledge that any of the following conditions precedent will not be satisfied at or prior to Closing, then Buyer shall provide written notice thereof to Seller:

10.1   Accuracy of Representations.   The representations and warranties of Buyer set forth in this Agreement shall be true and correct in all material respects (except that those representations and warranties which are qualified as to materiality or similar expressions shall be true and correct in all respects) as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (*provided* that representations and warranties which are expressly confined to a specified date shall speak only as of such date); *provided*, *however*, that in the event of a breach of or inaccuracy in the representations and warranties of Buyer set forth in this Agreement (which shall be determined without giving effect to any limitation or qualification as to materiality, material adverse effect or similar qualification), the condition set forth in this Section 10.1 shall be deemed satisfied unless the effect of all such breaches or of inaccuracies in such representations and warranties taken together results in a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement.  In addition, Seller shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.  If Seller determines that there has been a breach of or inaccuracy in any of Buyer's representations and warranties on which it will rely for purposes of asserting the condition set forth in this Section 10.1 is not satisfied, it shall provide Buyer with notice of such breach or inaccuracy as promptly as reasonably practicable after the determination thereof.

46

10.2   <u>Sale Order in Effect</u>.  The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be in full force and effect and shall not be subject to a stay pending appeal.

10.3   <u>Buyer's Performance</u>.  The covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects (except that those covenants and agreements that are qualified as to materiality or similar expressions shall have been duly performed and complied with in all respects), and Seller shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

10.4   <u>No Order</u>.  No Governmental Authority shall have enacted, issued, promulgated or entered any Order or other Legal Requirement which is in effect and which has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or could cause any of such transactions to be rescinded following the Closing.  No suit, action, or other proceeding instituted by any Person (other than Seller or any Affiliate of Seller) shall be pending before any Governmental Authority seeking to restrain, prohibit, enjoin, or declare illegal, or seeking substantial damages in connection with the transactions contemplated by this Agreement.

10.5   <u>Buyer's Deliveries</u>.  Buyer shall have delivered (or shall deliver at the Closing) each of the deliveries required to be made to Seller pursuant to <u>Section 4.3</u>.

## ARTICLE 11
## TERMINATION

11.1   <u>Termination Events</u>.  Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time prior to the Closing:

(a)   by either Seller or Buyer:

(i)   if a Governmental Authority issues a Final Order or any Legal Requirement is enacted prohibiting the transactions contemplated hereby; *provided*, *however*, that (1) Buyer shall be permitted to terminate this Agreement pursuant to this <u>Section 11.1(a)(i)</u> only if Buyer is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein, and (2) Seller shall be permitted to terminate this Agreement pursuant to this <u>Section 11.1(a)(i)</u> only if Seller is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein;

(ii)   by mutual written consent of Seller and Buyer;

(iii)   if the Closing has not occurred by the close of business on October 31, 2020 (the "<u>Outside Date</u>"); *provided*, *however*, that (1) Buyer shall be permitted to terminate this Agreement pursuant to this <u>Section 11.1(a)(iii)</u> only if Buyer is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein, and (2) Seller shall be permitted to terminate this Agreement pursuant to this <u>Section 11.1(a)(iii)</u> only if Seller is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein; *provided*, *further*, that a Party may not terminate pursuant to this <u>Section 11.1(a)(iii)</u> if the Closing has not occurred due to the failure of such Party to satisfy a

condition set forth in Article 9 and Article 10 (as applicable) that is within the reasonable control of such Party;

(iv)    if the Bankruptcy Court enters an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by Seller under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Case; *provided however*, that neither Buyer nor Seller shall be permitted to terminate this Agreement pursuant to this Section 11.1(a)(iv) to the extent that such Order was requested, encouraged or supported by such Party; or

(b)    by Buyer:

(i)    in the event of any breach by Seller (or any Seller Party's) of any of Seller's (or any Seller Party's) agreements, covenants, representations or warranties contained herein (*provided* such breach would result in the failure of a condition set forth in Section 9.1 or Section 9.2 to be satisfied on the Closing Date), and the failure of Seller to cure such breach within ten (10) days after receipt of the Buyer Termination Notice; *provided*, *however*, that (A) Buyer is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein, (B) Buyer notifies Seller in writing (the "Buyer Termination Notice") of its intention to exercise its rights under this Section 11.1(b)(i) as a result of the breach, and (C) Buyer specifies in the Buyer Termination Notice the representation, warranty, covenant or agreement contained herein or in the Sale Order of which Seller is allegedly in breach and a reasonably detailed description of the factual circumstances to support the allegation;

(ii)    if the Bankruptcy Court enters an Order that precludes the consummation of the transactions contemplated by this Agreement on terms and conditions set forth herein;

(iii)    there is a termination of the right to use cash collateral under the Cash Collateral Order, if such termination is not cured within five (5) Business Days thereafter;

(iv)    if Seller (A) enters into one or more agreements to sell, transfer or otherwise dispose of any material portion of the Assets in a transaction or series of transactions other than in the ordinary course of business with one or more Persons other than Buyer or (B) terminates the Restructuring Support Agreement pursuant to Section 13.03(c) of the Restructuring Support Agreement;

(v)    if the Bankruptcy Court has not entered the Sale Order on or before 40 days from the Petition Date or the Sale Order ceases to be in full force and effect or shall have been stayed, reversed, modified or amended in any material respect in a manner adverse to Buyer without the prior written consent of Buyer;

(vi)    if the aggregate sum of all costs and expenses (calculated in accordance with Section 11.5) to fully repair, restore, replace and/or otherwise Remediate any Assets affected by one or more Casualty Losses ("Restoration Costs") is equal to or in excess of an amount equal to twenty percent (20%) of the Purchase Price (and, for the avoidance of doubt, the Restoration Costs of any Asset may exceed the Allocated Value of such Asset);

48

(vii)     (A) if the Restructuring Support Agreement (x) is terminated or (y) is supplemented, amended, waived or otherwise modified, in a manner inconsistent with the Restructuring Support Agreement, or (B) if at any time after the date hereof the parties to the Restructuring Support Agreement do not constitute the Required Supporting Parties; or

(viii)    if Seller (A) withdraws or seeks authority to withdraw (x) the Sale Order at any time after the entry thereof or (y) any notice or motion seeking entry thereof at any time prior to the entry thereof (it being agreed and understood by Buyer and Seller that the filing of a revised or amended form of the Sale Order with the consent of Buyer shall not constitute a withdrawal of the Sale Order, as applicable), or (B) announces any standalone plan of reorganization or liquidation that does not contemplate the sale of the Assets in accordance with the Sale Order, in each case with respect to the Assets.

(c)     by Seller:

(i)     in the event of any breach by Buyer of any of Buyer's agreements, covenants, representations or warranties contained herein (*provided* such breach would result in the failure of a condition set forth in <u>Section 10.1</u> or <u>Section 10.3</u> to be satisfied) or (if such breach is material) in the Sale Order, and the failure of Buyer to cure such breach within ten (10) days after receipt of the Seller Termination Notice; *provided*, *however*, that Seller (A) is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein or in the Sale Order, (B) notifies Buyer in writing (the "<u>Seller Termination Notice</u>") of its intention to exercise its rights under this <u>Section 11.1(c)(i)</u> as a result of the breach, and (C) specifies in the Seller Termination Notice the representation, warranty, covenant or agreement contained herein or in the Sale Order of which Buyer is allegedly in breach and a reasonably detailed description of the factual circumstances to support the allegation; or

(ii)    if Seller terminates the Restructuring Support Agreement pursuant to Section 13.03(c) of the Restructuring Support Agreement.

11.2    <u>Effect of Termination</u>.

(a)     In the event of termination of this Agreement by Buyer or Seller pursuant to this <u>Article 11</u>, all rights and obligations of the Parties under this Agreement shall terminate without any Liability of any Party to any other Party; *provided*, *however*, that, subject to <u>Section 11.2(b)</u>, nothing herein shall relieve any Party from Liability for such Party's (or its Representatives') breach of this Agreement prior to such termination.  The provisions of this <u>Section 11.2</u>, <u>Section 11.4</u> and <u>Section 3.2</u> (and, to the extent applicable to the interpretation or enforcement of such provisions, <u>Article 1</u>), shall expressly survive the termination of this Agreement.

(b)     In the event that Seller has the right to terminate this Agreement pursuant to <u>Section 11.1(c)(i)</u>, notwithstanding <u>Sections 13.4</u> and <u>13.14</u>, Seller shall be entitled, as its sole and exclusive remedy, to (i) terminate this Agreement pursuant to <u>Section 11.1(c)(i)</u> and retain the Deposit as liquidated damages (and not as a penalty) for such termination, free and clear of any claims thereon by Buyer (and the Parties shall give joint written instructions to the Escrow Agent to release the Deposit to Seller pursuant to <u>Section 3.2</u>), or (ii) if applicable, enforce specific performance in accordance with <u>Section 11.3</u>.  The Parties agree that, should Seller have the right

49

to terminate this Agreement pursuant to <u>Section 11.1(c)(i)</u>, the foregoing described liquidated damages are reasonable considering all of the circumstances existing as of the Execution Date and constitute the Parties' good faith estimate of the actual damages reasonably expected to result from such termination of this Agreement by Seller.

11.3     <u>Specific Performance</u>.  In the event that Seller has the right to terminate this Agreement pursuant to <u>Section 11.1(c)(i)</u>, in lieu of seeking the Deposit as a remedy in accordance with <u>Section 11.2(b)</u>, as its sole remedy under this Agreement, Seller shall be entitled to specific performance of this Agreement, it being specifically agreed that monetary damages will not be sufficient to compensate Seller, and this right shall include the right of Seller to cause the closing of the transactions contemplated hereby to be consummated in accordance with the terms of this Agreement.  Seller shall not be required to provide any bond or other security in connection with seeking an injunction or injunctions to enforce specifically the terms and provisions of this Agreement.  The Parties hereto further agree that (a) by seeking the remedies provided for in this <u>Section 11.3</u>, Seller shall not in any respect waive its right to seek any other form of relief in law or in equity that may be available to it and (b) nothing set forth in this <u>Section 11.3</u> shall require Seller to institute any Proceeding for (or limit Seller's right to institute any Proceeding for) specific performance under this <u>Section 11.3</u> prior to, or as a condition to, exercising any termination right under this <u>Article 11</u>. Notwithstanding anything contained herein to the contrary, (x) if Seller elects to receive the Deposit as liquidated damages in accordance with <u>Section 11.2(b)</u>, then Seller shall not be entitled to seek specific performance of this Agreement and, without limitation of the foregoing, shall be deemed to have waived all of its rights to seek specific performance under this Agreement, and (y) if Seller elects to seek specific performance of this Agreement, Seller shall not be entitled to receive the Deposit under <u>Section 11.2(b)</u>; *provided that* if Seller withdraws its claim for specific performance or is unable to enforce specific performance and is entitled to receive the Deposit pursuant to the terms hereof, it may elect to receive the Deposit as its sole remedy.  For the avoidance of doubt, Seller's determination pursuant to this <u>Section 11.3</u> shall be at the sole discretion of Seller's transaction committee.

11.4     <u>Break-Up Fee and Expense Reimbursement</u>.

(a)     In the event that this Agreement is terminated pursuant to <u>Sections 11.1(b)(i)</u> (solely for purposes of clause (ii) below), <u>11.1(b)(ii)</u>, <u>11.1(b)(iii)</u>, <u>11.1(b)(iv)</u>, <u>11.1(b)(vii)</u>, <u>11.1(b)(viii)</u>, or <u>11.1(c)(ii)</u>, Lime Rock shall be entitled to payment by Seller of (i) a termination fee equal to two and four-tenths percent (2.4%) of the Purchase Price (the "<u>Break-Up Fee</u>") and Buyer and Lime Rock shall be entitled to payment by Seller of (ii) an amount equal to the lesser of (A) an amount equal to one and one-half percent (1.5%) of the Purchase Price and (B) Buyer's and Lime Rock's actual out-of-pocket fees and expenses incurred (directly or indirectly) in connection with this Agreement and other agreements, pleadings, documents, hearings, discovery, and transactions related hereto (including attorneys' and advisors' fees) (the "<u>Expense Reimbursement</u>").

(b)     Seller's obligation to pay the Break-Up Fee and the Expense Reimbursement shall survive termination of this Agreement.  Seller shall pay the Break-up Fee to Lime Rock (and not to Buyer or any of its managers, directors, or officers) and Seller shall pay the Expense Reimbursement to Lime Rock and/or Buyer (as applicable) within ten (10) Business Days after the termination of this Agreement; *provided that* if this Agreement is terminated pursuant to

Sections 11.1(b)(iv), or 11.1(c)(ii), such payment shall be due within ten (10) Business Days after the termination of the Restructuring Support Agreement pursuant to Section 13.03(c) of the Restructuring Support Agreement.

(c)     Lime Rock's right to payment of the Break-Up Fee and Lime Rock's and Buyer's (as applicable) right to payment of the Expense Reimbursement shall constitute an administrative expense in the Bankruptcy Case pursuant to Section 503 and 507 of the Bankruptcy Code.

(d)     Each Party acknowledges that the agreements contained in this Section 11.4 are an integral part of this Agreement and that, without these agreements, the other Party would not enter into this Agreement.

(e)     Buyer represents to Seller that this Section 11.4 is a condition precedent to Buyer's execution of this Agreement and is necessary to ensure that Buyer will continue to pursue the proposed acquisition of the Assets, and Seller acknowledges that the Break-Up Fee and Expense Reimbursement, if payable hereunder, (i) constitute actual and necessary costs and expenses of preserving Seller's estates, within the meaning of Section 503(b) of the Bankruptcy Code, (ii) are of substantial benefit to Seller's estates by, among other things, establishing a bid standard or minimum for other bidders and placing estate property in a sales configuration mode attracting other bidders to a potential auction, (iii) are reasonable and appropriate, including in light of the size and nature of the sale of the Assets by Seller to Buyer contemplated hereby and the efforts that have been or will be expended by Buyer and Lime Rock, notwithstanding that such sale is subject to higher and better offers, and (iv) was negotiated by the Parties at arm's-length and in good faith.

11.5     Dispute Resolution.  Buyer and Seller shall attempt to agree as to whether the combined value of the matters described in Section 11.1(b)(vi) is less than the percentage of the Purchase Price described therein prior to the Closing Date (any disagreements between the Parties as to such matters, collectively, the "Disputed Matters").  If Seller and Buyer are unable to agree by the Closing Date, the Disputed Matters shall be exclusively and finally resolved by arbitration pursuant to this Section 11.5; *provided, however,* the Parties will resolve all such Disputed Matters under this Section 11.5 prior to Closing or termination, as applicable.  There will be a single arbitrator who will be an attorney with at least 15 years' experience in matters involving oil and gas producing properties in the Gulf of Mexico, as selected by the mutual agreement of Buyer and Seller (the "Arbitrator").  Notwithstanding the foregoing, the Bankruptcy Court may serve as the Arbitrator upon the mutual agreement of the Parties.  If the Parties do not mutually agree upon the Arbitrator in accordance with this Section 11.5, the Houston, Texas office of the AAA shall appoint such Arbitrator under such conditions as the AAA in its sole discretion deems necessary or advisable.  The place of arbitration shall be Houston, Texas, and the arbitration shall be conducted in accordance with the AAA Rules, to the extent such rules do not conflict with the terms of this Section 11.5.  Each of Buyer and Seller shall submit to the Arbitrator, with a simultaneous copy to the other Party, a single written statement of its position on the Disputed Matters in question, together with a copy of this Agreement and any supporting material that such Party desires to furnish, as soon as reasonably practicable, but not later than the tenth (10th) Business Day after appointment of the Arbitrator.  The Parties shall instruct the Arbitrator to make a determination, choosing either Seller's position or Buyer's position with respect to the Disputed

Matters in question, with such determination to be made within twenty (20) days after the end of such ten (10) Business Day period after the submission of the Disputed Matters and shall be final and binding upon both Parties, without right of appeal.  In making his determination, the Arbitrator shall make a determination of the Disputed Matters submitted based solely on the single written submissions of Seller and Buyer (and without any additional or supplemental submittals by any Party, except to the extent the Arbitrator requests additional information from either Party), shall be bound by the rules set forth in this Section 11.5 and, subject to the foregoing, may consider such other legal and industry matters as in the opinion of the Arbitrator are necessary or helpful to make a proper determination.  The Arbitrator shall act as an expert for the limited purpose of determining specific Disputed Matters submitted by either Party and may not award damages, interest or penalties to either Party with respect to any matter, except as otherwise provided in the following sentence.  The costs of the Arbitrator (and the AAA, if applicable) and the reasonable legal costs and expenses incurred by the Parties in connection with the arbitration shall be borne by the Party whose position is not selected by the Arbitrator.

## ARTICLE 12
## SURVIVAL AND INDEMNIFICATION

12.1    No Survival of Seller's Representations and Warranties.    The representations and warranties of Seller contained herein and in any certificate or other Transaction Document delivered by Seller pursuant to this Agreement shall terminate upon and not survive the Closing and there shall be no liability thereafter in respect thereof.  Each of Seller's covenants and other agreements contained in this Agreement shall terminate upon the Closing, except the covenants and agreements of Seller in Sections 2.6, 2.7, 2.8, 7.2(a), 7.2(b), and 8.2 (each a "Post-Closing Covenant"), which shall survive the Closing until the earlier of (a) performance of such Post-Closing Covenant in accordance with this Agreement or, (b)(i) if time for performance of such Post-Closing Covenant is specified in this Agreement, sixty (60) days following the expiration of the time period for such performance or (ii) if time for performance of such Post-Closing Covenant is not specified in this Agreement, the expiration of the applicable statute of limitations with respect to any claim for any failure to perform such Post-Closing Covenant; *provided* that if a written notice of any claim with respect to any Post-Closing Covenant is given prior to the expiration thereof then such Post-Closing Covenant shall survive until, but only for purposes of, the resolution of such claim by Final Order or settlement.

12.2    Survival of Buyer's Representations and Warranties.    The representations and warranties of Buyer contained in Article 6 of this Agreement (other than the representations and warranties contained in Section 6.8) shall survive the Closing through and including the date that is twelve (12) months after the Closing Date (the "Expiration Date"); *provided, however*, that any obligations to indemnify and hold harmless shall not terminate with respect to any Liabilities as to which a Seller Indemnified Party shall have given notice to Buyer in accordance with Section 12.4(a) on or before the Expiration Date.  The representations and warranties of Buyer contained in Section 6.8 shall terminate upon and not survive the Closing and there shall be no Liability thereafter in respect thereof.

12.3    Indemnification by Buyer.

(a)    Subject to Section 12.2, from and after Closing, Buyer hereby agrees to indemnify and hold Seller and each member of the Seller Group (collectively, the "Seller

Indemnified Parties") harmless from and against any all Liabilities to the extent based upon, attributable or resulting from:

               (i)      the breach of any representation or warranty of Buyer set forth in Article 6 hereof, or any representation or warranty contained in any certificate delivered by or on behalf of Buyer pursuant to this Agreement;

               (ii)     the breach of any covenant or other agreement on the part of Buyer under this Agreement; and

               (iii)    the Assumed Liabilities.

     (b)    Notwithstanding anything contained herein to the contrary, any Seller Indemnified Party making an Indemnification Claim under Section 12.3 must give notice to the indemnifying Party of any such Indemnification Claim in writing on or prior to the Expiration Date.

     12.4    Indemnification Procedures.

     (a)    In the event that any Actions shall be instituted or that any claim or demand shall be asserted by any Seller Indemnified Party in respect of which payment may be sought under Section 12.3 (an "Indemnification Claim"), the Seller Indemnified Party shall reasonably and promptly cause written notice of the assertion of any Indemnification Claim of which it has knowledge which is covered by this indemnity to be forwarded to the indemnifying Party; *provided* that a Seller Indemnified Party need not wait until an Action has been instituted or demand has been asserted before delivering written notice of an Indemnification Claim to the indemnifying Party.  The indemnifying Party shall have the right, at its sole option and expense, to be represented by counsel of its choice, which must be reasonably satisfactory to the Seller Indemnified Party, and to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Liabilities indemnified against hereunder.  If the indemnifying Party elects to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Liabilities indemnified against hereunder, it shall within thirty (30) days (or sooner, if the nature of the Indemnification Claim so requires) notify the Seller Indemnified Party of its intent to do so. If the indemnifying Party elects not to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Liabilities indemnified against hereunder, the Seller Indemnified Party may defend against, negotiate, settle or otherwise deal with such Indemnification Claim.  If the indemnifying Party shall assume the defense of any Indemnification Claim, the Seller Indemnified Party may participate, at his or its own expense, in the defense of such Indemnification Claim; *provided, however*, that such Seller Indemnified Party shall be entitled to participate in any such defense with separate counsel at the expense of the indemnifying Party if (a) so requested by the indemnifying Party to participate or (b) in the reasonable opinion of counsel to the Seller Indemnified Party a conflict or potential conflict exists between the Seller Indemnified Party and the indemnifying Party that would make such separate representation advisable; and *provided, further*, that the indemnifying Party shall not be required to pay for more than one such counsel for all Seller Indemnified Parties in connection with any Indemnification Claim.  The Parties agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such Indemnification Claim.  Notwithstanding anything in this Section 12.4 to the contrary, neither the indemnifying Party nor any Seller Indemnified Party shall,

without the written consent of the other, settle or compromise any Indemnification Claim or permit a default or consent to entry of any judgment unless the claimant and such party provide to such other party an unqualified release from all liability in respect of the Indemnification Claim. If the indemnifying Party makes any payment on any Indemnification Claim, the indemnifying Party shall be subrogated, to the extent of such payment, to all rights and remedies of the Seller Indemnified Party to any insurance benefits or other claims of the Seller Indemnified Party with respect to such Indemnification Claim.

(b)     After any final decision, judgment or award shall have been rendered by a Governmental Authority of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the Seller Indemnified Party and the indemnifying Party shall have arrived at a mutually binding agreement with respect to an Indemnification Claim hereunder, the Seller Indemnified Party shall forward to the indemnifying Party notice of any sums due and owing by the indemnifying Party pursuant to this Agreement with respect to such matter.

12.5     Calculation of Liabilities.  The amount of any Liabilities for which indemnification is provided under this Article 12 shall be net of any amounts actually recovered by the Seller Indemnified Party under insurance policies with respect to such Liabilities.

12.6     Tax Treatments of Indemnity Payments.  The Parties agree to treat any indemnity payment made pursuant to this Article 12 as an adjustment to the Purchase Price for federal, state, local and foreign income tax purposes.  Any indemnity payment under this Article 12 shall be treated as an adjustment to the value of the Asset upon which the underlying Indemnification Claim was based, unless a final determination (which shall include the execution of a Form 870-AD or successor form) with respect to the Seller Indemnified Party causes any such payment not to be treated as an adjustment to the value of the asset for United States federal income tax purposes.

12.7     Exclusive Remedy.  If Closing occurs, the indemnities in this Article 12 are the sole and exclusive remedy for any Liabilities based upon or relating to the Assets or this Agreement, regardless of the manner in which any Liability is characterized or pleaded, including rights to contribution under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, and any other Environmental Law.  For the avoidance of doubt, nothing contained in this Section 12.7 shall limit the RBL Facility Lenders' rights in respect of a breach of Buyer's obligations set forth on Exhibit F.

**ARTICLE 13**
**GENERAL PROVISIONS**

13.1     Confidentiality.     Notwithstanding anything in the Non-Disclosure Agreement to the contrary, the Parties agree that the non-disclosure agreement entered into by them and their Affiliates, dated effective as of June 11, 2020 (the "Non-Disclosure Agreement"), shall continue in full force and effect notwithstanding the execution and delivery by the Parties of this Agreement; *provided*, *however*, that (a) disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and the filings related thereto shall not constitute a breach of such Non-Disclosure Agreement, and (b) disclosures permitted under this Agreement shall not

constitute a breach of such Non-Disclosure Agreement. In addition, if Closing should occur, the terms of the Non-Disclosure Agreement shall terminate as to Buyer.

       13.2   <u>Public Announcements</u>. Buyer, on the one hand, and Seller, on the other hand, shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement, the transaction contemplated hereby or the activities and operations of the other Party, and shall not issue any such release or make any such statement without the prior written consent of the other Party (such consent not to be unreasonably withheld or delayed). Notwithstanding the foregoing, prior to or after the Closing, if Buyer (including any of its parent entities), on the one hand, or Seller (including any of its parent entities), on the other is required to make any statement, declaration or public announcement regarding this Agreement or the transaction contemplated hereunder pursuant to (a) any Legal Requirement, (b) applicable rules or regulations of any national securities exchange, or (c) the terms of such Party's (including such Party's respective parent entities) indentures, loan agreements, credit agreements or other similar debt agreements or financial instruments, then the same may be made without the approval of the other Party, but, in the case of disclosures made by Buyer, only to the extent the name of Seller is omitted from such statement, declaration or announcement if permitted by the applicable Legal Requirements.

       13.3   <u>Notices</u>. All notices, consents, waivers and other communications under this Agreement must be in writing (with a copy delivered to the RBL Facility Agent) and shall be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by email (with read receipt requested, with the receiving Party being obligated to respond affirmatively to any read receipt requests delivered by the other Party), (c) received by the addressee, if sent by a delivery service (prepaid, receipt requested) or (d) received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses and representatives (if applicable) set forth below (or to such other addresses and representatives as a Party may designate by notice to the other Parties):

       (i)    If to Seller, then to:

                Arena Energy, LP
                2103 Research Forest Drive, Suite 400
                The Woodlands, Texas 77380
                Attn: Ed Menger
                E-mail: EMenger@arenaenergy.com

             with copies (which shall not constitute notice) to:

                Kirkland & Ellis LLP
                601 Lexington Avenue
                New York, New York 10022
                Attn: Brian E. Schartz, P.C.
                Phone: (212) 446-5932
                E-mail: brian.schartz@kirkland.com

                Kirkland & Ellis LLP
                609 Main Street, 45th Floor
                Houston, Texas 77002

Attn:   Rahul D. Vashi, P.C.
         Kim Hicks, P.C.
Phone: (713) 836-3639
         (713) 836-3529
E-mail: rahul.vashi@kirkland.com
         kim.hicks@kirkland.com

(ii)   If to Buyer:

San Juan Offshore, LLC
2000 Hughes Landing Blvd., Suite 781
The Woodlands, TX 77380
Attn: Michael J. Minarovic
E-mail: mike@sanjuanoffshore.com

with a copy (which shall not constitute notice) to:

Lime Rock Partners VIII, L.P.
1111 Bagby Street, Suite 4600
Houston, TX 77002
Attn: J McLane
E-mail: jm@lrpartners.com

Willkie Farr & Gallagher LLP
600 Travis Street, Suite 2100
Houston, Texas 77002
Attn: Michael De Voe Piazza
E-mail: mpiazza@willkie.com

Willkie Farr & Gallagher LLP
600 Travis Street, Suite 2100
Houston, Texas 77002
Attn: Jennifer Hardy
E-mail: jhardy2@willkie.com

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attn: Brian Resnick
E-mail:brian.resnick@davispolk.com

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attn: Harold Birnbaum
E-mail: harold.birnbaum@davispolk.com

56

(iii)    If to the RBL Facility Agent:

> Wells Fargo Bank, N.A.
> 1000 Louisiana St., Ninth Floor
> Houston, Texas 77002
> Attn: Oleg Kogan
> E-mail: Oleg.Kogan@wellsfargo.com
>
> with a copy (which shall not constitute notice) to:
>
> Haynes and Boone, LLP
> 1221 McKinney Street, Suite 4000
> Houston, Texas 77010
> Attn:   Austin Elam
>            Ellen Conley
>            Frasher Murphy
> E-mail:        austin.elam@haynesboone.com
>                    ellen.conley@haynesboone.com
>                    frasher.murphy@haynesboone.com

13.4    Waiver; Waiver of Damages.  No waiver of any of the provisions of this Agreement or rights hereunder shall operate as a waiver unless it is in writing and signed by the Party ("Party" and "Parties," for purposes of Exhibit F and any other provision of this Agreement that expressly runs to the benefit of the RBL Facility Agent), shall be deemed to include the RBL Facility Agent) against whom enforcement of such waiver is sought.  Neither the failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege shall preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.  To the maximum extent permitted by applicable law, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.  NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, NO PARTY SHALL BE LIABLE TO THE OTHER FOR SPECIAL, INDIRECT, EXEMPLARY, CONSEQUENTIAL OR PUNITIVE DAMAGES ARISING OUT OF, ASSOCIATED WITH, OR RELATING TO THIS AGREEMENT (INCLUDING LOSS OF PROFIT OR BUSINESS INTERRUPTIONS, HOWEVER THE SAME MAY BE CAUSED) AND THE PARTIES HEREBY WAIVE ALL CLAIMS FOR ANY SUCH DAMAGES, EXCEPT TO THE EXTENT ANY SELLER INDEMNIFIED PARTY SUFFERS SUCH DAMAGES TO AN UNAFFILIATED THIRD PARTY IN CONNECTION WITH A FINALLY ADJUDICATED THIRD PARTY CLAIM, IN WHICH CASE SUCH DAMAGES SHALL BE RECOVERABLE (TO THE EXTENT

RECOVERABLE UNDER <u>ARTICLE 12</u>) WITHOUT GIVING EFFECT TO THIS <u>SECTION 13.4</u>.

13.5 <u>Entire Agreement; Amendment</u>. This Agreement (including the Schedules and the Exhibits) and the other Transaction Documents supersede all prior agreements between (a) Buyer, on the one hand, and Seller, on the other hand, and (b) solely with respect to <u>Exhibit F</u>, Buyer, on the one hand, and the RBL Facility Lenders, on the other hand, in each case, with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between (x) Buyer, on the one hand, and Seller, on the other hand, and (y) solely with respect to <u>Exhibit F</u>, Buyer, on the one hand, and the RBL Facility Lenders, on the other hand, in each case, with respect to their subject matter. This Agreement may not be amended, waived or otherwise modified except by a written agreement executed by all of the Parties and, with respect to any amendments, waivers or other modifications affecting the holders of RBL Facility Claims (in the reasonable discretion of the RBL Facility Agent), reasonably consented to by the RBL Facility Agent.

13.6 <u>Assignment</u>. This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Parties and, to the extent provided in <u>Exhibit F</u>, the consent of the RBL Facility Agent, as applicable (which consents may be granted or withheld in the sole discretion of such other Party and, if applicable, the RBL Facility Agent). Notwithstanding the foregoing, Buyer shall have the right to assign any or all of its rights or obligations hereunder, in each case to one or more Affiliates of Buyer prior to the Closing by providing written notice to Seller and each such designated Affiliate shall be deemed to be Buyer for all purposes hereunder and under the Transaction Documents, except that no such assignment shall relieve Buyer of any of its obligations hereunder.

13.7 <u>Severability</u>. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

13.8 <u>Expenses</u>. Except as otherwise specifically provided in this Agreement, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby.

13.9 <u>Time of the Essence</u>. Time shall be of the essence with respect to all time periods and notice periods set forth in this Agreement.

13.10 <u>Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver</u>.

(a) Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas applicable to contracts made and to be performed entirely in such state without

regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Texas applicable hereto.

(b)     Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding; *provided*, *however*, that, if the Bankruptcy Case is closed, all Actions and Proceedings arising out of or relating to this Agreement shall be heard and determined in a Texas state court or a federal court sitting in the state of Texas, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Action or Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding.  The Parties consent to service of process by mail (in accordance with Section 13.3) or any other manner permitted by law.

(c)     THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLER, BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

13.11   Counterparts.  This Agreement and any amendment hereto may be executed in two (2) or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall constitute one and the same instrument.  Notwithstanding anything to the contrary in Section 13.3, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by telecopier or email attachment shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

13.12   Parties in Interest; No Third Party Beneficiaries.  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.  Except for Section 11.4 and Section 13.13, this Agreement is for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind, except that (a) the RBL Facility Lenders are express third-party beneficiaries of Buyer's obligations set forth in Exhibit F and shall have the right to directly enforce such obligations of Buyer in any manner that Seller is otherwise permitted to enforce the same in a manner consistent with this Agreement, and (b) if at any time Seller liquidates or otherwise has a trustee or other representative appointed by the Bankruptcy Court, then such trustee or other representative shall be entitled to enforce Seller's rights under this Agreement. Notwithstanding anything contained herein to the contrary, in no event shall the RBL Facility Agent or RBL Facility Lenders have any Liability for the representations, warranties, covenants, agreements or other obligations of Seller hereunder or in any of the certificates, notices or agreements delivered

59

pursuant hereto and, from and after Closing, no default or breach by Seller shall affect or diminish Buyer's obligations set forth on Exhibit F.

13.13   No Recourse.  Notwithstanding anything that may be expressed or implied in this Agreement or any Transaction Document, and notwithstanding the fact that any Party may be a partnership or limited liability company, each Party, by its acceptance of the benefits of this Agreement, covenants, agrees and acknowledges that no Persons other than the Parties shall have any obligation hereunder and that it has no rights of recovery hereunder against, and no recourse hereunder or under any Transaction Documents or in respect of any oral representations made or alleged to be made in connection herewith or therewith shall be had against, any former, current or future Affiliate, incorporator, controlling Person, fiduciary, Representative, co-owner or equity holder of any Party (or any of their successors or permitted assignees) (each, a "Party Affiliate"), whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, contract or otherwise) by or on behalf of such Person against the Party Affiliates, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable Legal Requirement, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any Party Affiliate, as such, for any obligations of the applicable Person under this Agreement or the transaction contemplated hereby, under any documents or instruments delivered contemporaneously herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

13.14   Specific Performance.  The Parties acknowledge that irreparable damage would occur if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Buyer further agrees that, in addition to any other remedy that Seller may have under law or equity, without posting bond or other undertaking, except as set forth in Section 11.2(b), Seller hereto shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement.  In the event that any such action is brought in equity to enforce the provisions of this Agreement, no Party will allege, and each Party hereby waives the defense or counterclaim, that there is an adequate remedy at law.  The Parties further agree that (i) by seeking any remedy provided for in this Section 13.14, a Party shall not in any respect waive its right to seek any other form of relief that may be available to such Party under this Agreement and (ii) nothing contained in this Section 13.14 shall require any Party to institute any action for (or limit such party's right to institute any action for) specific performance under this Section 13.14 before exercising any other right under this Agreement.

13.15   Liquidating Trustee.  If at any time Seller liquidates or otherwise has a trustee or other representative appointed by the Bankruptcy Court, then such trustee or other representative shall be entitled to exercise the rights of Seller under this Agreement.  Any successor or assign of Seller or any liquidation or other trust established by the Plan or any other chapter 11 plan with respect to Seller shall, without any further approval by or notice to any court, Person, or entity, shall succeed in all respects to the rights of Seller under this Agreement.

*[Signature page follows.]*

60

**IN WITNESS WHEREOF,** the Parties and the RBL Facility Agent (solely for purposes of Sections 3.1(x), 13.3, 13.4, 13.5, 13.6, 13.9, 13.10, 13.11, 13.12, 13.14 and Exhibit F of this Agreement) have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the day and year first above written.

ARENA ENERGY, LP

By: _____
Name: Anthony R. Horton
Title:   Authorized Person

ARENA EXPLORATION, LLC

By: _____
Name: Anthony R. Horton
Title:   Authorized Person

VALIANT ENERGY LLC

By: _____
Name: Anthony R. Horton
Title:   Authorized Person

SAGAMORE HILL HOLDINGS, LP

By: _____
Name: Anthony R. Horton
Title:   Authorized Person

SAN JUAN OFFSHORE, LLC

By: _____
Name: Michael J. Minarovic
Title:   Chief Executive Officer

WELLS FARGO BANK, N.A.

By: _____

Name: __ Oleg Kogan _____

Title: ____ Director _____

# EXHIBIT A

Attached to and made a part of that certain Asset Purchase Agreement by and among
Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller
and San Juan Offshore, LLC, as Buyer

## ASSIGNED LEASES AND INTERESTS

__LEASES__

| Area/ Block | Lease | Effective Date | Description/Depths | Record Title/Operating Rights Interest |
|---|---|---|---|---|
| East Cameron 328 | OCS-G 10638 | 5/1/1989 | All of Block 328, East Cameron Area, South Addition, INSOFAR AND ONLY INSOFAR as said lease covers and affects operating rights attributable to depths from the surface of the earth down to and including 100 feet below the deepest stratigraphic equivalent of 3,515 feet (MD) as encountered in the Zilkha Energy Company, OCS-G 10638 Well No. 1 | 48.00000% OR |
| East Cameron 328 | OCS-G 10638 | 5/1/1989 | All of Block 328, East Cameron Area, South Addition, INSOFAR AND ONLY INSOFAR as said lease covers depths from below 100 feet below the deepest stratigraphic equivalent of 3,515 feet (MD) as encountered in the Zilkha Energy Company, OCS-G 10638 Well No. 1 down to the stratigraphic equivalent of the base of the HB-5 sand, the base of which is seen at a depth of 4,195 feet (TVD) in the Mesa Petroleum Co. OCS-G 2255 Well No. A-22, located in East Cameron Block 323 | 48.00000% OR |
| Eugene Island 38 | OCS-G 24883 | 7/1/2003 | That portion of Block 38, Eugene Island Area, OCS Leasing Map, Louisiana Map No. 4, seaward of the 1975 Supreme Court Decree Line containing approximately 4,378.23 acres, INSOFAR AND ONLY INSOFAR, as said operating rights cover and effect the Southeast Quarter (SE/4) of Eugene Island Block 38, limited as to depths from the surface to 11,500 feet true vertical depth subsea | 54.05000% OR |
| Eugene Island 57 | OCS-G 02601 Expired | 5/1/1974 | E/2 SE/4 NE/4 of Block 57, Eugene Island Area, from the surface of the earth down to and including the stratigraphic equivalent depth of 13,097' SS TVD as seen at 13,150' MD in the electric log of the Eugene Island 57 OCS-G 2601 Well No. 6 being the stratigraphic equivalent of the total depth drilled in the Eugene Island 58 Well No. 8 BP-1 plus one hundred feet | 54.05000% OR |

| Area/ Block | Lease | Effective Date | Description/Depths | Record Title/Operating Rights Interest |
|---|---|---|---|---|
| Eugene Island 58 | OCS-G 02895 | 12/1/1974 | NW/4 NW/4; SW/4 NW/4; N/2 NW/4 SW/4 of Block 58 from the surface of the earth down to and including the stratigraphic equivalent depth of 13,097' SS TVD as seen at 13,150' MD in the electric log of the Eugene Island Block 57 OCS-G 2601 Well No. 6 being the stratigraphic equivalent of the total depth drilled in Eugene Island 58 OCS-G 2895 Well No. 8 BP-1 plus one hundred feet | 57.73155% OR |
| Eugene Island 99 | OCS-G 31369 | 3/1/2008 | All of Block 99, Eugene Island Area | 98.00000% RT |
| Eugene Island 100 | OCS 00796 | 5/1/1960 | All of Block 100, Eugene Island Area | 98.00000% RT |
| Eugene Island 174 | OCS-G 03782 | 6/1/1978 | SW1/4 of Block 174, Eugene Island Area, INSOFAR AND ONLY INSOFAR as operating rights from the surface down to the stratigraphic equivalent of 100' below a true vertical depth of 10,960' as encountered in the Newfield Exploration Company OCS-G 3782 Well No. A-10 | 68.00000% OR |
| Eugene Island 182 | OCS-G 04452 | 11/1/1980 | All of Block 182, Eugene Island Area | 98.00000% RT |
| Eugene Island 214 | OCS-G 00977 | 6/1/1962 | All of Block W/2W/2E/2 and W/2 of 214, Eugene Island Area | 98.00000% RT |
| Eugene Island 215 | OCS 00578 | 9/1/1955 | E/2 Block 215, Eugene Island Area | 98.00000% RT |
| Eugene Island 215 | OCS-G 26033 | 7/1/2004 | W/2 Block 215, Eugene Island Area | 98.00000% RT |
| Eugene Island 217 | OCS-G 36743 | 11/1/2019 | All of Block 217, Eugene Island Area, OCS Leasing Map, Louisiana Map Number 4 | 98.00000% RT |

EXHIBIT A
PAGE 2

| Eugene Island 227 | OCS-G 36745 | 11/1/2019 | All of Block 227, Eugene Island Area, OCS Leasing Map, Louisiana Map Number 4 | 98.00000% RT |
|---|---|---|---|---|
| Eugene Island 229 | OCS-G 05505 | 7/1/1983 | All of Block 229, Eugene Island Area | 98.00000% RT |
| Eugene Island 230 | OCS-G 00979 | 6/1/1962 | All of Block 230, Eugene Island Area | 98.00000% RT |
| Eugene Island 231 | OCS-G 00980 | 6/1/62 | All of Block 231, Eugene Island Area | 98.00000% RT |
| Eugene Island 237 | OCS-G 00981 | 6/1/1962 | All of Block 237, Eugene Island Area | 98.00000% RT |
| Eugene Island 238 | OCS-G 00982 | 6/1/1962 | All of Block 238, Eugene Island Area | 98.00000% RT |
| Eugene Island 251 | OCS-G 03331 | 4/1/1976 | All of Block 251, Eugene Island Area | 98.00000% RT |
| Eugene Island 252 | OCS-G 00983 | 6/1/1962 | All of Block 252, Eugene Island Area | 98.00000% RT |
| Eugene Island 253 | OCS-G 35938 | 6/1/2017 | W1/2SW1/4NW1/4 of Block 253, Eugene Island Area | 98.00000% RT |
| Eugene Island 253 | OCS-G 10741 | 7/1/1989 | NE1/4; E1/2NW1/4; NW1/4NW1/4; E1/2SW1/4NW1/4; S1/2 of Block 253, Eugene Island Area | 98.00000% RT |
| Eugene Island 254 | OCS-G 36207 | 7/1/2018 | All of Block 254, Eugene Island Area | 98.00000% RT |
| Eugene Island 261 | OCS-G 36208 | 7/1/2018 | All of Block 261, Eugene Island Area | 98.00000% RT |
| Eugene Island 262 | OCS-G 36209 | 7/1/2018 | All of Block 262, Eugene Island Arena | 98.00000% RT |

| | | | | |
|---|---|---|---|---|
| Eugene Island 275 | OCS-G 24910 | 5/1/2003 | All of Block 275, Eugene Island Area, South Addition (less and except the Operating Rights from 20,000' TVDSS down to 99,999' TVDSS) | 98.00000% RT |
| Eugene Island 276 | OCS-G 00989 | 6/1/1962 | All of Block 276, Eugene Island Area, South Addition | 98.00000% RT |
| Eugene Island 276 | OCS-G 00989 | 6/1/1962 | All of Block 276, Eugene Island Area, South Addition, limited to those depths below 13,000' TVD | 64.66700% OR |
| Eugene Island 314 | OCS-G 02111 | 2/1/1971 | S/2 of Block 314, Eugene Island Area, South Addition (less and except Operating Rights 25,000' SSTVD to 99,999' SSTVD) | 98.00000% RT |
| Eugene Island 314 | OCS-G 33636 | 6/1/2010 | N/2 of Block 314, Eugene Island Area, South Addition | 98.00000% RT |
| Eugene Island 315 | OCS-G 02112 | 8/1/1974 | S/2 of Block 315, Eugene Island Area, South Addition | 50.00000% RT |
| Eugene Island 315 | OCS-G 02112 | 8/1/1974 | S/2 of Block 315, Eugene Island Area, South Addition, from 7,759' TVDSS to 25,000' SSTVD | 50.00000% OR |
| Eugene Island 320 | OCS-G 36211 | 7/1/2018 | All of Block 320, Eugene Island Area, South Addition | 98.00000% RT |
| Eugene Island 324 | OCS-G 36118 | 11/1/2017 | All of Block 324, Eugene Island Area, South Addition | 98.00000% RT |
| Eugene Island 325 | OCS-G 36119 | 11/1/2017 | All of Block 325, Eugene Island Area, South Addition | 98.00000% RT |
| Eugene Island 332 | OCS-G 02613 | 5/1/1974 | All of Block 332, Eugene Island Area, South Addition (less and except Operating Rights 25,000' SSTVD to 99,999' SSTVD) | 98.00000% RT |
| Eugene Island 332 | OCS-G 02613 | 5/1/1974 | NW of Block 332, Eugene Island Area, South Addition, insofar and only insofar as said lease covers from the surface down to 13,100 feet subsea TVD below the surface | 98.00000% OR |

| Eugene Island 338 | OCS-G 02118 | 2/1/1971 | All of Block 338, Eugene Island Arena, South Addition | 98.00000% RT |
|---|---|---|---|---|
| Eugene Island 339 | OCS-G 02318 | 2/1/1973 | All of Block 339, Eugene Island Arena, South Addition | 98.00000% RT |
| Eugene Island 340 | OCS-G 36212 | 7/1/2018 | All of Block 340, Eugene Island Area, South Addition | 98.00000% RT |
| Eugene Island 341 | OCS-G 02914 | 12/1/1974 | All of Block 341, Eugene Island Area, South Addition | 98.00000% RT |
| Eugene Island 346 | OCS-G 14482 | 6/1/1994 | W/2SW/4NW/4; SE/4SW/4NW/4; NW/4SW/4; W/2SW/4SW/4, Eugene Island Area, South Addition, from the surface down to stratigraphic equivalent of 12,890', being the total depth drilled in the EI 346 B-1 Well, plus 100' | 48.00000% OR |
| Galveston 192 | OCS-G 03229 | 9/1/1975 | All of Block 192, Galveston Area, as shown on OCS Official Leasing Map, Texas Map No. 6 | 98.00000% RT |
| Galveston 209 | OCS-G 06093 | 10/1/1983 | All of Block 209, Galveston Area, as shown on OCS Official Leasing Map, Texas Map No. 6 | 98.00000% RT |
| High Island 193 | OCS-G 03237 | 9/1/1975 | All of Block 193, High Island Area, as shown OCS Official Leasing Map, Texas Map No. 7 | 98.00000% RT |
| High Island A-547 | OCS-G 02705 | 7/1/1974 | All of Block A 547, High Island, South Addition | 98.00000% RT |
| High Island A-547 | OCS-G 02705 | 7/1/1974 | N2NE from the surface to 100' below the stratigraphic equivalent of the true vertical depth subsea (TVDSS) of the Arena Offshore, LP HI A-547 C001 well, ST00BP01 (42-709-41168-01) being 15,198' TVDSS; and the NENW from below 3,500' TVDSS to 100' below the stratigraphic equivalent of the true vertical depth subsea (TVDSS) of the Arena Offshore, LP HI A-547 C001 well, ST00BP01 (42-709-41168-01) being 15,198' TVDSS. | 83.00000% OR |
| High Island A-547 | OCS-G 2705 | 7/1/1974 | N2NW of Block A-547, High Island Area, South Addition, INSOFAR AND ONLY INSOFAR AS the operating rights cover the depths from the surface to the subsea depth of 3,500' | 34.41296% OR |

EXHIBIT A
PAGE 5

| Main Pass 120 | OCS-G 03197 | 7/1/1975 | All of Block 120, Main Pass Area | 67.80000% RT |
|---|---|---|---|---|
| Main Pass 120 | OCS-G 03197 | 7/1/1975 | All of Block 120, Main Pass Area, INSOFAR AND ONLY INSOFAR as said operating rights pertain to all depths from surface to and including 8,000 SSTVD | 67.80000% OR |
| Main Pass 120 | OCS-G 03197 | 7/1/1975 | All of Block 120, Main Pass Area, INSOFAR AND ONLY INSOFAR AS said lease covers and affects depths below 8,000' TVD subsea | 67.80000% OR |
| Main Pass 121 | OCS-G 23969 | 7/1/2002 | All of Block 121, Main Pass Area | 67.80000% RT |
| Main Pass 121 | OCS-G 23969 | 7/1/2002 | All of Block 121, Main Pass Area, INSOFAR AND ONLY INSOFAR as said operating rights cover from 6,500' TVD down to 50,000' TVD | 32.90000% OR |
| Main Pass 122 | OCS-G 13964 | 7/1/1993 | N/2; N/2S/2; N/2SE/4SE/4 of Block 122, Main Pass Area | 67.80000% RT |
| Main Pass 123 | OCS-G 12088 | 5/1/1990 | All of Block 123, Main Pass Area | 73.00000% RT |
| Main Pass 123 | OCS-G 12088 | 5/1/1990 | All of Block 123, Main Pass Area, from the surface to 100' below the stratigraphic equivalent of the deepest depth drilled and logged (7,233 feet TVD) in the Humble Oil and Refining No. 1 OCS-G 1630 | 98.00000% OR |
| Main Pass 236 | OCS-G 02955 | 12/1/1974 | N/2; N/2SW/4; N/2SW/4SW/4 of Block 236, Main Pass Area, South and East Addition | 67.80000% RT |
| Main Pass 236 | OCS-G 02955 | 12/1/1974 | N/2; N/2SW/4; N/2SW/4SW/4 of Block 236, Main Pass Area, South and East Addition | 67.80000% OR |
| Mississippi Canyon 800 | OCS-G 18292 | 7/1/1997 | All of Block 800, Mississippi Canyon | 12.50000% RT |
| South Marsh 192 | OCS-G 24878 | 7/1/2003 | All of Block 192, South Marsh Island Area, South Addition | 98.00000% RT |
| South Pass 74 | OCS-G 26144 Expired | 7/1/2004 | All of Block 74, South Pass Area, South and East Addition | 98.00000% RT |

| South Pass 82 | OCS-G 05685 Expired | 7/1/1983 | All of Block 82, South Pass Area, South and East Addition | 98.00000% OR |
|---|---|---|---|---|
| South Pass 83 | OCS-G 05052 Expired | 4/1/2982 | All of Block 83, South Pass Area, South and East Addition | 98.00000% RT |
| South Timbalier 35 | OCS-G 03336 | 4/1/1976 | All of Block 35, South Timbalier Area | 98.00000% RT |
| South Timbalier 35 | OCS-G 03336 | 4/1/1976 | All of Block 35, South Timbalier Area, INSOFAR AND ONLY INSOFAR as the N1/2NE/4 to depths from the stratigraphic equivalent of the top of E-3 Sand as encountered at 14,560' MD in the South Timbalier Block 35 OCS-G 3336 Well No. D-1 down to the stratigraphic equivalent of 100' below 15,500' MD as found on the Array Induction Imager Dipole Sonic Compensated Neutron log of the South Timbalier Block 36 OCS-G 2624 Well No. 2. | 48.00000% OR |
| South Timbalier 35 | OCS-G 03336 | 4/1/1976 | All of Block 35, South Timbalier Area, INSOFAR AND ONLY INSOFAR as the SE1/4NE1/4 and the SE1/4SW1/4NE1/4, limited to depths from the stratigraphic equivalent of the top of E-3 sand as encountered at 14,682' MD on the Array Induction/Three Detector Density Compensated Neutron GR log of the South Timbalier Block 35 OCS-G 3336 No. 7 down to the stratigraphic equivalent of 100' below 15,814' MD as found on the aforesaid log in the aforesaid well. | 98.00000% OR |
| South Timbalier 36 | OCS-G 02624 | 5/1/1974 | All of Block 36, South Timbalier Area | 98.00000% RT |
| South Timbalier 36 | OCS-G 02624 | 5/1/1974 | Block 36, South Timbalier Area, INSOFAR AND ONLY INSOFAR as the N1/2NW1/4, limited to depths from the stratigraphic equivalent of the top of the E-3 Sand as encountered at 14,560'MD in the South Timbalier Block 35 OCS-G 3336 Well No. D-1 down to the stratigraphic equivalent of 100' below 15,500' MD as found on the Array Induction Imager Dipole Sonic Compensated Neutron log of the South Timbalier Block 36 OCS-G 2624 Well No. 2 | 50.00000% OR |
| South Timbalier 37 | OCS-G 02625 | 5/1/1974 | NE1/4NE1/4; E1/2SE1/4NE1/4; N1/2NW1/4NE1/4 of Block 37, South Timbalier Area | 98.00000% RT |
| South Timbalier 37 | OCS-G 02625 | 5/1/1974 | NE1/4NE1/4; E1/2SE1/4NE1/4; N1/2NW1/4NE1/4 of Block 37, South Timbalier Area, as to all depths from | 81.33333% OR |

| | | | 18,000 feet total vertical depth subsea down to 99,999 feet total vertical depth. | |
|---|---|---|---|---|
| South Timbalier 37 | OCS-G 02625 | 5/1/1974 | S1/2NW1/4NE1/4;  SW1/4NE1/4;  W1/2SE1/4NE1/4; NW1/4; SW1/4; SE1/4 of Block 37, South Timbalier Area | 98.00000% RT |
| South Timbalier 37 | OCS-G 02625 | 5/1/1974 | S1/2NW1/4NE1/4;  SW1/4NE1/4;  W1/2SE1/4NE1/4; NW1/4; SW1/4; SE1/4 of Block 37, South Timbalier Area, as to all depths from 18,000 feet total vertical depth subsea down to 99,999 feet total vertical depth subsea. | 64.66667% OR |
| South Timbalier 38 | OCS-G 09637 | 5/1/1988 | All of Block 38, South Timbalier Area less and except the NWNWNW; E2NWNW; NENW; NWNWNE from 12,100' to 16,603' TVD | 98.00000% RT |
| South Timbalier 38 | OCS-G 09637 | 5/1/1988 | NWNWNW; E2NWNW; NENW; NWNWNE  from 12,100' to 16,603' TVD | 0.00000% WI |
| South Timbalier 51 | OCS-G 01240 | 5/1/1962 | All of Block 51, South Timbalier and Bay Marchand Areas, as shown on OCS Leasing Map, LA6 | 98.00000% RT |
| South Timbalier 52 | OCS-G 01241 | 5/1/1962 | All of Block 52, South Timbalier Area | 98.00000% RT |
| South Timbalier 128 | OCS 00498 | 12/1/1954 | All of Block 128, South Timbalier Area | 98.00000% RT |
| South Timbalier 129 | OCS 00465 | 1/1/1955 | All of Block 129, South Timbalier Area | 98.00000% RT |
| South Timbalier 130 | OCS 00456 | 1/1/1955 | All of Block 130, South Timbalier Area | 98.00000% RT |
| South Timbalier 131 | OCS 00457 | 1/1/1955 | All of Block 131, South Timbalier Area | 98.00000% RT |
| South Timbalier 131 | OCS 00457 | 1/1/1955 | All of ST 131, South Timbalier Area, INSOFAR AND ONLY INSOFAR as said operating rights cover and affect the NE/4SE/4 of Block 131, South Timbalier Area, limited as to depth from the top of the C-3 Sand, which depth is 7,452' MD (5,994' TVD) to the deepest depth drilled, which depth is 8,297' MD (6,760' TVD), in well OCS-G 5660 AA6 ST#1. | 98.00000% OR |

| South Timbalier 131 | OCS 00457 | 1/1/1955 | NE/4 of SE/4 of ST 131, South Timbalier Area, from the surface down to 5,994' TVDSS | 98.00000% OR |
|---|---|---|---|---|
| South Timbalier 131 | OCS 00457 | 1/1/1955 | N/2; SW/4; S/2SE/4; NW/4SE/4 of Block 131, South Timbalier Area, from the surface down to and including 25,000' TVDSS | 98.00000% OR |
| South Timbalier 134 | OCS 00461 | 1/1/1955 | All of Block 134, South Timbalier Area | 98.00000% RT |
| South Timbalier 135 | OCS 00462 | 1/1/1955 | All of Block 135, South Timbalier Area | 98.00000% RT |
| South Timbalier 148 | OCS-G 01960 | 2/1/1970 | E/2 of Block 148, South Timbalier Area | 38.00000% RT |
| South Timbalier 148 | OCS-G 01960 | 2/1/1970 | W/2SE/4;    NW1/4SE1/4SE1/4;    S1/2SE1/4SE1/4; SW1/4NE1/4SE1/4 of Block 148, South Timbalier Area, from the surface to 25,000' TVDSS | 38.00000% OR |
| South Timbalier 148 | OCS-G 01960 | 2/1/1970 | NE1/4;   N1/2NE1/4SE1/4;   SE1/4NE1/4SE1/4;   and NE1/4SE1/4SE1/4 of Block 148, South Timbalier Area, from 17,777' TVDSS to 99,999' TVDSS | 38.00000% OR |
| South Timbalier 151 | OCS 00463 | 1/1/1955 | All of Block 151, South Timbalier Area | 98.00000% RT |
| South Timbalier 152 | OCS 00464 | 1/1/1955 | All of Block 152, South Timbalier Area | 98.00000% RT |
| South Timbalier 161 | OCS-G 01248 | 6/1/1962 | All of Block 161, South Timbalier Area | 98.00000% RT |
| South Timbalier 161 | OCS-G 01248 | 6/1/1962 | SW/4 NW/4 SW/4 of Block 161, South Timbalier Area, from the stratigraphic equivalent of a depth of 6,400 feet TVD, as measured in the OCS-G 1248 D-5 Well, down to and including the stratigraphic equivalent of 7,571 feet TVD, as measured in the OCS-G 1248 D-7 Well | 73.00000% OR |
| South Timbalier 161 | OCS-G 01248 | 6/1/1962 | SW/4 SW/4; SE/4 NW/4 SW/4; SW/4 NE/4 SW/4; W/2 SE/4 SW/4 of Block 161, South Timbalier Area, from the surface down to and including the stratigraphic equivalent of 7,571 feet TVD, as measured in the OCS-G 1248 D-7 Well | 73.00000% OR |

| South Timbalier 161 | OCS-G 01248 | 6/1/1962 | S/2 SW/4 NE/4; N/2 NW/4 SE/4 of Block 161, South Timbalier Area, INSOFAR AND ONLY INSOFAR as the lease covers depths from the surface of the earth down to a depth of 8,448 feet True Vertical Depth, being the deepest depth drilled in the OCS 01248 No. A10 ST3 Well, and its stratigraphic equivalent plus 100 feet | 98.00000% OR |
|---|---|---|---|---|
| South Timbalier 161 | OCS-G 01248 | 6/1/1962 | S/2 NW/4 NE/4; N/2 SW/4 NE/4; SW/4 NE/4 NE/4; SE/4 NE/4; N/2 NE/4 SE/4 of Block 161, South Timbalier Area, INSOFAR AND ONLY INSOFAR as the Lease covers depths from the surface of the earth down to a depth of eleven thousand, six hundred, ninety-nine feet (11,699') True Vertical depth, being the deepest depth drilled in the OCS-G 01248 No. C-7 ST-1 Well, and its stratigraphic equivalent plus one hundred (100) feet | 98.00000% OR |
| South Timbalier 177 | OCS-G 01260 | 6/1/1962 | All of Block 177, South Timbalier Area | 98.00000% RT |
| South Timbalier 188 | OCS-G 01899 | 3/1/1969 | NW of Block 188, South Timbalier Area | 98.00000% RT |
| South Timbalier 189 | OCS-G 01572 | 6/1/1967 | All of Block 189, South Timbalier Area less and except the S2S2 of Block 189, South Timbalier Area from surface down to 18,544' TVD | 98.00000% RT |
| Vermilion 71 | OCS-G 21592 | 5/1/2000 | All of Block 71, Vermilion Area | 98.00000% RT |
| Vermilion 72 | OCS-G 27851 | 5/1/2006 | W1/2 of Block 72, Vermillion Area, INSOFAR AND ONLY INSOFAR as the lease covers depths from the surface to 11,900' subsea true vertical depth | 96.00000% OR |
| Vermilion 325 | OCS-G 36200 | 6/1/2018 | All of Block 325, Vermilion Area, South Addition | 48.00000% RT |
| Vermilion 341 | OCS-G 33607 | 7/1/2010 | All of Block 341, Vermilion Area, South Addition | 48.00000% RT |
| Vermilion 342 | OCS-G 33608 | 7/1/2010 | All of Block 342, Vermilion Area, South Addition | 48.00000% RT |
| West Cameron 522 | OCS-G 34033 | 2/1/2012 | All of Block 522, West Cameron Area, South Addition | 98.00000% RT |

| West Cameron 543 | OCS-G 12802 | 5/1/1991 | All of Block 543, West Cameron Area, South Addition | 98.00000% RT |
| West Cameron 544 | OCS-G 14342 | 6/1/1994 | All of Block 544, West Cameron Area, South Addition | 98.00000% RT |
| West Delta 72 | OCS-G 01082 | 6/1/1962 | N/2 S/2 and N/2 N/2 S/2 S/2, West Delta Block 72 from the surface down to 12,013 feet subsea true vertical depth LESS AND EXCEPT ExxonMobil's contractual interest in all producible reservoirs as of 9/18/2009 including, but not limited to, the K-30 Sand penetrated by the WD B72 Exxon Mobil OCS-G01082 No. 10 Well (API #177194065701) between the depths of 15,598 feet and 15,787 feet MD | 50.00000% OR |
| West Delta 73 | OCS-G 01083 | 6/1/1962 | NW/4 N/2 SW/4 West Delta Block 73 from the surface to 12,013 feet subsea true vertical depth LESS AND EXCEPT ExxonMobil's contractual interest in all producible reservoirs as of 9/18/2009 including, but not limited to, the K-30 Sand penetrated by the WD B72 Exxon Mobil OCS-G01082 No. 10 Well (API #177194065701) between the depths of 15,598 feet and 15,787 feet MD | 50.00000% OR |
| West Delta 86 | OCS-G 04243 | 1/1/1980 | NE/4 NE/4 SE/4 of Block 86, West Delta Area, from surface down to and including the stratigraphic equivalent of 7,850' TVD | 60.00000% OR |
| West Delta 86 | OCS-G 04243 | 1/1/1980 | SE/4 NE/4 SW/4; NE/4 SE/4 SW/4; NE/4 NW/4 SE/4; S/2 N/2 SE/4; N/2 S/2 SE/4 of Block 86, West Delta Area, from surface down to and including the stratigraphic equivalent 9,388' TVD | 60.00000% OR |
| West Delta 86 | OCS-G 04243 | 1/1/1980 | NW/4 SW/4; N/2 SW/4 SW/4; N/2 NE/4 SW/4; SW/4 NE/4 SW/4; NW/4 SE/4 SW/4; NW/4 NW/4 SE/4 of Block 86, West Delta Area, from surface down to and including the stratigraphic equivalent of 8,560' TVD | 60.00000% OR |
| West Delta 117 | OCS-G 35951 | 6/1/2017 | All of Block 117, West Delta Area, South Addition | 98.00000% RT |
| West Delta 118 | OCS-G 36227 | 7/1/2018 | All of Block 118, West Delta Area, South Addition | 98.00000% RT |
| West Delta 133 | OCS-G 01106 | 5/1/1962 | South half (S/2) of Block 133, West Delta Area, South Addition limited as to those depths from the surface of the earth to the stratigraphic equivalent depth of 10,923' TVD, (being the total depth drilled in the Newfield Exploration Company - OCS-G 01106 No. F-1 Well, plus one hundred feet | 58.00000% OR |

EXHIBIT A
PAGE 11

| Vermilion 342 | OCS-G 33608 | 7/1/2010 | All of Block 342, Vermilion Area, South Addition | 1.00000% ORRI |

**SERVITUDES**

| Area/ Block | Right-of-Way Number | Pipeline Segment No. | Description |
|---|---|---|---|
| EC 328 | OCS-G14716 | 10375 | Pipeline Right-of-way (ROW) OCS-G 14716 is a 200-feet wide and approximately 4.04 miles (21327.61 feet) long corridor associated with the 4.5-inch Pipeline Segment (PSN) 10375. The purpose of ROW OCS-G 14716 is to operate and maintain PSN 10375 and, to transport oil from Platform B in Block 328, through Block 323 to an 8.625-inch subsea tie-in (SN 4235) in Block 322, all in the East Cameron Area, South Addition. |
| EC 328 | OCS-G14717 | 10376 | Pipeline Right-of-way (ROW) OCS-G 14717 is a 200-foot wide and approximately 13.907 feet (2.63 miles) long corridor associated with Segment 10376. The purpose of ROW OCS-G 14717 is to maintain, operate and transport Gas. Segment 10376 originates at East Cameron Block 328, Platform B with a 4-inch pipeline and terminates at a 12-inch Sub Sea Tie (SSTI) in East Cameron Block 323. |
| EC 328 | OCS-G29256 | 19167 | Pipeline Right-of-way (ROW) OCS-G29256 is a 200-foot wide and approximately 3.99 miles (21,089 feet) long corridor associated with the 6 5/8-inch Pipeline Segment No. (PSN) 19167. The purpose of Pipeline ROW OCS-G29256 is to install, maintain, and operate PSN 19167 and to transport oil originating at Platform B in Block 328, through Block 323, and terminating at an 8-inch subsea tie-in with PSN 4235, at X=l,552,523.38 and Y=-160,331.86, in Block 322, all located in East Cameron Area. |
| EI 58 | OCS-G26962 | 15542 | A 200-foot right-of-way to a 4-1/2 inch pipeline, o.62 miles in length, to transport Bulk Gas from No. 8 Caisson in Block 58 to the D Platform in Block 57, all located within the Eugene Island Area. |
| EI 100 | OCS-G29088 | 18290 | A 200-foot wide right-of-way to install, operated, and maintain a 6-inch pipeline, 5.23 miles in length, to transport oil from Platform B in Block 100, thru Block 105 to a subsea tie-in in Block 106, all located in Eugene Island Area. |

| EI 182 | OCS-G05938 | 6849 | A 200-foot wide right-of-way to operate and maintain a 6-inch pipeline, 1.75 miles in length, to transport oil from Platform A in Block 182 to a 12-inch subsea tie-in in Block 174, all located in Eugene Island Area. |
|--------|------------|------|-----------------------------------------------------------------------------------------------------------------|
| EI 182 | OCS-G07097 | 7112 | A 200-foot wide right-of-way to operate and maintain an 8 5/8-inch pipeline, 4.81 miles in length, to transport gas/oil from Platform A in Block 182 to a 24-inch subsea tie-in in Block 197, all located in Eugene Island Area. |
| EI 215 | OCS-G29120 | 18543 | A 200-foot wide right-of-way to operate and maintain a 6-inch pipeline, 8.11 miles in length, to transport bulk oil from a subsea tie-in in Block 206, through Blocks 207 and 216, to Platform B-AUX in Block 215, all located in Eugene Island. |
| EI 215 | OCS-G13441 | 10 | A 200-foot wide right-of-way to operate and maintain a 6 5/8-inch pipeline, 11.16 miles in length, to transport oil from Platform B-PRD in Block 215, through Blocks 208, 209, 192, and 191, to Platform A in Block 188, all in Eugene Island Area. |
| EI 215 | OCS-G29399 | 19970 | Pipeline Right-of-way (ROW) OCS-G 29399 is a 200-foot wide and approximately 2.4 miles (12,797-feet) long corridor associated with 6-inch Pipeline Segment No. (PSN) 19970. The purpose of pipeline ROW OCS-G 29399 is to install, maintain, and operate PSN 19970 and to transport oil from Platform E in Block 208 to Platform B-PROD in Block 215 all located in Eugene Island. |
| EI 227 | OCS-G29317 | 19370 (PROP) | Pipeline Right-of-way OCS-G29317 is a 200-foot wide and approximately 11.31 miles (59,724 feet) long corridor associated with the 4 1/2-inch Pipeline Segment No. (PSN) 19370. The purpose of pipeline ROW OCS-G29317 is to install, maintain, and operate PSN 19370 and to transport bulk gas from Platform B in Block 227, through Blocks 218, 205, 204, and 197 to Platform A in Block 182, all located in Eugene Island Area. |
| EI 227 | OCS-G29319 | 19372 (PROP) | Pipeline Right-of-way OCS-G29319 is a 200-foot wide and approximately 11.31 miles (59,724 feet) long corridor associated with the 8-inch Pipeline Segment No. (PSN) 19372. The purpose of pipeline ROW OCS-G29319 is to install, maintain, and operate PSN 19372 and to transport bulk oil from Platform B in Block 227, through Blocks 218, 205, 204, and 197 to Platform A in Block 182, all located in Eugene Island Area. |

| EI 253 | OCS-G29390 | 19924 | Pipeline Right-of-way (ROW) OCS-G29390 is a 200-foot wide and approximately 4.89 miles (25,817') long corridor associated with the 6-inch Pipeline Segment No. 19924. The purpose of pipeline ROW OCS-G29390 is to maintain and operate PSN 19924 and to transport oil originating Platform A in Block 259 through Block 260 and terminating at a 14-inch subsea tie-in with PSN 19785 in Block 253, all located in Eugene Island Area. |
|---|---|---|---|
| EI 275 | OCS-G26979 | 15619 | A pipeline right-of-way 200-feet in width to operate and maintain a 6 5/8-inch pipeline, 3.72 miles in length, to transport gas and condensate from Platform K in Block 275, through Block 260, to a 12-inch subsea tie-in in with Segment Number 2301 in Block 259, all located in Eugene Island Area. |
| EI 276 | OCS-G28342 | 17103 | A pipeline Right-of-way 200-feet in width to operate and maintain a 10-3/4-inch pipeline, 8.51 miles in length, to transport bulk oil from Platform F in Block 276, through Blocks 275, 260, and 261 to Platform I in Block 252, all located in Eugene Island Area. |
| EI 276 | OCS-G28343 | 17104 | A pipeline Right-of-way 200-feet in width to operate and maintain a bidirectional 6-5/8-inch pipeline, 8.59 miles in length to transport lift gas from Platform F in Block 276, through Blocks 275, 260, and 261 to Platform I in Block 252, all located in Eugene Island Area. |
| EI 276 | OCS-G28344 | 17105 | A pipeline Right-of-way 200-feet in width to operate and maintain a 6-5/8-inch pipeline, 2.66 miles in length to transport bulk oil from Platform E in Block 276 to a 10-inch subsea tie-in with Segment No. 17103, in Block 275, all located in Eugene Island Area. |
| EI 276 | OCS-G28345 | 17106 | A pipeline Right-of-way 200-feet in width for the operation and maintenance of a bidirectional 4-1/2-inch pipeline, 2.66 miles in length, to transport lift gas from Block 276 to a 6-inch subsea tie-in with Pipeline Segment Number 17104 in Block 275, all located in Eugene Island Area. |
| EI 314 | OCS-G29112 | 18509 | A 200-foot wide right-of-way to operate and maintain a 6.625-inch pipeline, 4.55 miles in length, to transport oil from Platform A, in Block 314, through Block 331 to a 14-inch Subsea Tie-In, in Block 330, all located in Eugene Island Area, South Addition. |
| EI 315 | OCS-G13447 | 6852 | A right of way 200-feet in width for the operation and maintenance of a 6 5/8-inch pipeline, 2.3 miles in length, for the transportation of oil from Platform A in Block 315, to a subsea tie-in, 14-inch pipeline, (OCS- |

| | | | |
|---|---|---|---|
| | | | G 2139A) in Block 330, all in the Eugene Island Area, South Addition. |
| EI 316 | OCS-G07555 | 7347 | A pipeline right of way two-hundred (200') feet in width to operate and maintain a 6 5/8-inch pipeline, 1.92 miles in length to transport natural gas from Platform A, in Block 316, through Block 315, to an 8 5/8-inch subsea tie-in in Block 330, all located in Eugene Island Area, South Addition. |
| EI 338 | OCS-G29119 | 18542 | A 200-foot wide right-of-way to operate and maintain an 8-inch pipeline, 2.24 miles in length, to transport oil from Platform K in Block 338 to a subsea tie-in in Block 339, all located in Eugene Island Area. |
| EI 338 | OCS-G29423 | 20192 (PROP) | Pipeline Right-of-way (ROW) OCS-G29423 is a 200-foot wide and approximately 4.02 miles (21,245.42-feet) long corridor associated with the 8-inch Pipeline Segment No. (PSN) 20192. The purpose of pipeline ROW OCS-G29423 is to install, maintain, and operate PSN 20192 and to transport gas from accessory Platform K in Block 338 through Blocks 338 and 330 to a 24-inch subsea tie-in with PSN 15532 at X= 1,880,039.06 and Y= -157,095.69 in Block 330, all located in Eugene Island. |
| EI 339 | OCS-G29121 | 18546 | A 200-foot wide right-of-way to operate and maintain a 10 3/4-inch pipeline, 0.23 miles in length, to transport gas and condensate from Platform K to a subsea tie-in, all located in Eugene Island Area Block 338. |
| EI 341 | OCS-G04971 | 5422 | Pipeline Right-of-way (ROW) OCS-G 04971 is a 200-foot wide and approximately 1.94 miles (10,235') long corridor associated with the 6 5/8-inch Pipeline Segment Number (PSN) 5422. The purpose of pipeline ROW OCS-G 04971 is to maintain and operate PSN 5422 and to transport oil from Platform A in Block 341 to an 8 5/8-inch subsea tie-in with PSN 4038 in Block 327, all located in Eugene Island Area, South Addition. |
| EI 341 | OCS-G29158 | 18670 | A 200-foot wide right-of-way to operate and maintain a 16-inch pipeline, 1.43 miles in length, to transport gas from a subsea tie-in in Block 341 to Platform A in Block 327, all located in the Eugene Island Area, South Addition. |
| EI 346 | OCS-G28422 | 17348 | A 200-foot wide right-of-way to operate and maintain a 6-inch pipeline, 1.23 miles in length, to transport bulk gas from Platform B to Platform A, all located in Block 346, Eugene Island Area, South Addition. |

| GA 209 | OCS-G21020 | 13977 | Pipeline Right-of-way (ROW) OCS-G 21020 is a 200-foot wide and approximately 4.22 miles (22,299 ft) long corridor associated with the 10-inch Pipeline Segment Number (PSN) 13977. The purpose of pipeline ROW OCS-G 21020 is to maintain and operate PSN 13977 and to transport gas and condensate from Block 209 in Galveston Area, through Blocks 192, 180 in Galveston Area to a 24-inch subsea tie-in with PSN 5381 in Block 179, High Island Area. |
|--------|------------|-------|------|
| GA 209 | OCS-G16053 | 11038 | Pipeline Right-of-way (ROW) OCS-G 16053 is a 200-foot wide and approximately 15.05 miles (79,439 ft) long corridor associated with the 6 5/8-inch Pipeline Segment Number (PSN) 11038. The purpose of ROW OCS-G 16053 is to maintain and operate PSN 11038 and to transport oil from Block 209, through Blocks 227, 226, 238, 239, 240 to a 14-inch subsea tie-in with PSN 4879 in Block 256, all located in Galveston Area. |
| MP 120 | OCS-G15035 | 5123 | Pipeline Right-of-Way (ROW) OCS-G15035 is a 200-foot wide and approximately 5.01 miles (26,465 feet) long corridor associated with the 8-inch Pipeline Segment Number (PSN) 5123. The purpose of pipeline ROW OCS-G15035 is to install, maintain, and operate PSN 5123, and to transport bulk gas from Platform CA in Block 120, through Blocks 121 and 122 to a plugged end in Block 133, all located in Main Pass Area. |
| MP 120 | OCS-G28405 | 17292 | Pipeline Right-of-way (ROW) OCS-G28405 is a 200-foot wide and approximately 2.54 miles (13,429 feet) long corridor associated with the 6-inch Pipeline Segment No. (PSN) 17292. The purpose of pipeline ROW OCS-G28405 is to maintain and operate PSN 17292 and to transport bulk gas originating at Platform CA in Block 120, through Blocks 121, and terminating at a subsea tie-in at Block 122, all located in Main Pass Area. |
| MP 122 | OCS-G29338 | 19542 | Pipeline Right-of-way (ROW) OCS-G 29338 is a 200-foot wide and approximately 1.45 miles (7,671 feet) long corridor associated with the 06-inch Pipeline Segment No. 19542. The purpose of pipeline ROW OCS-G29338 is to install, maintain, and operate PSN 19542 and to transport bulk gas from 6-inch sub sea tie-in in Block 122 to Platform A in Block 123, all in Main Pass Area. |

| Area/ Block | Right-of-Way Number | Pipeline Segment No. | Description |
|---|---|---|---|
| MP 123 | OCS-G29318 | 19371 | Pipeline Right-of-way (ROW) OCS-G29318 is a 200-foot wide and approximately 8.97 miles (47,357') long corridor associated with the 6-inch Pipeline Segment Number 19371. The purpose of pipeline ROW OCS-G29318 is to maintain and operate PSN 19371 and to transport oil originating at Platform A in Block 123 through Blocks 132, 135, and terminating at a subsea tie in in Block 144, all located in Main Pass Area. |
| MP 123 | OCS-G14709 | 10358 | Pipeline Right-of-way (ROW) OCS-G14709 is a 200-foot wide and approximately 2.44 miles (12,861 feet) long corridor associated with the bidirectional 6-inch Pipeline Segment No. 10358. The purpose of pipeline ROW OCS-G14709 is to maintain and operate PSN 10358 and to transport gas and condensate originating at A Platform in Block 123 through Block 122 and terminating at a 12-inch SSTI with PSN 3363, at X=2859915 Y=271774, in Block 133 all in the Main Pass Area. |
| MP 236 | OCS-G28743 | 17763 (PROP) | Pipeline Right-of-way (ROW) OCS-G28743 is a 200-foot wide and approximately 5.44 miles (28,728 feet) long corridor associated with the 6-5/8-inch Pipeline Segment No. 17763. The purpose of pipeline ROW OCS-G28743 is to maintain and operate PSN 17763 and to transport bulk gas from Platform D in Block 236, through Blocks 122 and 133 to a 6-inch subsea tie-in in Block 122, all located in Main Pass Area. |
| MC 800 | OCS-G28980 | 16273 | Pipeline Right-of-way (ROW) OCS-G28980 is a 200-foot wide and approximately 18.61 miles (96,865 feet) long corridor associated with the 5 1/2-inch x 8 5/8-inch pipe-in-pipe pipeline, Pipeline Segment No. (PSN) 16273 and 16274 as well as 5-inch umbilical PSN 16275. The purpose of the pipeline ROW OCS-G28980 is to maintain and operate PSN 16273 to transport bulk oil originating at a Pipeline End Terminal (PLET) in Block 800 through Blocks 756, 757, 713, 669, 670, 626 terminating at Platform A in Block 582, all located in Mississippi Canyon Area. |

| Area/ Block | Right-of-Way Number | Pipeline Segment No. | Description |
|---|---|---|---|
|  |  |  |  |

| MC 800 | OCS-G28980 | 16274 | Pipeline Right-of-way (ROW) OCS-G28980 is a 200-foot wide and approximately 18.61 miles (96,865 feet) long corridor associated with the 5 1/2-inch x 8 5/8-inch pipe-in-pipe pipeline, Pipeline Segment No. (PSN) 16273 and 16274 as well as 5-inch umbilical PSN 16275. The purpose of the pipeline ROW OCS-G28980 is to maintain and operate PSN 16273 to transport bulk oil originating at a Pipeline End Terminal (PLET) in Block 800 through Blocks 756, 757, 713, 669, 670, 626 terminating at Platform A in Block 582, all located in Mississippi Canyon Area. |
|---|---|---|---|
| MC 800 | OCS-G28980 | 16275 | Pipeline Right-of-way (ROW) OCS-G28980 is a 200-foot wide and approximately 18.61 miles (96,865 feet) long corridor associated with the 5 1/2-inch x 8 5/8-inch pipe-in-pipe pipeline, Pipeline Segment No. (PSN) 16273 and 16274 as well as 5-inch umbilical PSN 16275. The purpose of the pipeline ROW OCS-G28980 is to maintain and operate PSN 16273 to transport bulk oil originating at a Pipeline End Terminal (PLET) in Block 800 through Blocks 756, 757, 713, 669, 670, 626 terminating at Platform A in Block 582, all located in Mississippi Canyon Area. |
| SM 192 | OCS-G26928 | 15290 | One 6 5/8-inch pipeline, 1.86 miles long, to transport oil from South Marsh Island Area Block 192 "A" to a 20-inch subsea tie-in in South Marsh Island Area Block 205. |
| SP 83 (Expired) | OCS-G13234 | 9465 | Right-of-way No. G13234, Pipeline Segment No. 9465: A 03-06-inch pipeline, 7.27 miles long, to transport condensate from SP 83 "A" to 10-inch SSTI in SP 55. |
| SP 83 (Expired) | OCS-G13236 | 9467 | A pipeline right-of-way two-hundred feet (200') in width for the operation and maintenance of a 10 3/4-inch pipeline, 4.02 miles in length, to transport gas from Platform A in Block 83, South Pass Area, South Addition, through Block 74 in South Pass, South Addition to a 20-inch Subsea Tie-in in Block 54, South Pass Area. |
| ST 35 | OCS-G8387 | 8087 | Pipeline Right-of-way (ROW) OCS-G08387 is a 200-foot wide and approximately 3.65 miles (19297 feet) long corridor. The purpose of the pipeline ROW OCS-G08387 is to maintain and operate the following: Pipeline Segment No. 8087 A 6 5/8 inch bidirectional pipeline, 3.37 miles (17,800 feet) in length, to transport gas originating at an 8-inch subsea tie-in in Block 35 through Block 50 to a 6-inch subsea tie-in in Block 51, all located in South Timbalier Area. Pipeline Segment No. 11872 A 6-inch bidirectional pipeline, 0.28 miles (1,497 feet) in length, to transport |

| | | | |
|---|---|---|---|
| | | | gas originating at a 6-inch subsea tie-in in to Platform CC, all in South Timbalier Area Block 51. |
| ST 51 | OCS-G8615 | 8073 | Right-of-way (ROW) OCS-G 08615 is a 200-foot wide and approximate 3.67 miles (19,400 ft) long corridor associated with the bidirectional 8-12-inch Pipeline Segment Number (PSN) 8073. The purpose of pipeline ROW OCS-G 08615 is to maintain and operate PSN 8073 and to transport bulk oil from Platform CC in Block 51, through Block 50, to 8-inch subsea tie-in in Block 35, all in South Timbalier Area. |
| ST 51 | OCS-G8387 | 11872 | Pipeline Right-of-way (ROW) OCS-G08387 is a 200-foot wide and approximately 3.65 miles (19297 feet) long corridor. The purpose of the pipeline ROW OCS-G08387 is to maintain and operate the following: Pipeline Segment No. 8087 A 6 5/8 inch bidirectional pipeline, 3.37 miles (17,800 feet) in length, to transport gas originating at an 8-inch subsea tie-in in Block 35 through Block 50 to a 6-inch subsea tie-in in Block 51, all located in South Timbalier Area. Pipeline Segment No. 11872 A 6-inch bidirectional pipeline, 0.28 miles (1,497 feet) in length, to transport gas originating at a 6-inch subsea tie-in in to Platform CC, all in South Timbalier Area Block 51. |
| ST 131 | OCS-G29307 | 19324 | Pipeline Right-of-way OCS-G29307 is a 200-foot wide and approximately 8.05 miles (42,493') long corridor associated with the 8 5/8-inch and 22-inch Pipeline Segment No. (PSN) 19324. The purpose of pipeline ROW OCS-G29307 is to maintain and operate PSN 19324 and to transport gas from Platform K in Block 131, through Blocks 130, 133, 134, 152, to Platform G-CMP in Block 151, all located in South Timbalier Area. |
| ST 131 | OCS-G29365 | 19720 | "Pipeline Right-of-way (ROW) OCS-G29365 is a 200-foot wide and approximately 8.58 miles (45,320 feet) long corridor associated with the 10-3/4-inch Pipeline Segment No. (PSN) 19720. The purpose of pipeline ROW OCS-G29365 is to install, maintain, and operate PSN 19720 and to transport bulk oil from Platform K in Block 131, through Block 130, 129, 134, and Block 135, to PROD#1 Platform in Block 151, all located in South Timbalier Area." |
| ST 131 | OCS-G29366 | 19721 | Pipeline Right-of-way (ROW) OCS-G29366 is a 200-foot wide and approximately 8.20 miles (43,320 feet) long corridor associated with the 6-5/8-inch bi-directional Pipeline Segment No. (PSN) 19721. The purpose of pipeline ROW OCS-G29366 is to install, maintain, and operate PSN 19721 and to transport gas/gas lift from/to Platform K in Block 131, through Block 130, 129, 134, and Block 135, to PROD#1 |

| | | | |
|---|---|---|---|
| | | | Platform in Block 151, all located in South Timbalier Area. |
| ST 148 | OCS-G18835 | 11595 | A 200-foot wide right-of-way for the operation and maintenance of a 12-inch pipeline, 9.05 miles in length, to transport bulk oil from Platform A in Block 148, through Block 149, 150 to Production #2 Platform in Block 151, all located in South Timbalier Area. |
| ST 148 | OCS-G29349 | 19591 | Pipeline Right-of-way (ROW) OCS-G29349 is a 200-foot wide and approximately 10.03 miles (52,936') long corridor. The purpose of the pipeline ROW OCS-G29349 is to maintain and operate the following: Pipeline Segment No. 19591 A 12 3/4-inch pipeline, 9.27 miles (48,932 feet) in length, to transport bulk oil originating at a 6-inch subsea tie-in with PSN 19715, at X= 2,301,761 and Y= -27,276, in Block 148, through Blocks 149 and 150, to Platform PROD-2 in Block 151, all located in South Timbalier Area. Pipeline Segment No. 19715 A 6 5/8-inch pipeline, 0.76 miles (4,004 feet) in length, to tansport bulk oil originating at Platform C in Block 161 to a 12-inch subsea tie-in with PSN 19591, at X= 2,301,761 and Y= -27,276, in Block 148, all located in South Timbalier Area. |
| ST 151 | OCS-G29305 | 199322 | Pipeline Right-of-way (ROW) OCS-G29305 is a 200-foot wide and approximately 1.51 miles (7,983ft) long corridor associated with the 8-inch Pipeline Segment 19322. The purpose of pipeline ROW OCS-G29305 is to maintain and operate PSN 19322 and to transport bulk oil from Platform AA to Platform PROD#1, all located in South Timbalier Area Block 151. |
| ST 151 | OCS-G29300 | 19312 | Pipeline Right-of-way OCS-G29300 is a 200-foot wide and approximately 1.51 miles (7,983 feet) long corridor associated with the 4-inch bi-directional Pipeline Segment No. (PSN) 19312. The purpose of pipeline ROW OCS-G29300 is to maintain and operate PSN 19312 and to transport gas originating at Platform AA and terminating at Platform PROD#1, all located in South Timbalier Area Block 151. |
| ST 161 | OCS-G29349 | 19715 | Pipeline Right-of-way (ROW) OCS-G29349 is a 200-foot wide and approximately 10.03 miles (52,936') long corridor. The purpose of the pipeline ROW OCS-G29349 is to maintain and operate the following: Pipeline Segment No. 19591 A 12 3/4-inch pipeline, 9.27 miles (48,932 feet) in length, to transport bulk oil originating at a 6-inch subsea tie-in with PSN 19715, at X= 2,301,761 and Y= -27,276, in Block 148, through Blocks 149 and 150, to Platform PROD-2 in Block 151, all located in South Timbalier Area. |

| | | | |
|---|---|---|---|
| | | | Pipeline Segment No. 19715 A 6 5/8-inch pipeline, 0.76 miles (4,004 feet) in length, to tansport bulk oil originating at Platform C in Block 161 to a 12-inch subsea tie-in with PSN 19591, at X= 2,301,761 and Y= -27,276, in Block 148, all located in South Timbalier Area. |
| ST 177 | OCS-G13510 | 9771 | Pipeline Right-of-way (ROW) OCS-G 13510 is a 200-foot wide and 10.87 miles long corridor associated with Pipeline Segment No. 9771. The purpose of pipeline ROW OCS-G 13510 is to transport bulk oil through an associated 14-10-inch ROW pipeline (Pipeline Segment No. 9771) from Platform E in South Timbalier Area, Block 177, through South Timbalier Area Blocks 178, 159, and 158, to Platform Prod 2 in South Timbalier Area, Block 151. |
| VR 71 | OCS-G29118 | 18541 | A 200-foot wide right-of-way to operate and maintain a 4 ½ -inch pipeline, 2.61 miles in length, to transport bulk gas from Caisson No. 1 in Block 71 to Platform C in Block 52, all located in Vermilion Area. |
| VR 72 | OCS-G28630 | 18544 | A 200-foot wide right-of-way to operate and maintain a 6 5/8-inch pipeline, 4.28 miles in length, to transport bulk gas from Caisson No. 1 in Block 72, through Block 71, to Platform C in Block 52, all located in Vermilion Area. |
| VR 72 | OCS-G28631 | 18545 | A 200-foot wide right-of-way to operate and maintain a 6.625-inch pipeline, 5.95 miles in length, to transport bulk gas from Caisson No. 2 in Block 72, through Block 71, to Platform C in Block 52, all located in Vermilion Area. |
| VR 72 | OCS-G26961 | 15541 | A 6.625-inch pipeline .437 miles (2,306 feet) in length to transport gas/condensate from Vermilion Area Block 52, Platform C to a subsea tie-in point with Pipeline Segment Number 3538 located in South Marsh Island Area Block 233. |
| VR 342 | OCS-G29143 | 18610 | Pipeline Right-of-way (ROW) OCG-G29143 is a 200-foot wide and approximately 10.2 miles (53,872 feet) long corridor associated with the 06-inch Pipeline Segment No. (PSN) 18610. The purpose of the pipeline ROW OCS-G29143 is to operate and maintain PSN 18610 and to transport bulk oil from Platform A in Block 342, through Blocks 343, 344, all in Vermilion Area and through Blocks 325, 326, and 327 to Platform A in Block 328, all in East Cameron Area. |

| WD 72 | OCS-G28994 | 18074 | Pipeline Right-of-way (ROW) OCS-G28994 is a 200-foot wide and approximately 3.9 miles (20,592 feet) long corridor associated with the 6 5/8-inch Pipeline Segment No. (PSN) 18074. The purpose of the pipeline ROW OCS-G28994 is to maintain and operate PSN 18074 and to transport gas and condensate originating at Platform B in Block 72, through Blocks 73 and 64, terminating at an 8-5/8-inch subsea tie-in in Block 65, all in the West Delta Area. |
|-------|------------|-------|------|
| WD 133 | OCS-G01502A | 15815 | Pipeline Right-of-way (ROW) OCS-G0152A is a 200-foot wide and approximately 8.94 miles (47,190 feet) long corridor associated with the bi-directional 6/8-inch Pipeline Segment No. (PSN) 15815. The purpose of the pipeline ROW-G0152A is to maintain and operate PSN 15815 and to transport gas lift gas originating at Platform A in Block 152, through Blocks 151, 140, and terminating at Platform F in Block 133, all located in the West Delta Area. |
| WD 133 | OCS-G26845 | 15816 | A 200-foot wide right-of-way to operate and maintain a 6-inch pipeline, 10.32 miles in length, to transport bulk oil from Platform F in Block 133, through Blocks 140 and 151, to platform A in Block 152, all located in West Delta Area. |

**END OF EXHIBIT A**

## EXHIBIT B

Attached to and made a part of that certain Asset Purchase Agreement by and among
Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller
and San Juan Offshore, LLC, as Buyer

## WELLS

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|-------|--------------|-----|------------|------|--------|---------------------|
| G10638 | Active | 17-704-41116-00 | EC 0328 | 008 | ST00BP00 | PA |
| G10638 | Active | 17-704-40779-00 | EC 0328 | A001 | ST00BP00 | PA |
| G10638 | Active | 17-704-40780-01 | EC 0328 | A002 | ST01BP00 | PA |
| G10638 | Active | 17-704-40947-00 | EC 0328 | A004 | ST00BP01 | PA |
| G10638 | Active | 17-704-40952-02 | EC 0328 | A006 | ST02BP00 | PA |
| G10638 | Active | 17-704-41033-00 | EC 0328 | A007 | ST00BP00 | PA |
| G10638 | Active | 17-704-40958-04 | EC 0328 | A008 | ST04BP00 | PA |
| G10638 | Active | 17-704-41032-02 | EC 0328 | A009 | ST02BP00 | PA |
| G10638 | Active | 17-704-41068-00 | EC 0328 | A010 | ST00BP00 | PA |
| G10638 | Active | 17-704-41070-00 | EC 0328 | A011 | ST00BP00 | PA |
| G10638 | Active | 17-704-41075-02 | EC 0328 | B001 | ST02BP00 | Prod |
| G10638 | Active | 17-704-41091-01 | EC 0328 | B002 | ST01BP00 | Prod |
| G10638 | Active | 17-704-41092-02 | EC 0328 | B003 | ST02BP00 | Prod |
| G10638 | Active | 17-704-41093-00 | EC 0328 | B004 | ST00BP00 | Prod |
| G10638 | Active | 17-704-41094-00 | EC 0328 | B005 | ST00BP00 | Prod |
| G10638 | Active | 17-704-41095-00 | EC 0328 | B006 | ST00BP00 | Prod |
| G10638 | Active | 17-704-41111-01 | EC 0328 | C001 | ST01BP00 | Prod |
| G10638 | Active | 17-704-41107-01 | EC 0328 | C003 | ST01BP00 | Prod |
| G10638 | Active | 17-704-41108-01 | EC 0328 | C004 | ST01BP00 | Prod |
| G10638 | Active | 17-704-41110-00 | EC 0328 | C005 | ST00BP00 | Prod |
| G10638 | Active | 17-704-41112-00 | EC 0328 | C006 | ST00BP00 | Prod |
| G10638 | Active | 17-704-41113-00 | EC 0328 | C007 | ST00BP00 | Prod |
| G10638 | Active | 17-704-41114-00 | EC 0328 | C008 | ST00BP00 | Prod |
| G10638 | Active | 17-704-41109-00 | EC 0328 | C002 | ST00BP00 | SI |
| G10638 | Active | 17-704-41115-05 | EC 0328 | C009 | ST03BP01 | SI |
| G24883 | Active | 17-709-41485-00 | EI 0038 | 017 | ST00BP00 | SI |
| G02601 | Active | 17-709-41484-00 | EI 0057 | 016 | ST00BP00 | SI |
| G02601 | Active | 17-709-40209-00 | EI 0057 | 001 | ST00BP00 | TA |
| G02895 | Active | 17-709-41452-01 | EI 0058 | 008 | ST00BP01 | SI |
| G31369 | Active | 17-709-41501-00 | EI 0099 | E001 | ST00BP00 | Prod |
| G31369 | Active | 17-709-41503-01 | EI 0099 | E002 | ST01BP00 | Prod |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|-------|--------------|-----|------------|------|--------|---------------------|
| 00796 | Active | 17-709-00314-00 | EI 0100 | 001 | ST00BP00 | PA |
| 00796 | Active | 17-709-00315-00 | EI 0100 | 002 | ST00BP00 | PA |
| 00796 | Active | 17-709-00316-00 | EI 0100 | 003 | ST00BP00 | PA |
| 00796 | Active | 17-709-00317-00 | EI 0100 | 004 | ST00BP00 | PA |
| 00796 | Active | 17-709-00318-00 | EI 0100 | 005 | ST00BP00 | PA |
| 00796 | Active | 17-709-00319-00 | EI 0100 | 006 | ST00BP00 | PA |
| 00796 | Active | 17-709-00320-00 | EI 0100 | 007 | ST00BP00 | PA |
| 00796 | Active | 17-709-00321-00 | EI 0100 | 008 | ST00BP00 | PA |
| 00796 | Active | 17-709-00322-00 | EI 0100 | 009 | ST00BP00 | PA |
| 00796 | Active | 17-709-00323-00 | EI 0100 | 010 | ST00BP00 | PA |
| 00796 | Active | 17-709-00324-00 | EI 0100 | 011 | ST00BP00 | PA |
| 00796 | Active | 17-709-00325-00 | EI 0100 | 012 | ST00BP00 | PA |
| 00796 | Active | 17-709-00327-00 | EI 0100 | 014 | ST00BP00 | PA |
| 00796 | Active | 17-709-00328-00 | EI 0100 | 015 | ST00BP00 | PA |
| 00796 | Active | 17-709-00329-00 | EI 0100 | 016 | ST00BP00 | PA |
| 00796 | Active | 17-709-00330-00 | EI 0100 | 017 | ST00BP00 | PA |
| 00796 | Active | 17-709-00332-00 | EI 0100 | 019 | ST00BP00 | PA |
| 00796 | Active | 17-709-20158-00 | EI 0100 | 021 | ST00BP00 | PA |
| 00796 | Active | 17-709-20168-00 | EI 0100 | 025 | ST01BP00 | PA |
| 00796 | Active | 17-709-20165-00 | EI 0100 | 026 | ST01BP00 | PA |
| 00796 | Active | 17-709-40954-00 | EI 0100 | 028 | ST00BP00 | PA |
| 00796 | Active | 17-709-40545-00 | EI 0100 | 029 | ST00BP02 | PA |
| 00796 | Active | 17-709-40919-01 | EI 0100 | 032 | ST01BP00 | PA |
| 00796 | Active | 17-709-40966-00 | EI 0100 | 036 | ST00BP00 | PA |
| 00796 | Active | 17-709-40967-00 | EI 0100 | 037 | ST00BP00 | PA |
| 00796 | Active | 17-709-41149-01 | EI 0100 | 040 | ST01BP00 | PA |
| 00796 | Active | 17-709-41433-00 | EI 0100 | 042 | ST00BP00 | PA |
| 00796 | Active | 17-709-00326-01 | EI 0100 | 013 | ST01BP00 | Prod |
| 00796 | Active | 17-709-00888-00 | EI 0100 | 020 | ST00BP01 | Prod |
| 00796 | Active | 17-709-20192-04 | EI 0100 | 024 | ST02BP02 | Prod |
| 00796 | Active | 17-709-20186-02 | EI 0100 | 027 | ST02BP00 | Prod |
| 00796 | Active | 17-709-40930-01 | EI 0100 | 033 | ST01BP00 | Prod |
| 00796 | Active | 17-709-40944-04 | EI 0100 | 034 | ST03BP01 | Prod |
| 00796 | Active | 17-709-41156-01 | EI 0100 | 041 | ST01BP00 | Prod |
| 00796 | Active | 17-709-41477-02 | EI 0100 | 043 | ST02BP00 | Prod |
| 00796 | Active | 17-709-40916-03 | EI 0100 | 031 | ST01BP02 | SI |
| 00796 | Active | 17-709-41051-01 | EI 0100 | 038 | ST01BP00 | SI |
| 00796 | Active | 17-709-41483-00 | EI 0100 | 044 | ST00BP00 | SI |
| 00796 | Active | 17-709-41499-00 | EI 0100 | 045 | ST00BP00 | SI |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|---|---|---|---|---|---|---|
| 00796 | Active | 17-709-00331-00 | EI 0100 | 018 | ST00BP00 | TA |
| 00796 | Active | 17-709-40527-00 | EI 0100 | 030 | ST00BP01 | TA |
| 00796 | Active | 17-709-40950-00 | EI 0100 | 035 | ST00BP00 | TA |
| 00796 | Active | 17-709-41138-01 | EI 0100 | 039 | ST01BP00 | TA |
| G03782 | Active | 17-709-41011-00 | EI 0174 | A010 | ST00BP00 | TA |
| G04451 | Inactive | 17-709-41023-00 | EI 0181 | A013 | ST00BP01 | TA |
| G04451 | Inactive | 17-709-40694-00 | EI 0181 | A015 | ST00BP00 | TA |
| G04452 | Active | 17-709-40657-05 | EI 0182 | A001 | ST04BP00 | Prod |
| G04452 | Active | 17-709-40650-04 | EI 0182 | A003 | ST04BP00 | Prod |
| G04452 | Active | 17-709-40993-00 | EI 0182 | A007 | ST00BP00 | SI |
| G04452 | Active | 17-709-40992-01 | EI 0182 | A008 | ST01BP00 | Prod |
| G04452 | Active | 17-709-41317-00 | EI 0182 | A016 | ST00BP00 | SI |
| G04452 | Active | 17-709-41024-02 | EI 0182 | A018 | ST02BP00 | Prod |
| G04452 | Active | 17-709-40454-00 | EI 0182 | 001 | ST00BP00 | PA |
| G04452 | Active | 17-709-40625-01 | EI 0182 | A005 | ST01BP00 | TA |
| G04452 | Active | 17-709-40673-00 | EI 0182 | A006 | ST00BP00 | TA |
| G04452 | Active | 17-709-40991-00 | EI 0182 | A009 | ST00BP00 | TA |
| G04452 | Active | 17-709-41021-00 | EI 0182 | A014 | ST00BP00 | TA |
| G04452 | Active | 17-709-41447-03 | EI 0182 | K001 | ST00BP03 | TA |
| G00977 | Active | 17-709-41294-00 | EI 0214 | A002 | ST00BP00 | SI |
| G00977 | Active | 17-709-41297-00 | EI 0214 | A005 | ST00BP00 | SI |
| G00977 | Active | 17-709-00878-00 | EI 0214 | 001 | ST00BP00 | PA |
| G00977 | Active | 17-709-40230-00 | EI 0214 | 002 | ST00BP00 | PA |
| G00977 | Active | 17-709-40847-00 | EI 0214 | 004 | ST00BP00 | PA |
| G00977 | Active | 17-709-41306-00 | EI 0214 | A003 | ST00BP00 | TA |
| G00977 | Active | 17-709-41327-01 | EI 0214 | A006 | ST00BP01 | TA |
| G00977 | Active | 17-709-41330-00 | EI 0214 | A008 | ST00BP00 | TA |
| 00578 | Active | 17-709-40777-00 | EI 0215 | 012 | ST00BP00 | SI |
| 00578 | Active | 17-709-40172-04 | EI 0215 | C006 | ST04BP01 | SI |
| G26033 | Active | 17-709-40773-01 | EI 0215 | C020 | ST01BP00 | SI |
| 00578 | Active | 17-709-40770-00 | EI 0215 | C021 | ST00BP00 | SI |
| 00578 | Active | 17-709-00162-00 | EI 0215 | 001 | ST00BP00 | PA |
| 00578 | Active | 17-709-00163-00 | EI 0215 | 002 | ST00BP00 | PA |
| 00578 | Active | 17-709-40073-00 | EI 0215 | 004 | ST00BP00 | PA |
| 00578 | Active | 17-709-40074-00 | EI 0215 | 005 | ST00BP00 | PA |
| 00578 | Active | 17-709-40075-00 | EI 0215 | 006 | ST00BP00 | PA |
| 00578 | Active | 17-709-40077-00 | EI 0215 | 008 | ST00BP00 | PA |
| 00578 | Active | 17-709-40677-00 | EI 0215 | 009 | ST00BP01 | PA |
| 00578 | Active | 17-709-40708-00 | EI 0215 | 011 | ST00BP00 | PA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|-------|--------------|-----|-----------|------|--------|---------------------|
| 00578 | Active | 17-709-00876-00 | EI 0215 | B001 | ST00BP00 | PA |
| 00578 | Active | 17-709-20044-00 | EI 0215 | B002 | ST00BP00 | PA |
| 00578 | Active | 17-709-20055-00 | EI 0215 | B003 | ST00BP00 | PA |
| 00578 | Active | 17-709-20104-00 | EI 0215 | B004 | ST00BP00 | PA |
| 00578 | Active | 17-709-20117-00 | EI 0215 | B005 | ST00BP00 | PA |
| 00578 | Active | 17-709-40145-00 | EI 0215 | C001 | ST00BP00 | PA |
| 00578 | Active | 17-709-40154-01 | EI 0215 | C004 | ST01BP00 | PA |
| 00578 | Active | 17-709-40167-00 | EI 0215 | C005 | ST00BP00 | PA |
| 00578 | Active | 17-709-40179-00 | EI 0215 | C007 | ST00BP00 | PA |
| 00578 | Active | 17-709-40184-00 | EI 0215 | C008 | ST00BP00 | PA |
| 00578 | Active | 17-709-40187-01 | EI 0215 | C009 | ST01BP01 | PA |
| 00578 | Active | 17-709-40191-02 | EI 0215 | C010 | ST02BP00 | PA |
| 00578 | Active | 17-709-40192-00 | EI 0215 | C011 | ST00BP00 | PA |
| 00578 | Active | 17-709-40221-01 | EI 0215 | C014 | ST00BP01 | PA |
| 00578 | Active | 17-709-40466-00 | EI 0215 | C016 | ST00BP01 | PA |
| 00578 | Active | 17-709-40478-00 | EI 0215 | C017 | ST00BP00 | PA |
| 00578 | Active | 17-709-40584-00 | EI 0215 | D001 | ST00BP00 | PA |
| 00578 | Active | 17-709-40161-00 | EI 0215 | C003 | ST00BP00 | TA |
| 00578 | Active | 17-709-40211-00 | EI 0215 | C012 | ST00BP00 | TA |
| 00578 | Active | 17-709-40465-00 | EI 0215 | C015 | ST00BP00 | TA |
| 00578 | Active | 17-709-40749-00 | EI 0215 | C018 | ST00BP00 | TA |
| 00578 | Active | 17-709-40761-00 | EI 0215 | C019 | ST00BP00 | TA |
| 00578 | Active | 17-709-40778-00 | EI 0215 | C022 | ST00BP00 | TA |
| G00978 | Inactive | 17-709-40784-00 | EI 0217 | B005 | ST00BP01 | PA |
| G36743 | Inactive | 17-709-40771-00 | EI 0217 | B004 | ST00BP01 | TA |
| 00809 | Inactive | 17-709-41300-00 | EI 0227 | B001 | ST00BP00 | SI |
| 00809 | Inactive | 17-709-41329-04 | EI 0227 | B002 | ST03BP00 | SI |
| 00809 | Inactive | 17-709-41426-02 | EI 0227 | B003 | ST01BP01 | SI |
| 00809 | Inactive | 17-709-41307-00 | EI 0227 | C001 | ST00BP00 | TA |
| G05505 | Active | 17-709-40792-00 | EI 0229 | B001 | ST00BP00 | Prod |
| G05505 | Active | 17-709-40786-00 | EI 0229 | A001 | ST00BP00 | PA |
| G05505 | Active | 17-709-41073-03 | EI 0229 | C001 | ST03BP00 | PA |
| G05505 | Active | 17-709-40821-00 | EI 0229 | 003 | ST00BP00 | TA |
| G00979 | Active | 17-709-00907-00 | EI 0230 | 002 | ST00BP00 | PA |
| G00979 | Active | 17-709-20017-00 | EI 0230 | 003 | ST00BP00 | PA |
| G00979 | Active | 17-709-40016-00 | EI 0230 | CB004 | ST00BP00 | PA |
| G00979 | Active | 17-709-40031-00 | EI 0230 | CB005 | ST00BP00 | PA |
| G00979 | Active | 17-709-41014-00 | EI 0230 | CB009 | ST00BP00 | PA |
| G00979 | Active | 17-709-00803-00 | EI 0230 | CC001 | ST00BP00 | PA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|---|---|---|---|---|---|---|
| G00979 | Active | 17-709-40131-00 | EI 0230 | CC006 | ST00BP01 | PA |
| G00979 | Active | 17-709-40853-00 | EI 0230 | CD007 | ST00BP00 | PA |
| G00979 | Active | 17-709-40964-00 | EI 0230 | CD008 | ST00BP00 | PA |
| G00979 | Active | 17-709-40837-02 | EI 0230 | J005 | ST02BP00 | TA |
| G00980 | Active | 17-709-41249-02 | EI 0231 | A001 | ST02BP00 | Prod |
| G00980 | Active | 17-709-00821-00 | EI 0231 | 001 | ST00BP00 | PA |
| G00980 | Active | 17-709-00784-00 | EI 0231 | 002 | ST00BP01 | PA |
| G00980 | Active | 17-709-00885-00 | EI 0231 | 005 | ST00BP00 | PA |
| G00980 | Active | 17-709-00857-00 | EI 0231 | CA003 | ST00BP00 | PA |
| G00980 | Active | 17-709-00861-01 | EI 0231 | CA004 | ST01BP00 | PA |
| G00980 | Active | 17-709-00922-00 | EI 0231 | CA006 | ST00BP00 | PA |
| G00980 | Active | 17-709-40907-01 | EI 0231 | CA007 | ST01BP00 | PA |
| G00980 | Active | 17-709-40979-00 | EI 0231 | CA008 | ST00BP00 | PA |
| G00980 | Active | 17-709-20135-00 | EI 0231 | CB008 | ST00BP00 | PA |
| G00980 | Active | 17-709-41305-00 | EI 0231 | A004 | ST00BP00 | TA |
| G00980 | Active | 17-709-41328-00 | EI 0231 | A007 | ST00BP00 | TA |
| G00980 | Active | 17-709-41513-01 | EI 0231 | A009 | ST00BP01 | TA |
| G00981 | Active | 17-709-40975-00 | EI 0237 | K001 | ST00BP00 | Prod |
| G00981 | Active | 17-709-41311-00 | EI 0237 | K010 | ST00BP00 | Prod |
| G00981 | Active | 17-709-41391-00 | EI 0237 | K011 | ST00BP00 | Prod |
| G00981 | Active | 17-709-40109-00 | EI 0237 | 001 | ST00BP00 | PA |
| G00981 | Active | 17-709-00679-00 | EI 0237 | D001 | ST00BP00 | PA |
| G00981 | Active | 17-709-00699-01 | EI 0237 | D003 | ST01BP00 | PA |
| G00981 | Active | 17-709-00696-00 | EI 0237 | D004 | ST00BP00 | PA |
| G00981 | Active | 17-709-00698-01 | EI 0237 | D006 | ST01BP00 | PA |
| G00981 | Active | 17-709-40674-03 | EI 0237 | J003 | ST02BP00 | PA |
| G00981 | Active | 17-709-00740-01 | EI 0237 | E002 | ST01BP00 | TA |
| G00981 | Active | 17-709-40519-01 | EI 0237 | J001 | ST01BP00 | TA |
| G00981 | Active | 17-709-40664-01 | EI 0237 | J002 | ST01BP01 | TA |
| G00981 | Active | 17-709-40680-02 | EI 0237 | J004 | ST02BP00 | TA |
| G00981 | Active | 17-709-40969-01 | EI 0237 | J006 | ST01BP00 | TA |
| G00981 | Active | 17-709-40994-01 | EI 0237 | K002 | ST01BP00 | TA |
| G00981 | Active | 17-709-41000-00 | EI 0237 | K003 | ST00BP00 | TA |
| G00981 | Active | 17-709-41105-01 | EI 0237 | K004 | ST01BP00 | TA |
| G00981 | Active | 17-709-41246-01 | EI 0237 | K007 | ST00BP01 | TA |
| G00981 | Active | 17-709-41304-00 | EI 0237 | K008 | ST00BP00 | TA |
| G00982 | Active | 17-709-40416-01 | EI 0238 | H006 | ST01BP00 | SI |
| G00982 | Active | 17-709-40502-01 | EI 0238 | H015 | ST01BP00 | Prod |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|-------|--------------|-----|------------|------|--------|---------------------|
| G00982 | Active | 17-709-20019-00 | EI 0238 | 001 | ST00BP00 | PA |
| G00982 | Active | 17-709-40103-00 | EI 0238 | 002 | ST00BP00 | PA |
| G00982 | Active | 17-709-00640-00 | EI 0238 | A005 | ST00BP00 | PA |
| G00982 | Active | 17-709-41061-00 | EI 0238 | AA001 | ST00BP00 | PA |
| G00982 | Active | 17-709-41062-00 | EI 0238 | AA002 | ST00BP00 | PA |
| G00982 | Active | 17-709-40090-00 | EI 0238 | F002 | ST00BP00 | PA |
| G00982 | Active | 17-709-40495-00 | EI 0238 | H014 | ST00BP00 | PA |
| G00982 | Active | 17-709-00593-00 | EI 0238 | A001 | ST00BP01 | TA |
| G00982 | Active | 17-709-00594-00 | EI 0238 | A002 | ST00BP00 | TA |
| G00982 | Active | 17-709-00595-00 | EI 0238 | A003 | ST00BP01 | TA |
| G00982 | Active | 17-709-00639-00 | EI 0238 | A004 | ST00BP01 | TA |
| G00982 | Active | 17-709-00641-00 | EI 0238 | A006 | ST00BP01 | TA |
| G00982 | Active | 17-709-00763-01 | EI 0238 | E005 | ST01BP00 | TA |
| G00982 | Active | 17-709-00783-01 | EI 0238 | E006 | ST01BP00 | TA |
| G00982 | Active | 17-709-41038-01 | EI 0238 | E007 | ST01BP00 | TA |
| G00982 | Active | 17-709-41045-00 | EI 0238 | E008 | ST00BP01 | TA |
| G00982 | Active | 17-709-41292-00 | EI 0238 | E009 | ST00BP00 | TA |
| G00982 | Active | 17-709-40086-01 | EI 0238 | F005 | ST01BP00 | TA |
| G00982 | Active | 17-709-40369-01 | EI 0238 | H002 | ST01BP02 | TA |
| G00982 | Active | 17-709-40380-02 | EI 0238 | H003 | ST02BP00 | TA |
| G00982 | Active | 17-709-40390-00 | EI 0238 | H004 | ST00BP01 | TA |
| G00982 | Active | 17-709-40512-00 | EI 0238 | H016 | ST00BP00 | TA |
| G03331 | Active | 17-709-41334-00 | EI 0251 | C001 | ST00BP00 | Prod |
| G03331 | Active | 17-709-41354-01 | EI 0251 | C002 | ST01BP00 | Prod |
| G03331 | Active | 17-709-41517-00 | EI 0251 | C003 | ST00BP00 | Prod |
| G03331 | Active | 17-709-40269-01 | EI 0251 | 002 | ST01BP00 | PA |
| G03331 | Active | 17-709-40360-00 | EI 0251 | A001 | ST00BP01 | PA |
| G03331 | Active | 17-709-40365-00 | EI 0251 | A002 | ST00BP00 | PA |
| G03331 | Active | 17-709-40372-00 | EI 0251 | A003 | ST00BP01 | PA |
| G03331 | Active | 17-709-40377-00 | EI 0251 | A005 | ST00BP00 | PA |
| G03331 | Active | 17-709-40392-00 | EI 0251 | A006 | ST00BP00 | PA |
| G03331 | Active | 17-709-40398-00 | EI 0251 | A007 | ST00BP00 | PA |
| G03331 | Active | 17-709-40389-00 | EI 0251 | A008 | ST00BP00 | PA |
| G03331 | Active | 17-709-40405-00 | EI 0251 | A009 | ST00BP00 | PA |
| G03331 | Active | 17-709-40403-00 | EI 0251 | A011 | ST00BP00 | PA |
| G03331 | Active | 17-709-41004-00 | EI 0251 | B003 | ST00BP00 | PA |
| G03331 | Active | 17-709-41013-00 | EI 0251 | B005 | ST00BP00 | PA |
| G03331 | Active | 17-709-40406-01 | EI 0251 | A010 | ST01BP00 | TA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|---|---|---|---|---|---|---|
| G00983 | Active | 17-709-40093-00 | EI 0252 | F003 | ST00BP01 | Prod |
| G00983 | Active | 17-709-40326-02 | EI 0252 | G005 | ST01BP01 | Prod |
| G00983 | Active | 17-709-40265-01 | EI 0252 | H001 | ST01BP00 | SI |
| G00983 | Active | 17-709-40401-01 | EI 0252 | H005 | ST01BP00 | SI |
| G00983 | Active | 17-709-40457-01 | EI 0252 | H010 | ST01BP00 | Prod |
| G00983 | Active | 17-709-40753-01 | EI 0252 | H017 | ST01BP00 | SI |
| G00983 | Active | 17-709-41381-00 | EI 0252 | H018 | ST00BP00 | Prod |
| G00983 | Active | 17-709-40575-00 | EI 0252 | I005 | ST00BP00 | SI |
| G00983 | Active | 17-709-40603-02 | EI 0252 | I008 | ST02BP00 | SI |
| G00983 | Active | 17-709-41119-02 | EI 0252 | I009 | ST02BP00 | SI |
| G00983 | Active | 17-709-41336-01 | EI 0252 | L001 | ST01BP00 | SI |
| G00983 | Active | 17-709-41340-00 | EI 0252 | L003 | ST00BP00 | SI |
| G00983 | Active | 17-709-41342-01 | EI 0252 | L005 | ST01BP00 | SI |
| G00983 | Active | 17-709-41478-02 | EI 0252 | L008 | ST00BP02 | SI |
| G00983 | Active | 17-709-41479-03 | EI 0252 | L009 | ST01BP00 | Prod |
| G00983 | Active | 17-709-20030-00 | EI 0252 | 001 | ST00BP02 | PA |
| G00983 | Active | 17-709-40368-00 | EI 0252 | 003 | ST00BP02 | PA |
| G00983 | Active | 17-709-41199-01 | EI 0252 | 004 | ST01BP00 | PA |
| G00983 | Active | 17-709-00709-00 | EI 0252 | B001 | ST00BP00 | PA |
| G00983 | Active | 17-709-00710-01 | EI 0252 | B002 | ST01BP00 | PA |
| G00983 | Active | 17-709-00722-00 | EI 0252 | B003 | ST00BP00 | PA |
| G00983 | Active | 17-709-00718-70 | EI 0252 | B005 | ST00BP01 | PA |
| G00983 | Active | 17-709-00716-01 | EI 0252 | B006 | ST01BP00 | PA |
| G00983 | Active | 17-709-00715-00 | EI 0252 | B007 | ST00BP00 | PA |
| G00983 | Active | 17-709-00643-02 | EI 0252 | C002 | ST02BP00 | PA |
| G00983 | Active | 17-709-00654-01 | EI 0252 | C003 | ST01BP00 | PA |
| G00983 | Active | 17-709-00663-00 | EI 0252 | C004 | ST00BP00 | PA |
| G00983 | Active | 17-709-00681-02 | EI 0252 | C006 | ST02BP00 | PA |
| G00983 | Active | 17-709-00680-01 | EI 0252 | C007 | ST01BP00 | PA |
| G00983 | Active | 17-709-00707-00 | EI 0252 | C008 | ST00BP00 | PA |
| G00983 | Active | 17-709-00721-01 | EI 0252 | C010 | ST01BP00 | PA |
| G00983 | Active | 17-709-00720-01 | EI 0252 | C011 | ST01BP00 | PA |
| G00983 | Active | 17-709-00717-01 | EI 0252 | C013 | ST01BP00 | PA |
| G00983 | Active | 17-709-00719-02 | EI 0252 | C014 | ST02BP00 | PA |
| G00983 | Active | 17-709-00708-03 | EI 0252 | C016 | ST03BP00 | PA |
| G00983 | Active | 17-709-41234-00 | EI 0252 | C017 | ST00BP00 | PA |
| G00983 | Active | 17-709-41242-00 | EI 0252 | C018 | ST00BP00 | PA |
| G00983 | Active | 17-709-41257-00 | EI 0252 | C019 | ST00BP00 | PA |
| G00983 | Active | 17-709-41260-00 | EI 0252 | C020 | ST00BP00 | PA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|-------|--------------|-----|------------|------|--------|---------------------|
| G00983 | Active | 17-709-40098-70 | EI 0252 | F004 | ST00BP01 | PA |
| G00983 | Active | 17-709-40310-00 | EI 0252 | G002 | ST00BP00 | PA |
| G00983 | Active | 17-709-40291-00 | EI 0252 | G001 | ST00BP01 | TA |
| G00983 | Active | 17-709-40312-01 | EI 0252 | G003 | ST01BP00 | TA |
| G00983 | Active | 17-709-40319-01 | EI 0252 | G004 | ST01BP00 | TA |
| G00983 | Active | 17-709-40330-00 | EI 0252 | G006 | ST00BP00 | TA |
| G00983 | Active | 17-709-40341-00 | EI 0252 | G007 | ST00BP01 | TA |
| G00983 | Active | 17-709-40343-00 | EI 0252 | G008 | ST00BP01 | TA |
| G00983 | Active | 17-709-40350-01 | EI 0252 | G009 | ST01BP00 | TA |
| G00983 | Active | 17-709-40370-00 | EI 0252 | G010 | ST00BP00 | TA |
| G00983 | Active | 17-709-40391-01 | EI 0252 | G011 | ST01BP00 | TA |
| G00983 | Active | 17-709-40409-01 | EI 0252 | G012 | ST01BP00 | TA |
| G00983 | Active | 17-709-40424-00 | EI 0252 | G013 | ST00BP00 | TA |
| G00983 | Active | 17-709-40432-00 | EI 0252 | G014 | ST00BP00 | TA |
| G00983 | Active | 17-709-40437-00 | EI 0252 | G015 | ST00BP01 | TA |
| G00983 | Active | 17-709-40447-00 | EI 0252 | G016 | ST00BP00 | TA |
| G00983 | Active | 17-709-40451-00 | EI 0252 | G017 | ST00BP00 | TA |
| G00983 | Active | 17-709-40458-00 | EI 0252 | G018 | ST00BP00 | TA |
| G00983 | Active | 17-709-40421-00 | EI 0252 | H007 | ST00BP01 | TA |
| G00983 | Active | 17-709-40426-00 | EI 0252 | H008 | ST00BP00 | TA |
| G00983 | Active | 17-709-40448-01 | EI 0252 | H009 | ST01BP00 | TA |
| G00983 | Active | 17-709-40474-00 | EI 0252 | H011 | ST00BP00 | TA |
| G00983 | Active | 17-709-40476-00 | EI 0252 | H012 | ST00BP00 | TA |
| G00983 | Active | 17-709-40487-00 | EI 0252 | H013 | ST00BP00 | TA |
| G00983 | Active | 17-709-40543-01 | EI 0252 | I001 | ST01BP00 | TA |
| G00983 | Active | 17-709-40550-01 | EI 0252 | I002 | ST01BP00 | TA |
| G00983 | Active | 17-709-40560-00 | EI 0252 | I003 | ST00BP00 | TA |
| G00983 | Active | 17-709-40571-01 | EI 0252 | I004 | ST01BP00 | TA |
| G00983 | Active | 17-709-40580-01 | EI 0252 | I006 | ST01BP00 | TA |
| G00983 | Active | 17-709-40595-00 | EI 0252 | I007 | ST00BP01 | TA |
| G00983 | Active | 17-709-41285-00 | EI 0252 | I010 | ST00BP00 | TA |
| G00983 | Active | 17-709-41337-00 | EI 0252 | L002 | ST00BP00 | TA |
| G10741 | Active | 17-709-41106-00 | EI 0253 | K005 | ST00BP01 | Prod |
| G10741 | Active | 17-709-41245-01 | EI 0253 | K006 | ST01BP00 | Prod |
| G10741 | Active | 17-709-41341-01 | EI 0253 | L004 | ST01BP00 | Prod |
| G10741 | Active | 17-709-41424-00 | EI 0253 | L007 | ST00BP00 | SI |
| G10741 | Active | 17-709-40833-02 | EI 0253 | 001 | ST02BP00 | PA |
| G10741 | Active | 17-709-41163-00 | EI 0253 | A005 | ST00BP00 | PA |
| G10741 | Active | 17-709-41313-00 | EI 0253 | K009 | ST00BP00 | TA |
| G10741 | Active | 17-709-41343-00 | EI 0253 | L006 | ST00BP00 | TA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|-------|--------------|-----|------------|------|--------|---------------------|
| G07736 | Inactive | 17-709-40378-06 | EI 0262 | A004 | ST03BP00 | TA |
| G07736 | Inactive | 17-709-40848-00 | EI 0262 | A012 | ST00BP00 | TA |
| G24910 | Active | 17-710-41595-00 | EI 0275 | K001 | ST00BP00 | Prod |
| G24910 | Active | 17-710-41690-00 | EI 0275 | K002 | ST00BP00 | Prod |
| G00989 | Active | 17-710-00052-01 | EI 0276 | C002 | ST01BP00 | SI |
| G00989 | Active | 17-710-00057-01 | EI 0276 | C005 | ST01BP00 | Prod |
| G00989 | Active | 17-710-00071-02 | EI 0276 | C006 | ST01BP01 | Prod |
| G00989 | Active | 17-710-00076-01 | EI 0276 | C009 | ST01BP00 | Prod |
| G00989 | Active | 17-710-00080-03 | EI 0276 | C010 | ST01BP02 | SI |
| G00989 | Active | 17-710-41403-00 | EI 0276 | C011 | ST00BP00 | Prod |
| G00989 | Active | 17-710-40462-02 | EI 0276 | E002 | ST02BP00 | SI |
| G00989 | Active | 17-710-41015-01 | EI 0276 | E004 | ST01BP00 | SI |
| G00989 | Active | 17-710-40996-01 | EI 0276 | E007 | ST01BP00 | SI |
| G00989 | Active | 17-710-41631-01 | EI 0276 | F001 | ST01BP00 | Prod |
| G00989 | Active | 17-710-41632-01 | EI 0276 | F002 | ST01BP00 | SI |
| G00989 | Active | 17-710-41633-01 | EI 0276 | F003 | ST01BP00 | Prod |
| G00989 | Active | 17-710-41634-03 | EI 0276 | F004 | ST00BP03 | Prod |
| G00989 | Active | 17-710-41635-01 | EI 0276 | F005 | ST01BP00 | Prod |
| G00989 | Active | 17-710-41636-00 | EI 0276 | F006 | ST00BP00 | Prod |
| G00989 | Active | 17-710-41637-01 | EI 0276 | F007 | ST01BP00 | Prod |
| G00989 | Active | 17-710-41639-00 | EI 0276 | F008 | ST00BP00 | Prod |
| G00989 | Active | 17-710-41691-00 | EI 0276 | K003 | ST00BP00 | Prod |
| G00989 | Active | 17-710-00005-00 | EI 0276 | 001 | ST00BP00 | PA |
| G00989 | Active | 17-710-00006-00 | EI 0276 | 002 | ST00BP00 | PA |
| G00989 | Active | 17-710-00007-00 | EI 0276 | 003 | ST00BP00 | PA |
| G00989 | Active | 17-710-00008-00 | EI 0276 | 004 | ST00BP00 | PA |
| G00989 | Active | 17-710-00024-00 | EI 0276 | 005 | ST00BP00 | PA |
| G00989 | Active | 17-710-00056-00 | EI 0276 | 006 | ST00BP01 | PA |
| G00989 | Active | 17-710-00053-00 | EI 0276 | 007 | ST00BP00 | PA |
| G00989 | Active | 17-710-00069-00 | EI 0276 | 008 | ST00BP00 | PA |
| G00989 | Active | 17-710-00068-00 | EI 0276 | 009 | ST01BP00 | PA |
| G00989 | Active | 17-710-00015-00 | EI 0276 | A001 | ST00BP00 | PA |
| G00989 | Active | 17-710-00017-00 | EI 0276 | A002 | ST00BP00 | PA |
| G00989 | Active | 17-710-00018-00 | EI 0276 | A003 | ST00BP00 | PA |
| G00989 | Active | 17-710-00020-01 | EI 0276 | B001 | ST01BP00 | PA |
| G00989 | Active | 17-710-00026-70 | EI 0276 | B002 | ST00BP01 | PA |
| G00989 | Active | 17-710-00025-00 | EI 0276 | B003 | ST00BP01 | PA |
| G00989 | Active | 17-710-00032-01 | EI 0276 | B004 | ST01BP00 | PA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|---|---|---|---|---|---|---|
| G00989 | Active | 17-710-00033-01 | EI 0276 | B005 | ST01BP00 | PA |
| G00989 | Active | 17-710-00031-04 | EI 0276 | B006 | ST04BP00 | PA |
| G00989 | Active | 17-710-00030-00 | EI 0276 | B007 | ST00BP00 | PA |
| G00989 | Active | 17-710-00029-00 | EI 0276 | B009 | ST02BP01 | PA |
| G00989 | Active | 17-710-00046-00 | EI 0276 | B010 | ST00BP00 | PA |
| G00989 | Active | 17-710-00037-00 | EI 0276 | B011 | ST00BP00 | PA |
| G00989 | Active | 17-710-00042-00 | EI 0276 | B012 | ST00BP00 | PA |
| G00989 | Active | 17-710-00049-02 | EI 0276 | B014 | ST02BP00 | PA |
| G00989 | Active | 17-710-00045-01 | EI 0276 | B015 | ST01BP01 | PA |
| G00989 | Active | 17-710-00055-00 | EI 0276 | C001 | ST00BP00 | PA |
| G00989 | Active | 17-710-00082-00 | EI 0276 | D001 | ST00BP01 | PA |
| G00989 | Active | 17-710-00086-01 | EI 0276 | D002 | ST01BP00 | PA |
| G00989 | Active | 17-710-00095-00 | EI 0276 | D003 | ST00BP01 | PA |
| G00989 | Active | 17-710-00092-01 | EI 0276 | D004 | ST01BP01 | PA |
| G00989 | Active | 17-710-00094-02 | EI 0276 | D005 | ST02BP00 | PA |
| G00989 | Active | 17-710-00097-01 | EI 0276 | D006 | ST01BP00 | PA |
| G00989 | Active | 17-710-41300-00 | EI 0276 | D007 | ST00BP01 | PA |
| G00989 | Active | 17-710-41450-00 | EI 0276 | D008 | ST00BP00 | PA |
| G00989 | Active | 17-710-41451-00 | EI 0276 | D009 | ST00BP01 | PA |
| G00989 | Active | 17-710-41470-04 | EI 0276 | D010 | ST02BP02 | PA |
| G00989 | Active | 17-710-41474-02 | EI 0276 | D011 | ST02BP00 | PA |
| G00989 | Active | 17-710-00058-00 | EI 0276 | C003 | ST00BP00 | TA |
| G00989 | Active | 17-710-00054-00 | EI 0276 | C004 | ST01BP00 | TA |
| G00989 | Active | 17-710-00066-00 | EI 0276 | C007 | ST00BP00 | TA |
| G00989 | Active | 17-710-00067-01 | EI 0276 | C008 | ST01BP00 | TA |
| G00989 | Active | 17-710-40461-00 | EI 0276 | E001 | ST00BP00 | TA |
| G00989 | Active | 17-710-40599-01 | EI 0276 | E003 | ST01BP00 | TA |
| G00989 | Active | 17-710-41021-00 | EI 0276 | E005 | ST00BP01 | TA |
| G00989 | Active | 17-710-41026-01 | EI 0276 | E006 | ST01BP01 | TA |
| G00989 | Active | 17-710-41389-00 | EI 0276 | E008 | ST00BP00 | TA |
| G02111 | Active | 17-710-40217-01 | EI 0314 | A001 | ST01BP00 | Prod |
| G02111 | Active | 17-710-40295-03 | EI 0314 | A005 | ST03BP00 | SI |
| G02111 | Active | 17-710-40297-00 | EI 0314 | A006 | ST00BP00 | Prod |
| G02111 | Active | 17-710-40465-00 | EI 0314 | A008 | ST00BP00 | Prod |
| G02111 | Active | 17-710-40334-02 | EI 0314 | A009 | ST02BP00 | Prod |
| G02111 | Active | 17-710-40686-01 | EI 0314 | B007 | ST01BP00 | Prod |
| G02111 | Active | 17-710-40719-00 | EI 0314 | B013 | ST00BP00 | Prod |
| G02111 | Active | 17-710-40661-00 | EI 0314 | B018 | ST00BP00 | Prod |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|-------|--------------|-----|------------|------|--------|---------------------|
| G02111 | Active | 17-710-40729-00 | EI 0314 | B019 | ST00BP00 | Prod |
| G02111 | Active | 17-710-41031-01 | EI 0314 | B025 | ST01BP00 | Prod |
| G33636 | Active | 17-710-40928-06 | EI 0314 | C001 | ST05BP01 | Prod |
| G02111 | Active | 17-710-40920-04 | EI 0314 | C002 | ST04BP00 | Prod |
| G02111 | Active | 17-710-40968-02 | EI 0314 | C003 | ST02BP00 | SI |
| G02111 | Active | 17-710-40929-03 | EI 0314 | C004 | ST02BP00 | Prod |
| G02111 | Active | 17-710-40941-03 | EI 0314 | C005 | ST03BP00 | Prod |
| G33636 | Active | 17-710-40961-03 | EI 0314 | C006 | ST03BP00 | Prod |
| G02111 | Active | 17-710-40973-03 | EI 0314 | C007 | ST02BP01 | Prod |
| G33636 | Active | 17-710-41101-05 | EI 0314 | C008 | ST03BP00 | Prod |
| G33636 | Active | 17-710-40993-03 | EI 0314 | C009 | ST03BP00 | Prod |
| G02111 | Active | 17-710-40999-06 | EI 0314 | C010 | ST05BP00 | Prod |
| G02111 | Active | 17-710-41114-01 | EI 0314 | C011 | ST01BP00 | Prod |
| G02111 | Active | 17-710-41083-04 | EI 0314 | C012 | ST04BP00 | Prod |
| G02111 | Active | 17-710-40982-03 | EI 0314 | C013 | ST02BP01 | SI |
| G33636 | Active | 17-710-41663-00 | EI 0314 | C014 | ST00BP00 | Prod |
| G33636 | Active | 17-710-41665-00 | EI 0314 | C015 | ST00BP00 | Prod |
| G33636 | Active | 17-710-41668-00 | EI 0314 | C016 | ST00BP00 | Prod |
| G02111 | Active | 17-710-41125-03 | EI 0314 | C017 | ST02BP01 | Prod |
| G33636 | Active | 17-710-41671-00 | EI 0314 | C018 | ST00BP00 | Prod |
| G33636 | Active | 17-710-41675-00 | EI 0314 | C019 | ST00BP00 | Prod |
| G33636 | Active | 17-710-41677-01 | EI 0314 | C020 | ST00BP01 | Prod |
| G33636 | Active | 17-710-41680-00 | EI 0314 | C021 | ST00BP00 | Prod |
| G33636 | Active | 17-710-41683-00 | EI 0314 | C022 | ST00BP00 | Prod |
| G33636 | Active | 17-710-41684-00 | EI 0314 | C023 | ST00BP00 | Prod |
| G33636 | Active | 17-710-41686-00 | EI 0314 | C024 | ST00BP00 | Prod |
| G02111 | Active | 17-710-40020-00 | EI 0314 | 001 | ST00BP00 | PA |
| G33636 | Active | 17-710-41654-05 | EI 0314 | 001 | ST04BP00 | PA |
| G02111 | Active | 17-710-40231-00 | EI 0314 | A003 | ST00BP00 | PA |
| G02111 | Active | 17-710-40268-00 | EI 0314 | A004 | ST00BP00 | PA |
| G02111 | Active | 17-710-40496-00 | EI 0314 | A014 | ST00BP00 | PA |
| G02111 | Active | 17-710-40484-02 | EI 0314 | A022 | ST02BP00 | PA |
| G02111 | Active | 17-710-40643-00 | EI 0314 | B006 | ST00BP00 | PA |
| G02111 | Active | 17-710-40608-00 | EI 0314 | B008 | ST00BP00 | PA |
| G02111 | Active | 17-710-40687-01 | EI 0314 | B015 | ST01BP01 | PA |
| G02111 | Active | 17-710-40709-01 | EI 0314 | B016 | ST01BP00 | PA |
| G02111 | Active | 17-710-40648-00 | EI 0314 | B017 | ST00BP00 | PA |
| G02111 | Active | 17-710-40959-00 | EI 0314 | B020 | ST00BP01 | PA |
| G02111 | Active | 17-710-41033-01 | EI 0314 | B022 | ST01BP00 | PA |
| G02111 | Active | 17-710-40232-00 | EI 0314 | A002 | ST00BP00 | TA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|---|---|---|---|---|---|---|
| G02111 | Active | 17-710-40385-02 | EI 0314 | A007 | ST02BP00 | TA |
| G02111 | Active | 17-710-40556-00 | EI 0314 | A023 | ST00BP00 | TA |
| G02111 | Active | 17-710-41013-00 | EI 0314 | B023 | ST00BP00 | TA |
| G02112 | Active | 17-710-40990-01 | EI 0315 | A001 | ST01BP00 | SI |
| G02112 | Active | 17-710-40998-00 | EI 0315 | A005 | ST00BP00 | SI |
| G02112 | Active | 17-710-41030-01 | EI 0315 | A007 | ST01BP00 | SI |
| G02112 | Active | 17-710-41037-00 | EI 0315 | A010 | ST00BP03 | SI |
| G02112 | Active | 17-710-41040-00 | EI 0315 | A012 | ST00BP00 | SI |
| G02112 | Active | 17-710-41270-00 | EI 0315 | A016 | ST00BP00 | SI |
| G02112 | Active | 17-710-40806-00 | EI 0315 | 001 | ST00BP00 | PA |
| G02112 | Active | 17-710-40829-00 | EI 0315 | 002 | ST00BP00 | PA |
| G02112 | Active | 17-710-40857-00 | EI 0315 | 003 | ST00BP00 | PA |
| G02112 | Active | 17-710-40881-00 | EI 0315 | 004 | ST00BP00 | PA |
| G02112 | Active | 17-710-40942-01 | EI 0315 | 005 | ST01BP00 | PA |
| G02112 | Active | 17-710-40995-00 | EI 0315 | A003 | ST00BP00 | TA |
| G02112 | Active | 17-710-41017-00 | EI 0315 | A006 | ST00BP00 | TA |
| G02112 | Active | 17-710-41520-00 | EI 0315 | A017 | ST00BP00 | TA |
| G05040 | Active | 17-710-41076-01 | EI 0316 | A013 | ST01BP00 | SI |
| G34823 | Inactive | 17-710-41591-00 | EI 0320 | B001 | ST00BP00 | TA |
| G02613 | Active | 17-710-40497-00 | EI 0332 | A011 | ST00BP00 | Prod |
| G02613 | Active | 17-710-40565-02 | EI 0332 | B004 | ST02BP00 | Prod |
| G02613 | Active | 17-710-40666-00 | EI 0332 | 001 | ST00BP00 | PA |
| G02613 | Active | 17-710-40440-00 | EI 0332 | A017 | ST00BP01 | PA |
| G02613 | Active | 17-710-41534-01 | EI 0332 | A021 | ST00BP01 | PA |
| G02613 | Active | 17-710-40563-00 | EI 0332 | A024 | ST00BP00 | PA |
| G02613 | Active | 17-710-40534-70 | EI 0332 | B001 | ST00BP01 | PA |
| G02613 | Active | 17-710-40562-00 | EI 0332 | B003 | ST00BP00 | PA |
| G02613 | Active | 17-710-40669-00 | EI 0332 | B005 | ST00BP00 | PA |
| G02613 | Active | 17-710-40616-00 | EI 0332 | B009 | ST00BP00 | PA |
| G02613 | Active | 17-710-40614-00 | EI 0332 | B010 | ST00BP01 | PA |
| G02613 | Active | 17-710-40723-00 | EI 0332 | B011 | ST00BP00 | PA |
| G02613 | Active | 17-710-40621-00 | EI 0332 | B012 | ST00BP00 | PA |
| G02613 | Active | 17-710-40395-00 | EI 0332 | A016 | ST00BP00 | TA |
| G02613 | Active | 17-710-40558-00 | EI 0332 | B002 | ST00BP00 | TA |
| G02613 | Active | 17-710-40986-00 | EI 0332 | B024 | ST00BP01 | TA |
| G02118 | Active | 17-710-41642-05 | EI 0338 | K001 | ST03BP00 | Prod |
| G02118 | Active | 17-710-41656-02 | EI 0338 | K003 | ST02BP00 | Prod |
| G02118 | Active | 17-710-41658-00 | EI 0338 | K005 | ST00BP00 | Prod |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|---|---|---|---|---|---|---|
| G02118 | Active | 17-710-41659-00 | EI 0338 | K006 | ST00BP00 | Prod |
| G02118 | Active | 17-710-41664-01 | EI 0338 | K007 | ST01BP00 | Prod |
| G02118 | Active | 17-710-41666-01 | EI 0338 | K008 | ST01BP00 | Prod |
| G02118 | Active | 17-710-41661-02 | EI 0338 | K009 | ST01BP00 | Prod |
| G02118 | Active | 17-710-41670-01 | EI 0338 | K010 | ST01BP00 | Prod |
| G02118 | Active | 17-710-41673-00 | EI 0338 | K012 | ST00BP00 | SI |
| G02118 | Active | 17-710-41674-00 | EI 0338 | K013 | ST00BP00 | Prod |
| G02118 | Active | 17-710-41685-01 | EI 0338 | K014 | ST01BP00 | Prod |
| G02118 | Active | 17-710-41679-01 | EI 0338 | K016 | ST01BP00 | Prod |
| G02118 | Active | 17-710-41678-00 | EI 0338 | K017 | ST00BP00 | Prod |
| G02118 | Active | 17-710-41676-01 | EI 0338 | K018 | ST01BP00 | Prod |
| G02118 | Active | 17-710-41681-00 | EI 0338 | K019 | ST00BP00 | Prod |
| G02118 | Active | 17-710-41682-00 | EI 0338 | K020 | ST00BP00 | Prod |
| G02118 | Active | 17-710-40035-00 | EI 0338 | 002 | ST00BP00 | PA |
| G02118 | Active | 17-710-40034-00 | EI 0338 | 003 | ST00BP00 | PA |
| G02118 | Active | 17-710-40137-00 | EI 0338 | 004 | ST00BP00 | PA |
| G02118 | Active | 17-710-41060-00 | EI 0338 | 005 | ST00BP00 | PA |
| G02118 | Active | 17-710-41613-00 | EI 0338 | 006 | ST00BP00 | PA |
| G02118 | Active | 17-710-40028-00 | EI 0338 | A001 | ST00BP00 | PA |
| G02118 | Active | 17-710-40069-00 | EI 0338 | A002 | ST00BP00 | PA |
| G02118 | Active | 17-710-40070-00 | EI 0338 | A003 | ST00BP00 | PA |
| G02118 | Active | 17-710-40071-02 | EI 0338 | A004 | ST01BP01 | PA |
| G02118 | Active | 17-710-40072-03 | EI 0338 | A005 | ST03BP00 | PA |
| G02118 | Active | 17-710-40104-04 | EI 0338 | A006 | ST04BP00 | PA |
| G02118 | Active | 17-710-40106-01 | EI 0338 | A007 | ST01BP00 | PA |
| G02118 | Active | 17-710-40146-01 | EI 0338 | A008 | ST02BP00 | PA |
| G02118 | Active | 17-710-40173-02 | EI 0338 | A010 | ST02BP00 | PA |
| G02118 | Active | 17-710-40177-00 | EI 0338 | A011 | ST00BP00 | PA |
| G02118 | Active | 17-710-40199-01 | EI 0338 | A012 | ST01BP00 | PA |
| G02118 | Active | 17-710-40212-00 | EI 0338 | A013 | ST00BP01 | PA |
| G02118 | Active | 17-710-40198-01 | EI 0338 | A014 | ST01BP01 | PA |
| G02118 | Active | 17-710-40218-01 | EI 0338 | A015 | ST01BP00 | PA |
| G02118 | Active | 17-710-40172-01 | EI 0338 | A017 | ST01BP00 | PA |
| G02118 | Active | 17-710-40226-01 | EI 0338 | A018 | ST01BP00 | PA |
| G02118 | Active | 17-710-40350-00 | EI 0338 | A019 | ST00BP01 | PA |
| G02118 | Active | 17-710-40837-00 | EI 0338 | A020 | ST00BP00 | PA |
| G02118 | Active | 17-710-41293-03 | EI 0338 | A021 | ST03BP00 | PA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|-------|-------------|-----|-----------|------|--------|--------------------|
| G02118 | Active | 17-710-40249-01 | EI 0338 | B001 | ST01BP00 | PA |
| G02118 | Active | 17-710-40273-01 | EI 0338 | B006 | ST01BP02 | PA |
| G02118 | Active | 17-710-40351-00 | EI 0338 | B011 | ST00BP00 | PA |
| G02118 | Active | 17-710-40343-06 | EI 0338 | B012 | ST06BP00 | PA |
| G02118 | Active | 17-710-40381-01 | EI 0338 | B014 | ST01BP00 | PA |
| G02118 | Active | 17-710-40380-00 | EI 0338 | B015 | ST00BP00 | PA |
| G02118 | Active | 17-710-40404-01 | EI 0338 | B017 | ST01BP00 | PA |
| G02118 | Active | 17-710-40420-02 | EI 0338 | B018 | ST02BP00 | PA |
| G02118 | Active | 17-710-40426-01 | EI 0338 | B019 | ST01BP00 | PA |
| G02318 | Active | 17-710-41655-01 | EI 0339 | K002 | ST00BP01 | Prod |
| G02318 | Active | 17-710-41657-03 | EI 0339 | K004 | ST00BP03 | Prod |
| G02318 | Active | 17-710-41672-00 | EI 0339 | K011 | ST00BP00 | Prod |
| G02318 | Active | 17-710-41660-03 | EI 0339 | K015 | ST03BP00 | Prod |
| G02318 | Active | 17-710-40184-00 | EI 0339 | 001 | ST00BP00 | PA |
| G02318 | Active | 17-710-40298-00 | EI 0339 | 002 | ST00BP00 | PA |
| G02318 | Active | 17-710-40272-02 | EI 0339 | B002 | ST02BP00 | PA |
| G02318 | Active | 17-710-40278-01 | EI 0339 | B003 | ST01BP00 | PA |
| G02318 | Active | 17-710-40283-00 | EI 0339 | B004 | ST00BP00 | PA |
| G02318 | Active | 17-710-40262-01 | EI 0339 | B005 | ST01BP00 | PA |
| G02318 | Active | 17-710-40333-03 | EI 0339 | B007 | ST03BP00 | PA |
| G02318 | Active | 17-710-40327-00 | EI 0339 | B008 | ST00BP00 | PA |
| G02318 | Active | 17-710-40358-01 | EI 0339 | B009 | ST01BP00 | PA |
| G02318 | Active | 17-710-40383-00 | EI 0339 | B013 | ST00BP00 | PA |
| G02318 | Active | 17-710-40405-02 | EI 0339 | B016 | ST02BP00 | PA |
| G02318 | Active | 17-710-40419-00 | EI 0339 | C001 | ST00BP00 | PA |
| G02318 | Active | 17-710-40460-00 | EI 0339 | C002 | ST00BP01 | PA |
| G02318 | Active | 17-710-40486-00 | EI 0339 | C003 | ST00BP00 | PA |
| G02318 | Active | 17-710-40467-00 | EI 0339 | C004 | ST00BP00 | PA |
| G02318 | Active | 17-710-40472-00 | EI 0339 | C005 | ST00BP01 | PA |
| G02318 | Active | 17-710-40481-00 | EI 0339 | C006 | ST00BP00 | PA |
| G02318 | Active | 17-710-40513-01 | EI 0339 | C009 | ST01BP01 | PA |
| G02318 | Active | 17-710-40546-00 | EI 0339 | C011 | ST00BP01 | PA |
| G02318 | Active | 17-710-40577-00 | EI 0339 | C012 | ST00BP00 | PA |
| G02318 | Active | 17-710-40524-01 | EI 0339 | C013 | ST01BP00 | PA |
| G02318 | Active | 17-710-40526-01 | EI 0339 | C014 | ST01BP01 | PA |
| G02318 | Active | 17-710-40564-00 | EI 0339 | C015 | ST00BP00 | PA |
| G02318 | Active | 17-710-40580-00 | EI 0339 | C016 | ST00BP00 | PA |
| G02318 | Active | 17-710-41488-01 | EI 0339 | C017 | ST01BP00 | PA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|---|---|---|---|---|---|---|
| G02318 | Active | 17-710-41486-00 | EI 0339 | C018 | ST00BP00 | PA |
| G02318 | Active | 17-710-41492-01 | EI 0339 | C019 | ST00BP01 | PA |
| G02318 | Active | 17-710-41570-00 | EI 0339 | C020 | ST00BP00 | PA |
| G02318 | Active | 17-710-41571-00 | EI 0339 | C021 | ST00BP00 | PA |
| G02914 | Active | 17-710-40764-01 | EI 0341 | A001 | ST01BP00 | Prod |
| G02914 | Active | 17-710-40802-03 | EI 0341 | A003 | ST02BP00 | Prod |
| G02914 | Active | 17-710-40818-02 | EI 0341 | A005 | ST02BP00 | Prod |
| G02914 | Active | 17-710-40868-02 | EI 0341 | A008 | ST01BP01 | Prod |
| G02914 | Active | 17-710-40883-02 | EI 0341 | A010 | ST02BP00 | Prod |
| G02914 | Active | 17-710-40901-01 | EI 0341 | A011 | ST01BP00 | Prod |
| G02914 | Active | 17-710-40924-02 | EI 0341 | A013 | ST02BP00 | Prod |
| G02914 | Active | 17-710-41404-04 | EI 0341 | A014 | ST03BP00 | Prod |
| G02914 | Active | 17-710-41487-01 | EI 0341 | A015 | ST01BP00 | Prod |
| G02914 | Active | 17-710-41489-01 | EI 0341 | A016 | ST01BP00 | Prod |
| G02914 | Active | 17-710-41494-01 | EI 0341 | A017 | ST01BP00 | Prod |
| G02914 | Active | 17-710-41687-00 | EI 0341 | A018 | ST00BP00 | Prod |
| G02914 | Active | 17-710-41688-01 | EI 0341 | A019 | ST00BP01 | Prod |
| G02914 | Active | 17-710-41689-00 | EI 0341 | A020 | ST00BP00 | Prod |
| G02914 | Active | 17-710-40483-00 | EI 0341 | 001 | ST00BP01 | PA |
| G02914 | Active | 17-710-40630-00 | EI 0341 | 002 | ST00BP00 | PA |
| G02914 | Active | 17-710-40640-00 | EI 0341 | 003 | ST00BP00 | PA |
| G02914 | Active | 17-710-40650-00 | EI 0341 | 004 | ST00BP00 | PA |
| G02914 | Active | 17-710-40692-00 | EI 0341 | 005 | ST00BP00 | PA |
| G02914 | Active | 17-710-41537-01 | EI 0341 | 006 | ST00BP01 | PA |
| G02914 | Active | 17-710-40827-01 | EI 0341 | A006 | ST01BP00 | PA |
| G02914 | Active | 17-710-40879-00 | EI 0341 | A009 | ST00BP02 | PA |
| G02914 | Active | 17-710-40796-01 | EI 0341 | A002 | ST00BP01 | TA |
| G02914 | Active | 17-710-40807-00 | EI 0341 | A004 | ST00BP00 | TA |
| G02914 | Active | 17-710-40853-00 | EI 0341 | A007 | ST00BP00 | TA |
| G02914 | Active | 17-710-40915-00 | EI 0341 | A012 | ST00BP00 | TA |
| G14482 | Active | 17-710-41617-00 | EI 0346 | B001 | ST00BP00 | TA |
| G14482 | Active | 17-710-41627-00 | EI 0346 | B002 | ST00BP00 | TA |
| G14482 | Active | 17-710-41628-00 | EI 0346 | B003 | ST00BP00 | TA |
| G03228 | Active | 42-708-40076-00 | GA 0180 | A017 | ST00BP00 | Prod |
| G03229 | Active | 42-706-40296-02 | GA 0192 | A003 | ST02BP00 | Prod |
| G03229 | Active | 42-706-40403-01 | GA 0192 | B003 | ST01BP00 | TA |
| G06093 | Active | 42-706-40292-00 | GA 0209 | A002 | ST00BP01 | Prod |
| G06093 | Active | 42-706-40297-00 | GA 0209 | A004 | ST00BP00 | SI |
| G06093 | Active | 42-706-40365-01 | GA 0209 | A005 | ST01BP00 | Prod |
| G06093 | Active | 42-706-40370-00 | GA 0209 | A006 | ST00BP00 | Prod |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|---|---|---|---|---|---|---|
| G06093 | Active | 42-706-40396-00 | GA 0209 | B001 | ST00BP00 | Prod |
| G06093 | Active | 42-706-40418-00 | GA 0209 | B006 | ST00BP00 | Prod |
| G06093 | Active | 42-706-40419-01 | GA 0209 | B007 | ST01BP00 | Prod |
| G06093 | Active | 42-706-40425-00 | GA 0209 | B008 | ST00BP00 | Prod |
| G06093 | Active | 42-706-40427-00 | GA 0209 | B009 | ST00BP00 | Prod |
| G06093 | Active | 42-706-40429-00 | GA 0209 | B010 | ST00BP00 | Prod |
| G06093 | Active | 42-706-40120-00 | GA 0209 | A001 | ST00BP00 | PA |
| G06093 | Active | 42-706-40400-00 | GA 0209 | B002 | ST00BP00 | PA |
| G06093 | Active | 42-706-40404-00 | GA 0209 | B004 | ST00BP00 | PA |
| G03236 | Active | 42-708-40055-00 | HI 0179 | A001 | ST00BP00 | Prod |
| G03237 | Active | 42-706-40406-00 | HI 0193 | B005 | ST00BP00 | Prod |
| G02705 | Active | 42-709-40955-01 | HI A0547 | B001 | ST01BP00 | Prod |
| G02705 | Active | 42-709-40959-01 | HI A0547 | B002 | ST01BP00 | Prod |
| G02705 | Active | 42-709-40980-01 | HI A0547 | B004 | ST01BP00 | Prod |
| G02705 | Active | 42-709-41168-01 | HI A0547 | C001 | ST00BP01 | Prod |
| G02705 | Active | 42-709-41172-00 | HI A0547 | C002 | ST00BP00 | Prod |
| G02705 | Active | 42-709-40950-00 | HI A0547 | 001 | ST00BP00 | PA |
| G02705 | Active | 42-709-40415-00 | HI A0547 | A002 | ST00BP00 | PA |
| G02705 | Active | 42-709-40523-00 | HI A0547 | A009 | ST00BP00 | PA |
| G02705 | Active | 42-709-40906-00 | HI A0547 | A012 | ST00BP00 | PA |
| G02705 | Active | 42-709-40978-00 | HI A0547 | 005 | ST00BP00 | TA |
| G02705 | Active | 42-709-40983-00 | HI A0547 | B005 | ST00BP00 | TA |
| G02705 | Active | 42-709-41001-01 | HI A0547 | B006 | ST01BP00 | TA |
| G02705 | Active | 42-709-41005-00 | HI A0547 | B007 | ST00BP00 | TA |
| G27264 | Inactive | 17-722-40235-02 | MC 0147 | A017 | ST01BP01 | TA |
| G26241 | Inactive | 17-722-40190-03 | MC 0191 | A008 | ST02BP01 | TA |
| G26241 | Inactive | 17-722-40194-01 | MC 0191 | A009 | ST01BP00 | TA |
| G26241 | Inactive | 17-722-40237-01 | MC 0191 | A019 | ST00BP01 | TA |
| G02968 | Active | 60-817-40109-01 | MC 0311 | A006 | ST01BP00 | Prod |
| G02968 | Active | 60-817-40339-01 | MC 0311 | A020 | ST01BP00 | Prod |
| G18292 | Active | 60-817-41406-00 | MC 0800 | 002 | ST00BP00 | Prod |
| G18292 | Active | 60-817-41127-01 | MC 0800 | SS001 | ST00BP00 | Prod |
| G03197 | Active | 17-725-40834-00 | MP 0120 | A001 | ST00BP00 | Prod |
| G03197 | Active | 17-725-40836-00 | MP 0120 | A002 | ST00BP00 | SI |
| G03197 | Active | 17-725-40132-01 | MP 0120 | CA001 | ST01BP00 | Prod |
| G03197 | Active | 17-725-40535-01 | MP 0120 | CA005 | ST01BP00 | SI |
| G03197 | Active | 17-725-40302-00 | MP 0120 | 005 | ST00BP00 | PA |
| G03197 | Active | 17-725-40164-00 | MP 0120 | CA002 | ST00BP00 | TA |
| G03197 | Active | 17-725-40177-00 | MP 0120 | CA003 | ST00BP00 | TA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|-------|--------------|-----|------------|------|--------|---------------------|
| G03197 | Active | 17-725-40611-00 | MP 0120 | CE001 | ST00BP00 | TA |
| G03197 | Active | 17-725-40644-00 | MP 0120 | CE002 | ST00BP00 | TA |
| G23969 | Active | 17-725-40166-01 | MP 0121 | CA004 | ST01BP00 | SI |
| G13964 | Active | 17-724-40938-00 | MP 0122 | E001 | ST00BP00 | Prod |
| G13964 | Active | 17-724-40952-03 | MP 0122 | E002 | ST02BP00 | SI |
| G13964 | Active | 17-725-40870-00 | MP 0122 | 002 | ST00BP00 | PA |
| G12088 | Active | 17-725-40574-00 | MP 0123 | A001 | ST00BP00 | SI |
| G12088 | Active | 17-725-40576-00 | MP 0123 | A002 | ST00BP00 | SI |
| G12088 | Active | 17-725-40594-00 | MP 0123 | A003 | ST00BP00 | SI |
| G12088 | Active | 17-725-40595-00 | MP 0123 | A004 | ST00BP00 | Prod |
| G12088 | Active | 17-725-40689-00 | MP 0123 | A005 | ST00BP00 | Prod |
| G12088 | Active | 17-725-40690-00 | MP 0123 | A006 | ST00BP00 | Prod |
| G33128 | Inactive | 17-724-40951-00 | MP 0206 | D003 | ST00BP00 | SI |
| G02955 | Active | 17-724-40936-00 | MP 0236 | D001 | ST00BP00 | Prod |
| G02955 | Active | 17-724-40949-02 | MP 0236 | D002 | ST01BP01 | SI |
| G02955 | Active | 17-724-40950-00 | MP 0236 | D004 | ST00BP00 | SI |
| G02955 | Active | 17-724-40953-00 | MP 0236 | E003 | ST00BP00 | SI |
| G14535 | Inactive | 17-713-40250-03 | PL 0025 | 006 | ST03BP00 | SI |
| G14535 | Inactive | 17-713-40243-03 | PL 0025 | 005 | ST02BP00 | TA |
| G14535 | Inactive | 17-713-40198-00 | PL 0025 | JA001 | ST00BP00 | TA |
| G24878 | Active | 17-708-40924-03 | SM 0192 | A002 | ST03BP00 | Prod |
| G24878 | Active | 17-708-40930-02 | SM 0192 | A003 | ST01BP01 | Prod |
| G24878 | Active | 17-708-40759-01 | SM 0192 | A001 | ST01BP00 | TA |
| G26144 | Active | 17-722-40197-02 | SP 0074 | A010 | ST02BP00 | TA |
| G26144 | Active | 17-722-40199-06 | SP 0074 | A012 | ST06BP00 | TA |
| G26144 | Active | 17-722-40236-02 | SP 0074 | A015 | ST01BP00 | TA |
| G05685 | Inactive | 17-722-40191-05 | SP 0082 | A011 | ST02BP01 | TA |
| G05685 | Inactive | 17-722-40239-00 | SP 0082 | A021 | ST00BP00 | TA |
| G05685 | Inactive | 17-722-40238-01 | SP 0082 | A020 | ST00BP01 | TA |
| G05052 | Inactive | 17-722-40185-01 | SP 0083 | A001 | ST00BP00 | TA |
| G05052 | Inactive | 17-722-40186-02 | SP 0083 | A002 | ST02BP00 | TA |
| G05052 | Inactive | 17-722-40187-00 | SP 0083 | A003 | ST00BP00 | TA |
| G05052 | Inactive | 17-722-40189-02 | SP 0083 | A004 | ST02BP00 | TA |
| G05052 | Inactive | 17-722-40188-01 | SP 0083 | A005 | ST01BP00 | TA |
| G05052 | Inactive | 17-722-40193-01 | SP 0083 | A006 | ST01BP00 | TA |
| G05052 | Inactive | 17-722-40196-00 | SP 0083 | A007 | ST00BP00 | TA |
| G05052 | Inactive | 17-722-40198-00 | SP 0083 | A013 | ST00BP00 | TA |
| G05052 | Inactive | 17-722-40232-00 | SP 0083 | A014 | ST00BP00 | TA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|---|---|---|---|---|---|---|
| G05052 | Inactive | 17-722-40233-00 | SP 0083 | A016 | ST00BP00 | TA |
| G03336 | Active | 17-715-41168-00 | ST 0035 | 007 | ST00BP00 | Prod |
| G03336 | Active | 17-715-40275-02 | ST 0035 | D007 | ST02BP00 | SI |
| G03336 | Active | 17-715-40776-02 | ST 0035 | D018 | ST02BP00 | SI |
| G03336 | Active | 17-715-40767-02 | ST 0035 | D019 | ST02BP00 | SI |
| G03336 | Active | 17-715-40705-00 | ST 0035 | 003 | ST00BP00 | PA |
| G03336 | Active | 17-715-40664-00 | ST 0035 | 005 | ST00BP00 | PA |
| G03336 | Active | 17-715-40668-00 | ST 0035 | 006 | ST00BP00 | PA |
| G03336 | Active | 17-715-40229-02 | ST 0035 | D004 | ST02BP00 | PA |
| G03336 | Active | 17-715-40253-00 | ST 0035 | D005 | ST00BP00 | PA |
| G03336 | Active | 17-715-40200-02 | ST 0035 | D006 | ST02BP00 | PA |
| G03336 | Active | 17-715-40316-01 | ST 0035 | D011 | ST01BP00 | PA |
| G03336 | Active | 17-715-40332-00 | ST 0035 | D012 | ST00BP00 | PA |
| G03336 | Active | 17-715-40348-00 | ST 0035 | D013 | ST00BP01 | PA |
| G03336 | Active | 17-715-40380-00 | ST 0035 | D015 | ST00BP00 | PA |
| G03336 | Active | 17-715-40386-00 | ST 0035 | D016 | ST00BP00 | PA |
| G03336 | Active | 17-715-40410-00 | ST 0035 | D017 | ST00BP01 | PA |
| G03336 | Active | 17-715-41088-00 | ST 0035 | EZ007 | ST00BP00 | PA |
| G03336 | Active | 17-715-41090-02 | ST 0035 | EZ008 | ST00BP02 | PA |
| G03336 | Active | 17-715-40137-00 | ST 0035 | D001 | ST00BP00 | TA |
| G03336 | Active | 17-715-40188-00 | ST 0035 | D002 | ST00BP00 | TA |
| G03336 | Active | 17-715-40304-00 | ST 0035 | D009 | ST00BP00 | TA |
| G03336 | Active | 17-715-40296-01 | ST 0035 | D010 | ST01BP00 | TA |
| G03336 | Active | 17-715-40367-02 | ST 0035 | D014 | ST01BP01 | TA |
| G03336 | Active | 17-715-40148-00 | ST 0035 | E001 | ST00BP00 | TA |
| G03336 | Active | 17-715-40206-00 | ST 0035 | E002 | ST00BP00 | TA |
| G03336 | Active | 17-715-40220-00 | ST 0035 | E003 | ST00BP00 | TA |
| G03336 | Active | 17-715-40232-00 | ST 0035 | E004 | ST00BP00 | TA |
| G03336 | Active | 17-715-40278-00 | ST 0035 | E006 | ST00BP00 | TA |
| G02624 | Active | 17-715-41174-03 | ST 0036 | 002 | ST03BP00 | SI |
| G02624 | Active | 17-715-40100-01 | ST 0036 | B001 | ST01BP00 | SI |
| G02624 | Active | 17-715-40237-01 | ST 0036 | B006 | ST01BP00 | Prod |
| G02624 | Active | 17-715-40289-01 | ST 0036 | B009 | ST01BP00 | Prod |
| G02624 | Active | 17-715-41020-00 | ST 0036 | B021 | ST00BP00 | SI |
| G02624 | Active | 17-715-40099-00 | ST 0036 | 001 | ST00BP00 | PA |
| G02624 | Active | 17-715-40187-00 | ST 0036 | B004 | ST00BP00 | PA |
| G02624 | Active | 17-715-40212-00 | ST 0036 | B005 | ST00BP00 | PA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|---|---|---|---|---|---|---|
| G02624 | Active | 17-715-40259-00 | ST 0036 | B007 | ST00BP01 | PA |
| G02624 | Active | 17-715-40272-00 | ST 0036 | B008 | ST00BP00 | PA |
| G02624 | Active | 17-715-40306-03 | ST 0036 | B010 | ST01BP02 | PA |
| G02624 | Active | 17-715-40322-00 | ST 0036 | B011 | ST00BP00 | PA |
| G02624 | Active | 17-715-40330-01 | ST 0036 | B014 | ST01BP00 | PA |
| G02624 | Active | 17-715-40368-01 | ST 0036 | B015 | ST01BP00 | PA |
| G02624 | Active | 17-715-40374-00 | ST 0036 | B016 | ST00BP00 | PA |
| G02624 | Active | 17-715-40403-00 | ST 0036 | B017 | ST00BP00 | PA |
| G02624 | Active | 17-715-40363-00 | ST 0036 | G001 | ST00BP00 | PA |
| G02624 | Active | 17-715-40473-00 | ST 0036 | G002 | ST00BP00 | PA |
| G02624 | Active | 17-715-40487-00 | ST 0036 | G004 | ST00BP00 | PA |
| G02624 | Active | 17-715-40144-00 | ST 0036 | B002 | ST00BP02 | TA |
| G02624 | Active | 17-715-40142-00 | ST 0036 | B003 | ST00BP01 | TA |
| G02624 | Active | 17-715-40342-01 | ST 0036 | B013 | ST01BP00 | TA |
| G02624 | Active | 17-715-40433-01 | ST 0036 | B018 | ST01BP00 | TA |
| G02624 | Active | 17-715-41131-00 | ST 0036 | B019 | ST00BP00 | TA |
| G02624 | Active | 17-715-41132-00 | ST 0036 | B020 | ST00BP00 | TA |
| G02625 | Active | 17-715-40086-01 | ST 0037 | A001 | ST01BP00 | SI |
| G02625 | Active | 17-715-40111-01 | ST 0037 | A002 | ST01BP00 | Prod |
| G02625 | Active | 17-715-40140-02 | ST 0037 | A004 | ST02BP00 | Prod |
| G02625 | Active | 17-715-40146-01 | ST 0037 | A006 | ST01BP00 | SI |
| G02625 | Active | 17-715-40186-01 | ST 0037 | A008 | ST01BP00 | Prod |
| G02625 | Active | 17-715-40976-00 | ST 0037 | A011 | ST00BP00 | Prod |
| G02625 | Active | 17-715-41002-00 | ST 0037 | A012 | ST00BP00 | SI |
| G02625 | Active | 17-715-41003-00 | ST 0037 | A013 | ST00BP00 | Prod |
| G02625 | Active | 17-715-41008-00 | ST 0037 | A015 | ST00BP00 | Prod |
| G02625 | Active | 17-715-41025-01 | ST 0037 | A016 | ST01BP00 | Prod |
| G02625 | Active | 17-715-41101-04 | ST 0037 | A018 | ST04BP00 | Prod |
| G02625 | Active | 17-715-41102-00 | ST 0037 | A019 | ST00BP00 | Prod |
| G02625 | Active | 17-715-41285-00 | ST 0037 | A020 | ST00BP00 | Prod |
| G02625 | Active | 17-715-40156-02 | ST 0037 | C001 | ST02BP00 | SI |
| G02625 | Active | 17-715-40198-01 | ST 0037 | C004 | ST01BP00 | Prod |
| G02625 | Active | 17-715-40302-02 | ST 0037 | C007 | ST02BP00 | Prod |
| G02625 | Active | 17-715-40947-01 | ST 0037 | C008 | ST02BP00 | SI |
| G02625 | Active | 17-715-41077-00 | ST 0037 | C009 | ST00BP00 | SI |
| G02625 | Active | 17-715-41078-01 | ST 0037 | C010 | ST01BP00 | Prod |
| G02625 | Active | 17-715-41246-00 | ST 0037 | C011 | ST00BP00 | SI |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|-------|--------------|-----|------------|------|--------|---------------------|
| G02625 | Active | 17-715-40875-00 | ST 0037 | H001 | ST00BP00 | Prod |
| G02625 | Active | 17-715-40880-00 | ST 0037 | H002 | ST00BP00 | Prod |
| G02625 | Active | 17-715-40885-00 | ST 0037 | H003 | ST00BP01 | Prod |
| G02625 | Active | 17-715-40893-03 | ST 0037 | H004 | ST03BP00 | Prod |
| G02625 | Active | 17-715-40895-00 | ST 0037 | H005 | ST00BP00 | Prod |
| G02625 | Active | 17-715-40896-01 | ST 0037 | H006 | ST01BP00 | Prod |
| G02625 | Active | 17-715-40926-03 | ST 0037 | H007 | ST03BP00 | Prod |
| G02625 | Active | 17-715-40927-00 | ST 0037 | H008 | ST00BP00 | Prod |
| G02625 | Active | 17-715-40965-00 | ST 0037 | H009 | ST00BP00 | SI |
| G02625 | Active | 17-715-41151-01 | ST 0037 | H013 | ST01BP00 | Prod |
| G02625 | Active | 17-715-40937-01 | ST 0037 | I001 | ST01BP00 | Prod |
| G02625 | Active | 17-715-41010-03 | ST 0037 | I002 | ST03BP00 | Prod |
| G02625 | Active | 17-715-40961-01 | ST 0037 | I004 | ST01BP00 | Prod |
| G02625 | Active | 17-715-41066-00 | ST 0037 | I005 | ST00BP00 | Prod |
| G02625 | Active | 17-715-40975-00 | ST 0037 | I007 | ST00BP00 | Prod |
| G02625 | Active | 17-715-41126-02 | ST 0037 | I008 | ST01BP01 | Prod |
| G02625 | Active | 17-715-41218-00 | ST 0037 | I009 | ST00BP00 | Prod |
| G02625 | Active | 17-715-41256-00 | ST 0037 | I010 | ST00BP00 | Prod |
| G02625 | Active | 17-715-41257-02 | ST 0037 | I011 | ST02BP00 | Prod |
| G02625 | Active | 17-715-41276-01 | ST 0037 | I012 | ST01BP00 | Prod |
| G02625 | Active | 17-715-41287-02 | ST 0037 | A021 | ST02BP00 | Prod |
| G02625 | Active | 17-715-41138-01 | ST 0037 | H011 | ST01BP00 | PA |
| G02625 | Active | 17-715-40128-02 | ST 0037 | A003 | ST02BP00 | TA |
| G02625 | Active | 17-715-40207-00 | ST 0037 | A009 | ST00BP00 | TA |
| G02625 | Active | 17-715-41004-00 | ST 0037 | A014 | ST00BP00 | TA |
| G02625 | Active | 17-715-41100-00 | ST 0037 | A017 | ST00BP00 | TA |
| G02625 | Active | 17-715-40230-00 | ST 0037 | C002 | ST00BP00 | TA |
| G02625 | Active | 17-715-40285-00 | ST 0037 | C006 | ST00BP00 | TA |
| G02625 | Active | 17-715-40941-05 | ST 0037 | I003 | ST05BP00 | TA |
| G02625 | Active | 17-715-40960-02 | ST 0037 | I006 | ST02BP00 | TA |
| G09637 | Active | 17-715-40731-05 | ST 0038 | A001 | ST04BP01 | Prod |
| G09637 | Active | 17-715-40846-02 | ST 0038 | A002 | ST01BP01 | SI |
| G09637 | Active | 17-715-40849-01 | ST 0038 | A003 | ST01BP00 | SI |
| G09637 | Active | 17-715-41057-00 | ST 0038 | A004 | ST00BP00 | SI |
| G09637 | Active | 17-715-41286-01 | ST 0038 | H014 | ST01BP00 | Prod |
| G14518 | Inactive | 17-715-41135-00 | ST 0048 | H010 | ST00BP00 | TA |
| G14518 | Inactive | 17-715-41150-01 | ST 0048 | H012 | ST00BP00 | TA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|-------|-------------|-----|-----------|------|--------|--------------------|
| G01240 | Active | 17-715-40627-00 | ST 0051 | 017 | ST00BP00 | Prod |
| G01240 | Active | 17-715-40922-00 | ST 0051 | 021 | ST00BP00 | Prod |
| G01240 | Active | 17-715-40658-01 | ST 0051 | 023 | ST01BP00 | Prod |
| G01240 | Active | 17-715-40592-02 | ST 0051 | CC013 | ST02BP00 | Prod |
| G01240 | Active | 17-715-40582-03 | ST 0051 | CC014 | ST03BP00 | Prod |
| G01240 | Active | 17-715-40597-00 | ST 0051 | CC015 | ST00BP00 | SI |
| G01240 | Active | 17-715-40950-00 | ST 0051 | CC025 | ST00BP00 | Prod |
| G01240 | Active | 17-715-40723-01 | ST 0051 | CE020 | ST01BP00 | SI |
| G01240 | Active | 17-715-41277-03 | ST 0051 | CE034 | ST03BP00 | Prod |
| G01240 | Active | 17-715-41279-01 | ST 0051 | CE035 | ST01BP00 | Prod |
| G01240 | Active | 17-715-41278-00 | ST 0051 | CE036 | ST00BP00 | Prod |
| G01240 | Active | 17-715-41207-03 | ST 0051 | CJ033 | ST03BP00 | Prod |
| G01240 | Active | 17-715-41231-00 | ST 0051 | CJ034 | ST00BP00 | Prod |
| G01240 | Active | 17-715-00305-00 | ST 0051 | 001 | ST00BP00 | PA |
| G01240 | Active | 17-715-00864-01 | ST 0051 | 004 | ST01BP00 | PA |
| G01240 | Active | 17-715-40157-00 | ST 0051 | 005 | ST00BP00 | PA |
| G01240 | Active | 17-715-40173-01 | ST 0051 | 007 | ST01BP00 | PA |
| G01240 | Active | 17-715-40313-00 | ST 0051 | 008 | ST00BP00 | PA |
| G01240 | Active | 17-715-40324-02 | ST 0051 | 009 | ST02BP00 | PA |
| G01240 | Active | 17-715-40498-00 | ST 0051 | 010 | ST00BP00 | PA |
| G01240 | Active | 17-715-40572-00 | ST 0051 | 011 | ST00BP00 | PA |
| G01240 | Active | 17-715-40559-00 | ST 0051 | 012 | ST00BP00 | PA |
| G01240 | Active | 17-715-40589-00 | ST 0051 | 026 | ST00BP00 | PA |
| G01240 | Active | 17-715-40596-00 | ST 0051 | 027 | ST00BP00 | PA |
| G01240 | Active | 17-715-40604-02 | ST 0051 | 028 | ST02BP00 | PA |
| G01240 | Active | 17-715-40631-00 | ST 0051 | 029 | ST00BP01 | PA |
| G01240 | Active | 17-715-40650-00 | ST 0051 | 030 | ST00BP00 | PA |
| G01240 | Active | 17-715-41091-00 | ST 0051 | CD031 | ST00BP00 | PA |
| G01240 | Active | 17-715-40840-02 | ST 0051 | CH024 | ST02BP00 | PA |
| G01240 | Active | 17-715-40628-01 | ST 0051 | 018 | ST01BP00 | TA |
| G01240 | Active | 17-715-40636-00 | ST 0051 | 019 | ST00BP00 | TA |
| G01240 | Active | 17-715-40938-02 | ST 0051 | 022 | ST02BP00 | TA |
| G01240 | Active | 17-715-41113-01 | ST 0051 | CE032 | ST01BP00 | TA |
| G01241 | Active | 17-715-20140-03 | ST 0052 | 003 | ST03BP00 | Prod |
| G01241 | Active | 17-715-40070-01 | ST 0052 | 008 | ST01BP01 | SI |
| G01241 | Active | 17-715-40553-01 | ST 0052 | 020 | ST01BP01 | SI |
| G01241 | Active | 17-715-40701-01 | ST 0052 | 021 | ST01BP00 | Prod |
| G01241 | Active | 17-715-40815-03 | ST 0052 | 022 | ST03BP00 | Prod |
| G01241 | Active | 17-715-40839-00 | ST 0052 | 023 | ST00BP00 | Prod |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|-------|-------------|-----|------------|------|--------|---------------------|
| G01241 | Active | 17-715-40866-01 | ST 0052 | 024 | ST01BP00 | Prod |
| G01241 | Active | 17-715-40972-01 | ST 0052 | 027 | ST01BP00 | Prod |
| G01241 | Active | 17-715-40102-01 | ST 0052 | 029 | ST01BP00 | Prod |
| G01241 | Active | 17-715-40044-00 | ST 0052 | CA004 | ST00BP01 | Prod |
| G01241 | Active | 17-715-40057-02 | ST 0052 | CA006 | ST02BP00 | Prod |
| G01241 | Active | 17-715-41280-00 | ST 0052 | CA007 | ST00BP00 | Prod |
| G01241 | Active | 17-715-41281-00 | ST 0052 | CA008 | ST00BP00 | Prod |
| G01241 | Active | 17-715-41282-00 | ST 0052 | CA009 | ST00BP00 | Prod |
| G01241 | Active | 17-715-41283-01 | ST 0052 | CA010 | ST01BP00 | Prod |
| G01241 | Active | 17-715-40932-02 | ST 0052 | CB025 | ST02BP00 | Prod |
| G01241 | Active | 17-715-41202-00 | ST 0052 | CJ031 | ST00BP00 | SI |
| G01241 | Active | 17-715-41263-00 | ST 0052 | CJ032 | ST00BP00 | SI |
| G01241 | Active | 17-715-41247-00 | ST 0052 | CK033 | ST00BP00 | Prod |
| G01241 | Active | 17-715-41248-00 | ST 0052 | CK034 | ST00BP00 | Prod |
| G01241 | Active | 17-715-41249-00 | ST 0052 | CK035 | ST00BP00 | Prod |
| G01241 | Active | 17-715-00814-00 | ST 0052 | 001 | ST00BP00 | PA |
| G01241 | Active | 17-715-00923-00 | ST 0052 | 002 | ST00BP01 | PA |
| G01241 | Active | 17-715-40072-00 | ST 0052 | 009 | ST00BP00 | PA |
| G01241 | Active | 17-715-40163-00 | ST 0052 | 010 | ST00BP01 | PA |
| G01241 | Active | 17-715-40167-00 | ST 0052 | 012 | ST00BP00 | PA |
| G01241 | Active | 17-715-40184-00 | ST 0052 | 014 | ST00BP00 | PA |
| G01241 | Active | 17-715-40183-00 | ST 0052 | 015 | ST00BP00 | PA |
| G01241 | Active | 17-715-40166-02 | ST 0052 | 016 | ST02BP00 | PA |
| G01241 | Active | 17-715-40291-01 | ST 0052 | 017 | ST01BP00 | PA |
| G01241 | Active | 17-715-40280-00 | ST 0052 | 018 | ST00BP00 | PA |
| G01241 | Active | 17-715-40430-00 | ST 0052 | 019 | ST00BP00 | PA |
| G01241 | Active | 17-715-40980-00 | ST 0052 | 026 | ST00BP00 | PA |
| G01241 | Active | 17-715-41005-00 | ST 0052 | CG001 | ST00BP00 | PA |
| G01241 | Active | 17-715-40992-02 | ST 0052 | CH028 | ST01BP00 | PA |
| G01241 | Active | 17-715-40065-01 | ST 0052 | 007 | ST01BP00 | TA |
| G01241 | Active | 17-715-40051-00 | ST 0052 | CA005 | ST00BP00 | TA |
| 00498 | Active | 17-715-01082-01 | ST 0128 | R006 | ST01BP00 | SI |
| 00498 | Active | 17-715-40710-03 | ST 0128 | R007 | ST03BP00 | Prod |
| 00498 | Active | 17-715-40675-03 | ST 0128 | X002 | ST02BP01 | Prod |
| 00498 | Active | 17-715-00406-00 | ST 0128 | A001 | ST00BP01 | PA |
| 00498 | Active | 17-715-00412-70 | ST 0128 | A009 | ST02BP01 | PA |
| 00498 | Active | 17-715-00960-00 | ST 0128 | A010 | ST00BP02 | PA |
| 00498 | Active | 17-715-00815-00 | ST 0128 | A011 | ST00BP00 | PA |
| 00498 | Active | 17-715-00924-00 | ST 0128 | A012 | ST00BP00 | PA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|---|---|---|---|---|---|---|
| 00498 | Active | 17-715-01014-00 | ST 0128 | R001 | ST00BP00 | PA |
| 00498 | Active | 17-715-01062-00 | ST 0128 | X001 | ST00BP00 | PA |
| 00498 | Active | 17-715-01036-00 | ST 0128 | R003 | ST00BP00 | TA |
| 00498 | Active | 17-715-40698-01 | ST 0128 | X003 | ST01BP00 | TA |
| 00498 | Active | 17-715-41265-00 | ST 0128 | X004 | ST00BP00 | TA |
| 00456 | Active | 17-715-41268-02 | ST 0130 | K001 | ST02BP00 | Prod |
| 00456 | Active | 17-715-41272-01 | ST 0130 | K007 | ST01BP00 | Prod |
| 00456 | Active | 17-715-41284-01 | ST 0130 | K009 | ST01BP00 | Prod |
| 00456 | Active | 17-715-00816-00 | ST 0130 | 001 | ST00BP00 | PA |
| 00456 | Active | 17-715-00868-00 | ST 0130 | 002 | ST00BP00 | PA |
| 00456 | Active | 17-715-41259-03 | ST 0130 | 002 | ST03BP00 | PA |
| 00456 | Active | 17-715-40081-01 | ST 0130 | 004 | ST01BP00 | PA |
| 00456 | Active | 17-715-00349-00 | ST 0130 | A003 | ST00BP00 | PA |
| 00456 | Active | 17-715-00350-00 | ST 0130 | A004 | ST00BP00 | PA |
| 00456 | Active | 17-715-00351-00 | ST 0130 | A005 | ST00BP00 | PA |
| 00456 | Active | 17-715-00355-01 | ST 0130 | A010 | ST01BP00 | PA |
| 00456 | Active | 17-715-40749-00 | ST 0130 | A011 | ST00BP00 | PA |
| 00456 | Active | 17-715-00376-00 | ST 0130 | C001 | ST00BP00 | PA |
| 00456 | Active | 17-715-00378-00 | ST 0130 | C003 | ST00BP00 | PA |
| 00456 | Active | 17-715-00383-00 | ST 0130 | C009 | ST00BP00 | PA |
| 00456 | Active | 17-715-00523-00 | ST 0130 | C011 | ST00BP00 | PA |
| 00456 | Active | 17-715-00522-01 | ST 0130 | C014 | ST01BP00 | PA |
| 00456 | Active | 17-715-40904-03 | ST 0130 | C021 | ST02BP01 | PA |
| 00456 | Active | 17-715-00357-00 | ST 0130 | D001 | ST00BP00 | PA |
| 00456 | Active | 17-715-00358-00 | ST 0130 | D002 | ST00BP00 | PA |
| 00456 | Active | 17-715-00359-00 | ST 0130 | D003 | ST00BP00 | PA |
| 00456 | Active | 17-715-00360-00 | ST 0130 | D004 | ST00BP00 | PA |
| 00456 | Active | 17-715-00361-00 | ST 0130 | D005 | ST00BP00 | PA |
| 00456 | Active | 17-715-00362-00 | ST 0130 | D006 | ST00BP00 | PA |
| 00456 | Active | 17-715-00363-00 | ST 0130 | D007 | ST00BP00 | PA |
| 00456 | Active | 17-715-00364-00 | ST 0130 | D008 | ST00BP00 | PA |
| 00456 | Active | 17-715-00365-01 | ST 0130 | D011 | ST01BP00 | PA |
| 00456 | Active | 17-715-00368-01 | ST 0130 | D013 | ST01BP00 | PA |
| 00456 | Active | 17-715-00370-00 | ST 0130 | D014 | ST00BP00 | PA |
| 00456 | Active | 17-715-00674-00 | ST 0130 | D015 | ST00BP00 | PA |
| 00456 | Active | 17-715-00664-00 | ST 0130 | D016 | ST00BP00 | PA |
| 00456 | Active | 17-715-00707-00 | ST 0130 | D018 | ST00BP00 | PA |
| 00456 | Active | 17-715-00366-01 | ST 0130 | D019 | ST01BP00 | PA |
| 00456 | Active | 17-715-00745-00 | ST 0130 | D020 | ST00BP01 | PA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|-------|--------------|-----|------------|------|--------|---------------------|
| 00456 | Active | 17-715-41107-00 | ST 0130 | D021 | ST00BP00 | PA |
| 00456 | Active | 17-715-00371-00 | ST 0130 | E001 | ST00BP00 | PA |
| 00456 | Active | 17-715-00372-00 | ST 0130 | E002 | ST00BP00 | PA |
| 00456 | Active | 17-715-00373-00 | ST 0130 | E003 | ST00BP01 | PA |
| 00456 | Active | 17-715-00374-00 | ST 0130 | E004 | ST00BP00 | PA |
| 00456 | Active | 17-715-00375-00 | ST 0130 | E005 | ST00BP00 | PA |
| 00456 | Active | 17-715-00527-00 | ST 0130 | E006 | ST00BP00 | PA |
| 00456 | Active | 17-715-00524-00 | ST 0130 | E007 | ST00BP00 | PA |
| 00456 | Active | 17-715-00528-02 | ST 0130 | E010 | ST02BP00 | PA |
| 00456 | Active | 17-715-00567-00 | ST 0130 | E011 | ST00BP00 | PA |
| 00456 | Active | 17-715-00568-00 | ST 0130 | E012 | ST00BP00 | PA |
| 00456 | Active | 17-715-00657-01 | ST 0130 | E014 | ST01BP00 | PA |
| 00456 | Active | 17-715-40842-00 | ST 0130 | G010 | ST00BP00 | PA |
| 00456 | Active | 17-715-00744-00 | ST 0130 | H002 | ST01BP00 | PA |
| 00456 | Active | 17-715-20032-00 | ST 0130 | J001 | ST00BP00 | PA |
| 00456 | Active | 17-715-20075-01 | ST 0130 | J008 | ST01BP00 | PA |
| 00456 | Active | 17-715-20089-00 | ST 0130 | J009 | ST00BP00 | PA |
| 00456 | Active | 17-715-20107-01 | ST 0130 | J012 | ST01BP00 | PA |
| 00456 | Active | 17-715-20068-01 | ST 0130 | J014 | ST01BP00 | PA |
| 00456 | Active | 17-715-00382-02 | ST 0130 | C008 | ST02BP00 | TA |
| 00456 | Active | 17-715-00563-00 | ST 0130 | C015 | ST00BP00 | TA |
| 00456 | Active | 17-715-00566-01 | ST 0130 | C018 | ST01BP00 | TA |
| 00457 | Active | 17-715-41275-00 | ST 0131 | K002 | ST00BP00 | Prod |
| 00457 | Active | 17-715-41269-01 | ST 0131 | K003 | ST01BP00 | Prod |
| 00457 | Active | 17-715-41270-00 | ST 0131 | K004 | ST00BP00 | Prod |
| 00457 | Active | 17-715-41271-00 | ST 0131 | K005 | ST00BP00 | Prod |
| 00457 | Active | 17-715-41274-01 | ST 0131 | K006 | ST01BP00 | Prod |
| 00457 | Active | 17-715-41273-00 | ST 0131 | K008 | ST00BP00 | Prod |
| 00457 | Active | 17-715-40688-01 | ST 0131 | 001 | ST01BP00 | PA |
| 00457 | Active | 17-715-00347-01 | ST 0131 | A002 | ST01BP00 | PA |
| 00457 | Active | 17-715-00352-01 | ST 0131 | A006 | ST01BP00 | PA |
| 00457 | Active | 17-715-00353-00 | ST 0131 | A007 | ST00BP00 | PA |
| 00457 | Active | 17-715-00354-00 | ST 0131 | A008 | ST00BP00 | PA |
| 00457 | Active | 17-718-40057-01 | ST 0131 | AA006 | ST01BP00 | PA |
| 00457 | Active | 17-715-00381-00 | ST 0131 | C007 | ST00BP00 | PA |
| 00457 | Active | 17-715-40712-02 | ST 0131 | C020 | ST02BP00 | PA |
| 00457 | Active | 17-715-00709-00 | ST 0131 | D017 | ST00BP00 | PA |
| 00457 | Active | 17-715-00673-00 | ST 0131 | F002 | ST00BP00 | PA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|-------|--------------|-----|------------|------|--------|---------------------|
| 00457 | Active | 17-715-00713-01 | ST 0131 | G002 | ST01BP00 | PA |
| 00457 | Active | 17-715-00779-04 | ST 0131 | G003 | ST04BP00 | PA |
| 00457 | Active | 17-715-00781-02 | ST 0131 | G005 | ST02BP00 | PA |
| 00457 | Active | 17-715-20113-03 | ST 0131 | G006 | ST03BP00 | PA |
| 00457 | Active | 17-715-40003-02 | ST 0131 | G007 | ST01BP01 | PA |
| 00457 | Active | 17-715-40005-02 | ST 0131 | G008 | ST02BP00 | PA |
| 00457 | Active | 17-715-40843-02 | ST 0131 | G009 | ST02BP00 | PA |
| 00457 | Active | 17-715-20040-02 | ST 0131 | J002 | ST02BP00 | PA |
| 00457 | Active | 17-715-20045-03 | ST 0131 | J003 | ST02BP01 | PA |
| 00457 | Active | 17-715-20056-01 | ST 0131 | J004 | ST01BP00 | PA |
| 00457 | Active | 17-715-20061-00 | ST 0131 | J005 | ST00BP00 | PA |
| 00457 | Active | 17-715-20071-01 | ST 0131 | J007 | ST01BP00 | PA |
| 00457 | Active | 17-715-20097-00 | ST 0131 | J010 | ST00BP00 | PA |
| 00457 | Active | 17-715-20105-02 | ST 0131 | J011 | ST02BP00 | PA |
| 00457 | Active | 17-715-40277-00 | ST 0131 | J013 | ST00BP00 | PA |
| 00457 | Active | 17-715-40715-00 | ST 0131 | L001 | ST00BP01 | PA |
| 00457 | Active | 17-715-00388-02 | ST 0131 | C005 | ST02BP00 | TA |
| 00457 | Active | 17-715-00529-03 | ST 0131 | C019 | ST03BP00 | TA |
| 00461 | Active | 17-715-01039-01 | ST 0134 | S002 | ST01BP00 | SI |
| 00461 | Active | 17-715-40666-03 | ST 0134 | S014 | ST02BP01 | SI |
| 00461 | Active | 17-715-40680-02 | ST 0134 | S015 | ST02BP00 | SI |
| 00461 | Active | 17-715-40928-06 | ST 0134 | W002 | ST05BP01 | SI |
| 00461 | Active | 17-715-40977-02 | ST 0134 | W003 | ST02BP00 | SI |
| 00461 | Active | 17-715-40990-01 | ST 0134 | W004 | ST01BP00 | Prod |
| 00461 | Active | 17-715-41017-00 | ST 0134 | W006 | ST00BP00 | SI |
| 00461 | Active | 17-715-41182-02 | ST 0134 | W007 | ST01BP01 | Prod |
| 00461 | Active | 17-715-41184-00 | ST 0134 | W008 | ST00BP00 | Prod |
| 00461 | Active | 17-715-41194-01 | ST 0134 | W009 | ST00BP01 | SI |
| 00461 | Active | 17-715-00404-00 | ST 0134 | C002 | ST00BP00 | PA |
| 00461 | Active | 17-715-00400-00 | ST 0134 | D001 | ST00BP00 | PA |
| 00461 | Active | 17-715-00401-00 | ST 0134 | D003 | ST00BP00 | PA |
| 00461 | Active | 17-715-00402-00 | ST 0134 | D006 | ST00BP00 | PA |
| 00461 | Active | 17-715-00389-00 | ST 0134 | F001 | ST00BP00 | PA |
| 00461 | Active | 17-715-00390-00 | ST 0134 | F002 | ST00BP00 | PA |
| 00461 | Active | 17-715-00393-00 | ST 0134 | F005 | ST00BP00 | PA |
| 00461 | Active | 17-715-00394-00 | ST 0134 | F006 | ST00BP00 | PA |
| 00461 | Active | 17-715-00391-01 | ST 0134 | F007 | ST01BP00 | PA |
| 00461 | Active | 17-715-00396-01 | ST 0134 | F008 | ST01BP00 | PA |
| 00461 | Active | 17-715-00397-01 | ST 0134 | F011 | ST01BP00 | PA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|---|---|---|---|---|---|---|
| 00461 | Active | 17-715-00896-00 | ST 0134 | N001 | ST00BP00 | PA |
| 00461 | Active | 17-715-00897-00 | ST 0134 | N002 | ST00BP00 | PA |
| 00461 | Active | 17-715-00935-00 | ST 0134 | N003 | ST00BP00 | PA |
| 00461 | Active | 17-715-00961-00 | ST 0134 | N004 | ST00BP00 | PA |
| 00461 | Active | 17-715-00988-00 | ST 0134 | N005 | ST00BP00 | PA |
| 00461 | Active | 17-715-01016-00 | ST 0134 | N006 | ST00BP01 | PA |
| 00461 | Active | 17-715-01012-01 | ST 0134 | N007 | ST01BP00 | PA |
| 00461 | Active | 17-715-01024-00 | ST 0134 | N008 | ST00BP00 | PA |
| 00461 | Active | 17-715-40234-00 | ST 0134 | P014 | ST00BP00 | PA |
| 00461 | Active | 17-715-01030-00 | ST 0134 | S001 | ST00BP00 | PA |
| 00461 | Active | 17-715-01042-01 | ST 0134 | S004 | ST01BP00 | PA |
| 00461 | Active | 17-715-01067-00 | ST 0134 | S005 | ST00BP00 | PA |
| 00461 | Active | 17-715-01072-00 | ST 0134 | S006 | ST00BP00 | PA |
| 00461 | Active | 17-715-01090-00 | ST 0134 | S007 | ST00BP01 | PA |
| 00461 | Active | 17-715-01098-00 | ST 0134 | S008 | ST00BP00 | PA |
| 00461 | Active | 17-715-01108-00 | ST 0134 | S009 | ST00BP01 | PA |
| 00461 | Active | 17-715-20011-71 | ST 0134 | S010 | ST00BP02 | PA |
| 00461 | Active | 17-715-20044-00 | ST 0134 | S012 | ST00BP00 | PA |
| 00461 | Active | 17-715-20051-00 | ST 0134 | S013 | ST00BP00 | PA |
| 00461 | Active | 17-715-01053-00 | ST 0134 | T001 | ST00BP00 | PA |
| 00461 | Active | 17-715-01060-00 | ST 0134 | T002 | ST00BP00 | PA |
| 00461 | Active | 17-715-01075-00 | ST 0134 | T003 | ST00BP00 | PA |
| 00461 | Active | 17-715-01078-00 | ST 0134 | T004 | ST00BP00 | PA |
| 00461 | Active | 17-715-01092-00 | ST 0134 | T005 | ST00BP01 | PA |
| 00461 | Active | 17-715-01095-00 | ST 0134 | T006 | ST00BP00 | PA |
| 00461 | Active | 17-715-01109-00 | ST 0134 | T007 | ST00BP02 | PA |
| 00461 | Active | 17-715-01105-00 | ST 0134 | T008 | ST00BP00 | PA |
| 00461 | Active | 17-715-20049-00 | ST 0134 | U001 | ST00BP00 | PA |
| 00461 | Active | 17-715-20080-00 | ST 0134 | U003 | ST00BP00 | PA |
| 00461 | Active | 17-715-20090-00 | ST 0134 | U004 | ST00BP01 | PA |
| 00461 | Active | 17-715-20095-00 | ST 0134 | U005 | ST00BP00 | PA |
| 00461 | Active | 17-715-20025-00 | ST 0134 | S011 | ST00BP01 | TA |
| 00461 | Active | 17-715-40689-00 | ST 0134 | S016 | ST00BP03 | TA |
| 00461 | Active | 17-715-20073-01 | ST 0134 | U002 | ST01BP00 | TA |
| 00461 | Active | 17-715-40315-00 | ST 0134 | W001 | ST00BP02 | TA |
| 00462 | Active | 17-715-40891-00 | ST 0135 | Q010 | ST00BP00 | SI |
| 00462 | Active | 17-715-40942-00 | ST 0135 | Q012 | ST00BP00 | SI |
| 00462 | Active | 17-715-41211-00 | ST 0135 | Q013 | ST00BP00 | SI |
| 00462 | Active | 17-715-41197-00 | ST 0135 | Z002 | ST00BP00 | SI |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|-------|--------------|-----|------------|------|--------|---------------------|
| 00462 | Active | 17-715-20006-00 | ST 0135 | 001 | ST00BP00 | PA |
| 00462 | Active | 17-715-20023-00 | ST 0135 | 002 | ST00BP00 | PA |
| 00462 | Active | 17-715-20024-00 | ST 0135 | 003 | ST00BP00 | PA |
| 00462 | Active | 17-715-40781-00 | ST 0135 | 005 | ST00BP00 | PA |
| 00462 | Active | 17-715-00407-02 | ST 0135 | A004 | ST02BP00 | PA |
| 00462 | Active | 17-715-00410-02 | ST 0135 | A013 | ST02BP00 | PA |
| 00462 | Active | 17-715-00416-00 | ST 0135 | B001 | ST00BP00 | PA |
| 00462 | Active | 17-715-00417-00 | ST 0135 | B002 | ST00BP00 | PA |
| 00462 | Active | 17-715-00403-00 | ST 0135 | C001 | ST00BP00 | PA |
| 00462 | Active | 17-715-00415-00 | ST 0135 | I001 | ST00BP00 | PA |
| 00462 | Active | 17-715-00533-01 | ST 0135 | I003 | ST01BP00 | PA |
| 00462 | Active | 17-715-00572-00 | ST 0135 | I006 | ST00BP01 | PA |
| 00462 | Active | 17-715-00573-00 | ST 0135 | I007 | ST00BP00 | PA |
| 00462 | Active | 17-715-00607-00 | ST 0135 | I008 | ST00BP00 | PA |
| 00462 | Active | 17-715-00653-02 | ST 0135 | I010 | ST01BP01 | PA |
| 00462 | Active | 17-715-00666-01 | ST 0135 | I012 | ST01BP00 | PA |
| 00462 | Active | 17-715-00782-00 | ST 0135 | M001 | ST00BP00 | PA |
| 00462 | Active | 17-715-00818-00 | ST 0135 | M002 | ST00BP00 | PA |
| 00462 | Active | 17-715-00817-00 | ST 0135 | M003 | ST00BP01 | PA |
| 00462 | Active | 17-715-00870-00 | ST 0135 | M004 | ST00BP00 | PA |
| 00462 | Active | 17-715-00869-00 | ST 0135 | M005 | ST00BP00 | PA |
| 00462 | Active | 17-715-20018-00 | ST 0135 | M006 | ST00BP00 | PA |
| 00462 | Active | 17-715-41000-00 | ST 0135 | M007 | ST00BP00 | PA |
| 00462 | Active | 17-715-40999-01 | ST 0135 | M008 | ST01BP00 | PA |
| 00462 | Active | 17-715-41152-00 | ST 0135 | M009 | ST00BP00 | PA |
| 00462 | Active | 17-715-01023-00 | ST 0135 | Q001 | ST00BP00 | PA |
| 00462 | Active | 17-715-01031-00 | ST 0135 | Q002 | ST00BP00 | PA |
| 00462 | Active | 17-715-01096-00 | ST 0135 | Q005 | ST00BP01 | PA |
| 00462 | Active | 17-715-40671-00 | ST 0135 | Q006 | ST00BP00 | PA |
| 00462 | Active | 17-715-01028-00 | ST 0135 | R002 | ST00BP00 | PA |
| 00462 | Active | 17-715-40080-00 | ST 0135 | V001 | ST00BP00 | PA |
| 00462 | Active | 17-715-40121-00 | ST 0135 | V002 | ST00BP00 | PA |
| 00462 | Active | 17-715-40145-00 | ST 0135 | V003 | ST00BP00 | PA |
| 00462 | Active | 17-715-40149-00 | ST 0135 | V004 | ST00BP00 | PA |
| 00462 | Active | 17-715-40152-00 | ST 0135 | V005 | ST00BP00 | PA |
| 00462 | Active | 17-715-41264-01 | ST 0135 | AA004 | ST01BP00 | TA |
| 00462 | Active | 17-715-01044-00 | ST 0135 | Q003 | ST00BP01 | TA |
| 00462 | Active | 17-715-01054-00 | ST 0135 | Q004 | ST00BP00 | TA |
| 00462 | Active | 17-715-40685-02 | ST 0135 | Q007 | ST02BP00 | TA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|-------|-------------|-----|-----------|------|--------|--------------------|
| 00462 | Active | 17-715-40693-02 | ST 0135 | Q008 | ST02BP00 | TA |
| 00462 | Active | 17-715-40708-03 | ST 0135 | Q009 | ST03BP00 | TA |
| 00462 | Active | 17-715-01043-00 | ST 0135 | R004 | ST00BP00 | TA |
| 00462 | Active | 17-715-01061-00 | ST 0135 | R005 | ST00BP00 | TA |
| 00462 | Active | 17-715-41192-00 | ST 0135 | Z001 | ST00BP00 | TA |
| G01960 | Active | 17-715-40890-00 | ST 0148 | A007 | ST00BP00 | Prod |
| G01960 | Active | 17-715-40905-01 | ST 0148 | A008 | ST01BP00 | SI |
| G01960 | Active | 17-715-40951-03 | ST 0148 | A009 | ST02BP00 | Prod |
| G01960 | Active | 17-715-20060-00 | ST 0148 | 001 | ST00BP00 | PA |
| G01960 | Active | 17-715-40951-02 | ST 0148 | A009 | ST01BP00 | PA |
| G01960 | Active | 17-715-40920-00 | ST 0148 | B001 | ST00BP01 | PA |
| G01960 | Active | 17-715-40944-00 | ST 0148 | B002 | ST00BP00 | PA |
| G01960 | Active | 17-715-40094-00 | ST 0148 | A001 | ST00BP00 | TA |
| G01960 | Active | 17-715-40132-00 | ST 0148 | A002 | ST00BP00 | TA |
| G01960 | Active | 17-715-40158-00 | ST 0148 | A003 | ST00BP00 | TA |
| G01960 | Active | 17-715-40397-00 | ST 0148 | A004 | ST00BP00 | TA |
| G01960 | Active | 17-715-40411-00 | ST 0148 | A005 | ST00BP00 | TA |
| G01960 | Active | 17-715-40746-03 | ST 0148 | A006 | ST02BP01 | TA |
| 00463 | Active | 17-715-41260-01 | ST 0151 | AA001 | ST01BP00 | Prod |
| 00463 | Active | 17-715-00926-02 | ST 0151 | P002 | ST02BP00 | Prod |
| 00463 | Active | 17-715-00932-01 | ST 0151 | P003 | ST01BP00 | Prod |
| 00463 | Active | 17-715-00982-02 | ST 0151 | P006 | ST02BP00 | Prod |
| 00463 | Active | 17-715-00992-01 | ST 0151 | P007 | ST01BP00 | Prod |
| 00463 | Active | 17-715-01002-02 | ST 0151 | P008 | ST01BP01 | Prod |
| 00463 | Active | 17-715-40256-01 | ST 0151 | P015 | ST01BP00 | SI |
| 00463 | Active | 17-715-00430-00 | ST 0151 | B003 | ST00BP00 | PA |
| 00463 | Active | 17-715-00463-00 | ST 0151 | D005 | ST00BP00 | PA |
| 00463 | Active | 17-715-00454-00 | ST 0151 | E001 | ST00BP00 | PA |
| 00463 | Active | 17-715-00441-01 | ST 0151 | E004 | ST01BP00 | PA |
| 00463 | Active | 17-715-00459-00 | ST 0151 | E007 | ST00BP00 | PA |
| 00463 | Active | 17-715-00537-00 | ST 0151 | E009 | ST00BP00 | PA |
| 00463 | Active | 17-715-00577-00 | ST 0151 | E011 | ST00BP00 | PA |
| 00463 | Active | 17-715-00671-00 | ST 0151 | E015 | ST00BP00 | PA |
| 00463 | Active | 17-715-00710-00 | ST 0151 | E016 | ST00BP00 | PA |
| 00463 | Active | 17-715-00784-00 | ST 0151 | E018 | ST00BP01 | PA |
| 00463 | Active | 17-715-00447-00 | ST 0151 | G001 | ST00BP00 | PA |
| 00463 | Active | 17-715-00442-00 | ST 0151 | G002 | ST00BP00 | PA |
| 00463 | Active | 17-715-00448-00 | ST 0151 | G003 | ST00BP00 | PA |
| 00463 | Active | 17-715-00443-00 | ST 0151 | G004 | ST00BP00 | PA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|-------|--------------|-----|------------|------|--------|---------------------|
| 00463 | Active | 17-715-00444-01 | ST 0151 | G005 | ST01BP00 | PA |
| 00463 | Active | 17-715-00449-00 | ST 0151 | G006 | ST00BP00 | PA |
| 00463 | Active | 17-715-00445-00 | ST 0151 | G007 | ST00BP00 | PA |
| 00463 | Active | 17-715-00450-00 | ST 0151 | G008 | ST00BP00 | PA |
| 00463 | Active | 17-715-00451-00 | ST 0151 | G009 | ST00BP01 | PA |
| 00463 | Active | 17-715-00452-01 | ST 0151 | G010 | ST01BP00 | PA |
| 00463 | Active | 17-715-00446-00 | ST 0151 | G011 | ST00BP00 | PA |
| 00463 | Active | 17-715-00453-00 | ST 0151 | G012 | ST00BP00 | PA |
| 00463 | Active | 17-715-00489-00 | ST 0151 | G013 | ST00BP00 | PA |
| 00463 | Active | 17-715-00534-00 | ST 0151 | G014 | ST00BP00 | PA |
| 00463 | Active | 17-715-00535-00 | ST 0151 | G015 | ST00BP00 | PA |
| 00463 | Active | 17-715-00536-00 | ST 0151 | G016 | ST00BP00 | PA |
| 00463 | Active | 17-715-00597-00 | ST 0151 | H001 | ST00BP00 | PA |
| 00463 | Active | 17-715-00599-00 | ST 0151 | H002 | ST00BP00 | PA |
| 00463 | Active | 17-715-00620-00 | ST 0151 | H003 | ST00BP00 | PA |
| 00463 | Active | 17-715-00618-00 | ST 0151 | H004 | ST00BP00 | PA |
| 00463 | Active | 17-715-00644-00 | ST 0151 | H005 | ST00BP00 | PA |
| 00463 | Active | 17-715-00647-00 | ST 0151 | H006 | ST00BP00 | PA |
| 00463 | Active | 17-715-00672-00 | ST 0151 | H007 | ST00BP00 | PA |
| 00463 | Active | 17-715-00669-00 | ST 0151 | H008 | ST00BP00 | PA |
| 00463 | Active | 17-715-00711-00 | ST 0151 | H009 | ST00BP00 | PA |
| 00463 | Active | 17-715-00705-00 | ST 0151 | H010 | ST00BP00 | PA |
| 00463 | Active | 17-715-00490-02 | ST 0151 | I002 | ST02BP00 | PA |
| 00463 | Active | 17-715-00570-00 | ST 0151 | I004 | ST00BP00 | PA |
| 00463 | Active | 17-715-00571-01 | ST 0151 | I005 | ST01BP00 | PA |
| 00463 | Active | 17-715-00619-00 | ST 0151 | I009 | ST00BP00 | PA |
| 00463 | Active | 17-715-00668-00 | ST 0151 | I011 | ST00BP01 | PA |
| 00463 | Active | 17-715-00696-00 | ST 0151 | I013 | ST00BP00 | PA |
| 00463 | Active | 17-715-00727-00 | ST 0151 | I014 | ST00BP00 | PA |
| 00463 | Active | 17-715-00788-00 | ST 0151 | I016 | ST00BP00 | PA |
| 00463 | Active | 17-715-00820-00 | ST 0151 | I017 | ST00BP01 | PA |
| 00463 | Active | 17-715-41019-00 | ST 0151 | I018 | ST00BP00 | PA |
| 00463 | Active | 17-715-00431-00 | ST 0151 | J001 | ST00BP01 | PA |
| 00463 | Active | 17-715-00432-00 | ST 0151 | J002 | ST00BP00 | PA |
| 00463 | Active | 17-715-00433-00 | ST 0151 | J003 | ST00BP00 | PA |
| 00463 | Active | 17-715-00434-01 | ST 0151 | J004 | ST01BP00 | PA |
| 00463 | Active | 17-715-00435-00 | ST 0151 | J005 | ST00BP00 | PA |
| 00463 | Active | 17-715-00437-00 | ST 0151 | J007 | ST00BP01 | PA |
| 00463 | Active | 17-715-00438-00 | ST 0151 | J008 | ST00BP00 | PA |
| 00463 | Active | 17-715-00439-00 | ST 0151 | J009 | ST00BP00 | PA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|-------|--------------|-----|------------|------|--------|---------------------|
| 00463 | Active | 17-715-00440-00 | ST 0151 | J010 | ST00BP00 | PA |
| 00463 | Active | 17-715-00492-00 | ST 0151 | J011 | ST00BP00 | PA |
| 00463 | Active | 17-715-00530-01 | ST 0151 | J012 | ST01BP00 | PA |
| 00463 | Active | 17-715-00532-00 | ST 0151 | J013 | ST00BP00 | PA |
| 00463 | Active | 17-715-00531-00 | ST 0151 | J014 | ST00BP00 | PA |
| 00463 | Active | 17-715-00538-00 | ST 0151 | J015 | ST00BP00 | PA |
| 00463 | Active | 17-715-00574-01 | ST 0151 | J016 | ST01BP01 | PA |
| 00463 | Active | 17-715-00436-01 | ST 0151 | J017 | ST01BP00 | PA |
| 00463 | Active | 17-715-00598-00 | ST 0151 | K001 | ST00BP00 | PA |
| 00463 | Active | 17-715-00609-00 | ST 0151 | K002 | ST00BP00 | PA |
| 00463 | Active | 17-715-00624-00 | ST 0151 | K003 | ST00BP00 | PA |
| 00463 | Active | 17-715-00646-00 | ST 0151 | K004 | ST00BP00 | PA |
| 00463 | Active | 17-715-00645-00 | ST 0151 | K005 | ST00BP00 | PA |
| 00463 | Active | 17-715-00667-00 | ST 0151 | K006 | ST00BP00 | PA |
| 00463 | Active | 17-715-00670-00 | ST 0151 | K007 | ST00BP00 | PA |
| 00463 | Active | 17-715-00697-00 | ST 0151 | K009 | ST00BP00 | PA |
| 00463 | Active | 17-715-00717-00 | ST 0151 | K010 | ST00BP00 | PA |
| 00463 | Active | 17-715-00759-00 | ST 0151 | K011 | ST00BP00 | PA |
| 00463 | Active | 17-715-00787-00 | ST 0151 | K012 | ST00BP00 | PA |
| 00463 | Active | 17-715-00718-01 | ST 0151 | K013 | ST01BP00 | PA |
| 00463 | Active | 17-715-00888-00 | ST 0151 | L001 | ST00BP00 | PA |
| 00463 | Active | 17-715-00823-00 | ST 0151 | L002 | ST00BP00 | PA |
| 00463 | Active | 17-715-00819-00 | ST 0151 | L003 | ST00BP00 | PA |
| 00463 | Active | 17-715-00822-00 | ST 0151 | L004 | ST00BP00 | PA |
| 00463 | Active | 17-715-00821-00 | ST 0151 | L005 | ST00BP01 | PA |
| 00463 | Active | 17-715-00871-01 | ST 0151 | L007 | ST01BP00 | PA |
| 00463 | Active | 17-715-00873-00 | ST 0151 | L008 | ST00BP00 | PA |
| 00463 | Active | 17-715-00901-00 | ST 0151 | L009 | ST00BP00 | PA |
| 00463 | Active | 17-715-00925-00 | ST 0151 | L010 | ST00BP00 | PA |
| 00463 | Active | 17-715-00951-00 | ST 0151 | L011 | ST00BP00 | PA |
| 00463 | Active | 17-715-00962-00 | ST 0151 | L012 | ST00BP00 | PA |
| 00463 | Active | 17-715-00963-00 | ST 0151 | O001 | ST00BP00 | PA |
| 00463 | Active | 17-715-00981-00 | ST 0151 | O002 | ST00BP00 | PA |
| 00463 | Active | 17-715-01003-00 | ST 0151 | O003 | ST00BP00 | PA |
| 00463 | Active | 17-715-01009-00 | ST 0151 | O004 | ST00BP00 | PA |
| 00463 | Active | 17-715-01026-00 | ST 0151 | O005 | ST00BP00 | PA |
| 00463 | Active | 17-715-01034-01 | ST 0151 | O006 | ST01BP00 | PA |
| 00463 | Active | 17-715-01045-00 | ST 0151 | O007 | ST00BP00 | PA |
| 00463 | Active | 17-715-01056-00 | ST 0151 | O008 | ST00BP00 | PA |
| 00463 | Active | 17-715-01066-00 | ST 0151 | O009 | ST00BP00 | PA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|-------|--------------|-----|------------|------|--------|---------------------|
| 00463 | Active | 17-715-01076-00 | ST 0151 | O010 | ST00BP00 | PA |
| 00463 | Active | 17-715-01091-00 | ST 0151 | O011 | ST00BP01 | PA |
| 00463 | Active | 17-715-01097-00 | ST 0151 | O012 | ST00BP00 | PA |
| 00463 | Active | 17-715-01104-00 | ST 0151 | O013 | ST00BP00 | PA |
| 00463 | Active | 17-715-20001-00 | ST 0151 | O014 | ST00BP00 | PA |
| 00463 | Active | 17-715-20007-00 | ST 0151 | O015 | ST00BP00 | PA |
| 00463 | Active | 17-715-41039-00 | ST 0151 | O016 | ST00BP00 | PA |
| 00463 | Active | 17-715-41040-00 | ST 0151 | O017 | ST00BP00 | PA |
| 00463 | Active | 17-715-41159-00 | ST 0151 | O018 | ST00BP00 | PA |
| 00463 | Active | 17-715-00904-00 | ST 0151 | P001 | ST00BP01 | PA |
| 00463 | Active | 17-715-20019-00 | ST 0151 | P010 | ST00BP01 | PA |
| 00463 | Active | 17-715-20027-00 | ST 0151 | P011 | ST00BP00 | TA |
| 00463 | Active | 17-715-40966-00 | ST 0151 | P016 | ST00BP00 | TA |
| 00464 | Active | 17-715-40989-03 | ST 0152 | W005 | ST03BP00 | Prod |
| 00464 | Active | 17-715-00461-00 | ST 0152 | D002 | ST00BP00 | PA |
| 00464 | Active | 17-715-00462-00 | ST 0152 | D004 | ST00BP01 | PA |
| 00464 | Active | 17-715-00903-01 | ST 0152 | D007 | ST01BP00 | PA |
| 00464 | Active | 17-715-00927-00 | ST 0152 | D008 | ST00BP00 | PA |
| 00464 | Active | 17-715-00939-00 | ST 0152 | D010 | ST00BP00 | PA |
| 00464 | Active | 17-715-00458-00 | ST 0152 | E006 | ST00BP00 | PA |
| 00464 | Active | 17-715-00460-00 | ST 0152 | E008 | ST00BP00 | PA |
| 00464 | Active | 17-715-00576-00 | ST 0152 | E010 | ST00BP00 | PA |
| 00464 | Active | 17-715-00455-02 | ST 0152 | E012 | ST02BP00 | PA |
| 00464 | Active | 17-715-00625-00 | ST 0152 | E013 | ST00BP00 | PA |
| 00464 | Active | 17-715-00652-00 | ST 0152 | E014 | ST00BP00 | PA |
| 00464 | Active | 17-715-00700-00 | ST 0152 | E017 | ST00BP00 | PA |
| 00464 | Active | 17-715-00785-00 | ST 0152 | E019 | ST00BP01 | PA |
| 00464 | Active | 17-715-00392-00 | ST 0152 | F004 | ST00BP00 | PA |
| 00464 | Active | 17-715-00964-00 | ST 0152 | P005 | ST00BP00 | PA |
| 00464 | Active | 17-715-20012-00 | ST 0152 | P009 | ST00BP00 | PA |
| 00464 | Active | 17-715-20039-00 | ST 0152 | P012 | ST00BP00 | PA |
| 00464 | Active | 17-715-00965-00 | ST 0152 | P004 | ST00BP01 | TA |
| 00464 | Active | 17-715-40210-01 | ST 0152 | P013 | ST01BP00 | TA |
| G01248 | Active | 17-715-40048-02 | ST 0161 | C003 | ST02BP00 | Prod |
| G01248 | Active | 17-715-40679-05 | ST 0161 | C011 | ST04BP01 | Prod |
| G01248 | Active | 17-715-40820-02 | ST 0161 | C013 | ST02BP00 | Prod |
| G01248 | Active | 17-715-00423-00 | ST 0161 | 001 | ST00BP00 | PA |
| G01248 | Active | 17-715-00424-00 | ST 0161 | 002 | ST00BP00 | PA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|-------|--------------|-----|------------|------|--------|---------------------|
| G01248 | Active | 17-715-00426-00 | ST 0161 | 004 | ST00BP00 | PA |
| G01248 | Active | 17-715-00487-00 | ST 0161 | 005 | ST00BP00 | PA |
| G01248 | Active | 17-715-00493-00 | ST 0161 | 006 | ST00BP00 | PA |
| G01248 | Active | 17-715-20042-01 | ST 0161 | 008 | ST01BP00 | PA |
| G01248 | Active | 17-715-40287-00 | ST 0161 | C005 | ST00BP00 | PA |
| G01248 | Active | 17-715-40284-00 | ST 0161 | C006 | ST00BP01 | PA |
| G01248 | Active | 17-715-40655-01 | ST 0161 | C008 | ST01BP00 | PA |
| G01248 | Active | 17-715-40670-00 | ST 0161 | C010 | ST00BP01 | PA |
| G01248 | Active | 17-715-40817-01 | ST 0161 | C012 | ST01BP00 | PA |
| G01248 | Active | 17-715-40564-01 | ST 0161 | C007 | ST01BP00 | TA |
| G01248 | Active | 17-715-40656-00 | ST 0161 | C009 | ST00BP00 | TA |
| G01260 | Active | 17-715-00950-00 | ST 0177 | E001 | ST00BP00 | SI |
| G01260 | Active | 17-715-40825-02 | ST 0177 | E016 | ST01BP01 | Prod |
| G01260 | Active | 17-715-41013-04 | ST 0177 | E017 | ST04BP00 | Prod |
| G01260 | Active | 17-715-41087-00 | ST 0177 | E018 | ST00BP00 | SI |
| G01260 | Active | 17-715-40078-00 | ST 0177 | 001 | ST00BP00 | PA |
| G01260 | Active | 17-715-40347-00 | ST 0177 | 002 | ST00BP00 | PA |
| G01260 | Active | 17-715-00540-01 | ST 0177 | A003 | ST01BP00 | PA |
| G01260 | Active | 17-715-00541-00 | ST 0177 | A004 | ST00BP00 | PA |
| G01260 | Active | 17-715-00617-00 | ST 0177 | B001 | ST00BP00 | PA |
| G01260 | Active | 17-715-00649-00 | ST 0177 | B002 | ST00BP00 | PA |
| G01260 | Active | 17-715-00682-72 | ST 0177 | B003 | ST00BP03 | PA |
| G01260 | Active | 17-715-00743-00 | ST 0177 | B005 | ST00BP00 | PA |
| G01260 | Active | 17-715-00790-00 | ST 0177 | B006 | ST00BP00 | PA |
| G01260 | Active | 17-715-00827-00 | ST 0177 | B008 | ST00BP00 | PA |
| G01260 | Active | 17-715-00824-00 | ST 0177 | B009 | ST00BP01 | PA |
| G01260 | Active | 17-715-00825-00 | ST 0177 | B010 | ST00BP00 | PA |
| G01260 | Active | 17-715-00931-00 | ST 0177 | B012 | ST00BP00 | PA |
| G01260 | Active | 17-715-00738-01 | ST 0177 | B013 | ST01BP00 | PA |
| G01260 | Active | 17-715-00789-01 | ST 0177 | B015 | ST01BP00 | PA |
| G01260 | Active | 17-715-00900-02 | ST 0177 | B016 | ST02BP00 | PA |
| G01260 | Active | 17-715-40581-00 | ST 0177 | B017 | ST00BP00 | PA |
| G01260 | Active | 17-715-40587-00 | ST 0177 | B018 | ST00BP01 | PA |
| G01260 | Active | 17-715-00791-00 | ST 0177 | C001 | ST00BP00 | PA |
| G01260 | Active | 17-715-00889-71 | ST 0177 | C002 | ST00BP02 | PA |
| G01260 | Active | 17-715-00829-00 | ST 0177 | C003 | ST00BP01 | PA |
| G01260 | Active | 17-715-00826-00 | ST 0177 | C004 | ST00BP00 | PA |
| G01260 | Active | 17-715-00828-00 | ST 0177 | C005 | ST00BP00 | PA |
| G01260 | Active | 17-715-00899-00 | ST 0177 | C007 | ST00BP00 | PA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|-------|-------------|-----|-----------|------|--------|--------------------|
| G01260 | Active | 17-715-00880-01 | ST 0177 | C008 | ST01BP00 | PA |
| G01260 | Active | 17-715-00930-00 | ST 0177 | C009 | ST00BP00 | PA |
| G01260 | Active | 17-715-40687-00 | ST 0177 | E015 | ST00BP04 | PA |
| G01260 | Active | 17-715-41187-01 | ST 0177 | F002 | ST01BP00 | PA |
| G01260 | Active | 17-715-00979-02 | ST 0177 | E003 | ST02BP00 | TA |
| G01260 | Active | 17-715-40059-01 | ST 0177 | E005 | ST01BP00 | TA |
| G01260 | Active | 17-715-01011-00 | ST 0177 | E006 | ST00BP00 | TA |
| G01260 | Active | 17-715-01025-00 | ST 0177 | E007 | ST00BP00 | TA |
| G01260 | Active | 17-715-01027-00 | ST 0177 | E009 | ST00BP00 | TA |
| G01260 | Active | 17-715-01037-00 | ST 0177 | E010 | ST00BP00 | TA |
| G01260 | Active | 17-715-40246-01 | ST 0177 | E012 | ST01BP00 | TA |
| G01260 | Active | 17-715-40185-01 | ST 0177 | E013 | ST01BP00 | TA |
| G01260 | Active | 17-715-00989-01 | ST 0177 | E014 | ST01BP01 | TA |
| G01899 | Active | 17-715-40419-02 | ST 0188 | CA002 | ST02BP00 | SI |
| G01899 | Active | 17-715-41111-00 | ST 0188 | CA003 | ST00BP00 | Prod |
| G01899 | Active | 17-715-00972-01 | ST 0188 | E002 | ST01BP00 | SI |
| G01899 | Active | 17-715-01111-00 | ST 0188 | A006 | ST00BP00 | PA |
| G01899 | Active | 17-715-20084-00 | ST 0188 | A011 | ST00BP00 | PA |
| G01899 | Active | 17-715-40290-00 | ST 0188 | CA001 | ST00BP00 | TA |
| G01572 | Active | 17-715-41133-05 | ST 0189 | CA004 | ST03BP00 | Prod |
| G01572 | Active | 17-715-41142-01 | ST 0189 | CA005 | ST01BP00 | Prod |
| G01572 | Active | 17-715-41114-02 | ST 0189 | CA007 | ST02BP03 | Prod |
| G01572 | Active | 17-715-41167-01 | ST 0189 | CB007 | ST01BP00 | SI |
| G01572 | Active | 17-715-40477-02 | ST 0189 | CA006 | ST02BP00 | TA |
| G01572 | Active | 17-715-41103-00 | ST 0189 | CB005 | ST00BP00 | TA |
| G21592 | Active | 17-705-41224-00 | VR 0071 | 001 | ST00BP00 | Prod |
| G21592 | Active | 17-705-41232-01 | VR 0071 | C001 | ST01BP00 | Prod |
| G27851 | Active | 17-705-41248-00 | VR 0072 | 001 | ST00BP00 | Prod |
| G27851 | Active | 17-705-41267-00 | VR 0072 | 002 | ST00BP00 | Prod |
| G19761 | Inactive | 17-705-41176-00 | VR 0207 | A003 | ST00BP00 | TA |
| G33607 | Active | 17-706-40973-01 | VR 0341 | A003 | ST00BP01 | Prod |
| G33608 | Active | 17-706-40967-01 | VR 0342 | A001 | ST01BP00 | Prod |
| G33608 | Active | 17-706-40972-01 | VR 0342 | A002 | ST00BP01 | SI |
| G33608 | Active | 17-706-40984-04 | VR 0342 | A004 | ST04BP00 | Prod |
| G33608 | Active | 17-706-40983-00 | VR 0342 | A005 | ST00BP00 | Prod |
| G34033 | Active | 17-702-41837-01 | WC 0522 | A010 | ST00BP01 | Prod |
| G12802 | Active | 17-702-41128-00 | WC 0543 | A007 | ST00BP03 | Prod |
| G12802 | Active | 17-702-41095-01 | WC 0543 | A005 | ST01BP00 | TA |

| Lease | Lease Status | API | Area Block | Well | Suffix | Current Well Status |
|---|---|---|---|---|---|---|
| G14342 | Active | 17-702-41071-00 | WC 0544 | A001 | ST00BP01 | Prod |
| G14342 | Active | 17-702-41087-01 | WC 0544 | A003 | ST01BP00 | Prod |
| G14342 | Active | 17-702-41091-02 | WC 0544 | A004 | ST01BP01 | Prod |
| G14342 | Active | 17-702-41108-04 | WC 0544 | A006 | ST03BP01 | Prod |
| G14342 | Active | 17-702-41182-01 | WC 0544 | A009 | ST01BP00 | Prod |
| G14342 | Active | 17-702-41839-02 | WC 0544 | A011 | ST02BP00 | Prod |
| G14342 | Active | 17-702-41838-00 | WC 0544 | A012 | ST00BP00 | Prod |
| G14342 | Active | 17-702-41144-00 | WC 0544 | A008 | ST00BP00 | PA |
| G14342 | Active | 17-702-41077-00 | WC 0544 | A002 | ST00BP00 | TA |
| G01082 | Active | 17-719-40851-00 | WD 0072 | B001 | ST00BP00 | SI |
| G04895 | Inactive | 17-719-40827-00 | WD 0085 | A016 | ST00BP00 | SI |
| G04243 | Active | 17-719-40500-00 | WD 0086 | B001 | ST00BP00 | SI |
| G04243 | Active | 17-719-40526-00 | WD 0086 | B002 | ST00BP00 | SI |
| G04243 | Active | 17-719-40834-00 | WD 0086 | B003 | ST00BP00 | SI |
| G04243 | Active | 17-719-40835-00 | WD 0086 | B005 | ST00BP00 | SI |
| G04243 | Active | 17-719-40201-01 | WD 0086 | 001 | ST01BP01 | PA |
| G04243 | Active | 17-719-40264-00 | WD 0086 | 002 | ST00BP00 | PA |
| G04243 | Active | 17-719-40270-00 | WD 0086 | 003 | ST00BP00 | PA |
| G04243 | Active | 17-719-40836-00 | WD 0086 | B004 | ST00BP00 | PA |
| G04243 | Active | 17-719-40256-00 | WD 0086 | A003 | ST00BP00 | TA |
| G04243 | Active | 17-719-40273-00 | WD 0086 | A004 | ST00BP00 | TA |
| G04243 | Active | 17-719-40239-00 | WD 0086 | A005 | ST01BP00 | TA |
| G04243 | Active | 17-719-40313-00 | WD 0086 | A008 | ST00BP01 | TA |
| G04243 | Active | 17-719-40325-00 | WD 0086 | A014 | ST00BP00 | TA |
| G35951 | Active | 17-720-40075-00 | WD 0117 | G004 | ST00BP00 | TA |
| G35951 | Active | 17-720-40079-01 | WD 0117 | G006 | ST01BP00 | TA |
| G35951 | Active | 17-720-40080-00 | WD 0117 | G008 | ST00BP00 | TA |
| G35951 | Active | 17-720-40089-00 | WD 0117 | G012 | ST00BP00 | TA |
| G35951 | Active | 17-720-40091-00 | WD 0117 | G013 | ST00BP00 | TA |
| G35951 | Active | 17-720-40092-00 | WD 0117 | G014 | ST00BP00 | TA |
| G35951 | Active | 17-720-40093-00 | WD 0117 | G015 | ST00BP00 | TA |
| G35951 | Active | 17-720-40096-00 | WD 0117 | G018 | ST00BP00 | TA |
| G35951 | Active | 17-720-40135-02 | WD 0117 | G023 | ST02BP00 | TA |
| G01106 | Active | 17-720-40165-01 | WD 0133 | F001 | ST01BP00 | Prod |
| G01106 | Active | 17-720-40171-00 | WD 0133 | F003 | ST00BP00 | Prod |
| G01106 | Active | 17-720-40176-00 | WD 0133 | F004 | ST00BP00 | Prod |
| G01106 | Active | 17-720-40170-00 | WD 0133 | F002 | ST00BP00 | TA |

**END OF EXHIBIT B**

# EXHIBIT C

Attached to and made a part of that certain Asset Purchase Agreement by and among
Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller
and San Juan Offshore, LLC, as Buyer

## ASSIGNED CONTRACTS

| Area/ Block | Lease | Agreement | Effective Date | Parties |
|---|---|---|---|---|
| East Cameron 328 | OCS-G 10638 | Offshore Operating Agreement | 1/1/2005 | Maritech Resources, Inc. and Arena Offshore, LLC |
| East Cameron 328 | OCS-G 10638 | Option Agreement | 11/23/2004 | Maritech Resources, Inc. and Arena Offshore, LLC |
| East Cameron 328 | OCS-G 10638 | Amendment to Option Agreement | 10/12/2005 | Maritech Resources, Inc. and Arena Offshore, LLC |
| East Cameron 328 | OCS-G 10638 | Participation Agreement | 11/23/2004 | Maritech Resources, Inc. and Arena Offshore, LLC |
| East Cameron 328 | OCS-G 10638 | Amendment to Participation Agreement | 1/28/2005 | Maritech Resources, Inc. and Arena Offshore, LLC |
| East Cameron 328 | OCS-G 10638 | Amendment to 1/1/2005 Offshore Operating Agreement | 9/16/2011 | Tana Exploration Company LLC and Arena Offshore, LLC |
| East Cameron 328 | OCS-G 10638 | Production Handling Agreement | 1/1/2012 | Arena Offshore, LLC, Peregrine Oil & Gas II, LLC and Entek USA General LLC |
| East Cameron 328 | OCS-G 10638 | Amendment to Production Handling Agreement | 5/1/2014 | Arena Offshore, LP, Peregrine Oil & Gas II, LLC and Arena Energy, LP |
| East Cameron 328 | OCS-G 10638 | Second Amendment to Production Handling Agreement | 9/11/2019 | Arena Offshore, LP, Peregrine Oil & Gas II, LLC and Arena Energy, LP |

| East Cameron 328 | OCS-G 10638 | Precedent Agreement | 12/30/2016 | Stingray Pipeline Company, L.L.C. |
|---|---|---|---|---|
| Eugene Island 38 | OCS-G 24883 | Acquisition Agreement | 1/16//2004 | Arena Offshore, LLC and Northstar Gulfsands, LLC, Etal |
| Eugene Island 38 | OCS-G 24883 | Prospect Area Offshore Operating Agreement | 10/18/2004 | Arena Offshore, LLC and Northstar Gulfsands, LLC, Etal |
| Eugene Island 38 | OCS-G 24883 | Acquisition Letter Agreement | 5/5/2008 | Chevron U.S.A. Inc., Union Oil Company o California and Arena Energy, LLC |
| Eugene Island 38 | OCS-G 24883 | Purchase and Sale Agreement | 6/1/2018 | GS E&R American Offshore, LLC and Arena Energy, LP |
| Eugene Island 38 | OCS-G 24883 | Evaluation Agreement | 5/8/2008 | Northstar GOM, Gulfsands Petroleum, Entech Enterprises and Arena Energy, LLC |
| Eugene Island 38 | OCS-G 24883 | Amendment to Evaluation Agreement | 1/28/05 | Northstar GOM, Gulfsands Petroleum, Entech Enterprises and Arena Energy, LLC |
| Eugene Island 38 | OCS-G 24883 | Resignation as Processor under Terminating Production Handling Agreement | 10/22/2019 | ANDKOR E&P Holdings, Entech Enterprises Inc., SCL Resources Inc., Sanare Energy Partners |
| Eugene Island 57 | OCS-G 02601 Expired | Prospect Area Offshore Operating Agreement | 10/18/2004 | Arena Offshore, LLC and Northstar Gulfsands, LLC, Etal |
| Eugene Island 57 | OCS-G 02601 Expired | Evaluation Agreement | 5/8/2008 | Northstar GOM, Gulfsands Petroleum, Entech Enterprises and Arena Energy, LLC |
| Eugene Island 57 | OCS-G 02601 Expired | Amendment to Evaluation Agreement | 1/28/05 | Northstar GOM, Gulfsands Petroleum, Entech Enterprises and Arena Energy, LLC |
| Eugene Island 57 | OCS-G 02601 Expired | Purchase and Sale Agreement | 6/1/2018 | GS E&R American Offshore, LLC and Arena Energy, LP |
| Eugene Island 57 | OCS-G 02601 Expired | Resignation as Processor under Terminating Production Handling Agreement | 10/22/2019 | ANDKOR E&P Holdings, Entech Enterprises Inc., SCL Resources Inc., Sanare Energy Partners |

EXHIBIT C
PAGE 2

| Eugene Island 58 | OCS-G 02895 | Prospect Area Offshore Operating Agreement | 10/18/2004 | Arena Offshore, LLC and Northstar Gulfsands, LLC, Etal |
|---|---|---|---|---|
| Eugene Island 58 | OCS-G 02895 | Evaluation Agreement | 5/8/2008 | Northstar GOM, Gulfsands Petroleum, Entech Enterprises and Arena Energy, LLC |
| Eugene Island 58 | OCS-G 02895 | Amendment to Evaluation Agreement | 1/28/05 | Northstar GOM, Gulfsands Petroleum, Entech Enterprises and Arena Energy, LLC |
| Eugene Island 58 | OCS-G 02895 | Purchase and Sale Agreement | 6/1/2018 | GS E&R American Offshore, LLC and Arena Energy, LP |
| Eugene Island 58 | OCS-G 02895 | Resignation as Processor under Terminating Production Handling Agreement | 10/22/2019 | ANKOR E&P Holdings, Entech Enterprises Inc., SCL Resources Inc., Sanare Energy Partners |
| Eugene Island 58 | OCS-G 02895 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| Eugene Island 99 | OCS-G 31369 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 99 | OCS-G 31369 | Master License Agreement, as amended | 6/10/2002 | Fairfield Industries Incorporated and Arena Energy, LLC |
| Eugene Island 99 | OCS-G 31369 | Production Handling Agreement | 12/1/2010 | Arena Offshore, LLC and Arena Energy, LLC/Arena Offshore, LLC |
| Eugene Island 100 | OCS 00796 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 100 | OCS 00796 | Offshore Operating Agreement | 2/13/2004 | Arena Offshore, LLC, SPN Resources, LLC and Triumph Energy, LLC |
| Eugene Island 100 | OCS 00796 | Purchase and Sale Agreement | 2/13/2004 | Apache Corporation and SPN Resources |
| Eugene Island 100 | OCS 00796 | Purchase and Sale Agreement | 2/13/2004 | SPN Resources, Triumph Energy, LLC and Arena Offshore, LLC |

EXHIBIT C
PAGE 3

| Eugene Island 100 | OCS 00796 | Exchange Agreement | 12/1/2007 | SPN Resources, Arena Energy, LLC and Arena Offshore, LLC |
|---|---|---|---|---|
| Eugene Island 100 | OCS 00796 | Production Handling Agreement | 12/1/2010 | Arena Energy, LLC, Arena Offshore, LLC and Arena Exploration |
| Eugene Island 100 | OCS 00796 | Oil Gathering and Reserve Dedication Agreement | 7/11/2019 | Renaissance Offshore, LLC |
| Eugene Island 174 | OCS-G 03782 | Offshore Operating Agreement | 4/14/1995 | Newfield Exploration Company and Vastar Resources, Inc. |
| Eugene Island 174 | OCS-G 03782 | Purchase and Sale Agreement | 7/1/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 174 | OCS-G 03782 | Amendment to Purchase and Sale Agreement | 10/30/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 174 | OCS-G 03782 | Second Amendment to Purchase and Sale Agreement | 11/9/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 174 | OCS-G 03782 | Third Amendment to Purchase and Sale Agreement | 11/13/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 181 | OCS-G 04451 Expired | Joint Operating Agreement attached to Participation Agreement | 6/1/1993 | Newfield Exploration Company |
| Eugene Island 182 | OCS-G 04452 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 182 | OCS-G 04452 | Joint Operating Agreement | 6/1/1993 | Newfield Exploration Company |
| Eugene Island 182 | OCS-G 04452 | Purchase and Sale Agreement | 7/1/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 182 | OCS-G 04452 | Purchase and Sale Agreement | 7/1/2012 | Diverse Offshore, Arena Energy, LP and Arena Offshore, LP |

EXHIBIT C
PAGE 4

| Eugene Island 182 | OCS-G 04452 | Purchase and Sale Agreement | 7/1/2012 | CL&F Resources, Piquant, Arena Energy, LP and Arena Offshore, LP |
|---|---|---|---|---|
| Eugene Island 182 | OCS-G 04452 | Amendment to Purchase and Sale Agreement | 10/30/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 182 | OCS-G 04452 | Second Amendment to Purchase and Sale Agreement | 11/9/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 182 | OCS-G 04452 | Third Amendment to Purchase and Sale Agreement | 11/13/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 182 | OCS-G 04452 | Purchase and Sale Agreement | 3/1/2014 | Fidelity Oil, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 182 | OCS-G 04452 | Gas Dehydration Agreement | 12/1/2000 | Enterprise Products Operating LLC |
| Eugene Island 182 | OCS-G 04452 | Gas Processing Commitment and Dedication Agreement | 12/27/2002 | Lone Star NGL Sea Robin LLC |
| Eugene Island 182 | OCS-G 04452 | Oil Sales Contract | 3/1/2020 | BP Oil Supply (BP Products North America) |
| Eugene Island 182 | OCS-G 04452 | Operation and Maintenance of Measurement Facilities | 7/1/1994 | Sea Robin Pipeline Company, LLC |
| Eugene Island 182 | OCS-G 04452 | Tie-In Agreement | 10/31/1983 | Crimson Gulf, LLC |
| Eugene Island 182 | OCS-G 04452 | Oil Gathering and Reserve Dedication Agreement | 8/30/2018 | Rosefield Pipeline Company, LLC |
| Eugene Island 182 | OCS-G 04452 | Connection Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 182 | OCS-G 04452 | Incentive And Discount Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |

EXHIBIT C
PAGE 5

| Eugene Island 214 | OCS-G 00977 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
|---|---|---|---|---|
| Eugene Island 214 | OCS-G 00977 | Unit Agreement 14-08-0001-8813 | 10/6/1966 | U.S.A. and Chevron Oil Company |
| Eugene Island 214 | OCS-G 00977 | Amendment Unit Agreement 14-08-0001-8813 | 5/21/1973 | U.S.A. and Chevron Oil Company |
| Eugene Island 214 | OCS-G 00977 | Amendment Unit Agreement 14-08-0001-8813 | 11/29/1983 | U.S.A. and Chevron Oil Company |
| Eugene Island 214 | OCS-G 00977 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 214 | OCS-G 00977 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 214 | OCS-G 00977 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 215 | OCS 00578 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 215 | OCS 00578 | Purchase and Sale Agreement | 7/1/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 215 | OCS 00578 | Amendment to Purchase and Sale Agreement | 10/30/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 215 | OCS 00578 | Second Amendment to Purchase and Sale Agreement | 11/9/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 215 | OCS 00578 | Third Amendment to Purchase and Sale Agreement | 11/13/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 215 | OCS 00578 | Asset Purchase and Sale Agreement | 10/1/2014 | Chevron U.S.A. Inc., Chevron Pipeline and Arena Energy, LP |

EXHIBIT C
PAGE 6

| Eugene Island 215 | OCS 00578 | Oil Gathering and Reserve Dedication Agreement | 8/30/2018 | Rosefield Pipeline Company, LLC |
|---|---|---|---|---|
| Eugene Island 215 | OCS 00578 | Connection Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 215 | OCS 00578 | Incentive And Discount Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 215 | OCS 00578 | Gas Processing & Fractionation Agreement | 1/1/2011 | Enterprise Gas Processing, LLC |
| Eugene Island 215 | OCS 00578 | Lateral Line Interconnect, Reimbursement and Operating Agreement | 5/3/2000 | Transcontinental Gas Pipeline ‖ Williams Field Services (WFS) |
| Eugene Island 215 | OCS 00578 | Lateral Line Interconnect, Reimbursement, Construction, and Operating Agreement | 11/8/2004 | Transcontinental Gas Pipeline |
| Eugene Island 215 | OCS 00578 | Successor Natural Gas Processing Agreement | 12/1/2012 | Targa Midstream Services LLC |
| Eugene Island 215 | OCS-G 26033 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 215 | OCS-G 26033 | Purchase and Sale Agreement | 1/1/2015 | Tarpon Operating & Development and Arena Energy, LP |
| Eugene Island 215 | OCS-G 26033 | Amendment to Purchase and Sale Agreement | 1/1/2015 | Tarpon Operating & Development and Arena Energy, LP |
| Eugene Island 217 | OCS-G 36743 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 217 | OCS-G 00978 Expired | Purchase and Sale Agreement | 7/1/2012 | McMoRan Oil & Gas LLC, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 227 | OCS-G 00809 Expired | Purchase and Sale Agreement | 7/1/2012 | McMoRan Oil & Gas LLC, Arena Energy, LP and Arena Offshore, LP |

EXHIBIT C
PAGE 7

| Eugene Island 227 | OCS-G 36745 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
|---|---|---|---|---|
| Eugene Island 227 | OCS-G 36745 | Oil Gathering and Reserve Dedication Agreement | 8/30/2018 | Rosefield Pipeline Company, LLC |
| Eugene Island 227 | OCS-G 36745 | Connection Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 227 | OCS-G 36745 | Incentive And Discount Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 227 | OCS-G 36745 | Connection Agreement | 8/1/2007 | W&T Offshore Inc. |
| Eugene Island 227 | OCS-G 36745 | Construction, Operation and Interconnect Agreement | 12/15/1989 | Kinetica Deepwater Express, LLC |
| Eugene Island 227 | OCS-G 36745 | Production Scheduling Agreement | 2/15/2002 | Kinetica Deepwater Express, LLC |
| Eugene Island 227 | OCS-G 36745 | Products Purchase Agreement | 3/1/2009 | Enterprise Gas Processing, LLC |
| Eugene Island 229 | OCS-G 05505 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 229 | OCS-G 05505 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 229 | OCS-G 05505 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 230 | OCS-G 00979 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 230 | OCS-G 00979 | Unit Agreement 14-08-0001-8813 | 10/6/1966 | U.S.A. and Chevron Oil Company |

EXHIBIT C
PAGE 8

| Eugene Island 230 | OCS-G 00979 | Amendment Unit Agreement 14-08-0001-8813 | 5/21/1973 | U.S.A. and Chevron Oil Company |
|---|---|---|---|---|
| Eugene Island 230 | OCS-G 00979 | Amendment Unit Agreement 14-08-0001-8813 | 11/29/1983 | U.S.A. and Chevron Oil Company |
| Eugene Island 230 | OCS-G 00979 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 230 | OCS-G 00979 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 230 | OCS-G 00979 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 231 | OCS-G 00980 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 231 | OCS-G 00980 | Unit Agreement 14-08-0001-8813 | 10/6/1966 | U.S.A. and Chevron Oil Company |
| Eugene Island 231 | OCS-G 00980 | Amendment Unit Agreement 14-08-0001-8813 | 5/21/1973 | U.S.A. and Chevron Oil Company |
| Eugene Island 231 | OCS-G 00980 | Amendment Unit Agreement 14-08-0001-8813 | 11/29/1983 | U.S.A. and Chevron Oil Company |
| Eugene Island 231 | OCS-G 00980 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 231 | OCS-G 00980 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 231 | OCS-G 00980 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 237 | OCS-G 00981 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |

EXHIBIT C
PAGE 9

| Eugene Island 237 | OCS-G 00981 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
|---|---|---|---|---|
| Eugene Island 237 | OCS-G 00981 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 237 | OCS-G 00981 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 238 | OCS-G 00982 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 238 | OCS-G 00982 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 238 | OCS-G 00982 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 238 | OCS-G 00982 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 238 | OCS-G 00982 | Oil Gathering and Reserve Dedication Agreement | 8/30/2018 | Rosefield Pipeline Company, LLC |
| Eugene Island 238 | OCS-G 00982 | Connection Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 238 | OCS-G 00982 | Incentive And Discount Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 238 | OCS-G 00982 | Agreement For Implementation Of Electronic Custody Transfer | 7/1/1993 | Kinetica Energy Express, LLC |
| Eugene Island 238 | OCS-G 00982 | Connection Agreement | 9/17/1990 | Kinetica Energy Express, LLC |
| Eugene Island 238 | OCS-G 00982 | Gas Gathering Agreement | 7/1/2019 | Kinetica Midstream Energy, LLC |

EXHIBIT C
PAGE 10

| Eugene Island 238 | OCS-G 00982 | Gas Processing Agreement - Venice Gas Processing Plant | 4/1/2013 | Venice Energy Services Company, L.L.C. |
|---|---|---|---|---|
| Eugene Island 238 | OCS-G 00982 | Platform Space Agreement | 12/19/1995 | Kinetica Deepwater Express, LLC |
| Eugene Island 238 | OCS-G 00982 | Transportation Service Agreement - Rate Schedule IT | 9/1/2013 | Kinetica Energy Express, LLC |
| Eugene Island 238 | OCS-G 00982 | Liquids Transportation Agreement - Cocodrie and Pecan Island Plants | 5/1/2004 | Kinetica Energy Express, LLC |
| Eugene Island 251 | OCS-G 03331 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 251 | OCS-G 03331 | Purchase and Sale Agreement | 7/1/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 251 | OCS-G 03331 | Purchase and Sale Agreement | 7/1/2012 | Diverse Offshore, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 251 | OCS-G 03331 | Purchase and Sale Agreement | 7/1/2012 | CL&F Resources, Piquant, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 251 | OCS-G 03331 | Amendment to Purchase and Sale Agreement | 10/30/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 251 | OCS-G 03331 | Second Amendment to Purchase and Sale Agreement | 11/9/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 251 | OCS-G 03331 | Third Amendment to Purchase and Sale Agreement | 11/13/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 251 | OCS-G 03331 | Purchase and Sale Agreement | 7/1/2012 | Milagro Production, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 251 | OCS-G 03331 | Oil Gathering and Reserve Dedication Agreement | 8/30/2018 | Rosefield Pipeline Company, LLC |

EXHIBIT C
PAGE 11

| Eugene Island 251 | OCS-G 03331 | Connection Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
|---|---|---|---|---|
| Eugene Island 251 | OCS-G 03331 | Incentive And Discount Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 251 | OCS-G 03331 | Transportation Service Agreement - Rate Schedule IT | 9/1/2013 | Kinetica Energy Express, LLC |
| Eugene Island 252 | OCS-G 00983 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 252 | OCS-G 00983 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 252 | OCS-G 00983 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 252 | OCS-G 00983 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 252 | OCS-G 00983 | Oil Gathering and Reserve Dedication Agreement | 8/30/2018 | Rosefield Pipeline Company, LLC |
| Eugene Island 252 | OCS-G 00983 | Connection Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 252 | OCS-G 00983 | Incentive And Discount Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 252 | OCS-G 00983 | Liquids Transportation Agreement - Cocodrie and Pecan Island Plants | 5/1/2004 | Kinetica Energy Express, LLC |
| Eugene Island 252 | OCS-G 00983 | Tie-In Agreement | 10/22/1997 | Crimson Gulf, LLC |
| Eugene Island 253 | OCS-G 10741 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |

EXHIBIT C
PAGE 12

| | | | | |
|---|---|---|---|---|
| Eugene Island 253 | OCS-G 10741 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 253 | OCS-G 10741 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 253 | OCS-G 10741 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 253 | OCS-G 35938 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 254 | OCS-G 36207 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 261 | OCS-G 36208 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 262 | OCS-G 07736 Expired | Purchase and Sale Agreement | 7/1/2012 | McMoRan Oil & Gas LLC, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 262 | OCS-G 36209 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 275 | OCS-G 24910 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 275 | OCS-G 24910 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 275 | OCS-G 24910 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 275 | OCS-G 24910 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 275 | OCS-G 24910 | Transportation Service Agreement - Rate Schedule IT | 9/1/2013 | Kinetica Energy Express, LLC |

EXHIBIT C
PAGE 13

| | | | | |
|---|---|---|---|---|
| Eugene Island 276 | OCS-G 00989 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 276 | OCS-G 00989 | Offshore Operating Agreement | 5/22/2002 | Union Oil Company of California and Kerr-McGee Oil & Gas Corporation |
| Eugene Island 276 | OCS-G 00989 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 276 | OCS-G 00989 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 276 | OCS-G 00989 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 276 | OCS-G 00989 | Oil Gathering and Reserve Dedication Agreement | 8/30/2018 | Rosefield Pipeline Company, LLC |
| Eugene Island 276 | OCS-G 00989 | Connection Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 276 | OCS-G 00989 | Incentive And Discount Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 276 | OCS-G 00989 | Facilities Agreement | 10/24/2005 | Kinetica Deepwater Express, LLC |
| Eugene Island 314 | OCS-G 02111 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 314 | OCS-G 02111 | Purchase and Sale Agreement | 6/1/2011 | ExxonMobil, ExxonMobil Pipeline and Arena Energy, LP |
| Eugene Island 314 | OCS-G 02111 | Unit Agreement 14-08-0001-16927 (Terminated) | 3/1/1977 | Exxon Corporation, Texaco Inc., Gulf Oil Corporation and Shell Oil Company |
| Eugene Island 314 | OCS-G 02111 | Unit Agreement 14-08-0001-16928 (Terminated) | 3/1/1977 | Exxon Corporation, Texaco Inc., Gulf Oil Corporation and Shell Oil Company |

EXHIBIT C
PAGE 14

| Eugene Island 314 | OCS-G 02111 | Unit Agreement 14-08-0001-16929 (Terminated) | 3/1/1977 | Exxon Corporation, Texaco Inc., Gulf Oil Corporation and Shell Oil Company |
|---|---|---|---|---|
| Eugene Island 314 | OCS-G 02111 | Unit Agreement 14-08-0001-16941 | 10/1/1976 | Exxon Corporation, Texaco Inc., Gulf Oil Corporation and Shell Oil Company |
| Eugene Island 314 | OCS-G 02111 | Unit Agreement 14-08-0001-16937 (Terminated) | 10/1/1976 | Exxon Corporation, Texaco Inc., Gulf Oil Corporation and Shell Oil Company |
| Eugene Island 314 | OCS-G 02111 | Unit Interest Exchange Agreement | 4/1/2014 | Renaissance Offshore LLC, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 314 | OCS-G 02111 | Asset Purchase and Sale Agreement | 10/1/2014 | Chevron U.S.A. Inc., Chevron Pipeline and Arena Energy, LP |
| Eugene Island 314 | OCS-G 02111 | Amendment to Asset Purchase and Sale Agreement | 10/1/2014 | Chevron U.S.A. Inc., Chevron Pipeline and Arena Energy, LP |
| Eugene Island 314 | OCS-G 02111 | Unit Interest Exchange Agreement | 8/1/2015 | Renaissance Offshore LLC, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 314 | OCS-G 33636 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 314 | OCS-G 33636 | Gas Processing Agreement | 6/1/2011 | Enterprise Gas Processing, LLC |
| Eugene Island 314 | OCS-G 33636 | Interruptible Transportation Service Agreement - GAS | 9/1/2006 | Sea Robin Pipeline Company, LLC |
| Eugene Island 315 | OCS-G 02112 | Purchase and Sale Agreement | 6/1/2011 | ExxonMobil, ExxonMobil Pipeline and Arena Energy, LP |
| Eugene Island 315 | OCS-G 02112 | Agreement for Ownership of Multi-Lease Platform and Facility | 1/1/1982 | McMoRan Etal |
| Eugene Island 315 | OCS-G 02112 | Operating Agreement | 1/1/1982 | Exxon Corporation and Sohio Petroleum |

EXHIBIT C
PAGE 15

| Eugene Island 315 | OCS-G 02112 | Amendment to Slot Sale and Purchase Agreement | 3/1/1984 | Sohio Petroleum, Exxon Corporation, Mesa Petroleum and Pennzoil Company |
| --- | --- | --- | --- | --- |
| Eugene Island 315 | OCS-G 02112 | Slot Sale and Purchase Agreement | 5/16/1984 | Sohio Petroleum and Exxon Corporation |
| Eugene Island 315 | OCS-G 02112 | Slot Sale and Purchase Agreement | 3/28/2000 | Exxon Corporation and Devon Energy |
| Eugene Island 315 | OCS-G 02112 | Gas Processing Agreement | 6/1/2011 | Enterprise Gas Processing, LLC |
| Eugene Island 320 | OCS-G 36211 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 324 | OCS-G 36118 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 325 | OCS-G 36119 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 332 | OCS-G 02613 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 332 | OCS-G 02613 | Purchase and Sale Agreement | 6/1/2011 | ExxonMobil, ExxonMobil Pipeline and Arena Energy, LP |
| Eugene Island 332 | OCS-G 02613 | Unit Agreement 14-08-0001-16927 (Terminated) | 3/1/1977 | Exxon Corporation, Texaco Inc., Gulf Oil Corporation and Shell Oil Company |
| Eugene Island 332 | OCS-G 02613 | Unit Agreement 14-08-0001-16928 (Terminated) | 3/1/1977 | Exxon Corporation, Texaco Inc., Gulf Oil Corporation and Shell Oil Company |
| Eugene Island 332 | OCS-G 02613 | Unit Agreement 14-08-0001-16929 (Terminated) | 3/1/1977 | Exxon Corporation, Texaco Inc., Gulf Oil Corporation and Shell Oil Company |
| Eugene Island 332 | OCS-G 02613 | Unit Agreement 14-08-0001-16937 (Terminated) | 10/1/1976 | Exxon Corporation, Texaco Inc., Gulf Oil Corporation and Shell Oil Company |

EXHIBIT C
PAGE 16

| | | | | |
|---|---|---|---|---|
| Eugene Island 332 | OCS-G 02613 | Unit Agreement 14-08-0001-16932 | 3/1/1977 | Exxon Corporation and Shell Oil Company |
| Eugene Island 332 | OCS-G 02613 | Unit Agreement 14-08-0001-16933 | 3/1/1977 | Exxon Corporation and Shell Oil Company |
| Eugene Island 332 | OCS-G 02613 | Asset Purchase and Sale Agreement | 10/1/2014 | Chevron U.S.A. Inc., Chevron Pipeline and Arena Energy, LP |
| Eugene Island 332 | OCS-G 02613 | Amendment to Asset Purchase and Sale Agreement | 10/1/2014 | Chevron U.S.A. Inc., Chevron Pipeline and Arena Energy, LP |
| Eugene Island 338 | OCS-G 02118 | Farmout Agreement | 12/15/2009 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 338 | OCS-G 02118 | Amendment to Farmout Agreement | 11/04/2010 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 338 | OCS-G 02118 | Second Amendment to Farmout Agreement | 3/28/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 338 | OCS-G 02118 | Third Amendment to Farmout Agreement | 6/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 338 | OCS-G 02118 | Fourth Amendment to Farmout Agreement | 9/24/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 338 | OCS-G 02118 | Fifth Amendment to Farmout Agreement | 10/1/2014 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 338 | OCS-G 02118 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 338 | OCS-G 02118 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 338 | OCS-G 02118 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |

EXHIBIT C
PAGE 17

| Eugene Island 338 | OCS-G 02118 | Successor Natural Gas Processing Agreement | 12/1/2012 | Targa Midstream Services LLC |
|---|---|---|---|---|
| Eugene Island 338 | OCS-G 02118 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 338 | OCS-G 02118 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 339 | OCS-G 02318 | Farmout Agreement | 12/15/2009 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 339 | OCS-G 02318 | Amendment to Farmout Agreement | 11/04/2010 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 339 | OCS-G 02318 | Second Amendment to Farmout Agreement | 3/28/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 339 | OCS-G 02318 | Third Amendment to Farmout Agreement | 6/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 339 | OCS-G 02318 | Fourth Amendment to Farmout Agreement | 9/24/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 339 | OCS-G 02318 | Fifth Amendment to Farmout Agreement | 10/1/2014 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 339 | OCS-G 02318 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 339 | OCS-G 02318 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 339 | OCS-G 02318 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 339 | OCS-G 02318 | Successor Natural Gas Processing Agreement | 12/1/2012 | Targa Midstream Services LLC |

EXHIBIT C
PAGE 18

| Eugene Island 339 | OCS-G 02318 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
|---|---|---|---|---|
| Eugene Island 339 | OCS-G 02318 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 340 | OCS-G 36212 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 341 | OCS-G 02914 | Asset Purchase and Sale Agreement | 10/1/2014 | Chevron U.S.A. Inc., Chevron Pipeline and Arena Energy, LP |
| Eugene Island 341 | OCS-G 02914 | Amendment to Asset Purchase and Sale Agreement | 10/1/2014 | Chevron U.S.A. Inc., Chevron Pipeline and Arena Energy, LP |
| Eugene Island 341 | OCS-G 02914 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 341 | OCS-G 02914 | Farmout Proposal | 11/24/1997 | NCX Company and Chevron U.S.A. Production Company |
| Eugene Island 341 | OCS-G 02914 | Participation Agreement | 2/17/1998 | NCX Company and King Ranch Energy |
| Eugene Island 341 | OCS-G 02914 | Amendment to Farmout Proposal | 1/17/2002 | NCX Company and Chevron U.S.A. Production Company |
| Eugene Island 341 | OCS-G 02914 | Oil Gathering and Reserve Dedication Agreement | 8/30/2018 | Rosefield Pipeline Company, LLC |
| Eugene Island 341 | OCS-G 02914 | Connection Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 341 | OCS-G 02914 | Incentive And Discount Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 341 | OCS-G 02914 | Successor Natural Gas Processing Agreement | 12/1/2012 | Targa Midstream Services LLC |

EXHIBIT C
PAGE 19

| Eugene Island 341 | OCS-G 02914 | Transportation Service Agreement - Rate Schedule IT | 9/1/2013 | Kinetica Energy Express, LLC |
|---|---|---|---|---|
| Eugene Island 341 | OCS-G 02914 | Metering and Facilities Agreement | 10/28/2013 | Kinetica Deepwater Express, LLC |
| Eugene Island 341 | OCS-G 02914 | ITS Service Agreement | 12/1/2012 | Kinetica Deepwater Express, LLC |
| Eugene Island 346 | OCS-G 14482 | Purchase and Sale Agreement | 7/1/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 346 | OCS-G 14482 | Amendment to Purchase and Sale Agreement | 10/30/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 346 | OCS-G 14482 | Second Amendment to Purchase and Sale Agreement | 11/9/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 346 | OCS-G 14482 | Third Amendment to Purchase and Sale Agreement | 11/13/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 346 | OCS-G 14482 | Offshore Operating Agreement | 3/15/2007 | Newfield Exploration and Ridgewood |
| Eugene Island 346 | OCS-G 14482 | Participation Agreement | 3/15/2007 | Newfield Exploration and Ridgewood |
| Eugene Island 346 | OCS-G 14482 | ITS Service Agreement | 12/1/2012 | Kinetica Deepwater Express, LLC |
| Galveston 192 | OCS-G 03229 | Purchase and Sale Agreement | 1/1/2019 | ExxonMobil and Arena Energy, LP |
| Galveston 192 | OCS-G 03229 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Galveston 192 | OCS-G 03229 | Unit Operating Agreement | 1/1/978 | Exxon Corporation and Shell Offshore |

EXHIBIT C
PAGE 20

| Galveston 192 | OCS-G 03229 | Agreement for Ownership of Multiple Lease Platform, Facilities, Quarters and Compressor | 1/1/1978 | Exxon Corporation and Shell Offshore |
|---|---|---|---|---|
| Galveston 192 | OCS-G 03229 | PHA for Agreement for Ownership of Multiple Lease Platform, Facilities, Quarters and Compressor | 10/6/1989 | Exxon Corporation and Shell Offshore |
| Galveston 192 | OCS-G 03229 | Unit Agreement #754388007 | 1/8/1988 | Exxon Corporation and Shell Offshore |
| Galveston 209 | OCS-G 06093 | Purchase and Sale Agreement | 1/1/2019 | ExxonMobil and Arena Energy, LP |
| Galveston 209 | OCS-G 06093 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Galveston 209 | OCS-G 06093 | HIPS Throughput Capacity Lease Agreement | 11/1/2007 | McMoran Oil & Gas LLC |
| Galveston 209 | OCS-G 06093 | Lateral Line Interconnect, Reimbursement and Operating Agreement | 2/27/2003 | Williams Field Services (WFS) |
| Galveston 209 | OCS-G 06093 | Offshore Pipeline Interconnect and Operating Agreement | 4/15/1997 | ExxonMobil Pipeline Company |
| High Island 193 | OCS-G 03237 | Purchase and Sale Agreement | 1/1/2019 | ExxonMobil and Arena Energy, LP |
| High Island 193 | OCS-G 03237 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| High Island 193 | OCS-G 03237 | Unit Operating Agreement | 1/1/978 | Exxon Corporation and Shell Offshore |
| High Island 193 | OCS-G 03237 | Agreement for Ownership of Multiple Lease Platform, Facilities, Quarters and Compressor | 1/1/1978 | Exxon Corporation and Shell Offshore |
| High Island 193 | OCS-G 03237 | PHA for Agreement for Ownership of Multiple Lease Platform, Facilities, Quarters and Compressor | 10/6/1989 | Exxon Corporation and Shell Offshore |

EXHIBIT C
PAGE 21

| High Island 193 | OCS-G 03237 | Unit Agreement #754388007 | 1/8/1988 | Exxon Corporation and Shell Offshore |
|---|---|---|---|---|
| High Island A-547 | OCS-G 02705 | Purchase and Sale Agreement | 9/1/2003 | Noble Energy, Inc. and Triumph Energy, LLC |
| High Island A-547 | OCS-G 02705 | Amendment to Purchase and Sale Agreement | 4/21/2004 | Noble Energy, Inc. and Triumph Energy, LLC |
| High Island A-547 | OCS-G 02705 | Second Amendment to Purchase and Sale Agreement | 4/28/2004 | Noble Energy, Inc. and Triumph Energy, LLC |
| High Island A-547 | OCS-G 02705 | Third Amendment to Purchase and Sale Agreement | 4/28/2004 | Noble Energy, Inc. and Triumph Energy, LLC |
| High Island A-547 | OCS-G 02705 | Fourth Amendment to Purchase and Sale Agreement | 4/28/2004 | Noble Energy, Inc. and Triumph Energy, LLC |
| High Island A-547 | OCS-G 02705 | Fifth Amendment to Purchase and Sale Agreement | 4/28/2004 | Noble Energy, Inc. and Triumph Energy, LLC |
| High Island A-547 | OCS-G 02705 | Purchase and Sale Agreement | 10/1/2012 | Anadarko E&P Company and Arena Energy, LLC |
| High Island A-547 | OCS-G 02705 | Purchase and Sale Agreement | 10/1/2012 | Tammany Oil and Gas, Tammany Ventures and Arena Energy, LLC |
| High Island A-547 | OCS-G 02705 | Participation Agreement | 1/1/2013 | Walter Oil & Gas and Arena Energy, LP |
| High Island A-547 | OCS-G 02705 | Offshore Operating Agreement | 1/1/2013 | Walter Oil & Gas and Arena Energy, LP |
| High Island A-547 | OCS-G 02705 | Amendment to Participation Agreement | 12/1/2014 | Walter Oil & Gas and Arena Energy, LP |
| High Island A-547 | OCS-G 02705 | Production Handling Agreement | 1/1/2015 | Arena Offshore, LP and Walter Oil & Gas and Arena Energy, LP |

EXHIBIT C
PAGE 22

| High Island A-547 | OCS-G 02705 | Precedent Agreement | 12/30/2016 | Stingray Pipeline Company, L.L.C. |
|---|---|---|---|---|
| High Island A-547 | OCS-G 02705 | Transportation Service Agreement - Rate Schedule IT | 9/1/2013 | Kinetica Energy Express, LLC |
| High Island A-547 | OCS-G 02705 | Gas Gathering and Processing Agreement | 8/1/2019 | Targa Midstream Services LLC |
| High Island A-547 | OCS-G 02705 | NGL Banks Agreement | 6/1/2004 | High Island Offshore System, L.L.C. || Southern Petroleum Laboratories (SPL) |
| High Island A-547 | OCS-G 02705 | Interruptible Transportation Service Agreement - GAS | 6/1/2004 | High Island Offshore System, L.L.C. |
| High Island A-547 | OCS-G 02705 | Reserve Commitment Agreement | 10/1/2009 | High Island Offshore System, L.L.C. |
| High Island A-547 | OCS-G 02705 | Oil Sales Contract | 4/1/2012 | Shell Trading (US) Company |
| Main Pass 120 | OCS-G 03197 | Asset Sale Agreement | 3/1/2001 | Chevron U.S.A. Inc., Kewanee Industries and PetroVentures |
| Main Pass 120 | OCS-G 03197 | Acquisition and Joint Development Proposal | 2/8/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 120 | OCS-G 03197 | Extension and Amendment to Acquisition and Joint Development Proposal | 3/27/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 120 | OCS-G 03197 | Offshore Operating Agreement | 3/27/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 120 | OCS-G 03197 | First Amendment to Acquisition and Joint Development Proposal | 5/17/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 120 | OCS-G 03197 | Purchase and Sale Agreement | 11/19/2014 | Arena Energy, LLC and PetroVentures |

EXHIBIT C
PAGE 23

| Main Pass 120 | OCS-G 03197 | Pipeline Construction and Operating Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
|---|---|---|---|---|
| Main Pass 120 | OCS-G 03197 | Pipeline Use and Compensation Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 120 | OCS-G 03197 | Production Handling Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 121 | OCS-G 26939 | Offer to Participate | 6/13/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 121 | OCS-G 26939 | Offshore Operating Agreement | 3/27/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 121 | OCS-G 26939 | Conditional Letter - Offer to Participate | 6/14/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 121 | OCS-G 26939 | Purchase and Sale Agreement | 11/19/2014 | Arena Energy, LLC and PetroVentures |
| Main Pass 121 | OCS-G 26939 | Pipeline Construction and Operating Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 121 | OCS-G 26939 | Pipeline Use and Compensation Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 121 | OCS-G 26939 | Production Handling Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 122 | OCS-G 13964 | Asset Sale Agreement | 3/1/2001 | Chevron U.S.A. Inc., Kewanee Industries and PetroVentures |
| Main Pass 122 | OCS-G 13964 | Acquisition and Joint Development Proposal | 2/8/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 122 | OCS-G 13964 | Extension and Amendment to Acquisition and Joint Development Proposal | 3/27/2007 | Arena Energy, LLC and PetroVentures |

EXHIBIT C
PAGE 24

| Main Pass 122 | OCS-G 13964 | Offshore Operating Agreement | 3/27/2007 | Arena Energy, LLC and PetroVentures |
|---|---|---|---|---|
| Main Pass 122 | OCS-G 13964 | First Amendment to Acquisition and Joint Development Proposal | 5/17/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 122 | OCS-G 13964 | Purchase and Sale Agreement | 11/19/2014 | Arena Energy, LLC and PetroVentures |
| Main Pass 122 | OCS-G 13964 | Pipeline Construction and Operating Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 122 | OCS-G 13964 | Pipeline Use and Compensation Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 122 | OCS-G 13964 | Production Handling Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 123 | OCS-G 12088 | Purchase and Sale Agreement | 6/1/2014 | Arena Energy, LP and Energy XXI |
| Main Pass 123 | OCS-G 12088 | Production Handling Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 123 | OCS-G 12088 | Pipeline Construction and Operating Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 123 | OCS-G 12088 | Pipeline Use and Compensation Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 123 | OCS-G 12088 | Construction, Installation, Operation and Maintenance of Measurement and Pipeline Facilities | 5/4/2004 | High Point Gas Gathering, L.L.C. |
| Main Pass 123 | OCS-G 12088 | Construction, Installation, Operation, and Maintenance of Measurement Facilities - BB Meter | 10/8/2004 | High Point Gas Gathering, L.L.C. |
| Main Pass 133 | OCS-G 01633 | Production Handling and Pumper Agreement | 12/1/2007 | Petro Ventures, Inc., Arena Energy, LLC and Mobil Oil Exploration & Producing Southeast, Inc |

EXHIBIT C
PAGE 25

| Main Pass 206 | OCS-G 33128 Expired | Offshore Operating Agreement | 3/27/2008 | Petro Venture, Inc. and Arena Energy, LLC |
|---|---|---|---|---|
| Main Pass 236 | OCS-G 02955 | Asset Sale Agreement | 3/1/2001 | Chevron U.S.A. Inc., Kewanee Industries and PetroVentures |
| Main Pass 236 | OCS-G 02955 | Acquisition and Joint Development Proposal | 2/8/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 236 | OCS-G 02955 | Extension and Amendment to Acquisition and Joint Development Proposal | 3/27/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 236 | OCS-G 02955 | Offshore Operating Agreement | 3/27/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 236 | OCS-G 02955 | First Amendment to Acquisition and Joint Development Proposal | 5/17/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 236 | OCS-G 02955 | Purchase and Sale Agreement | 11/19/2014 | Arena Energy, LLC and PetroVentures |
| Main Pass 122 | OCS-G 13964 | Pipeline Use and Compensation Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 236 | OCS-G 02955 | Pipeline Construction and Operating Agreement | 8/16/2017 | Arena Energy, LLC and PetroVentures |
| Main Pass 236 | OCS-G 02955 | Pipeline Use and Compensation Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 236 | OCS-G 02955 | Production Handling Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Mississippi Canyon 147 | OCS-G 27264 Expired | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Mississippi Canyon 311 | OCS-G 02968 | Purchase and Sale Agreement | 1/1/2019 | ExxonMobil and Arena Energy, LP |

EXHIBIT C
PAGE 26

| Mississippi Canyon 311 | OCS-G 02968 | Joint Operating Agreement | 9/1/1987 | Exxon Corporation and Shell Offshore Inc. |
|---|---|---|---|---|
| Mississippi Canyon 311 | OCS-G 02968 | Agreement of Assignment | 10/22/1992 | Exxon Corporation and Shell Offshore Inc. |
| Mississippi Canyon 311 | OCS-G 02968 | Letter Agreement | 1/23/2003 | Exxon Corporation and Shell Offshore Inc. |
| Mississippi Canyon 800 | OCS-G 18292 | Offshore Operating Agreement | 1/23/2007 | Newfield Exploration Company, Deep Gulf Energy LP and ATP Oil & Gas Corporation |
| Mississippi Canyon 800 | OCS-G 18292 | Amendment of Offshore Operating Agreement | 1/24/2007 | Newfield Exploration Company, Deep Gulf Energy LP and ATP Oil & Gas Corporation |
| Mississippi Canyon 800 | OCS-G 18292 | Second Amendment of Offshore Operating Agreement | 2/18/2008 | Newfield Exploration Company, Deep Gulf Energy LP, ATP Oil & Gas Corporation, CL&F Resources LP and Arena Exploration, LLC |
| Mississippi Canyon 800 | OCS-G 18292 | Third Amendment of Offshore Operating Agreement | 1/1/2010 | Newfield Exploration Company, Deep Gulf Energy LP, CL&F Resources LP and Arena Exploration, LLC |
| Mississippi Canyon 800 | OCS-G 18292 | Production Handling Agreement | 1/2/2010 | Newfield Exploration Company, Deep Gulf Energy LP, CL&F Resources LP and Arena Exploration, LLC |
| Mississippi Canyon 800 | OCS-G 18292 | Participation Agreement | 3/1/2007 | Newfield Exploration Company and Arena Exploration, LLC |
| Main Pass 122 | OCS-G 13964 | Pipeline Use and Compensation Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Mississippi Canyon 800 | OCS-G 18292 | Amendment to Participation Agreement | 6/20/2007 | Newfield Exploration Company and Arena Exploration, LLC |
| Mississippi Canyon 800 | OCS-G 18292 | Second Amendment to Participation Agreement | 2/18/2008 | Newfield Exploration Company and Arena Exploration, LLC |
| Mississippi Canyon 800 | OCS-G 18292 | Oil Sales Contract | 4/1/2012 | Shell Trading (US) Company |

EXHIBIT C
PAGE 27

| Mississippi Canyon 800 | OCS-G 18292 | Gas Gathering Agreement | 2/2/2011 | Third Coast Midstream |
|---|---|---|---|---|
| South Marsh 192 | OCS-G 24878 | Conditional Letter of Acceptance | 4/25/2003 | Anadarko Petroleum Corporation and Arena Energy, LLC |
| South Marsh 192 | OCS-G 24878 | Offer to Purchase | 7/14/2003 | Marathon Oil Company and Arena Energy, LLC |
| South Marsh 192 | OCS-G 24878 | Participation Agreement | 6/1/2004 | Stone Energy, Energy Partners, Ltd. Arena Offshore, LLC and Triumph Energy, L.L.C. |
| South Marsh 192 | OCS-G 24878 | Purchase and Sale Agreement | 11/1/2014 | Arena Energy, LP and Stone Energy |
| South Marsh 192 | OCS-G 24878 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| South Pass 74 | OCS-G 26144 Expired | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Pass 74 | OCS-G 26144 Expired | Purchase and Sale Agreement | 9/1/2003 | Noble Energy, Inc. and Triumph Energy, L.L.C. |
| South Pass 82 | OCS-G 05685 Expired | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Pass 82 | OCS-G 05685 Expired | Purchase and Sale Agreement | 9/1/2003 | Noble Energy, Inc. and Triumph Energy, L.L.C. |
| South Pass 82 | OCS-G 05685 Expired | Purchase and Sale Agreement | 4/1/2005 | Bundy Partners and Triumph Energy, L.L.C. |
| South Pass 82 | OCS-G 05685 Expired | Offer to Purchase | 4/25/2005 | CLK Exploration Co., LLC and Triumph Energy |
| South Pass 82 | OCS-G 05685 Expired | Offer to Purchase | 4/29/2005 | Piquant, Inc. and Triumph Energy |

EXHIBIT C
PAGE 28

| South Pass 82 | OCS-G 05685 Expired | Offer to Purchase | 5/9/2005 | Crescent Investment Co. and Triumph Energy |
| South Pass 83 | OCS-G 05052 Expired | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Pass 83 | OCS-G 05052 Expired | Purchase and Sale Agreement | 9/1/2003 | Noble Energy, Inc. and Triumph Energy, L.L.C. |
| South Pass 83 | OCS-G 05052 Expired | Purchase and Sale Agreement | 4/1/2005 | Bundy Partners and Triumph Energy, L.L.C. |
| South Pass 83 | OCS-G 05052 Expired | Offer to Purchase | 4/25/2005 | CLK Exploration Co., LLC and Triumph Energy |
| South Pass 83 | OCS-G 05052 Expired | Offer to Purchase | 4/29/2005 | Piquant, Inc. and Triumph Energy |
| South Pass 83 | OCS-G 05052 Expired | Offer to Purchase | 5/9/2005 | Crescent Investment Co. and Triumph Energy |
| South Pelto 25 | OCS-G 14535 Expired | Master License Agreement, as amended | 6/10/2002 | Fairfield Industries Incorporated and Arena Energy, LLC |
| South Pelto 25 | OCS-G 14535 Expired | Farmout Agreement | 12/17/2002 | Apache Corporation and Arena Energy, LLC |
| South Pelto 25 | OCS-G 14535 Expired | Platform Operations Agreement | 12/21/2002 | Triumph Energy and Apache Corporation |
| South Pelto 25 | OCS-G 14535 Expired | Farmout Agreement | 2/13/2004 | Apache Corporation and Arena Energy, LLC |
| South Pelto 25 | OCS-G 14535 Expired | Farmout Agreement | 5/19/2003 | Apache Corporation and Arena Energy, LLC |
| South Pelto 25 | OCS-G 14535 Expired | Platform Operations Agreement | 12/21/2002 | Triumph Energy and Apache Corporation |

EXHIBIT C
PAGE 29

| South Pelto 25 | OCS-G 14535 Expired | Offshore Operating Agreement | 7/23/2003 | Arena Energy, LLC and Bois d'Arc Offshore Ltd. and Bois d'Arc Resources Ltd. |
|---|---|---|---|---|
| South Pelto 25 | OCS-G 14535 Expired | Participation Agreement | 7/23/2003 | Arena Energy, LLC and Bois d'Arc Offshore Ltd. and Bois d'Arc Resources Ltd. |
| South Pelto 25 | OCS-G 14535 Expired | Purchase and Sale Agreement | 4/1/2011 | Stone Energy Offshore, L.L.C. and Arena Energy, LP |
| South Pelto 25 | OCS-G 14535 Expired | Offer to Acquire Wellbore | 1/3/2012 | Arena Energy, LP and Apache Corporation |
| South Pelto 25 | OCS-G 14535 Expired | Purchase and Sale Agreement | 8/1/2015 | Arena Energy, LP and John Cook |
| South Timbalier 35 | OCS-G 03336 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 35 | OCS-G 03336 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 35 | OCS-G 03336 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 35 | OCS-G 03336 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 35 | OCS-G 03336 | Offshore Operating Agreement | 12/30/2004 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 35 | OCS-G 03336 | Farmout Agreement | 6/15/2004 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 35 | OCS-G 03336 | Amendment to Farmout Agreement | 3/28/2005 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 35 | OCS-G 03336 | Amendment to Farmout Agreement | 9/4/2007 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |

EXHIBIT C
PAGE 30

| South Timbalier 35 | OCS-G 03336 | Processing and Operations Services Agreement | 12/30/2004 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
|---|---|---|---|---|
| South Timbalier 35 | OCS-G 03336 | Amendment to Processing and Operations Services Agreement | 11/28/2005 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 35 | OCS-G 03336 | Termination to Amendment to Processing and Operations Services Agreement | 5/18/2006 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 35 | OCS-G 03336 | Amendment to Processing and Operations Services Agreement | 12/27/2007 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 35 | OCS-G 03336 | Amendment to Processing and Operations Services Agreement | 10/29/2008 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 35 | OCS-G 03336 | Amendment to Processing and Operations Services Agreement | 3/11/2014 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 35 | OCS-G 03336 | Platform Use Agreement | 9/1/2016 | Chevron Pipe Line Company and Arena Offshore, LP |
| South Timbalier 35 | OCS-G 03336 | Election to Take Over | 7/12/2017 | Walter Oil and Gas Corporation and Arena Energy, LP |
| South Timbalier 35 | OCS-G 03336 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 35 | OCS-G 03336 | Condensate Transportation Agreement | 12/22/1997 | Discovery Producer Services, LLC |
| South Timbalier 35 | OCS-G 03336 | Condensate, Separation, Handling, and Stabilization Agreement | 12/22/1997 | Discovery Producer Services, LLC |
| South Timbalier 35 | OCS-G 03336 | Connection Agreement | 6/26/1998 | Chevron Pipeline Company |
| South Timbalier 35 | OCS-G 03336 | Dehydration Services Agreement | 1/1/2003 | Discovery Producer Services, LLC |

EXHIBIT C
PAGE 31

| South Timbalier 35 | OCS-G 03336 | Facilities Interconnect And Reimbursement Agreement | 5/31/2000 | Sea Robin Pipeline Company, LLC |
|---|---|---|---|---|
| South Timbalier 35 | OCS-G 03336 | FT-2 Transportation Service Agreement (w/Temporary Release Info) | 11/1/2016 | Discovery Producer Services, LLC |
| South Timbalier 35 | OCS-G 03336 | Gas Processing & Fractionation Agreement | 11/3/2010 | Discovery Producer Services, LLC |
| South Timbalier 35 | OCS-G 03336 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 35 | OCS-G 03336 | Interruptible Gas Gathering Agreement | 5/1/2003 | Discovery Producer Services, LLC |
| South Timbalier 35 | OCS-G 03336 | Platform Use Agreement | 8/1/1997 | Discovery Gas Transmission LLC |
| South Timbalier 36 | OCS-G 02624 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 36 | OCS-G 02624 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 36 | OCS-G 02624 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 36 | OCS-G 02624 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 36 | OCS-G 02624 | Offshore Operating Agreement | 12/30/2004 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 36 | OCS-G 02624 | Farmout Agreement | 6/15/2004 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 36 | OCS-G 02624 | Amendment to Farmout Agreement | 3/28/2005 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |

EXHIBIT C
PAGE 32

| South Timbalier 36 | OCS-G 02624 | Amendment to Farmout Agreement | 9/4/2007 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
|---|---|---|---|---|
| South Timbalier 36 | OCS-G 02624 | Processing and Operations Services Agreement | 12/30/2004 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 36 | OCS-G 02624 | Amendment to Processing and Operations Services Agreement | 11/28/2005 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 36 | OCS-G 02624 | Termination to Amendment to Processing and Operations Services Agreement | 5/18/2006 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 36 | OCS-G 02624 | Amendment to Processing and Operations Services Agreement | 12/27/2007 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 36 | OCS-G 02624 | Amendment to Processing and Operations Services Agreement | 10/29/2008 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 36 | OCS-G 02624 | Amendment to Processing and Operations Services Agreement | 3/11/2014 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 36 | OCS-G 02624 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 36 | OCS-G 02624 | Condensate Transportation Agreement | 12/22/1997 | Discovery Producer Services, LLC |
| South Timbalier 36 | OCS-G 02624 | Condensate, Separation, Handling, and Stabilization Agreement | 12/22/1997 | Discovery Producer Services, LLC |
| South Timbalier 36 | OCS-G 02624 | Connection Agreement | 6/26/1998 | Chevron Pipeline Company |
| South Timbalier 36 | OCS-G 02624 | Dehydration Services Agreement | 1/1/2003 | Discovery Producer Services, LLC |
| South Timbalier 36 | OCS-G 02624 | Facilities Interconnect And Reimbursement Agreement | 5/31/2000 | Sea Robin Pipeline Company, LLC |

EXHIBIT C
PAGE 33

| South Timbalier 36 | OCS-G 02624 | FT-2 Transportation Service Agreement (w/Temporary Release Info) | 11/1/2016 | Discovery Producer Services, LLC |
|---|---|---|---|---|
| South Timbalier 36 | OCS-G 02624 | Gas Processing & Fractionation Agreement | 11/3/2010 | Discovery Producer Services, LLC |
| South Timbalier 36 | OCS-G 02624 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 36 | OCS-G 02624 | Interruptible Gas Gathering Agreement | 5/1/2003 | Discovery Producer Services, LLC |
| South Timbalier 36 | OCS-G 02624 | Platform Use Agreement | 8/1/1997 | Discovery Gas Transmission LLC |
| South Timbalier 37 | OCS-G 02625 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 37 | OCS-G 02625 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 37 | OCS-G 02625 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 37 | OCS-G 02625 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 37 | OCS-G 02625 | Offshore Operating Agreement, as amended | 5/1/1974 | Gulf Oil Corporation, Mobil Oil Corporation, Texaco Inc., Tenneco Oil Company, Tenneco Exploration II, Ltd. and Tenneco Exploration, Ltd. |
| South Timbalier 37 | OCS-G 02625 | Purchase and Sale Agreement | 6/23/2006 | BP Exploration & Production Inc., Chevron U.S.A. Inc. and Union Oil Company of California |
| South Timbalier 37 | OCS-G 02625 | Memorandum of Termination (ST 30/37) | 9/1/2016 | Arena Energy, LP |
| South Timbalier 37 | OCS-G 02625 | Memorandum of Termination (ST 37/48) | 9/1/2016 | Arena Energy, LP |

EXHIBIT C
PAGE 34

| South Timbalier 37 | OCS-G 02625 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
|---|---|---|---|---|
| South Timbalier 37 | OCS-G 02625 | Condensate Transportation Agreement | 12/22/1997 | Discovery Producer Services, LLC |
| South Timbalier 37 | OCS-G 02625 | Condensate, Separation, Handling, and Stabilization Agreement | 12/22/1997 | Discovery Producer Services, LLC |
| South Timbalier 37 | OCS-G 02625 | Connection Agreement | 6/26/1998 | Chevron Pipeline Company |
| South Timbalier 37 | OCS-G 02625 | Dehydration Services Agreement | 1/1/2003 | Discovery Producer Services, LLC |
| South Timbalier 37 | OCS-G 02625 | Facilities Interconnect And Reimbursement Agreement | 5/31/2000 | Sea Robin Pipeline Company, LLC |
| South Timbalier 37 | OCS-G 02625 | FT-2 Transportation Service Agreement (w/Temporary Release Info) | 11/1/2016 | Discovery Producer Services, LLC |
| South Timbalier 37 | OCS-G 02625 | Gas Processing & Fractionation Agreement | 11/3/2010 | Discovery Producer Services, LLC |
| South Timbalier 37 | OCS-G 02625 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 37 | OCS-G 02625 | Interruptible Gas Gathering Agreement | 5/1/2003 | Discovery Producer Services, LLC |
| South Timbalier 37 | OCS-G 02625 | Platform Use Agreement | 8/1/1997 | Discovery Gas Transmission LLC |
| South Timbalier 38 | OCS-G 09637 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 38 | OCS-G 09637 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |

EXHIBIT C
PAGE 35

| South Timbalier 38 | OCS-G 09637 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
|---|---|---|---|---|
| South Timbalier 38 | OCS-G 09637 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 38 | OCS-G 09637 | Offshore Operating Agreement, as amended | 5/1/1974 | Gulf Oil Corporation, Mobil Oil Corporation, Texaco Inc., Tenneco Oil Company, Tenneco Exploration II, Ltd. and Tenneco Exploration, Ltd. |
| South Timbalier 38 | OCS-G 09637 | Purchase and Sale Agreement | 6/23/2006 | BP Exploration & Production Inc., Chevron U.S.A. Inc. and Union Oil Company of California |
| South Timbalier 38 | OCS-G 09637 | Farmout Agreement | 5/1/2004 | Chevron U.S.A. Inc. and Bois d'Arc Offshore Ltd. |
| South Timbalier 38 | OCS-G 09637 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 38 | OCS-G 09637 | Condensate Transportation Agreement | 12/22/1997 | Discovery Producer Services, LLC |
| South Timbalier 38 | OCS-G 09637 | Condensate, Separation, Handling, and Stabilization Agreement | 12/22/1997 | Discovery Producer Services, LLC |
| South Timbalier 38 | OCS-G 09637 | Connection Agreement | 6/26/1998 | Chevron Pipeline Company |
| South Timbalier 38 | OCS-G 09637 | Dehydration Services Agreement | 1/1/2003 | Discovery Producer Services, LLC |
| South Timbalier 38 | OCS-G 09637 | Facilities Interconnect And Reimbursement Agreement | 5/31/2000 | Sea Robin Pipeline Company, LLC |
| South Timbalier 38 | OCS-G 09637 | FT-2 Transportation Service Agreement (w/Temporary Release Info) | 11/1/2016 | Discovery Producer Services, LLC |
| South Timbalier 38 | OCS-G 09637 | Gas Processing & Fractionation Agreement | 11/3/2010 | Discovery Producer Services, LLC |

EXHIBIT C
PAGE 36

| South Timbalier 38 | OCS-G 09637 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
|---|---|---|---|---|
| South Timbalier 38 | OCS-G 09637 | Interruptible Gas Gathering Agreement | 5/1/2003 | Discovery Producer Services, LLC |
| South Timbalier 38 | OCS-G 09637 | Platform Use Agreement | 8/1/1997 | Discovery Gas Transmission LLC |
| South Timbalier 48 | OCS-G 14518 Expired | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 51 | OCS-G 01240 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 51 | OCS-G 01240 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 51 | OCS-G 01240 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 51 | OCS-G 01240 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 51 | OCS-G 01240 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 51 | OCS-G 01240 | Condensate Transportation Agreement | 12/22/1997 | Discovery Producer Services, LLC |
| South Timbalier 51 | OCS-G 01240 | Condensate, Separation, Handling, and Stabilization Agreement | 12/22/1997 | Discovery Producer Services, LLC |
| South Timbalier 51 | OCS-G 01240 | Connection Agreement | 6/26/1998 | Chevron Pipeline Company |
| South Timbalier 51 | OCS-G 01240 | Dehydration Services Agreement | 1/1/2003 | Discovery Producer Services, LLC |

EXHIBIT C
PAGE 37

| South Timbalier 51 | OCS-G 01240 | Facilities Interconnect And Reimbursement Agreement | 5/31/2000 | Sea Robin Pipeline Company, LLC |
|---|---|---|---|---|
| South Timbalier 51 | OCS-G 01240 | FT-2 Transportation Service Agreement (w/Temporary Release Info) | 11/1/2016 | Discovery Producer Services, LLC |
| South Timbalier 51 | OCS-G 01240 | Gas Processing & Fractionation Agreement | 11/3/2010 | Discovery Producer Services, LLC |
| South Timbalier 51 | OCS-G 01240 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 51 | OCS-G 01240 | Interruptible Gas Gathering Agreement | 5/1/2003 | Discovery Producer Services, LLC |
| South Timbalier 51 | OCS-G 01240 | Platform Use Agreement | 8/1/1997 | Discovery Gas Transmission LLC |
| South Timbalier 52 | OCS-G 01241 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 52 | OCS-G 01241 | Master License Agreement, as amended | 6/10/2002 | Fairfield Industries Incorporated and Arena Energy, LLC |
| South Timbalier 52 | OCS-G 01241 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 52 | OCS-G 01241 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 52 | OCS-G 01241 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 52 | OCS-G 01241 | Visitation Agreement | 3/1/2019 | Arena Offshore, LP, Board of Supervisors of Louisiana State University and A&M College |
| South Timbalier 52 | OCS-G 01241 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |

EXHIBIT C
PAGE 38

| South Timbalier 52 | OCS-G 01241 | Condensate Transportation Agreement | 12/22/1997 | Discovery Producer Services, LLC |
|---|---|---|---|---|
| South Timbalier 52 | OCS-G 01241 | Condensate, Separation, Handling, and Stabilization Agreement | 12/22/1997 | Discovery Producer Services, LLC |
| South Timbalier 52 | OCS-G 01241 | Connection Agreement | 6/26/1998 | Chevron Pipeline Company |
| South Timbalier 52 | OCS-G 01241 | Dehydration Services Agreement | 1/1/2003 | Discovery Producer Services, LLC |
| South Timbalier 52 | OCS-G 01241 | Facilities Interconnect And Reimbursement Agreement | 5/31/2000 | Sea Robin Pipeline Company, LLC |
| South Timbalier 52 | OCS-G 01241 | FT-2 Transportation Service Agreement (w/Temporary Release Info) | 11/1/2016 | Discovery Producer Services, LLC |
| South Timbalier 52 | OCS-G 01241 | Gas Processing & Fractionation Agreement | 11/3/2010 | Discovery Producer Services, LLC |
| South Timbalier 52 | OCS-G 01241 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 52 | OCS-G 01241 | Interruptible Gas Gathering Agreement | 5/1/2003 | Discovery Producer Services, LLC |
| South Timbalier 52 | OCS-G 01241 | Platform Use Agreement | 8/1/1997 | Discovery Gas Transmission LLC |
| South Timbalier 128 | OCS 00498 | License Agreement | 10/3/1951 | Marine Instrument Company and Gulf Research & Development Company |
| South Timbalier 128 | OCS 00498 | Concurrent Agreement, as amended | 7/1/1959 | Humble Oil & Refining Company and Gulf Oil Corporation |
| South Timbalier 128 | OCS 00498 | Unit Agreement 14-08-001-6669 | 12/16/1959 | Gulf Oil Corporation and Secretary of Interior |

EXHIBIT C
PAGE 39

| South Timbalier 128 | OCS 00498 | Agreement of Compromise | 8/13/1970 | Marine Petroleum Corporation, Continental Oil Company and Gulf Oil Corporation |
|---|---|---|---|---|
| South Timbalier 128 | OCS 00498 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 128 | OCS 00498 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 128 | OCS 00498 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 128 | OCS 00498 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 128 | OCS 00498 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 128 | OCS 00498 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 128 | OCS 00498 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 128 | OCS 00498 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| South Timbalier 128 | OCS 00498 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 128 | OCS 00498 | Connection Agreement | 3/1/2005 | Arena/VGS |
| South Timbalier 128 | OCS 00498 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |
| South Timbalier 128 | OCS 00498 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |

EXHIBIT C
PAGE 40

| South Timbalier 128 | OCS 00498 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
| South Timbalier 128 | OCS 00498 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 128 | OCS 00498 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |
| South Timbalier 128 | OCS 00498 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 128 | OCS 00498 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 128 | OCS 00498 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |
| South Timbalier 128 | OCS 00498 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
| South Timbalier 128 | OCS 00498 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |
| South Timbalier 129 | OCS 00465 | License Agreement | 10/3/1951 | Marine Instrument Company and Gulf Research & Development Company |
| South Timbalier 129 | OCS 00465 | Concurrent Agreement, as amended | 7/1/1959 | Humble Oil & Refining Company and Gulf Oil Corporation |
| South Timbalier 129 | OCS 00465 | Unit Agreement 14-08-001-6669 | 12/16/1959 | Gulf Oil Corporation and Secretary of Interior |
| South Timbalier 129 | OCS 00465 | Agreement of Compromise | 8/13/1970 | Marine Petroleum Corporation, Continental Oil Company and Gulf Oil Corporation |
| South Timbalier 129 | OCS 00465 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |

EXHIBIT C
PAGE 41

| South Timbalier 129 | OCS 00465 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
|---|---|---|---|---|
| South Timbalier 129 | OCS 00465 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 129 | OCS 00465 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 129 | OCS 00465 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 129 | OCS 00465 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 129 | OCS 00465 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 129 | OCS 00465 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| South Timbalier 129 | OCS 00465 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 129 | OCS 00465 | Connection Agreement | 3/1/2005 | Arena/VGS |
| South Timbalier 129 | OCS 00465 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |
| South Timbalier 129 | OCS 00465 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |
| South Timbalier 129 | OCS 00465 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
| South Timbalier 129 | OCS 00465 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |

EXHIBIT C
PAGE 42

| South Timbalier 129 | OCS 00465 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |
|---|---|---|---|---|
| South Timbalier 129 | OCS 00465 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 129 | OCS 00465 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 129 | OCS 00465 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |
| South Timbalier 129 | OCS 00465 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
| South Timbalier 129 | OCS 00465 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |
| South Timbalier 130 | OCS 00456 | License Agreement | 10/3/1951 | Marine Instrument Company and Gulf Research & Development Company |
| South Timbalier 130 | OCS 00456 | Agreement of Compromise | 8/13/1970 | Marine Petroleum Corporation, Continental Oil Company and Gulf Oil Corporation |
| South Timbalier 130 | OCS 00456 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 130 | OCS 00456 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 130 | OCS 00456 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 130 | OCS 00456 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 130 | OCS 00456 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |

EXHIBIT C
PAGE 43

| South Timbalier 130 | OCS 00456 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| --- | --- | --- | --- | --- |
| South Timbalier 130 | OCS 00456 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 130 | OCS 00456 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| South Timbalier 130 | OCS 00456 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 130 | OCS 00456 | Connection Agreement | 3/1/2005 | Arena/VGS |
| South Timbalier 130 | OCS 00456 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |
| South Timbalier 130 | OCS 00456 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |
| South Timbalier 130 | OCS 00456 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
| South Timbalier 130 | OCS 00456 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 130 | OCS 00456 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |
| South Timbalier 130 | OCS 00456 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 130 | OCS 00456 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 130 | OCS 00456 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |

EXHIBIT C
PAGE 44

| South Timbalier 130 | OCS 00456 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
|---|---|---|---|---|
| South Timbalier 130 | OCS 00456 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |
| South Timbalier 131 | OCS 00457 | License Agreement | 10/3/1951 | Marine Instrument Company and Gulf Research & Development Company |
| South Timbalier 131 | OCS 00457 | Agreement of Compromise | 8/13/1970 | Marine Petroleum Corporation, Continental Oil Company and Gulf Oil Corporation |
| South Timbalier 131 | OCS 00457 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 131 | OCS 00457 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 131 | OCS 00457 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 131 | OCS 00457 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 131 | OCS 00457 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 131 | OCS 00457 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 131 | OCS 00457 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 131 | OCS 00457 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| South Timbalier 131 | OCS 00457 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |

EXHIBIT C
PAGE 45

| South Timbalier 131 | OCS 00457 | Connection Agreement | 3/1/2005 | Arena/VGS |
|---|---|---|---|---|
| South Timbalier 131 | OCS 00457 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |
| South Timbalier 131 | OCS 00457 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |
| South Timbalier 131 | OCS 00457 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
| South Timbalier 131 | OCS 00457 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 131 | OCS 00457 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |
| South Timbalier 131 | OCS 00457 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 131 | OCS 00457 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 131 | OCS 00457 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |
| South Timbalier 131 | OCS 00457 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
| South Timbalier 131 | OCS 00457 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |
| South Timbalier 134 | OCS 00461 | Concurrent Agreement, as amended | 7/1/1959 | Humble Oil & Refining Company and Gulf Oil Corporation |
| South Timbalier 134 | OCS 00461 | Unit Agreement 14-08-001-6669 | 12/16/1959 | Gulf Oil Corporation and Secretary of Interior |

EXHIBIT C
PAGE 46

| South Timbalier 134 | OCS 00461 | Agreement of Compromise | 8/13/1970 | Marine Petroleum Corporation, Continental Oil Company and Gulf Oil Corporation |
|---|---|---|---|---|
| South Timbalier 134 | OCS 00461 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 134 | OCS 00461 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 134 | OCS 00461 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 134 | OCS99 00461 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 134 | OCS 00461 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 134 | OCS 00461 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 134 | OCS 00461 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 134 | OCS 00461 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| South Timbalier 134 | OCS 00461 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 134 | OCS 00461 | Connection Agreement | 3/1/2005 | Arena/VGS |
| South Timbalier 134 | OCS 00461 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |
| South Timbalier 134 | OCS 00461 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |

EXHIBIT C
PAGE 47

| | | | | |
|---|---|---|---|---|
| South Timbalier 134 | OCS 00461 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
| South Timbalier 134 | OCS 00461 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 134 | OCS 00461 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |
| South Timbalier 134 | OCS 00461 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 134 | OCS 00461 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 134 | OCS 00461 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |
| South Timbalier 134 | OCS 00461 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
| South Timbalier 134 | OCS 00461 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |
| South Timbalier 135 | OCS 00462 | Concurrent Agreement, as amended | 7/1/1959 | Humble Oil & Refining Company and Gulf Oil Corporation |
| South Timbalier 135 | OCS 00462 | Unit Agreement 14-08-001-6669 | 12/16/1959 | Gulf Oil Corporation and Secretary of Interior |
| South Timbalier 135 | OCS 00462 | Agreement of Compromise | 8/13/1970 | Marine Petroleum Corporation, Continental Oil Company and Gulf Oil Corporation |
| South Timbalier 135 | OCS 00462 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 135 | OCS 00462 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |

EXHIBIT C
PAGE 48

| South Timbalier 135 | OCS 00462 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
|---|---|---|---|---|
| South Timbalier 135 | OCS 00462 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 135 | OCS 00462 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 135 | OCS 00462 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 135 | OCS 00462 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 135 | OCS 00462 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| South Timbalier 135 | OCS 00462 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 135 | OCS 00462 | Connection Agreement | 3/1/2005 | Arena/VGS |
| South Timbalier 135 | OCS 00462 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |
| South Timbalier 135 | OCS 00462 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |
| South Timbalier 135 | OCS 00462 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
| South Timbalier 135 | OCS 00462 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 135 | OCS 00462 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |

EXHIBIT C
PAGE 49

| South Timbalier 135 | OCS 00462 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |
|---|---|---|---|---|
| South Timbalier 135 | OCS 00462 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 135 | OCS 00462 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |
| South Timbalier 135 | OCS 00462 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
| South Timbalier 135 | OCS 00462 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |
| South Timbalier 148 | OCS-G 01960 | Farmout Agreement, as amended | 10/31/1974 | Chevron Oil Company and C & K Offshore Company |
| South Timbalier 148 | OCS-G 01960 | Operating Agreement, as amended | 4/23/1975 | Chevron Oil Company and C & K Offshore Company, Etal |
| South Timbalier 148 | OCS-G 01960 | Processing Agreement | 8/1/1997 | Chevron U.S.A. Production Company, The Louisiana Land and Exploration Company, Forcenergy Inc., Lannie Mecom Moses and WI&T Offshore, L.L.C. |
| South Timbalier 148 | OCS-G 01960 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 148 | OCS-G 01960 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 148 | OCS-G 01960 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 148 | OCS-G 01960 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |

EXHIBIT C
PAGE 50

| South Timbalier 148 | OCS-G 01960 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
|---|---|---|---|---|
| South Timbalier 148 | OCS-G 01960 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 148 | OCS-G 01960 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| South Timbalier 148 | OCS-G 01960 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 148 | OCS-G 01960 | Connection Agreement | 3/1/2005 | Arena/VGS |
| South Timbalier 148 | OCS-G 01960 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |
| South Timbalier 148 | OCS-G 01960 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |
| South Timbalier 148 | OCS-G 01960 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
| South Timbalier 148 | OCS-G 01960 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 148 | OCS-G 01960 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |
| South Timbalier 148 | OCS-G 01960 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 148 | OCS-G 01960 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 148 | OCS-G 01960 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |

EXHIBIT C
PAGE 51

| South Timbalier 148 | OCS-G 01960 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
|---|---|---|---|---|
| South Timbalier 148 | OCS-G 01960 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |
| South Timbalier 151 | OCS 00463 | Concurrent Agreement, as amended | 7/1/1959 | Humble Oil & Refining Company and Gulf Oil Corporation |
| South Timbalier 151 | OCS 00463 | Unit Agreement 14-08-001-6669 | 12/16/1959 | Gulf Oil Corporation and Secretary of Interior |
| South Timbalier 151 | OCS 00463 | Agreement of Compromise | 8/13/1970 | Marine Petroleum Corporation, Continental Oil Company and Gulf Oil Corporation |
| South Timbalier 151 | OCS 00463 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 151 | OCS 00463 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 151 | OCS 00463 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 151 | OCS 00463 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 151 | OCS 00463 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 151 | OCS 00463 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 151 | OCS 00463 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |

EXHIBIT C
PAGE 52

| | | | | |
|---|---|---|---|---|
| South Timbalier 151 | OCS 00463 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| South Timbalier 151 | OCS 00463 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 151 | OCS 00463 | Connection Agreement | 3/1/2005 | Arena/VGS |
| South Timbalier 151 | OCS 00463 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |
| South Timbalier 151 | OCS 00463 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |
| South Timbalier 151 | OCS 00463 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
| South Timbalier 151 | OCS 00463 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 151 | OCS 00463 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |
| South Timbalier 151 | OCS 00463 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 151 | OCS 00463 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 151 | OCS 00463 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |
| South Timbalier 151 | OCS 00463 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
| South Timbalier 151 | OCS 00463 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |

EXHIBIT C
PAGE 53

| South Timbalier 151 | OCS 00463 | Water Saturated Gas Agreement | 6/1/2013 | Arena Energy, LP and Sea Robin Pipeline Company, LLC |
|---|---|---|---|---|
| South Timbalier 151 | OCS 00463 | Services Agreement | 2/1/2013 | Arena Energy, LP and Sea Robin Pipeline Company, LLC |
| South Timbalier 152 | OCS 00464 | Concurrent Agreement, as amended | 7/1/1959 | Humble Oil & Refining Company and Gulf Oil Corporation |
| South Timbalier 152 | OCS 00464 | Unit Agreement 14-08-001-6669 | 12/16/1959 | Gulf Oil Corporation and Secretary of Interior |
| South Timbalier 152 | OCS 00464 | Agreement of Compromise | 8/13/1970 | Marine Petroleum Corporation, Continental Oil Company and Gulf Oil Corporation |
| South Timbalier 152 | OCS 00464 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 152 | OCS 00464 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 152 | OCS 00464 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 152 | OCS 00464 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 152 | OCS 00464 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 152 | OCS 00464 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 152 | OCS 00464 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 152 | OCS 00464 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |

EXHIBIT C
PAGE 54

| South Timbalier 152 | OCS 00464 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
|---|---|---|---|---|
| South Timbalier 152 | OCS 00464 | Connection Agreement | 3/1/2005 | Arena/VGS |
| South Timbalier 152 | OCS 00464 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |
| South Timbalier 152 | OCS 00464 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |
| South Timbalier 152 | OCS 00464 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
| South Timbalier 152 | OCS 00464 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 152 | OCS 00464 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |
| South Timbalier 152 | OCS 00464 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 152 | OCS 00464 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 152 | OCS 00464 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |
| South Timbalier 152 | OCS 00464 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
| South Timbalier 152 | OCS 00464 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |
| South Timbalier 161 | OCS-G 01248 | Farmout Agreement | 7/21/2003 | Apache Corporation and Arena Energy, LLC |

EXHIBIT C
PAGE 55

| South Timbalier 161 | OCS-G 01248 | Offer to Purchase | 12/15/2005 | Apache Corporation and Arena Energy, LLC |
|---|---|---|---|---|
| South Timbalier 161 | OCS-G 01248 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 161 | OCS-G 01248 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 177 | OCS-G 01260 | License Agreement | 10/3/1951 | Marine Instrument Company and Gulf Research & Development Company |
| South Timbalier 177 | OCS-G 01260 | Agreement of Compromise | 8/13/1970 | Marine Petroleum Corporation, Continental Oil Company and Gulf Oil Corporation |
| South Timbalier 177 | OCS-G 01260 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 177 | OCS-G 01260 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 177 | OCS-G 01260 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 177 | OCS-G 01260 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 177 | OCS-G 01260 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 177 | OCS-G 01260 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 177 | OCS-G 01260 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 177 | OCS-G 01260 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |

EXHIBIT C
PAGE 56

| South Timbalier 177 | OCS-G 01260 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
|---|---|---|---|---|
| South Timbalier 177 | OCS-G 01260 | Connection Agreement | 3/1/2005 | Arena/VGS |
| South Timbalier 177 | OCS-G 01260 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |
| South Timbalier 177 | OCS-G 01260 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |
| South Timbalier 177 | OCS-G 01260 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
| South Timbalier 177 | OCS-G 01260 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 177 | OCS-G 01260 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |
| South Timbalier 177 | OCS-G 01260 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 177 | OCS-G 01260 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 177 | OCS-G 01260 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |
| South Timbalier 177 | OCS-G 01260 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
| South Timbalier 177 | OCS-G 01260 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |
| South Timbalier 188 | OCS-G 01899 | License Agreement | 10/3/1951 | Marine Instrument Company and Gulf Research & Development Company |

EXHIBIT C
PAGE 57

| | | | | |
|---|---|---|---|---|
| South Timbalier 188 | OCS-G 01899 | Agreement of Compromise | 8/13/1970 | Marine Petroleum Corporation, Continental Oil Company and Gulf Oil Corporation |
| South Timbalier 188 | OCS-G 01899 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 188 | OCS-G 01899 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 188 | OCS-G 01899 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 188 | OCS-G 01899 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 188 | OCS-G 01899 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 188 | OCS-G 01899 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 188 | OCS-G 01899 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 188 | OCS-G 01899 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| South Timbalier 188 | OCS-G 01899 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 188 | OCS-G 01899 | Connection Agreement | 3/1/2005 | Arena/VGS |
| South Timbalier 188 | OCS-G 01899 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |
| South Timbalier 188 | OCS-G 01899 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |

EXHIBIT C
PAGE 58

| South Timbalier 188 | OCS-G 01899 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
|---|---|---|---|---|
| South Timbalier 188 | OCS-G 01899 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 188 | OCS-G 01899 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |
| South Timbalier 188 | OCS-G 01899 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 188 | OCS-G 01899 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 188 | OCS-G 01899 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |
| South Timbalier 188 | OCS-G 01899 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
| South Timbalier 188 | OCS-G 01899 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |
| South Timbalier 189 | OCS-G 01572 | License Agreement | 10/3/1951 | Marine Instrument Company and Gulf Research & Development Company |
| South Timbalier 189 | OCS-G 01572 | Agreement of Compromise | 8/13/1970 | Marine Petroleum Corporation, Continental Oil Company and Gulf Oil Corporation |
| South Timbalier 189 | OCS-G 01572 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 189 | OCS-G 01572 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 189 | OCS-G 01572 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |

EXHIBIT C
PAGE 59

| South Timbalier 189 | OCS-G 01572 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
|---|---|---|---|---|
| South Timbalier 189 | OCS-G 01572 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 189 | OCS-G 01572 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 189 | OCS-G 01572 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 189 | OCS-G 01572 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| South Timbalier 189 | OCS-G 01572 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 189 | OCS-G 01572 | Connection Agreement | 7/1/2001 | Arena/VGS |
| South Timbalier 189 | OCS-G 01572 | Connection Agreement | 3/1/2005 | Arena/VGS |
| South Timbalier 189 | OCS-G 01572 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |
| South Timbalier 189 | OCS-G 01572 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |
| South Timbalier 189 | OCS-G 01572 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
| South Timbalier 189 | OCS-G 01572 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 189 | OCS-G 01572 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |

EXHIBIT C
PAGE 60

| South Timbalier 189 | OCS-G 01572 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |
|---|---|---|---|---|
| South Timbalier 189 | OCS-G 01572 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 189 | OCS-G 01572 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |
| South Timbalier 189 | OCS-G 01572 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
| South Timbalier 189 | OCS-G 01572 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |
| Vermilion 52 | OCS-G 22606 | Right-of-Use and Easement G3183 | 7/7/2010 | BSEE, Arena Energy, LP and Arena Offshore, LP |
| Vermilion 71 | OCS-G 21592 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Vermilion 71 | OCS-G 21592 | Letter Agreement | 3/30/2005 | Stone Energy and Arena Offshore, LLC and Triumph Energy, LLC |
| Vermilion 71 | OCS-G 21592 | Gas Processing Agreement | 6/1/2011 | Enterprise Gas Processing, LLC |
| Vermilion 71 | OCS-G 21592 | Liquid Hydrocarbon Transportation Agreement | 9/1/2006 | Sea Robin Pipeline Company, LLC |
| Vermilion 72 | OCS-G 27851 | Offshore Operating Agreement | 2/1/2006 | Arena Offshore, LLC and Arena Exploration, LLC |
| Vermilion 72 | OCS-G 27851 | Farmout Agreement | 6/9/2006 | Energy Partners Ltd. and Arena Energy, LLC |
| Vermilion 72 | OCS-G 27851 | Production Handling Agreement | 12/31/2006 | Arena Offshore, LLC, Arena Energy, LLC, Arena Exploration, LLC and Chadbourne Partners Ltd. |

EXHIBIT C
PAGE 61

| Vermilion 72 | OCS-G 27851 | Purchase and Sale Agreement, as corrected | 1/1/2008 | Energy Partners Ltd. and Arena Energy, LLC |
|---|---|---|---|---|
| Vermilion 72 | OCS-G 27851 | Gas Processing Agreement | 6/1/2011 | Enterprise Gas Processing, LLC |
| Vermilion 207 | OCS-G 19761 Expired | Commitment Letter | 5/6/2003 | Noble Energy and Arena Energy, LLC |
| Vermilion 325 | OCS-G 36200 | Offshore Operating Agreement, as amended | 4/26/2010 | Peregrine Oil & Gas II, LP and Entek USA General LLC |
| Vermilion 325 | OCS-G 36200 | Production Handling Agreement | 1/1/2012 | Arena Offshore, LP, Peregrine Oil & Gas II, LP and Entek USA General LLC |
| Vermilion 325 | OCS-G 36200 | Amendment to Production Handling Agreement | 5/1/2014 | Arena Offshore, LP, Peregrine Oil & Gas II, LP and Arena Energy, LP |
| Vermilion 325 | OCS-G 36200 | Second Amendment to Production Handling Agreement | 9/11/2019 | Arena Offshore, LP, Peregrine Oil & Gas II, LP and Arena Energy, LP |
| Vermilion 341 | OCS-G 33607 | Offshore Operating Agreement, as amended | 4/26/2010 | Peregrine Oil & Gas II, LP and Entek USA General LLC |
| Vermilion 341 | OCS-G 33607 | Purchase and Sale Agreement | 1/1/2012 | Entek USA General LLC and Arena Energy, LLC |
| Vermilion 341 | OCS-G 33607 | Production Handling Agreement | 1/1/2012 | Arena Offshore, LP, Peregrine Oil & Gas II, LP and Entek USA General LLC |
| Vermilion 341 | OCS-G 33607 | Amendment to Production Handling Agreement | 5/1/2014 | Arena Offshore, LP, Peregrine Oil & Gas II, LP and Arena Energy, LP |
| Vermilion 341 | OCS-G 33607 | Second Amendment to Production Handling Agreement | 9/11/2019 | Arena Offshore, LP, Peregrine Oil & Gas II, LP and Arena Energy, LP |
| Vermilion 342 | OCS-G 33608 | Offshore Operating Agreement, as amended | 4/26/2010 | Peregrine Oil & Gas II, LP and Entek USA General LLC |

EXHIBIT C
PAGE 62

| Vermilion 342 | OCS-G 33608 | Purchase and Sale Agreement | 1/1/2012 | Entek USA General LLC and Arena Energy, LLC |
|---|---|---|---|---|
| Vermilion 342 | OCS-G 33608 | Production Handling Agreement | 1/1/2012 | Arena Offshore, LP, Peregrine Oil & Gas II, LP and Entek USA General LLC |
| Vermilion 342 | OCS-G 33608 | Amendment to Production Handling Agreement | 5/1/2014 | Arena Offshore, LP, Peregrine Oil & Gas II, LP and Arena Energy, LP |
| Vermilion 342 | OCS-G 33608 | Second Amendment to Production Handling Agreement | 9/11/2019 | Arena Offshore, LP, Peregrine Oil & Gas II, LP and Arena Energy, LP |
| West Cameron 522 | OCS-G 34033 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| West Cameron 543 | OCS-G 12802 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| West Cameron 543 | OCS-G 12802 | Facilities Agreement, as amended | 11/1/2008 | Stingray Pipeline Company, L.L.C. and Fairways Offshore Exploration Inc. |
| West Cameron 543 | OCS-G 12802 | Purchase and Sale Agreement | 5/1/2013 | Fairways Offshore Exploration Inc. and Arena Energy, LP and Arena Offshore, LP |
| West Cameron 543 | OCS-G 12802 | Sale Agreement | 5/3/2013 | Stingray Pipeline Company, L.L.C. and Arena Offshore, LP |
| West Cameron 544 | OCS-G 14342 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| West Cameron 544 | OCS-G 14342 | Facilities Agreement, as amended | 11/1/2008 | Stingray Pipeline Company, L.L.C. and Fairways Offshore Exploration Inc. |
| West Cameron 544 | OCS-G 14342 | Purchase and Sale Agreement | 5/1/2013 | Fairways Offshore Exploration Inc. and Arena Energy, LP and Arena Offshore, LP |
| West Cameron 544 | OCS-G 14342 | Sale Agreement | 5/3/2013 | Stingray Pipeline Company, L.L.C. and Arena Offshore, LP |

EXHIBIT C
PAGE 63

| West Cameron 544 | OCS-G 14342 | Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| West Cameron 544 | OCS-G 14342 | Interruptible Transportation Service Agreement - GAS | 8/1/2013 | Stingray Pipeline Company, L.L.C. |
| West Cameron 544 | OCS-G 14342 | Platform Space Agreement | 6/1/1995 | Stingray Pipeline Company, L.L.C. |
| West Cameron 544 | OCS-G 14342 | Reserve Dedication Agreement | 8/1/2013 | Stingray Pipeline Company, L.L.C. |
| West Cameron 639 | OCS-G 02027 Expired | Operating Agreement | 12/1/1979 | Sun Oil, Aquitaine, Apache Corporation Clark and Huber |
| West Cameron 648 | OCS-G 04268 Expired | Operating Agreement | 12/1/1979 | Sun Oil, Aquitaine, Apache Corporation Clark and Huber |
| West Delta 72 | OCS-G 01082 | Participation Agreement | 9/18/2009 | Exxon Mobil Corporation and Newfield Exploration Company |
| West Delta 72 | OCS-G 01082 | Offshore Operating Agreement | 12/1/2009 | Exxon Mobil Corporation and Newfield Exploration Company |
| West Delta 72 | OCS-G 01082 | Purchase and Sale Agreement | 1/1/2019 | ExxonMobil and Arena Energy, LP |
| West Delta 73 | OCS-G 01083 | Participation Agreement | 9/18/2009 | Exxon Mobil Corporation and Newfield Exploration Company |
| West Delta 73 | OCS-G 01083 | Offshore Operating Agreement | 12/1/2009 | Exxon Mobil Corporation and Newfield Exploration Company |
| West Delta 73 | OCS-G 01083 | Purchase and Sale Agreement | 1/1/2019 | ExxonMobil and Arena Energy, LP |
| West Delta 86 | OCS-G 04243 | Evaluation Agreement | 10/15/2004 | Arena Energy, LLC and SPN Resources, LLC |

EXHIBIT C
PAGE 64

| West Delta 86 | OCS-G 04243 | Offshore Operating Agreement | 11/1/2004 | Arena Energy, LLC and SPN Resources, LLC |
|---|---|---|---|---|
| West Delta 86 | OCS-G 04243 | Purchase and Sale Agreement | 11/1/2004 | Amerada Hess Corporation and SPN Resources, LLC |
| West Delta 86 | OCS-G 04243 | Amendment and Supplement to Evaluation Agreement | 11/5/2004 | Arena Energy, LLC and SPN Resources, LLC |
| West Delta 86 | OCS-G 04243 | Assignment Agreement and Amendment to Offshore Operating Agreement | 5/5/2005 | Arena Energy, LLC and SPN Resources, LLC |
| West Delta 86 | OCS-G 04243 | Second/Third Amendment to Offshore Operating Agreement | 7/12/2007 | Arena Energy, LLC, Arena Offshore, LLC and SPN Resources, LLC |
| West Delta 86 | OCS-G 04243 | Amendment to Offshore Operating Agreement | 8/1/2010 | Arena Energy, LLC, Arena Offshore, LLC and SPN Resources, LLC |
| West Delta 117 | OCS-G 35951 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| West Delta 117 | OCS-G 35951 | Negotiated Sale Agreement | 6/14/2018 | Chevron U.S.A. Inc. and Arena Energy, LP |
| West Delta 118 | OCS-G 36227 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| West Delta 133 | OCS-G 01106 | Option Agreement | 12/30/2003 | Apache Corporation and Newfield Exploration Company |
| West Delta 133 | OCS-G 01106 | Operating Agreement | 6/1/2004 | Newfield Exploration Company and Triumph Energy, LLC |
| West Delta 133 | OCS-G 01106 | Participation Agreement | 6/1/2004 | Newfield Exploration Company and Triumph Energy, LLC |
| West Delta 133 | OCS-G 01106 | Liquid Hydrocarbons Transportation Agreement | 1/1/2007 | Newfield Exploration Company, Etal, and Arena Energy, LLC |

EXHIBIT C
PAGE 65

| West Delta 133 | OCS-G 01106 | Production Handling Agreement | 1/1/2007 | Newfield Exploration, Etal, and Arena Energy, LLC |
|---|---|---|---|---|
| West Delta 133 | OCS-G 01106 | Purchase and Sale Agreement | 7/1/2012 | McMoRan Oil & Gas LLC and Renaissance Offshore |
| West Delta 133 | OCS-G 01106 | Pipeline Ownership Agreement | 10/1/2012 | Renaissance Offshore, Arena Energy, LP and Arena Offshore, LP |
| West Delta 133 | OCS-G 01106 | Purchase and Sale Agreement | 10/1/2012 | Renaissance Offshore, Arena Energy, LP and Arena Offshore, LP |
| West Delta 133 | OCS-G 01106 | Contract Operator Agreement | 3/16/2013 | Renaissance Offshore, Arena Energy, LP and Arena Offshore, LP |
| West Delta 133 | OCS-G 01106 | 1st Amendment to Production Handling Agreement | 2/3/2014 | Renaissance Offshore, Arena Energy, LP and Arena Offshore, LP |
| West Delta 133 | OCS-G 01106 | Gathering Agreement | 8/1/2006 | Renaissance Offshore, LLC |

**END OF EXHIBIT C**

EXHIBIT C
PAGE 66

<u>**EXHIBIT D**</u>

Attached to and made a part of that certain Asset Purchase Agreement
by and among Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller and San Juan Offshore, LLC, as Buyer

**FORM OF COUNTY ASSIGNMENT**

<u>**ASSIGNMENT, BILL OF SALE AND CONVEYANCE**</u>

| | | |
|---|---|---|
| STATE OF [●] | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| [COUNTY/PARISH] OF [●] | § | |

This ASSIGNMENT, BILL OF SALE AND CONVEYANCE (this "<u>Assignment</u>"), effective as of the Effective Time (defined below), is from ARENA ENERGY, LP, a Delaware limited partnership, whose address is 2103 Research Forest Drive, Suite 400, The Woodlands, Texas 77380, ARENA EXPLORATION, LLC, a Delaware limited liability company, whose address is [●], VALIANT ENERGY LLC, a Delaware limited liability company, whose address is [●] and SAGAMORE HILL HOLDINGS, LP, a Delaware limited partnership, whose address is [●], (each an "<u>Assignor Party</u>", and collectively, "<u>Assignor</u>"), to SAN JUAN OFFSHORE, LLC, a Delaware limited liability company, whose address is [●] ("<u>Assignee</u>").  Assignor and Assignee are hereinafter referred to as a "<u>Party</u>" and collectively as the "<u>Parties</u>."

WHEREAS, on [●], Assignor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>");

WHEREAS, Assignor and Assignee entered into that certain Asset Purchase Agreement dated [●], 2020 (the "<u>Purchase Agreement</u>"), pursuant to which Assignor has agreed to assign, transfer and convey and Assignee has agreed to purchase and acquire all of Assignor's right, title, and interest in and to the Conveyed Assets (defined below); and

WHEREAS, on [●], the Bankruptcy Court entered the Sale Order authorizing the Assignor to sell the Conveyed Assets to Assignee pursuant to the terms and conditions of the Purchase Agreement.

**ARTICLE I**
**Assignment**

**Section 1.1**    <u>Effective Time</u>. The conveyance and assignment herein shall be deemed effective as of [●] at 12:00 a.m., Central Time (the "<u>Effective Time</u>").

**Section 1.2**    <u>Assignment</u>.  Assignor, for Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and subject to the terms set forth herein, does by these presents GRANT, BARGAIN, SELL, CONVEY, ASSIGN, TRANSFER, SET OVER, AND DELIVER unto Assignee all of Assignor's rights, title, and interest in, to, and under all oil and gas properties and all other assets, rights and interest owned by Assignor, including the following (collectively, the "<u>Conveyed Assets</u>"), but excluding the Excluded Assets (as hereinafter defined):

(a)    all Leases, including the Leases described in Exhibit A, together with any and all other rights, titles, and interests of Assignor in and to the leasehold estates created thereby, including royalty interests, overriding royalty interests, production payments, net profits interests, farmout interests, carried interests, reversionary interests, and all other interests of any kind or character described in Exhibit A, subject to any depth restrictions described in Exhibit A, the terms, conditions, covenants, and obligations set forth in the Leases and/or Exhibit A, along with all pools and units that include all or any part of any Lease (the "Units"), including without limitation, all of Assignor's right, title and interest in Hydrocarbon production from any Unit, regardless of whether such Unit production is derived from wells located on or off a Lease (collectively, the "Assigned Leases and Interests");

(b)    all oil and gas wells (whether producing, inactive, temporarily or permanently abandoned, shut-in or otherwise) and any water injection wells located on or traversing the Assigned Leases and Interests (collectively, and including the wells set forth in Exhibit B, the "Wells", and together with the Assigned Leases and Interests, the "Properties");

(c)    (A) all Hydrocarbons produced from or allocated to any or all of the Properties prior to, on or after the Effective Time (which have not already been sold), and all proceeds therefrom and revenues related thereto; and (B) all marketable Hydrocarbons produced from or attributable to the Properties in storage tanks, and Hydrocarbons above or below a custody transfer point, and all proceeds attributable thereto;

(d)    all Contracts, including sales and purchase contracts, unit operating agreements, exploration agreements, development agreements, seismic licenses, balancing agreements, farmout agreements, service agreements, transportation, processing, treatment and gathering agreements, equipment leases and other contracts, agreements and instruments, including the Contracts described on Exhibit C of the Purchase Agreement, in each case, insofar as they relate to any other Conveyed Asset (collectively, the "Assigned Contracts"), and any rights to reimbursement due thereunder;

(e)    to the extent that they may be transferred to Assignee, whether through assignment or otherwise as contemplated under Section 8.9(b) of the Purchase Agreement (*provided* that Assignor will use commercially reasonable efforts to obtain any necessary consent to assignment, without any obligation to incur any out-of-pocket cost or expense or to provide any other consideration), all permits, licenses, servitudes, easements, rights-of-way and other surface agreements used primarily in connection with the ownership or operation of the Properties, including any pending applications therefor;

(f)    all equipment, machinery, fixtures, and other real, personal, and mixed property, operational and nonoperational, known or unknown, located on the Properties or the other Conveyed Assets described above, but excluding any such items constituting Excluded Assets (collectively, the "Equipment"); all physical assets located on the Properties or other Conveyed Assets described above as of the Effective Time or covered by an Assigned Contract and used or previously used for production, mechanical separation, handling, gathering, storage, treatment, sale, disposal or other operations relating to assigned Hydrocarbons, including (a) all buildings, structures, facilities and foundations; (b) all platforms, pipelines of every form and character, including gathering lines, transfer lines, gas lines, oil lines, water lines, flowlines and production and storage facilities and (c) pipeline laterals, to the extent located on or within any of

the Assigned Leases or Interests as a lease term pipeline or serving the Conveyed Assets in any manner, including as a gathering line under a distinct right of way;

(g) all of the files, records, information, and data, whether written or electronically stored, in Assignor's possession and primarily relating to the Conveyed Assets, including (a) land and title records (including abstracts of title and title curative documents); (b) contract files; (c) correspondence; (d) operations, environmental, production, and accounting records; (e) proprietary seismic and specific seismic lines if assignable by Assignor without cost, unless Assignee has agreed to and pays the cost; and (f) facility and well records but excluding any of the foregoing items that are Excluded Assets (collectively, the "Records");

(h) except with respect to the Excluded Assets and the Excluded Liabilities, all claims, refunds, abatements, variances, allocations, causes of action, claims for relief, choses in action, rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, counter-claims, cross-claims and defenses of Assignor to the extent related to the Conveyed Assets and arising or relating to events occurring prior to, on or after the Effective Time or related to the Assumed Liabilities, but excluding any such matters released pursuant to the Plan;

(i) all cash call pre-payments and other refunds due to Assignor for royalty overpayments and/or future deductions as royalty offsets associated with any Conveyed Asset;

(j) all trade credits, accounts receivable, note receivables, take or pay amounts receivable, and other receivables attributable to the other Conveyed Assets, with respect to any period of time;

(k) all proprietary rights and non-proprietary rights to all geological, geochemical, geophysical and other seismic and related technical data and information relating to the Conveyed Assets, to the extent such data and information may be assigned without the payment of a fee (or, in the event a transfer fee applies, to the extent Assignee has agreed in writing to pay, or has paid, such transfer fee); *provided* that Assignor will use commercially reasonable efforts to obtain any necessary consent to assignment, without any obligation to incur any out-of-pocket cost or expense or to provide any other consideration

(l) all Intellectual Property;

(m) the office(s) and associated office lease(s) described on Exhibit D of the Purchase Agreement and all personal computers and associated peripherals, office fixtures, office equipment and inventory located at such office(s);

(n) any and all actions, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, in each case whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured and whether asserted or assertable directly or derivatively, in law, equity, or otherwise, including Avoidance Actions owned by or available to any Assignor Party;

(o) (A) all interests of any kind or character owned by Assignor or any of its Affiliates in and to Oil Insurance Limited, a Bermuda company ("Oil Insurance Limited"), subject to Assignee's compliance with the applicable requirements set forth the Shareholders' Agreement of Oil Insurance Limited issued to Arena Energy, LP., and (B) subject to Section 8.7(b) of the Purchase Agreement, all insurance policies and rights to proceeds (and rights of recovery)

thereof, including all insurance policies issued by Oil Insurance Limited and rights to proceeds thereof;

(p)  (A) all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit, letters of credit, bank accounts and other bank deposits as of the Closing Date, including the Suspense Funds (and applicable accounts therefor), and (B) all escrow accounts maintained by Assignor or any of its Affiliates to secure Decommissioning Obligations or relating to the Properties (other than the Escrow Account), in each case, (x) including those accounts identified on Schedule 2.1(b)(xvi) of the Purchase Agreement, and any and all funds and other income thereof, (y) including any retainers returned by Assignor's advisors to Assignor due to the fees owing to such advisors being less than the applicable retainer, and (z) excluding the Wind Down Amount;

(q)  all receivables related to the Conveyed Assets including all expenditures incurred by Assignor in connection with the ownership, operation and maintenance of the Properties (including rentals, overhead, royalties, Lease option and extension payments, Taxes and other charges and expenses billed under applicable operating agreements or applicable Legal Requirements) and billed by Assignor to third party working interest owners, which remain outstanding and owed to Assignor;

(r)  all claims, refunds, loss carry forwards, abatements, variances, allocations, causes of action, claims for relief, choses in action, rights of recovery, audit rights, rights of set-off, rights of indemnity, contribution or recoupment, counter-claims, cross-claims and defenses of Assignor, other than those constituting Excluded Assets or those related to any Excluded Liability or released pursuant to the Plan; and

(s)  all rights, defenses, claims and causes of action (including rights to enforce Encumbrances, trade credits, receivables, audit rights and rights to receive indemnity, funds, reimbursements or other payments and rights under policies or agreements of insurance) except to the extent released pursuant to the Plan.

**Section 1.3**  Excluded Assets.  Assignor shall EXCEPT, RESERVE and RETAIN and the Conveyed Assets shall not include the following assets (the "Excluded Assets"):

(a)  the Purchase Price delivered to Assignor pursuant to the Purchase Agreement;

(b)  all shares of capital stock or other equity interest of Assignor or any of Assignor's Subsidiaries or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of Assignor or any of Assignor's Subsidiaries;

(c)  all minute books, stock ledgers, corporate seals and stock certificates of Assignor;

(d)  all Excluded Records;

(e)  any rights, claims or causes of action of Assignor against Assignee under this Assignment, the Purchase Agreement or any other Transaction Document;

(f)  documents prepared or received by Assignor with respect to (i) lists of prospective purchasers for such transactions compiled by Assignor, (ii) bids submitted by other prospective purchasers of the Conveyed Assets, (iii) analyses by Assignor of any bids submitted

by any prospective purchaser, (iv) correspondence between or among Assignor, its respective representatives, and any prospective purchaser other than Assignee, (v) internal valuations or economic models prepared in connection with the transactions contemplated in this Assignment and the Purchase Agreement and (vi) correspondence between Assignor or any of its respective representatives with respect to any of the bids, the prospective purchasers, or the transactions contemplated in this Assignment or the Purchase Agreement;

(g) all Excluded Contracts;

(h) all Benefit Plans and any assets associated with or attributable thereto;

(i) the Wind Down Amount; and

(j) all rights to the use of deposits and retainers to the extent held and applied by Assignor's professionals on or before sixty (60) days after the earlier to occur of (i) the effective date of a plan of reorganization or liquidation, (ii) the conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, or (iii) the dismissal of the Bankruptcy Case by the Bankruptcy Court; *provided, however,* any right to deposits or retainers in excess of the fees owing to such advisors shall constitute Conveyed Assets.

TO HAVE AND TO HOLD the Conveyed Assets, together with all and singular the rights, titles, interests, estates, remedies, powers, privileges, and appurtenances thereto and forever belonging thereto unto Assignee, and its successors and assigns forever subject to the other terms and provisions set forth in this Assignment.

## ARTICLE II
## DISCLAIMERS; ASSUMPTION

**Section 2.1 Disclaimers.** NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS ASSIGNMENT OR THE PURCHASE AGREEMENT, EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN THIS ASSIGNMENT, THE PURCHASE AGREEMENT, THE CERTIFICATE DELIVERED BY ASSIGNOR PURSUANT TO SECTION 4.4(C) OF THE PURCHASE AGREEMENT AND IN THE TRANSACTION DOCUMENTS, ASSIGNOR MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, AND DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO ASSIGNEE (INCLUDING ANY OPINION, INFORMATION, OR ADVICE THAT MAY HAVE BEEN PROVIDED TO ASSIGNEE BY ANY RESPECTIVE AFFILIATE OR REPRESENTATIVE OF ASSIGNOR OR BY ANY INVESTMENT BANK OR INVESTMENT BANKING FIRM, ANY PETROLEUM ENGINEER OR ENGINEERING FIRM, ASSIGNOR'S COUNSEL, OR ANY OTHER AGENT, CONSULTANT, OR REPRESENTATIVE OF ASSIGNOR). EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN THIS ASSIGNMENT, THE PURCHASE AGREEMENT, THE CERTIFICATE DELIVERED BY ASSIGNOR PURSUANT TO SECTION 4.4(C) OF THE PURCHASE AGREEMENT AND IN THE TRANSACTION DOCUMENTS, ASSIGNOR FURTHER MAKES NO REPRESENTATION, COVENANT OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY OR COMPLETENESS OF ANY FILES, RECORDS OR DATA HERETOFORE OR HEREAFTER FURNISHED IN CONNECTION WITH THE CONVEYED ASSETS, OR AS TO THE QUALITY OR QUANTITY OF HYDROCARBON RESERVES (IF ANY) ATTRIBUTABLE TO THE CONVEYED ASSETS, OR THE ABILITY OF THE CONVEYED ASSETS TO PRODUCE HYDROCARBONS. ANY AND ALL SUCH FILES, RECORDS AND DATA FURNISHED BY ASSIGNOR IS PROVIDED AS A CONVENIENCE, AND ANY RELIANCE ON OR USE OF THE SAME SHALL BE AT ASSIGNEE'S SOLE RISK. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING,

EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN THIS ASSIGNMENT, ARTICLE 5 OF THE PURCHASE AGREEMENT, THE CERTIFICATE DELIVERED BY ASSIGNOR PURSUANT TO SECTION 4.4(C) OF THE PURCHASE AGREEMENT AND THE TRANSACTION DOCUMENTS, ASSIGNOR EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE, OR OTHERWISE, RELATING TO (A) THE TITLE TO ANY OF THE CONVEYED ASSETS, (B) THE CONDITION OF THE CONVEYED ASSETS (INCLUDING ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS), IT BEING DISTINCTLY UNDERSTOOD THAT THE CONVEYED ASSETS ARE BEING SOLD "AS IS," "WHERE IS," AND "WITH ALL FAULTS AS TO ALL MATTERS," (C) FREEDOM FROM HIDDEN OR REDHIBITORY DEFECTS OR VICES (D) ANY INFRINGEMENT BY ASSIGNOR OF ANY PATENT OR PROPRIETARY RIGHT OF ANY THIRD PARTY, (E) ANY INFORMATION, DATA, OR OTHER MATERIALS (WRITTEN OR ORAL) FURNISHED TO ASSIGNEE BY OR ON BEHALF OF ASSIGNOR (INCLUDING, WITHOUT LIMITATION, IN RESPECT OF ANY SEISMIC DATA, THE EXISTENCE OR EXTENT OF HYDROCARBONS OR THE MINERAL RESERVES, THE RECOVERABILITY OF SUCH RESERVES, ANY PRODUCT PRICING ASSUMPTIONS, AND THE ABILITY TO SELL HYDROCARBON PRODUCTION AFTER THE CLOSING), AND (F) THE ENVIRONMENTAL CONDITION AND OTHER CONDITION OF THE CONVEYED ASSETS AND ANY POTENTIAL LIABILITY ARISING FROM OR RELATED TO THE CONVEYED ASSETS.

AS TO ANY OF THE CONVEYED ASSETS WHICH MAY BE LOCATED WITHIN THE JURISDICTION OF LOUISIANA, THE ASSIGNEE EXPRESSLY WAIVES: (I) THE WARRANTY OF FITNESS FOR INTENDED PURPOSES OR GUARANTEE AGAINST HIDDEN OR LATENT REDHIBITORY VICES UNDER LOUISIANA LAW, INCLUDING LOUISIANA CIVIL CODE ARTICLES 2520, ET SEQ, (II) ALL RIGHTS IN REDHIBITION PURSUANT TO LOUISIANA CIVIL CODE ARTICLE 2520, ET SEQ.; AND (III) ALL RIGHTS WHICH MAY EXIST UNDER THE LOUISIANA UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW, LA. R.S. 51:1402 ET SEQ. FURTHER, FOR ALL SUCH PURPOSES, ASSIGNOR ACKNOWLEDGES THAT THIS EXPRESS WAIVER SHALL BE CONSIDERED A MATERIAL AND INTEGRAL PART OF THIS SALE AND THE CONSIDERATION THEREOF; AND ACKNOWLEDGES THAT THE WAIVER HAS BEEN BROUGHT TO THE ATTENTION OF ASSIGNEE AND EXPLAINED IN DETAIL AND THAT ASSIGNEE HAS VOLUNTARILY AND KNOWINGLY CONSENTED TO THIS WAIVER OF WARRANTY OF FITNESS AND/OR WARRANTY AGAINST REDHIBITORY VICES AND DEFECTS FOR THE ASSETS.

ASSIGNEE WAIVES ITS RIGHTS UNDER THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT, SPECIFICALLY INCLUDING SECTION 17.41 ET SEQ., VERNON'S TEXAS CODE ANNOTATED, BUSINESS AND COMMERCE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS, OR ANY SIMILAR STATE OR FEDERAL LAW.

Section 2.2    ENVIRONMENTAL CONDITION.  ASSIGNEE ACKNOWLEDGES THAT THE CONVEYED ASSETS HAVE BEEN USED FOR EXPLORATION, DEVELOPMENT AND PRODUCTION OF OIL, GAS AND WATER AND THAT THERE MAY BE PETROLEUM, PRODUCED WATER, WASTES OR OTHER HAZARDOUS MATERIALS LOCATED ON, UNDER OR ASSOCIATED WITH THE CONVEYED ASSETS AND THE CONVEYED ASSETS MAY ALSO CONTAIN PREVIOUSLY PLUGGED AND ABANDONED WELLS, BURIED PIPELINES, STORAGE TANKS, AND OTHER EQUIPMENT, WHETHER OR NOT OF A SIMILAR NATURE, THE LOCATIONS OF WHICH MAY NOT BE KNOWN BY ASSIGNOR OR BE READILY APPARENT BY A PHYSICAL INSPECTION OF THE CONVEYED ASSETS. EQUIPMENT AND SITES INCLUDED IN THE CONVEYED ASSETS MAY CONTAIN NATURALLY OCCURRING

RADIOACTIVE MATERIALS ("NORM").  NORM MAY AFFIX OR ATTACH ITSELF TO THE INSIDE OF WELLS, MATERIALS AND EQUIPMENT AS SCALE, OR IN OTHER FORMS; THE WELLS, MATERIALS AND EQUIPMENT LOCATED ON OR INCLUDED IN THE CONVEYED ASSETS MAY CONTAIN NORM AND OTHER WASTES OR HAZARDOUS MATERIALS; AND NORM CONTAINING MATERIAL AND OTHER WASTES OR HAZARDOUS MATERIALS MAY HAVE BEEN BURIED, COME IN CONTACT WITH THE SOIL OR OTHERWISE BEEN DISPOSED OF ON OR AROUND THE CONVEYED ASSETS.  SPECIAL PROCEDURES MAY BE REQUIRED FOR THE REMEDIATION, REMOVAL, TRANSPORTATION OR DISPOSAL OF WASTES, ASBESTOS, HAZARDOUS MATERIALS, INCLUDING HYDROGEN SULFIDE GAS AND NORM FROM THE CONVEYED ASSETS.  FROM AND AFTER THE CLOSING, ASSIGNEE SHALL ASSUME RESPONSIBILITY FOR THE CONTROL, STORAGE, HANDLING, TRANSPORTING AND DISPOSING OF OR DISCHARGE OF ALL MATERIALS, SUBSTANCES AND WASTES FROM THE CONVEYED ASSETS (INCLUDING PRODUCED WATER, HYDROGEN SULFIDE GAS, DRILLING FLUIDS, NORM, HAZARDOUS MATERIALS AND OTHER WASTES) IN A SAFE AND PRUDENT MANNER AND IN ACCORDANCE WITH ALL APPLICABLE ENVIRONMENTAL LAWS.

**Section 2.3**    Conspicuous.  Assignee and Assignor agree that, to the extent required by applicable law to be effective, the disclaimers of certain warranties contained in this Assignment are "conspicuous" disclaimers.

**Section 2.4**    Independent Investigation.  Assignee acknowledges and affirms that it has made its own independent investigation, analysis, and evaluation of the transactions contemplated hereby and the Conveyed Assets (including Assignee's own estimate and appraisal of the extent and value of Assignor's Hydrocarbon reserves attributable to the Conveyed Assets and an independent assessment and appraisal of the environmental risks associated with the acquisition of the Conveyed Assets).  Assignee acknowledges that in entering into this Assignment, it has relied on the aforementioned investigation.  Assignee hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim, or commencing, instituting, or causing to be commenced, any Proceeding of any kind against Assignor or its Affiliates or Subsidiaries, alleging facts contrary to the foregoing acknowledgment and affirmation.

**Section 2.5**    Assumption.  Assignee hereby assumes, effective as of the Effective Time, and agrees to fulfill, perform, pay, and discharge (or cause to be fulfilled, performed, paid, or discharged) all of the Assumed Liabilities (as such term is defined in the Purchase Agreement) arising in respect of the Conveyed Assets; *provided* that Assignee does not assume any obligations or Liabilities attributable to the Excluded Liabilities (as such term is defined in the Purchase Agreement).

## ARTICLE III
## OTHER PROVISIONS

**Section 3.1**    Conveyance subject to the Purchase Agreement.  This Assignment is expressly subject to the Purchase Agreement.  Nothing in this Assignment shall operate to limit, release, or otherwise impair any Party's respective rights, obligations, remedies, or indemnities in the Purchase Agreement.  Except as otherwise defined in this Assignment, all capitalized terms in this Assignment shall have the meanings given to them in the Purchase Agreement.  If any provision of this Assignment is construed to conflict with any provision of the Purchase

Agreement, the provisions of the Purchase Agreement shall be deemed controlling to the extent of such conflict.

**Section 3.2**    Further Assurance.  The Parties agree to (a) furnish upon request to each other such further information, (b) execute, acknowledge and deliver to each other such other documents and (c) do such other acts and things, all as the other Party may reasonably request for the purpose of carrying out the intent of this Assignment; *provided* that nothing in this Section 3.2 shall prohibit Assignor from ceasing operations or winding up its affairs following the Closing.

**Section 3.3**    Assignment.  The provisions of this Assignment shall be construed as covenants running with the land and this Assignment shall be binding upon and inure to the benefit of Assignor and Assignee and each of their respective successors and assigns.  This Assignment is made subject to any and all licenses, leases, easements, rights of way, restrictions, covenants, restrictions and other matters of record affecting the Conveyed Assets, and land use or similar laws, rules or regulations.

**Section 3.4**    Severability.  The provisions of this Assignment shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Assignment, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Assignment and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

**Section 3.5**    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    EXCEPT TO THE EXTENT THE MANDATORY PROVISIONS OF THE BANKRUPTCY CODE APPLY, THIS ASSIGNMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY IN SUCH STATE WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OR CHOICE OF LAWS OR ANY OTHER LAW THAT WOULD MAKE THE LAWS OF ANY OTHER JURISDICTION OTHER THAN THE STATE OF TEXAS APPLICABLE HERETO.

(b)    Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Assignment and to decide any claims or disputes which may arise or result from, or be connected with, this Assignment, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding; *provided*, *however*, that, if the Bankruptcy Case is closed, all Actions and Proceedings arising out of or relating to this Assignment shall be heard and determined in a Texas state court or a federal court sitting in the state of Texas, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Action or Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of

any such Action or Proceeding.  The Parties consent to service of process by mail (in accordance with Section 13.3 of the Purchase Agreement) or any other manner permitted by law.

(c)   **THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS ASSIGNMENT OR THE ACTIONS OF ASSIGNOR, ASSIGNEE OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.**

Section 3.6   <u>Waiver of Damages</u>.  **NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, NO PARTY SHALL BE LIABLE TO THE OTHER FOR SPECIAL, INDIRECT, EXEMPLARY, CONSEQUENTIAL OR PUNITIVE DAMAGES ARISING OUT OF, ASSOCIATED WITH, OR RELATING TO THIS ASSIGNMENT (INCLUDING LOSS OF PROFIT OR BUSINESS INTERRUPTIONS, HOWEVER THE SAME MAY BE CAUSED) AND THE PARTIES HEREBY WAIVE ALL CLAIMS FOR ANY SUCH DAMAGES, EXCEPT TO THE EXTENT ANY SELLER INDEMNIFIED PARTY SUFFERS SUCH DAMAGES TO AN UNAFFILIATED THIRD PARTY IN CONNECTION WITH A FINALLY ADJUDICATED THIRD PARTY CLAIM, IN WHICH CASE SUCH DAMAGES SHALL BE RECOVERABLE (TO THE EXTENT RECOVERABLE UNDER ARTICLE 12 OF THE PURCHASE AGREEMENT) WITHOUT GIVING EFFECT TO THIS <u>SECTION 3.6</u>.**

Section 3.7   <u>Interpretive Matters</u>.  Unless otherwise expressly provided, for purposes of this Assignment, the following rules of interpretation shall apply:

(a)   When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Assignment, the date that is the reference date in calculating such period shall be excluded;

(b)   Any reference in this Assignment to gender includes all genders, and words imparting the singular number only include the plural and vice versa;

(c)   Words such as "<u>herein</u>," "<u>hereof</u>" and "<u>hereunder</u>" refer to this Assignment as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires; and

(d)   The word "<u>including</u>" or any variation thereof means "<u>including, without limitation,</u>" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

Section 3.8   <u>Amendment</u>.  This Assignment may not be amended except by a written agreement executed by all of the Parties.

Section 3.9   <u>Counterparts</u>.  This Assignment and any amendment hereto may be executed in two (2) or more counterparts, each of which shall be deemed to be an original of this Assignment or such amendment and all of which, when taken together, shall constitute one and the same instrument.

Section 3.10   <u>Additional Assignments</u>.  Certain of the Conveyed Assets may require approval to transfer by a Governmental Authority, and as such may require separate assignment

instruments made on officially approved forms, or forms acceptable to such Governmental Authority, (including any assignments of record title, operating rights and/or rights of ways filed with the BOEM or BSEE) and in sufficient multiple originals to satisfy applicable statutory and regulatory requirements.  Assignor's interest conveyed by such separate assignments are the same, and not in addition to, Assignor's interest conveyed in this Assignment.

Where separate assignments of the Conveyed Assets have been or will be executed for filing with, and approval by, applicable Governmental Authorities, any such separate assignments (a) shall evidence this Assignment and assignment of the applicable Conveyed Assets herein made and shall not constitute any additional Assignment or assignment of such properties, (b) are not intended to modify, and shall not modify, any of the terms, covenants and conditions or limitations on warranties set forth in this Assignment or the other Transaction Documents and are not intended to create, and shall not create, any representations, warranties or additional covenants of or by Assignor to Assignee and (c) shall be deemed to contain all of the terms and provisions of this Assignment and the Transaction Documents, as fully and to all intents and purposes as though the same were set forth at length in such separate assignments.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the Parties have executed this Assignment on the dates set forth in their respective acknowledgements hereto, but this Assignment shall be effective for all purposes as of the Effective Time.

WITNESSES TO ALL SIGNATURES:          ASSIGNORS:

ARENA ENERGY, LP

_____
Printed Name:_____
                                              By: _____
_____      Name:_____
Printed Name:_____      Title:_____


ARENA EXPLORATION, LLC

_____
Printed Name:_____
                                              By: _____
_____      Name:_____
Printed Name:_____      Title:_____


VALIANT ENERGY LLC

_____
Printed Name:_____
                                              By: _____
_____      Name:_____
Printed Name:_____      Title:_____


SAGAMORE HILL HOLDINGS, LP

_____
Printed Name:_____
                                              By: _____
_____      Name:_____
Printed Name:_____      Title:_____

## CORPORATE ACKNOWLEDGMENT

STATE OF _____       §
                            §
COUNTY OF _____      §

    This Assignment was acknowledged before me on this _____ day of _____, 2020, by _____ as _____ for Arena Energy, LP, a Delaware limited partnership, on behalf of the partnership.

_____ (Sign)
_____ (Print Name)
Notary Public in and for

My Commission Expires:                _____, _____

_____


STATE OF _____       §
                            §
COUNTY OF _____      §

    This Assignment was acknowledged before me on this _____ day of _____, 2020, by _____ as _____ for Arena Exploration, LLC, a Delaware limited liability company, on behalf of the company.

_____ (Sign)
_____ (Print Name)
Notary Public in and for

My Commission Expires:                _____, _____

_____

STATE OF _____    §
                          §
COUNTY OF _____   §

     This Assignment was acknowledged before me on this _____ day of _____, 2020, by _____ as _____ for Valiant Energy LLC, a Delaware limited liability company, on behalf of the company.

_____ (Sign)

_____ (Print Name)

Notary Public in and for

_____, _____

My Commission Expires:

_____


STATE OF _____    §
                          §
COUNTY OF _____   §

     This Assignment was acknowledged before me on this _____ day of _____, 2020, by _____ as _____ for Sagamore Hill Holdings, LP, a Delaware limited partnership, on behalf of the partnership.

_____ (Sign)

_____ (Print Name)

Notary Public in and for

_____, _____

My Commission Expires:

_____

WITNESSES TO ALL SIGNATURES:  ASSIGNEE:

              San Juan Offshore, LLC

_____

Printed Name:_____

              By: _____

_____ Name:_____

Printed Name:_____ Title:_____


## CORPORATE ACKNOWLEDGMENT


STATE OF _____   §
             §
COUNTY OF _____  §

   This Assignment was acknowledged before me on this _____ day of _____, 2020, by _____ as _____ of San Juan Offshore, LLC a Delaware limited liability company, on behalf of the company.


        _____ (Sign)

        _____ (Print Name)

        Notary Public in and for

My Commission Expires:    _____, _____


_____

**EXHIBIT E**

Attached to and made a part of that certain Asset Purchase Agreement
by and among Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller and San Juan Offshore, LLC, as Buyer

**FORM OF ASSIGNMENT OF OIL INTERESTS**

**ASSIGNMENT OF EQUITY INTEREST**

This Assignment of Equity Interest (this "Equity Assignment") made and entered into this [●] day of [●], 2020 (the "Execution Date"), by and among ARENA ENERGY, LP, a Delaware limited partnership, whose address is 2103 Research Forest Drive, Suite 400, The Woodlands, Texas 77380,("Assignor"), and SAN JUAN OFFSHORE, LLC, a Delaware limited liability company, whose address is [●] ("Assignee").  Assignor and Assignee are sometimes referred to herein individually as a "Party" and collectively as the "Parties."  Capitalized terms used but not otherwise defined herein shall have the respective meanings given to such terms in that certain Asset Purchase Agreement dated August [●], 2020 by and among Assignor, Arena Exploration, LLC, Valiant Energy LLC, and Sagamore Hill Holdings, LP, as Seller and Assignee, as Buyer (the "Purchase Agreement").

WITNESSETH:

WHEREAS, Assignor owns one 'A' share, issued June 26, 2013 (the "Equity Interest")in Oil Insurance Limited, a Bermuda company (the "Company");

WHEREAS, in connection with the issuance of the Equity Interest to Assignor, Assignor became a party to that certain Shareholders' Agreement, dated March 2013, by and among the Company and the shareholder members party thereto (as amended from time to time, the "Shareholders Agreement"); and

WHEREAS, subject to and in accordance with the terms of the Purchase Agreement, Assignor desires to sell, assign, transfer and convey to Assignee the Equity Interest.

NOW, THEREFORE, for and in consideration of the promises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the Parties hereby agree as follows:

**ARTICLE I**
**ASSIGNMENT; WITHDRAWAL AS MEMBER**

**Section 1.1**     **Assignment.**  Effective as of the Execution Date, Assignor does hereby sell, assign, transfer, convey and deliver to Assignee, and its successors and permitted assigns, and Assignee does hereby purchase, acquire and accept all of Assignor's right, title and interest in, to and under the Equity Interest and, subject to the terms of Section 8.7(b) of the Purchase Agreement, Assignee shall be entitled to all insurance policies and rights to proceeds (and rights of recovery) thereof, including all insurance policies issued by the Company and rights to proceeds thereof from and after the Execution Date.

**Section 1.2    Withdrawal as Member.**  Effective as of the Execution Date, Assignor shall and does hereby withdraw from the Company as a member, withdraw as a shareholder party to the Shareholders Agreement, cease to be a member of the Company, cease to be a shareholder party to the Shareholders Agreement and cease to have or exercise any right or power as a member of the Company or otherwise under the Shareholders Agreement. Concurrently with the execution of this Equity Assignment, the Assignee has executed and delivered to the Company a joinder to the Shareholders Agreement agreeing to be bound by the terms thereof that is in form and substance agreeable to the Company.

**Section 1.3    Consent to Assignment.**  By its signature hereto, the Company hereby consents to this Equity Assignment by Assignor to Assignee. The Company hereby waives all provisions in the organizational documents of the Company, including, without limitation, the bye-laws and memorandum of association of the Company, that would prohibit, delay, require notice of, grant rights in connection with or require compliance with any other requirements in connection with this Equity Assignment.

**ARTICLE II**
**General Provisions.**

**Section 2.1    Governing Law; Venue; Jury Waiver.**  Section 13.10 to the Purchase Agreement is hereby incorporated into this Equity Assignment by reference, *mutatis mutandis*.

**Section 2.2    Amendments.**  No amendments or other modifications to this Equity Assignment shall be effective or binding on either of the Parties unless the same are in writing, designated as an amendment or modification and signed by both Assignor and Assignee.

**Section 2.3    Headings.**  The titles and headings set forth in this Equity Assignment have been included solely for ease of reference and may not be considered in the interpretation or construction of this Equity Assignment.

**Section 2.4    Successors and Assigns.**  This Equity Assignment shall apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the Parties.

**Section 2.5    Counterparts.**  This Equity Assignment may be executed in one (1) or more counterparts, each of which will be deemed an original and all of which together shall constitute the same agreement.

**Section 2.6    Subject to Purchase Agreement.**  This Equity Assignment is being delivered pursuant to, and subject to the terms and conditions of, the Purchase Agreement.  Notwithstanding any other provision of this Equity Assignment to the contrary, nothing contained in this Equity Assignment shall in any way supersede, modify, replace, amend, change, rescind or waive any of the provisions set forth in the Purchase Agreement.  To the extent that any term or condition of this Equity Assignment conflicts with any term or condition of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall prevail.

*[Signature Page Follows]*

IN WITNESS WHEREOF, this Equity Assignment has been duly executed by each of the Parties as of the date and year first above written.

**ASSIGNOR:**

**ARENA ENERGY, LP**

By: _____
Name:  [●]
Title:  [●]

**ASSIGNEE:**

**SAN JUAN OFFSHORE, LLC**


By: _____
Name:  [ _____ ]
Title:  [ _____ ]

**COMPANY:**

**OIL INSURANCE LIMITED**

By: _____
Name:  [_____]
Title:  [_____]

## EXHIBIT F

Attached to and made a part of that certain Asset Purchase Agreement
by and among Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller and San Juan Offshore, LLC, as Buyer

### CONTINGENT CONSIDERATION PROVISIONS

1.   Certain Defined Terms.

"2021 Contingent Payments" has the meaning set forth in Section 2(a) of this Exhibit F.

"2022 Contingent Payments" has the meaning set forth in Section 2(b) of this Exhibit F.

"2023 Contingent Payments" has the meaning set forth in Section 2(c) of this Exhibit F.

"2024 Contingent Payments" has the meaning set forth in Section 2(d) of this Exhibit F.

"Agreement" means the Asset Purchase Agreement dated as of the Execution Date, but effective for all purposes as of the Effective Time, by and among each Seller Party and Buyer, to which this Exhibit F is attached.

"Contingent Payment Amount" means Seven Million Five Hundred Thousand and No/100 Dollars ($7,500,000.00).

"Contingent Payment Date" means, in respect of (a) the First-Half Contingent Payment Period, if applicable, the first (1st) Business Day of August of the applicable calendar year, and (b) the Second-Half Contingent Payment Period, if applicable, the first (1st) Business Day of February of the calendar year following such applicable calendar year referenced in clause (a).

"Contingent Payment Obligations" has the meaning set forth in Section 4 of this Exhibit F.

"Contingent Payment Periods" means (a) the period beginning on January 1 of a calendar year and ending on and including June 30 of such calendar year (the "First-Half Contingent Payment Period") and (b) the period beginning on July 1 of a calendar year and ending on and including December 31 of such calendar year (the "Second-Half Contingent Payment Period").

"Contingent Payments" means, collectively, the 2021 Contingent Payments, the 2022 Contingent Payments, the 2023 Contingent Payments, and the 2024 Contingent Payments.

"Lender Representative" means the RBL Facility Agent.

"Memorandum" means a memorandum of the Contingent Payment Obligations in the form attached to the Agreement as Exhibit H.

"WTI Average Price" means the arithmetic average of the WTI Price for each day during the period from the first day of the applicable Contingent Payment Period to the last day of such period.

"WTI Price" means the daily closing spot price, in Dollars per barrel, reported by the U.S. Energy Information Administration, on the "Spot Prices" chart, set for a daily period (excluding weekends or holidays), in the row labeled "WTI - Cushing, Oklahoma", which chart can be currently accessed at the following link: http://www.eia.gov/dnav/pet/pet_pri_spt_s1_d.htm.

Capitalized terms used but not defined herein have the meanings ascribed to them in the Agreement.

2.    Contingent Consideration.

　　　a.    2021 Contingent Payment.  If the WTI Average Price for (x) the First-Half Contingent Payment Period of calendar year 2021 or (y) the Second-Half Contingent Payment Period of calendar year 2021, is greater than $52.50, then Buyer shall pay the Contingent Payment Amount to the Lender Representative for the benefit of the RBL Facility Lenders, on or before each applicable Contingent Payment Date (collectively, the "2021 Contingent Payments").

　　　b.    2022 Contingent Payment.  If the WTI Average Price for (x) the First-Half Contingent Payment Period of calendar year 2022 or (y) the Second-Half Contingent Payment Period of calendar year 2022, is greater than $55.00, then Buyer shall pay the Contingent Payment Amount to the Lender Representative for the benefit of the RBL Facility Lenders, on or before each applicable Contingent Payment Date (collectively, the "2022 Contingent Payments").

　　　c.    2023 Contingent Payment.  If the WTI Average Price for (x) the First-Half Contingent Payment Period of calendar year 2023 or (y) the Second-Half Contingent Payment Period of calendar year 2023, is greater than $57.50, then Buyer shall pay the Contingent Payment Amount to the Lender Representative for the benefit of the RBL Facility Lenders, on or before each applicable Contingent Payment Date (collectively, the "2023 Contingent Payments").

　　　d.    2024 Contingent Payment.  If the WTI Average Price for (x) the First-Half Contingent Payment Period of calendar year 2024 or (y) the Second-Half Contingent Payment Period of calendar year 2024, is greater than $60.00, then Buyer shall pay the Contingent Payment Amount to the Lender Representative for the benefit of the RBL Facility Lenders, on or before each applicable Contingent Payment Date (collectively, the "2024 Contingent Payments").

3.    Designation of Account.  All Contingent Payments shall be made by wire transfer of immediately available funds to a bank account designated by the Lender Representative in writing to Buyer no later than five (5) Business Days prior to the applicable Contingent Payment Date and such payments shall not be subject to any defense or be affected by a right of set-off, counterclaim or recoupment Buyer or any Affiliate may now or hereafter have against any Seller, Affiliates of the Seller, the Lender Representative or the RBL Facility Lenders.

4.      Covenants.  Concurrently with Closing, the obligations with respect to the Contingent Payments, as applicable (the "Contingent Payment Obligations"), contained in this Exhibit F shall be a real obligation and constitute covenants that run with the land and equitable servitudes and binding and a burden upon all of the Assets (the "Contingent Payment Covenants"); *provided, however*, that the Contingent Payment Covenants shall no longer run with the land or otherwise constitute a burden on the Assets with respect to any assignment or transfer of the Assets with an effective time on or after January 1, 2025 (the "Termination Time").  Notwithstanding the foregoing, the Contingent Payment Covenants shall remain in effect to the extent attributable to the applicable Assets owned by any Person who has not satisfied in full such Person's obligations to make payments in respect of any applicable Contingent Payments as of January 1, 2025 (including, for purposes of clarity, any obligation to make any Contingent Payment with respect to the Second-Half Contingent Payment Period of calendar year 2024), and the Termination Time shall be deemed to occur with respect to such Assets when such payment obligations are satisfied. For purposes of clarity, the fact that the Contingent Payment Covenants cease to run with the land or otherwise constitute a burden on the Assets shall not, on a retroactive basis, affect (a) any Contingent Payment Covenants that did run with the land or otherwise constitute a burden on the Assets with respect to any assignments or transfers with an effective time prior to January 1, 2025, or (b) the Contingent Payment with respect to the Second-Half Contingent Payment Period of calendar year 2024, if applicable.  Except as expressly set forth in this Exhibit F, no other covenants, conditions or other obligations shall apply to Buyer or its Affiliates (or its or their successors or assigns), or otherwise burden the Assets, with respect to the Contingent Payment Obligations.

5.      Certain Contingent Payment-Related Matters.  Without limitation of Section 6 of this Exhibit F, including in the case of the events described in Sections 6(a) and 6(b) of this Exhibit F where the provisions of this Section 5 shall not apply, in the event that Buyer assigns, conveys, sells or otherwise transfers all or any portion of the Assets prior to the Termination Time, then Buyer shall cause such assignee to expressly assume a proportionate share of the Contingent Payment Obligations (calculated by reference to the Allocated Value of the Assets with positive Allocated Values transferred (as determined pursuant to Schedule 3.3 of the Agreement in effect on the Closing Date)) but, for purposes of clarity, such assignee shall not assume, or otherwise responsible for, any other share of the Contingent Payment Obligations. If any such assignment or transfer is to an Affiliate of Buyer, then Buyer shall remain jointly and severally liable with such Buyer Affiliate with respect to the Contingent Payment Obligations. Any assignment or other transfer of this Assets by Buyer (or its successors or assigns) in violation of the foregoing shall be null and void *ab initio*.

6.      Release.  Notwithstanding anything to the contrary in Sections 4 or 5 of this Exhibit F, in the event that no default or breach of Buyer with respect to any Contingent Payment then exists and is continuing:

        a.      Buyer assigns, conveys, sells or otherwise transfers some or all of the Assets to any other Person (other than an Affiliate of Buyer) (a "Transferee"), effective at any time prior to the Termination Time (a "Sale"), if Buyer provides evidence, after giving pro forma effect to such Sale, of financial wherewithal, reasonably satisfactory to the Lender Representative, supporting Buyer's future responsibility with respect to any potential Contingent Payment Obligations, then Buyer may request from the Lender Representative, and the Lender Representative shall be

obligated to promptly deliver, a written release in favor of such Transferee of the Contingent Payment Covenants (a "Release"), such that only Buyer would remain (and such Transferee would not be) obligated for the Contingent Payment Obligations previously burdening such transferred Assets and the Transferee shall be assigned the applicable Assets free and clear of this Exhibit F and any burdens or obligations arising from or attributable to this Exhibit F that were related to such Assets prior to such transfer. If Buyer's evidence of financial wherewithal is reasonably satisfactory to the Lender Representative, then the Lender Representative shall promptly, and no later than five (5) Business Days after the Lender Representative's receipt of such evidence from Buyer, (i) confirm in writing to Buyer that such evidence of financial wherewithal is satisfactory (such confirmation, a "Lender Representative Confirmation") and (ii) execute, notarize and deliver a Release to Buyer. If the Lender Representative fails to respond (affirmatively or otherwise) within ten (10) Business Days following its receipt of Buyer's evidence, then the Lender Representative shall be deemed to have provided a Lender Representative Confirmation to Buyer, and Buyer shall be irrevocably authorized to execute, notarize and file of record a Release concurrently with the closing of the Sale the subject of such request and such authorization shall be reflected of record in the Memorandum (defined below).

b.      Buyer assigns, conveys, sells or otherwise transfers to a Transferee, effective at any time prior to the Termination Time, less than fifty percent (50%) of the Allocated Value of the Assets with positive Allocated Values (as determined pursuant to Schedule 3.3 of the Agreement in effect on the Closing Date), calculated by reference and inclusive of any prior assignments or transfers of the Assets, then (i) only Buyer shall remain (and such Transferee will not be obligated) for the Contingent Payment Obligations previously burdening such transferred Assets and the Transferee shall be assigned the applicable Assets free and clear of this Exhibit F and any burdens or obligations arising from or attributable to this Exhibit F that were related to such Assets prior to such transfer and (ii) Buyer shall be irrevocably authorized to execute, notarize and file of record a Release and such authorization shall be reflected of record in the Memorandum.

7.      Lender Representative.  The RBL Facility Lenders shall irrevocably appoint or have irrevocably appointed the Lender Representative as their agent, with the power to act on behalf of the RBL Facility Lenders with respect to this Exhibit F and the Agreement and the transactions contemplated hereby and thereby in accordance with the terms and provisions of this Exhibit F and the Agreement, and to do or refrain from doing all such further acts and things as the Lender Representative shall deem necessary or appropriate in connection with the transactions contemplated hereby. Buyer and any other Person may conclusively and absolutely rely, without inquiry, upon any action of the Lender Representative in all matters referred to herein, including to, on behalf of the RBL Facility Lenders, receive the Contingent Payments, if any. All Contingent Payments and notices required to be made or delivered by Buyer to RBL Facility Lenders shall be made to the Lender Representative for the benefit of the RBL Facility Lenders and shall discharge in full the applicable payment (including the Contingent Payment Obligations) and notice requirements of Buyer to the RBL Facility Lenders with respect thereto.  Buyer shall not be liable for any claim made by any RBL Facility Lender relating to such Persons' rights with respect to any decision or action of the Lender Representative with respect to the disbursement or allocation of the Contingent Payments to the RBL Facility Lenders. The Lender Representative may not assign any of its rights or obligations with respect to this Exhibit F, other than to an Affiliate or another RBL Facility Lender (provided that the Lender Representative provide Buyer with

advance written notice of any such assignment), without the express written consent of Buyer, such consent not to be unreasonably withheld, conditioned or delayed, and any assignment in violation of the foregoing shall be null and void *ab initio*.

8.      Memorandum.  At the Closing, Buyer and the Lender Representative, on behalf of the RBL Facility Lenders, shall execute, acknowledge (and witness, where applicable) and deliver the Memorandum in sufficient number of counterparts to be recorded by Buyer in the applicable parishes or counties where the Assets are located, including necessary counterparts for recording in the relevant BOEM records.

9.      Assignment.  Notwithstanding anything to the contrary in the Agreement, Buyer and the RBL Facility Lenders shall not assign its or their rights and obligations with respect to this Exhibit F without the express written consent of the other Party (for purposes of clarity, said assignment restriction shall not apply to those Contingent Payment Obligations that run with the lands as provided herein), provided that any consent of Buyer in connection with a transfer by an RBL Facility Lender shall not be unreasonably withheld, conditioned or delayed; *provided, however*, the RBL Facility Lenders shall have the right to assign any or all of their rights and obligations under this Exhibit F to one or more Affiliates of the RBL Facility Lenders, provided that the Lender Representative provide written notice of such assignment to Buyer within one (1) Business Day of any such assignment. Any assignment in violation of the foregoing shall be null and void *ab initio*.  All covenants and obligations set forth in this Exhibit F shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.

## EXHIBIT G

Attached to and made a part of that certain Asset Purchase Agreement by and among
Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller
and San Juan Offshore, LLC, as Buyer

## EMPLOYEE MATTERS

1.      <u>Definitions</u>.

        "<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

        "<u>ERISA Affiliate</u>" means each entity, trade or business that is, or was at the relevant time, a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes or included Seller or any of its Subsidiaries, or that is, or was at the relevant time, a member of the same "controlled group" as Seller or any of its Subsidiaries pursuant to Section 4001(a)(14) of ERISA.

        Capitalized Terms used but not defined herein have the meanings ascribed to them in the Agreement to which this Exhibit G is attached.

2.      <u>Access and Interview</u>.  During the period from the Execution Date to the Closing, Seller agrees to provide Buyer, upon reasonable advance notice to Seller, with reasonable opportunity to interview or otherwise meet with each Seller Employee during Seller's regular business hours in order to determine if Buyer wishes to offer employment to any such Seller Employee; provided, however, that any such reasonable opportunity shall be conducted in such a manner as not to interfere with the conduct of Seller's business.

3.      <u>Employee Offers</u>.

        (a)      At least five (5) days prior to the expected Closing Date, Buyer (or an Affiliate thereof) shall provide Seller with a list of Seller Employees to whom it plans to offer employment (the "<u>Offer Employees</u>").  Buyer shall make oral or written offers of employment to such Offer Employees effective as of the Closing, and Sellers shall terminate the employment of any such Offer Employee who is not on leave effective as of the Closing; provided, that, notwithstanding anything in this Agreement to the contrary, Buyer shall not be required to make an offer of employment to any Seller Employee (and shall have no obligation to hire any Seller Employee). Such offers of employment shall be on such terms and subject to such conditions as the Buyer determines in its sole discretion. All Offer Employees who accept employment with Buyer and who subsequently commence employment with Buyer, pursuant to an offer described either in this Section 3(a) or in Section 3(b) are referred to herein as "<u>Transferring Employees</u>" and the date on which any Transferring Employee so commences employment shall be referred to herein as such Transferring Employee's "<u>Transfer Date</u>." Seller shall reasonably cooperate with Buyer in respect of Buyer's efforts to hire and retain any Offer Employee who accepts an offer of employment with Buyer.

(b)     With respect to any Offer Employee who is on leave as of the Closing Date, Buyer shall make an offer of employment to such Offer Employee with Buyer, contingent upon such Seller Employee's return to active status within three (3) months following the Closing Date or such longer period as may be required by applicable Law and Seller, if applicable, shall terminate the employment of such Offer Employee on the date of their return to active status.

(c)     All Transferring Employees shall become employees of Buyer, effective as of 11:59 p.m. Central Time on the applicable Transfer Date.

(d)     Subject to applicable Legal Requirements, with respect to all accrued but unused vacation or other paid time off for the Transferring Employees, Seller shall remain responsible for payments to each Transferring Employee relating to such accrued but unused vacation and other paid time off through the date that such Transferring Employee's employment with Seller terminates and Seller shall timely pay all such accrued and unused vacation or other paid time off days to any Offer Employees and Buyer (or its Affiliate) shall have no Liability with respect to any paid amounts under this section.

(e)     Seller of its Affiliate will be solely responsible for any Liability related to the WARN Act and any Seller Employees previous to, at and following Closing, other than with respect to any Liability that arises solely as a result of Buyer terminating the employment of Transferring Employees following the Closing.

(f)     Buyer, on behalf of itself, its Affiliates and their respective Representatives, hereby releases and agrees to indemnify, defend and hold harmless Seller Group, Arena Offshore, LP and the other owners of interests in the Assets from and against any and all Liabilities arising out of or relating to any material breach of this Exhibit G by Buyer or its Affiliates.

(g)     Seller shall take (or cause to be taken) all actions necessary or appropriate ensure that each Transferring Employee who is a participant in any Benefit Plan that contains a cash or deferred arrangement intended to qualify under Section 401(k) of the Code to be fully vested in his or her accrued benefits under such Benefit Plan, effective as of the day immediately prior to the Closing Date, subject to Closing, without regard to such Transferring Employee's period of service with Seller.

(h)     Nothing in the Agreement, express or implied, shall (i) be treated as an amendment of any Benefit Plan or any employee benefit plan of Buyer; (ii) prevent Buyer or any of its Affiliates from amending or terminating any compensation or benefit plan of Buyer or its Affiliates on or after the Closing Date in accordance with their terms; (iii) prevent Buyer or any of its Affiliates from modifying or terminating the employment or terms of employment of any Transferring Employee; or (iv) confer upon any Person other than the Parties any rights or remedies of any nature whatsoever, including any right to employment, any terms of employment or continued employment for any period.  No Person other than the Parties is a third-party beneficiary or entitled to any other rights under this Exhibit G or under any other provisions of the Agreement.  Without limiting the foregoing, no provision of the Agreement shall require Buyer to make available to any Person any specific or specific-level of health

insurance or other insurance, severance, vacation, pension, compensation or other benefits; provided, that it otherwise complies with its obligations pursuant to this <u>Exhibit G</u>.

# EXHIBIT H

Attached to and made a part of that certain Asset Purchase Agreement
by and among Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller and San Juan Offshore, LLC, as Buyer

## FORM OF MEMORANDUM

To be attached.

## SCHEDULE 1.1(a)

Attached to and made a part of that certain Asset Purchase Agreement by and among
Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller
and San Juan Offshore, LLC, as Buyer

### SELLER'S KNOWLEDGE PERSONS

Michael Vallejo

Keith Goodwin

## SCHEDULE 1.1(b)

Attached to and made a part of that certain Asset Purchase Agreement by and among
Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller
and San Juan Offshore, LLC, as Buyer

### BUYER'S KNOWLEDGE PERSONS

Michael Minarovic

Christopher Capsimalis

**SCHEDULE 2.1(b)(xiii)**

Attached to and made a part of that certain Asset Purchase Agreement by and among
Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller
and San Juan Offshore, LLC, as Buyer

**OFFICES AND OFFICE LEASES**

1. Office Lease between The Woodlands Development Company, L.P., Dated November 6, 2018, 2103 Research Forest Drive, The Woodlands, Texas 77380, re Rentable SF of 105,864, Suites 200, 300, 400 ("Office Lease");

2. First Amendment to Office Lease dated April 24, 2019;

3. Office Sublease ("Sublease") between Arena Energy, LP and Arena Offshore, LP, dated November 6, 2018, for Suite 200 of Office Lease;

4. First Amendment to Master Service Agreement between Arena Energy, LP and Rosefield Pipeline Company, LLC re use/cost sharing of office space;

5. First Amendment to Master Service Agreement between Arena Energy, LP and White Fleet Holdings, LLC re use/cost sharing of office space;

6. First Amendment to Third Amended and Restated Mutual Services Agreement between Arena Energy, LP and Arena Offshore, LP re Sublease and use/cost sharing of office space.

## SCHEDULE 2.1(b)(xvi)

Attached to and made a part of that certain Asset Purchase Agreement by and among
Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller
and San Juan Offshore, LLC, as Buyer

### BANK AND ESCROW ACCOUNTS

BANK ACCOUNTS

| Company | Bank | Purpose | Account Number |
|---|---|---|---|
| Arena Energy, LP | Wells Fargo Bank, N.A. | Main Operating | 4945035632 |
| Arena Energy, LP | Wells Fargo Bank, N.A. | AOP 2 Tracking Account | 4121697734 |
| Arena Energy, LP | Wells Fargo Bank, N.A. | AOP 3 Tracking Account | 4125656538 |
| Arena Energy, LP | Wells Fargo Bank, N.A. | Restricted Hedge Proceeds | 4328980529 |
| Arena Energy, LP | Hancock Whitney | Payroll | 46713025 |
| Arena Exploration LLC | Wells Fargo Bank, N.A. | Operating | 4121244040 |
| Sagamore Hill Holdings, LP | First Horizon Bank | Operating | 180245445 |

DECOMMISSIONING ESCROW ACCOUNTS

| Company | Holder | Account Number | Amount |
|---|---|---|---|
| Arena Energy, LP | Wells Fargo Bank, N.A. | 39007200 | $103,894 |
| Arena Energy, LP | US Bank | 222642000 | $100,835 |
| Arena Energy, LP | Wells Fargo Bank, N.A. | 85519700 | $108,087 |

SECURITY DEPOSITS

| Company | Holder | Purpose | Amount |
|---|---|---|---|
| Arena Energy, LP | Oil Insurance Ltd. | Cash collateral for OIL Insurance Withdrawal Liability | $3,571,000 |
| Arena Energy, LP | 2103 Research Forest Holding Co., LLC | Rent Deposit | $191,094 |
| Arena Energy, LP | Discovery Gas | Transportation Deposit | $45,000 |

## SCHEDULE 2.2(g)

Attached to and made a part of that certain Asset Purchase Agreement by and among
Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller
and San Juan Offshore, LLC, as Buyer

## EXCLUDED CONTRACTS

None.

## SCHEDULE 3.3

Attached to and made a part of that certain Asset Purchase Agreement by and among
Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller
and San Juan Offshore, LLC, as Buyer

## ALLOCATED VALUES

See attached.

| Field | Block | Lease/Well Name | Allocated Value ($/Thousands) |
|---|---|---|---|
| EAST CAMERON 328 | EC 328 | OCS 10638 | -136 |
| EUGENE ISLAND 058 | EI 58 | OCS 02895 | -495 |
| EUGENE ISLAND 099 | EI 99 | OCS 31369 | -550 |
| EUGENE ISLAND 100 | EI 100 | OCS 00796 | -2,032 |
| EUGENE ISLAND 182 | EI 182 | OCS 04452 | 7,535 |
| EUGENE ISLAND 208/215 | EI 215 E/2 | OCS 00578 | -2,405 |
| EUGENE ISLAND 227 | EI 227 | OCS 36745 | -1,675 |
| EUGENE ISLAND 231 | EI 231 | OCS 00980 | -299 |
| EUGENE ISLAND 238 | EI 237 | OCS 00981 | -445 |
| EUGENE ISLAND 238 | EI 252 | OCS 00983 | -2,078 |
| EUGENE ISLAND 238 | EI 229 | OCS 05505 | 0 |
| EUGENE ISLAND 238 | EI 253 | OCS 10741 | -626 |
| EUGENE ISLAND 251/262 | EI 251 | OCS 03331 | -21 |
| EUGENE ISLAND 251/262 | EI 261 | OCS 36208 | -8 |
| EUGENE ISLAND 251/262 | EI 262 | OCS 36209 | -13 |
| EUGENE ISLAND 276 | EI 276 | OCS 00989 | 17,655 |
| EUGENE ISLAND 276 | EI 275 | OCS 24910 | 4,130 |
| EUGENE ISLAND 314 | EI 314 S/2 | OCS 02111 | 4,282 |
| EUGENE ISLAND 314 | EI 332 | OCS 02613 | 0 |
| EUGENE ISLAND 314 | EI 314 N/2 | OCS 33636 | 2,883 |
| EUGENE ISLAND 330 NON-OP | EI 315 S/2 & EI 316 | OCS 02112 | -786 |
| EUGENE ISLAND 338 (RIKER) | EI 338 | OCS 02118 | 16,667 |
| EUGENE ISLAND 338 (RIKER) | EI 339 | OCS 02318 | 13,646 |
| EUGENE ISLAND 338 (RIKER) | EI 340 | OCS 36212 | 1,893 |
| EUGENE ISLAND 341 | EI 341 | OCS 02914 | 9,970 |
| EUGENE ISLAND 346 | EI 346 | OCS 14482 | -337 |
| GALVESTON ISLAND 209 | GA 192 | OCS 03229 | 229 |
| GALVESTON ISLAND 209 | HI 193 & HI 179 & GA 180 | OCS 03237 | -236 |
| GALVESTON ISLAND 209 | GA 209 | OCS 06093 | 7,073 |
| HIGH ISLAND A-545 | HIA 547 "Shallow Oil" | OCS 02705 | -974 |
| HIGH ISLAND A-547 DEEP | HIA 547 "Deep Gas" | OCS 02705 | 1,460 |
| MAIN PASS 120 AREA | MP 120 | OCS 03197 | -3,891 |
| MAIN PASS 123 | MP 123 | OCS 12088 | -2,009 |
| MISSISSIPPI CANYON 268 | MC 311 | OCS 02968 | 257 |
| MISSISSIPPI CANYON 800 | MC 800 | OCS 18292 | 1,652 |
| SOUTH MARSH ISLAND 192 | SM 192 | OCS 24878 | -2,080 |
| SOUTH PASS 83 | SP 83 | OCS 05052 | -2,436 |
| SOUTH PELTO 25 | PL 25 | OCS 14535 | -1,398 |
| SOUTH TIMBALIER 036 | ST 36 | OCS 02624 | -1,479 |
| SOUTH TIMBALIER 036 | ST 35 | OCS 03336 | -1,668 |
| SOUTH TIMBALIER 037 | ST 37 | OCS 02625 | 13,256 |
| SOUTH TIMBALIER 037 | ST 38 | OCS 09637 | 2,151 |
| SOUTH TIMBALIER 052 | ST 51 | OCS 01240 | -1,239 |
| SOUTH TIMBALIER 052 | ST 52 | OCS 01241 | -2,525 |
| SOUTH TIMBALIER 131 (DEEP) | ST 130 | OCS 00456 | -143 |

| Field | Block | Lease/Well Name | Allocated Value ($/Thousands) |
|---|---|---|---|
| SOUTH TIMBALIER 131 (DEEP) | ST 131 | OCS 00457 | -764 |
| SOUTH TIMBALIER 135 (DEEP) | ST 134 | OCS 00461 | -1,048 |
| SOUTH TIMBALIER 135 (DEEP) | ST  135 | OCS 00462 | -361 |
| SOUTH TIMBALIER 135 (DEEP) | ST 151 | OCS 00463 | -2,344 |
| SOUTH TIMBALIER 135 (DEEP) | ST 152 | OCS 00464 | -311 |
| SOUTH TIMBALIER 135 (DEEP) | ST 129 | OCS 00498 | -368 |
| SOUTH TIMBALIER 148 (DEEP) | ST 148 | OCS 01960 | -693 |
| SOUTH TIMBALIER 161 | ST 161 | OCS 01248 | 210 |
| SOUTH TIMBALIER 176 (DEEP) | ST 177 | OCS 01260 | 208 |
| SOUTH TIMBALIER 176 (DEEP) | ST 189 | OCS 01572 | 1,102 |
| SOUTH TIMBALIER 176 (DEEP) | ST 188 | OCS 01899 | 49 |
| VERMILION 071 AREA | VR 71 | OCS 21592 | -446 |
| VERMILION 072 | VR 72 | OCS 27851 | -628 |
| VERMILION 342 | VR 341 | OCS 33607 | 69 |
| VERMILION 342 | VR 342 | OCS 33608 | 474 |
| VERMILION 342 | VR 325 | OCS 36200 | 99 |
| WEST CAMERON 543/544 | WC 543 | OCS 12802 | -69 |
| WEST CAMERON 543/544 | WC 544 | OCS 14342 | -1,447 |
| WEST CAMERON 543/544 | WC 522 | OCS 34033 | -370 |
| WEST DELTA 072 | WD 72 | OCS 01082 | -370 |
| WEST DELTA 086 | WD 86 | OCS 04243 | -503 |
| WEST DELTA 117 | WD 117 | OCS 35951 | -1,658 |
| WEST DELTA 133 | WD 133 | OCS 01106 | 412 |
| Grand Total | | | 64,000 |

**SCHEDULE 5.3**

Attached to and made a part of that certain Asset Purchase Agreement by and among
Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller
and San Juan Offshore, LLC, as Buyer

**NO CONFLICTS**

None.

## SCHEDULE 5.8

Attached to and made a part of that certain Asset Purchase Agreement by and among
Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller
and San Juan Offshore, LLC, as Buyer

**CONSENTS AND PREFERENTIAL PURCHASE RIGHTS**

See attached.

| Area | Block | Parties | Agreement Type | Date | Provision Number | Terms | Comment | Requirement |
|---|---|---|---|---|---|---|---|---|
| EC | 328 | Maritech/AOL | Offshore Operating Agreement | 1/1/2005 | 26.1 | Transfer of Interest shall be preceded by written notice to the Operator and the other Parties. Any Transfer of Interest shall be made to a party financially capable of assuming the corresponding obligations under this Agreement. | Tana/AE current parties | Written Notice |
| EC | 328 | AOL/Tana-Peregrine/Entek | Production Handling Agreement | 1/1/2012 | 21.1 | Producer shall not assign, convey or transfer any of its rights, privileges duties and/or obligations, in whole or part without prior written consent of the Processor. | AOL/Tana-Peregrine | Prior written consent |
| EI | 38/57/58 | AOL/Northstar Etal | Offshore Operating Agreement | 10/18/2004 | 26.1 | Any proposed Transfer of Interest shall be preceded by written notice to the other Parties …and the proposed Transfer of Interest shall not be effective until the other Parties hereto have provided their written consent… | AOL/ANKOR Etal | Prior written notice and prior written consent |
| EI | 174 | Newfield/Vastar | Offshore Operating Agreement | 4/14/1995 | 25.2 | Transfer of Interest.  A Party may sell, farmout, transfer or assign all or any part of its interest in the Lease, provided that: (a) its made to financially responsible party or parties; (b) Party provides copy of fully executed assignment/farmout agreement within 30 days after all signatures have been obtained; (c) Provision stating that sale, farmout, assignment, etc. made subject to this OOA and will provide transferee's written consent to be bound by the provisions of the OOA. | AE/ Fieldwood current | Copy of FO/assignment within 30 days to parties |
| EI | 215 E2 | Texaco/MMR | PSA | 12/1/1999 | 19.8 | This Agreement may not be assigned, either in whole or in part, without the express written consent of the non-assigning Party; provided however this restriction on assignment does not apply to the assignment of the Properties. The terms, covenants and conditions contained in this Agreement are binding upon and inure to the benefit of Seller and Buyer and their respective successors and assigns, and such terms, covenants and conditions are covenants running with the land and with each subsequent transfer or assignment of the Properties. | AE/MMR current parties | Written consent |
| EI | 215 E2 | Transco/MMR | Lateral Line Interconnect | 11/8/2004 | VIII.B | No party may assign or otherwise convey any of its rights, titles, or interests under this Agreement to any other third party without the written consent of the other party hereto, which consent shall not be unreasonably withheld. The assigning party shall provide written notice to the other party with the name and address of the third party to whom it plans to assign all or a portion of its interest in this Agreement.  Within thirty (30) days from receipt of such notice, the receiving party shall either provide its consent or a written explanation of its reasons for not consenting to the assignment. | Agreement in effect but Arena no longer utilizes it. | Prior written consent |
| EI | 215 E2 | Williams/MMR | Interruptible Transportation Rates #210573000 | 6/1/2001 | 10 | This Agreement shall not be assigned by either party without the prior written consent of the other party. | Agreement in effect but Arena no longer utilizes it. | Prior written consent |
| EI | 215 E2 | WFS-Liquids/MMR | Lateral Dehydration Service | 6/1/2001 | 13 | Either party may assign or otherwise convey any of its rights, title, or interest under this Agreement to any third party, provided it has obtained the prior written consent of the other party hereto, which consent shall not be unreasonably withheld. | Agreement in effect but Arena no longer utilizes it. | Prior written consent |

| EI | 215 E2 | Enterprise/MMR | Gas Processing & Fractionation | 1/1/2011 | XI.6 | No assignment of this Agreement by Plant Supplier shall affect or bind Processor until Processor has been furnished at its address given above, with the original recorded instrument or a certified copy of a recorded copy thereof, under which the assignment takes place, if a recorded instrument is required in connection with such assignment, or with a written notice of the assignment, if no recording is required | Agreement in effect but Arena no longer utilizes it. | Written notice |
|---|---|---|---|---|---|---|---|---|
| EI | 215 W2 | Enterprise/ Tarpon | Gas Processing & Fractionation | 2/1/2009 | XII.5 | No assignment of this Agreement by Plant Supplier shall affect or bind Processor until Processor has been furnished at its address given above, with the original recorded instrument or a certified copy of a recorded copy thereof, under which the assignment takes place, if a recorded instrument is required in connection with such assignment, or with a written notice of the assignment, if no recording is required | Agreement in effect but Arena no longer utilizes it. | Written notice |
| EI | 215 E2 | Chevron/Arena | PSA | 10/1/2014 | 24.5 | This Agreement is binding on and inures for the benefit of the rightful successors and permitted assigns of the Parties, but the rights, duties and obligations of Buyer under this Agreement may not be assigned, in whole or in part, without Seller's prior consent to the assignment, which consent will not be unreasonably delayed or withheld | | Prior written consent |
| EI | 276 | Unocal/Kerr-McGee | Offshore Operating Agreement | 5/22/2002 | 26.1 | Transfer of Interest shall be preceded by written notice to the Operator and the other Parties. Any Transfer of Interest shall be made to a party financially capable of assuming the corresponding obligations under this Agreement. | | Written notice |
| EI | 215, 341, 330 Field Units | Chevron/Arena | PSA | 10/1/2014 | 24.5 | This Agreement is binding on and inures for the benefit of the rightful successors and permitted assigns of the Parties, but the rights, duties and obligations of Buyer under this Agreement may not be assigned, in whole or in part, without Seller's prior consent to the assignment, which consent will not be unreasonably delayed or withheld. | | Prior written consent |
| EI | 314, 332, EI 330 Field | Exxon/Arena | PSA | 6/1/2011 | 27.06 | After Closing, Buyer shall provide ExxonMobil with prior written notice of transfer of interest | | Prior written notice |
| EI | 314, 332, EI 330 Field | Exxon/Arena | PSA | 6/1/2011 | 14 | Exxon for the life of the lease has the right to purchase the oil and gas | | Pref Rt Exxon has the right to purchase oil and gas |
| EI | 346 | Newfield/ Ridgewood | Offshore Operating Agreement | 3/15/2007 | 26.1 | Transfer of Interest shall be preceded by written notice to the Operator and the other Parties. Any Transfer of Interest shall be made to a party financially capable of assuming the corresponding obligations under this Agreement. | Arena/Ridgewood current parties | Written notice |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| GA/HI/ WD/MC | GA 209, GA 192/ HI 193, HI 179 Unit/WD 72, WD 73/ MC 311 | Exxon/Arena | PSA | 1/1/2019 | 27.05 | After Closing, Buyer shall provide ExxonMobil with prior written notice at the address listed in Article 23 (ExxonMobil Upstream Business Development Company, 22777 Springwoods Village Parkway, Spring, TX 77389, Attention: Divestment Manager) of any assignment of rights and obligations under this Agreement to a transferee of all or any portion of the Interests; provided, however, no assignment or delegation by Buyer of its rights and obligations under this Agreement shall serve to release Buyer from such rights or obligations in the absence of an express release by ExxonMobil. Buyer shall deliver to ExxonMobil copies of any and all such assignments or delegation agreements within thirty (30) days of execution. | | Prior written notice |
| HI | A547 | Pennzoil/Etal | OA | 7/1/1974 | XXVI | …any conveyance to a third party must be approved by Parties respresenting 51% interest | Chevron/Arena current parties | Approval by 51% interest |
| HI | A547 | AOL and AE and Walter | Offshore Operating Agreement | 1/1/2013 | 26.1 | Transfer of Interest preceded by written notice to the Operator and other Parties. Any transfer shall be made to a party financially capable of assuming the corresponding obligations and liabilities under this Agreement. | | Prior written notice |
| HI | A547 | AOL and AE and Walter | Production Handling Agreement | 1/1/2015 | 20.1 | Producer shall not have the right to assign its rights and obligation in this Agreement in whole or in part to any third party without the written consent of the Processors. Processor can assign its interest, however, needs to provide producer with written notice. | | Prior written consent |
| MP | 120, 122, 236 | Arena/PVI | Offshore Operating Agreement | 3/27/2007 | 26.1 | A transfer of interest shall be preceded by written notice to the Operator and the other Parties. No transfer shall be made unless the prior written consent of the other parties is obtained which consent shall not be unreasonably withheld. Arena hereby consent to any Transfer of Interest from PVI to PV, LLC and Wells Fargo Energy. PVI hereby consents to any Transfer of Interest from Arena to Arena Offshore, LLC and/or Arena Offshore I, LP. | PVI in Default | Prior written consent |
| MP | 120, 122, 236 | Chevron/PVI | Asset Sale Agreement | 3/1/2001 | 12.7 | Buyer further agrees to give Seller notice before Buyer transfers, sells, assigns, subleases or delegates any rights or interest acquired under this Agreement. | | Prior written notice |
| MC | 800 | Newfield/Deep Gulf, ATP | Offshore Operating Agreement | 1/23/2007 | 24.1 | Transfer of Interest shall be preceded by written notice to the Operator and the other Parties. Any Transfer of Interest shall be made to a party financially capable of assuming the corresponding obligations under this Agreement. | W&T/AEX/ Kosmos/ CL&F current parties | Prior written notice |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| MC | 800 | Newfield/Deep Gulf, ATP | Offshore Operating Agreement | 1/23/2007 | 24.2.2 | Preferential Right 30 days after receipt of transfer notice; Preferential Right does not apply if: 1)party proposes to mortgage, pledge, hypothecate, or grant a security interest in all or a portion of its working interest or grants an overriding royalty, net profits interest or production payment, 2) disposes of interest by a merger, reorganization or consolidation or by transfer of substantially all of a Party's exploration and production properties in the GOM, or by transfer to an affiliate, provided that if Affiliate ceases to be an Affiliate within 1 year, rights shall immediately be re-assigned to original Party. | W&T/AEX/ Kosmos/ CL&F current parties | Pref Right does not apply, but prior notice must still be provided |
| MC | 800 | Murphy, Callon, ENI, Medusa and Newfield, Deep Gulf, Arena Exp ATP, CL&F | Production Handling and Operating Services Agreement | 1/2/2010 | 22.1 | Producer shall not have the right to assign its rights and obligation in this Agreement in whole or in part to any third party without the written consent of the Property Owners and Spar Owners. | Murphy/Callon/ENI Medusa/W&T/ Kosmos/AEX/CL&F current parties | Written consent |
| GI/ST/EI | GI 85, ST 130, ST 131, ST 128, ST 129, ST 134, ST 135, ST 151, ST 152, ST 148, ST 176, ST 177, ST 188, ST 189, ST 35, ST 36, ST 30, ST 37, ST 38, ST 30/37 Unit, ST 37/48 Unit, ST 51, ST 52, EI 338, EI 339, EI 214, EI 230, EI 231, EI 229, EI 237, EI 238, EI 252, EI 253, EI 275, EI 276 | Chevron/AE | ASPA | 9/1/2016 | 24.5 | This Agreement is binding on and inures for the benefit of the rightful successors and permitted assigns of the Parties, but the rights, duties and obligations of Buyer under this Agreement may not be assigned, in whole or in part, without Seller's prior consent to the assignment, which consent will not be unreasonably delayed or withheld. | Chevron/AE/AOL current parties | Prior  consent |
| ST | 35/36 | Chevron/Walter | Offshore Operating Agreement | 12/30/2004 | 25.1 | Transfer of Interest shall be preceded by written notice to the Operator and the other Parties. Any Transfer of Interest shall be made to a party financially capable of assuming the corresponding obligations under this Agreement. | AE/Walter current parties | Written notice |
| ST | 35/36 | Chevron/Walter | Offshore Operating Agreement | 12/30/2004 | 25.2.2 | Preferential Right.  15 days after receipt of transfer notice, non-assigning Party may<br><br>Preferential Right does not apply if party proposes to mortgage, pledge, hypothecate, or grant a security interest in all or a portion of its working interest or grants an overriding royalty, net profits interest or production payment.  Disposes of interest by a merger, reorganization, or consolidation or by Transfer of substantially all of a Party's exploration and production properties in the GOM, or by transfer to an affiliate. | AE/Walter current parties | Pref Right does not apply, but prior notice must still be provided |
| ST | 148 | CK Marine/ Bethlehem Steel/ Candel Oil/ Chevron/Four M/ Deco/St Joe Petroleum/ Transco | Operating Agreement | 4/23/1975 | XX | The interest of any party hereto may be assigned or transferred, in whole or in part, and the  terms of this Agreement shall be covenants running with interests in the Joint Lease.  However, prior to any such assignment or transfer the party proposing to assign or transfer its interest, in whole or in part, in and to this Agreement shall notify the other party(is) hereto in writing of the proposed assignment or transfer and shall pay to Operator any and all sums then due and payable by it hereunder.  Any such assignment or transfer shall contain a provision making said assignment or transfer subject to this agreement and assignee shall assume all obligations and liabilities of the assignor. | AE/AOL/ Fieldwood/Wichita W&T Offshore/ W&T Energy VI current parties | Written notice |

| ST | 161 | AE ST 161/AOL ST 151 | PHA | 7/19/2017 | | Producers shall not, except to such Producers' affiliates, or financing entities as part of a financing arrangement, assign, convey, transfer, or hypothecate any of its rights, pricileges, duties or obligations, in whole or part, under this Agreement without fir notifying Processor in writing and receiving Processor's approval. | | Written Consent |
|---|---|---|---|---|---|---|---|---|
| ST | 161 | Apache/Arena | FOA | 7/21/2003 | VII | Except for assignments to affiliates of Farmee, internal partners of Farmee or financial institutions as part of a financing arrqangement, Farmee may not assign any rights under this Agreement without the prior written consent of Farmor | | Written consent |
| VR | 72 | AOL/ AEX | Offshore Operating Agreement | 2/1/2006 | 26.1 | Transfer of Interest shall be preceded by written notice to the Operator and the other Parties. Any Transfer of Interest shall be made to a party financially capable of assuming the corresponding obligations under this Agreement. | | Written notice |
| VR | 325/341/ 342 | Peregrine/Entek | Offshore Operating Agreement | 4/26/2010 | 26.3 | A party may not sell, transfer, farm out, assign or otherwise dispose of all or part of its interest in the Leases without prior written consent of the other Parties.   Written notice of the transfer at least 15 days prior to the date of transfer. | AE/AOL/Peregrine current parties | Written notice |
| WD | 133 | Newfield/ Triumph | Operating Agreement | 6/1/2004 | 25.2 | A party may sell, farmout, transfer or assign all or any part of its interest in the Lease provided that such sale, farmout, transfer or assignment shall be made only to a financially responsible Party or Parties.  Such Party shall provide the other Parties a copy of the fully executed assignment/farmout agreement within 30 days after all signatures on the assignment/farmout agreement have been obtained and that such transfer is made expressly subject to this agreement and furnish such transferee's written consent to be bound by all provisions of this OA. | Renaissance/AE | Copy of FO/assignment within 30 days to parties |

## SCHEDULE 5.9(a)

Attached to and made a part of that certain Asset Purchase Agreement by and among
Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller
and San Juan Offshore, LLC, as Buyer


## MATERIAL CONTRACTS BREACHES

None.

## SCHEDULE 5.9(b)

Attached to and made a part of that certain Asset Purchase Agreement by and among
Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller
and San Juan Offshore, LLC, as Buyer

## MATERIAL CONTRACTS

See attached.

| Area/ Block | Lease | Agreement | Effective Date | Parties |
|---|---|---|---|---|
| East Cameron 328 | OCS-G 10638 | Offshore Operating Agreement | 1/1/2005 | Maritech Resources, Inc. and Arena Offshore, LLC |
| East Cameron 328 | OCS-G 10638 | Option Agreement | 11/23/2004 | Maritech Resources, Inc. and Arena Offshore, LLC |
| East Cameron 328 | OCS-G 10638 | Amendment to Option Agreement | 10/12/2005 | Maritech Resources, Inc. and Arena Offshore, LLC |
| East Cameron 328 | OCS-G 10638 | Participation Agreement | 11/23/2004 | Maritech Resources, Inc. and Arena Offshore, LLC |
| East Cameron 328 | OCS-G 10638 | Amendment to Participation Agreement | 1/28/2005 | Maritech Resources, Inc. and Arena Offshore, LLC |
| East Cameron 328 | OCS-G 10638 | Amendment to 1/1/2005 Offshore Operating Agreement | 9/16/2011 | Tana Exploration Company LLC and Arena Offshore, LLC |
| East Cameron 328 | OCS-G 10638 | Production Handling Agreement | 1/1/2012 | Arena Offshore, LLC, Peregrine Oil & Gas II, LLC and Entek USA General LLC |
| East Cameron 328 | OCS-G 10638 | Amendment to Production Handling Agreement | 5/1/2014 | Arena Offshore, LP, Peregrine Oil & Gas II, LLC and Arena Energy, LP |
| East Cameron 328 | OCS-G 10638 | Second Amendment to Production Handling Agreement | 9/11/2019 | Arena Offshore, LP, Peregrine Oil & Gas II, LLC and Arena Energy, LP |
| East Cameron 328 | OCS-G 10638 | Precedent Agreement | 12/30/2016 | Stingray Pipeline Company, L.L.C. |
| Eugene Island 38 | OCS-G 24883 | Acquisition Agreement | 1/16//2004 | Arena Offshore, LLC and Northstar Gulfsands, LLC, Etal |
| Eugene Island 38 | OCS-G 24883 | Prospect Area Offshore Operating Agreement | 10/18/2004 | Arena Offshore, LLC and Northstar Gulfsands, LLC, Etal |

| Eugene Island 38 | OCS-G 24883 | Acquisition Letter Agreement | 5/5/2008 | Chevron U.S.A. Inc., Union Oil Company o California and Arena Energy, LLC |
|---|---|---|---|---|
| Eugene Island 38 | OCS-G 24883 | Purchase and Sale Agreement | 6/1/2018 | GS E&R American Offshore, LLC and Arena Energy, LP |
| Eugene Island 38 | OCS-G 24883 | Evaluation Agreement | 5/8/2008 | Northstar GOM, Gulfsands Petroleum, Entech Enterprises and Arena Energy, LLC |
| Eugene Island 38 | OCS-G 24883 | Amendment to Evaluation Agreement | 1/28/05 | Northstar GOM, Gulfsands Petroleum, Entech Enterprises and Arena Energy, LLC |
| Eugene Island 38 | OCS-G 24883 | Resignation as Processor under Terminating Production Handling Agreement | 10/22/2019 | ANDKOR E&P Holdings, Entech Enterprises Inc., SCL Resources Inc., Sanare Energy Partners |
| Eugene Island 57 | OCS-G 02601 Expired | Prospect Area Offshore Operating Agreement | 10/18/2004 | Arena Offshore, LLC and Northstar Gulfsands, LLC, Etal |
| Eugene Island 57 | OCS-G 02601 Expired | Evaluation Agreement | 5/8/2008 | Northstar GOM, Gulfsands Petroleum, Entech Enterprises and Arena Energy, LLC |
| Eugene Island 57 | OCS-G 02601 Expired | Amendment to Evaluation Agreement | 1/28/05 | Northstar GOM, Gulfsands Petroleum, Entech Enterprises and Arena Energy, LLC |
| Eugene Island 57 | OCS-G 02601 Expired | Purchase and Sale Agreement | 6/1/2018 | GS E&R American Offshore, LLC and Arena Energy, LP |
| Eugene Island 57 | OCS-G 02601 Expired | Resignation as Processor under Terminating Production Handling Agreement | 10/22/2019 | ANDKOR E&P Holdings, Entech Enterprises Inc., SCL Resources Inc., Sanare Energy Partners |
| Eugene Island 58 | OCS-G 02895 | Prospect Area Offshore Operating Agreement | 10/18/2004 | Arena Offshore, LLC and Northstar Gulfsands, LLC, Etal |
| Eugene Island 58 | OCS-G 02895 | Evaluation Agreement | 5/8/2008 | Northstar GOM, Gulfsands Petroleum, Entech Enterprises and Arena Energy, LLC |
| Eugene Island 58 | OCS-G 02895 | Amendment to Evaluation Agreement | 1/28/05 | Northstar GOM, Gulfsands Petroleum, Entech Enterprises and Arena Energy, LLC |

| Eugene Island 58 | OCS-G 02895 | Purchase and Sale Agreement | 6/1/2018 | GS E&R American Offshore, LLC and Arena Energy, LP |
|---|---|---|---|---|
| Eugene Island 58 | OCS-G 02895 | Resignation as Processor under Terminating Production Handling Agreement | 10/22/2019 | ANKOR E&P Holdings, Entech Enterprises Inc., SCL Resources Inc., Sanare Energy Partners |
| Eugene Island 58 | OCS-G 02895 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| Eugene Island 99 | OCS-G 31369 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 99 | OCS-G 31369 | Master License Agreement, as amended | 6/10/2002 | Fairfield Industries Incorporated and Arena Energy, LLC |
| Eugene Island 99 | OCS-G 31369 | Production Handling Agreement | 12/1/2010 | Arena Offshore, LLC and Arena Energy, LLC/Arena Offshore, LLC |
| Eugene Island 100 | OCS 00796 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 100 | OCS 00796 | Offshore Operating Agreement | 2/13/2004 | Arena Offshore, LLC, SPN Resources, LLC and Triumph Energy, LLC |
| Eugene Island 100 | OCS 00796 | Purchase and Sale Agreement | 2/13/2004 | Apache Corporation and SPN Resources |
| Eugene Island 100 | OCS 00796 | Purchase and Sale Agreement | 2/13/2004 | SPN Resources, Triumph Energy, LLC and Arena Offshore, LLC |
| Eugene Island 100 | OCS 00796 | Exchange Agreement | 12/1/2007 | SPN Resources, Arena Energy, LLC and Arena Offshore, LLC |
| Eugene Island 100 | OCS 00796 | Production Handling Agreement | 12/1/2010 | Arena Energy, LLC, Arena Offshore, LLC and Arena Exploration |
| Eugene Island 100 | OCS 00796 | Oil Gathering and Reserve Dedication Agreement | 7/11/2019 | Renaissance Offshore, LLC |

| Eugene Island 174 | OCS-G 03782 | Offshore Operating Agreement | 4/14/1995 | Newfield Exploration Company and Vastar Resources, Inc. |
|---|---|---|---|---|
| Eugene Island 174 | OCS-G 03782 | Purchase and Sale Agreement | 7/1/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 174 | OCS-G 03782 | Amendment to Purchase and Sale Agreement | 10/30/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 174 | OCS-G 03782 | Second Amendment to Purchase and Sale Agreement | 11/9/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 174 | OCS-G 03782 | Third Amendment to Purchase and Sale Agreement | 11/13/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 181 | OCS-G 04451 Expired | Joint Operating Agreement attached to Participation Agreement | 6/1/1993 | Newfield Exploration Company |
| Eugene Island 182 | OCS-G 04452 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 182 | OCS-G 04452 | Joint Operating Agreement | 6/1/1993 | Newfield Exploration Company |
| Eugene Island 182 | OCS-G 04452 | Purchase and Sale Agreement | 7/1/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 182 | OCS-G 04452 | Purchase and Sale Agreement | 7/1/2012 | Diverse Offshore, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 182 | OCS-G 04452 | Purchase and Sale Agreement | 7/1/2012 | CL&F Resources, Piquant, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 182 | OCS-G 04452 | Amendment to Purchase and Sale Agreement | 10/30/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 182 | OCS-G 04452 | Second Amendment to Purchase and Sale Agreement | 11/9/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |

| Eugene Island 182 | OCS-G 04452 | Third Amendment to Purchase and Sale Agreement | 11/13/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
|---|---|---|---|---|
| Eugene Island 182 | OCS-G 04452 | Purchase and Sale Agreement | 3/1/2014 | Fidelity Oil, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 182 | OCS-G 04452 | Gas Dehydration Agreement | 12/1/2000 | Enterprise Products Operating LLC |
| Eugene Island 182 | OCS-G 04452 | Gas Processing Commitment and Dedication Agreement | 12/27/2002 | Lone Star NGL Sea Robin LLC |
| Eugene Island 182 | OCS-G 04452 | Oil Sales Contract | 3/1/2020 | BP Oil Supply (BP Products North America) |
| Eugene Island 182 | OCS-G 04452 | Operation and Maintenance of Measurement Facilities | 7/1/1994 | Sea Robin Pipeline Company, LLC |
| Eugene Island 182 | OCS-G 04452 | Tie-In Agreement | 10/31/1983 | Crimson Gulf, LLC |
| Eugene Island 182 | OCS-G 04452 | Oil Gathering and Reserve Dedication Agreement | 8/30/2018 | Rosefield Pipeline Company, LLC |
| Eugene Island 182 | OCS-G 04452 | Connection Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 182 | OCS-G 04452 | Incentive And Discount Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 214 | OCS-G 00977 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 214 | OCS-G 00977 | Unit Agreement 14-08-0001-8813 | 10/6/1966 | U.S.A. and Chevron Oil Company |
| Eugene Island 214 | OCS-G 00977 | Amendment Unit Agreement 14-08-0001-8813 | 5/21/1973 | U.S.A. and Chevron Oil Company |

| Eugene Island 214 | OCS-G 00977 | Amendment Unit Agreement 14-08-0001-8813 | 11/29/1983 | U.S.A. and Chevron Oil Company |
|---|---|---|---|---|
| Eugene Island 214 | OCS-G 00977 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 214 | OCS-G 00977 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 214 | OCS-G 00977 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 215 | OCS 00578 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 215 | OCS 00578 | Purchase and Sale Agreement | 7/1/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 215 | OCS 00578 | Amendment to Purchase and Sale Agreement | 10/30/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 215 | OCS 00578 | Second Amendment to Purchase and Sale Agreement | 11/9/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 215 | OCS 00578 | Third Amendment to Purchase and Sale Agreement | 11/13/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 215 | OCS 00578 | Asset Purchase and Sale Agreement | 10/1/2014 | Chevron U.S.A. Inc., Chevron Pipeline and Arena Energy, LP |
| Eugene Island 215 | OCS 00578 | Oil Gathering and Reserve Dedication Agreement | 8/30/2018 | Rosefield Pipeline Company, LLC |
| Eugene Island 215 | OCS 00578 | Connection Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 215 | OCS 00578 | Incentive And Discount Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |

| Eugene Island 215 | OCS 00578 | Gas Processing & Fractionation Agreement | 1/1/2011 | Enterprise Gas Processing, LLC |
|---|---|---|---|---|
| Eugene Island 215 | OCS 00578 | Lateral Line Interconnect, Reimbursement and Operating Agreement | 5/3/2000 | Transcontinental Gas Pipeline ‖ Williams Field Services (WFS) |
| Eugene Island 215 | OCS 00578 | Lateral Line Interconnect, Reimbursement, Construction, and Operating Agreement | 11/8/2004 | Transcontinental Gas Pipeline |
| Eugene Island 215 | OCS 00578 | Successor Natural Gas Processing Agreement | 12/1/2012 | Targa Midstream Services LLC |
| Eugene Island 215 | OCS-G 26033 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 215 | OCS-G 26033 | Purchase and Sale Agreement | 1/1/2015 | Tarpon Operating & Development and Arena Energy, LP |
| Eugene Island 215 | OCS-G 26033 | Amendment to Purchase and Sale Agreement | 1/1/2015 | Tarpon Operating & Development and Arena Energy, LP |
| Eugene Island 217 | OCS-G 36743 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 217 | OCS-G 00978 Expired | Purchase and Sale Agreement | 7/1/2012 | McMoRan Oil & Gas LLC, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 227 | OCS-G 00809 Expired | Purchase and Sale Agreement | 7/1/2012 | McMoRan Oil & Gas LLC, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 227 | OCS-G 36745 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 227 | OCS-G 36745 | Oil Gathering and Reserve Dedication Agreement | 8/30/2018 | Rosefield Pipeline Company, LLC |
| Eugene Island 227 | OCS-G 36745 | Connection Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |

| Eugene Island 227 | OCS-G 36745 | Incentive And Discount Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
|---|---|---|---|---|
| Eugene Island 227 | OCS-G 36745 | Connection Agreement | 8/1/2007 | W&T Offshore Inc. |
| Eugene Island 227 | OCS-G 36745 | Construction, Operation and Interconnect Agreement | 12/15/1989 | Kinetica Deepwater Express, LLC |
| Eugene Island 227 | OCS-G 36745 | Production Scheduling Agreement | 2/15/2002 | Kinetica Deepwater Express, LLC |
| Eugene Island 227 | OCS-G 36745 | Products Purchase Agreement | 3/1/2009 | Enterprise Gas Processing, LLC |
| Eugene Island 229 | OCS-G 05505 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 229 | OCS-G 05505 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 229 | OCS-G 05505 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 230 | OCS-G 00979 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 230 | OCS-G 00979 | Unit Agreement 14-08-0001-8813 | 10/6/1966 | U.S.A. and Chevron Oil Company |
| Eugene Island 230 | OCS-G 00979 | Amendment Unit Agreement 14-08-0001-8813 | 5/21/1973 | U.S.A. and Chevron Oil Company |
| Eugene Island 230 | OCS-G 00979 | Amendment Unit Agreement 14-08-0001-8813 | 11/29/1983 | U.S.A. and Chevron Oil Company |
| Eugene Island 230 | OCS-G 00979 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |

| Eugene Island 230 | OCS-G 00979 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| --- | --- | --- | --- | --- |
| Eugene Island 230 | OCS-G 00979 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 231 | OCS-G 00980 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 231 | OCS-G 00980 | Unit Agreement 14-08-0001-8813 | 10/6/1966 | U.S.A. and Chevron Oil Company |
| Eugene Island 231 | OCS-G 00980 | Amendment Unit Agreement 14-08-0001-8813 | 5/21/1973 | U.S.A. and Chevron Oil Company |
| Eugene Island 231 | OCS-G 00980 | Amendment Unit Agreement 14-08-0001-8813 | 11/29/1983 | U.S.A. and Chevron Oil Company |
| Eugene Island 231 | OCS-G 00980 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 231 | OCS-G 00980 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 231 | OCS-G 00980 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 237 | OCS-G 00981 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 237 | OCS-G 00981 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 237 | OCS-G 00981 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 237 | OCS-G 00981 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |

| Eugene Island 238 | OCS-G 00982 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
|---|---|---|---|---|
| Eugene Island 238 | OCS-G 00982 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 238 | OCS-G 00982 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 238 | OCS-G 00982 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 238 | OCS-G 00982 | Oil Gathering and Reserve Dedication Agreement | 8/30/2018 | Rosefield Pipeline Company, LLC |
| Eugene Island 238 | OCS-G 00982 | Connection Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 238 | OCS-G 00982 | Incentive And Discount Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 238 | OCS-G 00982 | Agreement For Implementation Of Electronic Custody Transfer | 7/1/1993 | Kinetica Energy Express, LLC |
| Eugene Island 238 | OCS-G 00982 | Connection Agreement | 9/17/1990 | Kinetica Energy Express, LLC |
| Eugene Island 238 | OCS-G 00982 | Gas Gathering Agreement | 7/1/2019 | Kinetica Midstream Energy, LLC |
| Eugene Island 238 | OCS-G 00982 | Gas Processing Agreement - Venice Gas Processing Plant | 4/1/2013 | Venice Energy Services Company, L.L.C. |
| Eugene Island 238 | OCS-G 00982 | Platform Space Agreement | 12/19/1995 | Kinetica Deepwater Express, LLC |
| Eugene Island 238 | OCS-G 00982 | Transportation Service Agreement - Rate Schedule IT | 9/1/2013 | Kinetica Energy Express, LLC |

| | | | | |
|---|---|---|---|---|
| Eugene Island 238 | OCS-G 00982 | Liquids Transportation Agreement - Cocodrie and Pecan Island Plants | 5/1/2004 | Kinetica Energy Express, LLC |
| Eugene Island 251 | OCS-G 03331 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 251 | OCS-G 03331 | Purchase and Sale Agreement | 7/1/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 251 | OCS-G 03331 | Purchase and Sale Agreement | 7/1/2012 | Diverse Offshore, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 251 | OCS-G 03331 | Purchase and Sale Agreement | 7/1/2012 | CL&F Resources, Piquant, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 251 | OCS-G 03331 | Amendment to Purchase and Sale Agreement | 10/30/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 251 | OCS-G 03331 | Second Amendment to Purchase and Sale Agreement | 11/9/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 251 | OCS-G 03331 | Third Amendment to Purchase and Sale Agreement | 11/13/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 251 | OCS-G 03331 | Purchase and Sale Agreement | 7/1/2012 | Milagro Production, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 251 | OCS-G 03331 | Oil Gathering and Reserve Dedication Agreement | 8/30/2018 | Rosefield Pipeline Company, LLC |
| Eugene Island 251 | OCS-G 03331 | Connection Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 251 | OCS-G 03331 | Incentive And Discount Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 251 | OCS-G 03331 | Transportation Service Agreement - Rate Schedule IT | 9/1/2013 | Kinetica Energy Express, LLC |

| Eugene Island 252 | OCS-G 00983 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
|---|---|---|---|---|
| Eugene Island 252 | OCS-G 00983 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 252 | OCS-G 00983 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 252 | OCS-G 00983 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 252 | OCS-G 00983 | Oil Gathering and Reserve Dedication Agreement | 8/30/2018 | Rosefield Pipeline Company, LLC |
| Eugene Island 252 | OCS-G 00983 | Connection Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 252 | OCS-G 00983 | Incentive And Discount Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 252 | OCS-G 00983 | Liquids Transportation Agreement - Cocodrie and Pecan Island Plants | 5/1/2004 | Kinetica Energy Express, LLC |
| Eugene Island 252 | OCS-G 00983 | Tie-In Agreement | 10/22/1997 | Crimson Gulf, LLC |
| Eugene Island 253 | OCS-G 10741 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 253 | OCS-G 10741 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 253 | OCS-G 10741 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 253 | OCS-G 10741 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |

| Eugene Island 253 | OCS-G 35938 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
|---|---|---|---|---|
| Eugene Island 254 | OCS-G 36207 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 261 | OCS-G 36208 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 262 | OCS-G 07736 Expired | Purchase and Sale Agreement | 7/1/2012 | McMoRan Oil & Gas LLC, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 262 | OCS-G 36209 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 275 | OCS-G 24910 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 275 | OCS-G 24910 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 275 | OCS-G 24910 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 275 | OCS-G 24910 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 275 | OCS-G 24910 | Transportation Service Agreement - Rate Schedule IT | 9/1/2013 | Kinetica Energy Express, LLC |
| Eugene Island 276 | OCS-G 00989 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 276 | OCS-G 00989 | Offshore Operating Agreement | 5/22/2002 | Union Oil Company of California and Kerr-McGee Oil & Gas Corporation |
| Eugene Island 276 | OCS-G 00989 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |

| Eugene Island 276 | OCS-G 00989 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
|---|---|---|---|---|
| Eugene Island 276 | OCS-G 00989 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 276 | OCS-G 00989 | Oil Gathering and Reserve Dedication Agreement | 8/30/2018 | Rosefield Pipeline Company, LLC |
| Eugene Island 276 | OCS-G 00989 | Connection Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 276 | OCS-G 00989 | Incentive And Discount Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 276 | OCS-G 00989 | Facilities Agreement | 10/24/2005 | Kinetica Deepwater Express, LLC |
| Eugene Island 314 | OCS-G 02111 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 314 | OCS-G 02111 | Purchase and Sale Agreement | 6/1/2011 | ExxonMobil, ExxonMobil Pipeline and Arena Energy, LP |
| Eugene Island 314 | OCS-G 02111 | Unit Agreement 14-08-0001-16927 (Terminated) | 3/1/1977 | Exxon Corporation, Texaco Inc., Gulf Oil Corporation and Shell Oil Company |
| Eugene Island 314 | OCS-G 02111 | Unit Agreement 14-08-0001-16928 (Terminated) | 3/1/1977 | Exxon Corporation, Texaco Inc., Gulf Oil Corporation and Shell Oil Company |
| Eugene Island 314 | OCS-G 02111 | Unit Agreement 14-08-0001-16929 (Terminated) | 3/1/1977 | Exxon Corporation, Texaco Inc., Gulf Oil Corporation and Shell Oil Company |
| Eugene Island 314 | OCS-G 02111 | Unit Agreement 14-08-0001-16941 | 10/1/1976 | Exxon Corporation, Texaco Inc., Gulf Oil Corporation and Shell Oil Company |

| Eugene Island 314 | OCS-G 02111 | Unit Agreement 14-08-0001-16937 (Terminated) | 10/1/1976 | Exxon Corporation, Texaco Inc., Gulf Oil Corporation and Shell Oil Company |
|---|---|---|---|---|
| Eugene Island 314 | OCS-G 02111 | Unit Interest Exchange Agreement | 4/1/2014 | Renaissance Offshore LLC, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 314 | OCS-G 02111 | Asset Purchase and Sale Agreement | 10/1/2014 | Chevron U.S.A. Inc., Chevron Pipeline and Arena Energy, LP |
| Eugene Island 314 | OCS-G 02111 | Amendment to Asset Purchase and Sale Agreement | 10/1/2014 | Chevron U.S.A. Inc., Chevron Pipeline and Arena Energy, LP |
| Eugene Island 314 | OCS-G 02111 | Unit Interest Exchange Agreement | 8/1/2015 | Renaissance Offshore LLC, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 314 | OCS-G 33636 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 314 | OCS-G 33636 | Gas Processing Agreement | 6/1/2011 | Enterprise Gas Processing, LLC |
| Eugene Island 314 | OCS-G 33636 | Interruptible Transportation Service Agreement - GAS | 9/1/2006 | Sea Robin Pipeline Company, LLC |
| Eugene Island 315 | OCS-G 02112 | Purchase and Sale Agreement | 6/1/2011 | ExxonMobil, ExxonMobil Pipeline and Arena Energy, LP |
| Eugene Island 315 | OCS-G 02112 | Agreement for Ownership of Multi-Lease Platform and Facility | 1/1/1982 | McMoRan Etal |
| Eugene Island 315 | OCS-G 02112 | Operating Agreement | 1/1/1982 | Exxon Corporation and Sohio Petroleum |
| Eugene Island 315 | OCS-G 02112 | Amendment to Slot Sale and Purchase Agreement | 3/1/1984 | Sohio Petroleum, Exxon Corporation, Mesa Petroleum and Pennzoil Company |
| Eugene Island 315 | OCS-G 02112 | Slot Sale and Purchase Agreement | 5/16/1984 | Sohio Petroleum and Exxon Corporation |

| Eugene Island 315 | OCS-G 02112 | Slot Sale and Purchase Agreement | 3/28/2000 | Exxon Corporation and Devon Energy |
|---|---|---|---|---|
| Eugene Island 315 | OCS-G 02112 | Gas Processing Agreement | 6/1/2011 | Enterprise Gas Processing, LLC |
| Eugene Island 320 | OCS-G 36211 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 324 | OCS-G 36118 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 325 | OCS-G 36119 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 332 | OCS-G 02613 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 332 | OCS-G 02613 | Purchase and Sale Agreement | 6/1/2011 | ExxonMobil, ExxonMobil Pipeline and Arena Energy, LP |
| Eugene Island 332 | OCS-G 02613 | Unit Agreement 14-08-0001-16927 (Terminated) | 3/1/1977 | Exxon Corporation, Texaco Inc., Gulf Oil Corporation and Shell Oil Company |
| Eugene Island 332 | OCS-G 02613 | Unit Agreement 14-08-0001-16928 (Terminated) | 3/1/1977 | Exxon Corporation, Texaco Inc., Gulf Oil Corporation and Shell Oil Company |
| Eugene Island 332 | OCS-G 02613 | Unit Agreement 14-08-0001-16929 (Terminated) | 3/1/1977 | Exxon Corporation, Texaco Inc., Gulf Oil Corporation and Shell Oil Company |
| Eugene Island 332 | OCS-G 02613 | Unit Agreement 14-08-0001-16937 (Terminated) | 10/1/1976 | Exxon Corporation, Texaco Inc., Gulf Oil Corporation and Shell Oil Company |
| Eugene Island 332 | OCS-G 02613 | Unit Agreement 14-08-0001-16932 | 3/1/1977 | Exxon Corporation and Shell Oil Company |
| Eugene Island 332 | OCS-G 02613 | Unit Agreement 14-08-0001-16933 | 3/1/1977 | Exxon Corporation and Shell Oil Company |

| Eugene Island 332 | OCS-G 02613 | Asset Purchase and Sale Agreement | 10/1/2014 | Chevron U.S.A. Inc., Chevron Pipeline and Arena Energy, LP |
|---|---|---|---|---|
| Eugene Island 332 | OCS-G 02613 | Amendment to Asset Purchase and Sale Agreement | 10/1/2014 | Chevron U.S.A. Inc., Chevron Pipeline and Arena Energy, LP |
| Eugene Island 338 | OCS-G 02118 | Farmout Agreement | 12/15/2009 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 338 | OCS-G 02118 | Amendment to Farmout Agreement | 11/04/2010 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 338 | OCS-G 02118 | Second Amendment to Farmout Agreement | 3/28/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 338 | OCS-G 02118 | Third Amendment to Farmout Agreement | 6/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 338 | OCS-G 02118 | Fourth Amendment to Farmout Agreement | 9/24/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 338 | OCS-G 02118 | Fifth Amendment to Farmout Agreement | 10/1/2014 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 338 | OCS-G 02118 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 338 | OCS-G 02118 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 338 | OCS-G 02118 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 338 | OCS-G 02118 | Successor Natural Gas Processing Agreement | 12/1/2012 | Targa Midstream Services LLC |
| Eugene Island 338 | OCS-G 02118 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |

| Eugene Island 338 | OCS-G 02118 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
|---|---|---|---|---|
| Eugene Island 339 | OCS-G 02318 | Farmout Agreement | 12/15/2009 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 339 | OCS-G 02318 | Amendment to Farmout Agreement | 11/04/2010 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 339 | OCS-G 02318 | Second Amendment to Farmout Agreement | 3/28/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 339 | OCS-G 02318 | Third Amendment to Farmout Agreement | 6/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 339 | OCS-G 02318 | Fourth Amendment to Farmout Agreement | 9/24/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 339 | OCS-G 02318 | Fifth Amendment to Farmout Agreement | 10/1/2014 | Chevron U.S.A. Inc. and Arena Energy, LP |
| Eugene Island 339 | OCS-G 02318 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 339 | OCS-G 02318 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 339 | OCS-G 02318 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| Eugene Island 339 | OCS-G 02318 | Successor Natural Gas Processing Agreement | 12/1/2012 | Targa Midstream Services LLC |
| Eugene Island 339 | OCS-G 02318 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 339 | OCS-G 02318 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |

| Eugene Island 340 | OCS-G 36212 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
|---|---|---|---|---|
| Eugene Island 341 | OCS-G 02914 | Asset Purchase and Sale Agreement | 10/1/2014 | Chevron U.S.A. Inc., Chevron Pipeline and Arena Energy, LP |
| Eugene Island 341 | OCS-G 02914 | Amendment to Asset Purchase and Sale Agreement | 10/1/2014 | Chevron U.S.A. Inc., Chevron Pipeline and Arena Energy, LP |
| Eugene Island 341 | OCS-G 02914 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Eugene Island 341 | OCS-G 02914 | Farmout Proposal | 11/24/1997 | NCX Company and Chevron U.S.A. Production Company |
| Eugene Island 341 | OCS-G 02914 | Participation Agreement | 2/17/1998 | NCX Company and King Ranch Energy |
| Eugene Island 341 | OCS-G 02914 | Amendment to Farmout Proposal | 1/17/2002 | NCX Company and Chevron U.S.A. Production Company |
| Eugene Island 341 | OCS-G 02914 | Oil Gathering and Reserve Dedication Agreement | 8/30/2018 | Rosefield Pipeline Company, LLC |
| Eugene Island 341 | OCS-G 02914 | Connection Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 341 | OCS-G 02914 | Incentive And Discount Agreement | 3/18/2019 | Rosefield Pipeline Company, LLC |
| Eugene Island 341 | OCS-G 02914 | Successor Natural Gas Processing Agreement | 12/1/2012 | Targa Midstream Services LLC |
| Eugene Island 341 | OCS-G 02914 | Transportation Service Agreement - Rate Schedule IT | 9/1/2013 | Kinetica Energy Express, LLC |
| Eugene Island 341 | OCS-G 02914 | Metering and Facilities Agreement | 10/28/2013 | Kinetica Deepwater Express, LLC |

| Eugene Island 341 | OCS-G 02914 | ITS Service Agreement | 12/1/2012 | Kinetica Deepwater Express, LLC |
|---|---|---|---|---|
| Eugene Island 346 | OCS-G 14482 | Purchase and Sale Agreement | 7/1/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 346 | OCS-G 14482 | Amendment to Purchase and Sale Agreement | 10/30/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 346 | OCS-G 14482 | Second Amendment to Purchase and Sale Agreement | 11/9/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 346 | OCS-G 14482 | Third Amendment to Purchase and Sale Agreement | 11/13/2012 | McMoRan Oil & Gas, Arena Energy, LP and Arena Offshore, LP |
| Eugene Island 346 | OCS-G 14482 | Offshore Operating Agreement | 3/15/2007 | Newfield Exploration and Ridgewood |
| Eugene Island 346 | OCS-G 14482 | Participation Agreement | 3/15/2007 | Newfield Exploration and Ridgewood |
| Eugene Island 346 | OCS-G 14482 | ITS Service Agreement | 12/1/2012 | Kinetica Deepwater Express, LLC |
| Galveston 192 | OCS-G 03229 | Purchase and Sale Agreement | 1/1/2019 | ExxonMobil and Arena Energy, LP |
| Galveston 192 | OCS-G 03229 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Galveston 192 | OCS-G 03229 | Unit Operating Agreement | 1/1/978 | Exxon Corporation and Shell Offshore |
| Galveston 192 | OCS-G 03229 | Agreement for Ownership of Multiple Lease Platform, Facilities, Quarters and Compressor | 1/1/1978 | Exxon Corporation and Shell Offshore |
| Galveston 192 | OCS-G 03229 | PHA for Agreement for Ownership of Multiple Lease Platform, Facilities, Quarters and Compressor | 10/6/1989 | Exxon Corporation and Shell Offshore |

| Galveston 192 | OCS-G 03229 | Unit Agreement #754388007 | 1/8/1988 | Exxon Corporation and Shell Offshore |
|---|---|---|---|---|
| Galveston 209 | OCS-G 06093 | Purchase and Sale Agreement | 1/1/2019 | ExxonMobil and Arena Energy, LP |
| Galveston 209 | OCS-G 06093 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Galveston 209 | OCS-G 06093 | HIPS Throughput Capacity Lease Agreement | 11/1/2007 | McMoran Oil & Gas LLC |
| Galveston 209 | OCS-G 06093 | Lateral Line Interconnect, Reimbursement and Operating Agreement | 2/27/2003 | Williams Field Services (WFS) |
| Galveston 209 | OCS-G 06093 | Offshore Pipeline Interconnect and Operating Agreement | 4/15/1997 | ExxonMobil Pipeline Company |
| High Island 193 | OCS-G 03237 | Purchase and Sale Agreement | 1/1/2019 | ExxonMobil and Arena Energy, LP |
| High Island 193 | OCS-G 03237 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| High Island 193 | OCS-G 03237 | Unit Operating Agreement | 1/1/978 | Exxon Corporation and Shell Offshore |
| High Island 193 | OCS-G 03237 | Agreement for Ownership of Multiple Lease Platform, Facilities, Quarters and Compressor | 1/1/1978 | Exxon Corporation and Shell Offshore |
| High Island 193 | OCS-G 03237 | PHA for Agreement for Ownership of Multiple Lease Platform, Facilities, Quarters and Compressor | 10/6/1989 | Exxon Corporation and Shell Offshore |
| High Island 193 | OCS-G 03237 | Unit Agreement #754388007 | 1/8/1988 | Exxon Corporation and Shell Offshore |
| High Island A-547 | OCS-G 02705 | Purchase and Sale Agreement | 9/1/2003 | Noble Energy, Inc. and Triumph Energy, LLC |

| High Island A-547 | OCS-G 02705 | Amendment to Purchase and Sale Agreement | 4/21/2004 | Noble Energy, Inc. and Triumph Energy, LLC |
|---|---|---|---|---|
| High Island A-547 | OCS-G 02705 | Second Amendment to Purchase and Sale Agreement | 4/28/2004 | Noble Energy, Inc. and Triumph Energy, LLC |
| High Island A-547 | OCS-G 02705 | Third Amendment to Purchase and Sale Agreement | 4/28/2004 | Noble Energy, Inc. and Triumph Energy, LLC |
| High Island A-547 | OCS-G 02705 | Fourth Amendment to Purchase and Sale Agreement | 4/28/2004 | Noble Energy, Inc. and Triumph Energy, LLC |
| High Island A-547 | OCS-G 02705 | Fifth Amendment to Purchase and Sale Agreement | 4/28/2004 | Noble Energy, Inc. and Triumph Energy, LLC |
| High Island A-547 | OCS-G 02705 | Purchase and Sale Agreement | 10/1/2012 | Anadarko E&P Company and Arena Energy, LLC |
| High Island A-547 | OCS-G 02705 | Purchase and Sale Agreement | 10/1/2012 | Tammany Oil and Gas, Tammany Ventures and Arena Energy, LLC |
| High Island A-547 | OCS-G 02705 | Participation Agreement | 1/1/2013 | Walter Oil & Gas and Arena Energy, LP |
| High Island A-547 | OCS-G 02705 | Offshore Operating Agreement | 1/1/2013 | Walter Oil & Gas and Arena Energy, LP |
| High Island A-547 | OCS-G 02705 | Amendment to Participation Agreement | 12/1/2014 | Walter Oil & Gas and Arena Energy, LP |
| High Island A-547 | OCS-G 02705 | Production Handling Agreement | 1/1/2015 | Arena Offshore, LP and Walter Oil & Gas and Arena Energy, LP |
| High Island A-547 | OCS-G 02705 | Precedent Agreement | 12/30/2016 | Stingray Pipeline Company, L.L.C. |
| High Island A-547 | OCS-G 02705 | Transportation Service Agreement - Rate Schedule IT | 9/1/2013 | Kinetica Energy Express, LLC |

| High Island A-547 | OCS-G 02705 | Gas Gathering and Processing Agreement | 8/1/2019 | Targa Midstream Services LLC |
|---|---|---|---|---|
| High Island A-547 | OCS-G 02705 | NGL Banks Agreement | 6/1/2004 | High Island Offshore System, L.L.C. \|\| Southern Petroleum Laboratories (SPL) |
| High Island A-547 | OCS-G 02705 | Interruptible Transportation Service Agreement - GAS | 6/1/2004 | High Island Offshore System, L.L.C. |
| High Island A-547 | OCS-G 02705 | Reserve Commitment Agreement | 10/1/2009 | High Island Offshore System, L.L.C. |
| High Island A-547 | OCS-G 02705 | Oil Sales Contract | 4/1/2012 | Shell Trading (US) Company |
| Main Pass 120 | OCS-G 03197 | Asset Sale Agreement | 3/1/2001 | Chevron U.S.A. Inc., Kewanee Industries and PetroVentures |
| Main Pass 120 | OCS-G 03197 | Acquisition and Joint Development Proposal | 2/8/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 120 | OCS-G 03197 | Extension and Amendment to Acquisition and Joint Development Proposal | 3/27/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 120 | OCS-G 03197 | Offshore Operating Agreement | 3/27/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 120 | OCS-G 03197 | First Amendment to Acquisition and Joint Development Proposal | 5/17/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 120 | OCS-G 03197 | Purchase and Sale Agreement | 11/19/2014 | Arena Energy, LLC and PetroVentures |
| Main Pass 120 | OCS-G 03197 | Pipeline Construction and Operating Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 120 | OCS-G 03197 | Pipeline Use and Compensation Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |

| | | | | |
|---|---|---|---|---|
| Main Pass 120 | OCS-G 03197 | Production Handling Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 121 | OCS-G 26939 | Offer to Participate | 6/13/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 121 | OCS-G 26939 | Offshore Operating Agreement | 3/27/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 121 | OCS-G 26939 | Conditional Letter - Offer to Participate | 6/14/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 121 | OCS-G 26939 | Purchase and Sale Agreement | 11/19/2014 | Arena Energy, LLC and PetroVentures |
| Main Pass 121 | OCS-G 26939 | Pipeline Construction and Operating Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 121 | OCS-G 26939 | Pipeline Use and Compensation Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 121 | OCS-G 26939 | Production Handling Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 122 | OCS-G 13964 | Asset Sale Agreement | 3/1/2001 | Chevron U.S.A. Inc., Kewanee Industries and PetroVentures |
| Main Pass 122 | OCS-G 13964 | Acquisition and Joint Development Proposal | 2/8/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 122 | OCS-G 13964 | Extension and Amendment to Acquisition and Joint Development Proposal | 3/27/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 122 | OCS-G 13964 | Offshore Operating Agreement | 3/27/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 122 | OCS-G 13964 | First Amendment to Acquisition and Joint Development Proposal | 5/17/2007 | Arena Energy, LLC and PetroVentures |

| Main Pass 122 | OCS-G 13964 | Purchase and Sale Agreement | 11/19/2014 | Arena Energy, LLC and PetroVentures |
|---|---|---|---|---|
| Main Pass 122 | OCS-G 13964 | Pipeline Construction and Operating Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 122 | OCS-G 13964 | Pipeline Use and Compensation Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 122 | OCS-G 13964 | Production Handling Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 123 | OCS-G 12088 | Purchase and Sale Agreement | 6/1/2014 | Arena Energy, LP and Energy XXI |
| Main Pass 123 | OCS-G 12088 | Production Handling Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 123 | OCS-G 12088 | Pipeline Construction and Operating Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 123 | OCS-G 12088 | Pipeline Use and Compensation Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 123 | OCS-G 12088 | Construction, Installation, Operation and Maintenance of Measurement and Pipeline Facilities | 5/4/2004 | High Point Gas Gathering, L.L.C. |
| Main Pass 123 | OCS-G 12088 | Construction, Installation, Operation, and Maintenance of Measurement Facilities - BB Meter | 10/8/2004 | High Point Gas Gathering, L.L.C. |
| Main Pass 133 | OCS-G 01633 | Production Handling and Pumper Agreement | 12/1/2007 | Petro Ventures, Inc., Arena Energy, LLC and Mobil Oil Exploration & Producing Southeast, Inc |
| Main Pass 206 | OCS-G 33128 Expired | Offshore Operating Agreement | 3/27/2008 | Petro Venture, Inc. and Arena Energy, LLC |
| Main Pass 236 | OCS-G 02955 | Asset Sale Agreement | 3/1/2001 | Chevron U.S.A. Inc., Kewanee Industries and PetroVentures |

| Main Pass 236 | OCS-G 02955 | Acquisition and Joint Development Proposal | 2/8/2007 | Arena Energy, LLC and PetroVentures |
|---|---|---|---|---|
| Main Pass 236 | OCS-G 02955 | Extension and Amendment to Acquisition and Joint Development Proposal | 3/27/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 236 | OCS-G 02955 | Offshore Operating Agreement | 3/27/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 236 | OCS-G 02955 | First Amendment to Acquisition and Joint Development Proposal | 5/17/2007 | Arena Energy, LLC and PetroVentures |
| Main Pass 236 | OCS-G 02955 | Purchase and Sale Agreement | 11/19/2014 | Arena Energy, LLC and PetroVentures |
| Main Pass 122 | OCS-G 13964 | Pipeline Use and Compensation Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 236 | OCS-G 02955 | Pipeline Construction and Operating Agreement | 8/16/2017 | Arena Energy, LLC and PetroVentures |
| Main Pass 236 | OCS-G 02955 | Pipeline Use and Compensation Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Main Pass 236 | OCS-G 02955 | Production Handling Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Mississippi Canyon 147 | OCS-G 27264 Expired | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Mississippi Canyon 311 | OCS-G 02968 | Purchase and Sale Agreement | 1/1/2019 | ExxonMobil and Arena Energy, LP |
| Mississippi Canyon 311 | OCS-G 02968 | Joint Operating Agreement | 9/1/1987 | Exxon Corporation and Shell Offshore Inc. |
| Mississippi Canyon 311 | OCS-G 02968 | Agreement of Assignment | 10/22/1992 | Exxon Corporation and Shell Offshore Inc. |

| | | | | |
|---|---|---|---|---|
| Mississippi Canyon 311 | OCS-G 02968 | Letter Agreement | 1/23/2003 | Exxon Corporation and Shell Offshore Inc. |
| Mississippi Canyon 800 | OCS-G 18292 | Offshore Operating Agreement | 1/23/2007 | Newfield Exploration Company, Deep Gulf Energy LP and ATP Oil & Gas Corporation |
| Mississippi Canyon 800 | OCS-G 18292 | Amendment of Offshore Operating Agreement | 1/24/2007 | Newfield Exploration Company, Deep Gulf Energy LP and ATP Oil & Gas Corporation |
| Mississippi Canyon 800 | OCS-G 18292 | Second Amendment of Offshore Operating Agreement | 2/18/2008 | Newfield Exploration Company, Deep Gulf Energy LP, ATP Oil & Gas Corporation, CL&F Resources LP and Arena Exploration, LLC |
| Mississippi Canyon 800 | OCS-G 18292 | Third Amendment of Offshore Operating Agreement | 1/1/2010 | Newfield Exploration Company, Deep Gulf Energy LP, CL&F Resources LP and Arena Exploration, LLC |
| Mississippi Canyon 800 | OCS-G 18292 | Production Handling Agreement | 1/2/2010 | Newfield Exploration Company, Deep Gulf Energy LP, CL&F Resources LP and Arena Exploration, LLC |
| Mississippi Canyon 800 | OCS-G 18292 | Participation Agreement | 3/1/2007 | Newfield Exploration Company and Arena Exploration, LLC |
| Main Pass 122 | OCS-G 13964 | Pipeline Use and Compensation Agreement | 8/16/2017 | Arena Energy, LP and Arena Offshore, LP |
| Mississippi Canyon 800 | OCS-G 18292 | Amendment to Participation Agreement | 6/20/2007 | Newfield Exploration Company and Arena Exploration, LLC |
| Mississippi Canyon 800 | OCS-G 18292 | Second Amendment to Participation Agreement | 2/18/2008 | Newfield Exploration Company and Arena Exploration, LLC |
| Mississippi Canyon 800 | OCS-G 18292 | Oil Sales Contract | 4/1/2012 | Shell Trading (US) Company |
| Mississippi Canyon 800 | OCS-G 18292 | Gas Gathering Agreement | 2/2/2011 | Third Coast Midstream |
| South Marsh 192 | OCS-G 24878 | Conditional Letter of Acceptance | 4/25/2003 | Anadarko Petroleum Corporation and Arena Energy, LLC |

| South Marsh 192 | OCS-G 24878 | Offer to Purchase | 7/14/2003 | Marathon Oil Company and Arena Energy, LLC |
|---|---|---|---|---|
| South Marsh 192 | OCS-G 24878 | Participation Agreement | 6/1/2004 | Stone Energy, Energy Partners, Ltd. Arena Offshore, LLC and Triumph Energy, L.L.C. |
| South Marsh 192 | OCS-G 24878 | Purchase and Sale Agreement | 11/1/2014 | Arena Energy, LP and Stone Energy |
| South Marsh 192 | OCS-G 24878 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| South Pass 74 | OCS-G 26144 Expired | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Pass 74 | OCS-G 26144 Expired | Purchase and Sale Agreement | 9/1/2003 | Noble Energy, Inc. and Triumph Energy, L.L.C. |
| South Pass 82 | OCS-G 05685 Expired | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Pass 82 | OCS-G 05685 Expired | Purchase and Sale Agreement | 9/1/2003 | Noble Energy, Inc. and Triumph Energy, L.L.C. |
| South Pass 82 | OCS-G 05685 Expired | Purchase and Sale Agreement | 4/1/2005 | Bundy Partners and Triumph Energy, L.L.C. |
| South Pass 82 | OCS-G 05685 Expired | Offer to Purchase | 4/25/2005 | CLK Exploration Co., LLC and Triumph Energy |
| South Pass 82 | OCS-G 05685 Expired | Offer to Purchase | 4/29/2005 | Piquant, Inc. and Triumph Energy |
| South Pass 82 | OCS-G 05685 Expired | Offer to Purchase | 5/9/2005 | Crescent Investment Co. and Triumph Energy |
| South Pass 83 | OCS-G 05052 Expired | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |

| South Pass 83 | OCS-G 05052 Expired | Purchase and Sale Agreement | 9/1/2003 | Noble Energy, Inc. and Triumph Energy, L.L.C. |
|---|---|---|---|---|
| South Pass 83 | OCS-G 05052 Expired | Purchase and Sale Agreement | 4/1/2005 | Bundy Partners and Triumph Energy, L.L.C. |
| South Pass 83 | OCS-G 05052 Expired | Offer to Purchase | 4/25/2005 | CLK Exploration Co., LLC and Triumph Energy |
| South Pass 83 | OCS-G 05052 Expired | Offer to Purchase | 4/29/2005 | Piquant, Inc. and Triumph Energy |
| South Pass 83 | OCS-G 05052 Expired | Offer to Purchase | 5/9/2005 | Crescent Investment Co. and Triumph Energy |
| South Pelto 25 | OCS-G 14535 Expired | Master License Agreement, as amended | 6/10/2002 | Fairfield Industries Incorporated and Arena Energy, LLC |
| South Pelto 25 | OCS-G 14535 Expired | Farmout Agreement | 12/17/2002 | Apache Corporation and Arena Energy, LLC |
| South Pelto 25 | OCS-G 14535 Expired | Platform Operations Agreement | 12/21/2002 | Triumph Energy and Apache Corporation |
| South Pelto 25 | OCS-G 14535 Expired | Farmout Agreement | 2/13/2004 | Apache Corporation and Arena Energy, LLC |
| South Pelto 25 | OCS-G 14535 Expired | Farmout Agreement | 5/19/2003 | Apache Corporation and Arena Energy, LLC |
| South Pelto 25 | OCS-G 14535 Expired | Platform Operations Agreement | 12/21/2002 | Triumph Energy and Apache Corporation |
| South Pelto 25 | OCS-G 14535 Expired | Offshore Operating Agreement | 7/23/2003 | Arena Energy, LLC and Bois d'Arc Offshore Ltd. and Bois d'Arc Resources Ltd. |
| South Pelto 25 | OCS-G 14535 Expired | Participation Agreement | 7/23/2003 | Arena Energy, LLC and Bois d'Arc Offshore Ltd. and Bois d'Arc Resources Ltd. |

| South Pelto 25 | OCS-G 14535 Expired | Purchase and Sale Agreement | 4/1/2011 | Stone Energy Offshore, L.L.C. and Arena Energy, LP |
|---|---|---|---|---|
| South Pelto 25 | OCS-G 14535 Expired | Offer to Acquire Wellbore | 1/3/2012 | Arena Energy, LP and Apache Corporation |
| South Pelto 25 | OCS-G 14535 Expired | Purchase and Sale Agreement | 8/1/2015 | Arena Energy, LP and John Cook |
| South Timbalier 35 | OCS-G 03336 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 35 | OCS-G 03336 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 35 | OCS-G 03336 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 35 | OCS-G 03336 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 35 | OCS-G 03336 | Offshore Operating Agreement | 12/30/2004 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 35 | OCS-G 03336 | Farmout Agreement | 6/15/2004 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 35 | OCS-G 03336 | Amendment to Farmout Agreement | 3/28/2005 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 35 | OCS-G 03336 | Amendment to Farmout Agreement | 9/4/2007 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 35 | OCS-G 03336 | Processing and Operations Services Agreement | 12/30/2004 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 35 | OCS-G 03336 | Amendment to Processing and Operations Services Agreement | 11/28/2005 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |

| South Timbalier 35 | OCS-G 03336 | Termination to Amendment to Processing and Operations Services Agreement | 5/18/2006 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
|---|---|---|---|---|
| South Timbalier 35 | OCS-G 03336 | Amendment to Processing and Operations Services Agreement | 12/27/2007 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 35 | OCS-G 03336 | Amendment to Processing and Operations Services Agreement | 10/29/2008 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 35 | OCS-G 03336 | Amendment to Processing and Operations Services Agreement | 3/11/2014 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 35 | OCS-G 03336 | Platform Use Agreement | 9/1/2016 | Chevron Pipe Line Company and Arena Offshore, LP |
| South Timbalier 35 | OCS-G 03336 | Election to Take Over | 7/12/2017 | Walter Oil and Gas Corporation and Arena Energy, LP |
| South Timbalier 35 | OCS-G 03336 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 35 | OCS-G 03336 | Condensate Transportation Agreement | 12/22/1997 | Discovery Producer Services, LLC |
| South Timbalier 35 | OCS-G 03336 | Condensate, Separation, Handling, and Stabilization Agreement | 12/22/1997 | Discovery Producer Services, LLC |
| South Timbalier 35 | OCS-G 03336 | Connection Agreement | 6/26/1998 | Chevron Pipeline Company |
| South Timbalier 35 | OCS-G 03336 | Dehydration Services Agreement | 1/1/2003 | Discovery Producer Services, LLC |
| South Timbalier 35 | OCS-G 03336 | Facilities Interconnect And Reimbursement Agreement | 5/31/2000 | Sea Robin Pipeline Company, LLC |
| South Timbalier 35 | OCS-G 03336 | FT-2 Transportation Service Agreement (w/Temporary Release Info) | 11/1/2016 | Discovery Producer Services, LLC |

| South Timbalier 35 | OCS-G 03336 | Gas Processing & Fractionation Agreement | 11/3/2010 | Discovery Producer Services, LLC |
|---|---|---|---|---|
| South Timbalier 35 | OCS-G 03336 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 35 | OCS-G 03336 | Interruptible Gas Gathering Agreement | 5/1/2003 | Discovery Producer Services, LLC |
| South Timbalier 35 | OCS-G 03336 | Platform Use Agreement | 8/1/1997 | Discovery Gas Transmission LLC |
| South Timbalier 36 | OCS-G 02624 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 36 | OCS-G 02624 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 36 | OCS-G 02624 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 36 | OCS-G 02624 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 36 | OCS-G 02624 | Offshore Operating Agreement | 12/30/2004 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 36 | OCS-G 02624 | Farmout Agreement | 6/15/2004 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 36 | OCS-G 02624 | Amendment to Farmout Agreement | 3/28/2005 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 36 | OCS-G 02624 | Amendment to Farmout Agreement | 9/4/2007 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 36 | OCS-G 02624 | Processing and Operations Services Agreement | 12/30/2004 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |

| South Timbalier 36 | OCS-G 02624 | Amendment to Processing and Operations Services Agreement | 11/28/2005 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
|---|---|---|---|---|
| South Timbalier 36 | OCS-G 02624 | Termination to Amendment to Processing and Operations Services Agreement | 5/18/2006 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 36 | OCS-G 02624 | Amendment to Processing and Operations Services Agreement | 12/27/2007 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 36 | OCS-G 02624 | Amendment to Processing and Operations Services Agreement | 10/29/2008 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 36 | OCS-G 02624 | Amendment to Processing and Operations Services Agreement | 3/11/2014 | Walter Oil and Gas Corporation and Chevron U.S.A. Inc. |
| South Timbalier 36 | OCS-G 02624 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 36 | OCS-G 02624 | Condensate Transportation Agreement | 12/22/1997 | Discovery Producer Services, LLC |
| South Timbalier 36 | OCS-G 02624 | Condensate, Separation, Handling, and Stabilization Agreement | 12/22/1997 | Discovery Producer Services, LLC |
| South Timbalier 36 | OCS-G 02624 | Connection Agreement | 6/26/1998 | Chevron Pipeline Company |
| South Timbalier 36 | OCS-G 02624 | Dehydration Services Agreement | 1/1/2003 | Discovery Producer Services, LLC |
| South Timbalier 36 | OCS-G 02624 | Facilities Interconnect And Reimbursement Agreement | 5/31/2000 | Sea Robin Pipeline Company, LLC |
| South Timbalier 36 | OCS-G 02624 | FT-2 Transportation Service Agreement (w/Temporary Release Info) | 11/1/2016 | Discovery Producer Services, LLC |
| South Timbalier 36 | OCS-G 02624 | Gas Processing & Fractionation Agreement | 11/3/2010 | Discovery Producer Services, LLC |

| South Timbalier 36 | OCS-G 02624 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
|---|---|---|---|---|
| South Timbalier 36 | OCS-G 02624 | Interruptible Gas Gathering Agreement | 5/1/2003 | Discovery Producer Services, LLC |
| South Timbalier 36 | OCS-G 02624 | Platform Use Agreement | 8/1/1997 | Discovery Gas Transmission LLC |
| South Timbalier 37 | OCS-G 02625 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 37 | OCS-G 02625 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 37 | OCS-G 02625 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 37 | OCS-G 02625 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 37 | OCS-G 02625 | Offshore Operating Agreement, as amended | 5/1/1974 | Gulf Oil Corporation, Mobil Oil Corporation, Texaco Inc., Tenneco Oil Company, Tenneco Exploration II, Ltd. and Tenneco Exploration, Ltd. |
| South Timbalier 37 | OCS-G 02625 | Purchase and Sale Agreement | 6/23/2006 | BP Exploration & Production Inc., Chevron U.S.A. Inc. and Union Oil Company of California |
| South Timbalier 37 | OCS-G 02625 | Memorandum of Termination (ST 30/37) | 9/1/2016 | Arena Energy, LP |
| South Timbalier 37 | OCS-G 02625 | Memorandum of Termination (ST 37/48) | 9/1/2016 | Arena Energy, LP |
| South Timbalier 37 | OCS-G 02625 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 37 | OCS-G 02625 | Condensate Transportation Agreement | 12/22/1997 | Discovery Producer Services, LLC |

| South Timbalier 37 | OCS-G 02625 | Condensate, Separation, Handling, and Stabilization Agreement | 12/22/1997 | Discovery Producer Services, LLC |
|---|---|---|---|---|
| South Timbalier 37 | OCS-G 02625 | Connection Agreement | 6/26/1998 | Chevron Pipeline Company |
| South Timbalier 37 | OCS-G 02625 | Dehydration Services Agreement | 1/1/2003 | Discovery Producer Services, LLC |
| South Timbalier 37 | OCS-G 02625 | Facilities Interconnect And Reimbursement Agreement | 5/31/2000 | Sea Robin Pipeline Company, LLC |
| South Timbalier 37 | OCS-G 02625 | FT-2 Transportation Service Agreement (w/Temporary Release Info) | 11/1/2016 | Discovery Producer Services, LLC |
| South Timbalier 37 | OCS-G 02625 | Gas Processing & Fractionation Agreement | 11/3/2010 | Discovery Producer Services, LLC |
| South Timbalier 37 | OCS-G 02625 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 37 | OCS-G 02625 | Interruptible Gas Gathering Agreement | 5/1/2003 | Discovery Producer Services, LLC |
| South Timbalier 37 | OCS-G 02625 | Platform Use Agreement | 8/1/1997 | Discovery Gas Transmission LLC |
| South Timbalier 38 | OCS-G 09637 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 38 | OCS-G 09637 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 38 | OCS-G 09637 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 38 | OCS-G 09637 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |

| South Timbalier 38 | OCS-G 09637 | Offshore Operating Agreement, as amended | 5/1/1974 | Gulf Oil Corporation, Mobil Oil Corporation, Texaco Inc., Tenneco Oil Company, Tenneco Exploration II, Ltd. and Tenneco Exploration, Ltd. |
|---|---|---|---|---|
| South Timbalier 38 | OCS-G 09637 | Purchase and Sale Agreement | 6/23/2006 | BP Exploration & Production Inc., Chevron U.S.A. Inc. and Union Oil Company of California |
| South Timbalier 38 | OCS-G 09637 | Farmout Agreement | 5/1/2004 | Chevron U.S.A. Inc. and Bois d'Arc Offshore Ltd. |
| South Timbalier 38 | OCS-G 09637 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 38 | OCS-G 09637 | Condensate Transportation Agreement | 12/22/1997 | Discovery Producer Services, LLC |
| South Timbalier 38 | OCS-G 09637 | Condensate, Separation, Handling, and Stabilization Agreement | 12/22/1997 | Discovery Producer Services, LLC |
| South Timbalier 38 | OCS-G 09637 | Connection Agreement | 6/26/1998 | Chevron Pipeline Company |
| South Timbalier 38 | OCS-G 09637 | Dehydration Services Agreement | 1/1/2003 | Discovery Producer Services, LLC |
| South Timbalier 38 | OCS-G 09637 | Facilities Interconnect And Reimbursement Agreement | 5/31/2000 | Sea Robin Pipeline Company, LLC |
| South Timbalier 38 | OCS-G 09637 | FT-2 Transportation Service Agreement (w/Temporary Release Info) | 11/1/2016 | Discovery Producer Services, LLC |
| South Timbalier 38 | OCS-G 09637 | Gas Processing & Fractionation Agreement | 11/3/2010 | Discovery Producer Services, LLC |
| South Timbalier 38 | OCS-G 09637 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 38 | OCS-G 09637 | Interruptible Gas Gathering Agreement | 5/1/2003 | Discovery Producer Services, LLC |

| South Timbalier 38 | OCS-G 09637 | Platform Use Agreement | 8/1/1997 | Discovery Gas Transmission LLC |
|---|---|---|---|---|
| South Timbalier 48 | OCS-G 14518 Expired | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 51 | OCS-G 01240 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 51 | OCS-G 01240 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 51 | OCS-G 01240 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 51 | OCS-G 01240 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 51 | OCS-G 01240 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 51 | OCS-G 01240 | Condensate Transportation Agreement | 12/22/1997 | Discovery Producer Services, LLC |
| South Timbalier 51 | OCS-G 01240 | Condensate, Separation, Handling, and Stabilization Agreement | 12/22/1997 | Discovery Producer Services, LLC |
| South Timbalier 51 | OCS-G 01240 | Connection Agreement | 6/26/1998 | Chevron Pipeline Company |
| South Timbalier 51 | OCS-G 01240 | Dehydration Services Agreement | 1/1/2003 | Discovery Producer Services, LLC |
| South Timbalier 51 | OCS-G 01240 | Facilities Interconnect And Reimbursement Agreement | 5/31/2000 | Sea Robin Pipeline Company, LLC |
| South Timbalier 51 | OCS-G 01240 | FT-2 Transportation Service Agreement (w/Temporary Release Info) | 11/1/2016 | Discovery Producer Services, LLC |

| South Timbalier 51 | OCS-G 01240 | Gas Processing & Fractionation Agreement | 11/3/2010 | Discovery Producer Services, LLC |
|---|---|---|---|---|
| South Timbalier 51 | OCS-G 01240 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 51 | OCS-G 01240 | Interruptible Gas Gathering Agreement | 5/1/2003 | Discovery Producer Services, LLC |
| South Timbalier 51 | OCS-G 01240 | Platform Use Agreement | 8/1/1997 | Discovery Gas Transmission LLC |
| South Timbalier 52 | OCS-G 01241 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 52 | OCS-G 01241 | Master License Agreement, as amended | 6/10/2002 | Fairfield Industries Incorporated and Arena Energy, LLC |
| South Timbalier 52 | OCS-G 01241 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 52 | OCS-G 01241 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 52 | OCS-G 01241 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 52 | OCS-G 01241 | Visitation Agreement | 3/1/2019 | Arena Offshore, LP, Board of Supervisors of Louisiana State University and A&M College |
| South Timbalier 52 | OCS-G 01241 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 52 | OCS-G 01241 | Condensate Transportation Agreement | 12/22/1997 | Discovery Producer Services, LLC |
| South Timbalier 52 | OCS-G 01241 | Condensate, Separation, Handling, and Stabilization Agreement | 12/22/1997 | Discovery Producer Services, LLC |

| South Timbalier 52 | OCS-G 01241 | Connection Agreement | 6/26/1998 | Chevron Pipeline Company |
|---|---|---|---|---|
| South Timbalier 52 | OCS-G 01241 | Dehydration Services Agreement | 1/1/2003 | Discovery Producer Services, LLC |
| South Timbalier 52 | OCS-G 01241 | Facilities Interconnect And Reimbursement Agreement | 5/31/2000 | Sea Robin Pipeline Company, LLC |
| South Timbalier 52 | OCS-G 01241 | FT-2 Transportation Service Agreement (w/Temporary Release Info) | 11/1/2016 | Discovery Producer Services, LLC |
| South Timbalier 52 | OCS-G 01241 | Gas Processing & Fractionation Agreement | 11/3/2010 | Discovery Producer Services, LLC |
| South Timbalier 52 | OCS-G 01241 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 52 | OCS-G 01241 | Interruptible Gas Gathering Agreement | 5/1/2003 | Discovery Producer Services, LLC |
| South Timbalier 52 | OCS-G 01241 | Platform Use Agreement | 8/1/1997 | Discovery Gas Transmission LLC |
| South Timbalier 128 | OCS 00498 | License Agreement | 10/3/1951 | Marine Instrument Company and Gulf Research & Development Company |
| South Timbalier 128 | OCS 00498 | Concurrent Agreement, as amended | 7/1/1959 | Humble Oil & Refining Company and Gulf Oil Corporation |
| South Timbalier 128 | OCS 00498 | Unit Agreement 14-08-001-6669 | 12/16/1959 | Gulf Oil Corporation and Secretary of Interior |
| South Timbalier 128 | OCS 00498 | Agreement of Compromise | 8/13/1970 | Marine Petroleum Corporation, Continental Oil Company and Gulf Oil Corporation |
| South Timbalier 128 | OCS 00498 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |

| South Timbalier 128 | OCS 00498 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
|---|---|---|---|---|
| South Timbalier 128 | OCS 00498 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 128 | OCS 00498 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 128 | OCS 00498 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 128 | OCS 00498 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 128 | OCS 00498 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 128 | OCS 00498 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| South Timbalier 128 | OCS 00498 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 128 | OCS 00498 | Connection Agreement | 3/1/2005 | Arena/VGS |
| South Timbalier 128 | OCS 00498 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |
| South Timbalier 128 | OCS 00498 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |
| South Timbalier 128 | OCS 00498 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
| South Timbalier 128 | OCS 00498 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |

| South Timbalier 128 | OCS 00498 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |
|---|---|---|---|---|
| South Timbalier 128 | OCS 00498 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 128 | OCS 00498 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 128 | OCS 00498 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |
| South Timbalier 128 | OCS 00498 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
| South Timbalier 128 | OCS 00498 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |
| South Timbalier 129 | OCS 00465 | License Agreement | 10/3/1951 | Marine Instrument Company and Gulf Research & Development Company |
| South Timbalier 129 | OCS 00465 | Concurrent Agreement, as amended | 7/1/1959 | Humble Oil & Refining Company and Gulf Oil Corporation |
| South Timbalier 129 | OCS 00465 | Unit Agreement 14-08-001-6669 | 12/16/1959 | Gulf Oil Corporation and Secretary of Interior |
| South Timbalier 129 | OCS 00465 | Agreement of Compromise | 8/13/1970 | Marine Petroleum Corporation, Continental Oil Company and Gulf Oil Corporation |
| South Timbalier 129 | OCS 00465 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 129 | OCS 00465 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 129 | OCS 00465 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |

| South Timbalier 129 | OCS 00465 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
|---|---|---|---|---|
| South Timbalier 129 | OCS 00465 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 129 | OCS 00465 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 129 | OCS 00465 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 129 | OCS 00465 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| South Timbalier 129 | OCS 00465 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 129 | OCS 00465 | Connection Agreement | 3/1/2005 | Arena/VGS |
| South Timbalier 129 | OCS 00465 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |
| South Timbalier 129 | OCS 00465 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |
| South Timbalier 129 | OCS 00465 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
| South Timbalier 129 | OCS 00465 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 129 | OCS 00465 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |
| South Timbalier 129 | OCS 00465 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |

| South Timbalier 129 | OCS 00465 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |
|---|---|---|---|---|
| South Timbalier 129 | OCS 00465 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |
| South Timbalier 129 | OCS 00465 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
| South Timbalier 129 | OCS 00465 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |
| South Timbalier 130 | OCS 00456 | License Agreement | 10/3/1951 | Marine Instrument Company and Gulf Research & Development Company |
| South Timbalier 130 | OCS 00456 | Agreement of Compromise | 8/13/1970 | Marine Petroleum Corporation, Continental Oil Company and Gulf Oil Corporation |
| South Timbalier 130 | OCS 00456 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 130 | OCS 00456 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 130 | OCS 00456 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 130 | OCS 00456 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 130 | OCS 00456 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 130 | OCS 00456 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 130 | OCS 00456 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |

| South Timbalier 130 | OCS 00456 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
|---|---|---|---|---|
| South Timbalier 130 | OCS 00456 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 130 | OCS 00456 | Connection Agreement | 3/1/2005 | Arena/VGS |
| South Timbalier 130 | OCS 00456 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |
| South Timbalier 130 | OCS 00456 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |
| South Timbalier 130 | OCS 00456 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
| South Timbalier 130 | OCS 00456 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 130 | OCS 00456 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |
| South Timbalier 130 | OCS 00456 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 130 | OCS 00456 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 130 | OCS 00456 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |
| South Timbalier 130 | OCS 00456 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
| South Timbalier 130 | OCS 00456 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |

| | | | | |
|---|---|---|---|---|
| South Timbalier 131 | OCS 00457 | License Agreement | 10/3/1951 | Marine Instrument Company and Gulf Research & Development Company |
| South Timbalier 131 | OCS 00457 | Agreement of Compromise | 8/13/1970 | Marine Petroleum Corporation, Continental Oil Company and Gulf Oil Corporation |
| South Timbalier 131 | OCS 00457 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 131 | OCS 00457 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 131 | OCS 00457 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 131 | OCS 00457 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 131 | OCS 00457 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 131 | OCS 00457 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 131 | OCS 00457 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 131 | OCS 00457 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| South Timbalier 131 | OCS 00457 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 131 | OCS 00457 | Connection Agreement | 3/1/2005 | Arena/VGS |
| South Timbalier 131 | OCS 00457 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |

| South Timbalier 131 | OCS 00457 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |
|---|---|---|---|---|
| South Timbalier 131 | OCS 00457 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
| South Timbalier 131 | OCS 00457 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 131 | OCS 00457 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |
| South Timbalier 131 | OCS 00457 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 131 | OCS 00457 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 131 | OCS 00457 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |
| South Timbalier 131 | OCS 00457 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
| South Timbalier 131 | OCS 00457 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |
| South Timbalier 134 | OCS 00461 | Concurrent Agreement, as amended | 7/1/1959 | Humble Oil & Refining Company and Gulf Oil Corporation |
| South Timbalier 134 | OCS 00461 | Unit Agreement 14-08-001-6669 | 12/16/1959 | Gulf Oil Corporation and Secretary of Interior |
| South Timbalier 134 | OCS 00461 | Agreement of Compromise | 8/13/1970 | Marine Petroleum Corporation, Continental Oil Company and Gulf Oil Corporation |
| South Timbalier 134 | OCS 00461 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |

| South Timbalier 134 | OCS 00461 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
|---|---|---|---|---|
| South Timbalier 134 | OCS 00461 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 134 | OCS99 00461 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 134 | OCS 00461 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 134 | OCS 00461 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 134 | OCS 00461 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 134 | OCS 00461 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| South Timbalier 134 | OCS 00461 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 134 | OCS 00461 | Connection Agreement | 3/1/2005 | Arena/VGS |
| South Timbalier 134 | OCS 00461 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |
| South Timbalier 134 | OCS 00461 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |
| South Timbalier 134 | OCS 00461 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
| South Timbalier 134 | OCS 00461 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |

| | | | | |
|---|---|---|---|---|
| South Timbalier 134 | OCS 00461 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |
| South Timbalier 134 | OCS 00461 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 134 | OCS 00461 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 134 | OCS 00461 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |
| South Timbalier 134 | OCS 00461 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
| South Timbalier 134 | OCS 00461 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |
| South Timbalier 135 | OCS 00462 | Concurrent Agreement, as amended | 7/1/1959 | Humble Oil & Refining Company and Gulf Oil Corporation |
| South Timbalier 135 | OCS 00462 | Unit Agreement 14-08-001-6669 | 12/16/1959 | Gulf Oil Corporation and Secretary of Interior |
| South Timbalier 135 | OCS 00462 | Agreement of Compromise | 8/13/1970 | Marine Petroleum Corporation, Continental Oil Company and Gulf Oil Corporation |
| South Timbalier 135 | OCS 00462 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 135 | OCS 00462 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 135 | OCS 00462 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 135 | OCS 00462 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |

| South Timbalier 135 | OCS 00462 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
|---|---|---|---|---|
| South Timbalier 135 | OCS 00462 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 135 | OCS 00462 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 135 | OCS 00462 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| South Timbalier 135 | OCS 00462 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 135 | OCS 00462 | Connection Agreement | 3/1/2005 | Arena/VGS |
| South Timbalier 135 | OCS 00462 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |
| South Timbalier 135 | OCS 00462 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |
| South Timbalier 135 | OCS 00462 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
| South Timbalier 135 | OCS 00462 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 135 | OCS 00462 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |
| South Timbalier 135 | OCS 00462 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 135 | OCS 00462 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |

| | | | | |
|---|---|---|---|---|
| South Timbalier 135 | OCS 00462 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |
| South Timbalier 135 | OCS 00462 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
| South Timbalier 135 | OCS 00462 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |
| South Timbalier 148 | OCS-G 01960 | Farmout Agreement, as amended | 10/31/1974 | Chevron Oil Company and C & K Offshore Company |
| South Timbalier 148 | OCS-G 01960 | Operating Agreement, as amended | 4/23/1975 | Chevron Oil Company and C & K Offshore Company, Etal |
| South Timbalier 148 | OCS-G 01960 | Processing Agreement | 8/1/1997 | Chevron U.S.A. Production Company, The Louisiana Land and Exploration Company, Forcenergy Inc., Lannie Mecom Moses and WI&T Offshore, L.L.C. |
| South Timbalier 148 | OCS-G 01960 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 148 | OCS-G 01960 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 148 | OCS-G 01960 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 148 | OCS-G 01960 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 148 | OCS-G 01960 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 148 | OCS-G 01960 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |

| South Timbalier 148 | OCS-G 01960 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
|---|---|---|---|---|
| South Timbalier 148 | OCS-G 01960 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 148 | OCS-G 01960 | Connection Agreement | 3/1/2005 | Arena/VGS |
| South Timbalier 148 | OCS-G 01960 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |
| South Timbalier 148 | OCS-G 01960 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |
| South Timbalier 148 | OCS-G 01960 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
| South Timbalier 148 | OCS-G 01960 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 148 | OCS-G 01960 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |
| South Timbalier 148 | OCS-G 01960 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 148 | OCS-G 01960 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 148 | OCS-G 01960 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |
| South Timbalier 148 | OCS-G 01960 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
| South Timbalier 148 | OCS-G 01960 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |

| South Timbalier 151 | OCS 00463 | Concurrent Agreement, as amended | 7/1/1959 | Humble Oil & Refining Company and Gulf Oil Corporation |
|---|---|---|---|---|
| South Timbalier 151 | OCS 00463 | Unit Agreement 14-08-001-6669 | 12/16/1959 | Gulf Oil Corporation and Secretary of Interior |
| South Timbalier 151 | OCS 00463 | Agreement of Compromise | 8/13/1970 | Marine Petroleum Corporation, Continental Oil Company and Gulf Oil Corporation |
| South Timbalier 151 | OCS 00463 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 151 | OCS 00463 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 151 | OCS 00463 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 151 | OCS 00463 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 151 | OCS 00463 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 151 | OCS 00463 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 151 | OCS 00463 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 151 | OCS 00463 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| South Timbalier 151 | OCS 00463 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |

| South Timbalier 151 | OCS 00463 | Connection Agreement | 3/1/2005 | Arena/VGS |
|---|---|---|---|---|
| South Timbalier 151 | OCS 00463 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |
| South Timbalier 151 | OCS 00463 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |
| South Timbalier 151 | OCS 00463 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
| South Timbalier 151 | OCS 00463 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 151 | OCS 00463 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |
| South Timbalier 151 | OCS 00463 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 151 | OCS 00463 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 151 | OCS 00463 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |
| South Timbalier 151 | OCS 00463 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
| South Timbalier 151 | OCS 00463 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |
| South Timbalier 151 | OCS 00463 | Water Saturated Gas Agreement | 6/1/2013 | Arena Energy, LP and Sea Robin Pipeline Company, LLC |
| South Timbalier 151 | OCS 00463 | Services Agreement | 2/1/2013 | Arena Energy, LP and Sea Robin Pipeline Company, LLC |

| South Timbalier 152 | OCS 00464 | Concurrent Agreement, as amended | 7/1/1959 | Humble Oil & Refining Company and Gulf Oil Corporation |
|---|---|---|---|---|
| South Timbalier 152 | OCS 00464 | Unit Agreement 14-08-001-6669 | 12/16/1959 | Gulf Oil Corporation and Secretary of Interior |
| South Timbalier 152 | OCS 00464 | Agreement of Compromise | 8/13/1970 | Marine Petroleum Corporation, Continental Oil Company and Gulf Oil Corporation |
| South Timbalier 152 | OCS 00464 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 152 | OCS 00464 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 152 | OCS 00464 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 152 | OCS 00464 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 152 | OCS 00464 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 152 | OCS 00464 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 152 | OCS 00464 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 152 | OCS 00464 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| South Timbalier 152 | OCS 00464 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 152 | OCS 00464 | Connection Agreement | 3/1/2005 | Arena/VGS |

| | | | | |
|---|---|---|---|---|
| South Timbalier 152 | OCS 00464 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |
| South Timbalier 152 | OCS 00464 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |
| South Timbalier 152 | OCS 00464 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
| South Timbalier 152 | OCS 00464 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 152 | OCS 00464 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |
| South Timbalier 152 | OCS 00464 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 152 | OCS 00464 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 152 | OCS 00464 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |
| South Timbalier 152 | OCS 00464 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
| South Timbalier 152 | OCS 00464 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |
| South Timbalier 161 | OCS-G 01248 | Farmout Agreement | 7/21/2003 | Apache Corporation and Arena Energy, LLC |
| South Timbalier 161 | OCS-G 01248 | Offer to Purchase | 12/15/2005 | Apache Corporation and Arena Energy, LLC |
| South Timbalier 161 | OCS-G 01248 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |

| South Timbalier 161 | OCS-G 01248 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
|---|---|---|---|---|
| South Timbalier 177 | OCS-G 01260 | License Agreement | 10/3/1951 | Marine Instrument Company and Gulf Research & Development Company |
| South Timbalier 177 | OCS-G 01260 | Agreement of Compromise | 8/13/1970 | Marine Petroleum Corporation, Continental Oil Company and Gulf Oil Corporation |
| South Timbalier 177 | OCS-G 01260 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 177 | OCS-G 01260 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 177 | OCS-G 01260 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 177 | OCS-G 01260 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 177 | OCS-G 01260 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 177 | OCS-G 01260 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 177 | OCS-G 01260 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 177 | OCS-G 01260 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| South Timbalier 177 | OCS-G 01260 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 177 | OCS-G 01260 | Connection Agreement | 3/1/2005 | Arena/VGS |

| South Timbalier 177 | OCS-G 01260 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |
|---|---|---|---|---|
| South Timbalier 177 | OCS-G 01260 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |
| South Timbalier 177 | OCS-G 01260 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
| South Timbalier 177 | OCS-G 01260 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 177 | OCS-G 01260 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |
| South Timbalier 177 | OCS-G 01260 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 177 | OCS-G 01260 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 177 | OCS-G 01260 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |
| South Timbalier 177 | OCS-G 01260 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
| South Timbalier 177 | OCS-G 01260 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |
| South Timbalier 188 | OCS-G 01899 | License Agreement | 10/3/1951 | Marine Instrument Company and Gulf Research & Development Company |
| South Timbalier 188 | OCS-G 01899 | Agreement of Compromise | 8/13/1970 | Marine Petroleum Corporation, Continental Oil Company and Gulf Oil Corporation |
| South Timbalier 188 | OCS-G 01899 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |

| South Timbalier 188 | OCS-G 01899 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
|---|---|---|---|---|
| South Timbalier 188 | OCS-G 01899 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 188 | OCS-G 01899 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 188 | OCS-G 01899 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 188 | OCS-G 01899 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 188 | OCS-G 01899 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 188 | OCS-G 01899 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| South Timbalier 188 | OCS-G 01899 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 188 | OCS-G 01899 | Connection Agreement | 3/1/2005 | Arena/VGS |
| South Timbalier 188 | OCS-G 01899 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |
| South Timbalier 188 | OCS-G 01899 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |
| South Timbalier 188 | OCS-G 01899 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
| South Timbalier 188 | OCS-G 01899 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |

| South Timbalier 188 | OCS-G 01899 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |
|---|---|---|---|---|
| South Timbalier 188 | OCS-G 01899 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 188 | OCS-G 01899 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 188 | OCS-G 01899 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |
| South Timbalier 188 | OCS-G 01899 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
| South Timbalier 188 | OCS-G 01899 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |
| South Timbalier 189 | OCS-G 01572 | License Agreement | 10/3/1951 | Marine Instrument Company and Gulf Research & Development Company |
| South Timbalier 189 | OCS-G 01572 | Agreement of Compromise | 8/13/1970 | Marine Petroleum Corporation, Continental Oil Company and Gulf Oil Corporation |
| South Timbalier 189 | OCS-G 01572 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| South Timbalier 189 | OCS-G 01572 | Participation Agreement, as amended | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 189 | OCS-G 01572 | Deep Resolve License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 189 | OCS-G 01572 | License Agreement | 8/27/2013 | Chevron U.S.A. Inc. and Arena Energy, LP |
| South Timbalier 189 | OCS-G 01572 | Asset Purchase and Sale Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |

| South Timbalier 189 | OCS-G 01572 | Letter Agreement to Asset Purchase and Sale Agreement | 8/30/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
|---|---|---|---|---|
| South Timbalier 189 | OCS-G 01572 | Data License Agreement | 9/1/2016 | Chevron U.S.A. Inc., Union Oil Company of California and Arena Energy, LP |
| South Timbalier 189 | OCS-G 01572 | Gas Processing, Fractionation & Product Purchase Agreement | 12/1/2008 | Enterprise Gas Processing, LLC |
| South Timbalier 189 | OCS-G 01572 | Oil Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 189 | OCS-G 01572 | Connection Agreement | 7/1/2001 | Arena/VGS |
| South Timbalier 189 | OCS-G 01572 | Connection Agreement | 3/1/2005 | Arena/VGS |
| South Timbalier 189 | OCS-G 01572 | Facilities Interconnect And Reimbursement Agreement | 12/1/2012 | Sea Robin Pipeline Company, LLC |
| South Timbalier 189 | OCS-G 01572 | FT-2 Transportation Service Agreement | 1/1/1998 | Arena/VGS |
| South Timbalier 189 | OCS-G 01572 | Gas Processing Agreement - Venice Gas Processing Plant | 11/1/1996 | Venice Energy Services Company, L.L.C. |
| South Timbalier 189 | OCS-G 01572 | Incentive And Discount Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| South Timbalier 189 | OCS-G 01572 | Interruptible Transportation Service Agreement - GAS | 12/9/2016 | Arena/VGS |
| South Timbalier 189 | OCS-G 01572 | Offshore Operating Agreement | 8/27/2013 | Chevron U.S.A. Inc |
| South Timbalier 189 | OCS-G 01572 | Participation Agreement | 8/27/2013 | Chevron U.S.A. Inc |

| South Timbalier 189 | OCS-G 01572 | Pipeline Connection Agreement | 11/1/2013 | Chevron Pipeline Company |
|---|---|---|---|---|
| South Timbalier 189 | OCS-G 01572 | Platform Use Agreement | 6/1/2010 | Arena/VGS |
| South Timbalier 189 | OCS-G 01572 | Reserve Commitment Agreement | 12/10/1997 | Arena/VGS |
| Vermilion 52 | OCS-G 22606 | Right-of-Use and Easement G3183 | 7/7/2010 | BSEE, Arena Energy, LP and Arena Offshore, LP |
| Vermilion 71 | OCS-G 21592 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| Vermilion 71 | OCS-G 21592 | Letter Agreement | 3/30/2005 | Stone Energy and Arena Offshore, LLC and Triumph Energy, LLC |
| Vermilion 71 | OCS-G 21592 | Gas Processing Agreement | 6/1/2011 | Enterprise Gas Processing, LLC |
| Vermilion 71 | OCS-G 21592 | Liquid Hydrocarbon Transportation Agreement | 9/1/2006 | Sea Robin Pipeline Company, LLC |
| Vermilion 72 | OCS-G 27851 | Offshore Operating Agreement | 2/1/2006 | Arena Offshore, LLC and Arena Exploration, LLC |
| Vermilion 72 | OCS-G 27851 | Farmout Agreement | 6/9/2006 | Energy Partners Ltd. and Arena Energy, LLC |
| Vermilion 72 | OCS-G 27851 | Production Handling Agreement | 12/31/2006 | Arena Offshore, LLC, Arena Energy, LLC, Arena Exploration, LLC and Chadbourne Partners Ltd. |
| Vermilion 72 | OCS-G 27851 | Purchase and Sale Agreement, as corrected | 1/1/2008 | Energy Partners Ltd. and Arena Energy, LLC |
| Vermilion 72 | OCS-G 27851 | Gas Processing Agreement | 6/1/2011 | Enterprise Gas Processing, LLC |

| Vermilion 207 | OCS-G 19761 Expired | Commitment Letter | 5/6/2003 | Noble Energy and Arena Energy, LLC |
|---|---|---|---|---|
| Vermilion 325 | OCS-G 36200 | Offshore Operating Agreement, as amended | 4/26/2010 | Peregrine Oil & Gas II, LP and Entek USA General LLC |
| Vermilion 325 | OCS-G 36200 | Production Handling Agreement | 1/1/2012 | Arena Offshore, LP, Peregrine Oil & Gas II, LP and Entek USA General LLC |
| Vermilion 325 | OCS-G 36200 | Amendment to Production Handling Agreement | 5/1/2014 | Arena Offshore, LP, Peregrine Oil & Gas II, LP and Arena Energy, LP |
| Vermilion 325 | OCS-G 36200 | Second Amendment to Production Handling Agreement | 9/11/2019 | Arena Offshore, LP, Peregrine Oil & Gas II, LP and Arena Energy, LP |
| Vermilion 341 | OCS-G 33607 | Offshore Operating Agreement, as amended | 4/26/2010 | Peregrine Oil & Gas II, LP and Entek USA General LLC |
| Vermilion 341 | OCS-G 33607 | Purchase and Sale Agreement | 1/1/2012 | Entek USA General LLC and Arena Energy, LLC |
| Vermilion 341 | OCS-G 33607 | Production Handling Agreement | 1/1/2012 | Arena Offshore, LP, Peregrine Oil & Gas II, LP and Entek USA General LLC |
| Vermilion 341 | OCS-G 33607 | Amendment to Production Handling Agreement | 5/1/2014 | Arena Offshore, LP, Peregrine Oil & Gas II, LP and Arena Energy, LP |
| Vermilion 341 | OCS-G 33607 | Second Amendment to Production Handling Agreement | 9/11/2019 | Arena Offshore, LP, Peregrine Oil & Gas II, LP and Arena Energy, LP |
| Vermilion 342 | OCS-G 33608 | Offshore Operating Agreement, as amended | 4/26/2010 | Peregrine Oil & Gas II, LP and Entek USA General LLC |
| Vermilion 342 | OCS-G 33608 | Purchase and Sale Agreement | 1/1/2012 | Entek USA General LLC and Arena Energy, LLC |
| Vermilion 342 | OCS-G 33608 | Production Handling Agreement | 1/1/2012 | Arena Offshore, LP, Peregrine Oil & Gas II, LP and Entek USA General LLC |

| Vermilion 342 | OCS-G 33608 | Amendment to Production Handling Agreement | 5/1/2014 | Arena Offshore, LP, Peregrine Oil & Gas II, LP and Arena Energy, LP |
|---|---|---|---|---|
| Vermilion 342 | OCS-G 33608 | Second Amendment to Production Handling Agreement | 9/11/2019 | Arena Offshore, LP, Peregrine Oil & Gas II, LP and Arena Energy, LP |
| West Cameron 522 | OCS-G 34033 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| West Cameron 543 | OCS-G 12802 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| West Cameron 543 | OCS-G 12802 | Facilities Agreement, as amended | 11/1/2008 | Stingray Pipeline Company, L.L.C. and Fairways Offshore Exploration Inc. |
| West Cameron 543 | OCS-G 12802 | Purchase and Sale Agreement | 5/1/2013 | Fairways Offshore Exploration Inc. and Arena Energy, LP and Arena Offshore, LP |
| West Cameron 543 | OCS-G 12802 | Sale Agreement | 5/3/2013 | Stingray Pipeline Company, L.L.C. and Arena Offshore, LP |
| West Cameron 544 | OCS-G 14342 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| West Cameron 544 | OCS-G 14342 | Facilities Agreement, as amended | 11/1/2008 | Stingray Pipeline Company, L.L.C. and Fairways Offshore Exploration Inc. |
| West Cameron 544 | OCS-G 14342 | Purchase and Sale Agreement | 5/1/2013 | Fairways Offshore Exploration Inc. and Arena Energy, LP and Arena Offshore, LP |
| West Cameron 544 | OCS-G 14342 | Sale Agreement | 5/3/2013 | Stingray Pipeline Company, L.L.C. and Arena Offshore, LP |
| West Cameron 544 | OCS-G 14342 | Gathering and Reserve Dedication Agreement | 8/19/2019 | Rosefield Pipeline Company, LLC |
| West Cameron 544 | OCS-G 14342 | Interruptible Transportation Service Agreement - GAS | 8/1/2013 | Stingray Pipeline Company, L.L.C. |

| West Cameron 544 | OCS-G 14342 | Platform Space Agreement | 6/1/1995 | Stingray Pipeline Company, L.L.C. |
|---|---|---|---|---|
| West Cameron 544 | OCS-G 14342 | Reserve Dedication Agreement | 8/1/2013 | Stingray Pipeline Company, L.L.C. |
| West Cameron 639 | OCS-G 02027 Expired | Operating Agreement | 12/1/1979 | Sun Oil, Aquitaine, Apache Corporation Clark and Huber |
| West Cameron 648 | OCS-G 04268 Expired | Operating Agreement | 12/1/1979 | Sun Oil, Aquitaine, Apache Corporation Clark and Huber |
| West Delta 72 | OCS-G 01082 | Participation Agreement | 9/18/2009 | Exxon Mobil Corporation and Newfield Exploration Company |
| West Delta 72 | OCS-G 01082 | Offshore Operating Agreement | 12/1/2009 | Exxon Mobil Corporation and Newfield Exploration Company |
| West Delta 72 | OCS-G 01082 | Purchase and Sale Agreement | 1/1/2019 | ExxonMobil and Arena Energy, LP |
| West Delta 73 | OCS-G 01083 | Participation Agreement | 9/18/2009 | Exxon Mobil Corporation and Newfield Exploration Company |
| West Delta 73 | OCS-G 01083 | Offshore Operating Agreement | 12/1/2009 | Exxon Mobil Corporation and Newfield Exploration Company |
| West Delta 73 | OCS-G 01083 | Purchase and Sale Agreement | 1/1/2019 | ExxonMobil and Arena Energy, LP |
| West Delta 86 | OCS-G 04243 | Evaluation Agreement | 10/15/2004 | Arena Energy, LLC and SPN Resources, LLC |
| West Delta 86 | OCS-G 04243 | Offshore Operating Agreement | 11/1/2004 | Arena Energy, LLC and SPN Resources, LLC |
| West Delta 86 | OCS-G 04243 | Purchase and Sale Agreement | 11/1/2004 | Amerada Hess Corporation and SPN Resources, LLC |

| West Delta 86 | OCS-G 04243 | Amendment and Supplement to Evaluation Agreement | 11/5/2004 | Arena Energy, LLC and SPN Resources, LLC |
|---|---|---|---|---|
| West Delta 86 | OCS-G 04243 | Assignment Agreement and Amendment to Offshore Operating Agreement | 5/5/2005 | Arena Energy, LLC and SPN Resources, LLC |
| West Delta 86 | OCS-G 04243 | Second/Third Amendment to Offshore Operating Agreement | 7/12/2007 | Arena Energy, LLC, Arena Offshore, LLC and SPN Resources, LLC |
| West Delta 86 | OCS-G 04243 | Amendment to Offshore Operating Agreement | 8/1/2010 | Arena Energy, LLC, Arena Offshore, LLC and SPN Resources, LLC |
| West Delta 117 | OCS-G 35951 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| West Delta 117 | OCS-G 35951 | Negotiated Sale Agreement | 6/14/2018 | Chevron U.S.A. Inc. and Arena Energy, LP |
| West Delta 118 | OCS-G 36227 | Master Offshore Operating Agreement, as amended | 10/1/2003 | Arena Offshore, LLC and Arena Energy, LLC |
| West Delta 133 | OCS-G 01106 | Option Agreement | 12/30/2003 | Apache Corporation and Newfield Exploration Company |
| West Delta 133 | OCS-G 01106 | Operating Agreement | 6/1/2004 | Newfield Exploration Company and Triumph Energy, LLC |
| West Delta 133 | OCS-G 01106 | Participation Agreement | 6/1/2004 | Newfield Exploration Company and Triumph Energy, LLC |
| West Delta 133 | OCS-G 01106 | Liquid Hydrocarbons Transportation Agreement | 1/1/2007 | Newfield Exploration Company, Etal, and Arena Energy, LLC |
| West Delta 133 | OCS-G 01106 | Production Handling Agreement | 1/1/2007 | Newfield Exploration, Etal, and Arena Energy, LLC |
| West Delta 133 | OCS-G 01106 | Purchase and Sale Agreement | 7/1/2012 | McMoRan Oil & Gas LLC and Renaissance Offshore |

| West Delta 133 | OCS-G 01106 | Pipeline Ownership Agreement | 10/1/2012 | Renaissance Offshore, Arena Energy, LP and Arena Offshore, LP |
|---|---|---|---|---|
| West Delta 133 | OCS-G 01106 | Purchase and Sale Agreement | 10/1/2012 | Renaissance Offshore, Arena Energy, LP and Arena Offshore, LP |
| West Delta 133 | OCS-G 01106 | Contract Operator Agreement | 3/16/2013 | Renaissance Offshore, Arena Energy, LP and Arena Offshore, LP |
| West Delta 133 | OCS-G 01106 | 1ˢᵗ Amendment to Production Handling Agreement | 2/3/2014 | Renaissance Offshore, Arena Energy, LP and Arena Offshore, LP |
| West Delta 133 | OCS-G 01106 | Gathering Agreement | 8/1/2006 | Renaissance Offshore, LLC |

**SCHEDULE 5.9(c)**


Attached to and made a part of that certain Asset Purchase Agreement by and among
Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller
and San Juan Offshore, LLC, as Buyer


**OTHER MATERIAL CONTRACTS**

None.

**<u>SCHEDULE 5.10</u>**

Attached to and made a part of that certain Asset Purchase Agreement by and among
Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller
and San Juan Offshore, LLC, as Buyer

**OUTSTANDING CAPITAL COMMITMENTS**

See attached.

| Block | AFE Name | AFE Code | Project Start | AFE Amount | Projected Final $ | Booked $ | % of Project Final | ≥ $1MM Project Balance |
|-------|----------|----------|---------------|------------|-------------------|----------|--------------------|------------------------|
| ST 36 | ST 36B, Platform repairs/upgrades | | 8/1/2020 | | 1,000,000.00 | | | 1,000,000.00 |
| WD 85 | TA of WD 85 A-16 (with sustained casing pressure on the 16" annulus) | | 7/1/2021 | | 1,000,000.00 | | | 1,000,000.00 |
| ST 52 | ST Shallow Riser Repairs | 19098STSRR | 11/1/2019 | 1,849,725.00 | 2,267,313.00 | 1,169,529.97 | 0.5158 | 1,097,783.03 |
| EI 57/58 | TA of 3 wells at EI 57/58 | | 7/1/2021 | | 1,120,000.00 | | | 1,120,000.00 |
| EI 251 | EI 251 A / EI 252 I Pig Launcher/ Receiver | | 6/1/2022 | | 1,150,000.00 | | | 1,150,000.00 |
| EI 238 | EI 238 H Solar Turbine 30,000 Hour Engine Exchange | | 8/1/2021 | | 1,200,000.00 | | | 1,200,000.00 |
| WD 72/73 | WD 72 Abandonment - Net Costs Entered | | 9/1/2021 | | 1,217,000.00 | | | 1,217,000.00 |
| EI 238 | EI 238 E/ EAux - Meter Move to EI 238 H | 20023238MM | 2/1/2020 | | 1,276,270.00 | 54,106.74 | 0.0423 | 1,222,163.26 |
| EI 238 | ZI of 2 wells at EI 238 H | EI252H17ZI | 7/1/2020 | 145,200.00 | 1,260,000.00 | 4,641.20 | 0.0036 | 1,255,358.80 |
| EI 237 | EI 237 J Re-route Pipeline | 20021237PL | 3/1/2020 | | 1,290,989.00 | 35,487.18 | 0.0274 | 1,255,501.82 |
| ST 135 | ST Deep Boat Landing replacements and waterline repairs | | 4/1/2021 | | 1,300,000.00 | | | 1,300,000.00 |
| EI 227 | EI 227C (Platform Removal) [$1.6MM] | 20007EI227 | 1/1/2020 | | 1,355,133.00 | 29,907.00 | 0.022 | 1,325,226.00 |
| PL 25 | TA of 3 wells at PL 25 | | 6/1/2021 | | 1,380,000.00 | | | 1,380,000.00 |
| ST 37 | ST 37 A, Sump Upgrade | 20055SMP7A | 1/1/2020 | | 1,400,000.00 | 12,772.95 | 0.0091 | 1,387,227.05 |
| ST 148 | ST 148 A-2, 3, 6, & 8 Well TA | 20004ST148 | 9/1/2020 | 1,210,000.00 | 1,210,000.00 | | | 1,210,000.00 |
| EI 182 | EI 182A Permanent Flot Cell Replacement | 19212EI182 | 2/1/2020 | 1,394,770.00 | 1,560,000.00 | 113,680.70 | 0.0728 | 1,446,319.30 |

| SM 192 | SMI 192 A2/A3 Zone Iso | | 5/1/2020 | | 1,500,000.00 | | | 1,500,000.00 |
|--------|------------------------|--|----------|--|--------------|--|--|--------------|
| EI 251 | EI 251 A - Meter addition on Separators at EI 251 A and EI 252 I | 19155251MA | 12/1/2019 | | 1,682,295.00 | 138,947.87 | 0.0825 | 1,543,347.13 |
| EI 215 | EI 215 Well Abandonment | | 4/1/2021 | | 1,550,000.00 | | | 1,550,000.00 |
| EI 238 | EI 238 E/A - Re- Route pipeline | 20020238PL | 3/1/2020 | | 1,659,500.00 | 32,820.27 | 0.0197 | 1,626,679.73 |
| EI 314 | EI 314 A P/L Abandonment OOS 6" Oil P/L - Clear and Flush | 20025314PL | 12/1/2019 | | 1,689,023.00 | 22,392.20 | 0.0132 | 1,666,630.80 |
| GA 209 | GA 209B Dehy Addition | 20046209BG | 1/1/2020 | | 1,780,000.00 | 28,707.13 | 0.0161 | 1,751,292.87 |
| EI 237 | EI 237J Platform Removal | 20008EI237 | 12/1/2019 | | 1,935,000.00 | 42,936.87 | 0.0221 | 1,892,063.13 |
| EI 215 | EI 215 Gas Pipeline to KDE | | 4/1/2021 | | 2,123,000.00 | | | 2,123,000.00 |
| EI 57/58 | EI 57/58 Cassion & Pipeline Abadonments (3) | | 6/1/2020 | | 2,423,000.00 | | | 2,423,000.00 |
| ST 37 | ST 37 H-3 | 2005637H03 | 3/1/2020 | 725,000.00 | 5,920,000.00 | 3,281,766.22 | 0.5543 | 2,638,233.78 |
| WD 86 | WD 86 B well abandonments | | 7/1/2021 | | 3,000,000.00 | | | 3,000,000.00 |
| Misc | 2020 Misc Facility Capital Repairs | | 4/1/2020 | | 3,225,000.00 | | | 3,225,000.00 |
| EI 238 | EI 238A - Re-route Pipeline | 20022238RM | 3/1/2020 | | 3,458,849.00 | 31,892.00 | 0.0092 | 3,426,957.00 |
| WC 648 | WC 648A Platform Removal (McMoRan) | | 5/1/2022 | | 3,500,000.00 | | | 3,500,000.00 |
| Misc | Misc Zone Changes | | 2/1/2020 | | 3,507,000.00 | | | 3,507,000.00 |
| ST 131 | ST 131J Platform Removal | 20010ST131 | 3/1/2020 | | 4,500,000.00 | | | 4,500,000.00 |
| ST 131 | ST 130C Platform & Pipeline Abandonment | ST130CABN | 8/1/2017 | 5,295,601.00 | 5,373,715.00 | 573,714.76 | 0.1067 | 4,800,000.24 |
| WC 639 | WC 639A Platform Removal (McMoRan) | 90248P | 5/1/2022 | 7,256,703.00 | 5,000,000.00 | | | 5,000,000.00 |
| EI 338 | EI 338 K - Compression Upgrade | 19214338CP | 3/1/2020 | | 5,036,883.00 | 19,973.88 | 0.0039 | 5,016,909.12 |
| EI 238 | EI 238E/E-Aux Removals | 20009238E | 1/1/2020 | | 6,355,000.00 | 135,027.06 | 0.0212 | 6,219,972.94 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EC 328 | EC 328 Gas pipeline installation to Stingray | 19126328PL | 11/1/2019 | 6,955,678.00 | 7,225,000.00 | 333,115.21 | 0.0461 | 6,891,884.79 |
| EI 215 | EI 215 Redevelopment - Platform Upgrades | | 1/1/2020 | | 8,850,000.00 | | | 8,850,000.00 |
| EI 215 | EI 215 B Platform Abandonment | | 6/1/2021 | | 9,200,000.00 | | | 9,200,000.00 |
| SP 83 | SP 83 Platform & Pipeline Abandonment | | 6/1/2020 | | 9,860,000.00 | | | 9,860,000.00 |
| | | | | | | | | |

All properties except the following - 98% WI
EC 328 - 48% WI
EI 58 - 57.73% WI
EI 57 - 54.05% WI
PL 25 - 91.875%
ST 148 - 38% WI
WD 85 - 60% WI
WD 86 - 25.00% WI/60.00% WI
WD 72/73 - 50% WI* Numbers above are net to 50%
WD 639 - 42.38% WI
WD 648 - 30.83% WI

**SCHEDULE 5.12**

Attached to and made a part of that certain Asset Purchase Agreement by and among
Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller
and San Juan Offshore, LLC, as Buyer

**CURE COSTS**

To be determined.

**SCHEDULE 5.13**

Attached to and made a part of that certain Asset Purchase Agreement by and among
Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller
and San Juan Offshore, LLC, as Buyer

**IMBALANCES**

See attached.

**Arena Gas Imbalances as of 6/30/20**

| Arena-Operated | Other Parties | Volume (mmbtu) Arena Owes (Owed) | Value Arena Owes (Owed) | Status/Notes |
|---|---|---|---|---|
| EC 328/VR 342 | Peregrine/Tana | 0 $ | - | |
| EI 57/58 | Ankor | 1135 $ | (3,320.36) | 2019 Gas Imbalance-Invoiced Ankor 7/15/20 |
| HI A547 | Talos, Fieldwood, Walter | 0 $ | - | |
| ST 148 | Fieldwood, W&T, W&T VI, Wichita | (10,877) $ | (17,729.51) | TIK- FIFO @ overdelivered party price, this is an estimate, W&T was overdelivered party @ 6/30/20 |
| ST Deep PTR Imbalance | Targa | 20,492 $ | 61,476.66 | through 4/20- Arena owes Targa.  Plant tells Tina when to make up, usually 2-3 mo lag |
| | | 10,750 $ | 40,426.79 | |
| | | | | |
| **Non-Op** | | | | |
| EI 315/316 | Fieldwood | 71,231 $ | 201,443.17 | TIK-Arena Owes Fieldwood-Accrued on Arena's books |
| MC 800 | Murphy | (17,251) $ | (34,779.00) | Murphy- Value includes ($20,677.23) Due Arena for 2019 imbalance set up as ACH payable in Murphy's AP system due today (7/20) |
| WD 133 | Renaissance | (180) $ | (3,339.50) | Valued monthly, settled annually with Renaissance |
| WD 86 | Fieldwood | (51) $ | (102.00) | TIK |
| HI 179 | Fieldwood | (9,186) $ | (18,372.00) | TIK-Fieldwood owes Arena through 5/20 |
| | | 44,563 $ | 144,850.67 | |
| | | | | |
| **TOTAL- Arena Owes other parties** | | **55,313 $** | **185,277.46** | |

## <u>SCHEDULE 5.14</u>

Attached to and made a part of that certain Asset Purchase Agreement by and among
Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller
and San Juan Offshore, LLC, as Buyer

### INSURANCE

See attached.

**ARENA ENERGY, LP**

*Insurance Summary as of July 1, 2020*

| Coverage | Policy Number | Policy Period | Limits | Deductible | Premium | Carrier | Marsh \| Wortham Technician |
|---|---|---|---|---|---|---|---|
| General Liability | GL305270n | 11/20/19-11/20/20 | $1,000,000  Each Event Limit<br>$2,000,000  Products/Comp. Ops. Total Limit<br>$2,000,000  General Total Limit<br>$1,000,000  Premises Damage Limit<br>$50,000  Medical Expenses | $25,000  Per Occ. | $470,000 | Liberty - UK and Underwriters at Lloyds, London | Jim Anderson 713/346-1283 |
| Description: | Provides legal liability coverage for bodily injury or property damage of third parties. | | | | | | |
| Hired Non-Owned Automobile Liability | AS2641005131040 | 1/1/20-1/1/21 | $1,000,000  Liability<br>$35,000  Hired Physical Damage | $1,000  Hired Physical Damage | $3,300 | Liberty Mutual Insurance Co. | Mike Feighl 713/346-1069 |
| Description: | Provides benefits to employees for injury arising out of, and in the course of, employment and will also respond to the legal liability of the employer to pay damages to the employee. | | | | | | |
| Primary Excess Liability ($5mm) | GL305260n | 11/20/19-11/20/20 | $5,000,000  Each Event Limit<br>$5,000,000  General Total Limit<br>$5,000,000  Products/Comp.Ops. Total Limit | Per Schedule of Underlying, | $307,500 | Liberty - UK and Underwriters at Lloyds, London | Jim Anderson 713/346-1283 |
| Description: | Provides legal liability coverage for bodily injury and property damage of third parties for loss in excess of the limits provided by the primary policies. | | | | | | |
| Excess Liability ($20mm x $5mm) | GL305230n | 11/20/19-11/20/20 | $20,000,000  Per Occurence<br>$20,000,000  Aggragate Limit<br>$20,000,000  Products/Comp.Ops. Total | Excess of Primary Excess policy above | $312,500 | Liberty - UK and Underwriters at Lloyds, London | Jim Anderson 713/346-1283 |
| Description: | Provides legal liability coverage for bodily injury and property damage of third parties for loss in excess of the limits provided by the Primary Umbrella policy. | | | | | | |
| Excess Liability ($75mm x $25mm) | GL305231n/JLWM4 | 11/20/19-11/20/20 | $75,000,000  Per Occurence<br>$75,000,000  Aggragate Limit<br>$75,000,000  Products/Comp.Ops. Total | Excess of above Excess Liability Policy | $353,684 | Markel and Underwriters at Lloyds, London | Jim Anderson 713/346-1283 |
| Description: | Provides legal liability coverage for bodily injury and property damage of third parties for loss in excess of the limits provided by the Primary Umbrella policy. | | | | | | |
| Charterer's Legal Liability | B0621EJAE000119 | 11/20/19-11/20/20 | $1,000,000  CSL per occ. | $10,000  Per Occ. | $25,625 | Lloyd's of London | Brandi Brown 713/346-1248 |
| Description: | Provides coverage for the legal and/or contractual liability of the Insured as a charterer of watercraft. | | | | | | |
| Non-Owned Aircraft Liability | 1.00023E+11 | 11/20/19-11/20/20 | $10,000,000  Combined Single Limit, each occurrence | $1,000  Per Occ. | $6,590 | Starr Aviation | Eddie Moreno 713/346-1378 |
| Description: | Provides benefits to employees for injury arising out of, and in the course of, employment and will also respond to the legal liability of the employer to pay damages to the employee. | | | | | | |

**MARSH | Wortham**

**ARENA ENERGY, LP**
*Insurance Summary as of July 1, 2020*

| Coverage | Policy Number | Policy Period | Limits | Deductible | Premium | Carrier | Marsh \| Wortham Technician |
|---|---|---|---|---|---|---|---|
| Property/ Office Contents | 61SBABT3216 | 11/20/19-11/20/20 | **Suite 500:** BPP: $596,300 EDP: $500,000 **Suite 230:** BPP: $298,200 EDP: $250,000 **Suite 280:** BPP: $119,200 EDP: $50,000 | $1,000 | $9,324 | Hartford Insurance Co. | Matthew Blades 713/346-1219 |
| Description: | Provides coverage for damage to office contents. | | | | | | |
| Workers' Compensation/ Employer's Liability | WC2-641-005131-050 | 1/1/20-1/1/21 | Statutory Workers' Comp MM/$1MM/$1MM Employer's Liab. $1MM/$1MM Maritime EL | Nil | $247,882 | Liberty Mutual | Mike Feighl 713/346-1069 |
| Description: | Provides benefits to employees for injury arising out of, and in the course of, employment and will also respond to the legal liability of the employer to pay damages to the employee.  Also provides legal liability coverage for the employer to pay damages to employees based on maritime law. | | | | | | |
| Energy Package Program | GU310150o GU310151o GU310152o GU310153o GU310154o GU310155o GU310156o JLWM4625 JLWM4626 JLWM4627 JLWM4628 | 6/15/20-5/1/21 6/15/20-5/1/21 6/15/20-5/1/21 6/15/20-5/1/21 6/15/20-5/1/21 6/15/20-5/1/21 6/15/20-6/15/21 6/15/20-5/1/21 6/15/20-5/1/21 6/15/20-5/1/21 6/15/20-5/1/21 | Risk        Wind As Attached | Risk        Wind As Attached | $7,974,889 Estimated Annual Premium (See Attached Breakdown) | Certain Ins. Cos. and Lloyd's of London | Jim Anderson 713/346-1283 |
| | Builders Risk: | | Provides coverage for losses arising from physical damage to offshore platforms, pipelines, and subsea equipment while being fabricated, transported, and/or installed.  Projects must be approved by underwriters prior to beginning of operation. | | | | |
| Control of Well OEE | JCOW101166 | 6/15/20-5/1/21 | 5MM (100%) AOO, subject to $10MM NWS Agg. Limit (Covers select wells only | $1MM (100%) AOO | $709,873 | Markel Internationa | Jim Anderson 713/346-1283 |
| Description: | Provides coverage for controlling and redrilling a "well out of control", and seepage and pollution cleanup arising from a "well out of control".  Also, provides other coverages as per  policy f | | | | | | |
| Excess Control of Well OEE | 41N28013 | 6/15/20-6/15/21 | 0MM (100%) AOO, subject to $10MM NWS Agg. Limit (Covers select wells only | Excess of above policy | $1,024,689 | Travelers Property Casuslty Co. of America | Jim Anderson 713/346-1283 |
| Description: | Provides coverage for controlling and redrilling a "well out of control", and seepage and pollution cleanup arising from a "well out of control".  Also, provides other coverages as per  policy f | | | | | | |
| Oil Pollution Act Liability | GL305860o | 3/7/20-3/7/21 | $35,000,000 | Nil subject to $100,000 indemnity letter | $583,229.00 Revised annual | Lloyds of Londor | Jim Anderson 713/346-1283 |
| Vessel Pollution Liability (White Fleet | V1467520 | 6/15/20-6/15/21 | Rigs: $18,796,800 Vessels: $5,000,000 | As per policy | $26,180 | Starr Indemnity & Liability Co | Jamie Lee 713/346-1405 |



70176946_1.xlsx

**ARENA ENERGY, LP**
*Insurance Summary as of July 1, 2020*

| Coverage | Policy Number | Policy Period | Limits | Deductible | Premium | Carrier | Marsh \| Wortham Technician |
|---|---|---|---|---|---|---|---|
| Drilling, LLC) | | | | | | | |
| Directors & Officers (Venice Gathering System, LLC) | DA5708201P (Run Off) | 4/4/17-4/4/23 | $5,000,000  Agg. Limit<br>$250,000  Investigative Expense | $50,000  each claim | $35,294 + Surplus Lines | Assoc. Ele. & Gas Ins. Services (AEGIS) | Lori Wheeler 713/346-1346 |
| Description: | Provides legal liability coverage for the negligent or wrongful acts of the Directors and Officers solely in their capacity as such. | | | | | | |
| Directors & Officers (Rosefield Pipeline Company, LLC) | G46823072003 | 10/5/19-10/5/20 | $3,000,000  Agg. Limit<br>$1,000,000  Additional Side A | $25,000 | $11,694 | Westchester Fire Insurance Co. (ACE) | Lori Wheeler 713/346-1346 |
| Description: | Provides legal liability coverage for the negligent or wrongful acts of the Directors and Officers solely in their capacity as such. | | | | | | |
| OIL Entry | 2013-302 | 1/1/20-1/1/21 | $300,000,000 (FAI) any one occurrence | $25,000,000 (100%) any one occurrence | $1,170,601 | OIL | Jim Anderson 713/346-1283 |

This document is a summary only.  All terms and conditions are as per the actual policies.  In the event of a discrepency between this summary and a policy, the actual policy shall pre

**MARSH** | Wortham

## SCHEDULE 5.15

Attached to and made a part of that certain Asset Purchase Agreement by and among
Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller
and San Juan Offshore, LLC, as Buyer

**SURETY BONDS AND CREDIT SUPPORT**

See attached.

**Arena Bonding Obligations**

| Lease | OCS | RLB No. | Original Principal | Principal Replaced | P&A Offsetting Escrow | Final Principal | Type | Obligee | Obligor | Comments | Issuer | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EI 314 | 2111 | RLB0013842 | 33,000,000 | | | 33,000,000 | Performance | ExxonMobil | Arena | P&A Obligations for EI 314/332/315 / Increased from $18M to $33M under Aband. Funding Agreement on 12/31/14 | RLI | 6-1-21 renewal |
| EI 314 | 2111 | RLB0015909 | 4,000,000 | | | 4,000,000 | Performance | ExxonMobil | Arena | P&A Obligations for EI 314 field/Exchanged for $4 million cash reimbursed from Escrow | | 1-12-21 renewal |
| EI 341 | 2914 | RLB0016014 | 5,950,000 | | | 5,950,000 | Performance | Chevron | Arena | P&A Obligations for EI 341 Re DG Agreement, Ex.L to October 1, 2014 PSA Re EI 341, 215, 313 | RLI | 4-14-21 renewal |
| EI 341 | 2914 | Evergreen 866609 | 5,950,000 | | | 5,950,000 | Performance | Chevron | Arena | P&A Obligations for EI 341 Re DG Agreement, Ex.L to October 1, 2014 PSA Re EI 341, 215, 313 | Evergreen | 4-14-21 renewal |
| HIA A547 | 2705 | RLB0011993 | 1,786,000 | | | 1,786,000 | Performance | Noble | Arena | Wells Fargo Escrow Account # 23242000 | RLI | 8-8-20 renewal |
| MI 668 | 04547 | RLB0009632 | 2,925,000 | | | 2,925,000 | Performance | Apache | Arena | In connection with acquisition of lease, wells and pipeline(s)-MI 668 and 669 | RLI | 8-30-20 renewal |
| SM 192 | 24878 | RLB0005598 | 665,000 | | | 665,000 | Performance | Anadarko | Arena | Well P&A and Platform Removal Bond | RLI | 6-2-21 renewal |
| SM 192 | 24878 | RLB0005923 | 332,500 | | | 332,500 | Performance | Marathon | Arena | Well P&A and Platform Removal Bond | RLI | 8-18-20 renewal |
| SM 192 | 24878 | RLB0006711 | 1,425,000 | | | 1,425,000 | Performance | Hess | Arena & AOL | Platform, Capital One Escrow Account # 75-9245-01-2 (transferred to Whitney Escrow Account) | RLI | 12-16-20 renewal |
| SP 83 | 05052 | RLB0007130 | 2,041,000 | | | 2,041,000 | Performance | Noble | Arena | Covers SP 82, Wells Fargo Escrow Account # 20080900 | RLI | 4-20-21 renewal |
| SP 83 | 05052 | RLB0008264 | 1,130,973 | | | 1,130,973 | Performance | Piquant | Arena | In connection with 04/01/05 record title acquisition | RLI | 6-20-21 renewal |
| SP 83 | 05052 | RLB0008265 | 471,246 | | | 471,246 | Performance | Apache | Arena | In connection with 04/01/05 record title acquisition | RLI | 6-20-21 renewal |
| SP 83 | 05052 | RLB0008266 | 452,378 | | | 452,378 | Performance | Bundy | Arena | In connection with 04/01/05 record title acquisition | RLI | 6-20-21 renewal |
| SP 83 | 05052 | RLB0008267 | 226,217 | | | 226,217 | Performance | Crescent | Arena | In connection with 04/01/05 record title acquisition | RLI | 6-20-21 renewal |
| SP 83 | 05052 | RLB0008285 | 45,222 | | | 45,222 | Performance | CLK | Arena | In connection with 04/01/05 record title acquisition | RLI | 6-23-21 renewal |
| ST 161 | 1248 | RLB0009467 | 2,000,000 | | | 2,000,000 | Performance | Apache | Arena | In connection with acquisition of lease, wells and pipeline(s): Whitney Bank Trust Escrow Account # 1110440-001 | RLI | 7-13-21 renewal |
| EI Properties | | RLB0014828 | 19,900,000 | | | 19,900,000 | Performance | McMoran | Arena | $19.9MM of P&A obligations from 4Q12 acquisition | RLI | 11-13-20 renewal |
| WC 544 | 14342 | B007929 (Indemco) | 5,000,000 | | | 5,000,000 | Performance | Apache | Arena | P&A Bond re: WC 543/544 Fairways acquisition; P&A Bond w/Apache as Obligee | Indemco | 5-1-21 renewal |
| ROW AW | Areawide | RLB0013522 | 300,000 | | | 300,000 | ROW | MMS | Arena | ROW Grant Bond to cover AE's pipeline right-of-way holdings in GOM. | RLI | 11-4-20 renewal |
| Chevron ASPA | ST Shallow, ST Deep, Riker, Other EI Properties | RLB0016597 | | 74,300,000 | | | Performance | Chevron | Arena | Initial P&A for Chevron ASPA Properties; Munich has 87.483%; RLI has 12.517% | RLI/Munich | Replaced with Rider 1 see below |
| Chevron ASPA | ST Shallow, ST Deep, Riker, Other EI Properties | RLB0016597 Rider 1 | | 74,300,000 | | | Performance | Chevron | Arena | Initial P&A for Chevron ASPA Properties; Munich has 43.7%; RLI has 56.3% | RLI/Munich | Replaced with Rider 2 see below |
| Chevron ASPA | ST Shallow, ST Deep, Riker, Other EI Properties | RLB0016597 Rider 2 | 74,300,000 | | | 74,300,000 | Performance | Chevron | Arena | Initial P&A for Chevron ASPA Properties; Munich has 72%; RLI has 28% | RLI/Munich | 9/26/20 renewal |
| ST38/Chevron ASPA | | RLB0016606 | 700,000 | | | 700,000 | Performance | Chevron/ Taylor Rider | Arena | P&A for ST 38 - Taylor Energy Rider as Co-Obligee | RLI | 9/26/20 renewal |
| Chevron ASPA | ST Shallow, ST Deep, Riker, Other EI Properties | RLB0017124 | 75,000,000 | | | 75,000,000 | Performance | Chevron | Arena | Additional P&A for Chevron ASPA Properties; Munich has 72%; RLI has 28% (10/1/19 Agmt) | RLI/Munich | 9/26/20 renewal |
| Chevron PA | ST Deep | RLB0017123 | 34,832,916 | | | 34,832,916 | Performance | Chevron | Arena | P&A for Chevron PA Properties; Munich has 72%; RLI has 28% (10/1/19 Agmt) | RLI/Munich | 9/26/20 renewal |
| Chevron FOA | Riker | RLB0017122 | 10,000,000 | | | 10,000,000 | Performance | Chevron | Arena | P&A for Chevron FOA Riker Properties; Munich has 72%; RLI has 28% (10/1/19 Agmt) | RLI/Munich | 9/26/20 renewal |
| WD 117 | G35951 | ROG0001422 | 103,800 | | | 8,650,000 | Performance | Chevron | Arena | P&A for WD 117 G Platform | RLI | 10/30/20 renewal |
| Exxon 2019 - Galveston, MC and WD | Various | SUR0056455 | 13,500,000 | | | 13,500,000 | Performance | Exxon Mobil/Exxon Pipeline | Arena | P&A Obligation for GA 209, GA 192, HI 193, HI 179 Unit, MC 311, WD 72, WD 73 | Argonaut | 1/1/21 renewal |
| **Arena and TOTALS** | | | **296,037,252** | | **-** | **304,583,452** | | | | **Total Arena Energy Bonds issued by RLI and Indemco** | | |

| Area-Wide Third Party Guarantee Agreement | Various | | 30,115,000 | | | 30,115,000 | Guaranty | AOL | Arena | Indirect credit support of Arena supporting AOL's obligations with respect to the identified pipelines | | |

## <u>SCHEDULE 6.8</u>

Attached to and made a part of that certain Asset Purchase Agreement by and among
Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller
and San Juan Offshore, LLC, as Buyer

**RELATIONSHIPS**

Michael Minarovic

**SCHEDULE 7.7(b)**

Attached to and made a part of that certain Asset Purchase Agreement by and among
Arena Energy, LP, Arena Exploration, LLC, Valiant Energy LLC
and Sagamore Hill Holdings, LP, as Seller
and San Juan Offshore, LLC, as Buyer

**SPECIFIED SELLER CREDIT OBLIGATIONS**

See attached.

**Specified Seller Credit Obligations**

| Lease | OCS | RLB No. | Original Principal | Principal Replaced | P&A Offsetting Escrow | Final Principal | Type | Obligee | Obligor | Comments | Issuer | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EI 314 | 2111 | RLB0013842 | 33,000,000 | | | 33,000,000 | Performance | ExxonMobil | Arena | P&A Obligations for EI 314/332/315 / Increased from $18M to $33M under Aband. Funding Agreement on 12/31/14 | RLI | 6-1-21 renewal |
| EI 314 | 2111 | RLB0015909 | 4,000,000 | | | 4,000,000 | Performance | ExxonMobil | Arena | P&A Obligations for EI 314 field/Exchanged for $4 million cash reimbursed from Escrow | | 1-12-21 renewal |
| EI 341 | 2914 | RLB0016014 | 5,950,000 | | | 5,950,000 | Performance | Chevron | Arena | P&A Obligations for EI 341 Re DG Agreement, Ex.L to October 1, 2014 PSA Re EI 341, 215, 313 | RLI | 4-14-21 renewal |
| EI 341 | 2914 | Evergreen 866609 | 5,950,000 | | | 5,950,000 | Performance | Chevron | Arena | P&A Obligations for EI 341 Re DG Agreement, Ex.L to October 1, 2014 PSA Re EI 341, 215, 313 | Evergreen | 4-14-21 renewal |
| HIA A547 | 2705 | RLB0011993 | 1,786,000 | | | 1,786,000 | Performance | Noble | Arena | Wells Fargo Escrow Account # 23242000 | RLI | 8-8-20 renewal |
| MI 668 | 04547 | RLB0009632 | 2,925,000 | | | 2,925,000 | Performance | Apache | Arena | In connection with acquisition of lease, wells and pipeline(s)-MI 668 and 669 | RLI | 8-30-20 renewal |
| SM 192 | 24878 | RLB0005598 | 665,000 | | | 665,000 | Performance | Anadarko | Arena | Well P&A and Platform Removal Bond | RLI | 6-2-21 renewal |
| SM 192 | 24878 | RLB0005923 | 332,500 | | | 332,500 | Performance | Marathon | Arena | Well P&A and Platform Removal Bond | RLI | 8-18-20 renewal |
| SM 192 | 24878 | RLB0006711 | 1,425,000 | | | 1,425,000 | Performance | Hess | Arena & AOL | Platform, Capital One Escrow Account # 75-9245-01-2 (transferred to Whitney Escrow Account) | RLI | 12-16-20 renewal |
| SP 83 | 05052 | RLB0007130 | 2,041,000 | | | 2,041,000 | Performance | Noble | Arena | Covers SP 82, Wells Fargo Escrow Account # 20080900 | RLI | 4-20-21 renewal |
| SP 83 | 05052 | RLB0008264 | 1,130,973 | | | 1,130,973 | Performance | Piquant | Arena | In connection with 04/01/05 record title acquisition | RLI | 6-20-21 renewal |
| SP 83 | 05052 | RLB0008265 | 471,246 | | | 471,246 | Performance | Apache | Arena | In connection with 04/01/05 record title acquisition | RLI | 6-20-21 renewal |
| SP 83 | 05052 | RLB0008266 | 452,378 | | | 452,378 | Performance | Bundy | Arena | In connection with 04/01/05 record title acquisition | RLI | 6-20-21 renewal |
| SP 83 | 05052 | RLB0008267 | 226,217 | | | 226,217 | Performance | Crescent | Arena | In connection with 04/01/05 record title acquisition | RLI | 6-20-21 renewal |
| SP 83 | 05052 | RLB0008285 | 45,222 | | | 45,222 | Performance | CLK | Arena | In connection with 04/01/05 record title acquisition | RLI | 6-23-21 renewal |
| ST 161 | 1248 | RLB0009467 | 2,000,000 | | | 2,000,000 | Performance | Apache | Arena | In connection with acquisition of lease, wells and pipeline(s): Whitney Bank Trust Escrow Account # 1110440-001 | RLI | 7-13-21 renewal |
| EI Properties | | RLB0014828 | 19,900,000 | | | 19,900,000 | Performance | McMoran | Arena | $19.9MM of P&A obligations from 4Q12 acquisition | RLI | 11-13-20 renewal |
| Chevron ASPA | ST Shallow, ST Deep, Riker, Other EI Properties | RLB0016597 | | 74,300,000 | | | Performance | Chevron | Arena | Initial P&A for Chevron ASPA Properties; Munich has 87.483%; RLI has 12.517% | RLI/Munich | Replaced with Rider 1 see below |
| Chevron ASPA | ST Shallow, ST Deep, Riker, Other EI Properties | RLB0016597 Rider 1 | | 74,300,000 | | | Performance | Chevron | Arena | Initial P&A for Chevron ASPA Properties; Munich has 43.7%; RLI has 56.3% | RLI/Munich | Replaced with Rider 2 see below |
| Chevron ASPA | ST Shallow, ST Deep, Riker, Other EI Properties | RLB0016597 Rider 2 | 74,300,000 | | | 74,300,000 | Performance | Chevron | Arena | Initial P&A for Chevron ASPA Properties; Munich has 72%; RLI has 28% | RLI/Munich | 9/26/20 renewal |
| ST38/Chevron ASPA | | RLB0016606 | 700,000 | | | 700,000 | Performance | Chevron/Taylor Rider | Arena | P&A for ST 38 - Taylor Energy Rider as Co-Obligee | RLI | 9/26/20 renewal |
| Chevron ASPA | ST Shallow, ST Deep, Riker, Other EI Properties | RLB0017124 | 75,000,000 | | | 75,000,000 | Performance | Chevron | Arena | Additional P&A for Chevron ASPA Properties; Munich has 72%; RLI has 28% (10/1/19 Agmt) | RLI/Munich | 9/26/20 renewal |
| Chevron PA | ST Deep | RLB0017123 | 34,832,916 | | | 34,832,916 | Performance | Chevron | Arena | P&A for Chevron PA Properties; Munich has 72%, RLI has 28% (10/1/19 Agmt) | RLI/Munich | 9/26/20 renewal |
| Chevron FOA | Riker | RLB0017122 | 10,000,000 | | | 10,000,000 | Performance | Chevron | Arena | P&A for Chevron FOA Riker Properties; Munich has 72%; RLI has 28% (10/1/19 Agmt) | RLI/Munich | 9/26/20 renewal |
| WD 117 | G35951 | ROG0001422 | 103,800 | | | 8,650,000 | Performance | Chevron | Arena | P&A for WD 117 G Platform | RLI | 10/30/20 renewal |
| **Arena and TOTALS** | | | **277,237,252** | | **-** | **285,783,452** | | | | **Total Arena Energy Bonds issued by RLI and Indemco** | | |

| Area-Wide Third Party Guarantee Agreement | Various | | 30,115,000 | | | 30,115,000 | Guaranty | AOL | Arena | Indirect credit support of Arena supporting AOL's obligations with respect to the identified pipelines | | |

**<u>Exhibit B</u>**

**Confirmation Notice**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|                                          |     |                              |
| ---------------------------------------- | --- | ---------------------------- |
| In re:                                   | )   | Chapter 11                   |
|                                          | )   |                              |
| ARENA ENERGY, LP, *et al.*,[1]           | )   | Case No. 20-34215 (MI)       |
|                                          | )   |                              |
|                    Debtors.              | )   | (Jointly Administered)       |
|                                          | )   |                              |

**NOTICE OF (I) ENTRY OF ORDER (A) APPROVING THE DISCLOSURE
STATEMENT, (B) CONFIRMING THE DEBTORS' JOINT PREPACKAGED
PLAN PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE, AND
(C) GRANTING RELATED RELIEF, AND (II) OCCURRENCE OF EFFECTIVE DATE**

**TO ALL CREDITORS, INTEREST HOLDERS, AND OTHER PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that on September 25, 2020, the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), entered an order [Docket No. [●]] (the "Confirmation Order") approving the *Disclosure Statement for the Debtors' Joint Prepackaged Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 13] and confirming the *Debtors' Joint Prepackaged Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 12] (with all supplements and exhibits thereto, the "Plan"),[2] attached as Exhibit A to the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE** that the Effective Date of the Plan occurred on September [●], 2020.

**PLEASE TAKE FURTHER NOTICE** that, unless otherwise ordered by the Bankruptcy Court, all final requests for payment of Professional Fee Claims must be Filed with the Bankruptcy Court no later than 30 days after the Effective Date.

**PLEASE TAKE FURTHER NOTICE** that the Plan, the Plan Supplement, the Confirmation Order, and copies of all documents Filed in the Chapter 11 Cases are available free of charge by visiting **http://www.kccllc.net/Arena** or by calling the Debtors' restructuring hotline at (866) 506-4002 (domestic toll free) or (781) 575-2094 (international).  You may also

---

[1]   The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are:  Arena Energy, LP (1436); Arena Energy 2020 GP, LLC (N/A); Arena Energy GP, LLC (7454); Arena Exploration, LLC (1947); Sagamore Hill Holdings, LP (8266); and Valiant Energy, L.L.C. (7184).  The location of the debtors' service address is:  2103 Research Forest Drive, Suite 400, The Woodlands, Texas 77380.

[2]   Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Plan or the Confirmation Order, as applicable.

obtain copies of any pleadings Filed in the Chapter 11 Cases for a fee via PACER at: https://ecf.txsb.uscourts.gov.

 **PLEASE TAKE FURTHER NOTICE** that the Bankruptcy Court has approved certain discharge, release, exculpation, injunction, and related provisions in Article IX of the Plan.

 **PLEASE TAKE FURTHER NOTICE** that, pursuant to the Confirmation Order, the terms of the Plan and its provisions are effective and enforceable and deemed binding on the Debtors, the Reorganized Acquired Debtors, the Plan Administrator, any and all Holders of Claims or Interests and each such Holder's respective successors and assigns (whether or not the Claim or the Interest of such Holder is Impaired under the Plan, and whether or not such Holder voted to accept the Plan), all Entities that are parties to or subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases.

 **PLEASE TAKE FURTHER NOTICE** that the Plan and the Confirmation Order contain other provisions that may affect your rights.  You are encouraged to review the Plan and the Confirmation Order in their entirety.

Houston, Texas
September [●], 2020

Respectfully Submitted,

*/s/ Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Genevieve Graham (TX Bar No. 24085340)
Veronica A. Polnick (TX Bar No. 24079148)
Victoria Argeroplos (TX Bar No. 24105799)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4200
Facsimile:    (713) 752-4221
Email:        mcavenaugh@jw.com
              ggraham@jw.com
              vpolnick@jw.com
              vargeroplos@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian Schartz, P.C. (TX Bar No. 24099361)
609 Main Street
Houston, Texas 77002
Telephone:    (713) 836-3600
Facsimile:    (713) 836-3601
Email:        brian.schartz@kirkland.com

-and-

Gregory F. Pesce (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        gregory.pesce@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in*
*Possession*

---

**IF YOU HAVE ANY QUESTIONS ABOUT THIS NOTICE, PLEASE
CONTACT KURTZMAN CARSON CONSULTANTS LLC BY CALLING
(866) 506-4002**

## Exhibit C

Schedule of Assumed Employee Agreements

| Party | Description of Agreement |
|---|---|
| John M. Austin | Purchase and Sale Agreement for Partnership Units of Class A Limited Partner Interests in Arena Offshore III, LP, effective March 1, 2019 |
| John M. Austin | Purchase and Sale Agreement for Partnership Units of Class A and Class C Limited Partner Interests in Arena Offshore II, LP, effective March 1, 2019 |
| Scott Bellaire | Arena Offshore III, LP Cash Liquidating Distribution Agreement, dated April 15, 2019 |
| Constance Jean Heinzman Goers Living Trust | Arena Offshore III, LP Cash Liquidating Distribution Agreement, dated June 15, 2019 |
| TJS&B, LLC | Arena Offshore III, LP Cash Liquidating Distribution Agreement, dated April 15, 2019 |
| Renee J. Kelly | Purchase and Sale Agreement for Partnership Units of Class A and Class C Limited Partner Interests in Arena Offshore III, LP, effective April 1, 2019 |
| Boeger Energy, LLC | Put Closing Agreement, effective June 30, 2020 |
| Zachary P. Ferreira | Put Closing Agreement, effective June 30, 2020 |
| Ed Menger | Interim General Counsel Compensation Agreement, dated July 13, 2020 |
| Johansson Energy, LLC | Satisfaction of Promissory Note and Put Closing Agreement, effective June 30, 2020 |